## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | |
|---|---|
| **WALTER WELCH, Individually and on Behalf of all Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**CHRISTOPHER MEAUX, DAVID PRINGLE, JEFF YURECKO, TILMAN J. FERTITTA, RICHARD HANDLER, WAITR HOLDINGS, INC. f/k/a LANDCADIA HOLDINGS, INC., JEFFERIES FINANCIAL GROUP, INC., and JEFFERIES, LLC,**<br><br>**Defendants.** | **CIVIL ACTION NO. _____**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

This action is brought as a class action by Plaintiff on behalf of himself and all others similarly situated against Waitr Holdings, Inc. ("Waitr" or the "Company") and certain officers and directors and other individuals and entities associated with the Company for their violations of Sections 11, 12 and 15 of the 1933 Securities Act, 15 U.S.C. §§ 77a, *et seq.* (the "Securities Act"), and/or Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the U.S. Securities Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5), (A) in connection with Old-Waitr's (defined below) going public transaction and business combination on November 15, 2018 with Landcadia Holdings, Inc. ("Landcadia") (the "Going Public Transaction"), and the follow-on secondary offering on May 16, 2019 (the "Secondary Offering") of Waitr securities (the "Negligence" and/or "Strict Liability" claims), and (B) for making materially false and misleading statements that were published into the market from May 17, 2018 to August 8, 2019

( the "Class Period"), that Defendants knew and/or recklessly disregarded were materially false and misleading when made and/or that omitted information necessary to make Defendants' statements, in light of such omissions, true, accurate and reliable. Plaintiff, through undersigned counsel, alleges upon personal knowledge with respect to Plaintiff, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## OVERVIEW

1.      Formed in 2013 in Lake Charles, Louisiana, Waitr Inc. ("Old-Waitr")[1] (pre-merger entity) began operations in 2014 as a platform for online mobile food ordering and delivery service from restaurants. Christopher Meaux ("Meaux") was co-Founder of Waitr Inc. and during the Class Period he served as Chief Executive Officer ("CEO") and Chairman of the Board of Directors. After a slow start, the Company expanded rapidly, connecting restaurants, diners and delivery drivers predominately in non-urban "underserved" tertiary-markets as the popularity of third-party online food delivery "apps" grew. At the same time Waitr was created, nationally, well-known, well-funded and even profitable competitive brands had already emerged. Thus, by the inception of the Class Period, Waitr faced strong competition from Grubhub, DoorDash, and UberEats, which were each dominant primary market participants who had set their sights on secondary markets.

2.      Prior to the Going Public Transaction, Landcadia was a special purpose acquisition company ("SPAC" or "blank check company") whose business was to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. Landcadia was founded in 2008, and in May

---

[1] Unless there is significance, pre-acquisition entity Old-Waitr and post-acquisition entity Waitr will be used as Waitr interchangeably.

2016, completed an initial public offering raising approximately $250 million. Pursuant to the terms of its offering, Landcadia and its co-chairmen, Tilman Fertitta ("Fertitta")—a billionaire sports, restaurant and casino owner—and Richard Handler ("Handler")—the CEO of global investment bank, Jefferies Financial Group, Inc. ("JFG") (together with its subsidiaries including Jefferies LLC hereinafter referred to as "Jefferies")—were required to complete an acquisition within 24 months, or by June 1, 2018. If, however, Landcadia, Fertitta, and Handler were unable to complete an initial business combination within that time, Landcadia would be forced to redeem 100% of its public shares and to liquidate itself at a per-share price, payable in cash and including interest.

3.     For Fertitta and Handler the failure to find an acquisition target within the two years since they raised money using their blank-check company was especially problematic. First, they set up this SPAC as a pet project to allow the friends an opportunity to combine their formidable talents and to impress the market with their deal-making acumen, and having to return shareholder money would evidence a failure of their goals and call into question their reputation as eminent deal makers. Second, for Jefferies, redemption meant the immediate loss of at least $10 million in fees, the bulk of which were from already earned but contingent "deferred underwriting commissions" (tied to the initial Landcadia offering which contemplated another transaction within 24 months), and from fees related to the takeover acquisition target (which ended up being Waitr). Ultimately, during the Class Period, Jefferies would extract more than $15 million in fees from transactions related to Waitr.

4.     It was with 2 weeks left before Landcadia's deadline that it announced the last-minute agreement to enter a combination with Old-Waitr, whereby Landcadia would acquire Old-Waitr for cash and stock valued at $308 million—with $50 million cash and the remainder

in stock—and whereby post-acquisition entity Waitr shares would immediately begin trading on the Nasdaq Stock Market (the "Nasdaq") (as previously defined as the "Going Public Transaction").[2] While this was never discussed by Defendants (defined below) or disclosed as a risk in Landcadia's SEC filings related to the Going Public Transaction, in fact, the use of the blank-check/SPAC—Landcadia initially formed as a SPAC whose business was to effect a merger—to acquire Waitr was fraught with additional risks that were undisclosed at the time of the merger, but which ultimately subjected investors to devastating and almost complete losses—90% from the Class Period high of $15.00.

5.      As investors ultimately learned, a SPAC facing the end of its redemption period combined with an immature under-developed company that would otherwise have remained private is a recipe for disaster. A SPAC (with notoriously weak internal controls) incentivized by its high-fee, low-risk structure faced with an impending redemption is also incentivized to rush deal(s) and foist heightened and often (as here) undisclosed risks onto investors. While SPACs may be referred to as "Poor Man's Private Equity" because of their high 20% fee structure, SPACs differ from most private equity ("PE") firms, which invest significant expertise, conduct massive due diligence, and do not rush into deals.

6.      Unfortunately for investors none of these additional risks were properly disclosed, and at the time Waitr shares began trading investors did not know that: (i) Waitr lacked a plan to achieve profitability and, contrary to Defendant Meaux's statements, Waitr was not at or near profitability and Defendants had created the illusion of financial stability by engaging in a host of illegal and improper activities each designed to inflate revenues and earnings—such as unilaterally breaking low-rate contracts and imposing significantly higher rates, and by refusing

---

[2] In connection with Landcadia's acquisition of Old-Waitr, Plaintiff received Landcadia shares, and upon the closing of this acquisition Landcadia adopted the name Waitr and ceased independent operations.

to pay drivers for mileage related expenses—both of which ultimately resulted in independent class action lawsuits; and (ii) Waitr's technology provided no real advantage, and again contrary to representations by Defendant Meaux, the Company could not obtain the developer, programming, or engineering resources necessary to enhance, maintain and develop industry-leading software from its headquarter location in Lake Charles, Louisiana.

7. Moreover, while Defendants consistently promoted Waitr's competitive advantages resulting in its lower 15% take rate (the rate that Waitr charged restaurants for providing food delivery services), they failed to reveal that Waitr had first achieved this rate by refusing to honor its lower rate contracts, but also that even at 15%, Waitr could not achieve profitability because its business model based on providing delivery service to small restaurant operators in "underserved" markets was not sound or sustainable, and the Company required draconian price increases that Waitr's core base customers could not afford to pay. Waitr failed to make these and other necessary disclosures until after Defendants had created the public market for Waitr stock, and after Waitr had used $100 million of its stock to acquire BiteSquad.com, LLC ("Bite Squad"), and after Waitr had sold an additional $50 million of stock into the open market in its Secondary Offering on May 16, 2019.

8. Throughout the Class Period, Meaux represented that Waitr could afford to maintain its 15% take rate, which made the service affordable to its core base of small restaurants in secondary markets and which also significantly under-cut competitors' pricing, because Waitr simply had a better business model. According to Meaux, Waitr employed an army of tens of thousands of drivers who were full-time employees and, therefore, provided the Company with fixed-cost labor which Waitr optimized to achieve greater efficiencies and lower

prices. This was purported to provide Waitr the ability to maintain low, affordable, and stable pricing.

9. In fact, as investors ultimately learned, Waitr could <u>not</u> drive any material efficiencies from its labor model; this model was instead reducing gross margins and increasing costs. In part this was true because Waitr lacked the sophisticated forecasting resources needed to deploy its fixed cost labor, especially once the Company rapidly expanded, again constrained by its lack of high-level programming and development resources. In any event, for Waitr to claim as it repeatedly did, that it maintained "Capital Efficiency" at any time during the Class Period was pure sophistry.

10. As investors also ultimately learned at the end of the Class Period, Waitr's business plan would <u>not</u> work, and the Company could not fund growth with operations because Waitr could not provide services in remote locations to small customers at a rate that they could afford (*i.e.*, 15%) and that also allowed Waitr to be profitable. In fact, throughout the Class Period, Defendants had been clandestinely raising prices in breach of low-rate agreements Waitr had previously entered into and/or were preparing for massive price increases to cover the subsidies of providing delivery service. Moreover, it now has been estimated that Waitr may also owe drivers as much as $800 million in withheld mileage reimbursement payments that acted as illegal wage kickbacks to the Company, and which resulted in Waitr drivers earning less than minimum wage of $7.25 per hour (less than half the rates Meaux reported drivers earned in the Class Period).

11. Prior to creating a public market for Waitr shares that could be exploited for hundreds of millions in stock-based acquisition currency and corporate operating cash (as Meaux repeatedly stated) Waitr was reasonably constrained by its inability to obtain large amounts of

capital and to grow beyond its means. Investment banks had repeatedly refused to invest in Waitr and repeatedly warned Meaux that Waitr would be unable to maintain and enhance its platform technology, and would be constrained by its inability to obtain necessary technology support in Lake Charles, Louisiana. Meaux—a failed serial entrepreneur who adopted contrarian views—rejected this and similar business advice at every turn.

12. Meaux's lack of operating experience and history of failures would have put a reasonable investor on notice that substantial due diligence was required before it was possible to determine if a public market should have been created for Waitr shares at the time Landcadia acquired Old-Waitr. In fact, because some investors were probably skeptical of Meaux's lack of experience and non-existent resume, at the time Waitr shares began trading, Defendants represented that Fertitta, who was purported to have unique experience in the restaurant market and with Waitr specifically, would play a special role at the Company beyond normal board participation—namely, that he would help guide and manage Waitr, affording it the purported advantages of his vast resources and experience.

13. That assistance and guidance, however, never materialized, and Fertitta did little more than add Waitr order buttons to websites that belong to Landry's Inc. ("Landry's")—a restaurant group that owns more than 600 restaurant locations, including more than 60 different brands—signature group restaurants, which has a Waitr order button at the bottom of one of its interior pages that can be seen if one scrolls to near where the legal information about Fertitta's website is located.[3] No special promotions were ever done, no promised "synergies" ever

---

[3] No mention of Waitr is made on Landry's homepage. Instead, however, visitors to www.landrysseafood.com are greeted with a pop-up screen ad promoting the pre-order of Fertitta's new book, *Shut Up and Listen*, purported "Business Advice from Self-Made Billionaire and Owner of Landry's Inc., Golden Nugget Casinos and Houston Rockets." His business acumen was, apparently, reserved for other endeavors.

materialized, and investors' trust that Fertitta would aid in the management of the Company was misplaced.

14.     As investors also ultimately learned following the end of the Class Period, the statements contained in or incorporated in the May 17, 2018 Proxy Statement and the November 19, 2018 Registration Statement (collectively, the "Going Public Transaction Proxy/Prospectus Filings") issued in connection with the Going Public Transaction were each materially false and misleading, for the following reasons, among others:

- At the time Waitr began trading publicly it was not true that the Company was on the verge of profitability, because Defendants had artificially bolstered profits and revenues by unilaterally raising prices in breach of customer contracts and by failing to properly reimburse drivers for mileage expenses.

- At the time Waitr began trading publicly it was not true that it was providing its services at a sustainable low take rate established at 15%.

- At the time Waitr began trading publicly it was not true that Waitr was able to extract efficiencies from its full time fixed-rate labor force that was purported to allow the Company to offer its services at a lower rate than competitors.

- At the time Waitr began trading publicly, it was not true that its financial statements and SEC reports or its Sarbanes Oxley certifications were true, accurate or reliable.

- At the time Waitr began trading publicly, contrary to Defendants' representations, its software provided little or no competitive advantages and what first-mover advantage the Company claimed existed, was quickly squandered by the inability to obtain sophisticated high-level programmers and software engineers who could enable Waitr to refine and develop the software necessary to stay competitive in its market.

- As a result of the aforementioned adverse conditions that Defendants failed to disclose, at the time Waitr began trading, Defendants lacked any reasonable basis to claim that Waitr was operating according to plan, or that Waitr could achieve guidance sponsored and/or endorsed by Defendants. Nor was it true that Waitr maintained an adequate system of internal controls so as to report and eliminate material conflicts of interest.

15.     Desperate to create revenues, as soon as a public market for Waitr shares existed, Defendants immediately announced plans to acquire Bite Squad using $100 million of stock as currency in the transaction. The Bite Squad acquisition was conducted with little or no due

diligence and with disregard for the fact that Bite Squad's haphazard structure, caused as a result of it being cobbled together through 17 other acquisitions, was not consistent with Waitr's "contiguous growth" model, whereby the Company grew in an orderly, regional contiguous expansion. The acquisition of Bite Squad also meant digesting a company of equal size—a difficult task under ideal circumstances for even experienced management.

16. As investors would also soon discover, Defendants were entirely unable to integrate Bite Squad and now have to run two poorly managed, money losing operations with little regional overlap and few "synergies." The first full quarter of Bite Squad's operating results revealed the weakness in its operations. Also, as a result of its operational problems and increased costs and disruptions caused by the Bite Squad merger, Waitr was burning through cash at an alarming rate. The Company had approximately $123 million of debt and was operating with significantly negative EBITDA.

17. Before the market learned of the significant problems Waitr was having, including with its integration of Bite Squad, shares of Waitr consistently traded above $10. Waitr took advantage of the artificial inflation in the price of its stock and filed a Shelf Registration with the SEC in April 2019, in order to allow Waitr to issue up to $300 million of mixed securities. Soon thereafter, Waitr shares began to decline—falling below $9.00 in early May 2019 and below $8.00 by May 15, 2019.

18. Against this share price decline Defendants hastily organized a $50 million Secondary Offering which was priced and sold the next day, May 16, 2019. The Secondary Offering occurred at prices still artificially inflated by Defendants' false and misleading statements to the market, and was effectuated pursuant to a materially false and misleading Proxy/Prospectus, Prospectus Supplements, and Registration Statement filed with the SEC on

April 26, 2019 and May 16 and 17, 2019 (the "Secondary Offering Filings") that each continued to conceal Waitr's mounting problems and impaired operational and financial condition.

19.     Investors later learned that Waitr's Secondary Offering was <u>under-subscribed</u> and that Defendant Meaux had spent over $1 million of his personal funds to prop up the Secondary Offering and prevent its failure.

20.     Almost immediately after selling the $50 million in stock in the open market in the Company's Secondary Offering, Defendants belatedly revealed a string of material adverse events and information which, despite existing since the inception of the Class Period, Defendants had waited to that time to disclose, including:

- **15% Take Rate Could Not Be Maintained**. Waitr belatedly admitted that it could not predicate a business of providing food delivery services to small restaurants in secondary markets with customers in remote locations at rates affordable to those target restaurants.

- **Huge Price Increases Were Necessary**. Starting August 1, 2019 and with 30 days' notice, Waitr raised prices to over 30%, with 25% minimum service fees, 3% mandatory service fees and other incremental charges. While the rate scaled down to its historical 15%, that rate was only for restaurants conducing $20,000 per month in Waitr sales—a staggering required amount for a small restaurant in a non-prime market. Fertitta himself stated he could not afford 25% - 30% take rates at his restaurants, many of which were located in <u>primary</u> markets.

- **Platform Integration Abandoned**. In early August 2019, Waitr belatedly disclosed that it had abandoned its quest to become the leading front-of-house restaurant software provider that could provide integrated point of service connectivity, and instead announced a deal with a competing third party provider to adopt their technology, more evidence of Waitr's inability to capitalize upon any purported first-mover advantage or to obtain sufficient technology resources to stay competitive in its industry.

21.     The draconian price increase resulted in significant and immediate negative media attention and loss of corporate goodwill as restaurant owner after restaurant owner—primarily in Waitr's local home-town region—voiced betrayal, shock and disbelief, many announcing that they would abandon Waitr and/or join boycotts. The first call for a national boycott against

Waitr came from the sole restaurant Defendant Meaux singled out as the model of a Waitr success during the Company's Earnings Call for the first quarter of 2019.

22.     The final shoe fell on Waitr investors on August 8, 2019, the last day of the Class Period.  That day, Waitr shares collapsed, falling over 50% in active trading as Waitr reported abysmal financial and operational results for the second quarter of 2019, and after it was reported that Defendant Meaux had been terminated as CEO of the Company (but allowed to remain as Board Chairman).  Investors then learned that Meaux had been replaced by a 35-year-old with very limited relevant work experience, who was promoted within Waitr three times since joining the Company in February 2019.

23.     At that time Waitr also reported massive losses, terrible operating performance, huge cost increases, diminishing prospects, and losses accelerating far in advance of any growth. Waitr also announced that it had failed to meet guidance, which had recently been reaffirmed. Despite raising prices dramatically, Waitr also reduced earnings forecasts by at least 20% on a forward-looking basis.  Waitr blamed many of its problems on the failure to integrate Bite Squad and managements' resultant loss of focus.  At that time the new CEO again reversed course and announced that Waitr would abandon its theretofore strategy of hyper-growth and instead focus on generating profits and sustaining operations.

24.     The collapse of Waitr's share price evidenced investors' loss of confidence in Waitr, its management, and Board.  In response to Waitr's shocking disclosures on August 8, 2019, the price of Waitr stock crashed from $3.76 per share on August 8 to an intraday low of $1.31 before closing the trading-day at $1.89 per share on August 9—a single-day decline of 50% and a decline of almost 90% from the Class Period high above $15.00, and a loss of almost $800 million of market capitalization, all in under 5 months.

25.     For these reasons and as set forth in detail herein, Plaintiff seeks to recover damages resulting from the Defendants' violations of the federal securities laws.

**JURISDICTION AND VENUE**

26.     Jurisdiction is conferred by §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.  The claims asserted herein arise under §§11, 12(a)(2) and 15 of the Securities Act, §§77k and 77o, and rules promulgated thereunder by the SEC, and §§10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

27.     Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. §1391(b), §1337 and §27, 15 U.S.C. §78aa.  Defendant Waitr maintains its principal place of business within this District, and/or the individual Defendants conduct business in and many of the acts giving rise to the violations complained of herein took place in this District.

28.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

**Plaintiff**

29.     Plaintiff **WALTER WELCH**, as set forth in the accompanying certification, incorporated by reference herein, acquired the common stock of Waitr in connection with the Going Public Transaction and the Secondary Offering at artificially inflated prices during the Class Period and has been damaged thereby.

**Defendants**

30. Defendant **CHRISTOPHER MEAUX** was CEO, Chairman of the Board of Directors and co-Founder of the Company during the Class Period. On August 8, 2019, Defendant Meaux was removed from his position as CEO of the Company. During the Class Period, Defendant Meaux was instrumental in the preparation of, and/or signed and certified the Company's SEC filings, including but not limited to Waitr's Form(s) 10-Q and Form 10-K and/or the materially false and misleading Secondary Offering Filings, and the materially false and misleading Going Public Transaction Proxy/Prospectus Filings.

31. Defendant **DAVID PRINGLE** ("Pringle") was Chief Financial Officer ("CFO") and Principal Financial Officer of the Company during the Class Period, until his departure in April 2019. During the Class Period, Defendant Pringle was instrumental in the preparation of, and/or signed and certified the Company's SEC filings, including but not limited to Waitr's Form 10-K and the materially false and misleading Going Public Transaction Proxy/Prospectus Filings.

32. Defendant **JEFF YURECKO** ("Yurecko") was CFO and Principal Financial Officer of the Company, beginning on April 2019 during the Class Period, after replacing Defendant Pringle. During the Class Period, Defendant Yurecko was instrumental in the preparation of, and/or signed and certified the Company's SEC filings, including but not limited to Waitr's Form(s) 10-Q and/or the materially false and misleading Secondary Offering Filings.

33. Defendant **TILMAN J. FERTITTA** is and during the Class Period was a member of the Board of Directors of the Company, since Old-Waitr's acquisition by Landcadia on or about November 15, 2018. Defendant Fertitta was also CEO and Co-Chairman of the Board of Directors of Landcadia from 2015 to November 2018. According to the Company's

releases, Defendant Fertitta purports to be "one of the foremost authorities in the dining, hospitality, entertainment and gaming industries." He is the sole owner and currently serves as CEO, Chairman of the Board, and President of Golden Nugget, Inc., Landry's, and Fertitta Entertainment, Inc., and is also the owner of the NBA Houston Rockets.[4] Defendant Fertitta is reported in the press to be a close personal friend of Defendant Handler.[5] Defendant Fertitta also assisted in the preparation of, and signed Waitr's Form 10-K and/or the materially false and misleading Secondary Offering Filings, and the materially false and misleading Going Public Transaction Proxy/Prospectus Filings.

34. Defendant **RICHARD HANDLER** was President and Co-Chairman of the Board of Directors of Landcadia during the Class Period, until Landcadia acquired Old-Waitr in November 2018, at which time Landcadia ceased operations in favor of Waitr. Defendant Handler is also CEO and Chairman of the Board of JFG which, through its underwriting and investment banking subsidiaries, earned almost $15 million in fees related to Waitr during the Class Period. Defendant Handler is reported in the press to be close personal friend of Defendant Fertitta. During the Class Period, Defendant Handler also signed and/or assisted in the preparation of the materially false and misleading Prospectus issued in connection with the Going Public Transaction. Handler was also CEO of JFG at such time that Jefferies served as underwriter in the Secondary Offering which, as alleged herein, was also accomplished by means of a materially false and misleading Secondary Offering Filings in violation of federal law, and was also CEO of Jefferies at such time as it collected over $10 million in "deferred underwriting

---

[4] After taking Landry's public in 1993, as sole shareholder, Fertitta took Landry's private again in 2010.

[5] In a CNBC Power Lunch interview on May 17, 2019, defendant Fertitta was quoted as stating that, "Rich [Handler] is 'my best friend … Rich is a great friend, a great friend.'"

commissions" and fees that were all wholly contingent upon the consummation of the Going Public Transaction.

35.     Defendant **WAITR HOLDINGS, INC.** is a Delaware corporation with its principal place of business located at 844 Ryan Street, Suite 300, Lake Charles, Louisiana 70601. According to the Company's profile, Waitr purports to be a leading online food ordering and delivery service connecting local restaurants to diners in underserved markets *via* its website and mobile application ("app") Waitrapp.com. Prior to being acquired by Landcadia, there was no public market for Old-Waitr common stock. Immediately following the acquisition of Old-Waitr by Landcadia, on November 16, 2018, Landcadia changed its name to Waitr and shares of the new combined entity Waitr began trading on the Nasdaq under the symbol "WTRH."

36.     Defendant **JEFFERIES FINANCIAL GROUP, INC.** and, together with its subsidiaries including **JEFFERIES LLC**, purports to be a diversified financial services company engaged in investment banking and capital markets, asset management and direct investing.[6] JFC is the parent of Jefferies, LLC. Jefferies' executive office is located at 520 Madison Ave., New York, NY 10022. At all relevant times, Defendant Handler, served as CEO of JFG. In connection with the Going Public Transaction, Defendant Jefferies was paid at least $10 million, all of which was contingent upon the closing of that transaction prior to Landcadia shareholders' redemption date. Defendant Jefferies was also paid over $2 million in underwriting fees in connection with the Company's Secondary Offering, on or about May 16, 2019, and millions more in advisory and banking fees in connection with Waitr's Warrant Exchange Offer and acquisition of Bite Squad.

---

[6] JFG beneficially owns almost 7% of Waitr common stock, including 753,500 shares beneficially owned by Jefferies, LLC. According to its most recent form 10-Q filed with the SEC, Jefferies LLC purports to operate as a broker-dealer registered with the SEC and member firms of the Financial Industry Regulatory Authority ("FINRA").

37. In connection with the Secondary Offering, Jefferies acted as a "Lead Underwriter" (collectively with RBC Capital Markets, LLC, the "Underwriters") of the Secondary Offering—distributing over 4.7 million shares of Waitr stock to investors:

| Underwriters | Number of Shares |
|---|---|
| **Jefferies LLC** | **4,729,900** |
| RBC Capital Markets, LLC | 2,027,100 |
| Total | 6,757,000 |

38. In connection with the Secondary Offering, the Underwriters received more than $3 million in fees—over $2.1 million to Jefferies. The Underwriters were paid at least $0.444 per share in connection with the sale of the 6.757 million shares. Jefferies was responsible for the sale of 70% of the shares in the Secondary Offering and received 70% of the underwriting fees.

39. Shareholders were willing to, and did, pay these fees—equal to at least 6% of the gross sales price—to compensate the Underwriters for conducting a purported significant due diligence investigation into Waitr. The Underwriters' due diligence investigation is a critical component of any public stock offering, and it was supposed to provide investors with important safeguards and protections when Waitr sold $50 million of stock to the public in May 2019. Similarly, for the $10 million in belated underwriting fees (and advisory fees) paid in connection with the acquisition by Landcadia of Old-Waitr, investors expected such due diligence to have occurred and for the results to have been made known if there were material deficiencies.

40. The due diligence investigation that was required by the Underwriters included a detailed investigation into Waitr's operations, accounting, and guidance assumptions that extended well beyond a mere casual review of Waitr's accounting, financial reports, and control

statements. The failure of the Underwriters to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

41. Defendants Meaux, Fertitta, Handler, Pringle, and Yurecko are referred to collectively and in various combinations herein as the "Individual Defendants." Each of the Individual Defendant at all relevant times had the power to control and did control and direct Waitr to engage in the fraudulent, reckless and/or negligent conduct alleged herein.

42. The Individual Defendants, Waitr, and Jefferies are collectively referred to herein as "Defendants."

43. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers and/or directors of Old-Waitr and/or Landcadia and/or Waitr and/or Jefferies, by virtue of their high-level positions or associations with and/or influence over the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and/or was privy to confidential proprietary information concerning Waitr and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly or negligently disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

44. As officers and/or controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

45. In addition to the foregoing, because of Jefferies' (as an underwriter) and the Individual Defendants' positions with the Company, they all had access to the adverse undisclosed information about Waitr's business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

46. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly or negligently disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially

false and misleading nature, or recklessly or negligently disregarded such materiality. Because of their Board membership and/or executive and managerial positions with Old-Waitr and/or Landcadia and/or Waitr and/or Jefferies, each of the Individual Defendants had access to the adverse undisclosed information about Waitr's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Waitr and its business issued or adopted by the Company materially false and misleading.

47.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, Landcadia, or Jefferies were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

48.     In addition to facing negligence and strict liability claims for providing false information in the Going Public Transaction Proxy/Prospectus Filings, and the Secondary Offering Filings, and its acquisition of Bite Squad for Waitr stock, Defendants are also liable as a participant in an independent and fraudulent scheme and course of business that operated as a fraud or deceit on acquirers of Waitr common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (i) deceived the investing public regarding Waitr's business, operations, management and the intrinsic value of Waitr common stock; (ii) created a public market for common shares of Waitr, which

Defendants then used to raise operating cash and as currency for acquisitions; (iii) enabled Defendants to register for sale with the SEC and sell over $50 million of Company stock in connection with a Secondary Offering during the Class Period while in possession of material adverse non-public information about Waitr; (iii) enabled Defendants to use over $100 million of Company stock to acquire the assets of Bite Squad during the Class Period; and (iv) caused Plaintiff and other members of the Class to purchase Waitr common stock at artificially inflated prices during the Class Period and to be damaged thereby.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of Plaintiff and class members that purchased, acquired and/or otherwise held the securities of Waitr (the "Class") from **May 17, 2018 to August 8, 2019** (as defined earlier as the "Class Period"), including, but not limited to, those who acquired Waitr shares in connection with the Going Public Transaction, and those who acquired shares of the Company in the May 2019 Secondary Offering. Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or entity related or affiliated with any Defendant.

50. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. As of August 6, 2019, there were approximately 76.685 million shares of Waitr common stock issued and outstanding. The number of Waitr public shareholders will be ascertained through discovery;

b. There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants have misrepresented or omitted material information concerning the Going Public Transaction in the Going Public Transaction Proxy/Prospectus Filings, in violation of Section 14(a) of the Exchange Act;

ii)      whether Defendants have misrepresented or omitted material information concerning the $50 million Secondary Offering, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act;

iii)      whether the Individual Defendants violated Section 20(a) of the Exchange Act;

iv)      whether Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and

v)      whether Plaintiff and other Class members were damaged thereby.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse or antagonistic to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for opposing parties; and

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background to the Going Public Transaction

52.     Landcadia was founded as a SPAC/blank check company whose sole purpose was to effect a merger or similar business combination and to acquire the assets of another company. Landcadia was incorporated in Delaware in November 2008 and, in May 2016, completed an initial public offering selling shares to the public, raising approximately $250 million.  In its 2016 SEC filings, Landcadia stated that, "[a]lthough our efforts to identify a prospective target business will not be limited to a particular industry or geographic region, we intend to focus our investment opportunities in the dining, hospitality, entertainment and gaming industries in the U.S. … Our management team and sponsors have significant experience investing and in advising companies in these areas."

53.     Pursuant to the terms of its own offering, Landcadia was required to complete an acquisition within two years – or by June 1, 2018, at the latest.  If Landcadia did not complete a contemplated acquisition or combination prior to that time it would be forced to redeem 100% of its public shares at a per-share price, payable in cash and including interest.  If this was to occur, millions of dollars in deferred underwriting commissions would also be forfeited by Landcadia's underwriters, including Jefferies.

54.     While Landcadia, Jefferies, Fertitta, and Handler had a full 24 months, and while this was the sole purpose for Landcadia's existence, they were unable to find any suitable acquisition or transaction for almost the entire two years. Thus, with only two weeks before the June 1st deadline, on May 16, 2018, Landcadia suddenly announced that it had entered into an agreement and plan of merger with Waitr Holdings, Inc. and announced the pending acquisition. In fact, because there was not even enough time to complete the contemplated transaction, Defendant Fertitta was forced to obtain Landcadia shareholder approval to an extension of time from June 1, 2018 to December 14, 2018, to complete the Waitr acquisition. The Old-Waitr acquisition was ultimately completed with less than 30 days remaining before even the extended deadline expired.

55.     On May 7, 2018, pursuant to a Schedule 14A filed with the SEC, Landcadia reported that its shareholder meeting to extend the redemption expiration date was scheduled *prior* to the announcement of the Waitr acquisition. The actual meeting, however, was scheduled to take place *after* the Going Public Transaction was announced.

56.     A letter to Landcadia shareholders by Fertitta reported what would occur if shareholders refused to approve the extension:

> If the Extension Amendment and Trust Amendment proposals are not approved and we do not consummate a business combination by June 1, 2018, as contemplated by our IPO prospectus and in accordance with our charter, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest not released to the Company to pay franchise and income taxes (less up to $50,000 of such net interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board, dissolve and liquidate, subject in each case to our

obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our business combination by June 1, 2018.

57.     Having raced to enter a merger agreement with Waitr prior to the time Landcadia, and Defendants Fertitta and Handler, would be forced to return $250 million, and thus admit that the powerhouse combination of the self-promoting billionaire Fertitta and the head of one of the nation's largest investment banks, Handler, could not find an investment for their pet project in two years (and prior to such time Jefferies would have to forfeit over $10 million in Underwriter fees (much already earned)), Defendants attempted to protect their reputations as high-power deal-makers.   The race to market and the use of a special purpose acquisition entity to accomplish a stock listing, however, have long been recognized by market commentators as presenting very significant and unique market risks.   In fact, in August 2013, the *New York Times* published a report, titled "A Thriving Financial Product, Despite a Record of Failure," ("*Times* Article") specifically warning of this dangerous combination.   The *Times* Article stated as follows:

> Two years may seem a long time, but time runs quickly in finance, and the promoters are often rushed to complete an acquisition.
>
> That means the promoters can make bad choices. According to SPAC Analytics, of the 198 SPACs since 2004, 72 have liquidated, earning almost no returns for their investors. Even so, liquidation may be the better option. Of the 111 SPACs that acquired companies, their average return, according to SPAC Analytics, was minus 14.4 percent. By contrast, the Russell 3000-stock index in that same period had a positive return of 5.9 percent.
>
> It's not just that the returns are terrible. There have been some spectacular failures as SPACs have rushed into hot markets like energy, China and even water.[7]

---

[7]      *See*          https://dealbook.nytimes.com/2013/08/13/a-thriving-financial-product-despite-a-record-of-failure/?mtrref=www.google.com&gwh=4A7950D10BC40518F09E3047320B5945&gwt=pay&assetType=REGIWALL (last visited Sept. 26, 2019).

58. Even absent having rushed to complete an acquisition using a SPAC, the *Times* Article reported on the unique risks inherent in investing in any blank check/SPAC company:

[A] special purpose acquisition company, or SPAC, which raises money through an I.P.O. and then casts a wide net in search of a private company to buy. Silver Eagle's I.P.O. is the largest in the past seven years for a SPAC and sure to earn its promoters millions, but the outcome is not so clear for its investors or even the company itself.

A SPAC, also known as a blank check company, has been referred to as the poor man's private equity because the promoters of the SPAC get up to 20 percent of the equity mostly for finding the target company. The fee is similar to that of a private equity firm, as is the idea of picking a company, but a SPAC is not as safe or rewarding as private equity. SPAC investors take all of the risk in one company instead of a portfolio of companies held by a private equity firm. And unlike a private equity firm, which hires the best and the brightest, there have been an assortment of SPAC promoters with varying expertise. …

59. The *Times* Article also documented the unsavory history of SPAC promotion:

In the 1980s, they were rife with fraud, and briefly disappeared from Wall Street in the wake of stricter federal regulation. But, like zombies, they reappeared in the mid-2000s. Before the credit crisis, these vehicles accounted for nearly 25 percent of all I.P.O.'s. They are less scandalous, but they still have problems. The biggest peril may be that while a SPAC is formed to acquire a company, the target is unknown at the time of the I.P.O. The SPAC has a period—nowadays up to two years—to complete an acquisition or liquidate.

60. The *Times* Article concludes that "SPACs have brought companies to market that do not appear to perform particularly well," and that the SPAC "failures appear to far outnumber the successes." The *Times* Article shows how SPACs prove beneficial for hedge funds looking to park money and SPAC operators who stand to collect huge fees and carry little risk, and concludes that they are good for promoters and hedge funds, but that "the real question is whether they are good for the acquired companies." The *Times* Article concludes:

After the acquisition, the companies often appear to perform poorly. The returns certainly show this. The stumbles of American Apparel and other SPAC acquisitions also show that these companies are sometimes being brought to market before they are ready.

In other words, SPACs may persist, not because they are good for investors or the companies themselves, but because they are a sought-after financial product.

61.     As addressed in significantly more detail herein, it is obvious Old-Waitr was rushed to market, as evidenced, in part, by the lack of credentials and experience of its senior-most executive leadership, and the limited history of the Company.  Throughout the Class Period and until his termination, Waitr was led by a serial failure of an entrepreneur, who was reportedly a week away from taking a job as a high school teacher before associating himself with the inventors of Old-Waitr, only several years prior to the merger.

62.     Waitr was purportedly founded in 2013 by Defendant Meaux and 4 college students, who came up with the concept at a pitch competition in Gainesville, Florida.  Meaux has given several media interviews about the moment he, along with maybe four college or post college "kids," came up with the idea for Waitr.  According to media accounts, Meaux was at the Gainesville competition to pitch a concept called Foogle, which would answer the eternal question as to "What's for dinner," but did little more.  Defendant Meaux quickly abandoned that pitch in favor of another group who had the Waitr name, but for a concept that allowed diners to order using an app in a restaurant.[8]  While this later idea may have given Meaux access to some of the back-end that was being used by food delivery companies like GrubHub and UberEats, these original concepts were far from what Waitr is (while Waitr is almost exactly what its competitors are).  The proprietary "platform" that the Company promoted was essentially built in less than 1 year by college students.

---

[8] The strength of this concept is demonstrated by the fact that, in January 2018, Defendant Meaux was quoted as saying that Waitr was going to "roll-out dine-in this year," which was the original Waitr concept, and now it is closing in on the fourth quarter of 2019 but has yet to provide any updates regarding the results of this test.

63.     A series of personal interviews with Defendant Meaux document his lack of experience in leading a company and reveal a chronic history of Meaux's business failures since college.  According to such reports:

- In a January 31, 2018 interview published in *Wining & Dining* magazine, Defendant Meaux stated that in 1987 he met Michael Dell of Dell Computer and was inspired to start building computers while at Louisiana State University ("LSU") and selling them to small businesses, under the CM Computer brand.  By his college graduation, that company had ceased operations.[9]

- Prior to creating Waitr, Defendant Meaux ran operations for the Swashbuckler's indoor football team in Lake Charles, Louisiana.  After three seasons, the Swashbuckler's ceased operations in 2013.

- In 2009, in the Dallas area of South Lake, Meauxs2Geaux was a virtual restaurant concept where food was prepared in a kitchen only location and where food was ordered from a menu online.  Defendant Meaux's claim, that despite being "fairly successful," he ceased operations because he could never find a location suitable for a warehouse kitchen, strains credibility.

- Cloud computing start-up, based in technology center, Silicon Valley, and still failed. Defendant Meaux claims he almost "lost every penny."  According to Meaux, this company had "a little success," providing "do-it-yourself" or "DIY" website tools to small businesses to build their own websites (again focusing on small, fractured markets), that "ended up being a colossal failure. … [And] ended up going out of business."  In retrospect, Meaux attributed his personal failure to the market collapse in general as the "bubble burst" in early 2000, causing the many inflated-value and no-value dot.com companies to no longer be able to obtain financing.

64.     In fact, it was not only Defendant Meaux's recent past history of business failure that should have given Landcadia, Fertitta, Handler, and the rest of the Individual Defendants pause as to whether Waitr was ready to be brought to market at that time, but the history of Old-Waitr itself warranted extensive due diligence.  A host of red flags existed at that time, including that:

- Defendant Meaux had little or no role in the initial concept, which was online ordering in-house for restaurants (so you never had to talk to a waiter), and had no

---

[9] *See* http://www.thriveswla.com/Blog/BlogDetail.asp?p1=7016&p2=33322&p7=3006 (last visited Sept. 26, 2019).

background in programming or engineering. The most relevant experience Meaux brought to Waitr was a bachelor's degree in business from LSU.

- The Company had no access to capital. Meaux had been turned down by all venture investors as a result of his refusal to move to technology centers where Waitr would have access to higher level programming and engineering resources. All capital had been raised locally from small business owners and, ultimately, a local National Football League ("NFL") athlete-investor group. The weekend Waitr was purported to be invented, Meaux was sleeping in a borrowed RV because he could not afford a hotel room, suggesting he had little or no capital and few resources that would have enabled him to hyper-inflate the value of the Company and create a market for those shares, absent the reckless involvement of Landcadia, Fertitta, Jefferies, and Handler, among others.

- The Company's proprietary platform technology that purported to provide Waitr with a significant competitive advantage was developed in under a year by former college students.

65. Ironically, in the same *Wining & Dining* interview, in response to a question as to what he had learned over the years as a result of his chronic failures, Meaux stated that he "used to think [he] knew everything and [would] never listen." He then stated that, "if you listen to people, especially those older and wiser, you'll get valuable information that can help you avoid mistakes." Those words are almost prophetic given Meaux's entire contrarian business strategy and refusal to take any advice from those who told him his plan was destined to fail without improvement. As it turned out, one of the Company's biggest disadvantages was its lack of access to high-level programmers and engineers in or near Lake Charles, Louisiana—as Meaux was told repeatedly by the venture capitalists who refused to invest unless he moved the Company. Thus, despite such resources existing in short supply outside of major technology centers, Meaux was repeatedly quoted in the press as saying, "You don't have to be in Silicon Valley to create a technology company. You can do it in Lake Charles, Louisiana." But as Meaux was repeatedly warned and as investors ultimately learned, apparently not.[10]

---

[10] In a January 31, 2018, *New Orleans Business* interview Meaux recounted his defiance in the face of experience stating, "I remember pitching some VCs in Houston and they sat me down and said, 'If you're going to do this

66.     In fact, while in early 2018 Meaux stated publicly that he wanted Waitr to be the leading platform for front-of-house restaurant operations, whereby the Waitr order manager would replace the order entry point at the point of sales system, by the end of the Class Period, Waitr had all but abandoned its software development and instead announced it would be getting this exact technology that was to be the future of the Company from third-party developer Mobo Systems, Inc. d/b/a Olo ("Olo")—based in New York, New York.

67.     The deal with Olo, announced on August 5, 2019, revealed to investors for the first time that Waitr could not stay competitive in software development and that it could not obtain the programmers and engineers necessary to stay at the forefront of its market, and that any first mover advantage Waitr had by adopting an established online ordering app designed to serve small restaurants in underserved and unprofitable markets was unlikely to be sustained. Now that it has effectively outsourced the back end that it was charging restaurants to implement, Waitr has become little more than a website that employs delivery drivers.

68.     It was remarkable that experienced investors like the CEO of Jefferies, head of a global investment bank with billions under management, and billionaire restaurant and gaming operator Fertitta were not dissuaded by Meaux's resume at least enough to engage in meaningful due diligence prior to creating a public market for tens of millions of shares of Waitr stock. It was Meaux himself who confessed to his local newspaper that, the day Waitr stock was listed on the Nasdaq on November 16, 2018, "I'm no longer a failed entrepreneur." He purported to prove this in May of 2019, stating, "[i]nvestors who invested in Waitr have made money."

69.     Waitr.com app debuted in Lafayette, Louisiana in mid-2015. The app started off slowly, scaling to 1000 order per day in 11 cities, primarily in Louisiana, by the end of 2016. By

---

you're going to have to be in Austin or Silicon Valley because you're not going to find enough software engineers in Louisiana.' They actually said, 'If we're going to invest, you have to move the company.'"

2017, that number had reached 5,000 orders per day from 150 cities and 6 states—an increase of 390%, and the Company was purported to be on track to double orders again in 2018.

70.     Prior to its association with Landcadia, however, Old-Waitr had only raised a little over $26 million, as Meaux stated, "almost every dime from investors in Louisiana."  In 2016, after seeing substantial growth, NFL legend Drew Brees invested $10 million through an investment vehicle.  Claiming in an early 2018 interview that he "could raise a ton more money if we needed to, but we don't need to," and that "there is a lot of money in [Louisiana] looking for entrepreneurs with great ideas to invest in," despite immediately following the Going Public Transaction and the creation of the public market for Waitr shares, Meaux repeatedly stated that Waitr was "capital constrained," and that it was forced to limit growth.  And yet, following the Landcadia deal, Waitr focused heavily on growth, even over goals of—or at the expense of—profitability.

### Materially False and Misleading Statements
### Made in Old-Waitr's Going Public Transaction Solicitation Materials

71.     Regardless of the issues surrounding the Company, on May 16, 2018, Defendants published a press release announcing that Landcadia intended to acquire Old-Waitr for stock and cash valued at $308 million.  This press release was filed with the SEC with a Form 8-K on May 17, 2018, and stated the following:

> Landcadia Holdings, Inc. (NASDAQ:LCA), a publicly traded special purpose acquisition company, and Waitr Incorporated ("Waitr"), the fast growing restaurant platform for online ordering and on-demand food delivery, announced today that they have entered into a definitive merger agreement whereby Waitr will become a wholly-owned subsidiary of Landcadia.  Immediately following the proposed transaction, Landcadia intends to change its name to Waitr Holdings Inc. and is expected to continue to trade on the Nasdaq stock exchange.

*  *  *

Under the terms of the definitive agreement, Landcadia would acquire Waitr for $308 million in total consideration. Landcadia will pay a minimum of $50 million in cash to the equity holders of Waitr at the closing of the proposed transaction (including holders of vested options for Waitr shares) with the remainder paid in the combined company's common stock. The net cash proceeds from this transaction in excess of those distributed to Waitr's equity holders are expected to be used to fund Waitr's continued growth in current and new markets and allow Waitr to pursue opportunistic acquisitions to grow its U.S. footprint.

Upon the closing of the proposed transaction, Tilman J. Fertitta, will serve as a director of the combined company, and in such capacity will be in a position to oversee the combined company's growth and brand building. Chris Meaux, founder and Chief Executive Officer of Waitr, and the rest of the Waitr executive team will continue in their respective roles in the combined company. Mr. Meaux will also be appointed Chairman of the combined company's board of directors.

According to the May 17, 2018 Form 8-K, "[Old-]Waitr and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of Landcadia in connection with the proposed transaction."

72.     The May 16, 2018 press release quoted Defendant Fertitta, in part, as follows:

This transaction with Waitr provides an incredible opportunity for the combined company to be the next leader in the fast growing online food delivery market. Our experience with Waitr as a partner combines best in class on-demand food delivery for diners and a true partnership for restaurants. Our brands and customers are critical to our success, and Waitr's high quality of service reflects well on our brands. We have seen firsthand the impact Waitr has had on our restaurants, the incremental sales growth it drives, and the positive feedback we receive from our customers. Not only am I excited about the Landcadia-Waitr transaction, I am also pleased to have Chris and the entire Waitr team as a Landry's delivery partner and look forward to growing successfully together.

73.     This press release also quoted Defendant Meaux, in part, as follows:

We are excited to partner with Landcadia and Tilman to accelerate our current growth and expand our footprint to new markets. Tilman's domain expertise and his team's deep experience and knowledge in the restaurant industry is the perfect complement to our focus on restaurant partners and our commitment to a unique customer experience in the online ordering and food delivery sector. Additionally, access to Landry's portfolio of over 600 restaurants as a delivery partner, promotion of Waitr to over four million loyalty members across Landry's restaurants and Golden Nugget Casinos, the opportunity for partnership with the

Houston Rockets and its more than nine million Facebook followers and also the ability to drive elevated traditional and social media exposure both nationally and in strategic markets creates an exciting opportunity to accelerate customer acquisition.

This release also stated that Jefferies would be acting as financial and capital markets advisors to Landcadia.

74.     On May 17, 2018, Defendants Fertitta, Meaux, and Pringle participated on a conference call for analysts and investors.  The transcript for this call was also filed with the SEC as an exhibit to Landcadia's Form 8-K—dated on May 16, 2018 and filed with the SEC on May 17, 2018—announcing the Going Public Transaction, pursuant to Form 14A as proxy solicitation materials.  During the call, Defendant Fertitta, stated:

Landcadia Holdings is an acquisition vehicle that [Handler] and I formed for the purpose of conducting a business combination.  In May of 2016, Landcadia Holdings completed its IPO, raising approximately $250 million.  Our mission was to find an investment opportunity in the dining, hospitality, entertainment or gaming industry.  After reviewing so many opportunities, we found Waitr in our own backyard, and we believe this transaction really delivers on our investment thesis.  Waitr is a restaurant ordering and food delivery technology platform based in Louisiana.  Unlike many of the companies that we looked at, Waitr is a growth business with a huge potential and a tremendous complementary relationship with my existing businesses.  They will also be able to leverage the tremendous industry knowledge and expertise Rich and I have.  We believe we have an incredible opportunity to create the next leader in the fast-growing online food delivery market.  Waitr is currently a delivery partner for Landry's and Golden Nugget, and we have seen firsthand the impact Waitr has had on our businesses.

*  *  *

We believe, number one, there is a massive unpenetrated market for online delivery, particularly in the secondary markets.  Number two, Waitr has already shown tremendous organic growth since their founding in 2013.  Number three, there are many acquisition opportunities that can help drive additional growth and scale throughout the U.S. …  They provide, number four, a great customer experience and have differentiated the value proposition for restaurant partners, which I have experienced firsthand.  Number five, they have a very capital efficient model, with strong unit economics and a proven track record. Six, they have significant operating leverage, on par with industry leaders.  Number seven, their business is highly complementary with the businesses we run at Fertitta

Entertainment. Number eight, as a preferred food and delivery partner for Landry's and the Golden Nugget, Waitr will have brand exposure to our over four million loyalty customers; and number nine, finally as a sponsor with the Houston Rockets, Waitr's brand will be exposed to over nine million Facebook followers.

At the close of this transaction, I will join the Board and tremendously give them the guidance of being a public company from '93 to 2010, besides all my expertise in growth and the hospitality and restaurant industry

75.     On this conference call, Defendant Meaux stated, in part, the following:

As you guys know, the restaurant delivery market is massive, and we are a first mover in the underpenetrated online space. We currently operate in underserved markets throughout the southeast. We have a strong value proposition to both customers and to restaurants, and we have a very differentiated proprietary technology platform in which we operate. Our business to date has had to be very capital efficient, and we have proven our ability to grow and expand in strategic markets and entrench our competitive positioning in the market.

We have over 5,000 restaurants on our platform and over 5,800 drivers. Our drivers are W2 employees, which gives us some flexibility and control over the user experience. ... We have the ability to schedule our drivers, which allows us to optimize performance and control quality. Our drivers are readily identifiable and uniformed when they show up at the customer's door, and they like the stable job environment that being an employee of Waitr provides, as well as the community, of being a part of something real.

76.     Defendant Meaux used this call to condition investors to believe that Waitr was differentiated from its peers and maintained a competitive advantage by having restaurants "onboarded," onto Waitr's "platform," and that the Company maintained pricing at 15%—which made it possible for small tertiary-market, independent restaurants to join the modern world of app-based restaurant delivery. As evidence of this Defendant Meaux stated the following:

Our platform is further differentiated through our relationship with our restaurant partners. In fact, we charge our restaurant partners an upfront fee to onboard onto the Waitr platform, and there's a reason that we do that. For one, they get the food photography. They get the menu onboarding using our team to onboard their menu, and they get the equipment installed in the restaurant that they need to receive the orders. But most importantly, it creates an investment on that restaurant's part in our partnership, and we have found that that investment in the partnership is an important part of solidifying the relationship and it gets

restaurants to promote Waitr inside of their stores, or promote their restaurant on Waitr as well.

We have the most attractive pricing in the industry, at 15% take rate, compared to our competitors, which are much higher. We partner with the restaurants on in-store marketing. …. [W]hat we've found is that restaurants—the longer they're on the platform, they see more benefits from this partnership. In fact, our 2015 restaurants that signed up with us there have seen almost a twofold increase in the average amounts of their orders on Waitr on a monthly basis.

\* \* \*

We've identified over 200 markets within our current operating territory that we can expand into. This partnership with Landcadia is going to give us the additional capital we need to expand into those markets more quickly and beyond just the 11-state area in which we operate today. … [W]e have proven that this model is scalable to multiple markets.

77. On this call Defendant Pringle also provided forward guidance, in part, as follows:

Now I'd like to walk you through our projections for gross food sales and net revenues going forward, and these numbers that I present to you are based upon our current rollout plan, which is to launch two new markets per month, and that rollout plan is what is anticipated to move forward throughout these projections. First, I'll start with our actual results for 2017. We had $120 million worth of gross food sales come through the network, resulting in $27 million worth of net revenue to Waitr. For 2018, we're projecting somewhere between $265 million and $275 million of gross food sales going through the platform. That would result in somewhere between $60 million and $65 million of net revenue to Waitr.

For 2019, we're projecting over $500 million worth of gross food sales through the platform, resulting in about $125 million worth of net revenue to Waitr. If we carry on out to 2020, again, still at the two markets per month rollout plan, we're projecting over $850 million worth of gross food sales through the platform, resulting in somewhere between $200 million and $220 million of net revenue to Waitr. So we're very excited about the future here and the capital that's going to be available to us through this transaction would allow us to accelerate that launch plan and perhaps get to those numbers even more rapidly.

78. Another exhibit to the Company's Form 8-K—dated on May 16, 2018 and filed with the SEC on May 17, 2018—announcing the Going Public Transaction, pursuant to Form 14A as proxy solicitation materials was a transcript of Defendant Fertitta's May 17, 2018

appearance on financial news network CNBC's Power Lunch.  This interview started off with the CNBC host, Tyler Mathisen, asking Fertitta why he changed his mind after previously stating that the food delivery business was <u>not</u> a market he had any interest in entering.  Fertitta's response was that, "it's really funny how things change" and that he had seen the increasing trends of third-party app-based food delivery at his hundreds of restaurants.  During this interview, Defendant Fertitta also conditioned investors to believe that the Company's low-cost competitive pricing would continue to drive growth, even as Waitr expanded.  Fertitta stated, in part, as follows:

> Well, one of edges is, is that the restaurant only hits 15%, where I will not use GrubHub because they want 25%, or, you know, different parts 20%, 30%.  We can't afford to do it, the quality of food that we serve, and so one of the things that attracted us to Waitr that got them in our restaurants was the 15%, because they hire their own drivers and they can do more deliveries, and we won't use Uber Eats because of the cost to us.[11]  So, it kind of started getting our attention, and then Jefferies and myself, Rich and I were looking for a company to buy with this special acquisition corp. and we went to them and—and, you know, they kind of liked the idea, because they already had a tie-in with Landry's, and we started talking.  I didn't think we were going to make a deal.  As I watched their sales, you know, last year $125 million, they're going to do around $250 million this year, and projected to do $500 million next year.  I mean, the growth is there, and what I like about them is they're in the smaller markets.  We're the only company out that's going to be public, besides GrubHub.  So, I'm excited about it. I wanted a real growth company and I think this is it.

79.     An unidentified speaker on the CNBC interview also grilled Fertitta about there being "so many competitors" and that there was little clarity on where the fragmented industry was headed, making it very difficult to provide accurate guidance.[12]  Fertitta responded:

---

[11] It is noteworthy that Fertitta stated that, even with his 400 restaurants, he could not afford to pay more than the 15% take rate delivery fee offered by Waitr and that fees in the 25-30% range made third-party delivery services not economical for even one of the nation's largest restaurant operators.

[12] One cannot underestimate the importance of Waitr's ability to forecast internally, and how critical it was for Waitr to be constantly improving its forecasting abilities.  Unlike competitors, Waitr had unique risks because its drivers were all full-time employees (fixed costs), where competitors hired drivers on an as needed basis, as surge labor, with more engaged during periods of peak demand.  The ability to integrate weather forecasting into the internal labor forecasts for the Company was even critical to Waitr.

All we're going to try to do is apply the same business model that I did in acquiring restaurants, is you've got to get out there, you want to be the Pacman and you want to eat up all the small companies and see what happens. You know, it's a plan, we know how to do it, we've been there before. We're going to have $150 million on the balance sheet after this deal, and so we're going to be in the acquisition mode and we want to eat up a lot of the competition and see what happens.

80. Defendants filed the merger agreement executed in connection with the acquisition of Old-Waitr by Landcadia in the contemplated Going Public Transaction (the "Merger Agreement") as an exhibit to a May 17, 2018 Schedule 14A filing with the SEC. The Merger Agreement contained several representations and warranties by each company, including the following:

Section 4.20 <u>Absence of Changes</u>.

( a ) Since the date of the most recent balance sheet included in the Interim Financial Statements, each Waitr Party has operated its business in the ordinary course, consistent with its past practices, and there has not been any been any change, development, condition, occurrence, event or effect relating to such Waitr Party that, individually or in the aggregate, resulted in, or would reasonably be expected to result in, a Waitr Material Adverse Effect.

\* \* \*

( a ) <u>Representations and Warranties</u>

(ii) the other representations and warranties of Waitr contained in Article IV shall be true and correct as of the Closing Date as if made at and as of such time (except for representations and warranties that speak as of a specific date prior to the Closing Date, in which case such representations and warranties need only be true and correct as of such earlier date); provided, that this condition shall be deemed satisfied unless any and all inaccuracies in such representations and warranties, in the aggregate, result in a material adverse effect upon (A) the business, results of operations, workforce, prospects, properties, assets, liabilities or condition (financial or otherwise) of Waitr or (B) the ability of Waitr to consummate the transactions contemplated by this Agreement or to perform its obligations hereunder, in each case without giving effect to any limitation as to materiality or Waitr Material Adverse Effect set forth therein.

\* \* \*

( d ) **No Waitr Material Adverse Effect**. Since the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any

change, event or effect that, individually or when taken together with all other changes, events or effect, constitutes a Waitr Material Adverse Effect.

81.     Waitr Material Adverse Effect was defined in the Merger Agreement, as follows:

"**Waitr Material Adverse Effect**" means, with respect to any change, event, fact or condition, individually or in the aggregate, together with all other changes, events, facts and conditions that have occurred prior to the date of determination, any material adverse effect upon (a) the business, results of operations, workforce, prospects, properties, assets, liabilities or condition (financial or otherwise) of Waitr, or (b) the ability of Waitr to consummate the transactions contemplated by this Agreement or to perform its obligations hereunder …

82.     On August 2, 2018, Defendants filed with the SEC pursuant to Schedule 14A, additional information required in the Going Public Transaction Proxy/Prospectus Filings concerning soliciting material pursuant to §240.14a-12, that attached the Company's Form 8-K filing of Waitr's release of 2018 second quarter business highlights for the period ended June 30, 2018.  This Form 8-K quoted Defendant Meaux, in part, as follows:

"We are very pleased with the results in the second quarter," said Chris Meaux, founder and Chief Executive Officer of Waitr.  "These results exceeded our expectations, allowing us to increase our outlook for the year.  We believe that our strong position in our current markets, proven expansion strategy, strong value proposition to customers and restaurants, differentiated proprietary technology platform and high growth business model built in a capital efficient manner has positioned us well for the long term."

"We are excited about the pending merger with Landcadia which we expect will provide us with the capital to accelerate our growth in our current markets, expand into new markets and take advantage of potential opportunistic acquisitions," continued Meaux.  "We are on track to complete the proposed transaction later this year."

The August 2, 2018 release also purported to provide raised forward guidance and a full year 2018 Outlook, as follows:

**Full Year 2018 Outlook**

|  | Updated Outlook | Previous Outlook |
| --- | --- | --- |
| Gross food sales | Between $260 and $280 million | Between $255 and $275 million |
| Revenue | Between $62 and $67 million | Between $60 and $65 million |
| Markets | 45+ | 45+ |

83.     The Schedule 14A filed on October 1, 2018 in connection with the Going Public Transaction Proxy/Prospectus Filings, also attached an Investor Presentation dated October 2018 which purported to represent to investors important information and Company specific metrics, in part, as follows:







84.     In addition, the October 2018 Investor Presentation also represented the following:



85.     The October 2018 Investor Presentation again highlighted the purported "massive" market opportunity that existed in "underserved" markets, as follows:



86. Waitr also represented its then-current purported Growth Profile, as follows:



87. The October 2018 Investor Presentation again highlighted Waitr's purported competitive pricing model:



88. Highlighting Waitr's purported "Better Business Model," the October 2018 Investor Presentation also represented:



89. The October 2018 Investor Presentation materials also included Waitr's purported forward guidance and Outlook, as follows:

90. On November 8, 2018, Landcadia filed with the SEC pursuant to Schedule 14A, definitive additional materials required in Going Public Transaction Proxy/Prospectus Filings,

which was filed along with the Company's Form 8-K filing of Waitr's release of 2018 third quarter business highlights for the period ended September 30, 2018, quoted Defendant Meaux, in part, as follows:

> "The momentum we experienced in the first half of the year continued into the third quarter. Growth in the third quarter was driven by entering 6 new markets (32 cities) as well as further penetrating our existing markets," said Chris Meaux, founder and Chief Executive Officer of Waitr. "We remain excited about the pending merger with Landcadia as well as the financing agreement to be provided by Luxor Capital Group. Both are high quality partners who will further enable us to accelerate our growth in our current markets, expand into new markets and take advantage of potential opportunistic acquisitions."

91. Despite his self-confessed history of business failure and his statement that he never felt success until Waitr began trading on the Nasdaq in November 2019, on November 13, 2019—still days shy of his revelation—Defendant Meaux provided the keynote address at the Entrepreneur Day of Baton Rouge during Enterprise Week. Meaux again used this podium to argue publicly that he was right, and all market analysts and venture investors were wrong, about: Meaux's growth projections and ability to scale the Company; and its ability to maintain any first mover market advantage with software that had no real distinguishing characteristics, other than Waitr's marketing and service agreements. Meaux was quoted by Businessreport.com as having stated, in part, the following:

> You can't scale if you don't take action, Waitr founder and CEO Chris Meaux said during his keynote address this afternoon at the Entrepreneur Day of Baton Rouge Entrepreneurship Week. And the confidence to make business moves comes from believing in yourself.
>
> *   *   *
>
> "When I pitched to investors, they didn't believe my projections—I was projecting Waitr bringing in $36 million in four years," Meaux said. "But I became a domain expert in the restaurant industry, and it didn't matter to me that they didn't believe me because I believed me."
>
> *   *   *

Meaux said he based his original projections on feedback from the kind of consumers and restaurants he wanted to serve, as well as his existing industry knowledge. He and his co-founders built their entire business plan around those findings.

Though he first approached venture capitalists with his idea, Meaux said they quickly wrote him off because he was based in Louisiana and they didn't think the state's job market was big enough.

Refusing to accept that, Meaux solicited investors and software engineers who lived in other states but were from Louisiana and wanted to move back. The method yielded him about $26 million in initial investment.[13]

92.     As investors ultimately learned following the end of the Class Period, the statements contained in or incorporated in the Going Public Transaction Proxy/Prospectus Filings issued in connection with the Going Public Transaction on or about November 15, 2018, referenced above in ¶71 - ¶91 *supra*, were each materially false and misleading for the following reasons, among others:

(a)     At the time Waitr began trading publicly, it was not true that the Company was at or near profitability because Defendants had artificially bolstered profits and revenues by: (i) unilaterally raising prices in breach of customer contracts; and (ii) failing to properly reimburse thousands of drivers for driving expenses such that their earnings were not the high rate of $15 per hour as represented, but below minimum wage and as low as $2.00 per hour as reported by one former driver who sued the Company for Fair Labor Standards Act (the "FLSA") violations in one of two similar class actions[14];

---

[13]  *See*  https://www.businessreport.com/article/waitr-ceo-chris-meaux-cant-scale-dont-act  (last visited Sept. 26, 2019).

[14]  Class actions alleging violations of FLSA and state law styled as *Halley, et al., v. Waitr Holdings, Inc. f/k/a Landcadia Holdings, Inc., et al.*, Civil Action No. 2:19-cv-01800 (the "First FLSA Class Action") and *Montgomery v. Waitr Holdings, Inc.*, Civil Action No. 2:19-cv-02208-EEF-DMD (the "Second FLSA Class Action") are both pending in the United States District Court for the Eastern District of Louisiana, collectively referred to herein as the "FLSA Class Actions."

(b)     At the time Waitr began trading publicly, it was not true that the Company was providing its services at a sustainable low take rate established at 15%. First, Waitr had breached certain customer contracts to force some customers (who had initially contracted to the 10% rate) to adopt at the 15% rate which appears 1.5x higher than then contracted rate. Second, even at 15% the Company could not possibly operate profitably providing services to small, independent restaurants in remote markets (with no available subsidy provided by large, profitable urban markets). It was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares and as soon as it could take advantage of that market by selling or issuing stock as currency for acquisitions or to raise cash directly from investors in its Secondary Offering;

(c)     At the time Waitr began trading publicly, it was not true that Waitr was able to extract efficiencies from its full time fixed-rate labor force that was purporting to allow the Company to offer its services at a lower rate than competitors, when in fact its W2 labor model was inefficient, it resulted in huge costs that could not be sustained (especially, if the Company paid all associated labor costs as required by state and federal law), and it resulted in Waitr reporting the lowest gross margins among its peers—another material competitive disadvantage;

(d)     At the time Waitr began trading publicly, it was not true that its financial statements and SEC reports or its Sarbanes Oxley certifications were true, accurate or reliable, as Waitr had failed to disclose that it had artificially inflated profits and revenues, that it was unable to sustain itself even with rates twice its current take rates, that it had failed to disclose known adverse trends that were already impacting the Company as required by Item 303 of Regulation

S-K, and that the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures;

(e)     At the time Waitr began trading publicly, contrary to Defendants' representations, its software provided little or no competitive advantages. What first-mover advantage the Company claimed existed was quickly squandered by its inability to obtain sophisticated high-level programmers and software engineers who could enable Waitr to refine and develop the software necessary to stay competitive in its market. In fact, while Waitr was entirely dependent upon its ability to accurately forecast a myriad of factors necessary to accurately predict foreseeable market conditions so that it could deploy its fixed-cost labor (W2 employees), it became more and more difficult to make accurate predictions as the Company exploded in size, in substantial part because Waitr lacked the availability or resources locally in its smaller home town of Lake Charles, Louisiana. Moreover, as investors would ultimately learn, Waitr was not capable of developing its software so as to remain competitive, much less to become the next front-of-house integrated point of sales solution, when Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers and engineers in its small market of Lake Charles, Louisiana. Indeed, it was only months before Waitr would completely abandon such software development in favor of purchasing a better solution from a competitor; and

(f)     As a result of the aforementioned adverse conditions that Defendants failed to disclose, at the time Waitr began trading, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Waitr could achieve the guidance sponsored and/or endorsed by Defendants. Nor was it true that Waitr maintained an adequate system of internal controls so as to report and eliminate material conflicts of interest.

93.     At the time Waitr shares began trading, Defendants represented to investors that Waitr had a proven, demonstrated model and expansion strategy, and that the partnership with Landcadia would foreseeably accelerate growth and provide unique branding opportunities, including Defendant Fertitta promoting and overseeing the business development of the Company.  As a result, Waitr forecasted Gross Food Sales of $255 million to $275 million in 2018 and $500 million in 2019 and net revenue of $60-65 million in 2018 and $120-$130 million in 2019.  Moreover, Waitr did not have a proven business model and expansion strategy, its revenues would not sustain its operations, and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, something which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures.  These representations were also false or misleading because Defendant Fertitta would do little or nothing to promote the Company, as evidenced by little more than a Waitr order button on the Landry's website, the same as any non-affiliated entity, and Fertitta's guidance and oversight purported to have been backed by decades of running a public company, also do not appear to have materialized or benefited Waitr in any material way.  Few, if any, of the "Synergies" promised at the time Waitr began trading have resulted.

94.     Defendants' positive statements and financial forecasts were also materially false or misleading at the time Waitr began trading, because, at that time, the cost of revenues was suddenly increasing relative to growth, such that Waitr had no viable path to profitability.  This was especially so since national competitors like Grubhub (public), DoorDash (backed by SoftBank) and UberEats were already expanding into Waitr's once unchallenged markets and negatively impacting Waitr's current and foreseeable future sales.  Not only were these bigger,

better run, and better funded companies with more experience and stronger management, but they each had a significantly stronger business model which allowed them to fund growth in secondary markets with profits generated in primary markets.[15]

95. By the time Waitr shares began trading, Waitr had achieved its sales growth by partnering with local restaurants and charging them less than the take rates charged by Grubhub and other larger competitors, but Waitr was effectively subsidizing these sales, using the restaurants own funds, that it had collected in "onboarding" fees. The problem of course, is that this was not sustainable, and Waitr could not achieve profitability with its existing contracts. Thus, Waitr was already in the process of drastically increasing its prices in a desperate attempt to raise revenue by imposing draconian price increases on small independent operators. These price increases were evidence that Waitr's model of providing low-cost services to remote markets was not viable, and the huge price increases were a cynical attempt to get customers to abandon their contracts so that Waitr did not have to return any of the thousands of dollars paid in "onboarding" fees by each restaurant.

96. The claims related to the false statements made in the Company's proxy prospectus and solicitation materials related to the Going Public Transaction are based in negligence and they do not sound in fraud. Defendants were required to assure that statements contained in the Going Public Transaction Proxy/Prospectus Filings or incorporated therein by reference, or which were filed as amendments or exhibits thereto, were true, accurate and reliable and to not contain any untrue statement of a material fact or omit to include material facts necessary to make the statements contained therein not materially false, at that time.

---

[15] At that time, analysts compared Waitr's metrics to Grubhub, another publicly traded third party app-based food delivery company, noting that Waitr's 7,700 restaurants in 235 cities and 850,000 active users was dwarfed by Grubhub's 95,000 restaurants, and 16.4 million active users in 1,700 cities. Analysts also noted that Grubhub was

## Materially False and Misleading Statements
### Made with Scienter During the Class Period

97. On November 15, 2018, Landcadia and Waitr announced they had completed the Going Public Transaction, pursuant to which Landcadia acquired Old-Waitr for $50 million cash and stock valued at $278 million, for total consideration of $308 million. At the same time, Landcadia announced that it had changed its name to Waitr Holdings, Inc.—adopting the name of Waitr prior to the combination. Thus, beginning the following day, November 16, 2018, shares would continue trading on the Nasdaq under the symbol "WTRH." The effect of this transaction was to create, for the first time, a public market for registered shares of Waitr.

98. Having created a public market for Waitr common shares valued at nearly $1 billion, pursuant to materially false and misleading Going Public Transaction Proxy/Prospectus Filings issued in connection with the November 15, 2018 Going Public Transaction, Defendants next embarked on a scheme and illegal course of conduct to artificially inflate and maintain the price of Waitr shares by issuing a series of materially false and misleading statements that Defendants knew or recklessly disregarded were materially false and misleading at that time. The artificial inflation in the price of Waitr shares during the Class Period also allowed Defendants to register and sell an additional $50 million of common stock while in possession of material adverse, non-public information about the Company and allowed Defendants to use an additional $100 million of artificially inflated Waitr stock as currency for the acquisition of Bite Squad.

---

profitable, recording $60 million in profits in the then current quarter. Moreover, in 2018 third and fourth quarter Grubhub saw approximately $534 million in revenues, while Waitr recorded only $99 million.

99. As evidence of this, in connection with the announcement of the Going Public Transaction, on November 16, 2018, Defendants filed with the SEC Form 8-K which include a press release dated November 15, 2018 that again quoted Defendant Fertitta, as follows:

> We are pleased to complete the merger with Waitr. I believe they are the best-in-class, on-demand food ordering and delivery partner for customers and restaurants. They are also positioned well to take advantage of the massive unpenetrated market for online delivery, particularly in secondary markets.

This press release also quoted Defendant Meaux, as follows:

> We are excited to partner with Tilman and the Landcadia team and we believe this is a great opportunity. Our combined expertise, experience and resources, and being a publicly-traded company will further enable us to accelerate our growth in the markets we currently serve, expand into new markets and take advantage of potential opportunistic acquisitions.

100. The November 15, 2018 press release also mentioned that Jefferies served as financial, and lead capital markets advisor and placement agent to Landcadia. What this release did not mention was that Jefferies earned $10 million in contingent fees upon the consummation of the Going Public Transaction and the creation of a public market for Waitr shares. The remuneration to Jefferies was detailed as follows:

- Of the $8,750,000 in "deferred underwriting commission" related to Landcadia's 2016 IPO, Jefferies was entitled to $3,718,750. In the event an initial business combination was not completed within 24 months of the closing of Landcadia's 2016 public offering, however, Jefferies would have gotten nothing. Accordingly, if the business combination with Waitr—or any other initial business combination—was not consummated prior to the required liquidation date, Jefferies would not receive any of the deferred underwriting commission and such funds would have been returned to Landcadia's public stockholders upon its liquidation.

- $4,500,000 plus expenses[16] as payment for financial advisory services to Landcadia in connection with the Waitr going public, all of which became payable, and was contingent upon the consummation of the Landcadia transaction.

---

[16] Under the terms of Jefferies' engagement, Landcadia also agreed to reimburse Jefferies for expenses, including fees, disbursements and other charges of counsel, and to indemnify Jefferies against liabilities, including liabilities under federal securities laws, relating to, or arising out of, its engagement.

- $1,700,000 in fees related to Debt Financings. Upon closing, Jefferies was paid a fee in addition to all out-of-pocket expenses (including fees and expenses of its counsel and experts) incurred by Jefferies as debt financing Placement Agent, and Waitr again agreed to indemnify Jefferies against liabilities arising out of this engagement.

Jefferies therefore had a financial interest in the completion of the Waitr business combination that resulted in the payment of the deferred underwriting commissions and additional fees and commissions—over $10 million. Jefferies would soon earn millions more underwriting the next $50 million offering of Waitr common stock to the public, and in connection with Waitr's Warrant Conversion and the acquisition of Bite Squad.

101. The creation of a public market for Waitr stock attracted the attention of industry press and on December 2, 2018, Defendant Meaux conducted another interview published on Table.skift.com, which stressed Waitr's differentiated model of focusing on non-urban markets, employing all of the Company's drivers and maintaining low restaurant fees of 15% to allow small restaurants in non-urban markets to afford Waitr's service offerings.[17] This interview revealed that Defendant Meaux had no formal business plan for the Company and, against convention, founded Waitr with a one page formulation, after "the lessons that [he] learned in all of [his] failures." Defendant Meaux did, however, acknowledge that this was not conventional and that while in business school he was "taught to write a business plan, follow the business plan, do these things."

102. In addition to the foregoing, Meaux also used this interview to publicize his purported empathy for restaurant operators ("[o]ne of my past failures was a restaurant business"[18]). He further explained how Waitr's model of under-cutting Grubhub pricing at the

---

[17] *See* https://table.skift.com/2018/12/03/interview-waitr-ceo-on-failure-persistence-and-delivery/ (last visited Sept. 26, 2019).

[18] Presumably, Meaux was referring in this interview to Meaux2Geaux; although Meaux had described this venture as "successful."

15% level was essential to allowing restaurants in small markets, "who need every dollar they can get," to optimize the Waitr service.

103. Meaux further explained that Waitr was able to offer such a competitive rate because of its superior business model, which involved employing its drivers as full-time, W-2 employees and not as independent contractors paid 1099 wages—the model adopted by competitors. Meaux stated that, Waitr employed a driver core that was half of its competitors, "because they're employees of the Company and we can tell them when we need them to work." Additionally, Meaux went on to state:

> So, by having that advantage, we have a fixed cost per hour for our drivers. Then, we can leverage that fixed cost to increase profitability for us and then pass that on to the restaurants. That's how we're able to charge 15 percent.

When asked by the interviewer if Meaux could give an example of how the fixed costs "play out," he replied, in part, as follows:

> Yeah, so with our drivers, we pay them federal minimum wage. [Currently $7.25 an hour.] Then we give them additional money for gas, use of their personal vehicle, and their phone. We also use a tip credit. If they earn enough gratuities to meet the minimum wage requirement, plus the additional that we give them for reimbursements, then we can lower our commitment to them. So our cost per hour is about $5 per driver.

> Our drivers earn on average $12 to $15 an hour. At $15 an hour, even if you subtract the monetary reimbursement, they're still making $11 to $12 an hour. In the small markets that we serve, it's a really good wage. That's an advantage for us because it allows us to do more orders with fewer drivers, keep our costs per delivery down, and then be able to keep our cost to the restaurants down.[19]

> In markets where we do have competitors, restaurants will push customers to Waitr because we are charging them less. That's been a big advantage for us.

---

[19] Posted on the "Drive for Waitr" section of its website, the Company states that its drivers earn an average of $13.00 - $17.00 per hour, keep 100% of tips, and can schedule their own hours. *See* https://waitrapp.com/ (last visited Sept. 26, 2019).

104.    Despite having debuted on the public markets less than 3 weeks prior, Meaux was

already explaining the shift in the Company's core model focusing primarily upon growth.  As

evidence of this, Meaux continued, in part, as follows:

> Our goal is growth right now.  That's what the market wants to see from us and so
> we've told the market that we're going to continue to invest and grow and we'll
> do it responsibly because we have to at this point.
>
> We haven't had a lot of capital.  So we've had to grow responsibly.  We'll
> continue to do that, but our focus is going to be on growth.  When the market tells
> us [the focus] needs to be on profitability, it's gonna be on profitability.  But right
> now, there's so much growth to be had.
>
> *  *  *
>
> Now we are a public company with $215 million on our balance sheet, a plan for
> growth, and the experienced board to help guide us through that path.

105.    Meaux also used this interview to assure investors that Defendant Fertitta was

engaged in management of the growth of Waitr, and that the plan for growth was being guided

and moderated by an experienced and engaged board.  As evidence of this, Meaux also stated, in

part, the following:

> Tilman's got a tremendous amount of restaurant experience, a tremendous amount
> of business experience, and he's been a phenomenal sounding board for me from
> a business perspective. He's going to remain on our board. If I ever have a
> question about what to do next, I can pick up the phone and call him because he
> ran a public company for 17 years. That's why we did the deal. We did the deal
> because of Tilman and his experience and what he brings to the table.

106.    Barely had the ink dried on the acquisition of Old-Waitr when, on December 11,

2018, the Company announced that it had entered into an agreement to acquire Bite Squad—

another third-party online restaurant delivery service based in Minnesota—for aggregate total

consideration of $321.3 million, consisting of 10.6 million shares of Waitr stock and $202.1

million cash, in addition to at least $42 million of debt to be incurred at the closing.[20]  Bite Squad itself was a conglomeration of 17 acquired restaurant-delivery companies scattered across the country.  At that time, Bite Squad had less than 900,000 active users and 11,000 restaurants in 350 cities across 20 states, which was not at all consistent with Waitr's contiguous expansion model.  Again, Jefferies served as financial advisor to Waitr in connection with this acquisition.

107.    Announcing the acquisition of Bite Squad, on December 11, 2018, Waitr filed a Form 8-K with the SEC, which included a press release dated December 12, 2018, that quoted Defendant Meaux, in part, as follows:

> "We have followed Bite Squad's growth and success for many years and believe their mission, business model and growth profile share many similarities to Waitr," said Chris Meaux, founder and Chief Executive Officer of Waitr.

> "We believe that a small fraction of the U.S. restaurant industry's sales are from off-premise online transactions and this is evolving rapidly.  This acquisition will help us drive additional growth and provide a step function increase in scale throughout the U.S. in order to better serve that developing market."[21]

108.    Bite Squad was asserted to be a high growth business, with 85% year-over-year gross food sales growth and 98% year-over-year revenue growth in 2018 third quarter. Accordingly, the release also purported to explain the "Strategic Rationale" for the acquisition, as follows:

- The combination will significantly expand Waitr's scale and footprint across the U.S., serving a total of over 86 markets in more than 500 cities and 22 states;

- Shared strategy to establish a market leadership position in the cities which the Company operates;

---

[20] The final aggregate consideration for the Bite Squad Merger consisted of $192.9 million in cash and 10,591,968 shares of Waitr common stock, with an implied value of approximately $14.25 per share for Waitr stock and based on an $11.26 closing share price on December 11, 2018, when announced.

[21] *See*  https://www.businesswire.com/news/home/20181212005245/en/Waitr-Holdings-Acquire-Bite-Squad  (last visited Sept. 26, 2019).

- Leverage respective strengths to create a best-in-class organization; and

- Opportunity to realize cost synergies.

109.    On February 10, 2019, at only 53 years old, Defendant Pringle, CFO of Waitr announced his "retirement," effective March 31, 2019.    Defendant Pringle announced his resignation less than 3 months after Waitr began trading publicly and only weeks after the Company provided very aggressive forward guidance.

110.    On March 7, 2019, Waitr filed a Form 8-K with the SEC, which included a press release announcing financial results for the fourth quarter of 2018 and Full Year 2018, ended, December 31, 2018.    The press release again quoted Defendant Meaux and stated, in part, that:

> We experienced a year of remarkable growth and operational development in 2018," said Chris Meaux, founder and Chief Executive Officer of Waitr.    "We successfully became a public company through our business combination with Landcadia, secured $85 million in private capital from a valued partner, organically expanded our footprint and most recently completed the acquisition of Bite Squad, an online food ordering and delivery service based in Minnesota.    In addition, we added valuable leadership experience to our team, expanded our technology platform into new underserved markets throughout the United States and increased our depth of penetration in our existing markets.

111.    The press release also provided purported business highlights of the fourth quarter of 2018 and Full Year 2018:

**Fourth Quarter 2018 Financial Highlights Compared to Fourth Quarter 2017**

- Revenue for the fourth quarter of 2018 increased 148% to $21.3 million compared to $8.6 million in the fourth quarter of 2017.

- Gross Food Sales for the fourth quarter of 2018 increased 113% to $83.4 million compared to $39.2 million in the fourth quarter of 2017.

- Net loss for the fourth quarter of 2018 was $17.0 million, or $0.52 per diluted share, compared to a loss of $15.5 million, or $1.55 per diluted share, in the fourth quarter of 2017.

- Adjusted EBITDA for the fourth quarter of 2018 was $(6.4) million compared to $(3.9) million in the fourth quarter of 2017.

**Full Year 2018 Financial Highlights Compared to Full Year 2017**

- Revenue for 2018 increased 202% to $69.3 million compared to $22.9 million in 2017.

- Gross Food Sales for 2018 increased 130% to $278.8 million compared to $121.1 million in 2017.

- Net loss for 2018 was $34.3 million, or $2.18 per diluted share, compared to a loss of $26.9 million, or $2.69 per diluted share, in 2017.

- Adjusted EBITDA for 2018 was $(13.2) million compared to $(13.4) million in 2017.

112.    The press release reported fourth quarter and full year 2018 financial highlights for Bite Squad:

- Revenue for the three months and year ended December 31, 2018 totaled $24.8 million and $83.4 million, respectively.

- Gross Food Sales for the three months and year ended December 31, 2018 totaled $74.1 million and $255.0 million, respectively.

113.    Providing a full year 2019 outlook, this release stated that, based on information available as of March 7, 2019, Waitr expects to achieve *pro forma* revenue of approximately $250 million for 2019 for the combined Company. The results of operations for Bite Squad were included in Waitr's consolidated financial statements beginning on the acquisition date.

114.    On the same day, Waitr held a conference call with investors and analysts. During the call, Defendant Meaux stated, in part, the following:

> 2018 was a transformational year for Waitr.  We began year as a high growth private company with the bright future went only a few months into the year our future became even brighter.

> In May 2018 we entered into a merger agreement with Landcadia Holdings, kicking off a series of events that included Investor road shows raising $85 million in private capital, adding experienced technology and restaurant executives to our Board and the bell ringing ceremony celebrating our listing on NASDAQ, all the while maintaining our growth minded focus to achieve incredible results for the company and our stakeholders.

Our record results in 2018 tap the remarkable year of growth and operational development by our company. Our growth came on the back of our differentiated business model and not only it serves consumers with a unique and consistent user experience, but provides a valuable brand additive service to our restaurant partners.

A few highlights for the year include, an increase in gross food sales of nearly 130% to $279 million, revenue growth of over 200% to $69 million, nearly 1 million active diners on our platform. We solidify our dominance in underserved markets including the addition of 109 new cities, added experienced leaders to round out our leadership team and finished the year with the balance sheet that included over $200 million in cash setting the stage for future organic growth and acquisitions in 2019. It truly was an incredible year one that we will not soon forget.

With the accomplishments of 2018 behind us and a strong balance sheet at year-end, we began 2019 focused on the future of Waitr and maintaining that great momentum. We kicked off the year with the acquisition of Bite Squad, an online ordering and food delivery platform more than doubling the size of our company with one acquisition. We are thrilled to welcome Bite Squad into the Waitr family and have spent time since the acquisition getting to know their team and diligently beginning the integration process of combining the two companies.

There were many reasons why this combination was right for Waitr, including significantly expanding our scale and footprint across the U.S. giving us a more national versus regional footprint. Today we serve over 80 markets with more than 600 cities and 30 states. *Both Bite Squad and Waitr has similar business models operating a three sided marketplace*, dedicated to serving our restaurant partners, active diners and W2 employed delivery drivers. *We have a shared strategies of entering underserved cities and establishing market dominant positions creating the foundation for growth in 2019 and beyond.*

We are able to leverage respective strengths for both companies to create a best-in-class organization, which was further expanded on a few weeks ago with our leadership transition announcement, strengthening our team. And together we expect to achieve net revenue for 2019 of $250 million. Since this is the first of what I hope will be many visits we have together, I'd like to share with you our vision for 2019 and beyond. The restaurant industry is dynamic and rapidly changing and it is our belief that Waitr is well positioned to be a leader in underserved markets as the industry evolves.

We recently outlined this vision to our board and to management. And we all agree that to achieve this vision over the next few years, 2019 must be a year of hyper focus and successful integration, which will be our foundation for future growth and opportunity.

First, we will accelerate our growth in the markets we currently serve gaining depth in restaurant selection and active diners, strengthening our dominance for

delivery in underserved markets. We will invest responsibly in these markets to capture a larger share than we already have, allowing us to achieve increased organic growth throughout the year.

Second, we will continue to expand into new markets. We've identified new markets within our current operating footprint and we can expand into with Bite Squad, this will allow this will now happen at a faster pace. We expect to add services around 200 cities in 2019 inside and out of our current footprint.

115. On the conference call, Alex Fuhrman, an analyst with Craig-Hallum Capital Group LLC ("Craig-Hallum"), asked for guidance on profitability and EBITDA for 2019 and 2020. The exchange with Defendant Meaux included, in part, the following:

**Alex Fuhrman**
[A]s you think about your guidance for next year, would it be possible for you to give us a better sense of how much of that $250 million of revenue we should expect to see from each of the 2 brands? And is there anything you can tell us a little bit more about profitability? … [A]nything you could tell us about your expectations for EBITDA as the year progresses? Or how we should think about it over the next couple of years would be very helpful.

**Christopher Meaux**
Yes, Alex, I'm going to take the second half of that question and then Jeff can expand on it. But as far as EBITDA and profitability, we -- as most people know, we're a very rapidly growing company and we're going to continue to grow rapidly again in 2019. And so because we're a growth-oriented company, we're making investments in growth and we're going to continue to make those investments.

116. These positive statements were false. As Defendants knew but failed to disclose at that time, Waitr's business was unraveling: after providing 2018 and 2019 full year earnings guidance in a proxy filed November 2018, Defendant Pringle, the CFO "retired" at age 53, and Waitr materially missed its full year 2018 earnings guidance and refused to provide any earnings guidance for full year 2019, as Waitr's business was being decimated by competition from

GrubHub, DoorDash and other bigger competitors.[22]  Thus, Waitr's "hyper growth" story was false.

117.    Waitr saw a pronounced slowdown in its sequential growth rate in 2018 fourth quarter because, after years of operating in markets without competition, Grubhub and (SoftBank-funded) DoorDash entered Waitr's primary markets.  By this time, DoorDash overlapped with Waitr in 46% of its markets, and GrubHub and Waitr overlapped in 75% of markets in Georgia and competed in 41% of the same markets in Texas.  In the case of UberEats, the overlap with Waitr increased from 2.4% in January 2018 to 9.8% in July 2108 to 35% by March of 2019.

118.    On February 27, 2019, the First FLSA Class Action was filed against Waitr in the United States District Court for the Eastern District of Louisiana by its drivers who alleged that, because Waitr does <u>not</u> pay mileage expenses, <u>drivers net pay actually falls below the minimum wage</u>.  The provision known as the "kickback rule" in the FLSA requires that employees are paid minimum wage free and clear of the cost of doing business.  When expenses cause take-home pay to fall below minimum-wage, employers are required to supplement such pay to a federally guaranteed minimum of $7.25 per hour.  As a result of Waitr classifying 95% of its employees as W2 employees, it was required to comply with such rules.

119.    Shortly thereafter, on March 8, 2019, the Second FLSA Class Action was filed in the United States District Court for the Eastern District of Louisiana, for unpaid minimum wages, overtime pay damages, penalties, and attorney fees and expenses.  This action includes a plea for injunctive relief under the FLSA and state law.  The plaintiff in this action claims she

---

[22] For example, in the period between third quarter of 2018 and fourth quarter of 2018, Grubhub grew revenues at a 12% sequential rate off a base of almost $250 million, while Waitr only grew revenues by $2 million in absolute terms and 9% in relative terms off an insignificant revenue base of under of under $20 million.

received a <u>net pay of less than $2.00 per hour</u> after she worked over 28 hours and drove over 280 miles delivering food to customers, a result of not being reimbursed for mileage expenses.

120.    Defendant Meaux immediately responded.  He was quoted by the local press as saying that the FLSA Class Actions were nuisance suits, and that they are just the cost of "doing business," adding "[t]hat's why we hire lawyers too."[23]  And, rather than correct his prior false statements that Waitr had reimbursed its drivers for mileage expenses—when it apparently does not—Defendant Meaux instead blamed drivers for not understanding how they were paid.  As evidence of this, Defendant Meaux stated:

> "If maybe a few drivers don't understand exactly how they got paid, we can't control that except maybe communicate better with those folks."

> He said Waitr has introduced a monthly drivers newsletter and made other efforts to deal with driver grumbles.

> "Some drivers didn't understand how they were paid so we tried to clarify that in info about how they're paid," he said.

121.    In essence, Meaux simply denied the claims in the FSLA Class Actions and basically accused the drivers of not knowing how they were paid.  The Second FSLA Class Action court, however, found that "[p]laintiff's claim that Waitr did not adequately compensate them given the cost associated with their vehicles is cognizable under FLSA."  The Second FSLA Class Action Dkt. 32.  Similarly, the financial press took these actions much more seriously and compered them with successful actions previously filed against national pizza delivery chains such as Domino's, Pizza Hut and Papa John's.[24]  On March 28, 2019, Anthony McAuley of Nola.com wrote as follows:

---

[23] *See* https://www.nola.com/news/business/article_df1969ca-14c0-56c9-8ec7-de4dadfbc5fa.html (last visited Sept. 26, 2019).

[24] *Id.*

[I]n the Uber cases, where the argument has been that drivers were underpaid because they were "misclassified" as independent contractors, the lawsuits filed in the Eastern District of Louisiana court against Waitr in February claim that even directly-employed drivers were underpaid because their net compensation fell below the mandated minimum wage.

That makes the lawsuits more akin to those brought by drivers in several states against Papa John's, Domino's and Pizza Hut franchisees, which resulted in multimillion-dollar settlements, according to Bohrer Brady lawyers, which are representing the plaintiffs in the first case filed.

122. On March 15, 2019, Waitr filed with the SEC pursuant to Form10-K its financial results for the fourth quarter and full year 2018, the period ended December 31, 2018. The Form 10-K was signed by Defendants Fertitta, Meaux and Pringle.

123. According to the 2018 Form 10-K, the Company's financial reporting had been prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), as follows:

Basis of Presentation and Summary of Significant Accounting Policies

**Basis of Presentation**
The consolidated financial statements and accompanying notes have been prepared in accordance with GAAP and in accordance with the rules and regulations of the United States Securities and Exchange Commission ("SEC").

**Principles of Consolidation**
The accompanying consolidated financial statements include the accounts of the Company and all wholly-owned subsidiaries. Intercompany transactions and balances have been eliminated upon consolidation. Reclassification Certain prior period amounts included in the consolidated statements

124. Regarding the purported adequacy of the Company's controls and procedures, the 2018 Form 10-K stated, in part, the following:

**Item 9A. Controls and Procedures**

Evaluation of Disclosure Controls and Procedures As required by Rule 13a-15(b) of the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Form 10-K. Our

disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. Based upon the evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures were effective as of December 31, 2018 at the reasonable assurance level.

125. In addition to signing the 2018 Form 10-K, Defendants Meaux and Pringle also signed Sarbanes Oxley certifications that purported to certify and attest to the truth, accuracy, and completeness of the entire Form 10-K. These certifications stated, in part, the following:

1. I have reviewed this Annual Report on Form 10-K of Waitr Holdings Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

126. The statements contained in Waitr's 2018 Form 10-K and the other public statements made by Defendants and reproduced herein, in ¶110 - ¶125 *supra*, were each materially false and misleading when made, and/or omitted to report material facts necessary to make such statements true, accurate and reliable, in light of circumstances that existed at that time, and were known by Defendants to be false at that time, or were recklessly disregarded as such thereby for the following reasons, among others:

(a) At that time it was not true that the Company was performing according to plan and fourth quarter, which was expected to be a seasonally strong quarter (when people stay inside and order food, headed into the Winter), evidenced a significant slowdown in sequential growth, implied negative 2019 EBITDA of ($30 million), material underperformance when

compared to competitors such as Grubhub (while spending increased), and staggering EBITDA losses, which were all endemic of the Company's failing model and dwindling prospects; and

(b)     At that time, while Defendants belatedly disclosed the existence of the two FLSA Class Actions against the Company, Waitr still failed to disclose the extent of this problem and the foreseeable material impact, estimated to be as much as 50% of an employee's compensation and with a profit and loss impact as high as $800 million, that this was likely to have on the Company's earnings and balance sheet;

(c)     At that time, it was not true that the Company was or could become profitable when Defendants had artificially bolstered profits and revenues by unilaterally raising prices in breach of customer contracts, and by failing to properly reimburse drivers for mileage expenses;

(d)     At the time it was not true that the Company was providing its services at a sustainable low take rate established at 15%.  First, Waitr had breached certain customer contracts to force some customers (who had initially contracted to the 10% rate) to adopt at the 15% rate which appears 1.5x higher than then contracted rate.  Second, even at 15% the Company could not possibly operate profitably providing services to small, independent restaurants in remote markets (with no available subsidy provided by large profitable large urban markets), and it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares and as soon as it could take advantage of that market by selling or issuing stock as currency for acquisitions or to raise cash directly from investors in its Secondary Offering;

(e)     At the time it was not true that Waitr was able to extract efficiencies from its full time fixed-rate labor force that was purporting to allow the Company to offer its services

at a lower rate than competitors. In fact, its W2 labor model was inefficient, it resulted in huge costs that could not be sustained (especially, if the Company paid all associated labor costs as required by state and federal law), and it resulted in Waitr reporting the lowest gross margins among its peers—another material competitive disadvantage;

(f)     At the time it was not true that its financial statements and SEC reports or its Sarbanes Oxley certifications were true, accurate or reliable, as Waitr had failed to disclose that it had artificially inflated profits and revenues, that it was unable to sustain itself even with rates twice its current take rates, that it had failed to disclose known adverse trends that were already impacting the Company as required by Item 303 of Regulation S-K [17 C.F.R. § 230.303(a)(3)(ii)], and that the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures;

(g)     At that time Waitr's "proprietary technology" provided little or no competitive advantages and what first-mover advantage the Company claimed existed was quickly squandered by its inability to obtain sophisticated high-level programmers and software engineers who could enable Waitr to refine and develop the software necessary to stay competitive in its market. In fact, at that time, it was only months before Waitr would completely abandon its integrated point of sales software development in favor of purchasing a better solution from a competitor; and

(h)     As a result of the aforementioned adverse conditions that Defendants failed to disclose, at that time Defendants lacked any reasonable basis to claim that the Company was operating according to plan or that Waitr could achieve guidance sponsored and/or endorsed by Defendants. Nor was it true that Waitr maintained an adequate system of internal controls so as to report and eliminate material conflicts of interest.

127. Other than a trademark dispute, the 2018 Form 10-K did <u>not</u> report any lawsuits expected to have a material adverse impact on the Company, other than those occurring in the normal course of business. Accordingly, no mention of the FLSA Class Actions was reported at that time.

128. While Waitr failed to report the FLSA Class Actions, and regardless of the foreseeable material impact on Waitr, a much more serious, third purported class action was filed against Waitr on April 30, 2019 in the United States District Court for the Western District of Louisiana, which was styled *Bobby's Country Cooking LLC v. Waitr Holdings Inc.*, Case No. 2:19-cv-00552-TAD-KK (the "Restaurant Partners' Class Action" ). The Restaurant Partners' Class Action revealed for the first time that ***Waitr had inflated its reported revenues prior to the Going Public Transaction by unilaterally breaking contracts and imposing higher rates on certain of its restaurant customers***. The Restaurant Partners' Class Action seeks damages for breach of contract, violation of the duty of good faith and fair dealing and unjust enrichment.

129. The plaintiff in the Restaurant Partners' Class Action claims to have had a one-year contract with Waitr that provided for a <u>Service Transaction Fee of 10%,</u> that could not be changed or modified absent written agreement of the parties. The Restaurant Partners' Class Action plaintiff further states that Waitr unilaterally, with 30 days' notice, raised its Service Transaction Fee to 15%. The Restaurant Partners' Class Action complaint points out that, "Waitr imposed this unlawful price increase after announcing its acquisition by an investment fund [Landcadia], but shortly before its initial public offering, suggest[ing] an intent to maximize potential revenue with disregard for its contractual obligations to its customers. ... [And] as part of a broad strategy to increase revenue and profit prior to the sale and public offering of the Company."

130.    On May 8, 2019, Waitr filed a Form 8-K with the SEC, which included a press release announcing results for first quarter 2019, the period ended March 31, 2019.  This press release again quoted Defendant Meaux, as follows:

 We are very pleased with our results this quarter, including revenue growth of 287%, which was a combination of Waitr driven organic growth and the successful acquisition of Bite Squad on January 17," said Chris Meaux, founder and Chief Executive Officer of Waitr. "Importantly, we continued to accelerate growth in the markets that we currently serve by increasing restaurant selection and growing our active diner base. During the first quarter, we added more than 3,600 restaurants, more than 240,000 active diners and we continued to expand by adding service to 49 new cities. Our continued rapid growth gives me confidence that we have the right team, the right business model and the right technology in place to optimize our pursuit of the large and growing off premise market in the United States. 2019 is proving to be a transformational year as we invest in continued growth, integrate Bite Squad and make strategic infrastructure investments that will strengthen our foundation and allow us to grow aggressively and efficiently into 2020 and beyond.

131.    The May 8, 2019 press release also provided purported Financial Highlights and Key Business Metrics, as follows:

**First Quarter 2019 Financial Highlights**

•    Revenue for the first quarter of 2019 increased 287% to $48.0 million compared to $12.4 million in the first quarter of 2018. Revenue related to the Bite Squad Merger totaled $22.9 million from the acquisition date through March 31, 2019. On a pro forma basis, revenue for the first quarter of 2019 increased 78% to $52.3 million compared to $29.4 million in the first quarter of 2018.

•    Net loss for the first quarter of 2019 was $24.7 million, or $0.38 per diluted share, compared to a loss of $3.4 million, or $0.34 per diluted share, in the first quarter of 2018. Net loss included $6.9 million of one-time business combination specific expenses related to the Bite Squad transaction and $2.1 million of non-cash stock compensation expenses.

•    Adjusted EBITDA for the first quarter of 2019 was a loss of $9.9 million compared to a loss of $2.1 million in the first quarter of 2018.

**First Quarter 2019 Key Business Metrics**

- Gross Food Sales for the first quarter of 2019 increased 215% to $170.4 million compared to $54.1 million in the first quarter of 2018. Gross Food Sales related to the Bite Squad Merger totaled $70.4 million from the acquisition date through March 31, 2019.

- Active Diners for the first quarter of 2019 increased 309% to 2.2 million compared to 541.9 thousand for the first quarter of 2018. Active Diners related to the Bite Squad Merger totaled 1.1 million as of March 31, 2019.

132. The May 8, 2019 press release also provided purported increased forward guidance and a Full Year 2019 Outlook, as follows:

**Full Year 2019 Outlook**

The combination of our strong start to the year, progress in new markets and most importantly positive momentum in existing markets makes us increasingly confident that we will now exceed our initial pro forma revenue guidance of $250 million.

133. On May 8, 2019, Defendants Meaux and Yurecko hosted a conference call for analysts and investors during which they again conditioned the market to believe that Waitr's purportedly proven business model and robust technology platform were providing Waitr with significant competitive advantages.[25] As evidence of this, Meaux stated, in part, the following:

When we founded Waitr in 2013, we couldn't imagine that the company would become what we are today. Our founding strategy to serve smaller markets in the U.S. continues to pay off. Our business model has proven to be an advantage over competitors in the small and midsized markets that we serve. These markets are won at the local level, and our proven playbook is local market focused. Therefore, national scale is not always an advantage to winning at a hyperlocal layer.

We cater to the wants and needs of the community for consumers and restaurant partners alike. Our technology platform is purpose built to serve restaurants and consumers in small to medium markets. Our routing algorithms are optimized for

---

[25] The level of detail Meaux provided on this call was highly unusual for a quarterly conference call. However, once Meaux turned the call to Defendant Yurecko, he immediately qualified the statements by adding that, "[a]s a newly public company … and given our unique focus on small and midsized cities, we wanted to help you to know our business a little bit better. This will not be a regular presentation, and we do not intend to update or release similar information on a regular basis, but we felt it warranted to share some information just this one time."

getting food to customers by car in the more spread-out geographies, creating leverageable advantages in our business model. …[26]

Our W2 drivers are uniformed and trained to represent our brand to be an extension of our restaurants. This enhances the quality of the experience for both restaurants and consumers. These are all advantages for Waitr over larger competitors in the markets we serve and provide a path for growth for our restaurant partners….

Our hyper-local focus was further expanded with the acquisition of Bite Squad in January.

134. Regarding the success of the integration of Bite Squad—now after a full quarter to assess the situation—Defendant Meaux conditioned investors to believe that the Bite Squad integration was on track and according to plan. As evidence of this, Defendant Meaux stated, in part, the following:

I am happy to report that the integration of the combined company is moving along nicely. We started unlocking the value of integration with the consolidation of the leadership team as reported in February. Since then, we have achieved nearly complete integration of marketing, accounting and sales and have made significant progress toward the integration of restaurant operations, customer support and technology. We expect to achieve full integration in the first half of 2020.

After the Bite Squad acquisition, we now have a hyper-local but national footprint, serving customers in over 700 cities in 29 states, and we continue to expand rapidly and successfully in local markets across the nation. In the first quarter of 2019, we added approximately 50 new cities in three states to the Waitr and Bite Squad footprint, and we now reach a population of more than 30 million Americans….

135. Despite having recently eschewed profitability over growth, on this call Meaux also spoke of the ability to expand margins as the Company also engaged in hyper-inflated growth. As evidence of this, Meaux stated, in part, the following:

---

[26] Evidence of the irrelevance of Waitr's purported unique algorithm optimization is demonstrated by Defendants' ultimate decision to turn over the reins of the Company to a 34-year-old logistics company operator whose only experience is with delivery logistics in New York City. Not that logistics experience is not valuable, but all routing algorithms are optimized for their environments and Waitr had no special software advantage—as it was outsourced to Olo—that provided it with any real competitive advantage, as Meaux falsely claimed.

What's even more exciting than the opportunity for sales is our opportunity for margin expansion as margins -- as markets scale.

Gross margins will improve with scale due to large levers on take rate and operating cost side of our business. We believe this illustrates the tremendous opportunity we have for growth in 2019 and beyond. In the hyper-local markets in which we operate, Waitr has a clear leadership position, and our sales continue to grow at a rapid pace. Not only are our sales continuing to grow, but the strength and commitment of our customers is strong.

At the end of Q1, we had over 2.2 million Active Diners, and we're serving more than 57,000 orders per day. Moreover, the order frequency of our customers has been increasing every year. This provides us with an attractive undercurrent for growth, which is not generally affected by economic conditions, our level of marketing spend or our growth in surrounding markets. We see clear and proven opportunities to further improve the cohort behavior, both at Waitr and Bite Squad, to supersize the recurring growing streams of orders and revenue.

136.    Defendant Meaux also used the opportunity of this conference call to reiterate Waitr's purported forward-looking guidance, in part, as follows:

While we are beginning to gain more visibility into the seasonality of our business, we foresee strong growth for the remainder of this, year particularly in the second half of the year and into 2020. A combination of our strong start to this year, progress in new markets, and most importantly, positive momentum in existing markets makes us increasingly confident that we will now exceed our initial pro forma revenue guidance of $250 million. By leveraging our continued growth, our W2 business model, restaurant partnerships and our consistently repeatable local market profitability, we are targeting long-term EBITDA margins of 20%. One only needs to look at the profitability of our top 10 markets to see a path to long-term profitability.

In conclusion, we believe opportunities abound for Waitr's continued growth in 2019 and beyond. In the coming months, we will provide more insight into our future plans around our vision for the future, as outlined in last quarter's call.

137.    Turning the call over, Defendant Yurecko reiterated guidance and added that his expectation at that time was that Waitr would exceed guidance. According to Yurecko, "the combination of our strong start to the year, progress in new markets, and most importantly, positive momentum in existing markets makes us increasingly confident that we will now exceed our 2019 revenue guidance of $250 million."

138.     Once the conference call was opened to questions, analyst Alex Fuhrman, from Craig-Hallum, immediately asked whether the influx of competition into once unchallenged markets was raising the "cost of acquiring" customers.  To this, Defendant Meaux responded that Waitr had a much lower cost of acquiring customers from its own network, such that the Company was "still acquiring a large percentage of our customers there."  Defendant Yurecko added that, "the majority of our customers still come in via organic means rather than paid media, so there is a natural increase in CPA when more dollars are spent because paid media is going to bring in a higher share of customers versus the organic customers."

139.     Next, Daniel Louis Kurnos, analyst from the Benchmark Company, LLC, asked whether Waitr was "seeing any take rate pressure or concern about take pressure in [Waitr's] small or mid-tier markets."  Meaux's reply focused entirely upon the benefits purportedly achieved by having "fixed cost per hour for [Waitr's] drivers," and how that created competitive advantages that allowed Waitr to maintain its low rates.

140.     When asked by Kurnos what the effect of increased competition by deep-pocket competitors willing to lose money in small markets to gain market share (but who are profitable in large markets and who could afford to spend and even lose money and still fund growth holistically within its organization), when "somebody comes in and dumps a whole bunch of spend into a market."  Defendant Yureckos' response was that "it's not a winner take all marketplace," and that such increased spending by competitors raises awareness of on-line food delivery and that, "as the incumbent-entrenched market leader," the Company is the "beneficiary" of such direct competition.

141.     Analyst Kurnos also asked whether losses were foreseeably likely to accelerate as the Company grew incrementally along the then current organic trajectory of its business.  To

this Defendant Yurecko responded that it was foreseeable only that, "over time, it would be reasonable for that [*i.e.*, losses] to come up a <u>little bit</u>."

142.    When asked by Jefferies analyst, Brent John Thill, generally about market conditions and whether the market would encourage restaurants "capable of supporting a handful of platforms."   Defendant Meaux responded by distinguishing Waitr based on its lower prices and better technology.   As evidence of this, Meaux stated, in part, the following:

> [T]he reality is, is that when we're entrenched in the market and a competitor comes in the market, it really doesn't matter how much money they spend. They still have to get the restaurant supply.   And without the restaurant supply, you don't attract consumers.
>
> \*   \*   \*
>
> And the other thing about it, too, Brent, is our platform.   Our technology platform is purpose-built for these kinds of markets.   So -- and this maybe is a part to the answer to the last question that Jeff was talking about as well.
>
> So if you take a platform that is built for stacking orders in major markets that allows you to deliver four or five orders in a high-rise at onetime and you try to put it in an area where orders might be four miles apart, it just doesn't work.[27] And so by having a purpose-built platform for the kinds of markets that we operate in, having the significant share of the restaurants in that market -- and remember, most of the restaurants in these markets are independent, not chains. That's very different than in a major market where you would have thousands of chain restaurants.   In the markets we serve, it's kind of 15 maybe.
>
> And in the biggest of markets that we serve, maybe 100.   So it takes the independence in order to make it work.   And so what we have found is that competitors have had a hard time signing up independent restaurants.   That gives us an advantage.

143.    When analyst Thill asked about the Company's ability to become profitable, Meaux again responded that, ***"when we did the Landcadia transaction, we were just a few hundred thousand dollars a month away from profitability***.   In the case of Bite Squad, they had already been profitable at some period.   So ***we know how to get this business profitable***…. And

---

[27] Within 3 months the CEO making this statement would be replaced by a new CEO whose only relevant experience was running a logistics company servicing New York City for only five years.

so if we stop expanding, if we -- or stop opening new markets, not so much stop expanding because most of our growth is coming from existing markets anyway. But if we just stopped opening new markets, it wouldn't take us long to find profitability."

144. Analyst Howard Wells Penny of Hedgeye Risk Management LLC asked about the Company's cash burn and its need to raise capital. Defendant Yurecko responded that the Company's position had not changed since the prior call and that, "we built our guidance plan without the need to raise capital. So we hold to that and that's our plan for the year." Yurecko qualified that by stating that if an M&A opportunity existed and if there was an opportunity in the capital markets at the right price, Waitr would foreseeably raise money under those circumstances. Defendant Meaux drew attention to the fact that Waitr had already filed a shelf registration in early April 2019, so that shares could be sold to fuel "additional growth, other than our organic growth, which is so strong."

145. Finally, when asked by analyst Thill what the most significant keys to unlocking Defendants' long-term +20% EBITDA forecasts, Meaux responded that, "most particularly, the complete integration of the technology platforms for the two companies [Bite Squad and Waitr]. Now that's later this year or into next year, but once we achieved full integration of that platform, there is significant leverage that will have been achieved at that point."

146. On May 10, 2019, Waitr filed its Form 10-Q with the SEC and announced its financial results for the first quarter of 2019, the period ended March 31, 2019. This Form 10-Q was signed by Defendant Yurecko and certified by Defendants Meaux and Yurecko. The first quarter 2019 Form 10-Q was substantially similar, and contained the same or similar representations as Waitr's 2018 Form 10-K regarding: (i) the Basis of the Company's Financial Reporting and Compliance with GAAP (*see* ¶123 *supra*); (ii) the suitability and viability of

Waitr's controls and procedures (*see* ¶124 *supra*); and (iii) the veracity of the Sarbanes Oxley certifications signed by Defendants Meaux and Yurecko (*see* ¶125 *supra*). The first quarter 2019 Form 10-Q again reported the trademark litigation, and added disclosure regarding the FLSA Class Actions. The first quarter 2019 Form 10-Q did <u>not</u> mention the Restaurant Partners' Class Action.

147. The statements contained in Waitr's first quarter 2019 Form 10-Q and the other public statements made by Defendants and reproduced herein, in ¶146 *supra*, were each materially false and misleading when made, and/or omitted to report material facts necessary to make such statements true, accurate and reliable, in light of circumstances that existed at that time, and were known by Defendants to be false at that time, or were recklessly disregarded as such thereby, for the reasons stated herein, in ¶146 *supra*. Waitr had failed to report the Restaurant Partners' Class Action filed against the Company, which made serious allegations against Waitr for inflating its revenues and earnings prior to going public, as well as posed a huge potential liability for the Company.

148. These statements made by Defendants during the first quarter 2019 conference call were also materially false and misleading and were known by Defendants to be false or were recklessly disregarded as such thereby, because:

(a) Waitr's business model was broken and it would be impossible for it to achieve projected financial results sponsored or endorsed by Defendants unless drastic and risky changes were made. In fact, as Defendants knew or recklessly disregarded, by May 2019, the problems arising from Bite Squad merger were so significant that management had already become distracted in attempting to integrate the incompatible Bite Squad and Waitr platforms,

which then significantly impacted operations and delayed a planned roll out an adjusted Master Services Agreement to restaurants on the Waitr platform;

(b)     Defendants failed to disclose that they were planning to update Waitr's Master Services Agreement and that it was already necessary to impose large and drastic price increases in order to remain solvent, which would materially and adversely affect a large number of restaurants on the Waitr platform.  At no time did Defendants ever disclose that these changes would move restaurants to a performance-based pricing program, which was unprecedented in the industry and which imposed material risk that the new agreement would alienate its restaurant partners or result in the outright rejection of the new terms; and

(c)     By May 2019 at the latest, Defendants knew that the integration of Bite Squad and Waitr were not proceeding according to plan and that the companies had completely diverse marketing leadership teams with different customer acquisition strategies.  Thus, Defendants knew that because management resources were preoccupied with problematic integration and organizational alignment of Bite Squad, they could not manage and were not managing the changes to the Master Service Agreement and effectively overseeing other areas of the business.

149.    Despite having said that Waitr was well-capitalized and did not need to raise money, and despite not having mentioned any possible acquisitions that needed to be financed, on May 16, 2019, Waitr sold $50 million worth of common stock in the open markets, pursuant to the Secondary Offering Filings.

**Materially False and Misleading Statements**
**Made in Waitr's Secondary Offering Filings**

150.    In connection with the Secondary Offering of almost 7 million more shares of Waitr stock, Defendants (including Jefferies as an underwriter) prepared and disseminated

materially false and misleading Secondary Offering Filings that contained false statements of material facts and that omitted to disclose material facts necessary to assure that statements contained therein were true, accurate and reliable at that time. In addition to making other representations about Waitr, the Secondary Offering Filings stated that the Company's financial statements and SEC reports were filed in accordance with GAAP, as follows:

**Basis of Presentation**
The Landcadia Business Combination was accounted for as a reverse recapitalization, with no goodwill or other intangible assets recorded, in accordance with GAAP. Under this method of accounting, Landcadia Holdings, Inc. has been treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the Landcadia Business Combination was treated as the equivalent of Waitr Incorporated issuing stock for the net assets of Landcadia Holdings, Inc., accompanied by a recapitalization. ...

The Bite Squad Merger was considered a business combination, in accordance with GAAP, and was accounted for using the acquisition method. Under the acquisition method of accounting, total merger consideration, acquired assets and assumed liabilities are recorded based on their estimated fair values on the acquisition date. The excess of the fair value of merger consideration over the fair value of the assets less liabilities acquired has been recorded as goodwill. The results of operations of Bite Squad have been included in our consolidated financial statements since the acquisition date, January 17, 2019.

151. In addition, as to the Company's GAAP compliance, the Secondary Offering Filings also represented that Critical Accounting Policies and Estimates were in effect, as follows:

**Critical Accounting Policies and Estimates**
The preparation of financial statements in accordance with GAAP requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period, along with related disclosures. We regularly assess these estimates and record changes to estimates in the period in which they become known. We base our estimates on historical experience and various other assumptions believed to be reasonable under the circumstances.

\* \* \*

Other than the changes disclosed in *Note 2—Basis of Presentation and Summary of Significant Accounting Policies* to our unaudited condensed consolidated financial statements included in our Quarterly Report, which is incorporated by reference herein, there have been no material changes to our critical accounting policies and estimates described in our Annual Report, which is incorporated by reference herein.

152.    While Waitr reported no material change in its critical accounting policies or estimates, one change that did appear in the Secondary Offering Filings was Waitr's description of its competitive advantage based on lower pricing. Whereas Waitr had theretofore promoted the Company's basic strategy as being a "low-cost leader" in providing services to underserved markets with a sustained take rate of 15%, suddenly Waitr reported that its competitive advantage was based on "Flexibility Around Price Point," which was explained as providing restaurant customers price flexibility, evidenced by "charging restaurants under two fee models: (1) with an initial setup and integration fee and partnership level pricing, and (2) with a higher fee rate and no upfront setup and integration fee." This change in emphasis to "flexibility" rather than cost-savings was obscured by the fact that the two-tiered pricing alternative highlighted existed throughout the Class Period and marked no change in corporate strategy regarding pricing models.

153.    A more serious defect of Waitr's Secondary Offering Filings, however, was its inadequate and generic risk disclosures that were not designed to fully disclose, nor did they provide investors with an understanding of, the true risks of investing in Waitr at that time. These purported Risk Factors were either false and misleading or omitted to disclose material facts necessary to make them true and accurate in light of circumstances existing at that time. While there are approximately 24 pages of Risk Factors in the Secondary Offering Filings, the majority of these disclosures are generic in form and apply to investing in any stock anywhere on earth, and/or they fail to disclose the actual risks facing investors and, repeatedly, state that

adverse conditions that were <u>already</u> impacting Waitr were merely potential contingent risks that could possibly impact Waitr at some unknown future time.

154.    The list of generic purported Risk Factors contained in the Secodary Offering Filings is purposefully too long to reproduce, as it was designed to obfuscate rather than inform investors of the true risks of investing in the Company at that time.   An example of such statements includes, in small part, possible injury resulting from the following:

- If the use of the Internet and websites do not continue to increase as anticipated.

- Changes in mobile operating systems, over which Waitr has no control.

- Disruption to its service by forces within and beyond the control of Waitr.

- Waitr could become a payment processor and could face compliance issues.

- Risks related to the acceptance of credit and debit card payments.

- Impact on Waitr if third-party vendors fail to perform.

- Major hurricanes, tropical storms or other instances of severe weather.

- Increases in costs.

- Employee Unionization.

- Compliance with the reporting requirements of the Exchange Act and the Sarbanes Oxley Act might strain resources, increase costs and distract management.

- Reliance on search engines (*i.e.*, Google) subjects Waitr to risk of termination of services.

155.    Other identified Risk Factors contained in the Secondary Offering Filings that were either generic in scope or predominately beyond Waitr's control, included in part, the following:

- industry or general market conditions;

- domestic and international political and economic factors unrelated to our performance;

- action by institutional stockholders or other large stockholders, including sales of large blocks of common stock;

- speculation in the press or investment community;

- changes in investor perception of us and our industry;

- changes in market valuations or earnings of similar companies;

- announcements by us or our competitors of significant products, contracts, acquisitions or strategic partnerships; [and]

- changes in applicable laws, rules or regulations, regulatory actions affecting us and other dynamics.

156. The order of importance in which the risks were disclosed belies Defendants' attempts to minimize them. The first risk in the Risk Factor section that purports to directly address the Company relates to "general economic and business risks that are largely beyond our control," the same generic risks related to "availability of disposable income" one would endure by investing almost anywhere and into almost anything.

157. In addition to the foregoing "disclosures," which were intended to misdirect investors, other statements that purported to be Risk Factors failed to disclose that the purported risk identified as a possible future contingency was <u>already</u> materially and adversely impacting the Company, such that the purported disclosure itself was materially false and misleading. Examples of such inadequate and false and misleading Risk Factors included the following:

- We may not be able to accurately forecast revenues and plan operating expenses;

- We may be unable to scale our technological and operational infrastructure to accommodate rapid growth in diners, orders or customer support needs;

- Our management team has had limited experience operating a public company and could be unable to transition from a developmental stage business to a larger organization;

- Our growth may depend on acquisitions, and our management team does not have significant experience managing acquisitions of other businesses;

- The relatively quick transition to a public company could pose operational, financial and quality risks that we are unable to manage effectively;

- Our ability to attract and retain restaurants over long periods of time has not been tested in several markets;

- Increases in marketing, sales, and other operating expenses that we may incur to grow and expand our operations and to remain competitive are unpredictable;

- Our ability to maintain gross margins and operating margins can be difficult to predict and impacted by numerous factors beyond our control (for example, due to transaction charge increases, technology cost increases, and other items);

- Internal controls, especially in light of the accelerated process with respect to the Landcadia Business Combination and Bite Squad Merger, may not keep pace with necessary requirements from a business, accounting or legal point of view.

158.    While there are few purported Risk Factors that are specific to Waitr, stating that "[t]he loss of restaurants to the Platforms could seriously harm our business" is not a disclosure as to possible negative outcomes in the future, but rather a verbalization of the necessary effects of breaking contracts with clients, unilaterally raising prices, and then preparing for massive price increases that foreseeably would, and immediately did, alienate the core base of the Company. To report as a risk that, "restaurants could leave the Platform, reducing revenues" at the time that Defendants had unilaterally raised prices and were making it uneconomical for small restaurants in remote markets to use Waitr's service is not adequate or designed to inform investors as to the true risk of investing in the Company at the time that Secondary Offering Filings were issued.

159.    Purported Risk Factors that said Waitr "may not continue to grow at historical growth rates or achieve profitability in the future" or that Defendants "inability to manage growth and meet demand could harm … operations and brands" were not contingencies, but rather facts and foregone conclusions, at that time.

160.    Again, it is telling that the most significant and specific purported Risk Factors related to Waitr appear approximately about 22 pages into Secondary Offering Filings, and

approximately 10 pages into the other purported Risk Factors.  The Secondary Offering Filings states, in part, that:

> ***Our industry is highly competitive and fragmented, and our business and results of operations may suffer if we are unable to adequately address downward pricing and other competitive pressures.***
>
> These factors include the following:
>
> - The continuing trend toward consolidation in the online and mobile app ordering and delivery industry may result in larger companies with greater financial resources and other competitive advantages, and we may have difficulty competing with them;
>
> - Advances in technology may require us to increase investments in order to remain competitive, and our restaurant diners and consumers may not be willing to accept higher onboarding fees, service fees, take rates or delivery charges to cover the cost of these investments;
>
> - Higher fuel prices and, in turn, higher fuel surcharges to our drivers may cause some of our drivers to demand higher wages or otherwise result in additional expense to us for reimbursement of mileage to drivers;
>
> - We may have higher exposure to litigation risks as compared to other providers of delivery services; and
>
> - Restaurants could develop their own online or mobile app food ordering and delivery technology and hire their own drivers to make their own deliveries, which could reduce demand for our services to restaurants and limit choices for consumers, reducing the number and frequency of orders using our technology.

161.    Similarly buried on the following page was a purported disclosure regarding the Company's technology, purporting to warn investors that Waitr faced "substantial competition in technology innovation and distribution" and that <u>if</u> the Company was "unable to continue to innovate … operations could materially suffer."  Waitr acknowledged that it "must continually innovate" to improve existing platform technology, yet failed to disclose that larger and more established companies, as well as smaller companies who were also developing products, features, and services similar to Waitr, were achieving greater market acceptance and providing

80

more far-reaching and successful product development efforts and marketing campaigns, and were adopting more aggressive pricing policies, such that Waitr was already finding it very difficult to continue to develop software that was necessary to stay competitive in its market.

162.     As investors would learn in the coming months, these purported risk "contingencies" were, in fact, actualities <u>already</u> negatively impacting Waitr at the time of the Secondary Offering and throughout the Class Period.

163.     Similarly, purported Risk Disclosures related to the integration of Bite Squad were also misleading, in failing to disclose that the purported risk contingencies related to the integration of a company of equal size, that was composed itself of 17 other companies, that was regionally diverse and not contiguous and which was itself facing serious internal problems resulting in slowing growth and integration issues, were in fact, negative actualities that were <u>already</u> impacting Waitr.  Rather than disclose the problems that already existed with the Bite Squad integration, Defendants incorporated the following Risk Factors disclosure that disguised these problems by presenting them as mere possibilities or future contingencies, as follows:

### *The following are risks related to the Bite Squad Merger:*

- Combining the two companies may prove to be more difficult, costly and time consuming than expected, which could cause us not to realize some or all of the anticipated benefits and synergies of the Bite Squad Merger.

- The Bite Squad Merger will involve substantial non-recurring costs, including significant transaction costs, regulatory costs and integration costs, such as facilities, systems and employment-related costs, and we may incur unanticipated costs or unknown liabilities which may be significant. Although we expect the elimination of duplicative costs and other cost synergies from operational and functional efficiencies following the integration of the two companies to exceed integration costs over time, we may not be able to achieve this result as quickly as anticipated or at all, particularly if we are not able to realize some or all of the anticipated benefits and cost savings from the acquisition.

- The Bite Squad Merger may disrupt our or Bite Squad's businesses, which may harm our respective businesses and impact our respective abilities to retain customers.

164.    As investors would learn in the coming months, these purported risk contingencies related to the "Bite Squad Merger" were, in fact, actualities already negatively impacting Waitr at the time of the Secondary Offering and throughout the Class Period.

165.    In addition to the foregoing, Waitr also omitted to disclose risks that were material to investing in Waitr during the Class Period.  Primarily, by using the SPAC structure in the acquisition of Old-Waitr by Landcadia, shareholders were subjected to unique risks related specifically to that structure that were required to have been disclosed.  Specifically, given the time constraint imposed on the Waitr acquisition, additional risk disclosures were required alerting investors to the heightened risk of being acquired by an expiring SPAC.   In addition, the risk disclosures in the Secondary Offering Filings were materially misleading as a result of omitting to warn of the significant additional risks that a fully employed driver staff imposed upon Waitr, including that it required very complex forecasting software to be able to determine before-hand what the market demands will ultimately be. At all times, the W2 model required Waitr to forecast demand, whereas competitors' 1099 models allow them to simply react to market demand by adding or subtracting labor supply at any time (by adjusting the bid on labor rates).

166.    The claims related to the false statements made in the Secondary Offering Filings are based in negligence and they do not sound in fraud.  Defendants were required to assure that statements contained in the Secondary Offering Filings, or incorporated therein by reference or which were filed as amendments or exhibits thereto, were true, accurate and reliable and did not contain any untrue statement of a material fact or omit to include material facts necessary to make the statements contained therein not materially false, at that time.

167.     As investors ultimately learned following the end of the Class Period, the statements contained in or incorporated in the Secondary Offering Filings, referenced above in ¶150 - ¶163 *supra*, were each materially false and misleading at that time, for the following reasons, among others:

(a)     At the time of the Secondary Offering, it was not true that the Company could obtain profitability and could easily switch from growth to profits, when Defendants had artificially bolstered profits and revenues by unilaterally raising prices in breach of customer contracts and by failing to properly reimburse drivers for mileage expenses;

(b)     At the time of the Secondary Offering, it was not true that the Company was providing its services at a sustainable low take rate established at 15%.  First, Waitr had breached certain customer contracts to force some customers (who had initially contracted to the 10% rate) to adopt at the 15% rate which appears 1.5x higher than then contracted rate.  Second, even at 15% the Company could not possibly operate profitably providing services to small, independent restaurants in remote markets (with no available subsidy provided by large profitable large urban markets), and it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares and as soon as it could take advantage of that market by selling or issuing stock as currency for acquisitions or to raise cash directly from investors in its Secondary Offering;

(c)     At the time of the Secondary Offering, it was not true that Waitr was able to extract efficiencies from its full time fixed-rate labor force that was purporting to allow the Company to offer its services at a lower rate than competitors, when in fact its W2 labor model was inefficient, it resulted in huge costs that could not be sustained (especially, if the Company

paid all associated labor costs as required by state and federal law), and it resulted in Waitr reporting the lowest gross margins among its peers—another material competitive disadvantage;

(d)     At the time of the Secondary Offering, it was not true that its financial statements and SEC reports (including its Sarbanes Oxley certifications) were true, accurate or reliable, as Waitr had failed to disclose that it had artificially inflated profits and revenues, that it was unable to sustain itself even with rates twice its current take rates, that it had failed to disclose known adverse trends that were <u>already</u> impacting the Company as required by Item 303 of Regulation S-K [17 C.F.R. § 230.303(a)(3)(ii)], and that the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures;

(e)     At the time of the Secondary Offering, the purported Risk Factors were not true, accurate or reliable and were not intended to disclose, nor did they alert investors to the true risks that were already impacting the Company at that time, and Defendants knew such purported disclosures were  materially false and misleading when made and omitted to disclose material facts necessary to make such statements not false and misleading, or were recklessly disregarded as such thereby for the specific reasons stated in ¶152 - ¶166 *supra*;

(f)     At the time of the Secondary Offering, Waitr's "proprietary technology" provided little or no competitive advantages and what first-mover advantage the Company claimed existed was quickly squandered by its inability to obtain sophisticated high-level programmers and software engineers who could enable Waitr to refine and develop the software necessary to stay competitive in its market.  In fact, at that time, it was only months before Waitr would completely abandon its integrated point of sales software development in favor of purchasing a better solution from a competitor; and

(g)    As a result of the aforementioned adverse conditions that Defendants failed to disclose, at the time of the Secondary Offering, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Waitr could achieve guidance sponsored and/or endorsed by Defendants.  Nor was it true that Waitr maintained an adequate system of internal controls so as to report and eliminate material conflicts of interest.

168.    Due to the aforementioned false and misleading statements Waitr's stock price was artificially inflated.  Indeed, at the beginning of April 2019, shares of Waitr consistently traded above $12.00, however, by early June 2019, Company shares traded as low as approximately $5.50 each.  Thus, in an effort to re-inflate the trading price of Waitr shares, Defendants Meaux and Yurecko immediately embarked on a multi-city investor conference tour, appearing at no less than 4 conferences between May 29 and June 18, 2019, during which they reiterated many of the same or substantially similar materially false and misleading statements as have been reproduced herein.  These conferences included the following: on May 29, 2019, Meaux attended the Cowen Technology, Media and Telecom Conference in New York, N.Y.; on May 29, 2019, Yurecko attended the 16th Annual Craig Hallum Institutional Investor Conference in Minneapolis, Minn.; on 6, 2019, the Company attended the 39th Annual Piper Jaffray Consumer Marketplace Conference in New York, N.Y.; and on June 18, 2019, the Company presented at the Jefferies 2019 Consumer Conference in Nantucket, Mass..

169.    On May 16, 2019, Waitr filed a Form 8-K with the SEC, which included a press release announcing the pricing of its follow-on public offering of 6,757,000 shares of its common stock at a price to the public of $7.40 per share (the "Offering") resulting in gross proceeds of $50.0 million.  According to this release, Waitr had also granted Jefferies a 30-day

option to purchase up to an additional 1.01 million shares of Waitr common stock. Jefferies served as an underwriter and co-book running manager.

170. On May 21, 2019, shares of Waitr rallied over 2% in active daily trading after it was reported that Defendant Meaux had purchased $1 million of Waitr stock at $7.40 per share in the Secondary Offering. It was also reported that director Steven Scheinthal had purchased 10,000 shares the same day, at a price of $6.80 per share. In Form 4(s) filed May 21, 2019, Meaux reported buying 135,135 Waitr stock at $7.40, as part of a follow-on the Offering. While the offering was priced at $7.40, Waitr stock price closed the day at $6.85, and it appears that director Scheinthal bought 10,000 shares at $6.80 on price weakness.

171. The fact the market believed that Defendant Meaux had purchased Waitr shares as an expression of confidence in the Company is extremely troubling, given that it is obvious that Meaux stepped in and purchased $1 million Secondary Offering shares at the $7.40 offering price because there was <u>no demand</u> for Waitr shares at that time and Defendants were frantically trying to unload the Secondary Offering shares without alerting the market. It was a material non-disclosure for Defendant Meaux to provide price support to the Secondary Offering and to fail to disclose that his purchases were necessary to prevent this offering from failing and being undersubscribed.

172. One can reasonably infer Defendant Meaux's actions from several known facts. First, Jefferies did not exercise the oversubscription option. The 1.01 million shares that would have been placed into the market if Jefferies has exercised the oversubscription are not reflected in Waitr's Form 10-Q for the period ended June 30, 2019. This indicates a significant lack of demand for Waitr shares at $7.40. Second, there is no mention of Meaux's intention to purchase the $1 million of Waitr shares in the Company's Form 454(b)(5) Supplemental Prospectus, filed

with the SEC on May 17, 2019, the day after the Secondary Offering was priced, nor once selling had begun. Third, there is no mention of any insider buyers in the Supplemental Prospectus, filed on May 17, 2019, the day <u>after</u> the Offering was priced and once selling had begun. And fourth, shares of Waitr closed trading at $6.85 the day of the Secondary Offering—well below the $7.40 Secondary Offering price.

173. The fact that the Secondary Offering was floundering to the point where Defendants were scrambling to find buyers, and knowing that Meaux would probably have to become one of them, also made statements within the Secondary Offering Filings materially false and misleading, including statements that continued to forecast the foreseeable gross consideration that Waitr could foreseeably expect from Jefferies exercise of its oversubscription option, when it had already become foreseeable that there was little or no possibility that would occur. Accordingly, at the time Defendants filed the Form 424(b)(5), on May 17—a day <u>after</u> the Secondary Offering had begun—it was materially false and misleading to report that Waitr would receive $53.8 million "[i]f the underwriters exercise in full their option to purchase additional shares."

174. In the moments before investors would learn the truth about Waitr and while still basking in the glow of his purported first success and after an almost lifetime of failure, on May 24, 2017, it was announced that Defendant Meaux had been named a finalist for Gulf Coast Entrepreneur of the Year. While Defendant Meaux was later named Regional Entrepreneurs of the Year for the Gulf South, on June 25, 2019, he would not make it to the inauguration dinner before he was terminated as CEO of Waitr.

175. On June 12, 2019, the Company filed a Form 8-K with the SEC that purported to announce that Adam Price had been elevated to the position of Chief Operating Officer ("COO")

of the Company.  Price had only recently joined Waitr in February 2019, as Chief Logistics Officer.  Upon his appointment, Joseph Stough, who had been appointed President and COO in November 2018, would remain President only, with no reduction in compensation.  Notably, the press release by the Company and published the same day made no mention of the fact that Price was only 34 years old and had very limited experience, the most relevant of which was a five year stint as CEO of a Metro New York based logistics company he founded.[28]

### The True Adverse Facts About Waitr and Conditions Adversely Impacting the Company Belatedly Become Disclosed

176.     On July 5, 2019, Waitr announced a massive price increase that was considerably disadvantageous to small restaurant operators in remote "underserved" markets.[29]  That day, Waitr announced that commissions were being raised from 15% to 25% for its smaller customers—but would remain at 15% for individual locations that generated over $20,000 per month of delivery—an astronomically large sum for any restaurant in a low-tier market, much less a small restaurant in such a market.  Waitr's bracketed approach imposed the following dramatic rate increases:

| Bracket | Rate* |
|---|---|
| $1,000.01  -  $2,000 | 24.5% |
| $2,000.01  -  $3,000 | 24.0% |
| $3,000.01  -  $4,000 | 23.5% |
| $5,000.01  -  $7,500 | 23.0% |
| $7,500.01  - $10,000 | 22.0% |
| $10,000.01 - $12,500 | 21.0% |
| $12,500.01 - $15,000 | 20.0% |
| $15,000.01 - $20,000 | 19.0% |
| Above  $ 20,000.01 | 15.0% |

---

[28] In total, it appears that Mr. Price's resume consists of approximately 6 years work at an engineering company, 5 years as CEO of Homer Logistics in Metro N.Y., and 3 months as Chief Logistics Officer ("CLO") at Waitr.

[29] *See*  https://www.wafb.com/2019/07/08/waitr-increases-rates-participating-businesses/  (last visited Sept. 26, 2019).

**\* plus an additional 3% for Credit Card Processing Fees**

177.    This massive price increase, which Defendants knew was necessary since the inception of the Class Period, was evidence that Waitr could not supply delivery services at prices that small restaurants in secondary markets could reasonably afford.  The price increase also demonstrated that Waitr was not achieving any competitive advantage as a result of utilizing full time driver labor that would allow it to maintain price stability at 15%.  In fact, these price increases were designed to drive away Waitr's core clients who were not profitable for Waitr and who could not afford non-subsidized services, and to avoid refunding any of the onboarding and set up fees that Waitr had charged.

178.    Having purported to have built Waitr into a thriving success based on a business model predicated upon providing low priced delivery services to small, sole proprietor "restaurant partners" in underserved remote markets, there was an immediate and almost hostile reaction by restaurant operations, especially Waitr's early adopters located in and around its headquarters and home-town.  On July 7, 2019 just days after announcing the price increases it was reported in the local press that at least 20 restaurant owners planned to protest Waitr's new "performance based rate structure" by boycotting the delivery platform.[30]  These boycotters broadcasted their intentions with hopes that other restaurant owners and Waitr customers would join in and support their protest over these draconian price increases.[31]

---

[30] *See* https://www.theadvocate.com/acadiana/news/business/article_c26bf0b2-a197-11e9-93b3-cf9a8504c97c.html (last visited Sept. 26, 2019).

[31] It was Zee Baloch, who was reported to own Hot Food Express, was "leading the effort" to get Waitr to "be fair" to its restaurant partners. This was remarkable, because of Waitr's tens of thousands of restaurant partners, it was Hot Foods Express that Meaux singled out in the first quarter of 2019 conference call as the shining example of a Waitr success, having generated such strong additional sales by adding Waitr that it was able open a second location.           *See*           https://www.theadvocate.com/acadiana/news/business/article_0802a05c-a7fc-11e9-8bce-f7ca252cde1c.html (last visited Sept. 26, 2019).

179. Reacting to the July 1, 2019 email they received as unilateral notice of the drastic price increases and that demanded signed consent or termination within 30 days, by July 8, 2019, it was reported that restaurant owners in Baton Rouge, Louisiana were threatening to leave Waitr.[32] Chris Ko, owner of Drunken Fish in Baton Rouge, was quoted in the local press as stating that there was no way he could make enough sales to cover the new pricing costs and not lose money.[33] Another Baton Rouge restaurant owner, also quoted, summed up the situation—noting Waitr's inability to make money in the markets it was now seeking to abandon—as follows:

> Ray Vanmerrienboer, who heads Red Zeppelin Pizza, says he's not sure if he'll stick with the company or not. He says … he understands how the smaller mom and pop shops can't survive this way and says that because Waitr is now public, they're trying to force those people out
>
> "Because they've gone public, they're all about profit," Vanmerrienboer said. "They're all about margins and they've got to cut off people who are costing them money in the long run. Small businesses are starting to cost them money 'cause they've got to make their quotas every quarter and they've got to start trimming the fat, and in doing so, they're going to pressure those people to get out and then they're gonna' flip it to people who are in."

180. The one day boycott in Lafayette soon became a week-long boycott in Baton Rouge, as restaurant owners voiced their displeasure and challenged Waitr to re-adjust its terms. In an extraordinary demonstration of the seriousness of Waitr's price increase impact on the

---

[32] Despite engaging in systematic unilateral price increases (whether in violation of their agreements or in technical compliance therewith), National Sales Director for Waitr, Tyson Queen, stated, "[t]he last thing we want to do is just serve notice and tell people to just deal with it." *See* https://www.theadvocate.com/acadiana/news/business/article_c26bf0b2-a197-11e9-93b3-cf9a8504c97c.html (last visited Sept. 26, 2019).

[33] *See* https://www.wafb.com/2019/07/09/baton-rouge-restaurants-threaten-leave-waitr/ (last visited Sept. 26, 2019)

viability of these small restaurant owners in remote locations, **Baton Rouge Turns Off Waitr Week** was scheduled from July 14 to 21, 2019.[34]

181.    While Meaux defended the price increases by stating that, "if we're bringing the Company $5,000 in sales, and they're paying us $1,150, it's still sales they wouldn't have … ." Defendant Meaux was clearly conflating gross sales and net revenues.  For a normal restaurant that might have a 10% or 15% margin on food, that $5,000 in sales represented a profit of at most $750 to the restaurant.  With Waitr's $1,150 delivery fee, the benefit of the added sales results in a *loss* to the restaurant partner of $400.

182.    Meaux's other rationale for the price increases was that it simply forces restaurant partners to consolidate their sales on one single platform, and allows Waitr to give volume discounts.  That, however, completely ignored the fact that restaurants have no control over how customers will order, including the traditional over the phone method, and unless restaurants simply refuse to adopt all other delivery services in favor of Waitr, which would have the effect of substantially limiting their overall reach to customers who are on other apps, restaurants cannot possibly force customers to use the Waitr app.  Waitr was simply attempting to shift the burden for keeping and retaining customers onto the restaurants, instead of simply competing in the market and maintaining its purported first mover advantage by rolling out better services and technologies and creating more efficiencies with better forecasting and lowering prices.

183.    In the days and weeks that followed, news reports regarding small restaurant partners' expressions of betrayal and discontent appeared widely in the press.  Restaurant owner after restaurant owner recounted how the economics of their business do not allow for them to pay 25% delivery fees when operating on a margin under 15%.  The message was repeatedly

---

[34] Zee Baloch of Hot Foods Express was quoted in the press as saying that she wanted to "salute" the Baton Rouge Boycotters.        *See*     https://www.theadvocate.com/acadiana/news/business/article_0802a05c-a7fc-11e9-8bce-

clear, "We can't give our food away. We can't give away that big a percentage … . [These] are conditions under which we cannot operate."[35] (Bradley Deroche, owner of several Moe's Southwest Grill locations.)

184.   Other business owners reacted negatively to the disrespect of being emailed 30-day notice of such material contract changes.   Joe Boudreaux, co-owner of Zack's Famous Frozen Yogurt in Houma, an original Waitr business partner in that town, stated, "[g]etting 30 days' notice to change up the entire contract is not sitting well with us.  What we signed up for was not to have all the terms and conditions changed." *Id.*  Mr. Boudreaux was probably referring to the fact Zack's previously paid $1,500 in upfront fees to obtain a lower take rate, and would not be paid a refund if service was discontinued, regardless of when such payment was made. *Id.*  One cannot help notice the simple wisdom in abandoning Waitr once concluding, as Boudreaux did, "Their values don't align with ours. … We are done with them. … [E]ven if they change the contract, it's tainted."[36]

185.   In fact, the rates were even higher than many realize.  As Nikki Robichaux, owner of Fig Café in Houma, calculated, "When you add it up, its over 38% that I'm going to have to give them, and our profit margin isn't even that.  We'd be losing money."  According to Robichaux, she would be forced to pay Waitr a 25% base fee, *plus* a 3.1% credit card processing fee, in addition to a 30-cent-per-transaction fee. *Id.*

186.   On July 22, 2019, Waitr filed a memorandum in support of its motion to dismiss the complaint filed in the Restaurant Partners' Class Action complaint, which did nothing to

---

f7ca252cde1c.html (last visited Sept. 26, 2019).

[35] *See*  https://www.houmatoday.com/news/20190718/waitr-boycott-affects-food-delivery-customers  (last visited Sept. 26, 2019).

[36] *See*  https://www.houmatoday.com/news/20190726/some-restaurants-giving-up-on-waitr-delivery-service  (last visited Sept. 26, 2019).

deny the fact that Waitr had unilaterally increased take rates in violation of certain customers' contracts. Waitr's position was that it had met the terms of its agreement (which required written modification and consent of the parties), because it had sent a form letter to thousands of its affected restaurants that had a signature (most likely a photocopy of a signature on a form letter, given the number of recipients). Where the recipient of the letter did not terminate service, Waitr argued, it by inaction had consented to the price increase and waived any objection by continuing to use Waitr's services. According to Waitr's attorneys, "[the Restaurant Partners' Class Action plaintiff] had no right to remain at the lower fee level and [its] remedy for a fee increase it did not accept was to terminate its Waitr contract."

187. At a minimum, Waitr does appear to acknowledge the existence of the contract, except it fails to recognize any damage for the breaches thereof. Regardless of how Waitr explains the unilateral price increase that was never consented to by the affected restaurant partners, one thing is clear, and that is that Old-Waitr had benefit revenues and earnings prior to the Going Public Transaction with Landcadia, so that just prior to creating the public market for shares of Waitr, the Company looked marginally more healthy financially than it was in reality. Thus, while Waitr had consistently stated that it had a 15% take rate, in fact, that rate was substantially lower than 15% for many of its restaurant customers. **To this day, no disclosure has been made by Waitr as to the existence of the Restaurant Partners' Class Action.**

188. On August 6, 2019, Waitr issued another press release that signaled a complete capitulation of its grand ambition to be the complete front-of-house software solution for restaurants with complete point of sale integration. That day, Waitr announced that it had made a deal with Olo, to integrate *Olo's* platform software into *its* restaurant partners, allowing Waitr customers to "now have their requests go directly into a restaurant's point-of-sale (POS)

system." Remarkably, Waitr presented it as a benefit that Olo allows users to "manage many different platforms and ordering systems." Clearly, the adaptation of Olo signaled the abandonment of Waitr's proprietary platform technology, a final admission that the Company was not maintaining any first mover advantage based on its ability to refine and enhance its technology, and that it could not obtain the resources necessary to update, improve and innovate its software without moving operations to areas rich with high-level programming and engineering support.

189. The final shoe dropped on August 8, 2019, after it was reported the prior day, after the market closed, that Defendant Meaux would resign as CEO, that the integration of Bite Squad was not proceeding according to plan, that Waitr would layoff personnel, and that losses were running far ahead of plan and at a rate that eclipsed historical growth trends. On August 8, 2019, shares of the Company fell 50% to a close of $1.89 per share, from $3.76 the prior day. Waitr's market capitalization was $134 million, down from $910 million on March 13, 2019. Net losses for the quarter reached a staggering $25 million, up from $7.4 million the prior year. During the second quarter of 2019 Earnings Call, Waitr also revealed that it had laid off 100 people in June 2019.[37]

190. According to the Company, it had already hired Jefferies as a financial advisor to "explore strategic alternatives that have the potential to increase shareholder value." Those options purported to include "taking the company private or a sale of the business." Adam Price, who had joined Waitr in February 2019 as a department head and became COO in June 2019 was then named CEO. Once again, investors were forced to endure another change in direction as Waitr zig-zagged from one direction to another (the chronic symptom of being born without

any formal business plan), as they were alerted by Price that "[s]lowing the pace of our expansion will really help us deploy our resources in existing markets."  Surprisingly, given Meaux's prior public statements regarding Waitr's commitment to growth at the expense of profitability, suddenly Price had available a developed "Path to Profitability," purported to have been prepared earlier in the year that would improve "annual operating cash flows in excess of $10 million."

191.    At that time, investors also first learned of the material problems integrating Bite Squad on time and according to plan.  According to Form 8-K filed with the SEC on August 8, 2019, Waitr announced it took longer to integrate Bite Squad, and that Waitr dropped its total annual revenue range for 2019 to as low as $210 million, down from +$250 million projected in May.  It also appears that Bite Squat had bit-the-dust—the service falling from being available in 150 cities in December 2018 to 60 cities in August.  *Id.*  At that time, it became apparent that there was little or no overlap in the footprint between Bite Squad and Waitr that would have resulted in material synergies.  Moreover, on August 8, 2019, Defendant Price stated on the second quarter of 2019 Earnings Call that **Waitr was able to fully migrate only 5 cities that included both Bite Squad and Waitr into a single platform and brand.**  Price also disclosed that Waitr had abandoned the important markets of Las Vegas, Nevada and Austin, Texas (saturated with diners with high disposable incomes).

192.    Providing more color on the failure of the Bite Squad acquisition, Price explained during the same call that the difficulties were "bringing together two completely different marketing leadership teams at that time from the Bite Squad system and the Waitr system.  And both of those teams came together with different strategies of how to acquire customers and get

---

[37] Headcount fell from 22,000 employees, including drivers, in March 2019 to 16,000 in August 2019.  *See also* https://www.theadvocate.com/baton_rouge/news/business/article_9de0fc4c-bac9-11e9-8b12-ef7ca1c24e50.html

installs and get orders. And we ended up rolling out strategies while trying to integrate those teams without really monitoring the correct metrics for the efficacy of those strategies."

193.     According to Price, Waitr's results for second quarter of 2019 suffered as a result of management becoming "distracted in the heavy complex integration effort of the Bite Squad Waitr platforms. … [I]t took our team's eyes off key growth metrics and delayed certain revenue initiatives.  Regarding growth, we did not catch real-time performance shortfalls in our new marketing strategy.  This coincided with a noticeable uptick in customer acquisition spend from competitors in many of our markets."  In other words, observing the massive, severe destruction of Waitr's goodwill caused by Defendants' "new marketing strategy," competitors immediately took advantage of the opportunities cause by the reckless manner in which Waitr was operated and managed.  In his concluding remarks, Price again stated that it was the delays in the integration of Bite Squad that impacted revenues and resulted in lower guidance.

194.     Despite having previously distinguished Waitr's platform technology as being suited only for remote location delivery and explaining how urban systems are incompatible with Waitr's technology and provide no competitive advantage, the new CEO, came from a background related to urban logistics and, during the August 8 Earnings Call, even stated that, "my experience [is] running millions of deliveries in places like New York City and other areas … ."  In fact, Price immediately qualified his experience by stating, "[w]ith small- and medium-sized markets, the drive times are often short because of limited traffic congestion compared to larger markets, and the hand-off time to customers in one- or two-story buildings is much faster than people in a 50-story office building. With planned changes to our current method for driver

(last visited Sept. 26, 2019).

routing on both platforms, we feel confident we can increase the current driver efficiency significantly over time."

195.   On the August 8 Earnings Call, investors learned that the draconian price increases negatively impacted approximately 35% of Waitr's restaurant base.  While 35% is 7x the 5% threshold for materiality under GAAP, Defendant Yurecko described this group as "a relatively small percent."  Price, however, said that Waitr does "anticipate a loss of restaurants" as a result of the price increases.

196.   While Defendants would not disclose to investors the full impact of those losses at that time, it was telling the Waitr slashed guidance by 20% at the same time it increased prices by 100% and, presumably improved gross margins dramatically.  A rational explanation is that the loss of customers was already dramatic and increasing as many of Waitr's historic restaurant owner customers realized they could not pay the take rates demanded by Waitr and not lose money on each transaction.

## VIOLATIONS OF GAAP AND SEC REPORTING RULES

197.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

198.   GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the

particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. 210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

199.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

200.    In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided.  Instructions to Item 303 require that this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. ...

201.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28.  Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

202.    The Company's financial statements contained in the quarterly reports filed with the SEC on Forms 10-Q for the quarterly periods throughout the Class Period were presented in a manner that violated the principle of fair financial reporting and the following GAAP measures, among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1).

(b)    The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)    The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)  The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (Accounting Principles Board ("APB") Opinion No. 28).

(g)  The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)  The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

203.  In addition, during the Class Period, Defendants violated SEC disclosure rules:

(a)  Defendants failed to disclose the existence of known trends, events, or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

(b)  by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. § 210.4-01(a)(1).

204.     Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP.   The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts that indicated that all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth herein.  Had the true financial position and results of operations of the Company been disclosed during the Class Period, the Company's common stock would have traded at prices well below that which it did.

### Applicability of Presumption of Reliance:
### Fraud-On-The-Market Doctrine

205.     At all relevant times, the market for Waitr's common stock was an efficient market for the following reasons, among others:

(a)     Waitr's stock met the requirements for listing, and was listed and actively traded on the Nasdaq national market exchange, a highly efficient and automated market;

(b)     As a regulated issuer, Waitr filed periodic public reports with the SEC and the Nasdaq;

(c)     Waitr regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Waitr was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

206. As a result of the foregoing, the market for Waitr securities promptly digested current information regarding Waitr from all publicly available sources and reflected such information in Waitr stock price. Under these circumstances, all purchasers of Waitr common stock during the Class Period suffered similar injury through their purchase of Waitr common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

207. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized or approved by an executive officer of Waitr who knew those statements were false when made.

## COUNT I

**(Against Waitr, Jefferies, Meaux, Fertitta, and Yurecko)**
**Violation of Section 11 of the Securities Act**

208. Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein only to the extent, however, that such allegations do ***not*** allege fraud, scienter

or the intent of the Defendants to defraud plaintiff or members of the Class. This count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Registration Statement and Proxy-Prospectus. This Count is asserted by plaintiff against all Defendants by and on behalf of persons who acquired shares of the Company pursuant to the false Secondary Offering Filings issued in connection with the May 16, 2019, 6.757 million shares Secondary Offering.

209. Waitr is the issuer of the stock issued *via* the false Registration Statement and Proxy-Prospectus. As such, Waitr is strictly liable for each false and misleading statement contained therein.

210. Defendants Waitr, Jefferies, Meaux, Fertitta, and Yurecko are each signatories of the Registration Statement and/or prepared the Proxy-Prospectus or were an Underwriter of the May 2019 Secondary Offering, therefore, each of these Defendants had a duty to make a reasonable investigation of the statements contained in the Registration Statement and Proxy-Prospectus to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, Defendants should have known of the material misstatements and omissions contained in the Secondary Offering Filings and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As such, each of these Defendants are liable to plaintiff and the Class.

211. Each of the Defendants identified in Count I issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Proxy Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct alleged herein, each Defendant

violated, and/or controlled a person who violated, § 11 of the Securities Act. As a direct and proximate result of Defendants' wrongful conduct, the price for the Waitr common stock sold in the Secondary Offering was artificially inflated, and plaintiff and the Class suffered substantial damages in connection with their purchase of such Waitr common stock.

212. Plaintiff and other members of the Class acquired their Waitr stock without knowledge of the untruths and/or omissions alleged herein. Plaintiff and the other members of the Class were thus damaged by Defendants' misconduct and by the material misstatements and omissions of the aforementioned Secondary Offering Filings.

213. This action was brought within one year after the discovery of the untrue statements and omissions and within three years of Waitr's Secondary Offering of stock.

## COUNT II

### (Against Waitr)
### For Violation of Section 12(a)(2) of the Securities Act

214. For the purposes of this Count, Plaintiff incorporates by reference those allegations concerning the parties, the Prospectuses, and the Securities Act claims only, consisting of those allegations contained and incorporated in Count I only. Any allegations of fraud, recklessness, knowledge, scienter or intent, are hereby expressly disclaimed and not incorporated by reference in this Count.

215. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against Waitr.

216. For the purposes of this Count, Plaintiffs do not allege that Waitr had scienter, which is not an element of a Section 12(a)(2) claim.

217. By means of the defective Prospectuses, Waitr promoted and sold Waitr common stock to Plaintiff and the Class.

218. The Prospectuses contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendant Waitr owed Plaintiff and the other members of the Class who purchased Waitr common stock pursuant to the Prospectuses the duty to make a reasonable and diligent investigation into the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The seller of securities, in the exercise of reasonable care, knew or should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

219. Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectuses at the time Plaintiff purchased or otherwise acquired Waitr common stock.

220. By reason of the conduct alleged herein, Waitr violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Waitr common stock pursuant to the Prospectuses sustained substantial damages in connection with their purchases of the securities.

221. Plaintiff and members of the Class hereby tender their securities to the sellers and seek rescission to the extent that they continue to own such securities. Class members who have sold their Waitr common stock seek damages to the extent permitted by law.

## COUNT III

### (Against Meaux, Fertitta, and Yurecko)
### Violation of Section 15 of the Securities Act

222. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct,

knowledge, scienter or intent, are hereby expressly disclaimed and not incorporated by reference in this Count.

223. This count is asserted against Defendants Meaux, Fertitta, and Yurecko and is based upon Section 15 of the Securities Act. As alleged herein, a primary violation of the Securities Act occurred, in that Defendants engaged in conduct in violation of Section 11 of the Securities Act.

224. Defendants Meaux, Fertitta, and Yurecko, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, Controlling Persons of Waitr within the meaning of Section 15 of the Securities Act. Defendants had the power and influence and exercised the same to cause Waitr to engage in the acts described herein.

225. Defendants Meaux, Fertitta, and Yurecko negligently, and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Secondary Offering Filings, lacked reasonable grounds to believe that such information was true, accurate and complete in all material respects at the time of the Secondary Offering.

226. Plaintiffs and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact and omissions of material facts in the Secondary Offering Filings when they purchased or acquired their securities.

227. By virtue of the conduct alleged herein, the aforementioned Defendants are liable for the wrongful conduct alleged herein and are liable to Plaintiff and the Class for damages.

## COUNT IV

**(Against Waitr, Jefferies, Handler, Meaux, Fertitta and Pringle)**
**Violations of Section 14(a) of the Securities Exchange Act of 1934**

228. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct, knowledge, scienter or intent, are hereby expressly disclaimed and not incorporated by reference in this Count.

229. Defendants Waitr, Jefferies, Handler, Meaux, Fertitta, and Pringle were instrumental in the preparation of, were deemed to be participants in, and/or issued the Going Public Transaction Proxy/Prospectus (and related filings) with the intention of soliciting stockholder support for the Landcadia business combination. Each of these Defendants reviewed and/or authorized the dissemination of the aforementioned filings issued in connection with the Going Public Transaction.

230. In so doing, Defendants made untrue statements of fact and omitted to state material facts necessary to make the statements made not misleading. Each of Defendants Waitr, Jefferies, Handler, Meaux, Fertitta, and Pringle, by virtue of their roles as officers and/or directors or as an underwriter, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

231. SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any 14D9 statement, form of 14D9, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a 14D9 for the same meeting or subject matter which has become false or misleading.

232. During the Class Period, these Defendants disseminated the false and misleading Proxy/Prospectus specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

233. Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning certain material information set forth in paragraphs 71 to 96 *supra*.

234. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding whether to support the Going Public Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy/Prospectus and in other information reasonably available to investors.

235. By reason of the foregoing, the aforementioned Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

## COUNT IV

**(Against Waitr, Meaux, Fertitta, Pringle, and Yurenko)**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**

236. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

237. During the Class Period, Waitr, Meaux, Fertitta, Pringle, and Yurenko carried out a scheme and course of conduct which was intended to and, throughout the Class Period, did:

(i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and

(ii)     cause Plaintiff and other members of the Class to acquire Waitr's securities at artificially inflated prices.

238.    In furtherance of this unlawful scheme, plan and course of conduct, the Company and the Individual Defendants, and each of them, took the actions set forth herein.

239.    The Company and the Individual Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Waitr's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Waitr and the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

240.    Waitr and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Waitr's financial well-being and prospects, as specified herein.

241.    These Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Waitr's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Waitr and its business operations and future prospects in light of the circumstances under which they were made, not

misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Waitr securities during the Class Period.

242.     Defendants Waitr, Meaux, Fertitta, Pringle, and Yurenko were each primarily liable, and control person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at Waitr during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of Waitr, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of Waitr's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of Waitr's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

243.     Waitr and the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Waitr's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Waitr and the Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects

throughout the Class Period, these Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

244. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Waitr's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Waitr's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Waitr and the Individual Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Waitr and the Individual Defendants, but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Waitr's securities during the Class Period at artificially high prices and were damaged thereby.

245. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Waitr was experiencing, which were not disclosed by Waitr and the Individual Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

246. By virtue of the foregoing, Waitr and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

247.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Waitr's securities during the Class Period.

## COUNT V

**(Against the Individual Defendants)**
**Violation of Section 20(a) of the Exchange Act**

248.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

249.    The Individual Defendants acted as controlling persons of Waitr within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

250.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

251.    As set forth above, Waitr and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury.

Dated: September 26, 2019

**LUNDY, LUNDY, SOILEAU &
SOUTH, LLP**

*/s/Matthew E. Lundy*

Matthew E. Lundy
501 Broad Street
Lake Charles, LA 70601
Telephone: (337) 439-0707
Facsimile: (337) 439-1029
Email: mlundy@lundylawllp.com


**KAHN SWICK & FOTI, LLC**
Melinda A. Nicholson (32911)
Lewis S. Kahn (23805)
Michael J. Palestina (31907)
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: Melinda.Nicholson@ksfcounsel.com
Email: Lewis.Kahn@ksfcounsel.com
Email: Michael.Palestina@ksfcounsel.com