UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| WALTER WELCH, Individually and on behalf of all others similarly situated, | **CASE NO. 2:19-cv-01260** |
| Plaintiff, | |
| vs. | **JUDGE TERRY A. DOUGHTY** |
| CHRISTOPHER MEAUX, DAVID PRINGLE, JEFF YURECKO, TILMAN J. FERTITTA, RICHARD HANDLER, WAITR HOLDINGS, INC. f/k/a LANDCADIA HOLDINGS, INC., JEFFERIES FINANCIAL GROUP, INC., and JEFFERIES, LLC, | **MAGISTRATE JUDGE KATHLEEN KAY** |
| Defendants. | |
| KELLY BATES, Individually and on Behalf of all Others Similarly Situated, | **CASE NO. 2:19-cv-01427** |
| Plaintiff, | |
| vs. | **JUDGE TERRY A. DOUGHTY** |
| CHRISTOPHER MEAUX, DAVID PRINGLE, JEFF YURECKO, TILMAN J. FERTITTA, RICHARD HANDLER, WAITR HOLDINGS, INC. f/k/a LANDCADIA HOLDINGS, INC., JEFFERIES FINANCIAL GROUP, INC., and JEFFERIES, LLC, | **MAGISTRATE JUDGE KATHLEEN KAY** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT
OF BARBARA BRIGIDEAR'S MOTION FOR
CONSOLIDATION OF ACTIONS, APPOINTMENT AS
LEAD PLAINTIFF, AND APPROVAL OF SELECTION OF COUNSEL**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

PROCEDURAL HISTORY........................................................................................................ 2

FACTUAL BACKGROUND ..................................................................................................... 2

ARGUMENT........................................................................................................................... 10

I.   CONSOLIDATION OF THE ACTIONS IS APPROPRIATE............................................ 10

II.  THE COURT SHOULD APPOINT MOVANT AS LEAD PLAINTIFF ........................... 11

    A.  The PSLRA's Provisions Concerning the Appointment of Lead Plaintiff .................... 11

    B.  Movant Satisfies the Lead Plaintiff Provisions of the PSLRA ...................................... 12

        1.   Movant Filed a Timely Motion........................................................................... 12

        2.   Movant Has the Largest Financial Interest in the Relief Sought .......................... 13

        3.   Movant Meets Rule 23's Typicality and Adequacy Requirements ...................... 14

III. MOVANT'S CHOICE OF COUNSEL SHOULD BE APPROVED ................................. 17

CONCLUSION....................................................................................................................... 18

i

## TABLE OF AUTHORITIES

**Cases**

*Bach v. Amedisys, Inc.*,
C.A. No. 10-395-BAJ-CN, 2010 U.S. Dist. LEXIS 112758 (M.D. La. Oct. 22, 2010) ........... 17

*Berger v. Compaq Computer Corp.*,
257 F.3d 475 (5th Cir. 2001)................................................................................................. 16

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001)...................................................................................... 13, 14, 15

*Esquivel v. BP Co. N. Am.*,
No 10-CV-236, 2010 U.S. Dist. LEXIS 110015 (S.D. Tex. Oct. 14, 2010)........................... 10

*Gen. Tel. Co. of the SW v. Falcon*,
457 U.S. 147 (1982) .............................................................................................................. 15

*Gluck v. CellStar Corp.*,
976 F. Supp. 542 (N.D. Tex. 1997)........................................................................................ 14

*Johnson v. Celotex Corp.*,
899 F.2d 1281 (2d Cir. 1990)................................................................................................. 10

*Lax v. First Merchs. Acceptance Corp.*,
No. 97 C 2715, 1997 U.S. Dist. LEXIS 11866 (N.D. Ill. Aug 6, 1997) ............................ 13, 14

*Mullen v. Treasure Chest Casino, L.L.C.*,
186 F.3d 620 (5th Cir. 1999)................................................................................................. 15

*Netsky v. Capstead Mortg. Corp.*,
C.A. No. 3:98-CV-1716-L, 2000 U.S. Dist. LEXIS 9941 (N.D. Tex. July 12, 2000).............. 13

*In re Orthodontic Ctrs. of Am., Inc.*,
C.A. No. 01-949 Section: "T"(5), 2001 U.S. Dist. LEXIS 21816
(E.D. La. Dec. 18, 2001) ........................................................................................ 13, 14, 15, 16

*Stirman v. Exxon Corp.*,
280 F.3d 554 (5th Cir. 2002)................................................................................................. 15

*Tarica v. McDermott Int'l., Inc.*,
C. A. No. 99-3831 Section: "R"(5), 2000 U.S. Dist. LEXIS 5031
(E.D. La. Apr. 13, 2000) ............................................................................................ 12, 13, 14

*Thompson v. Shaw Group, Inc.*,
C.A. No. 04-1685 Section "C"(1), 2004 U.S. Dist. LEXIS 25641
(E.D. La. Dec. 14, 2004) ................................................................................................ 14, 16

*In re Waste Mgmt., Inc.*,
128 F. Supp. 2d 401 (S.D. Tex. 2000) ..................................................................................... 15

*Weltz v. Lee*,
199 F.R.D. 129 (S.D.N.Y. 2001) ............................................................................................. 10

**Statutes**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4.............................................. passim

**Rules**

Fed. R. Civ. P. Rule 23 ...................................................................................................... passim

Fed. R. Civ. P. Rule 42(a).................................................................................................. 10, 11

Movant Barbara Brigidear ("Movant"), on behalf of herself and all similarly situated persons and entities, hereby respectfully submits this Memorandum of Law in support of Movant's Motion for Consolidation of Actions, Appointment as Lead Plaintiff, and Approval of Selection of Bragar Eagel & Squire, P.C. ("BES") as Lead Counsel pursuant to the lead plaintiff provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), codified as Section 27(a)(3) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77z-1(a)(3) (2013), and/or Section 21D(a)(3) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3).[1]

## **PRELIMINARY STATEMENT**

Presently pending before the Court are two securities class action lawsuits (the "*Welch* Action" and the "*Bates* Action," collectively, the "Action") brought on behalf of a class consisting of all persons and entities, other than defendants, who purchased, acquired and/or otherwise held the securities of Waitr Holdings, Inc. ("Waitr" or the "Company") (the "Class") from May 17, 2018 to August 8, 2019 (the "Class Period"), including, but not limited to, those who acquired Waitr shares in connection with the Going Public Transaction (defined below), and those who acquired shares of the Company in the follow-on secondary offering on May 16, 2019 (the "Secondary Offering").  The Action alleges violations of Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), as well as U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[2]

---

[1] Because the lead plaintiff provisions of the Securities Act and the Exchange Act are identical, only citations to the Exchange Act are provided herein.

[2] The *Welch* Action also alleges violations of Section 12 of the Securities Act and Sections 14(a) of the Exchange Act.

The PSLRA, as amended, 15 U.S.C. § 78u-4(a)(3)(B), provides for the Court to appoint as lead plaintiff the movant who has the largest financial interest in the litigation and has made a *prima facie* showing that he, she, or it is an adequate class representative under Rule 23 of the Federal Rules of Civil Procedure. Movant has lost $400,536.21 as a result of the alleged fraud during the Class Period.[3] Movant believes that she has the largest financial interest in the outcome of this Action. Moreover, Movant satisfies the requirements of Rule 23 in that her claims are typical of the claims of the Class (defined herein), and in that she will fairly and adequately represent the interests of the Class.

Accordingly, the Court should grant Movant's Motion in its entirety.

## PROCEDURAL HISTORY

The *Welch* Action was filed in this District on September 26, 2019 on behalf of the Class against certain officers and directors of Waitr, Old-Waitr,[4] and Landcadia Holdings, Inc. ("Landcadia")[5], as well as the lead underwriter for the Secondary Offering and its parent company (collectively, the "Defendants"). The *Bates* Action was filed in this District on November 4, 2019 on behalf of the same Class, against the same Defendants, and with nearly identical allegations.

## FACTUAL BACKGROUND

Waitr, headquartered in Lake Charles, Louisiana, is a platform for online mobile food ordering and delivery services from restaurants. ¶ 1.[6] The Company expanded rapidly, connecting

---

[3] The PSLRA certification of Barbara Brigidear identifying her transactions in Waitr, as well as a chart identifying her losses, are attached to the Declaration of John H. Smith, dated November 26, 2019 ("Smith Decl."), as Exhibits A and B, respectively.

[4] Old-Waitr is the pre-merger entity.

[5] Landcadia was a special purpose acquisition company whose business was to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses which acquired Old-Waitr, resulting in the post-acquisition entity Waitr and the trading of Waitr shares on the Nasdaq Stock Market (the "Nasdaq").

[6] Citations to "¶ __" are to paragraphs in the *Welch* Action Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), ECF No. 1. Unless otherwise defined, capitalized terms shall have the same meaning as set forth in the Complaint. The facts set forth in the Complaint are incorporated herein by reference.

2

restaurants, diners, and delivery drivers primarily in non-urban "underserved" tertiary-markets as the popularity of third-party online food delivery "apps" grew. *Id*.

At the same time that Waitr was created, other nationally, well-known, well-funded and even profitable competitive brands had already emerged. *Id*. By the start of the Class Period, Waitr faced strong competition from GrubHub, DoorDash, and UberEats, which were each dominant primary market participants who had set their sights on secondary markets. *Id*.

Prior to the Going Public Transaction, Landcadia was a special purpose acquisition company ("SPAC" or "blank check company") whose business was to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. ¶ 2. Landcadia was founded in 2008, and in May 2016, completed an initial public offering raising approximately $250 million. *Id*. Pursuant to the terms of its offering, Landcadia and its co-chairmen, Tilman Fertitta ("Fertitta") and Richard Handler ("Handler"), were required to complete an acquisition within 24 months, or by June 1, 2018. *Id*. If, however, Landcadia, Fertitta, and Handler were unable to complete an initial business combination within that time, Landcadia would be forced to redeem 100% of its public shares and to liquidate itself at a per-share price, payable in cash and including interest. *Id*.

The failure to find an acquisition target within the two years since they raised money using their blank-check would be especially problematic for Fertitta and Handler. ¶ 3. First, they set up this SPAC as a pet project to allow their friends an opportunity to combine their formidable talents and to impress the market with their deal-making acumen, and having to return shareholder money would evidence a failure of their goals and call into question their reputation as eminent deal makers. *Id*. Second, for Jefferies (Jeffries Financial Group, Inc. and Jefferies LLC), redemption meant the immediate loss of at least $10 million in fees, the bulk of which were from already

3

earned but contingent "deferred underwriting commissions" (tied to the initial Landcadia offering which contemplated another transaction within 24 months), and from fees related to the takeover acquisition target (which ended up being Waitr). *Id.* Ultimately, during the Class Period, Jefferies would extract more than $15 million in fees from transactions related to Waitr. *Id.*

With only two weeks left before Landcadia's deadline, it announced the last-minute agreement to enter a combination with Old-Waitr, whereby Landcadia would acquire Old-Waitr for cash and stock valued at $308 million—with $50 million cash and the remainder in stock—and whereby post-acquisition entity Waitr shares would immediately begin trading on the Nasdaq (the "Going Public Transaction"). ¶ 54. While this was never discussed by Defendants or disclosed as a risk in Landcadia's SEC filings related to the Going Public Transaction, in fact, the use of the blank-check/SPAC to acquire Waitr was fraught with additional risks that were undisclosed at the time of the merger, but which ultimately subjected investors to devastating and almost complete losses—90% from the Class Period high of $15.00. ¶ 4.

Unfortunately for investors none of these additional risks were properly disclosed, and at the time Waitr shares began trading investors did not know that: (i) Waitr lacked a plan to achieve profitability and, contrary to Defendant Christopher Meaux's ("Meaux") statements, Waitr was not at or near profitability and Defendants had created the illusion of financial stability by engaging in a host of illegal and improper activities each designed to inflate revenues and earnings—such as unilaterally breaking low-rate contracts and imposing significantly higher rates, and by refusing to pay drivers for mileage related expenses—both of which ultimately resulted in independent class action lawsuits; and (ii) Waitr's technology provided no real advantage, and again contrary to representations by Defendant Meaux, the Company could not obtain the developer,

4

programming, or engineering resources necessary to enhance, maintain, and develop industry-leading software from its headquarter location in Lake Charles, Louisiana. ¶ 6.

While Defendants consistently promoted Waitr's competitive advantages resulting in its lower 15% take rate (the rate that Waitr charged restaurants for providing food delivery services), they failed to reveal that Waitr had first achieved this rate by refusing to honor its lower rate contracts, but also that even at 15%, Waitr could not achieve profitability because its business model based on providing delivery service to small restaurant operators in "underserved" markets was not sound or sustainable, and the Company required draconian price increases that Waitr's core base customers could not afford to pay. ¶ 7. Waitr failed to make these and other necessary disclosures until after Defendants had created the public market for Waitr stock, and after Waitr had used $100 million of its stock to acquire BiteSquad.com, LLC ("Bite Squad"), and after Waitr had sold an additional $50 million of stock into the open market in its Secondary Offering on May 16, 2019. *Id.*

According to Meaux, Waitr employed an army of tens of thousands of drivers who were full-time employees and, therefore, provided the Company with fixed-cost labor which Waitr optimized to achieve greater efficiencies and lower prices. ¶ 8. This was purported to provide Waitr the ability to maintain low, affordable, and stable pricing. *Id.* This model was instead reducing gross margins and increasing costs. ¶ 9. In part this was true because Waitr lacked the sophisticated forecasting resources needed to deploy its fixed cost labor, especially once the Company rapidly expanded, again constrained by its lack of high-level programming and development resources. *Id.*

As investors also ultimately learned at the end of the Class Period, Waitr's business plan would not work, and the Company could not fund growth with operations because Waitr could not

5

provide services in remote locations to small customers at a rate that they could afford (*i.e.*, 15%) and that also allowed Waitr to be profitable.  In fact, throughout the Class Period, Defendants had been clandestinely raising prices in breach of low-rate agreements Waitr had previously entered into and/or were preparing for massive price increases to cover the subsidies of providing delivery service.  ¶ 10.  Moreover, it now has been estimated that Waitr may also owe drivers as much as $800 million in withheld mileage reimbursement payments that acted as illegal wage kickbacks to the Company, and which resulted in Waitr drivers earning less than minimum wage of $7.25 per hour (less than half the rates Meaux reported drivers earned in the Class Period).  *Id.*

Prior to creating a public market for Waitr shares that could be exploited for hundreds of millions in stock-based acquisition currency and corporate operating cash Waitr was reasonably constrained by its inability to obtain large amounts of capital and to grow beyond its means.  ¶ 11.  Investment banks had repeatedly refused to invest in Waitr and repeatedly warned Meaux that Waitr would be unable to maintain and enhance its platform technology, and would be constrained by its inability to obtain necessary technology support in Lake Charles, Louisiana.  *Id.*

Defendants represented that Fertitta, who was purported to have unique experience in the restaurant market and with Waitr specifically, would play a special role at the Company beyond normal board participation—namely, that he would help guide and manage Waitr, affording it the purported advantages of his vast resources and experience.  ¶ 12.  That assistance and guidance, however, never materialized, and Fertitta did little more than add Waitr order buttons to websites that belong to Landry's Inc. ("Landry's").  ¶ 13.  No special promotions were ever done, no promised "synergies" ever materialized, and investors' trust that Fertitta would aid in the management of the Company was misplaced.  *Id.*

The statements contained in or incorporated in the May 17, 2018 Proxy Statement and the Going Public Transaction November 19, 2018 Registration Statement were each materially false and misleading, for the following reasons, among others:  (i) at the time Waitr began trading publicly it was not true that the Company was on the verge of profitability, because Defendants had artificially bolstered profits and revenues by unilaterally raising prices in breach of customer contracts and by failing to properly reimburse drivers for mileage expenses; (ii) at the time Waitr began trading publicly it was not true that it was providing its services at a sustainable low take rate established at 15%; (iii) at the time Waitr began trading publicly it was not true that Waitr was able to extract efficiencies from its full time fixed-rate labor force that was purported to allow the Company to offer its services at a lower rate than competitors; (iv) at the time Waitr began trading publicly, it was not true that its financial statements and SEC reports or its Sarbanes Oxley certifications were true, accurate or reliable; (v) at the time Waitr began trading publicly, contrary to Defendants' representations, its software provided little or no competitive advantages and what first-mover advantage the Company claimed existed, was quickly squandered by the inability to obtain sophisticated high-level programmers and software engineers who could enable Waitr to refine and develop the software necessary to stay competitive in its market; (vi) as a result of the aforementioned adverse conditions that Defendants failed to disclose, at the time Waitr began trading, Defendants lacked any reasonable basis to claim that Waitr was operating according to plan, or that Waitr could achieve guidance sponsored and/or endorsed by Defendants.  ¶ 14.  Nor was it true that Waitr maintained an adequate system of internal controls so as to report and eliminate material conflicts of interest.  *Id*.

Desperate to create revenues, as soon as a public market for Waitr shares existed, Defendants immediately announced plans to acquire Bite Squad using $100 million of stock as

currency in the transaction.  ¶ 15.  The Bite Squad acquisition was conducted with little or no due diligence and with disregard for the fact that Bite Squad's haphazard structure, caused as a result of it being cobbled together through 17 other acquisitions, was not consistent with Waitr's "contiguous growth" model, whereby the Company grew in an orderly, regional contiguous expansion.  *Id.*

As investors would also soon discover, Defendants were entirely unable to integrate Bite Squad and now have to run two poorly managed, money losing operations with little regional overlap and few "synergies."  ¶ 16.

Before the market learned of the significant problems Waitr was having, including with its integration of Bite Squad, shares of Waitr consistently traded above $10.  ¶ 17.  Waitr took advantage of the artificial inflation in the price of its stock and filed a Shelf Registration with the SEC in April 2019, in order to allow Waitr to issue up to $300 million of mixed securities.  *Id.* Soon thereafter, Waitr shares began to decline—falling below $9.00 in early May 2019 and below $8.00 by May 15, 2019.  *Id.*

Against this share price decline Defendants hastily organized a $50 million Secondary Offering which was priced and sold the next day, May 16, 2019.  ¶ 18.  The Secondary Offering occurred at prices still artificially inflated by Defendants' false and misleading statements to the market, and was effectuated pursuant to a materially false and misleading Proxy/Prospectus, Prospectus Supplements, and Registration Statement filed with the SEC on April 26, 2019 and May 16 and 17, 2019 (the "Secondary Offering Filings") that each continued to conceal Waitr's mounting problems and impaired operational and financial condition.  *Id.*

Investors later learned that Waitr's Secondary Offering was under-subscribed and that Defendant Meaux had spent over $1 million of his personal funds to prop up the Secondary Offering and prevent its failure.  ¶ 19.

Almost immediately after selling the $50 million in stock in the open market in the Company's Secondary Offering, Defendants belatedly revealed a string of material adverse events and information which, despite existing since the inception of the Class Period, Defendants had waited to that time to disclose, including:  (i) a 15% take rate could not be maintained; (ii) drastic price increases were necessary; and (iii) the quest for platform integration had been abandoned. ¶ 20.

On August 8, 2019, Waitr shares collapsed, falling over 50% in active trading as Waitr reported abysmal financial and operational results for the second quarter of 2019, and after it was reported that Defendant Meaux had been terminated as Chief Executive Officer ("CEO") of the Company (but allowed to remain as Board Chairman).  ¶ 22.  Investors then learned that Meaux had been replaced by a 35-year-old with very limited relevant work experience, who was promoted within Waitr three times since joining the Company in February 2019.  *Id*.

At that time Waitr also reported massive losses, terrible operating performance, huge cost increases, diminishing prospects, and losses accelerating far in advance of any growth. ¶ 23.  Waitr also announced that it had failed to meet guidance, which had recently been reaffirmed.  *Id*. Despite raising prices dramatically, Waitr also reduced earnings forecasts by at least 20% on a forward-looking basis.  *Id*.  Waitr blamed many of its problems on the failure to integrate Bite Squad and managements' resultant loss of focus.  *Id*.  At that time the new CEO again reversed course and announced that Waitr would abandon its theretofore strategy of hyper-growth and instead focus on generating profits and sustaining operations.  *Id*.

In response to Waitr's shocking disclosures on August 8, 2019, the price of Waitr stock crashed from $3.76 per share on August 8 to an intraday low of $1.31 before closing the trading-day at $1.89 per share on August 9—a single-day decline of 50% and a decline of almost 90% from the Class Period high above $15.00, and a loss of almost $800 million of market capitalization, all in under 5 months.  ¶ 24.

**ARGUMENT**

## I.    CONSOLIDATION OF THE ACTIONS IS APPROPRIATE

The PSLRA provides that "[i]f more than one action on behalf of a class asserting substantially the same claim or claims arising under this [sub-]chapter have been filed," the court shall not make the determination of the most adequate plaintiff until "after the decision on the motion to consolidate is rendered."  15 U.S.C. § 78u-4(a)(3)(B)(ii).  Thereafter, the court "shall appoint the most adequate plaintiff for the consolidated actions."  *Id.*

Under the Federal Rules of Civil Procedure, consolidation is appropriate when the actions involve common questions of law or fact.  *See* Fed. R. Civ. P. 42(a); *see also Weltz v. Lee*, 199 F.R.D. 129, 131 (S.D.N.Y. 2001) (citing *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284-85 (2d Cir. 1990)); *Esquivel v. BP Co. N. Am.*, No 10-CV-236, 2010 U.S. Dist. LEXIS 110015 (S.D. Tex. Oct. 14, 2010).  Courts, therefore, routinely find that consolidating multiple securities cases is an efficient solution where the complaints arise generally from the same alleged false and misleading statements.

The actions here present similar factual and legal issues, as they involve the same subject matter and are based on the same wrongful course of conduct.  The actions name the same parties as Defendants.  Because the actions arise from the same facts and circumstances and involve the same subject matter, the same discovery and similar class certification issues will be relevant to all related actions.  Accordingly, consolidation under Rule 42(a) is appropriate.

10

## II.   THE COURT SHOULD APPOINT MOVANT AS LEAD PLAINTIFF

### A.   The PSLRA's Provisions Concerning the Appointment of Lead Plaintiff

The PSLRA mandates that the Court decide the lead plaintiff issue "as soon as practicable." 15 U.S.C. § 78u-4(a)(3)(B)(ii).  The PSLRA establishes the procedure for appointment of the lead plaintiff in "each private action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure."  15 U.S.C. §§ 78u-4(a) and (a)(3)(B).

First, the PSLRA provides that within 20 days after the date on which the first class action is filed, the plaintiff to that action shall publish, in a widely circulated national business publication or wire service, a notice advising members of the proposed class of the pendency of the action and their right to move for appointment as lead plaintiff within 60 days of the notice publication.

Under 15 U.S.C. § 78u-4(a)(3)(B)(i), the Court will, no later than 90 days after the date on which a notice is published, consider any motion filed by any purported class member in response to the notice and appoint as lead plaintiff the movant that the court determines to be "most capable of adequately representing the interests of class members."  *Id.*   The PSLRA provides a presumption that the most "adequate plaintiff" to serve as lead plaintiff is the "person or group of persons" that:

(aa)   has either filed the complaint or made a motion in response to a notice;

(bb)   in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc)   otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  The presumption may be rebutted only upon proof by another class member that the presumptive most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

11

As set forth below, Movant has complied with the procedural prerequisites of the PSLRA and has, what is to the best of her knowledge, the largest financial interest in the litigation of any other Class member(s) seeking appointment as lead plaintiff.  Movant is also unaware of any unique defenses against her that Defendants could raise.  Therefore, Movant is entitled to the presumption that she is the most adequate plaintiff to represent the Class and, as a result, should be appointed lead plaintiff in the Consolidated Action.  *See Tarica v. McDermott Int'l., Inc.*, C.A. No. 99-3831 Section: "R"(5), 2000 U.S. Dist. LEXIS 5031 (E.D. La. Apr. 13, 2000).

### B.    Movant Satisfies the Lead Plaintiff Provisions of the PSLRA

As described in further detail below, Movant should be appointed lead plaintiff because she satisfies all of the requirements of the PSLRA.  Movant filed a timely motion to be appointed lead plaintiff, holds the largest financial interest in the relief sought by the Class, and satisfies the typicality and adequacy requirements of Rule 23.

### 1.    Movant Filed a Timely Motion

Pursuant to 15 U.S.C. § 78u-4(a)(3)(A)(i), counsel for plaintiff in the *Welch* Action published notice of the action on September 27, 2019, within 20 days of the filing of the first-filed complaint, through *PRNewswire*, a widely circulated national business-oriented wire service.  *See* Smith Decl., Ex. C.  Consequently, any member of the proposed Class was required to seek appointment as lead plaintiff within 60 days after publication of that notice.  *See* 15 U.S.C. § 78u-4(a)(3)(A)(i).  Therefore, the time period in which class members may move to be appointed lead plaintiff herein under 15 U.S.C. § 78u-4(a)(3)(A) and (B) expires on November 26, 2019.  Pursuant to the PSLRA and within the requisite time frame after publication of the required notice, Movant timely moves this Court to be appointed lead plaintiff on behalf of all members of the Class.

## 2.    Movant Has the Largest Financial Interest in the Relief Sought

According to 15 U.S.C. § 78u-4(a)(3)(B)(iii), the Court shall appoint as lead plaintiff the movant or movants with the largest financial interest in the relief sought by the Action.  As demonstrated herein, Movant has the largest known financial interest in the relief sought by the Class.  *See* Smith Decl., Ex. B.  The movant who has the largest financial interest in this litigation and meets the adequacy and typicality requirements of Rule 23 is presumptively the lead plaintiff. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 222 (3d Cir. 2001) ("the most adequate plaintiff is the movant that has the largest financial interest in the relief sought by the class….") (internal citations omitted).

Within the Class Period, Movant purchased Waitr securities in reliance upon the materially false and misleading statements issued by the Defendants and was injured thereby.  Movant has suffered substantial losses of $400,536.21 under a last-in-first-out ("LIFO") analysis as a result of Defendants' alleged fraudulent statements. *See* Smith Decl., Ex. B (Loss Chart); *see also In re Orthodontic Ctrs. of Am., Inc.*, C.A. No. 01-949 Section: "T"(5), 2001 U.S. Dist. LEXIS 21816 (E.D. La. Dec. 18, 2001); *Tarica*, 2000 U.S. Dist. LEXIS 5031; *Netsky v. Capstead Mortg. Corp.*, C.A. No. 3:98-CV-1716-L, 2000 U.S. Dist. LEXIS 9941 (N.D. Tex. July 12, 2000); *Lax v. First Merchs. Acceptance Corp.*, No. 97 C 2715, 1997 U.S. Dist. LEXIS 11866 (N.D. Ill. Aug 6, 1997).[7]  Movant, thus, has a significant financial interest in the outcome of this case.  To the best of Movant's knowledge, there are no other applicants who have sought, or are seeking, appointment as lead plaintiff that have a larger financial interest and also satisfy Rule 23.

---

[7]  Movant purchased a total of 65,535 shares, expended net funds of $579,577.75 on her securities during the Class Period, retained 56,235 shares through the close of the Class Period, and suffered $400,536.21 in losses.

### 3.   Movant Meets Rule 23's Typicality and Adequacy Requirements

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(iii), in addition to possessing the largest financial interest in the outcome of the litigation, the lead plaintiff must also "otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure."   15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc); *Orthodontic*, 2001 U.S. Dist. LEXIS 21816; *Tarica*, 2000 U.S. Dist. LEXIS 5031, at *12; *see also Cendant*, 264 F.3d at 262.  Rule 23(a) provides that a class may be certified only if the following four requirements are satisfied:  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative party are typical of the claims or defenses of the class; and (4) the representative party will fairly and adequately protect the interests of the class.  Of these four prerequisites, only two—typicality and adequacy—directly address the personal characteristics of the lead plaintiff movant.  Consequently, in deciding a lead plaintiff motion, the Court should limit its inquiry to the typicality and adequacy prongs of Rule 23(a) and defer examination of the remaining requirements until a class certification motion is filed.  *See Thompson v. Shaw Group, Inc.*, C.A. No. 04-1685 Section "C"(1), 2004 U.S. Dist. LEXIS 25641 (E.D. La. Dec. 14, 2004); *see also Gluck v. CellStar Corp.*, 976 F. Supp. 542, 546 (N.D. Tex. 1997); *Lax*, 1997 U.S. Dist. LEXIS 11866.

As detailed below, Movant satisfies both the typicality and adequacy requirements of Rule 23, thereby justifying her appointment as lead plaintiff.

### (i)   Movant's Claims Are Typical of the Claims of the Class

Under Rule 23 (a)(3), the claims or defenses of the representative parties must be typical of those of the class.  A plaintiff satisfies the typicality requirement if the plaintiff has:  (a) suffered the same injuries as the absent class members; (b) the injuries are as a result of the same course of conduct by defendants; and (c) the plaintiff's claims are based on the same legal issues that prove

14

the defendant's liability. *See In re Waste Mgmt., Inc.*, 128 F. Supp. 2d 401, 411 (S.D. Tex. 2000); *Orthodontic*, 2001 U.S. Dist. LEXIS 21816. Rule 23 does not require the lead plaintiff to be identically situated with all class members. *See Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002). The Fifth Circuit has held that "the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 625 (5th Cir. 1999) (internal quotation marks and citations omitted. Typicality exists if claims "arise from the same event or course of conduct that gave rise to the claims of the other class members and are premised upon the same legal theory." *Id.* at 620. A finding of commonality frequently supports a finding of typicality. *See Gen. Tel. Co. of the SW v. Falcon*, 457 U.S. 147, 158 n.13 (1982) (noting that the typicality and commonality requirements tend to merge).

In this case, the typicality requirement is met because Movant's claims are identical to, and neither compete nor conflict with, the claims of the other Class members. *Cendant*, 264 F.3d at 265. Movant, like the other members of the Class, acquired Waitr securities during the Class Period at prices artificially inflated by Defendants' materially false and misleading statements, and was damaged thereby. Thus, Movant's claims are typical, if not identical, to those of the other members of the Class because Movant suffered losses similar to those of other Class members and her losses were a result of Defendants' common course of wrongful conduct. Accordingly, Movant satisfies the typicality requirement of Rule 23(a)(3).

Movant therefore satisfies the required *prima facie* showing of the typicality requirements of Rule 23 for purposes of this Motion.

### (ii)   Movant Is an Adequate Representative for the Class

Movant is also an adequate representative for the Class. Under Rule 23(a)(4), representative parties must "fairly and adequately protect the interests of the class." Adequate

15

representation will be found if the representative has: (a) retained able and experienced counsel and (b) the representative has no fundamental conflicts of interest with the interests of the class as a whole. *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-480 (5th Cir. 2001); *Thompson*, 2004 U.S. Dist. LEXIS 25641. The PSLRA directs the Court to limit its inquiry regarding the adequacy of the movant to whether the interests of the movant are clearly aligned with the members of the putative Class and whether there is evidence of any antagonism between the interests of the movant and other members of the Class. 15 U.S.C. § 78u-4(a)(3)(B).

Movant meets the requirements under Rule 23(a)(4) to fairly and adequately protect the interests of the putative Class. Not only is there no evidence of conflict between the interests of Movant and those of the other members of the putative Class, but Movant has a significant and compelling interest in prosecuting the Action based on the large financial loss she has incurred as a result of the wrongful conduct alleged therein. "In order to satisfy adequacy of representation, counsel must be qualified, experienced, and able to prosecute the action vigorously, and the class representatives must not have interests antagonistic to the class members." *See Orthodontic*, 2001 U.S. Dist. LEXIS 21816. Indeed, Movant has already taken steps which demonstrate that she both recognizes and will protect the interests of the Class, including: (1) executing a certification detailing her Class Period transactions and expressing her willingness to serve as Class representative; (2) moving this Court to be appointed lead plaintiff; and (3) retaining competent and experienced counsel, who, as shown below, are experienced in class action litigation such as this involving allegations of securities fraud. Therefore, Movant will prosecute the Action vigorously on behalf of the Class.

Accordingly, at this stage of the proceedings, Movant has made the preliminary showing necessary to satisfy the typicality and adequacy requirements of Rule 23 and therefore satisfies 15

16

U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).  In addition, because Movant sustained the largest amount of losses from Defendants' alleged wrongdoing, Movant is the presumptive lead plaintiff in accordance with 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) and should be appointed as such to lead this Action.

### III.    MOVANT'S CHOICE OF COUNSEL SHOULD BE APPROVED

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v), the PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to the Court's approval.  15 U.S.C. § 78u-4(a)(3)(B)(v); *see also Bach v. Amedisys, Inc.*, C.A. No. 10-395-BAJ-CN, 2010 U.S. Dist. LEXIS 112758 (M.D. La. Oct. 22, 2010).  The Court should interfere with the lead plaintiff's selection only when necessary to "protect the interests of the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa).  Here, Movant has selected and retained BES as the proposed Lead Counsel for the Class and Smith Shanklin Sosa as Liaison Counsel.

As set forth in its accompanying firm résumé (Smith Decl., Ex. D), BES is highly accomplished in, and is currently acting as lead counsel in, a number of federal securities actions and has achieved many multi-million-dollar recoveries for investors.  The members of the firm have extensive experience in successfully prosecuting complex securities class actions such as this and are well-qualified to represent the Class.

Additionally, Smith Shanklin Sosa, specifically John H Smith and is well qualified to represent the Class as Liaison Counsel, and has served in multiple complex litigation class actions, including *In Re: Shaw Litigation* as liaison counsel.  *See* Smith Decl., Ex. E.

Thus, this Court may be assured that in the event that the instant Motion is granted, the members of the Class will receive the highest caliber of legal representation.

17

## **CONCLUSION**

For all the foregoing reasons, Movant respectfully requests that the Court:  (1) consolidate

the actions; (2) appoint Movant as Lead Plaintiff on behalf the Class in the Consolidated Action;

(3) approve Movant's selection of BES as Lead Counsel for the Class and Smith Shanklin Sosa as

Liaison Counsel; and (4) grant such other and further relief as the Court may deem just and proper.

DATED: November 26, 2019                          Respectfully submitted,

s/ John H Smith_____
John H Smith, Bar Roll No.  23308
Loren D. Shanklin, Bar Roll No. 33366
Alicia M. Sosa, Bar Roll No. 34101
**SMITH SHANKLIN SOSA, L.L.C.**
16851 Jefferson Highway, Suite 7C
Baton Rouge, Louisiana 70817
Telephone: 225-223-6333
Facsimile: 888-413-8345


*Proposed Liaison Counsel for the Class*

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone:  (646) 860-9449
Facsimile:  (212) 214-0506
Email: holleman@bespc.com

*Counsel for Movant and Proposed*
*Lead Counsel for the Class*

18

## <u>CERTIFICATE OF SERVICE</u>

I, John H. Smith, hereby certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 26th day of November, 2019.

*/s/ John H. Smith*

John H. Smith