**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

| | |
|---|---|
| **WALTER WELCH, Individually and on Behalf of all Others Similarly Situated,** ) ) ) ) | **No. 2:19-CV-01260-TAD-KK (LEAD)** |
| **Plaintiff,** ) ) | **No. 2:19-CV-01427-TAD-KK (MEMBER)** |
| **vs.** ) ) | **JUDGE TERRY A. DOUGHTY** |
| ) ) | **MAGISTRATE KATHLEEN KAY** |
| **CHRISTOPHER MEAUX, DAVID PRINGLE, JEFF YURECKO, TILMAN J. FERTITTA, RICHARD HANDLER, WAITR HOLDINGS, INC. f/k/a LANDCADIA HOLDINGS, INC., JEFFERIES FINANCIAL GROUP, INC., and JEFFERIES, LLC,** ) ) ) ) ) ) ) ) | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |
| **Defendants.** ) ) | |

## <u>TABLE OF CONTENTS</u>

**Page:**

I.  STRICT LIABILITY/NEGLIGENCE CLAIMS UNDER SECTION 14(a)
    OF THE EXCHANGE ACT...................................................................................... 2

    A.  Introduction...................................................................................................... 2

    B.  Jurisdiction and Venue..................................................................................... 2

    C.  Parties .............................................................................................................. 3

        1.  Plaintiffs ................................................................................................ 3

        2.  Defendants ............................................................................................. 3

    D.  Background ....................................................................................................... 6

    E.  Materially False and Misleading Misrepresentations and Omissions
        Actionable Under Section 14(a) of the Exchange Act..................................... 10

        1.  False and Misleading Statements and/or Omissions on
            May 17, 2018 Conference Call Announcing Going Public Transaction .................. 10

        2.  False and Misleading Statements and/or Omissions in
            Defendant Fertitta's May 17, 2018 CNBC Interview ................................ 17

        3.  False and Misleading Statements and/or Omissions in
            Defendants' August 2, 2018 Form 8-K for 2Q18 ..................................... 19

        4.  False and Misleading Statements and/or Omissions in
            Defendants' October 1, 2018 Investor Presentation ................................ 20

        5.  False and Misleading Statements and/or Omissions in
            Defendants' November 8, 2018 Form 8-K for 3Q18 ................................. 21

    F.  Loss Causation ................................................................................................. 23

    G.  Causes of Action Under Section 14 of the Exchange Act ............................... 28

        1.  COUNT I for Violations of Section 14(a) of the Securities Exchange Act of 1934
            Against Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle ...................... 28

II. FRAUD CLAIMS UNDER SECTIONS 10(b) AND 20(a)
    OF THE EXCHANGE ACT...................................................................................... 29

    A.  Introduction and Overview .............................................................................. 29

    B.  Jurisdiction and Venue..................................................................................... 31

    C.  Parties .............................................................................................................. 31

        1.  Plaintiffs ................................................................................................ 31

        2.  Defendants ............................................................................................. 32

    D.  Background ....................................................................................................... 34

    E.  Materially False and Misleading Misrepresentations and Omissions
        Under Sections 10(b) and 20(a) of the Exchange Act ..................................... 38

1.  False and Misleading Statements and/or Omissions in Waitr's November 16, 2018 Form 8-K Announcing Completion of the Going Public Transaction...................................................... 39

2.  False and Misleading Statements and/or Omissions in Meaux's December 3, 2018 Interview........................................ 40

3.  False and Misleading Statements and/or Omissions in Waitr's December 11, 2018 Form 8-K Announcing Bite Squad Acquisition ........... 43

4.  False and Misleading Statements and/or Omissions in Waitr's March 7, 2019 Form 8-K and Earnings Call for 4Q and FY18 .................... 45

5.  False and Misleading Statements and/or Omissions in Waitr's March 15, 2019 Form 10-K for 4Q and FY18.............................. 47

6.  False and Misleading Statements and/or Omissions in Waitr's May 8, 2019 Form 8-K and Earnings Call for 1Q19 .................................. 51

7.  False and Misleading Statements and/or Omissions in Waitr's May 10, 2019 Form 10-Q for 1Q19............................................. 60

8.  False and Misleading Statements and/or Omissions in Waitr's Secondary Offering Materials........................................ 62

F.  The Truth Is Revealed or Materialized in a Series of Disclosures .................................. 68

1.  April 30, 2019 Restaurant Partners' Class Action ...................................... 68

2.  July 5, 2019 Take Rate Increase Announcement......................................... 69

3.  August 6, 2019 Olo Partnership Announcement ........................................ 70

4.  August 7, 2019 Press Release and Earnings Call ..................................... 71

G.  Presumption of Reliance; Fraud-On-the-Market ...................................... 78

H.  Additional Indicia of Scienter.................................................................... 79

1.  Confidential Witness Testimony Supports Falsity and Scienter............................... 81

2.  Post-Class Period Developments ........................................................ 83

3.  Defendant Pringle's Early "Retirement" .............................................. 84

4.  Meaux's Resignation and Stock Forfeiture............................................. 85

5.  Waitr's Going Public Transaction ...................................................... 86

6.  Waitr's Secondary Offering ............................................................ 87

I.  Causes of Action Under Sections 10(b) and 20(a) of the Exchange Act.......................... 90

1.  COUNT II for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Waitr, Meaux, Fertitta, Pringle, and Yurecko ...... 90

2.  COUNT III for Violations of Section 20(a) of the Exchange Act Against Defendants Meaux, Fertitta, Pringle, and Yurecko................................. 94

III. PRAYER FOR RELIEF ................................................................................... 95

IV. JURY TRIAL DEMANDED ................................................................................ 95

Court-appointed Lead Plaintiff the Delivery Investment Group, consisting of Andrew Brown, William Moore, Daniel Sinor, and Thomas Colangelo ("Lead Plaintiff"), together with Additional Plaintiffs Walter Welch and Sean Barnard (collectively, "Plaintiffs"), bring this federal securities Class Action asserting violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78t(a), and Rule 14a-9 promulgated thereunder by the U.S. Securities Exchange Commission (the "SEC") (17 CFR § 240.14a-9), as well as §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), on behalf of themselves and all other persons or entities who purchased or otherwise acquired the securities of Waitr Holdings, Inc., f/k/a Landcadia Holdings, Inc. ("Waitr" or the "Company"), during the period from May 17, 2018 through August 8, 2019, inclusive.

Plaintiffs allege certain Defendants made materially false and/or misleading statements and omissions in proxy and prospectus materials with respect to Waitr's going public transaction and business combination with Landcadia Holdings, Inc. ("Landcadia"), in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, from May 17, 2018 through November 15, 2018, inclusive (the "Section 14(a) Class Period"). These allegations are set forth in Section I. herein. Plaintiffs also allege certain Defendants made additional materially false and/or misleading statements and omissions in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, from November 16, 2018 through August 8, 2019, inclusive (the "Section 10(b)/20(a) Class Period"). These allegations are set forth in Section II. herein.

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and information and belief as to all other matters. Plaintiffs' information and belief is based

upon, *inter alia*, the investigation conducted by and through their counsel, which included, among other things, a review and analysis of: (i) regulatory filings made by Waitr with the United States Securities and Exchange Commission ("SEC"); (ii) Defendants' other public statements, including those made in press releases and during Earnings Conferences; (iii) analysts' reports and advisories about the Company; (iv) news articles and other commentary and analysis concerning Waitr and the industry in which it operates; and (v) interviews with Confidential Witnesses possessing personal knowledge of facts.

## I.   STRICT LIABILITY/NEGLIGENCE CLAIMS UNDER SECTION 14(a) OF THE EXCHANGE ACT

### A.   Introduction

1.      Plaintiffs Walter Welch and Sean Barnard assert claims against Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle (all defined below) for their violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78t(a), and Rule 14a-9 promulgated thereunder by the SEC (17 CFR § 240.14a-9).

2.      Plaintiffs Welch and Barnard allege Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle made materially false and/or misleading statements and omissions in proxy and prospectus materials (the "Going Public Transaction Proxy/Prospectus Filings") with respect to Waitr's going public transaction and business combination with Landcadia Holdings, Inc. ("Landcadia") on or about November 15, 2018 (the "Going Public Transaction").

### B.   Jurisdiction and Venue

3.      Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331. The claims asserted herein arise under § 14(a) of the Exchange Act, 15 U.S.C. § 78t(a), and rules promulgated thereunder by the SEC, 17 CFR § 240.14a-9.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), §1337 and §27, 15 U.S.C. §78aa. Defendant Waitr maintains its principal place

of business within this District, and/or conducts business in within this District, and many of the acts giving rise to the violations complained of herein took place within this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### C.      Parties

#### 1.      Plaintiffs

6.      Plaintiff **WALTER WELCH**, as set forth in the certification at Dkt. No. 13-9, acquired the common stock of Landcadia during the Section 14(a) Class Period, held shares of Landcadia common stock as of November 15, 2018, and was eligible to vote on the merger of Landcadia and Waitr. In exchange for his Landcadia shares, Welch received shares of Waitr common stock at an inflated price upon consummation of the merger and has been damaged thereby.

7.      Plaintiff **SEAN BARNARD**, as set forth in the certification at Dkt. No. 13-11, acquired the common stock of Landcadia during the Section 14(a) Class Period, held shares of Landcadia common stock as of November 15, 2018, and was eligible to vote on the merger of Landcadia and Waitr. In exchange for his Landcadia shares, Barnard received shares of Waitr common stock at an inflated price upon consummation of the merger and has been damaged thereby.

#### 2.      Defendants

8.      Defendant **CHRISTOPHER MEAUX** was CEO, Chairman of the Board of Directors, and co-Founder of the Company during the Section 14(a) Class Period. On August 8, 2019, Defendant Meaux was removed from his position as CEO of the Company. During the

Section 14(a) Class Period, Defendant Meaux signed, made, and/or assisted in the preparation of the materially false and misleading Going Public Transaction Proxy/Prospectus Filings.

9.      Defendant **DAVID PRINGLE** ("Pringle") was Chief Financial Officer ("CFO") and Principal Financial Officer of the Company during the Section 14(a) Class Period, until his departure in April 2019. During the Section 14(a) Class Period, Defendant Pringle signed, made, and/or assisted in the preparation of the materially false and misleading Going Public Transaction Proxy/Prospectus Filings.

10.     Defendant **TILMAN J. FERTITTA** is and during the Section 14(a) Class Period was a member of the Board of Directors of the Company, since Waitr's acquisition by Landcadia on or about November 15, 2018. Defendant Fertitta was also CEO and Co-Chairman of the Board of Directors of Landcadia from 2015 to November 2018. According to the Company's releases, Defendant Fertitta purports to be "one of the foremost authorities in the dining, hospitality, entertainment and gaming industries." He is the sole owner and currently serves as CEO, Chairman of the Board, and President of Golden Nugget, Inc., Landry's, and Fertitta Entertainment, Inc., and is also the owner of the NBA Houston Rockets. Defendant Fertitta signed, made, and/or assisted in the preparation of the materially false and misleading Going Public Transaction Proxy/Prospectus Filings.

11.     Defendant **RICHARD HANDLER** was President and Co-Chairman of the Board of Directors of Landcadia during the Section 14(a) Class Period, until Landcadia acquired Waitr on or about November 15, 2018, at which time Landcadia ceased operations in favor of Waitr. Defendant Handler is also CEO and Chairman of the Board of Jefferies Financial Group, Inc. During the Section 14(a) Class Period, Defendant Handler signed, made, and/or assisted in the preparation of the materially false and misleading Going Public Transaction Proxy/Prospectus

4

Filings. Handler was also CEO of JFG at such time that Jefferies served as underwriter in the Going Public Transaction.

12.     Defendant **WAITR HOLDINGS, INC.** is a Delaware corporation with its principal place of business located at 844 Ryan Street, Suite 300, Lake Charles, Louisiana 70601. According to the Company's profile, Waitr purports to be a leading online food ordering and delivery service connecting local restaurants to diners in underserved markets via its website and mobile application ("app") Waitrapp.com. Prior to being acquired by Landcadia, there was no public market for Waitr common stock. Immediately following the acquisition of Waitr by Landcadia, on November 16, 2018, Landcadia changed its name to Waitr and shares of the new combined entity Waitr began trading on the NASDAQ under the symbol "WTRH."

13.     Defendant **JEFFERIES FINANCIAL GROUP, INC.** ("JFG") purports to be a diversified financial services company engaged in investment banking and capital markets, asset management and direct investing. JFG beneficially owns almost 7% of Waitr common stock, including 753,500 shares beneficially owned by Jefferies, LLC. JFG is the parent of Jefferies, LLC. At all relevant times, Defendant Handler served as CEO of JFG. JFG and/or Jefferies served as Underwriter(s) for the Going Public Transaction and is liable for the materially false and/or misleading statements and/or omissions contained in Going Public Transaction Proxy/Prospectus Filings under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

14.     Defendant **JEFFERIES, LLC** ("Jefferies") is a subsidiary of JFG. According to its most recent Form 10-Q filed with the SEC, Jefferies LLC purports to operate as a broker-dealer registered with the SEC and member firms of the Financial Industry Regulatory Authority ("FINRA"). Jefferies' executive office is located at 520 Madison Ave., New York, NY 10022.

JFG and/or Jefferies served as Underwriter(s) for the Going Public Transaction and is liable for the materially false and/or misleading statements and/or omissions contained in Going Public Transaction Proxy/Prospectus Filings under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

### D.    Background

15.    Waitr was founded in 2013 by Defendant Meaux and four college students who developed the concept at a pitch competition in Gainesville, Florida. Meaux has given several media interviews about the moment he, along with four "kids," came up with the idea for Waitr. According to an interview published in *The Advocate* on May 23, 2019, Defendant Meaux was at the competition to pitch a concept called Foogle, which would answer the eternal question: "What's for dinner," but did little more. Meaux quickly abandoned that pitch in favor of another group that had the Waitr name and a concept that allowed diners to order using a mobile app, instead of a human waiter, while seated in a restaurant. While this latter concept may have given Meaux access to some of the back-end that was being used by food delivery companies like GrubHub and UberEats, Waitr's proprietary "platform" was essentially built in less than 1 year for a concept that was markedly different than the traditional, food delivery service model Waitr eventually adopted.

16.    The Waitr.com app debuted in Lafayette, Louisiana in mid-2015. The app started off slowly, scaling to 1000 orders per day in 11 cities, primarily in Louisiana, by the end of 2016. By 2017, that number had reached 5,000 orders per day from 150 cities and 6 states—an increase of 390%, and the Company was purported to be on track to double orders again in 2018.

17.    Landcadia was founded as a Special Purpose Acquisition Company ("SPAC") whose sole purpose was to effect a merger or similar business combination and to acquire the assets of another company. Landcadia was incorporated in Delaware in November 2008 and, in

May 2016, completed an initial public offering selling shares to the public, raising approximately $250 million. In its 2016 SEC filings, Landcadia stated that, "[a]lthough our efforts to identify a prospective target business will not be limited to a particular industry or geographic region, we intend to focus our investment opportunities in the dining, hospitality, entertainment and gaming industries in the U.S.….Our management team and sponsors have significant experience investing and in advising companies in these areas."

18.     Pursuant to the terms of its own offering, Landcadia was required to complete an acquisition within two years – or by June 1, 2018, at the latest. If Landcadia did not complete a contemplated acquisition or combination prior to that time it would be forced to redeem 100% of its public shares at a per-share price, payable in cash and including interest. If this was to occur, millions of dollars in deferred underwriting commissions would also be forfeited by Landcadia's underwriters, including Jefferies.

19.     While Landcadia, Jefferies, Fertitta, and Handler had a full 24 months, and while this was the sole purpose for Landcadia's existence, they were unable to find any suitable acquisition or transaction for almost the entire two years. Thus, with only two weeks before the June 1 deadline, on May 16, 2018, Landcadia suddenly announced that it had entered into an agreement and plan of merger with Waitr Holdings, Inc. and announced the pending acquisition. In fact, because there was not even enough time to complete the contemplated transaction, Defendant Fertitta was forced to obtain Landcadia shareholder approval to an extension of time from June 1, 2018 to December 14, 2018, to complete the Waitr acquisition. The Waitr acquisition was ultimately completed with less than 30 days remaining before even the extended deadline expired.

20.     On May 7, 2018, pursuant to a Schedule filed with the SEC, Landcadia reported that its shareholder meeting to extend the redemption expiration date was scheduled *prior* to the announcement of the Waitr acquisition. The actual meeting, however, was scheduled to take place *after* the Going Public Transaction was announced.

21.     A letter to Landcadia shareholders by Fertitta reported what would occur if shareholders refused to approve the extension:

> ***If the Extension Amendment and Trust Amendment proposals are not approved and we do not consummate a business combination by June 1, 2018, as contemplated by our IPO prospectus and in accordance with our charter, we will (i) cease all operations except for the purpose of winding up,*** (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares…and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. ***There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our business combination by June 1, 2018.***

(emphasis added).

22.     Having raced to enter a merger agreement with Waitr prior to the time Landcadia (and Defendants Fertitta and Handler), would be forced to return $250 million, and thus admit that the powerhouse combination of the self-promoting billionaire Fertitta and the head of one of the nation's largest investment banks, Handler, could not find an investment for their pet project in two years, Defendants attempted to protect their reputations as high-power deal-makers.

23.     Further, if Landcadia had not finalized the Waitr acquisition prior to the extended deadline, Jefferies would have had to forfeit over $10 million in Underwriter fees, much of which were already earned.

24.     Waitr was clearly rushed to market, as evidenced, in part, by the lack of credentials and experience of its senior-most executive leadership, and the limited history of the

Company. Throughout the Section 14(a) Class Period and until Meaux's termination, Waitr was led by a serial failure of an entrepreneur, who was reportedly a week away from taking a job as a high school teacher before associating himself with the inventors of Waitr.

25.     In early 2018, Meaux stated publicly that he wanted Waitr to be the leading platform for front-of-house restaurant operations, whereby the Waitr order manager would replace the order entry point at the point of sales system. This plan did not come to fruition. One of the Company's biggest disadvantages was its lack of access to high-level programmers and engineers in or near Lake Charles, Louisiana—as Meaux was told repeatedly by the venture capitalists who refused to invest unless he moved the Company. Thus, despite such resources existing in short supply outside of major technology centers, Meaux was repeatedly quoted in the press as saying, "You don't have to be in Silicon Valley to create a technology company. You can do it in Lake Charles, Louisiana." In an interview published in *New Orleans Business* on January 31, 2018, Meaux recounted his defiance in the face of experience stating, "I remember pitching some VCs in Houston and they sat me down and said, 'If you're going to do this you're going to have to be in Austin or Silicon Valley because you're not going to find enough software engineers in Louisiana.' They actually said, 'If we're going to invest, you have to move the company.'" But, as Meaux was repeatedly warned and as investors ultimately learned, Waitr's failure to attract high-level programmers and engineers was a significant roadblock to success.

26.     In fact, by mid-2019, Waitr had all but abandoned its software development and instead announced it would be obtaining this exact technology that was to be the future of the Company from third-party developer Mobo Systems, Inc. d/b/a Olo ("Olo")—based in New York, New York. The deal with Olo, announced on August 6, 2019, revealed to investors for the first time that Waitr could not stay competitive in software development and that it could not

obtain the programmers and engineers necessary to stay at the forefront of its market, and that any first mover advantage Waitr had by adopting an established online ordering app designed to serve small restaurants in underserved and unprofitable markets was unlikely to be sustained. Once it effectively outsourced the back-end that it was charging restaurants to implement, Waitr became little more than a website that employs delivery drivers.

> E.    **Materially False and Misleading Misrepresentations and Omissions Actionable Under Section 14(a) of the Exchange Act**

27.    For all claims stated within this Section I., Plaintiffs Welch and Barnard expressly disclaim any allegations that could be construed as alleging fraud or intentional misconduct. The claims related to the false statements made in the Company's proxy prospectus and solicitation materials related to the Going Public Transaction are based in negligence and do not sound in fraud. Defendants were required to assure that statements contained in the Going Public Transaction Proxy/Prospectus Filings or incorporated therein by reference, or which were filed as amendments or exhibits thereto, were true, accurate and reliable and did not contain any untrue statement of a material fact or omit to include material facts necessary to make the statements contained therein not materially false, at that time.

28.    These claims are brought against only the following Defendants: Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle.

> 1.    **False and Misleading Statements and/or Omissions on May 17, 2018 Conference Call Announcing Going Public Transaction**

29.    On May 17, 2018, the first day of the Section 14(a) Class Period, Defendants Fertitta, Meaux, and Pringle participated on a conference call for analysts and investors addressing Landcadia's intention to acquire Waitr for stock and cash valued at $308 million. The transcript for this call was filed with the SEC as an exhibit to Landcadia's Form 8-K—dated on May 16, 2018 but filed with the SEC on May 17, 2018—announcing the Going Public

Transaction, pursuant to Form 14A as proxy solicitation materials. During the call, Defendant

Fertitta, stated, in part, the following:

> Waitr is a restaurant ordering and food delivery technology platform based in Louisiana. ***Unlike many of the companies that we looked at, Waitr is a growth business with a huge potential and a tremendous complementary relationship with my existing businesses. They will also be able to leverage the tremendous industry knowledge and expertise Rich and I have.*** We believe we have an incredible opportunity to create the next leader in the fast-growing online food delivery market….

*     *     *

> We believe, number one, there is a massive unpenetrated market for online delivery, particularly in the secondary markets. Number two, Waitr has already shown tremendous organic growth since their founding in 2013. ***Number three, there are many acquisition opportunities that can help drive additional growth and scale throughout the U.S.….They provide, number four, a great customer experience and have differentiated the value proposition for restaurant partners, which I have experienced firsthand.*** Number five, they have a very capital efficient model, with strong unit economics and a proven track record. Six, they have significant operating leverage, on par with industry leaders. ***Number seven, their business is highly complementary with the businesses we run at Fertitta Entertainment. Number eight, as a preferred food and delivery partner for Landry's and the Golden Nugget, Waitr will have brand exposure to our over four million loyalty customers; and number nine, finally as a sponsor with the Houston Rockets, Waitr's brand will be exposed to over nine million Facebook followers.***

> (emphasis added).

30.     The foregoing statements were materially false and misleading when made for the

following reasons: Waitr was not a "growth business with a huge potential" because it did not

have a proven business model and expansion strategy, its revenues would not sustain its

operations, and it would be impossible to achieve these results without merging with sizable

competitors and successfully integrating these competitors into Waitr's operations, something

which would entail great risks given CEO Meaux's limited operating experience and history of

serial business failures; Waitr did not enjoy "a tremendous complementary relationship" with

11

Defendant Fertitta's "existing businesses," nor was it "highly complementary with th[ose] businesses," as Defendant Fertitta did little or nothing to promote the Company, and Fertitta's guidance and/or oversight did not materially benefit Waitr in any way; and Waitr did not "have a differentiated…value proposition for restaurant partners" because it was not true that the Company was providing its services at a sustainable low take rate established at 15%. While the Company repeatedly stressed to investors that its 15% take rate was a significant market differentiator that would enable Waitr to grow and succeed, Defendants omitted to state the following material facts necessary in order to make the aforementioned statement(s) not misleading: Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares. As recounted by Confidential Witness 1 ("CW1") herein (*see infra* at ¶¶ 188-95), Waitr unilaterally raised its take rate to 18% during the Class Period, and thereafter raised its take rate to 33% (plus an additional 3.1% credit card processing fee), after admitting to CW1 that the increase was necessary for Waitr to "continue doing business and be solvent."

31.    On the same May 17, 2018 conference call, Defendant Meaux stated, in part, the following:

> As you guys know, ***the restaurant delivery market is massive, and we are a first mover in the underpenetrated online space.*** We currently operate in underserved markets throughout the southeast. ***We have a strong value proposition to both customers and to restaurants, and we have a very differentiated proprietary technology platform in which we operate.*** Our business to date has had to be very capital efficient, and we have proven our ability to grow and expand in strategic markets and entrench our competitive positioning in the market.
>
> We have over 5,000 restaurants on our platform and over 5,800 drivers. ***Our drivers are W2 employees, which gives us some flexibility and control over the***

*user experience…. We have the ability to schedule our drivers, which allows us to optimize performance and control quality.* Our drivers are readily identifiable and uniformed when they show up at the customer's door, and like the stable job environment that being an employee of Waitr provides, as well as the community, of being a part of something real.

(emphasis added).

32.     The foregoing statements were each materially false and misleading when made for the following reasons: Whatever "first mover" advantage the Company claimed existed was quickly squandered by its inability to obtain sophisticated high-level programmers and software engineers who could enable Waitr to refine and develop the software necessary to stay competitive in its market; Waitr did not present "a strong value proposition to…restaurants" because it was not true that the Company was providing its services at a sustainable low take rate established at 15%. While the Company repeatedly stressed to investors that its 15% take rate was a significant market differentiator that would enable Waitr to grow and succeed, Defendants omitted to state the following material facts necessary in order to make the aforementioned statement(s) not misleading: Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares. As recounted by CW1 herein, Waitr unilaterally raised its take rate to 18% during the Class Period, and thereafter raised its take rate to 33% (plus an additional 3.1% credit card processing fee), after admitting to CW1 that the increase was necessary for Waitr to "continue doing business and be solvent"; Waitr's "very differentiated proprietary technology platform" provided little or no competitive advantages as the Company was not capable of refining and developing its software to remain competitive in the market (much less become the

13

next front-of-house integrated point of sales solution), because Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers, and engineers in Lake Charles, Louisiana; and Waitr was not able to extract efficiencies from its full time fixed-rate labor force that purportedly allowed the Company to offer its services at a lower rate than competitors, when in fact its W2 labor model was inefficient, resulted in huge costs that could not be sustained (especially if the Company paid all associated labor costs as required by state and federal law), and Waitr reporting the lowest gross margins among its peers. Moreover, unlike its competitors, Waitr incurred unique risks because its drivers were all full-time employees (fixed costs), whereas competitors hired drivers on an as-needed basis, as surge labor, engaging more drivers during periods of peak demand.

33.     Defendant Meaux used this call to condition investors to believe that Waitr was differentiated from its peers and maintained a competitive advantage by having restaurants "onboarded," onto Waitr's "platform," and that the Company maintained pricing at 15%—which made it possible for small tertiary-market, independent restaurants to join the modern world of app-based restaurant delivery. As evidence of this Defendant Meaux stated the following:

> *We have the most attractive pricing in the industry, at 15% take rate, compared to our competitors, which are much higher. We partner with the restaurants on in-store marketing.…[W]hat we've found is that restaurants—the longer they're on the platform, they see more benefits from this partnership. In fact, our 2015 restaurants that signed up with us there have seen almost a twofold increase in the average amounts of their orders on Waitr on a monthly basis.*

> *      *      *

> We've identified over 200 markets within our current operating territory that we can expand into. This partnership with Landcadia is going to give us the additional capital we need to expand into those markets more quickly and beyond just the 11-state area in which we operate today.…[W]e have proven that this model is scalable to multiple markets.

> (emphasis added).

14

34.     The foregoing statements were each materially false and misleading for the following reasons: Waitr had achieved its sales growth by partnering with local restaurants and charging them less than the take rates charged by GrubHub and other larger competitors, but Waitr was effectively subsidizing these sales with "onboarding" fees. This was not sustainable, and Waitr could not achieve profitability with its existing contracts. Thus, Waitr was already in the process of drastically increasing its prices in a desperate attempt to raise revenue by imposing draconian price increases on small independent restaurants. These price increases were evidence that Waitr's model of providing low-cost services to remote markets was not viable, and the huge price increases were a cynical attempt to get customers to abandon their contracts so that Waitr did not have to return any of the thousands of dollars paid in "onboarding" fees by each restaurant; Waitr did not have "the most attractive pricing in the industry" because it could not provide its services at a sustainable low take rate established at 15%. As evidence of this, Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares; and Waitr did not have a "proven" business model "scalable to multiple markets", its revenues would not sustain its operations, and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, something which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures.

35.     On the same May 17, 2018 conference call, Defendant Pringle stated, in part, the following:

We had $120 million worth of gross food sales come through the network, resulting in $27 million worth of net revenue to Waitr. ***For 2018, we're projecting somewhere between $265 million and $275 million of gross food sales going through the platform. That would result in somewhere between $60 million and $65 million of net revenue to Waitr.***

***For 2019, we're projecting over $500 million worth of gross food sales through the platform, resulting in about $125 million worth of net revenue to Waitr. If we carry on out to 2020, again, still at the two markets per month rollout plan, we're projecting over $850 million worth of gross food sales through the platform, resulting in somewhere between $200 million and $220 million of net revenue to Waitr.***

(emphasis added).

36.     The foregoing statements were each materially false and misleading for the following reasons: It was not true that Waitr's financial statements, SEC reports, or Sarbanes Oxley certifications were true, accurate or reliable, as Waitr had failed to disclose that it had artificially inflated profits and revenues, that it was unable to sustain itself even with rates twice its current take rates, that known adverse trends that were *already* impacting the Company, and that the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures. As a result of the aforementioned adverse conditions that Defendants failed to disclose, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Waitr could achieve the guidance sponsored and/or endorsed by Defendants. Nor was it true that Waitr maintained an adequate system of internal controls to report and eliminate material conflicts of interest; and Defendants' financial forecasts were also materially false or misleading because, at that time, the cost of revenues was suddenly increasing relative to growth, such that Waitr had no viable path to profitability. This was especially true since national competitors like GrubHub (public), DoorDash (backed by SoftBank), and UberEats were already expanding into Waitr's once unchallenged markets and negatively impacting Waitr's current and foreseeable future

sales. Not only were these competitors bigger, better run, and better funded (with more experience and stronger management), but they also each had a significantly stronger business model which allowed them to fund growth in secondary markets with profits generated in primary markets.

### 2. False and Misleading Statements and/or Omissions in Defendant Fertitta's May 17, 2018 CNBC Interview

37.    A transcript of Defendant Fertitta's May 17, 2018 appearance on financial news network CNBC's Power Lunch, attached as an exhibit to the Company's Form 8-K announcing the Going Public Transaction pursuant to Form 14A as proxy solicitation materials, was also materially false and misleading. This interview started off with the CNBC host, Tyler Mathisen, asking Fertitta why he changed his mind after previously stating that the food delivery business was *not* a market he had any interest in entering. Fertitta's response was that "it's really funny how things change" and that he had seen the increasing trends of third-party app-based food delivery at his hundreds of restaurants. During this interview, Defendant Fertitta also conditioned investors to believe that the Company's low-cost competitive pricing would continue to drive growth, even as Waitr expanded. Fertitta stated, in part, as follows:

> *Well, one of edges is, is that the restaurant only hits 15%, where I will not use GrubHub because they want 25%, or, you know, different parts 20%, 30%. We can't afford to do it, the quality of food that we serve, and so one of the things that attracted us to Waitr that got them in our restaurants was the 15%, because they hire their own drivers and they can do more deliveries, and we won't use Uber Eats because of the cost to us.* So, it kind of started getting our attention, and then Jefferies and myself, Rich and I were looking for a company to buy with this special acquisition corp. and we went to them and—and, you know, they kind of liked the idea, because they already had a tie-in with Landry's, and we started talking. I didn't think we were going to make a deal. *As I watched their sales, you know, last year $125 million, they're going to do around $250 million this year, and projected to do $500 million next year. I mean, the growth is there, and what I like about them is they're in the smaller markets*. We're the only company out that's going to be public, besides GrubHub. So, I'm excited about it. I wanted a real growth company and I think this is it.

(emphasis added).

38.     The foregoing statements were each materially false and misleading for the following reasons: Waitr could not provide its services at a sustainable low take rate established at 15%. As evidence of this, Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares. It is also noteworthy that Fertitta, one of the nation's largest restaurant operators, stated his restaurants could not afford to pay more than a 15% take rate and that fees in the 25-30% range made third-party delivery services not economical; Waitr was not able to extract efficiencies from its full time fixed-rate labor force that purportedly allowed the Company to offer its services at a lower rate than competitors, when in fact its W2 labor model was inefficient, resulted in huge costs that could not be sustained (especially if the Company paid all associated labor costs as required by state and federal law), and resulted in Waitr reporting the lowest gross margins among its peers. Moreover, unlike its competitors, Waitr incurred unique risks because its drivers were all full-time employees (fixed costs), whereas competitors hired drivers on an as-needed basis, as surge labor, engaging more drivers during periods of peak demand; and Defendants' financial forecasts were also materially false or misleading because, at that time, the cost of revenues was suddenly increasing relative to growth, such that Waitr had no viable path to profitability. This was especially so since national competitors like GrubHub (public), DoorDash (backed by SoftBank) and UberEats were already expanding into Waitr's once unchallenged markets and negatively impacting Waitr's current and foreseeable future sales. Not only were these competitors bigger, better run, and better funded (with more

experience and stronger management), but they also each had a significantly stronger business model which allowed them to fund growth in secondary markets with profits generated in primary markets.

### 3.  False and Misleading Statements and/or Omissions in Defendants' August 2, 2018 Form 8-K for 2Q18

39.     On August 2, 2018, Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle filed with the SEC pursuant to Schedule 14A, additional information required in the Going Public Transaction Proxy/Prospectus Filings concerning soliciting material pursuant to §240.14a-12, that attached the Company's Form 8-K filing of Waitr's release of 2018 second quarter business highlights for the period ended June 30, 2018. This Form 8-K quoted Defendant Meaux, in part, as follows:

> We are very pleased with the results in the second quarter," said Chris Meaux, founder and Chief Executive Officer of Waitr. "These results exceeded our expectations, allowing us to increase our outlook for the year. ***We believe that our strong position in our current markets, proven expansion strategy, strong value proposition to customers and restaurants, differentiated proprietary technology platform and high growth business model built in a capital efficient manner has positioned us well for the long term.***

(emphasis added).

40.     The foregoing statements were each materially false and misleading for the following reasons: Waitr did not have a "proven expansion strategy" because its revenues would not sustain its operations and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, something which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures; Waitr did not present "a strong value proposition to…restaurants" because it was not true that the Company was providing its services at a sustainable low take rate established at 15%. While the Company repeatedly stressed to investors

19

that its 15% take rate was a significant market differentiator that would enable Waitr to grow and succeed, Defendants omitted to state the following material facts necessary in order to make the aforementioned statement(s) not misleading: Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares. As recounted by CW1 herein, Waitr unilaterally raised its take rate to 18% during the Class Period, and thereafter raised its take rate to 33% (plus an additional 3.1% credit card processing fee), after admitting to CW1 that the increase was necessary for Waitr to "continue doing business and be solvent"; and Waitr's "differentiated proprietary technology platform" provided little or no competitive advantages as the Company was not capable of refining and developing its software to remain competitive in the market (much less become the next front-of-house integrated point of sales solution), because Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers, and engineers in Lake Charles, Louisiana.

### 4. False and Misleading Statements and/or Omissions in Defendants' October 1, 2018 Investor Presentation

41.     Next, on October 1, 2018, Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle filed with the SEC pursuant to Schedule 14A an Investor Presentation, dated October 2018, which purported to represent to investors important information and Company specific metrics, including Waitr's purported competitive pricing model. Therein, Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle claimed Waitr provided the "[m]ost attractive transaction pricing," charging only a "15% commission versus ~30% at competitors."

42.     The foregoing statements were each materially false and misleading for the following reasons: It was not true that the Company was providing its services at a sustainable low take rate established at 15%. While the Company repeatedly stressed to investors that its 15% take rate was a significant market differentiator that would enable Waitr to grow and succeed, Defendants omitted to state the following material facts necessary in order to make the aforementioned statement(s) not misleading: Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares. As recounted by CW1 herein, Waitr unilaterally raised its take rate to 18% during the Class Period, and thereafter raised its take rate to 33% (plus an additional 3.1% credit card processing fee), after admitting to CW1 that the increase was necessary for Waitr to "continue doing business and be solvent."

### 5.     False and Misleading Statements and/or Omissions in Defendants' November 8, 2018 Form 8-K for 3Q18

43.     Finally, on November 8, 2018, Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle filed with the SEC pursuant to Schedule 14A, definitive additional materials required in Going Public Transaction Proxy/Prospectus Filings, which was filed along with the Company's Form 8-K filing of Waitr's release of 2018 third quarter business highlights for the period ended September 30, 2018, and quoted Defendant Meaux, in part, as follows:

> "***The momentum we experienced in the first half of the year continued into the third quarter. Growth in the third quarter was driven by entering 6 new markets (32 cities) as well as further penetrating our existing markets***," said Chris Meaux, founder and Chief Executive Officer of Waitr. "We remain excited about the pending merger with Landcadia as well as the financing agreement to be provided by Luxor Capital Group. ***Both are high quality partners who will further enable us to accelerate our growth in our current markets, expand into new markets and take advantage of potential opportunistic acquisitions***."

(emphasis added).

44.     The foregoing statements were each materially false and misleading for the following reasons: It was not true that its financial statements, SEC reports, or Sarbanes Oxley certifications were true, accurate or reliable, as Waitr had failed to disclose that it had artificially inflated profits and revenues, that it was unable to sustain itself even with rates twice its current take rates, that known adverse trends that were _already_ impacting the Company, and that the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures; As a result of the aforementioned adverse conditions that Defendants failed to disclose, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Waitr could achieve the guidance sponsored and/or endorsed by Defendants. Nor was it true that Waitr maintained an adequate system of internal controls to report and eliminate material conflicts of interest; Waitr did not have a proven business model and expansion strategy, its revenues would not sustain its operations, and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, something which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures; and Defendants' financial forecasts were also materially false or misleading because, at that time, the cost of revenues was suddenly increasing relative to growth, such that Waitr had no viable path to profitability. This was especially so since national competitors like GrubHub (public), DoorDash (backed by SoftBank) and UberEats were already expanding into Waitr's once unchallenged markets and negatively impacting Waitr's current and foreseeable future sales. Not only were these competitors bigger, better run, and better funded (with more experience and stronger management), but they also each had a significantly stronger

business model which allowed them to fund growth in secondary markets with profits generated in primary markets.

      **F.**    **Loss Causation**

    45.    Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle's materially false and/or misleading statements and omissions, as alleged in Section I.E. herein, directly and proximately caused the economic loss suffered by Plaintiff Welch and the Class of Landcadia shareholders entitled to vote on the merger who acquired Waitr shares in exchange for their Landcadia shares.

    46.    At the consummation of the merger between Landcadia and Waitr, Plaintiffs Welch, Barnard, and the Class of Landcadia shareholders were entitled to vote on the merger acquired Waitr common stock at an inflated price and were damaged thereby. The inflation in Waitr's stock price was removed when Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle's misrepresentations and omissions made in the Going Public Transaction Proxy/Prospectus Materials were revealed or materialized, causing Plaintiff's losses.

    47.    The inflation created by Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle's misrepresentations and omissions was partially removed when, on April 30, 2019, a putative class action was filed against Waitr in the United States District Court for the Western District of Louisiana, styled *Bobby's Country Cooking LLC v. Waitr Holdings Inc.*, Case No. 2:19-cv-00552-TAD-KK (the "Restaurant Partners' Class Action" ). *See infra* at ¶¶ 147-55. The Restaurant Partners' Class Action alleged that Waitr had inflated its reported revenues prior to the Going Public Transaction by unilaterally breaking contracts and imposing higher rates on certain of its restaurant customers. The Restaurant Partners' Class Action seeks damages for breach of contract, violation of the duty of good faith and fair dealing and unjust enrichment. The plaintiff in the Restaurant Partners' Class Action claimed to have had a one-

year contract with Waitr that provided for a <u>Service Transaction Fee of 10%</u> that could not be changed or modified absent written agreement of the parties. The Restaurant Partners' Class Action plaintiff further states that Waitr unilaterally, with 30 days' notice, raised its Service Transaction Fee to 15%. The Restaurant Partners' Class Action complaint points out that, "Waitr imposed this unlawful price increase after announcing its acquisition by an investment fund [Landcadia], but shortly before its initial public offering, suggest[ing] an intent to maximize potential revenue with disregard for its contractual obligations to its customers.…[And] as part of a broad strategy to increase revenue and profit prior to the sale and public offering of the Company." The allegations contained in the Restaurant Partners' Class Action complaint were evidence that Waitr could not supply delivery services at prices that small restaurants in secondary markets could reasonably afford.

48.     Following this disclosure and/or materialization of foreseeable risks, Waitr common stock declined $0.94 per share, or 8.78%, to close at $9.76 per share on April 30, 2019 after trading at a high of $10.70 on April 29, 2019. However, the disclosures and/or materialization of foreseeable risks made on April 30, 2019 were not sufficient to fully remove the inflation from Waitr's share price because the disclosures and/or materialization of foreseeable risks only partially revealed or materialized the full truth of concealed financial conditions, risks, and trends of the Company.

49.     The inflation created by Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle's misrepresentations and omissions was further partially removed when, on July 5, 2019, Waitr announced a massive price increase that was considerably disadvantageous to small restaurant operators in remote "underserved" markets. Waitr announced that commissions were being raised from 15% to 25% for its smaller customers—but would remain

at 15% for individual locations that generated over $20,000 per month of delivery—an astronomically large sum for any restaurant in a low-tier market, much less a small restaurant in such a market. This massive price increase was evidence that Waitr could not supply delivery services at prices that small restaurants in secondary markets could reasonably afford. The price increase also demonstrated that Waitr was not achieving any competitive advantage by utilizing full-time driver labor that would allow it to maintain price stability at 15%.

50.     Following this disclosure and/or materialization of foreseeable risks, Waitr common stock declined $0.39 per share, or 6.23%, to close at $5.87 per share on July 8, 2019, the first trading day after the July 5, 2019 announcement, after opening at $6.26 per share on July 5, 2019. However, the disclosures and/or materialization of foreseeable risks made on July 5, 2019 were not sufficient to fully remove the inflation from Waitr's share price because the disclosures and/or materialization of foreseeable risks only partially revealed or materialized the full truth of concealed financial conditions, risks, and trends of the Company.

51.     The inflation created by Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle's misrepresentations and omissions was further partially removed when, on August 6, 2019, Waitr announced a partnership with third-party developer Olo, to integrate Olo's platform software into its restaurant partners. Clearly, the adaptation of Olo's platform signaled the abandonment of Waitr's proprietary platform technology, an admission that the Company was not maintaining any first mover advantage based on its ability to refine and enhance its technology, and that it could not obtain the resources necessary to update, improve, and innovate its software without moving operations to areas rich with high-level programming and engineering support.

25

52.     Following this disclosure and/or materialization of foreseeable risks, Waitr common stock declined $0.28 per share, or over 7%, to close at $3.71 per share on August 7, 2019 after opening at $3.99 per share on August 6, 2019. However, the disclosures and/or materialization of foreseeable risks made on August 6, 2019 were not sufficient to fully remove the inflation from Waitr's share price because the disclosures and/or materialization of foreseeable risks only partially revealed or materialized the full truth of concealed financial conditions, risks, and trends of the Company.

53.     The truth was fully revealed and/or the foreseeable risks fully materialized after the market closed on August 7, 2019, when, as alleged above, Waitr issued a press release revealing that Defendant Meaux would resign as CEO, that the integration of Bite Squad – another online restaurant delivery platform based in Minnesota – was not proceeding according to plan, that Waitr would layoff personnel, and that losses were running far ahead of plan and at a rate that eclipsed historical growth trends. Net losses for the quarter reached a staggering $25 million, up from $7.4 million the prior year. According to the Company, it had already hired Jefferies as a financial advisor to "explore strategic alternatives that have the potential to increase shareholder value." Those options purported to include "taking the company private or a sale of the business." Adam Price, who had joined Waitr in February 2019 as a department head and became COO in June 2019, was named CEO.

54.     On August 8, 2019, shares of the Company fell nearly 50% to a close of $1.89 per share, from a closing price of $3.76 per share the prior day, on unusually heavy trading volume of over 11.6 million shares. Waitr's market capitalization was $134 million, down from $910 million on March 13, 2019.

55.     The declines in the price of Waitr securities after the truth came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. When the truth underlying Defendants' misrepresentations came to be revealed through a series of partial disclosures and/or materialization of foreseeable risks, the inflation was removed, causing losses to Class members that would not have occurred but-for Defendants' misrepresentations and omissions throughout the Class Period. The concepts of stock price inflation and loss causation discussed herein are supported by the weight of economic literature.

56.     Additionally, the aforementioned disclosures revealed the truth regarding Waitr's financial condition, risks, and trends of the Company, and represented the materialization of concealed risks which masked the fundamental flaws in Waitr's purported business model and execution. During the Section 14(a) Class Period, in order to conceal the problems imposed by, among other things, Waitr's unsustainable 15% take rate and inability to successfully integrate Bite Squad, Defendants made materially false and/or misleading statements and omissions, as alleged in Section I.E. herein.

57.     As a result of their acquisition of Waitr common stock in the merger in exchange for their Landcadia common stock, at an inflated price, and the corrections removing the inflation in the price of those Waitr shares, Plaintiffs Welch, Barnard, and the Class suffered economic harm under Section 14(a) of the Exchange Act. Alternatively, Plaintiff Welch and the Class of Landcadia shareholders entitled to vote on the merger who received Waitr shares are entitled to a rescissory measure of damages sufficient to put them back in the economic position they were in before the consummation of the merger.

### G.     Causes of Action Under Section 14 of the Exchange Act

#### 1.     COUNT I for Violations of Section 14(a) of the Securities Exchange Act of 1934 Against Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle

58.     Plaintiffs Welch and Barnard repeat and re-allege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct, knowledge, scienter or intent, are hereby expressly disclaimed and not incorporated by reference in this Count.

59.     Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle are the makers of the statements contained in the Going Public Transaction Proxy/Prospectus Filings. Each of Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle were instrumental in the preparation of, were deemed to be participants in, and/or issued the Going Public Transaction Proxy/Prospectus (and related filings) with the intention of soliciting stockholder support for the Landcadia business combination. Each of these Defendants reviewed and/or authorized the dissemination of the aforementioned filings issued in connection with the Going Public Transaction.

60.     In so doing, Defendants made untrue statements of fact and omitted to state material facts necessary to make the statements made not misleading. Each of Defendants Handler, Meaux, Fertitta, and Pringle, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

61.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any 14D9 statement, form of 14D9, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with

respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a 14D9 for the same meeting or subject matter which has become false or misleading.

62. During the Section 14(a) Class Period, these Defendants disseminated the false and misleading Going Public Transaction Proxy/Prospectus Filings specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

63. Specifically, and as detailed above, the Going Public Transaction Proxy/Prospectus Filings violate Section 14(a) and Rule 14a-9 because they omit material facts concerning certain material information set forth in herein. *See supra* at ¶¶ 27-44.

64. The omissions and false and misleading statements in the Going Public Transaction Proxy/Prospectus Filings are material in that a reasonable stockholder would consider them important in deciding whether to support the Going Public Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy/Prospectus and in other information reasonably available to investors.

65. By reason of the foregoing, Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

## II.   FRAUD CLAIMS UNDER SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT

### A.   Introduction and Overview

66. Plaintiffs Walter Welch, Andrew Brown, William Moore, Daniel Sinor, and Thomas Colangelo assert claims against the Company, certain of its officers and directors for

their violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the U.S. Securities Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5).

67.     Plaintiffs Walter Welch, Andrew Brown, William Moore, Daniel Sinor, and Thomas Colangelo allege Defendants made materially false and/or misleading statements and omissions throughout the Section 10(b)/20(a) Class Period up until the truth was finally revealed or materialized to the market on August 8, 2019.

68.     As discussed in Section II.D. below, in May of 2018 the Landcadia SPAC faced a severe time crunch to find a suitable company with which to merge. This time crunch prevented Defendants from doing thorough due diligence regarding the growth prospects and/or business model of the targeted acquisition company, Waitr. Defendants nevertheless went forward with the acquisition of Waitr, presenting Waitr to investors as a promising growth company. Waitr's business model, however – as conceded by current CEO Carl Grimstad after the end of the 10(b)/20(a) Class Period – was not geared for growth of any kind. In order to manufacture the appearance of growth, rather, within a month of going public, Waitr promptly announced its intention to acquire Bite Squad. As Defendants knew, or were severely reckless in not knowing, however, Bite Squad could not be integrated into Waitr and instead only exacerbated existing problems. While Defendant Meaux claimed he obtained guidance from successful business billionaire Defendant Fertitta, in truth, Fertitta did little or nothing to promote the Company and Fertitta's guidance and oversight did not materially benefit Waitr in any way. To keep afloat, the Company radically changed its pricing structure, which it represented to the market was a key differentiator from GrubHub, UberEats, and its other competitors. This led to the filing of a class action lawsuit and outcry from businesses, signaling to the market that the Company never had a

sustainable model to begin with. Indeed, according to Confidential Witness 1, the owner of a bar and grille in Baton Rouge, Louisiana which was one of Waitr's first customers in that market, Waitr represented to him that the business would fold like a lawn chair if it didn't foist him with an astronomical fee. Thereafter, on August 8, 2019 it was announced that Defendant Meaux had been ousted as CEO and the price of Waitr's securities fell precipitously.

### B.   Jurisdiction and Venue

69.   Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

70.   Venue is proper in this District pursuant §27 of the Exchange Act and 28 U.S.C. §1391(b), §1337 and 15 U.S.C. §78aa. Defendant Waitr maintains its principal place of business within this District, and/or conducts business within this District, and many of the acts giving rise to the violations complained of herein took place within this District.

71.   In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### C.   Parties

#### 1.   Plaintiffs

72.   Plaintiff **WALTER WELCH**, as set forth in the certification at Dkt. No. 13-9, acquired the common stock of Waitr at artificially inflated prices during the Section 10(b)/20(a) Class Period, including in connection with the Going Public Transaction, and was harmed when the true facts were revealed or materialized and the artificial inflation was removed from the price of the stock at the end of the Section 10(b)/20(a) Class Period.

73.     Plaintiff **ANDREW BROWN**, as set forth in the certification at Dkt. No. 13-4, acquired the common stock of Waitr at artificially inflated prices during the Section 10(b)/20(a) Class Period and was harmed when the true facts were revealed or materialized and the artificial inflation was removed from the price of the stock at the end of the Section 10(b)/20(a) Class Period.

74.     Plaintiff **WILLIAM MOORE**, as set forth in the certification at Dkt. No. 13-6, purchased the common stock of Waitr at artificially inflated prices during the Section 10(b)/20(a) Class Period, including in connection with the Secondary Offering, and was harmed when the true facts were revealed or materialized and the artificial inflation was removed from the price of the stock at the end of the Section 10(b)/20(a) Class Period.

75.     Plaintiff **DANIEL SINOR**, as set forth in the certification at Dkt. No. 13-5, acquired the common stock of Waitr at artificially inflated prices during the Section 10(b)/20(a) Class Period and was harmed when the true facts were revealed or materialized and the artificial inflation was removed from the price of the stock at the end of the Section 10(b)/20(a) Class Period.

76.     Plaintiff **THOMAS COLANGELO**, as set forth in the certification at Dkt. No. 13-7, acquired the common stock of Waitr at artificially inflated prices during the Section 10(b)/20(a) Class Period and was harmed when the true facts were revealed or materialized and the artificial inflation was removed from the price of the stock at the end of the Section 10(b)/20(a) Class Period.

### 2.     Defendants

77.     Defendant **CHRISTOPHER MEAUX** was CEO, Chairman of the Board of Directors and co-Founder of the Company during the Section 10(b)/20(a) Class Period. On August 8, 2019, Defendant Meaux was removed from his position as CEO of the Company.

During the Section 10(b)/20(a) Class Period, Defendant Meaux signed and certified the Company's SEC filings, including Waitr's Form(s) 10-Q and Form 10-K and/or the materially false and misleading Secondary Offering Filings, and the materially false and misleading Going Public Transaction Proxy/Prospectus Filings.

78.     Defendant **DAVID PRINGLE** ("Pringle") was Chief Financial Officer ("CFO") and Principal Financial Officer of the Company during the Section 10(b)/20(a) Class Period, until his departure in April 2019. During the Section 10(b)/20(a) Class Period, Defendant Pringle signed and certified the Company's SEC filings, including but not limited to Waitr's Form 10-K and the materially false and misleading Going Public Transaction Proxy/Prospectus Filings.

79.     Defendant **JEFF YURECKO** ("Yurecko") was CFO and Principal Financial Officer of the Company, beginning in April 2019 during the Section 10(b)/20(a) Class Period, after replacing Defendant Pringle. During the Section 10(b)/20(a) Class Period, Defendant Yurecko signed and certified the Company's SEC filings, including Waitr's Form(s) 10-Q and/or the materially false and misleading Secondary Offering Filings.

80.     Defendant **TILMAN J. FERTITTA** is and during the Section 10(b)/20(a) Class Period was a member of the Board of Directors of the Company, since Waitr's acquisition by Landcadia on or about November 15, 2018. Defendant Fertitta was also CEO and Co-Chairman of the Board of Directors of Landcadia from 2015 to November 2018. According to the Company's releases, Defendant Fertitta purports to be "one of the foremost authorities in the dining, hospitality, entertainment and gaming industries." He is the sole owner and currently serves as CEO, Chairman of the Board, and President of Golden Nugget, Inc., Landry's, and Fertitta Entertainment, Inc., and is also the owner of the NBA Houston Rockets. Defendant

Fertitta signed, made, and/or assisted in the preparation of the materially false and misleading Secondary Offering Filings.

81. Defendant **WAITR HOLDINGS, INC.** is a Delaware corporation with its principal place of business located at 844 Ryan Street, Suite 300, Lake Charles, Louisiana 70601. According to the Company's profile, Waitr purports to be a leading online food ordering and delivery service connecting local restaurants to diners in underserved markets *via* its website and mobile application ("app") Waitrapp.com. Prior to being acquired by Landcadia, there was no public market for Waitr common stock. Immediately following the acquisition of Waitr by Landcadia, on November 16, 2018, Landcadia changed its name to Waitr and shares of the new combined entity Waitr began trading on the NASDAQ under the symbol "WTRH."

### D. Background

82. Waitr was purportedly founded in 2013 by Defendant Meaux and four college students who developed the concept at a pitch competition in Gainesville, Florida. Meaux has given several media interviews about the moment he, along with four "kids," came up with the idea for Waitr. According to an interview published in *The Advocate* on May 23, 2019, Defendant Meaux was at the competition to pitch a concept called Foogle, which would answer the eternal question: "What's for dinner," but did little more. Meaux quickly abandoned that pitch in favor of another group that had the Waitr name and a concept that allowed diners to order using a mobile app, instead of a human waiter, while seated in a restaurant. While this latter concept may have given Meaux access to some of the back-end software platforms being used by food delivery companies like GrubHub and UberEats, Waitr's proprietary "platform" was essentially built in less than 1 year for a concept that was markedly different than the traditional, food delivery service model Waitr eventually adopted.

83.    The Waitr.com app debuted in Lafayette, Louisiana in mid-2015. The app started off slowly, scaling to 1000 order per day in 11 cities, primarily in Louisiana, by the end of 2016. By 2017, that number had reached 5,000 orders per day from 150 cities and 6 states—an increase of 390%, and the Company was purported to be on track to double orders again in 2018.

84.    Landcadia was founded as a Special Purpose Acquisition Company ("SPAC") whose sole purpose was to effect a merger or similar business combination and to acquire the assets of another company. Landcadia was incorporated in Delaware in November 2008 and, in May 2016, completed an initial public offering selling shares to the public, raising approximately $250 million. In its 2016 SEC filings, Landcadia stated that, "[a]lthough our efforts to identify a prospective target business will not be limited to a particular industry or geographic region, we intend to focus our investment opportunities in the dining, hospitality, entertainment and gaming industries in the U.S.…Our management team and sponsors have significant experience investing and in advising companies in these areas."

85.    Pursuant to the terms of its own offering, Landcadia was required to complete an acquisition within two years – or by June 1, 2018, at the latest. If Landcadia did not complete a contemplated acquisition or combination prior to that time it would be forced to redeem 100% of its public shares at a per-share price, payable in cash and including interest. If this was to occur, millions of dollars in deferred underwriting commissions would also be forfeited by Landcadia's underwriters, including Jefferies.

86.    While Landcadia, Jefferies, and Fertitta had a full 24 months, and while this was the sole purpose for Landcadia's existence, they were unable to find any suitable acquisition or transaction for almost the entire two years. Thus, with only two weeks before the June 1 deadline, on May 16, 2018, Landcadia suddenly announced that it had entered into an agreement

and plan of merger with Waitr Holdings, Inc. and announced the pending acquisition. In fact, because there was not even enough time to complete the contemplated transaction, Defendant Fertitta was forced to obtain Landcadia shareholder approval for an extension of time from June 1, 2018 to December 14, 2018, to complete the Waitr acquisition. The Waitr acquisition was ultimately completed with less than 30 days remaining before even the extended deadline expired.

87.     On May 7, 2018, pursuant to a Schedule filed with the SEC, Landcadia reported that its shareholder meeting to extend the redemption expiration date was scheduled *prior* to the announcement of the Waitr acquisition. The actual meeting, however, was scheduled to take place *after* the Going Public Transaction was announced.

88.     A letter to Landcadia shareholders by Fertitta reported what would occur if shareholders refused to approve the extension:

> ***If the Extension Amendment and Trust Amendment proposals are not approved and we do not consummate a business combination by June 1, 2018, as contemplated by our IPO prospectus and in accordance with our charter, we will (i) cease all operations except for the purpose of winding up,*** (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest not released to the Company to pay franchise and income taxes (less up to $50,000 of such net interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. ***There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our business combination by June 1, 2018.***

(emphasis added).

89.     Having raced to enter a merger agreement with Waitr prior to the time Landcadia, and Defendant Fertitta would be forced to return $250 million, and thus admit that the powerhouse combination of the self-promoting billionaire Fertitta and the head of one of the nation's largest investment banks, Handler, could not find an investment for their pet project in two years, Defendants attempted to protect their reputations as high-power deal-makers.

90.     Further, if Landcadia had not finalized the Waitr acquisition prior to the extended deadline, Jefferies would have had to forfeit over $10 million in Underwriter fees, much of which were already earned.

91.     Waitr was clearly rushed to market, as evidenced, in part, by the lack of credentials and experience of its senior-most executive leadership, and the limited history of the Company. Throughout the Section 10(b)/20(a) Class Period and until Meaux's termination, Waitr was led by a serial failure of an entrepreneur, who was reportedly a week away from taking a job as a high school teacher before associating himself with the inventors of Waitr, only several years prior to the merger.

92.     In early 2018, Meaux stated publicly that he wanted Waitr to be the leading platform for front-of-house restaurant operations, whereby the Waitr order manager would replace the order entry point at the point of sales system. As would eventually be revealed or materialized this plan did not come to fruition. As it turned out, one of the Company's biggest disadvantages was its lack of access to high-level programmers and engineers in or near Lake Charles, Louisiana—as Meaux was told repeatedly by the venture capitalists who refused to invest unless he moved the Company. Thus, despite such resources existing in short supply outside of major technology centers, Meaux was repeatedly quoted in the press as saying, "You don't have to be in Silicon Valley to create a technology company. You can do it in Lake

Charles, Louisiana." In an interview published in *New Orleans Business* on January 31, 2018, Meaux recounted his defiance in the face of experience stating, "I remember pitching some VCs in Houston and they sat me down and said, 'If you're going to do this you're going to have to be in Austin or Silicon Valley because you're not going to find enough software engineers in Louisiana.' They actually said, 'If we're going to invest, you have to move the company.'" But, as Meaux was repeatedly warned and as investors ultimately learned, Waitr's failure to attract high-level programmers and engineers ended up being a significant roadblock to success.

93.     In fact, by mid-2019, Waitr had all but abandoned its software development and instead announced it would be obtaining this exact technology that was to be the future of the Company from third-party developer Olo—based in New York, New York. The deal with Olo, announced on August 6, 2019, revealed or materialized to investors for the first time that Waitr could not stay competitive in software development and that it could not obtain the programmers and engineers necessary to stay at the forefront of its market, and that any first mover advantage Waitr had by adopting an established online ordering app designed to serve small restaurants in underserved and unprofitable markets was unlikely to be sustained. Now that it has effectively outsourced the back-end software platform that it was charging restaurants to implement, Waitr became little more than a website that employs delivery drivers.

E.      **Materially False and Misleading Misrepresentations and Omissions Under Sections 10(b) and 20(a) of the Exchange Act**

94.     The allegations contained in this Section II. are made with respect to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act only. Plaintiffs disclaim any reliance upon these allegations or incorporation of these allegations in the claims set forth in Section I.

95.     These claims are brought against only the following Defendants: Waitr, Meaux, Fertitta, Pringle, and Yurecko.

1.      **False and Misleading Statements and/or Omissions in Waitr's November 16, 2018 Form 8-K Announcing Completion of the Going Public Transaction**

96.      On November 15, 2018, Landcadia and Waitr announced they had completed the Going Public Transaction, pursuant to which Landcadia acquired Waitr for $50 million cash and stock valued at $278 million, for total consideration of $308 million. At the same time, Landcadia announced that it had changed its name to Waitr Holdings, Inc.—adopting the name of Waitr prior to the combination. Thus, beginning the following day, November 16, 2018, shares would continue trading on the NASDAQ under the symbol "WTRH." The effect of this transaction was to create, for the first time, a public market for registered shares of Waitr common stock.

97.      Having created a public market for Waitr common shares valued at nearly $1 billion, pursuant to materially false and misleading Going Public Transaction Proxy/Prospectus Filings issued in connection with the November 15, 2018 Going Public Transaction, Defendants next embarked on an illegal scheme and course of conduct to artificially inflate and maintain the price of Waitr shares by issuing a series of materially false and misleading statements that Defendants knew or recklessly disregarded were materially false and misleading at that time.

98.      In connection with the announcement of the Going Public Transaction, on November 16, 2018, Defendants filed with the SEC a Form 8-K which included a press release dated November 15, 2018 that again quoted Defendant Fertitta, as follows:

> We are pleased to complete the merger with Waitr. I believe they are the best-in-class, on-demand food ordering and delivery partner for customers and restaurants. ***They are also positioned well to take advantage of the massive unpenetrated market for online delivery, particularly in secondary markets***.
>
> (emphasis added).

This press release also quoted Defendant Meaux, as follows:

39

We are excited to partner with Tilman and the Landcadia team and we believe this is a great opportunity. ***Our combined expertise, experience and resources, and being a publicly-traded company will further enable us to accelerate our growth in the markets we currently serve, expand into new markets and take advantage of potential opportunistic acquisitions***.

(emphasis added).

99.     The foregoing statements were each materially false and misleading for the following reasons: Waitr was not "positioned well to take advantage of the massive unpenetrated market for online delivery." It did not have a proven business model and expansion strategy, its revenues would not sustain its operations, and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures. Waitr would not enjoy benefits from Defendant Fertitta's "expertise, experience and resources" because Defendant Fertitta did little or nothing to promote the Company and Fertitta's guidance and oversight did not materially benefit Waitr in any way.

### 2.      False and Misleading Statements and/or Omissions in Meaux's December 3, 2018 Interview

100.    The creation of a public market for Waitr stock attracted the attention of industry press and, on December 3, 2018, Defendant Meaux conducted another interview for the website 'Skift Table', www.table.skift.com, wherein he stressed Waitr's differentiated model of maintaining low restaurant fees of 15% to allow small restaurants in non-urban markets to afford Waitr's service offerings and employing all of the Company's drivers, as follows:

Meaux: I knew the problems that restaurateurs were facing, so I wanted to be a partner to the restaurant. We knew what Grubhub was charging. ***So we priced ours at half — 15 percent — because in the small markets, restaurants need every dollar they can get.***

ST: And that's what you currently charge.

Meaux: *Yeah, we're still at 15 percent.* Our business model involves employing the drivers, as opposed to just using contracted workers. *Our driver core is probably half of what most of the other companies in our space is, because they're employees of the company and we can tell them when we need them to work.*

*So, by having that advantage, we have a fixed cost per hour for our drivers. Then, we can leverage that fixed cost to increase profitability for us and then pass that on to the restaurants. That's how we're able to charge 15 percent.*

\*         \*         \*

*In markets where we do have competitors, restaurants will push customers to Waitr because we are charging them less. That's been a big advantage for us.*

(emphasis added).

101.    The foregoing statements were each materially false and misleading for the following reasons: It was not true that the Company was providing its services at a sustainable low take rate established at 15%. While the Company repeatedly stressed to investors that its 15% take rate was a significant market differentiator that would enable Waitr to grow and succeed, Defendants omitted to state the following material facts necessary in order to make the aforementioned statement(s) not misleading: Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares. As recounted by CW1 herein, Waitr unilaterally raised its take rate to 18% during the Class Period, and thereafter raised its take rate to 33% (plus an additional 3.1% credit card processing fee), after admitting to CW1 that the increase was necessary for Waitr to "continue doing business and be solvent." Waitr was not able to extract efficiencies from its full time fixed-rate labor force that purportedly allowed the Company to offer its services at a lower rate than competitors, when in fact its W2 labor model was inefficient, resulted in huge costs that could not be sustained (especially if the Company paid all

associated labor costs as required by state and federal law), and resulted in Waitr reporting the lowest gross margins among its peers. Moreover, unlike its competitors, Waitr incurred unique risks because its drivers were all full-time employees (fixed costs), whereas competitors hired drivers on an as-needed basis, as surge labor, engaging more drivers during periods of peak demand.

102.    Despite having debuted on the public markets less than 3 weeks prior, Meaux was already explaining the shift in the Company's core model focusing primarily upon growth. As evidence of this, Meaux continued, in part, as follows:

> *Our goal is growth right now. That's what the market wants to see from us and so we've told the market that we're going to continue to invest and grow and we'll do it responsibly because we have to at this point*.
>
> We haven't had a lot of capital. So we've had to grow responsibly. We'll continue to do that, but our focus is going to be on growth. When the market tells us [the focus] needs to be on profitability, it's gonna be on profitability. *But right now, there's so much growth to be had.*

(emphasis added).

103.    The foregoing statements were each materially false and misleading for the following reasons: Waitr was not a "growth" business with growth potential because it did not have a proven business model and expansion strategy, its revenues would not sustain its operations, and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, something which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures.

104.    Meaux also used this interview to assure investors that Defendant Fertitta was engaged in management of the growth of Waitr, and that the plan for growth was being guided and moderated by an experienced and engaged board. As evidence of this, Meaux also stated, in part, the following:

Tilman's got a tremendous amount of restaurant experience, a tremendous amount of business experience, and he's been a phenomenal sounding board for me from a business perspective. He's going to remain on our board. *If I ever have a question about what to do next, I can pick up the phone and call him because he ran a public company for 17 years. That's why we did the deal. We did the deal because of Tilman and his experience and what he brings to the table*.

(emphasis added).

105.    The foregoing statements were each materially false and misleading because Waitr would not enjoy benefits from Defendant Fertitta's "experience" because Defendant Fertitta did little or nothing to promote the Company and Fertitta's guidance and/or oversight did not materially benefit Waitr in any way.

### 3.    False and Misleading Statements and/or Omissions in Waitr's December 11, 2018 Form 8-K Announcing Bite Squad Acquisition

106.    On December 11, 2018, not even a month after the acquisition of Waitr, the Company announced that it had entered into an agreement to acquire Bite Squad—another third-party online restaurant delivery service based in Minnesota—for aggregate total consideration of $321.3 million, consisting of 10.6 million shares of Waitr stock and $202.1 million cash, in addition to at least $42 million of debt to be incurred at the closing. The final aggregate consideration for the Bite Squad Merger consisted of $192.9 million in cash and 10,591,968 shares of Waitr common stock, with an implied value of approximately $14.25 per share for Waitr stock and based on an $11.26 closing share price on December 11, 2018, when announced.

107.    Bite Squad itself was a conglomeration of 17 acquired restaurant-delivery companies scattered across the country. At that time, Bite Squad had less than 900,000 active users and 11,000 restaurants in 350 cities across 20 states, which was not at all consistent with Waitr's contiguous expansion model. Again, Jefferies served as financial advisor to Waitr in connection with this acquisition.

108.    Announcing the acquisition of Bite Squad, on December 11, 2018, Waitr filed a

Form 8-K with the SEC, which included a press release dated December 12, 2018, that quoted

Defendant Meaux, in part, as follows:

> *"We have followed Bite Squad's growth and success for many years and believe their mission, business model and growth profile share many similarities to Waitr,"* said Chris Meaux, founder and Chief Executive Officer of Waitr.

> "We believe that a small fraction of the U.S. restaurant industry's sales are from off-premise online transactions and this is evolving rapidly. *This acquisition will help us drive additional growth and provide a step function increase in scale throughout the U.S. in order to better serve that developing market.*"

> (emphasis added).

109.    Additionally, Defendants asserted Bite Squad was also a 'high growth' business,

with 85% year-over-year gross food sales growth and 98% year-over-year revenue growth in

2018 third quarter. Accordingly, the release also purported to explain the "Strategic Rationale"

for the acquisition, as follows:

- The combination will significantly expand Waitr's scale and footprint across the U.S., serving a total of over 86 markets in more than 500 cities and 22 states;
- *Shared strategy to establish a market leadership position in the cities which the Company operates*;
- *Leverage respective strengths to create a best-in-class organization; and*
- *Opportunity to realize cost synergies*.

> (emphasis added).

110.    The foregoing statements were each materially false and misleading for the

following reasons: The Bite Squad acquisition was conducted with little or no due diligence and

with disregard for the fact that Bite Squad's haphazard structure resulting from it being cobbled

together through 17 other acquisitions, was not consistent with Waitr's "contiguous growth"

model. Defendants were unable to integrate Bite Squad with Waitr because the two platforms

were incompatible, and as a result Defendants were forced to run two poorly managed, money-losing operations with little regional overlap and few synergies.

### 4. False and Misleading Statements and/or Omissions in Waitr's March 7, 2019 Form 8-K and Earnings Call for 4Q and FY18

111.   On March 7, 2019, Waitr filed a Form 8-K with the SEC which included a press release announcing financial results for the Fourth Quarter and Fiscal Year of 2018, ended, December 31, 2018. The press release provided purported business highlights of the fourth quarter of 2018 and Full Year 2018:

**Fourth Quarter 2018 Financial Highlights Compared to Fourth Quarter 2017**

- Revenue for the fourth quarter of 2018 increased 148% to $21.3 million compared to $8.6 million in the fourth quarter of 2017.

- Gross Food Sales for the fourth quarter of 2018 increased 113% to $83.4 million compared to $39.2 million in the fourth quarter of 2017.

- Net loss for the fourth quarter of 2018 was $17.0 million, or $0.52 per diluted share, compared to a loss of $15.5 million, or $1.55 per diluted share, in the fourth quarter of 2017.

- Adjusted EBITDA for the fourth quarter of 2018 was $(6.4) million compared to $(3.9) million in the fourth quarter of 2017.

**Full Year 2018 Financial Highlights Compared to Full Year 2017**

- Revenue for 2018 increased 202% to $69.3 million compared to $22.9 million in 2017.

- Gross Food Sales for 2018 increased 130% to $278.8 million compared to $121.1 million in 2017.

- Net loss for 2018 was $34.3 million, or $2.18 per diluted share, compared to a loss of $26.9 million, or $2.69 per diluted share, in 2017.

- Adjusted EBITDA for 2018 was $(13.2) million compared to $(13.4) million in 2017.

112.   The press release reported fourth quarter and full year 2018 financial highlights for Bite Squad:

- Revenue for the three months and year ended December 31, 2018 totaled $24.8 million and $83.4 million, respectively.

- Gross Food Sales for the three months and year ended December 31, 2018 totaled $74.1 million and $255.0 million, respectively.

113.    The foregoing statements were each materially false and misleading for the following reasons: Defendants failed to disclose the existence of material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. Waitr had artificially inflated profits and revenues and failed to disclose that it was unable to sustain itself even with rates twice its current take rates and that the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures. In reality, Waitr saw a pronounced slowdown in its sequential growth rate in the Fourth Quarter of 2018 because, after years of operating in markets without competition, Grubhub and (SoftBank-funded) DoorDash entered Waitr's primary markets. By this time, DoorDash overlapped with Waitr in 46% of its markets, and GrubHub and Waitr overlapped in 75% of markets in Georgia and competed in 41% of the same markets in Texas. In the case of UberEats, the overlap with Waitr increased from 2.4% in January 2018 to 9.8% in July 2108 to 35% by March of 2019. In the period between third quarter of 2018 and fourth quarter of 2018, moreover, Grubhub grew revenues at a 12% sequential rate off a base of almost $250 million, while Waitr only grew revenues by $2 million in absolute terms and 9% in relative terms off an insignificant revenue base of under $20 million; and as a result of the aforementioned adverse conditions that Defendants failed to disclose, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Waitr could achieve the guidance sponsored and/or endorsed by Defendants.

114.    On the same day, Waitr held a conference call with investors and analysts. During the call, Defendant Meaux stated, in part, the following:

> We kicked off the year with the acquisition of Bite Squad, an online ordering and food delivery platform more than doubling the size of our company with one

acquisition. *We are thrilled to welcome Bite Squad into the Waitr family and have spent time since the acquisition getting to know their team and diligently beginning the integration process of combining the two companies.*

There were many reasons why this combination was right for Waitr, including significantly expanding our scale and footprint across the U.S. giving us a more national versus regional footprint. Today we serve over 80 markets with more than 600 cities and 30 states. *Both Bite Squad and Waitr has similar business models operating a three sided marketplace*, dedicated to serving our restaurant partners, active diners and W2 employed delivery drivers. *We have a shared strategy of entering underserved cities and establishing market dominant positions creating the foundation for growth in 2019 and beyond.*

*We are able to leverage respective strengths for both companies to create a best-in-class organization, which was further expanded on a few weeks ago with our leadership transition announcement, strengthening our team. And together we expect to achieve net revenue for 2019 of $250 million.*

*           *           *

*We've identified new markets within our current operating footprint and we can expand into with Bite Squad, this will allow this will now happen at a faster pace*. We expect to add services around 200 cities in 2019 inside and out of our current footprint

(emphasis added).

115.    The foregoing statements were each materially false and misleading for the following reasons: The Bite Squad acquisition was conducted with little or no due diligence and with disregard for the fact that Bite Squad's haphazard structure was not consistent with Waitr's "contiguous growth" model. Defendants were unable to integrate Bite Squad with Waitr because the two platforms were incompatible, and as a result Defendants were forced to run two poorly managed, money-losing operations with little regional overlap and few synergies.

### 5.    False and Misleading Statements and/or Omissions in Waitr's March 15, 2019 Form 10-K for 4Q and FY18

116.    On March 15, 2019, Waitr filed with the SEC pursuant to Form10-K its financial results for the fourth quarter and full year 2018, the period ended December 31, 2018. The Form 10-K was signed by Defendants Fertitta, Meaux and Pringle.

117.    According to the 2018 Form 10-K, the Company's financial reporting had been

prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), as follows:

Basis of Presentation and Summary of Significant Accounting Policies

**Basis of Presentation**

The consolidated financial statements and accompanying notes have been
prepared in accordance with GAAP and in accordance with the rules and
regulations of the United States Securities and Exchange Commission ("SEC").

118.    Regarding the purported adequacy of the Company's controls and procedures, the

2018 Form 10-K stated, in part, the following:

**Item 9A. Controls and Procedures**

Evaluation of Disclosure Controls and Procedures As required by Rule 13a-15(b)
of the Exchange Act, we have evaluated, under the supervision and with the
participation of our management, including our principal executive officer and
principal financial officer, the effectiveness of the design and operation of our
disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e)
of the Exchange Act) as of the end of the period covered by this Form 10-K. Our
disclosure controls and procedures are designed to provide reasonable assurance
that the information required to be disclosed by us in reports that we file or submit
under the Exchange Act is accumulated and communicated to our management,
including our principal executive officer and principal financial officer, as
appropriate, to allow timely decisions regarding required disclosure and is
recorded, processed, summarized and reported within the time periods specified in
the rules and forms of the SEC. Based upon the evaluation, our principal
executive officer and principal financial officer have concluded that our
disclosure controls and procedures were effective as of December 31, 2018 at the
reasonable assurance level.

119.    In addition to signing the 2018 Form 10-K, Defendants Meaux and Pringle also

signed Sarbanes Oxley certifications that purported to certify and attest to the truth, accuracy,

and completeness of the entire Form 10-K. These certifications stated, in part, the following:

1. I have reviewed this Annual Report on Form 10-K of Waitr Holdings Inc.;

2. Based on my knowledge, *this report does not contain any untrue statement of
a material fact or omit to state a material fact necessary to make the statements
made, in light of the circumstances under which such statements were made,
not misleading with respect to the period covered by this report*;

3. Based on my knowledge, the financial statements, and other financial
information included in *this report, fairly present in all material respects the*

*financial condition, results of operations and cash flows of the registrant* as of,
and for, the periods presented in this report;

(emphasis added).

120.    The foregoing statements were each materially false and misleading for the following reasons: Defendants failed to disclose the existence of material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. Waitr's financial statements and Defendants' Sarbanes Oxley certifications were not true, accurate or reliable, as Waitr had artificially inflated profits and revenues, failed to disclose known adverse trends that were *already* impacting the Company as required by Item 303 of Regulation S-K [17 C.F.R. § 230.303(a)(3)(ii)], and failed to disclose the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures. Defendants failed to disclose the existence of known trends, events, or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way Defendants knew, or were severely reckless in not knowing, the facts described herein that indicated all of the Company's interim financial statements, press releases, public statements, and filings with the SEC were materially false and misleading for the reasons set forth herein. Moreover, it was not true that the Company was providing its services at a sustainable low take rate established at 15%. While the Company repeatedly stressed to investors that its 15% take rate was a significant market differentiator that would enable Waitr to grow and succeed, Defendants omitted to state the following material facts necessary in order to make the aforementioned statement(s) not misleading: Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to

immediately raise take rates as soon as Waitr created a public market for Waitr shares. As recounted by CW1 herein, Waitr unilaterally raised its take rate to 18% during the Class Period, and thereafter raised its take rate to 33% (plus an additional 3.1% credit card processing fee), after admitting to CW1 that the increase was necessary for Waitr to "continue doing business and be solvent." Waitr was not able to extract efficiencies from its full time fixed-rate labor force that purportedly allowed the Company to offer its services at a lower rate than competitors, when in fact its W2 labor model was inefficient, resulted in huge costs that could not be sustained (especially if the Company paid all associated labor costs as required by state and federal law), and resulted in Waitr reporting the lowest gross margins among its peers. Moreover, unlike its competitors, Waitr incurred unique risks because its drivers were all full-time employees (fixed costs), whereas competitors hired drivers on an as-needed basis, as surge labor, engaging more drivers during periods of peak demand. In fact, on February 27, 2019, in the First FLSA Class Action a former Waitr driver sued the Company for violations of the Fair Labor Standards Act alleging Waitr did not pay drivers mileage expenses, such that drivers' net pay actually fell below the minimum wage. The FLSA provision known as the "kickback rule" requires that employees are paid minimum wage free and clear of the cost of doing business. When expenses cause take-home pay to fall below minimum-wage, employers are required to supplement such pay to a federally guaranteed minimum of $7.25 per hour. As a result of Waitr classifying 95% of its workers as W2 employees, it was required to comply with such rules. Shortly thereafter, on March 8, 2019, the Second FLSA Class Action was filed alleging similar violations of the kickback rule for Waitr's failure to reimburse mileage expenses. The foreseeable material impact of a determination in the plaintiffs' favor on the Company's earnings and balance sheet was estimated to be as much as 50% of an employee's compensation and with a profit and loss

impact as high as $800 million. Waitr's technology platform provided little or no competitive advantages as the Company was not capable of refining and developing its software to remain competitive in the market (much less become the next front-of-house integrated point of sales solution), because Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers, and engineers in Lake Charles, Louisiana. As a result of the aforementioned adverse conditions that Defendants failed to disclose, at that time Defendants lacked any reasonable basis to claim that the Company was operating according to plan or that Waitr could achieve guidance sponsored and/or endorsed by Defendants.

### 6.    False and Misleading Statements and/or Omissions in Waitr's May 8, 2019 Form 8-K and Earnings Call for 1Q19

121.    On May 8, 2019, Waitr filed a Form 8-K with the SEC, which included a press release announcing results for first quarter 2019, the period ended March 31, 2019. This press release again quoted Defendant Meaux, as follows:

> *We are very pleased with our results this quarter, including revenue growth of 287%, which was a combination of Waitr driven organic growth and the successful acquisition of Bite Squad on January 17*," said Chris Meaux, founder and Chief Executive Officer of Waitr....*Our continued rapid growth gives me confidence that we have the right team, the right business model and the right technology in place to optimize our pursuit of the large and growing off premise market in the United States. 2019 is proving to be a transformational year as we invest in continued growth, integrate Bite Squad and make strategic infrastructure investments that will strengthen our foundation and allow us to grow aggressively and efficiently into 2020 and beyond*.

(emphasis added).

122.    The foregoing statements were each materially false and misleading for the following reasons: The Bite Squad acquisition was not "successful," as it was conducted with little or no due diligence and with disregard for the fact that Bite Squad's haphazard structure (caused as a result of it being cobbled together through 17 other acquisitions). It was not consistent with Waitr's contiguous growth model, whereby the Company grew in an orderly,

regionally contiguous expansion. Defendants were entirely unable to integrate Bite Squad with Waitr because the two platforms were incompatible, and as a result Defendants were forced to run two poorly managed, money-losing operations with little regional overlap and few synergies. Waitr would not experience "continued growth" because it did not have a proven business model and expansion strategy, its revenues would not sustain its operations, and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, something which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures. Waitr had achieved its sales growth by partnering with local restaurants and charging them less than the take rates charged by Grubhub and other larger competitors, but Waitr was effectively subsidizing these sales with "onboarding" fees. This was not sustainable, and Waitr could not achieve profitability with its existing contracts. Thus, Waitr was already in the process of drastically increasing its prices in a desperate attempt to raise revenue by imposing draconian price increases on small independent operators. These price increases demonstrated that Waitr's model of providing low-cost services to remote markets was not viable, and the huge price increases were a cynical attempt to get customers to abandon their contracts so that Waitr did not have to return any of the thousands of dollars paid in "onboarding" fees by each restaurant. Further, Waitr's "technology" provided little or no competitive advantages as the Company was not capable of refining and developing its software to remain competitive in the market (much less become the next front-of-house integrated point of sales solution), because Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers, and engineers in Lake Charles, Louisiana.

123.    On May 8, 2019, Defendants Meaux and Yurecko hosted a conference call for analysts and investors during which they again conditioned the market to believe that Waitr's purportedly proven business model and robust technology platform were providing Waitr with significant competitive advantages. As evidence of this, Defendant Meaux stated, in part, the following:

> **Our business model has proven to be an advantage over competitors in the small and midsized markets that we serve.** These markets are won at the local level, and our proven playbook is local market focused. Therefore, national scale is not always an advantage to winning at a hyperlocal layer….
>
> We cater to the wants and needs of the community for consumers and restaurant partners alike. **Our technology platform is purpose built to serve restaurants and consumers in small to medium markets. Our routing algorithms are optimized for getting food to customers by car in the more spread-out geographies, creating leverageable advantages in our business model**….
>
> **Our W2 drivers are uniformed and trained to represent our brand to be an extension of our restaurants. This enhances the quality of the experience for both restaurants and consumers. These are all advantages for Waitr over larger competitors in the markets we serve and provide a path for growth for our restaurant partners**….
>
> **Our hyper-local focus was further expanded with the acquisition of Bite Squad in January**.

(emphasis added).

124.    Regarding the success of the integration of Bite Squad—now after a full quarter to assess the situation—Defendant Meaux conditioned investors to believe that the Bite Squad integration was on track and according to plan. As evidence of this, Defendant Meaux stated, in part, the following:

> **I am happy to report that the integration of the combined company is moving along nicely. We started unlocking the value of integration with the consolidation of the leadership team as reported in February. Since then, we have achieved nearly complete integration of marketing, accounting and sales and have made significant progress toward the integration of restaurant operations, customer support and technology. We expect to achieve full integration in the first half of 2020**.

(emphasis added).

125.    The foregoing statements were each materially false and misleading for the following reasons: Waitr did not have a "proven" "business model" with "an advantage over competitors" because its revenues would not sustain its operations, and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, something which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures. Waitr's "technology platform" provided little or no competitive advantages, as the Company was not capable of refining and developing its software to remain competitive in the market (much less become the next front-of-house integrated point of sales solution), because Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers, and engineers in Lake Charles, Louisiana. Waitr did not enjoy any "advantages" of, and was not able to extract efficiencies from, its full time fixed-rate labor force that purportedly allowed the Company to offer its services at a lower rate than competitors. In fact, its W2 labor model was inefficient, resulted in huge costs that could not be sustained (especially if the Company paid all associated labor costs as required by state and federal law), and resulted in Waitr reporting the lowest gross margins among its peers. Moreover, unlike its competitors, Waitr incurred unique risks because its drivers were all full-time employees (fixed costs), whereas competitors hired drivers on an as-needed basis, as surge labor, engaging more drivers during periods of peak demand. The Bite Squad acquisition was conducted with little or no due diligence and with disregard for the fact that Bite Squad's haphazard structure (caused as a result of it being cobbled together through 17 other acquisitions), was not consistent with Waitr's contiguous growth model, whereby the Company grew in an orderly, regionally contiguous expansion. The Bite Squad integration was not "moving along nicely," as Defendants were entirely unable to integrate Bite Squad with

Waitr because the two platforms were incompatible, and as a result Defendants were forced to run two poorly managed, money-losing operations with little regional overlap and few synergies.

126.    Defendant Meaux also used the opportunity of this conference call to reiterate Waitr's purported growth and forward-looking guidance, in part, as follows

> *By leveraging our continued growth, our W2 business model, restaurant partnerships and our consistently repeatable local market profitability, we are targeting long-term EBITDA margins of 20%.* One only needs to look at the profitability of our top 10 markets to see a path to long-term profitability.
>
> *In conclusion, we believe opportunities abound for Waitr's continued growth in 2019 and beyond.* In the coming months, we will provide more insight into our future plans around our vision for the future, as outlined in last quarter's call.

(emphasis added).

127.    The foregoing statements were each materially false and misleading for the following reasons: Waitr was not experiencing "continued growth" because it did not have a proven business model and expansion strategy, its revenues would not sustain its operations, and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, something which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures. Waitr did not enjoy productive "restaurant partnerships" because it was not true that the Company was providing its services at a sustainable low take rate established at 15%. While the Company repeatedly stressed to investors that its 15% take rate was a significant market differentiator that would enable Waitr to grow and succeed, Defendants omitted to state the following material facts necessary in order to make the aforementioned statement(s) not misleading: Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr

shares. As recounted by CW1 herein, Waitr unilaterally raised its take rate to 18% during the Class Period, and thereafter raised its take rate to 33% (plus an additional 3.1% credit card processing fee), after admitting to CW1 that the increase was necessary for Waitr to "continue doing business and be solvent". Waitr had achieved its sales growth by partnering with local restaurants and charging them less than the take rates charged by Grubhub and other larger competitors, but Waitr was effectively subsidizing these sales with "onboarding" fees. This was not sustainable, and Waitr could not achieve profitability with its existing contracts. Thus, Waitr was already in the process of drastically increasing its prices in a desperate attempt to raise revenue by imposing draconian price increases on small independent operators. These price increases were evidence that Waitr's model of providing low-cost services to remote markets was not viable, and the huge price increases were a cynical attempt to get customers to abandon their contracts so that Waitr did not have to return any of the thousands of dollars paid in "onboarding" fees by each restaurant. Waitr was not able to extract efficiencies from its full time fixed-rate labor force that purportedly allowed the Company to offer its services at a lower rate than competitors, when in fact its W2 labor model was inefficient, resulted in huge costs that could not be sustained (especially if the Company paid all associated labor costs as required by state and federal law), and resulted in Waitr reporting the lowest gross margins among its peers. Moreover, unlike its competitors, Waitr incurred unique risks because its drivers were all full-time employees (fixed costs), whereas competitors hired drivers on an as-needed basis, as surge labor, engaging more drivers during periods of peak demand. In fact, on February 27, 2019, in the First FLSA Class Action a former Waitr driver sued the Company for violations of the Fair Labor Standards Act alleging Waitr did not pay drivers mileage expenses, such that drivers' net pay actually fell below the minimum wage. The FLSA provision known as the "kickback rule"

requires that employees are paid minimum wage free and clear of the cost of doing business. When expenses cause take-home pay to fall below minimum-wage, employers are required to supplement such pay to a federally guaranteed minimum of $7.25 per hour. As a result of Waitr classifying 95% of its workers as W2 employees, it was required to comply with such rules. Shortly thereafter, on March 8, 2019, the Second FLSA Class Action was filed alleging, *inter alia*, similar violations of the kickback rule for Waitr's failure to reimburse mileage expenses. The foreseeable material impact of a determination in the plaintiffs' favor on the Company's earnings and balance sheet was estimated to be as much as 50% of an employee's compensation and with a profit and loss impact as high as $800 million. As a result of the aforementioned adverse conditions that Defendants failed to disclose, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Waitr could achieve the guidance sponsored and/or endorsed by Defendants. Nor was it true that Waitr maintained an adequate system of internal controls to report and eliminate material conflicts of interest.

128.    When asked by Jefferies analyst, Brent John Thill, generally about market conditions and whether the market would encourage restaurants "capable of supporting a handful of platforms," Defendant Meaux responded by distinguishing Waitr based on its lower prices and better technology. As evidence of this, Meaux stated, in part, the following:

> *[T]he reality is, is that when we're entrenched in the market and a competitor comes in the market, it really doesn't matter how much money they spend*. They still have to get the restaurant supply. And without the restaurant supply, you don't attract consumers.
>
> *        *        *
>
> *And the other thing about it, too, Brent, is our platform. Our technology platform is purpose-built for these kinds of markets*. So -- and this maybe is a part to the answer to the last question that Jeff was talking about as well.

(emphasis added).

129.    The foregoing statements were each materially false and misleading for the following reasons: Whatever 'first mover' or 'market entrenchment' advantage Waitr enjoyed was squandered by its inability to obtain sophisticated high-level programmers and software engineers who could enable Waitr to refine and develop the software necessary to stay competitive in its market. At the time Defendant Meaux made the aforementioned statements, national competitors like Grubhub (public), DoorDash (backed by SoftBank), and UberEats were already expanding into Waitr's once unchallenged markets and negatively impacting Waitr's current and foreseeable future sales. Not only were these bigger, better run, and better funded companies with more experience and stronger management, but they each had a significantly stronger business model which allowed them to fund growth in secondary markets with profits generated in primary markets. Waitr's "technology platform" provided little or no competitive advantages, as the Company was not capable of refining and developing its software to remain competitive in the market (much less become the next front-of-house integrated point of sales solution), because Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers, and engineers in Lake Charles, Louisiana.

130.    When analyst Thill asked about the Company's ability to become profitable, Meaux again stated, in part, the following:

> [W]hen we did the Landcadia transaction, we were just a few hundred thousand dollars a month away from profitability. In the case of Bite Squad, they had already been profitable at some period. So we know how to get this business profitable….And so if we stop expanding, if we -- or stop opening new markets, not so much stop expanding because most of our growth is coming from existing markets anyway. But if we just stopped opening new markets, it wouldn't take us long to find profitability.

(emphasis added)

131.    The foregoing statements were each materially false and misleading for the following reasons: Waitr lacked a plan to achieve profitability and, contrary to Defendant

Meaux's statements, Waitr was not at or near profitability. Rather, Defendants had created the illusion of financial stability by engaging in a host of illegal and improper activities each designed to inflate revenues and earnings. Waitr could not achieve profitability because its business model based on providing delivery service to small restaurant operators in "underserved" markets was not sound or sustainable, and the Company required draconian price increases that Waitr's core base customers could not afford to pay. Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares.

132.    Finally, when asked by analyst Thill what the most significant keys to unlocking Defendants' long-term +20% EBITDA forecasts, Meaux responded that, "***most particularly, the complete integration of the technology platforms for the two companies [Bite Squad and Waitr]***. Now that's later this year or into next year, ***but once we achieved full integration of that platform, there is significant leverage that will have been achieved at that point***." (emphasis added).

133.    The foregoing statements were each materially false and misleading because Defendants were unable to integrate Bite Squad with Waitr, let alone achieve "the complete integration of the technology platforms," because the two platforms were incompatible. As a result Defendants were forced to run two poorly managed, money-losing operations with little regional overlap and few synergies.

### 7.    False and Misleading Statements and/or Omissions in Waitr's May 10, 2019 Form 10-Q for 1Q19

134.    On May 10, 2019, Waitr filed its Form 10-Q with the SEC and announced its financial results for the first quarter of 2019, the period ended March 31, 2019. This Form 10-Q was signed by Defendant Yurecko and certified by Defendants Meaux and Yurecko. The first quarter 2019 Form 10-Q was substantially similar, and contained the same or similar representations as Waitr's 2018 Form 10-K regarding: (i) the Basis of the Company's Financial Reporting and Compliance with GAAP (*see supra* at ¶ 117); (ii) the suitability and viability of Waitr's controls and procedures (*see supra* at ¶ 117); and (iii) the veracity of the Sarbanes Oxley certifications signed by Defendants Meaux and Yurecko (*see supra* at ¶ 119).

135.    The foregoing statements were each materially false and misleading for the following reasons: Defendants failed to disclose the existence of material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. Waitr's financial statements and Defendants' Sarbanes Oxley certifications were not true, accurate or reliable. In fact, Waitr had artificially inflated profits and revenues, failed to disclose known adverse trends that were *already* impacting the Company as required by Item 303 of Regulation S-K [17 C.F.R. § 230.303(a)(3)(ii)], and failed to disclose the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures. Defendants failed to disclose the existence of known trends, events, or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way. Defendants knew, or were reckless in not knowing, the facts described herein that indicated all of the Company's interim financial statements, press releases, public statements, and filings with the SEC were materially false and

misleading for the reasons set forth herein; Moreover, it was not true that the Company was providing its services at a sustainable low take rate established at 15%. While the Company repeatedly stressed to investors that its 15% take rate was a significant market differentiator that would enable Waitr to grow and succeed, Defendants omitted to state the following material facts necessary in order to make the aforementioned statement(s) not misleading: Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares. As recounted by CW1 herein, Waitr unilaterally raised its take rate to 18% during the Class Period, and thereafter raised its take rate to 33% (plus an additional 3.1% credit card processing fee), after admitting to CW1 that the increase was necessary for Waitr to "continue doing business and be solvent". Waitr was not able to extract efficiencies from its full time fixed-rate labor force that purportedly allowed the Company to offer its services at a lower rate than competitors, when in fact its W2 labor model was inefficient, resulted in huge costs that could not be sustained (especially if the Company paid all associated labor costs as required by state and federal law), and resulted in Waitr reporting the lowest gross margins among its peers. Moreover unlike its competitors, Waitr incurred unique risks because its drivers were all full-time employees (fixed costs), whereas competitors hired drivers on an as-needed basis, as surge labor, engaging more drivers during periods of peak demand. In fact, on February 27, 2019, in the First FLSA Class Action a former Waitr driver sued the Company for violations of the Fair Labor Standards Act alleging Waitr did not pay drivers mileage expenses, such that drivers' net pay actually fell below the minimum wage. The FLSA provision known as the "kickback rule" requires that

employees are paid minimum wage free and clear of the cost of doing business. When expenses cause take-home pay to fall below minimum-wage, employers are required to supplement such pay to a federally guaranteed minimum of $7.25 per hour. As a result of Waitr classifying 95% of its workers as W2 employees, it was required to comply with such rules. Shortly thereafter, on March 8, 2019, the Second FLSA Class Action was filed alleging similar violations of the kickback rule for Waitr's failure to reimburse mileage expenses. The foreseeable material impact of a determination in the plaintiffs' favor on the Company's earnings and balance sheet was estimated to be as much as 50% of an employee's compensation and with a profit and loss impact as high as $800 million. Waitr's technology platform provided little or no competitive advantages, as the Company was not capable of refining and developing its software to remain competitive in the market (much less become the next front-of-house integrated point of sales solution), as Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers, and engineers in Lake Charles, Louisiana. As a result of the aforementioned adverse conditions that Defendants failed to disclose, Defendants lacked any reasonable basis to claim that the Company was operating according to plan or that Waitr could achieve guidance sponsored and/or endorsed by Defendants.

**8.     False and Misleading Statements and/or Omissions in Waitr's Secondary Offering Materials**

136.     Despite having previously represented that Waitr was well-capitalized and did not need to raise money, on April 4, 2019, Waitr filed its Secondary Offering Registration Statement on Form S-3 with the SEC utilizing a "shelf" registration process authorizing Waitr to sell securities up to a maximum aggregate offering price of $300,000,000. That Secondary Offering Registration Statement was declared effective on April 26, 2019. Thereafter, on May 16, 2019, Waitr filed its Preliminary Prospectus Supplement to the Secondary Offering Registration

Statement with the SEC. Finally, on May 17, 2019, Waitr filed its final Prospectus Supplement to the Secondary Offering Registration Statement with the SEC, thereby registering 6,757,000 shares of Waitr common stock at $7.400/share, totaling $50,001,800.00, for sale to the public.

137.    In connection with the Secondary Offering, Defendants prepared and disseminated materially false and misleading Secondary Offering Filings that contained false statements of material facts and that omitted to disclose material facts necessary to assure that statements contained therein were true, accurate and reliable at that time. In addition to making other representations about Waitr, the Secondary Offering Filings stated that the Company's financial statements and SEC reports were filed in accordance with GAAP and represented that Critical Accounting Policies and Estimates were in effect, as follows:

> **Critical Accounting Policies and Estimates**
> ***The preparation of financial statements in accordance with GAAP*** requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period, along with related disclosures. ***We regularly assess these estimates and record changes to estimates in the period in which they become known. We base our estimates on historical experience and various other assumptions believed to be reasonable under the circumstances.***
>
> *      *      *
>
> Other than the changes disclosed in *Note 2—Basis of Presentation and Summary of Significant Accounting Policies* to our unaudited condensed consolidated financial statements included in our Quarterly Report, which is incorporated by reference herein, ***there have been no material changes to our critical accounting policies and estimates described in our Annual Report, which is incorporated by reference herein.***

(emphasis added).

138.    While Waitr reported no material change in its critical accounting policies or estimates, one change that did appear in the Secondary Offering Filings was Waitr's description of its competitive advantage based on lower pricing. Whereas Waitr had theretofore promoted the Company's basic strategy as being a "low-cost leader" in providing services to underserved

markets with a sustained take rate of 15%, suddenly Waitr reported that its competitive advantage was based on "Flexibility Around Price Point," which was explained as providing restaurant customers price flexibility, evidenced by "charging restaurants under two fee models: (1) with an initial setup and integration fee and partnership level pricing, and (2) with a higher fee rate and no upfront setup and integration fee." This change in emphasis to "flexibility," rather than cost-savings, was obscured by the fact that the two-tiered pricing alternatives existed throughout the Section 10(b)/20(a) Class Period and marked no change in corporate strategy regarding pricing models.

139.    The MD&A section of Waitr's May 16, 2019 Preliminary Prospectus Supplement to the Secondary Offering Registration Statement also stated, in part, as follows:

> ***On January 17, 2019, we completed the acquisition of Bite Squad, an online food ordering and delivery platform, which operates a three-sided marketplace, consistent with Waitr***, expanding our scale and footprint across the United States to more than 600 cities and adding more than 11,800 restaurants. The aggregate consideration for the Bite Squad Merger consisted of $192,949 payable in cash (subject to adjustments), the pay down of $12,705 of indebtedness of Bite Squad and 10,591,968 shares of our common stock. ***We believe the acquisition will help us drive additional growth as we leverage our respective strengths, with the opportunity to realize cost and operational synergies, including the integration of the two platforms.***

(emphasis added).

140.    The foregoing statements were each materially false and misleading for the following reasons: The Bite Squad acquisition was conducted with little or no due diligence and with disregard for the fact that Bite Squad's haphazard structure resulting from its being cobbled together through 17 other acquisitions was not "consistent with" Waitr's contiguous growth model. Defendants were unable to integrate Bite Squad with Waitr because the two platforms were incompatible. As a result Defendants were forced to run two poorly managed, money-losing operations with little regional overlap and few synergies.

141.     The MD&A section of Waitr's May 16, 2019 Preliminary Prospectus Supplement

to the Secondary Offering Registration Statement also stated, in part, as follows:

> ***Our continued growth is driven in significant part by our ability to successfully
> expand our network of restaurants and diners using the Platforms. We believe
> that our modest fee structures combined with our differentiated, value-added
> services foster restaurant loyalty and incentivize restaurants to drive business
> toward the Platforms.*** We also believe that recognition of our brands, driven by
> our strong regional presence and employee delivery drivers, accessible customer
> service, and low diner fee further contributes to diner loyalty.

(emphasis added).

142.     The foregoing statements were each materially false and misleading for the

following reasons: Waitr was not experiencing "continued growth" because it did not have a

proven business model and expansion strategy. Its revenues would not sustain its operations, and

it would be impossible to achieve these results without merging with sizable competitors and

successfully integrating these competitors into Waitr's operations, something which would entail

great risks given CEO Meaux's limited operating experience and history of serial business

failures. Waitr had achieved its sales growth by partnering with local restaurants and charging

them less than the take rates charged by Grubhub and other larger competitors, but Waitr was

effectively subsidizing these sales with "onboarding" fees. This was not sustainable, and Waitr

could not achieve profitability with its existing contracts. Thus, Waitr was already in the process

of drastically increasing its prices in a desperate attempt to raise revenue by imposing draconian

price increases on small independent operators. These price increases were evidence that Waitr's

model of providing low-cost services to remote markets was not viable, and the huge price

increases were a cynical attempt to get customers to abandon their contracts so that Waitr did not

have to return any of the thousands of dollars paid in "onboarding" fees by each restaurant. It

was not true that Waitr would be able to maintain a "modest fee structure[]" at a take rate of

15%. In fact, Waitr had already breached certain customer contracts to force customers who had

initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares.

143.    The Business section of Waitr's May 16, 2019 Preliminary Prospectus Supplement to the Secondary Offering Registration Statement also stated, in part, as follows:

> Company drivers are brand ambassadors for Waitr and the primary point of contact with Waitr's diners. ***As a result, Waitr invests significant resources in its drivers, including background checks, in-person interviews, training, uniforms, peer reviews and scheduled working hours. This allows Waitr to better manage a consistent delivery experience for both restaurants and diners, provides drivers with steady income and predictable hours and ensures efficient utilization of the driver workforce.***

(emphasis added).

144.    The foregoing statements were each materially false and misleading for the following reasons: Waitr was not able to "ensure[] efficient utilization" of its full time fixed-rate labor force that purportedly allowed the Company to offer its services at a lower rate than competitors. In fact its W2 labor model was inefficient, resulted in huge costs that could not be sustained (especially if the Company paid all associated labor costs as required by state and federal law), and resulted in Waitr reporting the lowest gross margins among its peers. Moreover, unlike its competitors, Waitr incurred unique risks because its drivers were all full-time employees (fixed costs), whereas competitors hired drivers on an as-needed basis, as surge labor, engaging more drivers during periods of peak demand. In fact, on February 27, 2019, in the First FLSA Class Action a former Waitr driver sued the Company for violations of the Fair Labor Standards Act alleging Waitr did not pay drivers mileage expenses, such that drivers' net pay actually fell below the minimum wage. The FLSA provision known as the "kickback rule" requires that employees are paid minimum wage free and clear of the cost of doing business.

When expenses cause take-home pay to fall below minimum-wage, employers are required to supplement such pay to a federally guaranteed minimum of $7.25 per hour. As a result of Waitr classifying 95% of its workers as W2 employees, it was required to comply with such rules. Shortly thereafter, on March 8, 2019, the Second FLSA Class Action was filed alleging, *inter alia*, similar violations of the kickback rule for Waitr's failure to reimburse mileage expenses. The foreseeable material impact of a determination in the plaintiffs' favor on the Company's earnings and balance sheet was estimated to be as much as 50% of an employee's compensation and with a profit and loss impact as high as $800 million.

145.    The Business section of Waitr's May 16, 2019 Preliminary Prospectus Supplement to the Secondary Offering Registration Statement also stated, in part, as follows:

> ***The Platforms use scalable software to provide a consistent and robust user experience as user adoption increases. The internally developed Platforms are purpose-built to streamline online ordering and delivery for consumers and restaurants.*** The Platforms are 100% hosted in the cloud. ***Cloud hosting assists Waitr with addressing potential capacity constraints that Waitr may face as it grows its core applications and provides a level of redundancy, fault tolerance and cost-effectiveness.*** Waitr also hosts its Driver Managr and call center applications on the cloud. The Platforms offer simplicity, ease of use, rich customer data, and online menu integrations. ***Continued scaling of the Platforms is expected to lead to a more consistent and robust user experience.*** Rich customer data and online menu integrations are also expected to result in higher average order value and increased incremental orders.

> (emphasis added).

146.    The foregoing statements were each materially false and misleading because Waitr's "internally developed" technology platform provided little or no competitive advantages. The Company was not capable of refining and developing its software to remain competitive in the market (much less become the next front-of-house integrated point of sales solution), because Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers, and engineers in Lake Charles, Louisiana.

67

F.      **The Truth Is Revealed or Materialized in a Series of Disclosures**

1.      **April 30, 2019 Restaurant Partners' Class Action**

147.    On April 30, 2019, a putative class action was filed against Waitr in the United States District Court for the Western District of Louisiana, styled *Bobby's Country Cooking LLC v. Waitr Holdings Inc.*, Case No. 2:19-cv-00552-TAD-KK (the "Restaurant Partners' Class Action"). The Restaurant Partners' Class Action alleged that Waitr had inflated its reported revenues prior to the Going Public Transaction by unilaterally breaking contracts and imposing higher rates on certain of its restaurant customers. The Restaurant Partners' Class Action seeks damages for breach of contract, violation of the duty of good faith and fair dealing and unjust enrichment. The plaintiff in the Restaurant Partners' Class Action claimed to have had a one-year contract with Waitr that provided for a <u>Service Transaction Fee of 10%</u> that could not be changed or modified absent written agreement of the parties. The Restaurant Partners' Class Action plaintiff further states that Waitr unilaterally, with 30 days' notice, raised its Service Transaction Fee to 15%. The Restaurant Partners' Class Action complaint points out that, "Waitr imposed this unlawful price increase after announcing its acquisition by an investment fund [Landcadia], but shortly before its initial public offering, suggest[ing] an intent to maximize potential revenue with disregard for its contractual obligations to its customers.…[And] as part of a broad strategy to increase revenue and profit prior to the sale and public offering of the Company."

148.    The allegations contained in the Restaurant Partners' Class Action complaint were evidence that Waitr could not supply delivery services at prices that small restaurants in secondary markets could reasonably afford.

149.    On this news, Waitr common stock declined $0.94 per share, or 8.78%, to close at $9.76 per share on April 30, 2019 after trading at a high of $10.70 on April 29, 2019.

## 2.    July 5, 2019 Take Rate Increase Announcement

150.    On July 5, 2019, Waitr announced a massive price increase that was considerably disadvantageous to small restaurant operators in remote "underserved" markets. Waitr announced that commissions were being raised from 15% to 25% for its smaller customers—but would remain at 15% for individual locations that generated over $20,000 per month of delivery—an astronomically large sum for any restaurant in a low-tier market, much less a small restaurant in such a market. Waitr's bracketed approach imposed the following dramatic rate increases:

| Bracket | Rate* |
|---|---|
| $1,000.01  -  $2,000 | 24.5% |
| $2,000.01  -  $3,000 | 24.0% |
| $3,000.01  -  $4,000 | 23.5% |
| $5,000.01  -  $7,500 | 23.0% |
| $7,500.01  - $10,000 | 22.0% |
| $10,000.01 - $12,500 | 21.0% |
| $12,500.01 - $15,000 | 20.0% |
| $15,000.01 - $20,000 | 19.0% |
| Above $ 20,000.01 | 15.0% |

**\* plus an additional 3% for Credit Card Processing Fees**

151.    This massive price increase was evidence that Waitr could not supply delivery services at prices that small restaurants in secondary markets could reasonably afford. The price increase also demonstrated that Waitr was not achieving any competitive advantage by utilizing full-time driver labor that would allow it to maintain price stability at 15%.

152.    On this news, Waitr common stock declined $0.39 per share, or 6.23%, to close at $5.87 per share on July 8, 2019, the first trading day after the July 5, 2019 announcement, after opening at $6.26 per share on July 5, 2019.

153.    Having purported to have built Waitr into a thriving success based on a business model predicated upon providing low priced delivery services to small, sole proprietor

"restaurant partners" in underserved remote markets, there was an immediate and almost hostile reaction by restaurant operations, especially Waitr's early adopters located in and around its headquarters and home-town. On July 7, 2019 just days after announcing the price increases it was reported in *The Advocate* that at least 20 restaurant owners planned to protest Waitr's new "performance based rate structure" by boycotting the delivery platform.

154.    In the days and weeks that followed, news reports regarding small restaurant partners' expressions of betrayal and discontent appeared widely in the press. Restaurant owner after restaurant owner recounted how the economics of their business do not allow for them to pay 25% delivery fees when operating on a margin under 15%. As Bradley Deroche, the owner of several Moe's Southwest Grill locations, stated in an article published in *www.houmatoday.com* on July 18, 2019, "We can't give our food away. We can't give away that big a percentage…. [These] are conditions under which we cannot operate."

155.    On July 22, 2019, Waitr filed a memorandum in support of its motion to dismiss the complaint filed in the Restaurant Partners' Class Action complaint, which memorandum did not deny the fact that Waitr had unilaterally increased take rates in violation of certain customers' contracts. According to Waitr's attorneys, "[the Restaurant Partners' Class Action plaintiff] had no right to remain at the lower fee level and [its] remedy for a fee increase it did not accept was to terminate its Waitr contract."

### 3.    August 6, 2019 Olo Partnership Announcement

156.    On August 6, 2019, Waitr issued a press release that signaled abandonment of its ambition to be the complete front-of-house software solution for restaurants with point of sale integration. That day, Waitr announced that it had made a deal with third-party developer Olo, to integrate *Olo's* platform software into *its* restaurant partners, allowing Waitr customers to "now have their requests go directly into a restaurant's point-of-sale (POS) system." Remarkably,

Waitr presented it as a benefit that Olo allows users to "manage many different platforms and ordering systems." Clearly, the adaptation of Olo's platform signaled the abandonment of Waitr's proprietary platform technology, a final admission that the Company was not maintaining any first mover advantage based on its ability to refine and enhance its technology, and that it could not obtain the resources necessary to update, improve and innovate its software without moving operations to areas rich with high-level programming and engineering support.

157.    On this news, Waitr common stock declined $0.28 per share, or over 7%, to close at $3.71 per share on August 7, 2019 after opening at $3.99 per share on August 6, 2019.

### 4.    August 7, 2019 Press Release and Earnings Call

158.    Finally, after the market closed on August 7, 2019, Waitr issued a press release revealing that Defendant Meaux would resign as CEO, that the integration of Bite Squad was not proceeding according to plan, that Waitr would layoff personnel, and that losses were running far ahead of plan and at a rate that eclipsed historical growth trends. Net losses for the quarter reached a staggering $25 million, up from $7.4 million the prior year. According to the Company, it had already hired Jefferies as a financial advisor to "explore strategic alternatives that have the potential to increase shareholder value." Those options purported to include "taking the company private or a sale of the business." Adam Price, who had joined Waitr in February 2019 as a department head and became COO in June 2019, was named CEO.

159.    On August 8, 2019, shares of the Company fell nearly 50% to a close of $1.89 per share, from a closing price of $3.76 per share the prior day, on unusually heavy trading volume of over 11.6 million shares. Waitr's market capitalization was $134 million, down from $910 million on March 13, 2019.

160.    At that time, investors also first learned of Defendant Meaux's "resignation" as CEO, as well as the material problems integrating Bite Squad on time and according to plan.

71

According to a Form 8-K filed with the SEC on August 8, 2019, Waitr announced it took longer to integrate Bite Squad, and that Waitr dropped its total annual revenue range for 2019 to as low as $210 million, down from +$250 million projected in May. Bite Squad had had also fallen from being available in 150 cities in December 2018 to only 60 cities in August 2019. Thus, it became apparent that there was little or no overlap in the footprint between Bite Squad and Waitr that would have resulted in material synergies. Moreover, on August 8, 2019, Defendant Price stated on the second quarter of 2019 Earnings Call that Waitr was able to fully migrate only 5 cities that included both Bite Squad and Waitr into a single platform and brand. Price also disclosed that Waitr had abandoned the important markets of Las Vegas, Nevada and Austin, Texas (saturated with diners with high disposable incomes).

161.    Providing more color on the failure of the Bite Squad acquisition, Price explained during the 2Q19 Earnings Call on August 8, 2019 that the difficulties were "bringing together two completely different marketing leadership teams at that time from the Bite Squad system and the Waitr system. And both of those teams came together with different strategies of how to acquire customers and get installs and get orders. And we ended up rolling out strategies while trying to integrate those teams without really monitoring the correct metrics for the efficacy of those strategies."

162.    According to Price, Waitr's results for Second Quarter of 2019 suffered as a result of management becoming "distracted in the heavy complex integration effort of the Bite Squad Waitr platforms.…[I]t took our team's eyes off key growth metrics and delayed certain revenue initiatives. Regarding growth, we did not catch real-time performance shortfalls in our new marketing strategy. This coincided with a noticeable uptick in customer acquisition spend from competitors in many of our markets." In other words, observing the massive, severe destruction

of Waitr's goodwill caused by Defendants' "new marketing strategy," competitors immediately took advantage of the opportunities created by Waitr's preoccupation with the Bite Squad integration. In his concluding remarks, Price again stated it was the delays in the integration of Bite Squad that impacted revenues and resulted in lower guidance.

163.    On the August 8 Earnings Call, investors learned that the price increases negatively impacted approximately 35% of Waitr's restaurant base. While Defendant Yurecko described this as "a relatively small percent," Price, on the other hand, said that Waitr did "anticipate a loss of restaurants" as a result of the price increases.

164.    Analysts following Waitr were shocked by the news. Daniel L. Kurnos, CFA ("Kurnos"), of The Benchmark Company, LLC ("Benchmark"), published an Earnings Note titled "Waitr Minute…What Just Happened? PT $8," stating, in part, as follows:

> Under the heading of "you can't make this stuff up," Waitr Holdings (WTRH:Buy, PT from $18 to $8) missed 2Q revenues, guided annual revenues down by 15% due to a combination of competitive pressures and distractions from the Bite Squad integration and replaced Founder and CEO Chris Meaux with the former head of Homer Logistics Adam Price, who went from being hired as Chief Logistic Officer in February to COO in June to now CEO….

> To recap, after transitioning to the WTRH symbol in November, Waitr acquired Bite Squad for $321 million (only $30 million less than the current EV and likely more than the current EV on the open today) in December, doubling the size of the business; beat 4Q and 1Q results, including a guidance raise to over $250 million in revenue last quarter; raised over $50 million in capital in a secondary at $7.40 in which the former CEO participated, which removed financial risk through 2020; then missed 2Q revenue, cut the outlook, replaced the CEO and announced that Evercore and Jeffries were advising them on strategic alternatives. Management cited competitive pressures from DoorDash causing increased CAC and lower new customer growth as part of the challenge, while manpower to integrate the BS acquisition caused the Company to lose focus on the core business, further dropping the ball….

165.    As a result of the foregoing, Kurnos stated that Benchmark was "slashing our 2019 and 2020 estimates, calling for GFS of $745 million and $994 million, respectively, driving revenue of $213.2 million and $305 million vs. $253 million and $413.9 million, prior."

166.     During the Section 10(b)/20(a) Class Period, as detailed herein, Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko engaged in a fraudulent scheme to deceive the market that artificially inflated the price of Waitr securities and operated as a fraud or deceit on Section 10(b)/20(a) Class Period purchases of Waitr securities.

167.     Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko's materially false and/or misleading statements and omissions concealed Waitr's true financial condition. As detailed above, when the truth about Waitr's materially false and/or misleading statements and omissions was revealed or materialized, the price of Waitr securities declined significantly as the prior artificial inflation was removed from the Company's stock price.

168.     As a result of their purchases of Waitr securities during the Section 10(b)/20(a) Class Period, at artificially inflated prices, Plaintiffs and the Class suffered damages under the federal securities laws. Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko's omissions and false and misleading statements had the intended effect and caused Waitr's common stock to trade at artificially inflated levels through the Section 10(b)/20(a) Class period, trading as high as $15.06 per share on November 16, 2018.

169.     The artificial inflation created by Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko's misrepresentations and omissions was partially removed when, on April 30, 2019, a putative class action was filed against Waitr in the United States District Court for the Western District of Louisiana, styled *Bobby's Country Cooking LLC v. Waitr Holdings Inc.*, Case No. 2:19-cv-00552-TAD-KK (the "Restaurant Partners' Class Action" ). The allegations contained in the Restaurant Partners' Class Action complaint were evidence that Waitr could not supply delivery services at prices that small restaurants in secondary markets could reasonably afford.

170.    Following this disclosure and/or materialization of foreseeable risks, Waitr common stock declined $0.94 per share, or 8.78%, to close at $9.76 per share on April 30, 2019 after trading at a high of $10.70 on April 29, 2019. However, the disclosures and/or materialization of foreseeable risks made on April 30, 2019 were not sufficient to fully remove the inflation from Waitr's share price because the disclosures and/or materialization of foreseeable risks only partially rev revealed or materialized the full truth of concealed financial conditions, risks, and trends of the Company.

171.    The artificial inflation created by Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko's misrepresentations and omissions was further partially removed when, on July 5, 2019, Waitr announced a massive price increase that was considerably disadvantageous to small restaurant operators in remote "underserved" markets. Waitr announced that commissions were being raised from 15% to 25% for its smaller customers—but would remain at 15% for individual locations that generated over $20,000 per month of delivery—an astronomically large sum for any restaurant in a low-tier market, much less a small restaurant in such a market. This massive price increase was evidence that Waitr could not supply delivery services at prices that small restaurants in secondary markets could reasonably afford. The price increase also demonstrated that Waitr was not achieving any competitive advantage by utilizing full-time driver labor that would allow it to maintain price stability at 15%.

172.    Following this disclosure and/or materialization of foreseeable risks, Waitr common stock declined $0.39 per share, or 6.23%, to close at $5.87 per share on July 8, 2019, the first trading day after the July 5, 2019 announcement, after opening at $6.26 per share on July 5, 2019. However, the disclosures and/or materialization of foreseeable risks made on July 5, 2019 were not sufficient to fully remove the inflation from Waitr's share price because the

disclosures and/or materialization of foreseeable risks only partially revealed or materialized the full truth of concealed financial conditions, risks, and trends of the Company.

173. The artificial inflation created by Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko's misrepresentations and omissions was further partially removed when, on August 6, 2019, Waitr announced a partnership with third-party developer Mobo Systems, Inc. d/b/a Olo ("Olo"), to integrate Olo's platform software into its restaurant partners. Clearly, the adaptation of Olo signaled the abandonment of Waitr's proprietary platform technology, a final admission that the Company was not maintaining any first mover advantage based on its ability to refine and enhance its technology, and that it could not obtain the resources necessary to update, improve and innovate its software without moving operations to areas rich with high-level programming and engineering support.

174. Following this disclosure and/or materialization of foreseeable risks, Waitr common stock declined $0.28 per share, or over 7%, to close at $3.71 per share on August 7, 2019 after opening at $3.99 per share on August 6, 2019. However, the disclosures and/or materialization of foreseeable risks made on August 6, 2019 were not sufficient to fully remove the inflation from Waitr's share price because the disclosures and/or materialization of foreseeable risks only partially revealed or materialized the full truth of concealed financial conditions, risks, and trends of the Company.

175. The truth was fully revealed and/or the risk was fully materialized on after the market closed on August 7, 2019, when, as alleged above, Waitr issued a press release revealing that Defendant Meaux would resign as CEO, that the integration of Bite Squad was not proceeding according to plan, that Waitr would layoff personnel, and that losses were running far ahead of plan and at a rate that eclipsed historical growth trends. Net losses for the quarter

reached a staggering $25 million, up from $7.4 million the prior year. According to the Company, it had already hired Jefferies as a financial advisor to "explore strategic alternatives that have the potential to increase shareholder value." Those options purported to include "taking the company private or a sale of the business." Adam Price, who had joined Waitr in February 2019 as a department head and became COO in June 2019, was named CEO.

176.    On August 8, 2019, shares of the Company fell nearly 50% to a close of $1.89 per share, from a closing price of $3.76 per share the prior day, on unusually heavy trading volume of over 11.6 million shares. Waitr's market capitalization was $134 million, down from $910 million on March 13, 2019.

177.    The declines in the price of Waitr securities after the truth came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. Had Defendants spoken the truth to investors, regarding, among other things, the facts that the Company was providing its services at a sustainable low take rate established at 15% and Waitr's technology platform provided little or no competitive advantages such that the Company would soon be forced to adopt a third party's platform, investors would have carried lower expectations regarding the true value of Waitr's securities throughout the Class Period. Waitr's stock price throughout the Class Period, therefore, would have been lower to reflect these lower expectations had investors known the truth. In other words, Defendants' material misrepresentations and omissions artificially raised investor expectations regarding Waitr's success, and accordingly, artificially raised Waitr's stock price. When the truth underlying Defendants' misrepresentations came to be revealed through a series of partial disclosures and/or materialization of foreseeable risks, the artificial inflation was removed, causing losses to Class members that would not have occurred but-for Defendants' misrepresentations and omissions

throughout the Class Period. The concepts of stock price inflation and loss causation discussed herein are supported by the weight of economic literature.

178.    Additionally, the aforementioned disclosures revealed the truth regarding Waitr's financial condition, risks, and trends of the Company, and represented the materialization of concealed risks which masked the fundamental flaws in Waitr's purported business model and execution. During the Section 10(b)/20(a) Class Period, in order to conceal the problems imposed by, among other things, Waitr's unsustainable 15% take rate and inability to successfully integrate Bite Squad, Defendants made materially false and/or misleading statements and omissions, as alleged in herein in Section II.E., *infra* at ¶¶ 94-146.

179.    The damages suffered by Plaintiffs and the Class were the direct and proximate result of Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko's materially false and misleading statements and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko's prior misrepresentations and fraudulent conduct was revealed or materialized.

### G.    Presumption of Reliance; Fraud-On-the-Market

180.    At all relevant times, the market for Waitr securities was an efficient market for the following reasons, among others:

a)    Waitr's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)    Waitr communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

c)    Waitr was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the

Section10(b)/20(a) Class Period. Each of these reports was publicly available and entered the public marketplace; and

d)      Unexpected material news about Waitr was reflected in and incorporated into its stock price during the Section10(b)/20(a) Class Period.

181.    As a result of the foregoing the market for Waitr securities promptly digested current information regarding Waitr from all publicly available sources and reflected such information in Waitr's stock price. Under these circumstances, all purchasers of Waitr securities during the Section 10(b)/20(a) Class Period suffered similar injury through their purchase of Waitr securities at artificially inflated prices, and a presumption of reliance applies.

182.    Alternatively, reliance need not be proven in this Action because the Action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**H.      Additional Indicia of Scienter**

183.    Each of Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material information. Throughout the Section 10(b)/20(a) Class Period, Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko acted intentionally or in such a reckless manner as to constitute a fraud upon Plaintiffs and the Class. Such actions caused the price of Waitr securities to be artificially inflated.

184.    As officers, directors, and/or controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and

was traded on the NASDAQ, and governed by the provisions of the federal securities laws, Defendants Meaux, Fertitta, Pringle, and Yurecko each had a duty to disseminate promptly, accurate and truthful information with respect to Company, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. Defendants Meaux, Fertitta, Pringle, and Yurecko's misrepresentations and omissions during the Section 10(b)/20(a) Class Period violated these specific requirements and obligations.

185.    In addition to the foregoing, because of Defendants Meaux, Fertitta, Pringle, and Yurecko's positions with the Company, they all had access to the adverse undisclosed information about Waitr's business, operations, products, operational trends, financial statements, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees, and other information provided to them in connection therewith.

186.    Defendants Meaux, Fertitta, Pringle, and Yurecko participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly or negligently disregarded, the material misstatements and/or omissions contained therein and omitted therefrom. Because of their Board membership and/or executive and managerial positions with Waitr and/or Landcadia, each of Defendants Meaux, Fertitta, Pringle, and Yurecko had access to the adverse undisclosed information about Waitr's business prospects, performance, and financial condition as particularized herein and knew (or recklessly disregarded) that these

adverse facts rendered the positive representations made by or about Waitr and its business materially false and misleading.

187.    Thus, Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko are liable as participants in a fraudulent scheme and course of business that operated as deceit on acquirers of Waitr common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (i) deceived the investing public regarding Waitr's business, operations, management, and the intrinsic value of Waitr common stock; (ii) created a public market for common shares of Waitr, which Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko then used to raise operating cash and as currency for acquisitions; (iii) enabled Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko to register for sale with the SEC and sell over $50 million of Company stock in connection with a Secondary Offering while in possession of material adverse non-public information about Waitr during the Section 10(b)/20(a) Class Period; and (iv) caused Plaintiffs and other members of the Class to purchase Waitr common stock at artificially inflated prices during the Section 10(b)/20(a) Class Period and to be damaged thereby.

### 1.    Confidential Witness Testimony Supports Falsity and Scienter

188.    Confidential Witness #1 ("CW1") is the owner of a bar and grille in Baton Rouge, Louisiana whose business was one of the first Waitr customers when Waitr originally expanded into Baton Rouge in 2016.

189.    CW1's initial agreement with Waitr provided for a Take rate of only 3.5%, plus a minimal transaction fee. CW1 continued to do business with Waitr under the terms of this initial agreement for approximately one year.

190.    Subsequently, Waitr representatives presented CW1 with an amended Master Services Agreement ("MSA") increasing Waitr's Take rate to 10%. While the increase in Waitr's

Take rate was significant and Waitr made no attempt to explain or justify said increase, CW1 stated it was nevertheless still profitable for him to enter into this second agreement. CW1 continued to do business with Waitr under the terms of this second agreement until Waitr proposed yet another amended MSA on July 18, 2019.

191.    On July 18, 2019, a Waitr representative visited CW1 at his business to propose the terms of the second amended MSA setting Waitr's Take rate at 18%. As with the prior increase, Waitr made no attempt to explain or justify said increase. While 18% was approaching the point of being unprofitable for CW1's business, CW1 nevertheless entered into the second amended MSA.

192.    In early January of 2020, after the end of the Section 10(b)/20(a) Class Period, Waitr representatives presented CW1 with a third amended MSA that would have raised Waitr's Take rate to 33% and add a 3.1% credit card processing fee. Thereafter, CW1 spoke with Waitr employee Katie Compton, a Business Development Manager, regarding the details of the third amended MSA and Take rate increase.

193.    CW1 was unsatisfied with Compton's explanations as to Waitr's justifications for raising its Take rate so dramatically, and eventually was put in touch with Anson Trahan, a more senior Business Development Manager at Waitr. CW1 spoke with Trahan on January 14 and 15 of 2020, at which point Trahan first admitted the basis of Waitr's continuous Take rate increases. When CW1 directly asked Trahan "What's the benefit for me to sign this contract?", Trahan stated, "Waitr can continue doing business and be solvent." Thereafter, Trahan became incensed and refused to speak with CW1, at which point CW1 was elevated to Waitr Regional Account Manager Dominque Hankins.

194.    CW1 spoke with Hankins twice, at which point Hankins confirmed the Take rate increase was solely tied to Waitr's profitability and refused to guarantee CW1 that Waitr would not unilaterally increase its Take raten again in the future.

195.    Despite the fact that Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko asserted, throughout the Section 10(b)/20(a) Class Period, that Waitr would be able to achieve profitability not in spite of, but because of, it's lower 15% take rate, Waitr employees nevertheless admitted to CW1 after the Section 10(b)/20(a) Class Period that Waitr could not achieve profitability and sustain itself as a business without unilaterally raising its Take rate to approximately 33%, at least 18% higher than the 15% take rate Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko touted throughout the Section 10(b)/20(a) Class Period. The forgoing allegations confirm Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko knew, or were reckless in not knowing, the material misstatements and/or omissions alleged herein in Section II.E., *infra* at ¶¶ 94-146, were materially false and/or misleading when made.

### 2.    Post-Class Period Developments

196.    Just months after Adam Price took over as CEO from Defendant Meaux, he was replaced with Waitr's current CEO, Carl Grimstad, on or about January 3, 2020. As Grimstad recounted in an interview published on *Restaurantbusuinessonline.com* on August 18, 2020, when he took over "[t]he company was definitely headed for bankruptcy." One of Grimstad's first efforts to stave off bankruptcy was abandoning Waitr's W2 labor model in favor of drivers who operated as independent contractors.

197.    In another interview published on *foodondemandnews.com* on July 23, 2020, Grimstad elaborated on his decision, stating, in part, as follows:

> "We were over-staffed, we were paying a lot of our vendors incorrectly or too much, ***our service offering was mispriced, we had a driver model that could never work***, and we had a dwindling cash position and a capital structure—

meaning $120 million in debt in front of equity that had no value—and were coming off a very big negative EBITDA year," said Grimstad, summing up the brutal position he found upon arrival. "To say the least, there were opportunities or problems everywhere to be fixed."

*     *     *

"**On a whiteboard if you looked at it mathematically, someone would argue the W-2 model, if you're giving a driver a certain amount of orders an hour, it would behoove you to use that model. That math does add [up], but when you dig into the details and it comes to Waitr and Bite Squad, we could never get to that level of efficiency. So, on an order-by-order basis, the profit margin would be all over the board or nonexistent depending on the efficiency of the drivers**," said Grimstad.

(emphasis added).

198.    As a result of, among other things, Waitr's broker W2 labor model, Grimstad again revealed "the company was on the trajectory to be bankrupt in the first quarter…."

199.    Plaintiffs allege the foregoing post-Section10(b)/20(a) Class Period statements by new Waitr CEO Grimstad are further evidence Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko knew, or were severely reckless in not knowing, the material misstatements and/or omissions regarding Waitr's W2 labor model alleged herein in Section II.E., *infra* at ¶¶ 94-146, were materially false and/or misleading when made.

### 3.    Defendant Pringle's Early "Retirement"

200.    On February 11, 2019, the same day it announced fourth quarter and fiscal year 2018 financial results, the Company also announced that "[o]n February 10, 2019, David Pringle advised the Company that he will retire as Chief Financial Officer of the Company, effective March 31, 2019…." In a Form 8-K filed with the SEC that same day, Waitr couched Pringle's "retirement" in terms of his replacement, Defendant Yurecko:

In conjunction with the recent completion of Waitr's acquisition of Bite Squad as well as the Company's rapid organic growth, the Company has announced the following management appointments:

- Jeff Yurecko, Bite Squad's Chief Financial Officer, has been appointed Chief Financial Officer of Waitr effective April 1, 2019,

84

succeeding David Pringle, who will remain with the Company through
March 31, 2019

\*       \*       \*

"In conjunction with these new appointments, Dave Pringle will retire to spend
more time with his family in California. He has been a great asset to the Company
as we transitioned from a private to a public company. I want to thank him for his
dedication to Waitr over the last few years and wish him and his family the best in
their future endeavors," concluded Meaux.

201.    Thus, while Defendant Pringle was purportedly retiring "to spend more time with

his family in California," it was simultaneously made clear that he was being replaced by

Defendant Yurecko as part of the Bite Squad acquisition and as Waitr "transitioned from a

private to a public company."

202.    The timing of Defendant Pringle's "retirement" is especially suspect considering

he was only 53 years of age at the time, and it came less than 3 months after Waitr began trading

publicly and only weeks after the Company provided very aggressive forward guidance.

203.    Plaintiffs allege Defendant Pringle's "retirement" is further evidence Defendants

Waitr, Meaux, Fertitta, Pringle, and Yurecko knew, or were severely reckless in not knowing, the

material misstatements and/or omissions alleged herein in Section II.E., *infra* at ¶¶ 94-146, were

materially false and/or misleading when made.

### 4.    Meaux's Resignation and Stock Forfeiture

204.    On August 8, 2019, the Company announced that Defendant Meaux "resigned as

the Chief Executive Officer of the Company." While Waitr's Press Release affirmatively stated

"Mr. Meaux's decision to resign was not related to a disagreement with the Company over any

of its operations, policies or practices," it did not provide any alternative reason actually

explaining why Meaux "resigned." This is because Defendant Meaux did not resign, but was

rather forced out of his position due to, among other things, his failure and inability to

successfully integrate Bite Squad and refine and enhance Waitr's technology platform, such that Waitr was forced to partner with Olo and utilize Olo's platform.

205.     Further evidence that Meaux's resignation constituted a constructive termination for the aforementioned reasons is evidenced by the terms of the August 8, 2019 Separation Agreement, which was attached as Exhibit 10.1 to Waitr's Form 8-K filed with the SEC on August 8, 2019. As indicated therein (and subsequently confirmed the following day when Meaux filed a Form 4 confirming the same), in connection with Meaux's "resignation," he was forced to "forfeit[] automatically without consideration" two-thirds of the shares of his restricted stock, being 166,667 shares.

206.     Plaintiffs allege Defendant Meaux's August 8, 2019 "resignation," viewed in light of his corresponding and punitive stock forfeiture, is further evidence Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko knew, or were reckless in not knowing, the material misstatements and/or omissions alleged herein in Section II.E., *infra* at ¶¶ 94-146, were materially false and/or misleading when made.

### 5.     Waitr's Going Public Transaction

207.     Defendant Fertitta is reported in the press to be a close personal friend of Section 14(a) Defendant Handler, who, at all relevant times, is and was the CEO of Defendant JFG. In a CNBC Power Lunch interview on May 17, 2019, in fact, Defendant Fertitta was quoted as stating that "Rich [Handler] is 'my best friend…Rich is a great friend, a great friend.'" Plaintiffs allege Defendants Fertitta and Section 14(a) Defendant Handler conspired to award Section 14(a) Defendant Jefferies the role of Underwriter with respect to the Going Public Transaction, a role which Jefferies did not obtain on merit, but rather the strength of Defendant Fertitta and Section 14(a) Defendant Handler's close personal relationship.

208.    In connection with the Going Public Transaction, Defendant Jefferies was paid at least $10 million in underwriting fees, all of which was contingent upon the closing of that transaction prior to Landcadia shareholders' redemption date. Section 14(a) Defendants Handler, JFG, and Jefferies therefore had a significant financial interest in the completion of the Waitr business combination that resulted in the payment of the deferred underwriting commissions and additional fees and commissions.

209.    An underwriter's due diligence investigation is a critical component of any public stock offering, and it was supposed to provide investors with important safeguards and protections. The due diligence investigation that was required by Section 14(a) Defendants JFG, Jefferies, and Handler included a detailed investigation into Waitr's operations, accounting, and guidance assumptions that extended well beyond a mere casual review of Waitr's accounting, financial reports, and control statements.

210.    Plaintiffs allege Defendant Fertitta knowingly failed to conduct adequate due diligence, or was severely reckless in not conducting such due diligence, with respect to the Going Public Transaction in order to "earn" at least $10 million in underwriting fees for Defendants JFG and/or Jefferies. As a result, Plaintiffs allege Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko knew, or were severely reckless in not knowing, the misstatements and/or omissions alleged herein in Section II.E., *infra* at ¶¶ 94-146, were materially false and/or misleading when made.

### 6.    Waitr's Secondary Offering

211.    In connection with the Secondary Offering, Defendant Jefferies once again received over $2.1 million in underwriting fees while acting as "Lead Underwriter." Plaintiffs allege Defendants Fertitta and Section 14(a) Defendant Handler conspired to award Section 14(a) Defendant Jefferies the role of Lead Underwriter with respect to the Secondary Offering, a role

which Jefferies did not obtain on merit, but rather the strength of Defendant Fertitta and Handler's close personal relationship. Plaintiffs also allege Defendants Fertitta and Section 14(a) Defendant Handler knowingly, or recklessly or negligently, failed to conduct adequate due diligence with respect to the Secondary Offering in order to "earn" at least $2.1 million in underwriting fees for Defendants JFG and/or Jefferies. As a result, Plaintiffs allege Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko knew, or were reckless in not knowing, the material misstatements and/or omissions alleged herein in Section II.E., *infra* at ¶¶ 94-146, were materially false when made.

212.    Additionally, on May 21, 2019, just five days after the Secondary Offering on May 16, 2019, shares of Waitr rallied over 2% in active daily trading after it was reported that Defendant Meaux had purchased $1 million of Waitr stock at $7.40 per share in the Secondary Offering. It was also reported that Waitr director Steven Scheinthal had purchased 10,000 shares the same day, at a price of $6.80 per share. In a Form 4 filed with the SEC on May 21, 2019, Meaux reported buying 135,135 Waitr stock at $7.40, as part of a follow-on offering. While the offering was priced at $7.40, Waitr stock price closed the day at $6.85, and it appears that director Scheinthal bought 10,000 shares at $6.80 on price weakness.

213.    Plaintiffs allege Defendant Meaux purchased $1 million Secondary Offering shares at the $7.40 offering price because there was *no demand* for Waitr shares at that time and Defendants were frantically trying to unload the Secondary Offering shares without alerting the market. It was a material non-disclosure for Defendant Meaux to provide price support to the Secondary Offering and to fail to disclose that his purchases were necessary to prevent this offering from failing and being undersubscribed.

214.     Jefferies did not exercise the oversubscription option. The 1.01 million shares that would have been placed into the market if Jefferies has exercised the oversubscription are not reflected in Waitr's Form 10-Q for the period ended June 30, 2019. This indicates a significant lack of demand for Waitr shares at $7.40. There is no mention of Meaux's intention to purchase the $1 million of Waitr shares in the Company's Form 454(b)(5) Supplemental Prospectus, filed with the SEC on May 17, 2019, the day after the Secondary Offering was priced, nor once selling had begun. Third, there is no mention of any insider buyers in the Supplemental Prospectus, filed on May 17, 2019, the day after the Secondary Offering was priced and once selling had begun. And fourth, shares of Waitr closed trading at $6.85 the day of the Secondary Offering—well below the $7.40 Secondary Offering price.

215.     The fact that the Secondary Offering was floundering while Defendants were scrambling to find buyers, and knowing that Defendant Meaux would likely have to become one of them, also made statements within the Secondary Offering Filings materially false and misleading, including statements that continued to forecast the foreseeable gross consideration that Waitr could foreseeably expect from Jefferies exercise of its oversubscription option, when it had already become foreseeable that there was little or no possibility that would occur. Accordingly, at the time Defendants filed the Form 424(b)(5), on May 17—a day *after* the Secondary Offering had begun—it was materially false and misleading to report that Waitr would receive $53.8 million "[i]f the underwriters exercise in full their option to purchase additional shares."

216.     As a result, Plaintiffs allege Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko knew, or were severely reckless in not knowing, the material misstatements and/or

omissions alleged herein in Section II.E., *infra* at ¶¶ 94-146, were materially false and/or misleading when made.

## I. Causes of Action Under Sections 10(b) and 20(a) of the Exchange Act

### 1. COUNT II for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Waitr, Meaux, Fertitta, Pringle, and Yurecko

217. Plaintiff repeats and re-alleges each and every allegation contained in Section II. above as if fully set forth herein.

218. During the Section 10(b)/20(a) Class Period, Waitr, Meaux, Fertitta, Pringle, and Yurecko carried out a scheme and course of conduct which was intended to and, throughout the Section 10(b)/20(a) Class Period, did:

(i)     deceive the investing public, including Plaintiff and other Class members, as alleged herein; and

(ii)    cause Plaintiff and other members of the Class to acquire Waitr's securities at artificially inflated prices.

219. In furtherance of this unlawful scheme, plan and course of conduct, the Company and Defendants Meaux, Fertitta, Pringle, and Yurecko, and each of them, took the actions set forth herein.

220. The Company and the Defendants Meaux, Fertitta, Pringle, and Yurecko: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Waitr's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Waitr and Defendants Meaux, Fertitta, Pringle, and Yurecko are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

221.    Waitr and Defendants Meaux, Fertitta, Pringle, and Yurecko, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Waitr's financial well-being and prospects, as specified herein.

222.    Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Waitr's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Waitr and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Waitr securities during the Section 10(b)/20(a) Class Period.

223.    Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko were each primarily liable, and control person liability arises from the following facts: (i) Defendants Meaux, Fertitta, Pringle, and Yurecko were high-level executives and/or directors at Waitr during the Section 10(b)/20(a) Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of Waitr, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and

was advised of, and had access to, other members of Waitr's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of Waitr's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

224.   Waitr and Defendants Meaux, Fertitta, Pringle, and Yurecko had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Waitr's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Waitr and Defendants Meaux, Fertitta, Pringle, and Yurecko's overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Section 10(b)/20(a) Class Period, Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

225.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Waitr's securities was artificially inflated during the Section 10(b)/20(a) Class Period. In ignorance of the fact that market prices of Waitr's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Waitr and Defendants

Meaux, Fertitta, Pringle, and Yurecko, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Waitr and Defendants Meaux, Fertitta, Pringle, and Yurecko, but not disclosed in public statements by Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko during the Section 10(b)/20(a) Class Period, Plaintiff and the other members of the Class acquired Waitr's securities during the Section 10(b)/20(a) Class Period at artificially high prices and were damaged thereby.

226.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Waitr was experiencing, which were not disclosed by Waitr and Defendants Meaux, Fertitta, Pringle, and Yurecko, Plaintiff and other members of the Class would not have purchased or otherwise acquired their securities, or, if they had acquired such securities during the Section 10(b)/20(a) Class Period, they would not have done so at the artificially inflated prices which they paid.

227.    By virtue of the foregoing, Waitr and Defendants Meaux, Fertitta, Pringle, and Yurecko have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

228.    As a direct and proximate result of Defendants Waitr, Meaux, Fertitta, Pringle, and Yurecko's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Waitr's securities during the Section 10(b)/20(a) Class Period.

2.      **COUNT III for Violations of Section 20(a) of the Exchange Act Against Defendants Meaux, Fertitta, Pringle, and Yurecko**

229.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

230.    Defendants Meaux, Fertitta, Pringle, and Yurecko acted as controlling persons of Waitr within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants Meaux, Fertitta, Pringle, and Yurecko had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Defendants Meaux, Fertitta, Pringle, and Yurecko were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

231.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

232.    As set forth above, Waitr and Defendants Meaux, Fertitta, Pringle, and Yurecko each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants Meaux, Fertitta,

94

Pringle, and Yurecko are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Section 10(b)/20(a) Class Period.

## III.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' Lead counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

## IV.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:      October 16, 2020                    Respectfully submitted,

                                                **KAHN SWICK & FOTI, LLC**

                                                */s/ Melinda A. Nicholson*
                                                Melinda A. Nicholson (32911)
                                                Lewis S. Kahn (23805)
                                                Michael J. Palestina (31907)
                                                1100 Poydras Street, Suite 3200
                                                New Orleans, LA 70163
                                                Telephone: (504) 455-1400
                                                Facsimile: (504) 455-1498
                                                Email: Melinda.Nicholson@ksfcounsel.com
                                                Email: Lewis.Kahn@ksfcounsel.com
                                                Email: Michael.Palestina@ksfcounsel.com

                                                **KAHN SWICK & FOTI, LLC**
                                                Kim E. Miller (*pro hac vice* forthcoming)
                                                250 Park Avenue, 7th Floor
                                                New York, NY 10177
                                                Telephone: (212) 696-3732
                                                Facsimile: (504) 455-1498
                                                Email: Kim.Miller@ksfcounsel.com

                                                *Lead Counsel for Lead Plaintiff Delivery Investment*
                                                *Group and the Class*

                                                -and-

                                                **LUNDY, LUNDY, SOILEAU & SOUTH, LLP**
                                                Matthew E. Lundy
                                                501 Broad Street
                                                Lake Charles, LA 70601
                                                Telephone: (337) 439-0707
                                                Facsimile: (337) 439-1029
                                                Email: mlundy@lundylawllp.com

                                                *Liaison Counsel for Lead Plaintiff Delivery*
                                                *Investment Group and the Class*