**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

|  |  |
|---|---|
| **WALTER WELCH, Individually and on Behalf of all Others Similarly Situated,** ) ) ) | |
| **Plaintiff,** ) ) | Case No. 2:19-CV-01260-TAD-KK |
| **vs.** ) ) ) | JUDGE TERRY A. DOUGHTY |
| **CHRISTOPHER MEAUX, DAVID PRINGLE, JEFF YURECKO, TILMAN J. FERTITTA, RICHARD HANDLER, WAITR HOLDINGS, INC. f/k/a LANDCADIA HOLDINGS, INC., JEFFERIES FINANCIAL GROUP, INC., and JEFFERIES, LLC,** ) ) ) ) ) ) ) ) ) ) ) | MAG. JUDGE KATHLEEN KAY |
| **Defendants.** ) ) ) | |

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND......................................................................................................4

ARGUMENT...............................................................................................................................7

  I.  PLAINTIFFS ADEQUATELY ALLEGE SECTION 10(b) CLAIMS ...............................7

    A.  Pleading Standards...............................................................................................7

    B.  The Complaint Adequately Pleads Materially False and Misleading
    Statements and Omissions ...................................................................................8

        1.  Material Misrepresentations and Omissions Regarding Waitr's
            Pricing Structure ........................................................................................8

        2.  Material Misrepresentations and Omissions Regarding Waitr's
            Labor Model .............................................................................................11

        3.  Material Misrepresentations and Omissions Regarding Waitr's
            Technology Platform .................................................................................12

        4.  Material Misrepresentations and Omissions Regarding Bite Squad ........12

        5.  Misrepresentations and Omissions Regarding Waitr's Growth ...............13

        6.  Material Misrepresentations and Omissions Regarding Waitr's
            Financial Performance and GAAP Compliance, and False
            SOX Certifications....................................................................................14

        7.  The PSLSRA Safe Harbor Does Not Apply ............................................15

        8.  None of the Statements Are Mere Puffery ...............................................16

    C.  The Complaint Adequately Pleads Scienter ..............................................17

        1.  Plaintiffs Adequately Plead Circumstantial Evidence of Scienter ...........17

        2.  The Misrepresentations Concern Waitr's Core Operations,
            Bolstering Scienter....................................................................................22

        3.  The Inference of Scienter is More Compelling Than Any Opposing
            Inferences.................................................................................................23

    D.  Plaintiffs Do Not Engage in Impermissible Group Pleading.....................24

  II.  PLAINTIFFS ADEQUATELY ALLEGE SECTION 20(a) CLAIMS .............................25

  III. PLAINTIFFS ADEQUATELY ALLEGE SECTION 14(a) CLAIMS .............................26

    A.  Pleading Standards.............................................................................................26

    B.  Defendants' Standing Argument is a Red Herring............................................26

    C.  The Jefferies Defendants Are Not Immune from Liability ........................................26

        1.  The Jefferies Defendants Were "Participants" in the Proxy Solicitation ..27

        2.  The Jefferies Defendants Permitted Their Names to be Used in a
            Manner Having a Substantial Connection to the Proxy Solicitation ........28

    D.  Scienter is Not Required for Section 14(a) Claims .....................................31

E.  The Complaint Adequately Pleads Negligence ...........................................................34

F.  The Complaint Adequately Pleads Materially False and Misleading Statements or
    Omissions ......................................................................................................................36

     1.  Material Misrepresentations and Omissions Regarding Waitr's
    Pricing Structure ..........................................................................................36

     2.  Material Misrepresentations and Omissions Regarding Waitr's
    Labor Force....................................................................................................36

     3.  Material Misrepresentations and Omissions Regarding Waitr's
    Technology Platform .....................................................................................37

     4.  Material Misrepresentations and Omissions Regarding Waitr's
    Growth ...........................................................................................................37

     5.  Material Misrepresentations and Omissions Regarding Waitr's
    Financial Performance and GAAP Compliance, and False
    SOX Certifications.........................................................................................37

     6.  None of the Statements are Inactionable Opinion ....................................38

     7.  The PSLRA Safe Harbor Does Not Apply .................................................38

     8.  None of the Statements Are Mere Puffery .................................................39

CONCLUSION....................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Abramson v. NewLink Genetic Corp.*, 965 F.3d 165 (2d Cir. 2020) ....................................... 38

*Adams v. Standard Knitting Mills*, 623 F.2d 422 (6th Cir. 1980),
   *cert. denied*, 449 U.S. 1067 (1980) ........................................................................................ 33

*Bach v. Amedisys,* 10-395, 2016 U.S. Dist. LEXIS 111077 (M.D. La. Aug. 19, 2016) ............ 10, 25, 36

*Bamburg v. Axis Onshore LP*, 08-1466, 2009 U.S. Dist. LEXIS 129709 (W.D. La. Apr. 28, 2009) 8, 40

*Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009) ....................................................... 31, 34, 35

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 3, 7, 27

*Biver v. Nicholas Fin. Inc.,* 14-250, 2014 U.S. Dist. LEXIS 73933 (M.D. Fla. May 30, 2014) ............ 31

*Britton v. Parker*, 06-1797, 2008 U.S. Dist. LEXIS 70430 (D. Colo. Sept. 5, 2008) ............................. 32

*Brody v. Zix Corp.*, 04-1931, 2006 U.S. Dist. LEXIS 69302 (N.D. Tex. Sept. 26, 2006) ..................... 22

*City of Pontiac Gen. Emps.' Ret. Sys. v. Dell,* 15-374, 2016 U.S. Dist. LEXIS 126219
   (W.D. Tex. Sep. 16, 2016) ...................................................................................................... 15

*Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395 (5th Cir. 1996) ........................................................ 7

*Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634 (D.C. Cir. 2008) ......................................................... 33

*Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008) ....................................................... 22

*Firefighters Pension & Relief Fund v. Bulmahn*, 147 F. Supp. 3d 493 (E.D. La. 2015) ....................... 15

*Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, 565 F.3d 200 (5th Cir. 2009) ......... 33

*Gaudet v. Nations*, 19-10356, 2020 U.S. Dist. LEXIS 191936 (E.D. La. Oct. 16, 2020) ....................... 7

*Gould v. Am.-Haw. S.S. Co.*, 535 F.2d 761 (3d Cir. 1976) ....................................................................... 31

*Greenthal v. Joyce,* 16-41, 2016 U.S. Dist. LEXIS 11132 (S.D. Tex. Jan. 29, 2016) ........................... 32

*Hall v. Rent-A-Ctr., Inc.,* 16-978, 2017 U.S. Dist. LEXIS 205959 (E.D. Tex. Oct. 19, 2017) ............. 21

*Herskowitz v. Nutri/System*, 857 F.2d 179 (3d Cir. 1988) ................................................................ 30, 34

*Hohenstein v. Behringer Harvard Reit I, Inc.*, 12-3772, 2014 U.S. Dist. LEXIS 40759
   (N.D. Tex. Mar. 27, 2014) ...................................................................................................... 32

*Holzwasser v. Staktek Holdings, Inc.*, 05-239, 2006 U.S. Dist. LEXIS 100346
(W.D. Tex. Mar. 30, 2006) ............................................................................................. 23, 24

*Hulliung v. Bolen*, 548 F. Supp. 2d 336 (N.D. Tex. 2008) ................................................... 32

*IBS Fin. Corp. v. Seidman Assocs., LLC*, 954 F.Supp. 980 (D.N.J. 1997) .............................. 28

*In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806 (S.D. Tex. 2013) .............. 27

*In re Avon Sec. Litig.*, 19-1420, 2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019) .................. 9

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F.Supp. 2d 260 (S.D.N.Y. 2010) ........ 28

*In re Blockbuster Inc. Sec. Litig.*, 03-398, 2004 U.S. Dist. LEXIS 7173 (N.D. Tex. Apr. 26, 2004) .... 16

*In re BP PLC*, 852 F. Supp. 2d 767 (S.D. Tex. 2012) ............................................................. 15

*In re BP PLC, Sec. Litig.*, 843 F. Supp. 2d 712 (S.D. Tex. 2012) .......................................... 21

*In re Digital Island Sec. Litig.*, 357 F.3d 322 (3d Cir. 2004) ............................................. 32

*In re Fleming Cos. Sec. & Derivative Litig.*, 03-1530, 2004 U.S. Dist. LEXIS 26488
(E.D. Tex. June 10, 2004) ................................................................................................. 8

*In re Fossil, Inc. Deriv. Litig.*, 713 F. Supp. 2d 644 (N.D. Tex. 2010) ............................. 26, 32

*In re NetSolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684 (W.D. Tex. 2001) .............................. 23

*In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008) .............................................. 19

*In re OCA, Inc. Sec. & Deriv. Litig.*, 05-2165, 2006 U.S. Dist. LEXIS 90854
(E.D. La. Dec. 14, 2006) ................................................................................................ 14

*In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368 (S.D.N.Y. 2015) ...................................... 17

*In re Sec. Litig. Bmc Software*, 183 F. Supp. 2d 860 (S.D. Tex. 2001) ............................... 39

*In re Willis Towers Watson PLC Proxy Litig.*, 439 F.Supp. 3d 704 (E.D. Va. 2020) .......... 31, 32, 34, 35

*In re Zagg Secs. Litig.*, 12-852, 2014 U.S. Dist. LEXIS 15783 (D. Utah Feb. 4, 2004) ........................ 32

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527 (5th Cir. 2008) ........... 10

*Jaroslawicz v. M&T Bank Corp.*, 15-897, 2017 U.S. Dist. LEXIS 47242 (D. Del. Mar. 30, 2017) ...... 34

*Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648 (W.D. Tex. 2006) ........................ 17

*Knollenberg v. Harmonic, Inc.*, 152 F.App'x 674 (9th Cir. 2005) ................................... 31, 34

*Knurr v. Orbital ATK, Inc.*, 276 F. Supp. 3d 527 (E.D. Va. 2017) ..................................... 34

*Krauth v. Exec. Telecard*, 870 F. Supp. 543 (S.D.N.Y. 1994) .......................................... 26

iv

*Lane v. Page*, 581 F.Supp. 2d 1094 (D.N.M. 2008) ................................................................. 32

*Lane v. Page*, 649 F.Supp. 2d 1256 (D.N.M. 2009) ................................................................. 28

*Lewis v. Byrnes*, 538 F. Supp. 1221 (S.D.N.Y. 1982) .................................................. 28, 30, 31

*Little Gem Life Scis. LLC v. Orphan Med., Inc.*, 637 F.3d 913, 917 (8th Cir. 2008) ............................ 34

*Local 120 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, 13-2393,
   2015 U.S. Dist. LEXIS 31468 (S.D. Tex. Mar. 13, 2015) .................................................. 11

*Madden v. Deloitte & Touche, LLP*, 118 F. App'x 150 (9th Cir. 2004) ................................. 31

*Marcus v. J.C. Penney Co.*, 13-736, 2015 U.S. Dist. LEXIS 131613 (E.D. Tex. Sep. 29, 2015) .......... 39

*Martinich v. Ward*, 14-07227, 2017 U.S. Dist. LEXIS 3713 (E.D.N.Y. Jan. 7, 2017) ........................... 8

*Mendell v. Greenberg*, 612 F.Supp. 1543 (S.D.N.Y. 1985) ...................................................... 31

*Monec Holding AG v. Motorola Mobility, Inc.*, 11-798, 2014 U.S. Dist. LEXIS 123898
   (D. Del. Sep. 5, 2014) ................................................................................................... 8

*Moskowitz v. Mitcham Indus.*, 98-1244, 1999 U.S. Dist. LEXIS 23293 (S.D. Tex. Sept. 28, 1999) ..... 26

*N. Port Firefighters' Pension-Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722
   (N.D. Tex. 2013) ........................................................................................................... 21

*N.J. v. Sprint Corp.*, 531 F.Supp. 2d 1273 (D. Kan. 2008) ..................................................... 36

*Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir. 2001) ............................................... 17, 23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) ... 3, 32, 38

*One Longhorn Land I, L.P. v. FF Arabian, LLC*, 15-203, 2015 U.S. Dist. LEXIS 158072
   (E.D. Tex. Nov. 23, 2015) ............................................................................................. 25

*Panella v. Tesco Corp.*, 17-cv-02904, 2019 U.S. Dist. LEXIS 65844 (S.D. Tex. Mar. 29, 2019) .. 32, 36

*Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690 (5th Cir. 2005) ......................... 10, 15, 16, 19, 23

*Plumbers & Pipefitters Nat. Pension Fund v. Davis*, 16-3591, 2020 U.S. Dist. LEXIS 66016
   (S.D.N.Y. Apr. 14, 2020) ............................................................................................... 13

*Ramirez v. Exxon*, 334 F. Supp. 3d 832 (N.D. Tex. 2018) ..................................................... 24

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003) .................................................... 10

*Rougier v. Applied Optoelectronics, Inc.*, 17-2399, 2019 U.S. Dist. LEXIS 199050
   (S.D. Tex. Mar. 27, 2019) ............................................................................................. 38

v

*Ruston La. Hosp. Co. v. Lincoln Health Found., Inc.*, 18-0881, 2018 U.S. Dist. LEXIS 205955 (W.D. La. Nov. 20, 2018) ........................................................................................................ 5

*Salit v. Stanley Works*, 802 F.Supp. 728 (D. Conn. 1992)................................................. 33

*SEC v. Falstaff Brewing Corp.*, 629 F.2d 62 (D.C. Cir. 1980)............................... 28, 30, 31, 32

*SEC v. Hurgin*, 19-5705, 2020 U.S. Dist. LEXIS 162447 (S.D.N.Y. Sep. 4, 2020) ............................. 36

*SEC v. Shanahan*, 646 F.3d 536 (8th Cir. 2011)............................................................... 33

*SEC v. Wills*, 472 F.Supp. 1250 (D.D.C. 1978)............................................................... 31

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) ........................ 16, 24

*Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676 (5th Cir. 2014).......................... 17, 24

*Steinberg v. BPO Mgmt. Servs.*, 09-cv-02291, 2010 U.S. Dist. LEXIS 34467 (N.D. Tex. Mar. 12, 2010) .................................................................................................... 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)........................... 17, 24, 36

*Tipton v. Northrop Grunman Corp.*, 08-1267, 2009 U.S. Dist. LEXIS 89887 (E.D. La. Sept. 29, 2009) ..................................................................................................... 5

*U.S. v. Peterson*, 101 F.3d 375 (5th Cir. 1996).......................................................... 8, 10

*Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) .................................................. 31

*Vaitkuviené v. Syneos Health, Inc.*, 18-29, 2020 U.S. Dist. LEXIS 176001 (E.D.N.C. Aug. 7, 2020) ..................................................................................................... 26, 31

*Walker v. Rent-A-Center*, 02-3, 2005 U.S. Dist. LEXIS 63595 (E.D. Tex. July 25, 2005) .................. 14

*Wieland v. Stone Energy Corp.,* 05-2088, 2007 U.S. Dist. LEXIS 76636 (W.D. La. Aug. 16, 2007)... 17

*Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987 (2d Cir. 1988)....................................... 31, 35

*Yamamoto v. Omiya*, 564 F.2d 1319 (9th Cir. 1977)....................................................... 29

*Zagami v. Natural Health Trends Corp.,* 540 F. Supp. 2d 705 (N.D. Tex. 2008)...................... 8

**Statutes**

15 U.S.C. § 77q(a)(2) ................................................................................................ 33

15 U.S.C. § 78u-4(b)(2) ............................................................................................ 34

15 U.S.C. § 78u5(c)(1) .............................................................................................. 15

15 U.S.C. §77k ........................................................................................................... 33

15 U.S.C. §78N(e) ...................................................................................................... 33

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................................*passim*

Fed. R. Civ. P. 9(b) ...............................................................................................*passim*

**Regulations**

17 C.F.R. § 229.303 ................................................................................................... 15

17 C.F.R. § 240.10b-5 ............................................................................................... 33

17 C.F.R. § 240.14a-101 ........................................................................................... 28

17 C.F.R. §240.14a-101 ............................................................................................ 28

17 C.F.R. §240.14a-9 ................................................................................................. 33

**Treatises**

2E Harold S. Bloomenthal & Samuel Wolff, *Securities and Federal Corporate Law* § 24:63 (2000) . 34

Plaintiffs respectfully submit this omnibus memorandum in opposition to the Motions to Dismiss filed by (1) Defendants Christopher Meaux, David Pringle, Jeff Yurecko, Tilman J. Fertitta, Richard Handler, and Waitr Holdings, Inc. ("Waitr") and (2) Jefferies Financial Group, Inc. ("JFG") and Jefferies, LLC ("JLLC") (collectively, "Jefferies Defendants").

## PRELIMINARY STATEMENT

Waitr was rushed to market in 2018 through a merger agreement with Landcadia Holdings, Inc. ("Landcadia"), a Special Purpose Acquisition Company ("SPAC") created for the sole purpose of finding a suitable acquisition within 24 months. ¶¶17, 84. Defendants Fertitta and Handler served as executives of Landcadia.  ¶¶10, 11. With just two weeks left before the clock ran out and triggered massive financial penalties, on May 16, 2018, Landcadia suddenly announced the deal with Waitr. ¶19, 86. Given this chaotic and last-minute decision, Fertitta was forced to obtain Landcadia shareholder approval for an extension from June 1, 2018 to December 14, 2018, to complete the acquisition. ¶¶19, 86. Without the rushed merger, Landcadia (and Defendants Fertitta and Handler, who had reputations as high-power deal makers to protect) would be forced to return $250 million under the terms of its own offering, and admit that the powerhouse combination of the self-promoting billionaire Fertitta and the head of one of the nation's largest investment banks, Handler, could not find an investment for their pet project in two years. ¶¶22, 89. If Landcadia had not finalized the acquisition prior to the extended deadline, Jefferies Defendants would have had to forfeit over $10 million in underwriter fees. ¶¶18, 90.

Until Defendant Meaux's termination on August 8, 2019, Waitr was led by a serial failure of an entrepreneur, a week away from taking a job as a teacher before associating himself with the inventors of Waitr. ¶¶24, 91. In early 2018, Meaux stated publicly he wanted Waitr to be the leading platform for front-of-house restaurant operations, whereby Waitr's order manager would replace the order entry point at the point of sales system. ¶¶25, 92. By mid-2019, Waitr abandoned its software development and abruptly announced it would be obtain the exact technology that was to be the future of the Company from third-party developer Mobo Systems, Inc. d/b/a Olo. ¶¶26, 93. Once it outsourced this technology, Waitr became little more than a website that employs delivery drivers.  *Id.* Meaux

1

purportedly "resigned" just two days after Olo deal was announced.  ¶204.

In a telling moment of candor, Waitr's current CEO Carl Grimstad publicly admitted in an interview that when he took over at Waitr just five months after the end of the Class Period on January 3, 2020, Waitr "was definitely headed for bankruptcy" because it "had a driver model that could *never* work" and its "service offering was mispriced." ¶¶196-97 (emphasis added).

Defendants' arguments in support of dismissal should be rejected. With respect to the Section 10(b) claims, Waitr, Meaux, Pringle, Yurecko, and Fertitta ("10(b) Defendants") do not challenge loss causation and argue only that Plaintiffs fail to plead falsity and scienter.  The 10(b) Defendants boldly assert Plaintiffs have not alleged a single misstatement or omission (Waitr Br. at 10-12), despite a sweeping array of detailed materially false and misleading statements concerning, *inter alia*, the strength of Waitr's technology platform; the sustainability of Waitr's "take rate" (fee charged to restaurant partners); the advantages of Waitr's labor model; and the benefits of the acquisition of third-party restaurant delivery service Bite Squad. This argument falls flat. Plaintiffs provide extensive detail in the Complaint regarding the "who, what, when, where, and how" of the false statements and their materiality, consistent with Rule 9(b and the PSLRA. The 10(b) Defendants claim some of their statements are forward-looking and protected under the PSLRA's safe harbor and/or are inactionable puffery. Yet the statements contain false statements of *present* fact, such as "the integration of the combined company is moving along nicely" (¶124), were not accompanied by meaningful cautionary language, and, even for those that are forward-looking, were made with knowledge of their falsity.

As to scienter for the 10(b) claims, the Complaint is replete with detailed allegations demonstrating a compelling inference of scienter, including admissions by Waitr's current CEO abrupt and oddly-timed departures of Defendants Meaux and Pringle; and the admissions of Waitr representatives to a former Waitr restaurant partner that a unilateral increase in rates was necessary so Waitr could "continue doing business and be solvent." ¶193.

With respect to Section 14(a), while they concede causation, Fertitta, Meaux, Pringle, Handler, and Jefferies Defendants ("14(a) Defendants") raise eyebrows with their "standing" challenge, arguing

2

Plaintiffs "propose to include Landcadia shareholders who sold their shares prior to the shareholder vote." Waitr Br. at 29-30. Yet the Complaint could not be clearer this is wrong: the very first paragraph identifies Plaintiffs Welch and Barnard, both holders of Landcadia stock as of November 15, 2018 and eligible to vote on the Going Public Transaction, as the 14(a) Plaintiffs. ¶¶1, 6, 58. Then, 14(a) Defendants argue Plaintiffs must plead scienter and have failed to do so. But while the Fifth Circuit has not yet spoken, the clear weight of authority persuasively holds that Plaintiffs need only plead negligence, which they have done. Plaintiffs allege the proxy filings that were made, reviewed, authorized, and disseminated by 14(a) Defendants, who had a duty to ensure their accuracy, contain false and/or misleading statements and/or omissions.

The 14(a) Defendants also argue Plaintiffs fail to adequately plead any false or misleading statements. However, Plaintiffs' detailed allegations more than satisfy Rule 8, which is all that is required for a Section 14(a) claim. Citing outdated law that ignores recent controlling Supreme Court precedent on opinion statements, the Jefferies Defendants also argue some of the statements are protected opinion. But under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), any statements that could be construed opinion are actionable because they omit material facts. The 14(a) Defendants also argue certain statements are protected under the PSLRA safe harbor and/or are mere puffery. These defenses fail because the statements are of present fact, such as "[w]e have a strong value proposition . . . and a "differentiated proprietary technology platform" (¶31) and/or are not accompanied by meaningful cautionary language.

Finally, again ignoring controlling law by engaging in factual squabbles contrary to the well-pleaded allegations that must be taken as true, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), Jefferies Defendants ask this Court to find them immune from liability on the shaky factual contention that their role in the transaction was purportedly "limited" and they should not be considered underwriters at all. Jefferies Br. at 5-7. Defendants' own proxy solicitation materials demonstrate otherwise: Jefferies Defendants earned millions of dollars in "underwriting fees," JFG was a "sponsor," Jefferies provided substantial advice and guidance to the Landcadia Board, and Jefferies Defendants

3

permitted their names to be used more than *one hundred times* in the Proxy.

Defendants' Motions to Dismiss should be denied.

## FACTUAL BACKGROUND

Waitr's public debut occurred on November 15, 2018, after it was acquired by Landcadia. ¶¶17, 84. Defendant Fertitta was CEO of Landcadia, Handler was President, and together they were Co-Chairmen of the Board and close personal friends. ¶¶10, 11, 80, 207. Handler was also CEO and Chairman of Jefferies' Board. ¶¶11, 13. Pursuant to the terms of its offering, Landcadia had to complete an acquisition by June 1, 2018; if it failed to do so, it (and its sponsors, including one of Fertitta's companies) would have to redeem 100% of its public shares – at a cost of approximately $250 million – and millions of dollars in deferred underwriting commissions would be forfeited by Landcadia's underwriters, including Jefferies Defendants. ¶18, 21-23, 85, 88-90. Moreover, Handler's and Fertitta's professional reputations would have been severely tarnished. ¶¶22, 89. With only two weeks before the deadline, on May 16, 2018, Landcadia announced the agreement and plan of merger with Waitr. ¶¶19, 86. In connection therewith, Jefferies Defendants earned at least $10 million in underwriting fees. ¶208.

In both the proxy solicitation materials[1] leading up to the Going Public Transaction (with respect to 14(a) Defendants) and in public filings and statements thereafter (with respect to 10(b) Defendants), touted Waitr's 15% "take rate," the "most attractive pricing in the industry," as a "strong" and "differentiated" "value proposition" that allowed small restaurants in non-urban markets to afford its service offering and a competitive advantage. ¶¶29, 31, 33, 37, 39, 41, 100, 121, 123, 126, 128, 141. According to Defendants, Waitr's pricing model was sustainable because of efficiencies it achieved by utilizing a full time, fixed-rate labor force, as opposed to using contracted workers on an as-needed basis (as its competitors generally did). ¶¶31, 37, 100, 123, 126, 141, 143. Defendants also highlighted other purported advantages of Waitr's labor model, including that Waitr was able to schedule its

---

[1] The proxy filings include transcripts of a May 17, 2018 conference call, May 17, 2018 interview, August 2, 2018 press release, October 1, 2018 investor presentation, and the Definitive Proxy Statement (sometimes referred to herein as the "Proxy"), all filed with the SEC pursuant to Schedule 14A. ¶¶29-43.

4

"uniformed" and "trained" drivers. ¶¶31, 141, 143. These statements were false and misleading because Waitr could never profitably provide its services to small, independent restaurants in remote markets at a 15% take rate. ¶¶30, 32, 34, 38, 40, 42, 101, 122, 125, 127, 129, 142. Waitr had achieved its growth by partnering with local restaurants and charging them substantially less than the rates charged by Grubhub and other larger competitors, but it was effectively subsidizing them with "onboarding" fees. ¶¶34, 122, 127, 142. This was never sustainable.  Indeed, in a last-ditch attempt to raise revenue, Waitr imposed draconian price increases on small independent operators to get them to abandon their contracts so it would not have to return thousands of dollars in "onboarding" fees. ¶¶34, 122, 127, 142.

On April 30, 2019, a putative class action (currently pending in this Court) was filed against Waitr by restaurant partners alleging Waitr had breached their contracts by unilaterally raising their take rates, beginning as early as 2009 and continuing throughout 2018, "as part of a broad strategy to increase revenue and profit prior to [its] sale and public offering." ¶¶47, 147; *Bobby's Country Cookin', LLC v. Waitr Holdings, Inc.*, No. 2:19-cv-00552-TAD-KK (W.D.L.A.) (the "Restaurant Partners' Class Action").[2] And on July 5, 2019, Waitr announced it was raising rates from 15% to 25% for "smaller" customers – an astronomically large sum for any restaurant, much less a small one, in a low-tier market. ¶¶49, 150. The price increase was expected to affect 35% of Waitr's restaurant base (¶63); ultimately it affected a majority. *See* Declaration of Kim E. Miller ("Miller Decl"), Ex. 2 at 58/152, 64/152. Following the announcement, numerous restaurants they could not afford a 25% fee (¶154) and approximately 22% of Waitr's restaurants left its platform. Miller Decl., Ex. 2 at 64/152. This massive rate increase demonstrates Waitr could not profitably provide its services at a 15% take rate. ¶¶49, 151.

Waitr's labor model was inefficient, resulting in huge costs that could not be sustained. ¶¶32, 38, 101, 125, 127, 142, 144. It also created unique risks for Waitr (who, unlike competitors, did not utilize contract labor), as demonstrated by two class action lawsuits for unpaid wages filed by Waitr

___

[2] *See* Miller Decl. Ex. 1 at ¶¶11, 14, 29-30, 35-37. The court can consider this as it is "incorporated into the complaint by reference" and it can take judicial notice of a federal court complaint. *See Ruston La. Hosp. Co. v. Lincoln Health Found., Inc.*, 18-0881, 2018 U.S. Dist. LEXIS 205955, at *4-5 (W.D. La. Nov. 20, 2018) (citation omitted); *Tipton v. Northrop Grunman Corp.*, 08-1267, 2009 U.S. Dist. LEXIS 89887, at *14-15 (E.D. La. Sept. 29, 2009).

drivers in February and March of 2019, which settled on September 20, 2020. Halley v. Waitr Holdings, Inc., No. 2:19-cv-01800 (E.D. La.) and Montgomery v. Waitr Holdings, Inc., No. 2:19-cv-02208 (E.D. La.) (collectively, the "FLSA Class Actions"). ¶120; *see also* Miller Decl., Ex. 3. Grimstad admitted that Waitr's labor model could never have worked. ¶¶196-97.

Defendants also boasted of Waitr's "differentiated proprietary technology platform," which used "scalable software" and was "purpose built" to "streamline online ordering and delivery" because its "routing algorithms are optimized for getting food to customers by car in the more spread-out geographies, creating leverageable advantages in our business model." ¶¶31, 39, 121, 123, 128, 145. But Waitr's technology platform provided few or no competitive advantages. ¶¶32, 40, 122, 125, 129, 146. Meaux was repeatedly told by venture capitalists they would not invest in Waitr unless he moved it from Lake Charles, Louisiana to a major technology hub, which he refused to do. ¶¶25, 92. Waitr was unable to attract and retain necessary, qualified developers, programmers, and engineers in Lake Charles who could refine and develop the software necessary to stay competitive in its market. ¶¶25, 92. Waitr's abandonment of its software development and the Olo deal demonstrated any "first mover" advantage Waitr had with its online ordering app was unlikely to be sustained. ¶¶26, 93, 156.

Defendants also represented that Waitr was a "growth company," with the "right business model" to achieve further growth, including expansion into new markets, which they claimed would be assisted by successful billionaire Fertitta's expertise, experience, and resources, including his "complementary businesses." ¶¶29, 33, 37, 39, 43, 98, 102, 104, 121, 126, 130. These statements were false and misleading because Waitr was not a growth company and Fertitta did not provide any meaningful guidance. ¶¶30, 34, 38, 40, 44, 99, 103, 105, 122, 126, 131.

To manufacture the appearance of growth, within a month of going public Waitr announced it was acquiring Bite Squad – another online restaurant delivery service based in Minnesota. ¶106. Jefferies was the financial advisor for this transaction. ¶107. The 10(b) Defendants characterized Bite Squad as a "high growth" business with a mission, business model, strategy, and growth profile similar to Waitr's, and touted the "strategic rationales" for the acquisition as driving additional growth and

6

creating various synergies. ¶¶108, 109, 114, 121, 123, 139. But the acquisition was inconsistent with Waitr's prior model of growth in an orderly, regionally contiguous process. ¶¶110, 115, 122, 125, 140. At the time of its acquisition, Bite Squad was a hodgepodge of 17 other companies, with restaurants in 350 cities and 20 states. ¶107. The 10(b) Defendants represented that the integration of Bite Squad was proceeding well. ¶¶114, 121, 124, 132, 139. In truth, Waitr was unable to integrate the companies because their platforms were incompatible, which exacerbated existing problems at Waitr. ¶¶115, 122, 125, 133, 140. As a result, 10(b) Defendants had to run two poorly managed, money losing operations with little regional overlap and few synergies. ¶¶110, 115, 122, 125, 133, 140. They *conceded* these material facts when, on August 7 and 8, 2019, Waitr announced the integration was not proceeding according to plan, Bite Squad was available in only 60 cities (compared to 150 in December 2018), and integration delays had negatively impacted Waitr's revenues and guidance. ¶¶158, 160-62.

These allegations give rise to claims against 10(b) Defendants for the statements made from November 16, 2018 through August 8, 2019, and 14(a) Defendants for the statements made from May 17, 2018 through November 15.

<strong><u>ARGUMENT</u></strong>

## I.  **<u>PLAINTIFFS ADEQUATELY ALLEGE SECTION 10(b) CLAIMS</u>**

### A.  **<u>Pleading Standards</u>**

On a motion to dismiss, the Court must "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, <u>565 F.3d 228, 232</u> (5th Cir. 2009). Plaintiffs' allegations need only "raise a right to relief above the speculative level." *Twombly*, <u>550 U.S. at 555</u>. The "issue is not whether a plaintiff will ultimately prevail but whether [it] is entitled to offer evidence to support [its] claims." *Doe v. Hillsboro Indep. Sch. Dist.*, <u>81 F.3d 1395, 1401-02</u> (5th Cir. 1996). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge . . . that the plaintiff will fail to find evidentiary support for his allegations." *Twombly*, <u>550 U.S. at 556</u>, <u>564</u> n.8. Rule 12(b)(6) motions are "generally disfavored and [ ] rarely granted." *Gaudet v. Nations*, 19-10356, <u>2020 U.S. Dist. LEXIS 191936, at *37</u> (E.D. La. Oct. 16, 2020) (citation omitted).

7

**B.** **The Complaint Adequately Pleads Materially False and Misleading Statements and Omissions**

Plaintiffs Welch, Brown, Moore, Sinor, and Colangelo provide detailed allegations about material[3] "statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they are fraudulent," thereby satisfying Rule 9(b) and the PSLRA, 15 U.S.C. §78u-4. *Bamburg v. Axis Onshore LP*, 08-1466, 2009 U.S. Dist. LEXIS 129709, at *14-15 (W.D. La. Apr. 28, 2009) (citing *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006)).[4] Instead of fully addressing these particularized allegations in their Motion, 10(b) Defendants attach a 14-page "Appendix" of challenged statements, which contains legal argument, and constitutes an impermissible end-run around this Court's page limitations. *See Martinich v. Ward*, 14-07227, 2017 U.S. Dist. LEXIS 3713, at *6 (E.D.N.Y. Jan. 7, 2017) (admonishing counsel for attempting to evade page limitations by attaching multiple exhibits and lengthy affirmation to motion); *Monec Holding AG v. Motorola Mobility, Inc.*, 11-798, 2014 U.S. Dist. LEXIS 123898, at *3-4 (D. Del. Sep. 5, 2014) noting "impropriety of including legal analyses in charts attached as exhibits to the briefing . . . for purposes of circumventing page limitations"). The Appendix contains errors and misrepresentations. The 10(b) Defendants simply omit the statements contained at ¶132 from their list. Regarding the column labeled "Not False/Misleading," it is unclear whether 10(b) Defendants intended to assert a particular legal defense or just make an unsupported conclusory assertion by checking the box. Further, 10(b) Defendants checked the "Forward-Looking" column for statements that include a component that is based on current or historic fact. *See*, *e.g.*, Appendix Nos. 17, 23 (citing ¶¶114, 124).

1. Material Misrepresentations and Omissions Regarding Waitr's Pricing Structure

The 10(b) Defendants repeatedly touted Waitr's pricing model as a significant market differentiator that allowed small restaurants in non-urban markets to afford its service and would

---

[3] Materiality is a "'mixed question of law and fact'" that is "'usually left for the jury.'" *Zagami v. Natural Health Trends Corp.,* 540 F. Supp. 2d 705, 711 (N.D. Tex. 2008) (citing *U.S. v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996)).

[4] Rule 9(b) and the PSLRA "should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession." *Fleming Cos. Sec. & Derivative Litig.*, 03-1530, 2004 U.S. Dist. LEXIS 26488, at 20-21 (E.D. Tex. June 10, 2004) (citing *ABC Arbitrage*, 291 F.3d at 348).

thereby enable Waitr to grow and succeed. For example, Meaux stated in a December 3, 2018 interview that Waitr's price was 15% – half of what its competitors charged – "because in the small markets, restaurants need every dollar they can get." ¶100. According to Meaux, "restaurants will push customers to Waitr because we are charging them less." *Id.*; *see also* ¶141 ("[O]ur modest fee structures combined with our differentiated, value-added services fosters restaurant loyalty and incentivize restaurants to drive business toward the Platforms."); ¶126 (Waitr's "consistently repeatable local market profitability"); ¶121 (Waitr's "right business model").

These statements were false and misleading because Waitr's 15% take rate was not sustainable and 10(b) Defendants omitted material facts regarding Waitr's inability to profitably provide its services at that rate. ¶¶101, 122, 127, 142.  Indeed, to stay afloat, the Company radically changed its pricing structure just after it went public, unilaterally forcing steep price increases on restaurants, and at the outset of the Class Period, Waitr had *already* breached certain contracts to force customers who had contracted at a lower take rate to adopt a higher rate. ¶147; Miller Decl., Ex. 1. Notably, in its motion to dismiss the Restaurant Partners Class Action, Waitr did not deny it unilaterally increased its rates. ¶155. CW1's statements also strongly support falsity, as they establish Waitr raised the take rate prior to and during the Class Period and even at 15%, Waitr could not profitably supply its services at prices that small restaurants in secondary markets could afford. ¶¶120, 127, 135, 195. Grimstad's admission that Waitr's service offerings were mispriced is further evidence of falsity. ¶¶196-98; *see In re Avon Sec. Litig.*, 19-1420, 2019 U.S. Dist. LEXIS 200816, at *54-56 (S.D.N.Y. Nov. 18, 2019) (considering statements of new CEO that training programs did not exist and finding Plaintiffs "allege[ed] enough facts to sustain a plausible inference that the [] statements [that the training programs did exist] were false or misleading").

The 10(b) Defendants argue their statements regarding Waitr's pricing structure were not false because Waitr did, in fact, charge 15%. *See* Waitr Br. at 11. First, this premature, fact-based argument is inconsistent with the well-pleaded allegations and not suitable for resolution on a motion to dismiss. Second, it ignores that under the express language of Section 10(b), materially misleading statements

9

are actionable. The Complaint alleges 10(b) Defendants represented Waitr's 15% take rate was sustainable, but it was not. *See Lormand*, 565 F.3d at 248-49 (once defendants speak, "they ha[ve] a duty to disclose a 'mix of information' that is not misleading"); *Bach v. Amedisys,* 10-395, 2016 U.S. Dist. LEXIS 111077, at *33 (M.D. La. Aug. 19, 2016) ("[W]hen a corporation [ ] make[s] a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate.").

Further, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers.'" *Stone v. Life Partners Holdings, Inc.*, 26 F.Supp. 3d 575, 586 (W.D. Tex. 2014) (quoting *Lormand*, 565 F.3d at 248); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003) ("Materiality is not judged in the abstract, but in light of the surrounding circumstances."). Even where "there [is] nothing technically inaccurate" in a statement, it may be misleading to a reasonable investor where, as here, it concerns the "viability, or future sustainability" of a company's product. *Stone*, 26 F. Supp. 3d at 595-96. Through their omissions, 10(b) Defendants "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]*." Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008). There is a "substantial likelihood that the disclosure of [the omitted information] . . . would have been viewed by the reasonable investor as having significantly altered the total mix of information made available," *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, (1988); *Peterson*, 101 F.3d at 380.

The 10(b) Defendants also argue Plaintiffs fail to establish their statements were false when made because the first pricing change occurred near the end of the Class Period. *See* Waitr Br. at 11-12. This is another premature, fact-based argument. Yet CW1's statements and the Restaurant Partners Class Action lawsuit demonstrate that Waitr continually raised its take rate before, during, and after the end of the Class Period – all while trumpeting it as sustainable. "[A]llegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation." *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 698 (5th Cir. 2005). As the Fifth Circuit noted, "the fact that a business files for bankruptcy on 'Day Two,'" may, under the right surrounding circumstances, provide grounds

for inferring that the business was performing poorly on 'Day one.'" *Id.* (citing *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000)). Finally, 10(b) Defendants' reliance upon *Local 120 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, 13-2393, 2015 U.S. Dist. LEXIS 31468 (S.D. Tex. Mar. 13, 2015) is unavailing. There, plaintiff "attempt[ed] to manufacture falsity by linking generalized, optimistic statements with disappointing earnings results announced weeks or months later" (*id.* at *28); here, Plaintiffs allege specific, fact-based statements that were false *when made*, not just because earlier projections turned out to be wrong.

### 2. Material Misrepresentations and Omissions Regarding Waitr's Labor Model

The 10(b) Defendants made material misrepresentations about Waitr's labor model, claiming that it created efficiencies that it could pass along to restaurants. For example, on a December 3, 2013 call, Meaux explained Waitr's "driver core is probably half of what most of the other companies in our space is, because they're employees of the company and we can tell them when we need them to work"; this "fixed cost per hour" was an "advantage" that Waitr could leverage . . . to increase profitability for us and then pass that on to the restaurants. That's how we're able to charge 15 percent." ¶100; *see also* ¶¶123, 126, 141, 143 (discussing advantages of labor model). They also touted Waitr's "uniformed and trained" drivers as "brand ambassadors" in whom Waitr had invested "significant resources," which "enhance[d] the quality of the experience for both restaurants and consumers," and that Waitr "efficient[ly] utilize[ed]" its drivers because it could schedule them. ¶¶141, 143.

These statements were false and misleading because Waitr's labor model was inefficient, costly, and resulted in Waitr reporting the lowest gross margins among its peers. ¶¶101, 125, 127, 144. Waitr's labor model was also risky, as evidenced by the FLSA Lawsuit. ¶120. Grimstad's admission that Waitr's labor model could never work further supports falsity. ¶¶196-98. The 10(b) Defendants' only argument in response is, again, that the "statements were truthful when uttered" but Waitr simply "incurred extra costs" after making them. *See* Waitr Br. at 12. Again, this is a premature, fact-based argument. Further, even if the statements about Waitr's labor model were technically true, it was materially misleading not to disclose the inefficiencies within, and risks caused by, Waitr's labor model

11

when they issued statements touting it.  *See supra* §I.B(1).

### 3.  Material Misrepresentations and Omissions Regarding Waitr's Technology Platform

The 10(b) Defendants ignore 10(b)'s express liability for materially misleading statements and seek to rely on the purported "literal truth" of their statements at the time they were made. *See* Waitr Br. at 12. Not only is this argument not a defense, but also it is reasonable to infer that the Olo partnership, which was announced on the last day of the Class Period (¶93) was being discussed and negotiated *beforehand*. That partnership was an admission by Waitr that it was not technologically competitive because it could not obtain the resources necessary to innovate its software without moving to an area rich with high-level programming and engineering support. ¶157. It was materially misleading to not disclose these deficiencies in Waitr's technology and its inability to stay competitive in software development when 10(b) Defendants made statements about the purported advantages and benefits of Waitr's technology.  *See supra* §I.B(1).

### 4.  Material Misrepresentations and Omissions Regarding Bite Squad

Defendants Waitr, Meaux, Pringle, Yurecko, and Fertitta argue Plaintiffs "fail to identify any misrepresentation about Bite Squad." Waitr Br. at 11. Not so. The 10(b) Defendants touted the strategic rationale for the acquisition of Bite Squad as helping Waitr to "drive additional growth" because Bite Squad was a "high growth business" whose "mission, business model and growth profile" were purportedly very similar to Waitr's. ¶¶108, 109, 114, 123, 124, 139. They also represented that the integration of Bite Squad was "moving along nicely," that as of May 8, 2019, Waitr had "achieved nearly complete integration of marketing, accounting and sales," had "made significant progress toward the integration of restaurant operations, customer support and technology," and "expect[ed] to achieve full integration in the first half of 2020." ¶124; *see also* ¶¶121, 132. These statements were materially false and misleading because the Bite Squad acquisition was conducted with rushed or inadequate due diligence, the two companies' platforms were incompatible, and 10(b) Defendants were unable to integrate them, with devastating consequences for Waitr. ¶¶110, 115, 122, 125, 133, 140.  Indeed, they *confirmed* the veracity of these allegations when they announced the integration was not proceeding

12

according to plan, negatively impacting revenue and resulting in lower guidance. ¶¶158, 160-62.

### 5. Misrepresentations and Omissions Regarding Waitr's Growth

The 10(b) Defendants claim that Plaintiffs fail to allege any false statements. Waitr. Br. at 11. But they regularly and falsely hyped Waitr's growth and growth plans. ¶¶98, 102, 121, 126, 130, 139. These statements were false and misleading. Waitr was not experiencing "growth," it did not have a proven business model or expansion strategy, its revenues would not sustain its operations, and it could not achieve these results without merging with sizable competitors and successfully integrating them into Waitr's operations, something that would have entailed great risks given Meaux's limited operating experience and history of serial business failures. ¶¶99, 103, 122, 127, 131. The 10(b) Defendants further omitted that in the fourth quarter of 2018, Waitr's growth substantially slowed because, after years without competition, Grubhub, DoorDash, and UberEats had expanded into Waitr's primary markets and were negatively impacting its sales. ¶¶113, 129. These were bigger, better-run, better-funded, more experienced companies, with stronger management and significantly stronger business models that allowed them to fund growth in secondary markets with profits from primary markets. ¶¶113, 129. *See*, *e.g.*, *Plumbers & Pipefitters Nat. Pension Fund v. Davis*, 16-3591, 2020 U.S. Dist. LEXIS 66016, at *26-30 (S.D.N.Y. Apr. 14, 2020) (statements about "fundamental growth drivers," including "strong demand" and "well-defined strategy" misleading because defendants failed to disclose information about sales practices and source and nature of growth).

The 10(b) Defendants misrepresented that Waitr would benefit from Fertitta's expertise, experience, and resources. In a November 15, 2018 press release, Meaux stated: "We are excited to partner with Tilman [Fertitta] and the Landcadia team . . . Our combined expertise, experience and resources . . . will further enable us to accelerate our growth . . . ." ¶98; see also ¶104 (Meaux: "If I ever have a question about what to do next, I can pick up the phone and call [Fertitta] because he ran a public company for 17 years. That's why we did the deal. We did the deal because of Tilman and his experience and what he brings to the table."). Waitr did not enjoy these benefits because Fertitta did little or nothing to promote the Company. ¶¶99, 105.

13

6. <u>Material Misrepresentations and Omissions Regarding Waitr's Financial Performance and GAAP Compliance, and False SOX Certifications</u>

In the 2018 10-K, 1Q19 10-Q, and Secondary Offering Filings, the 10(b) Defendants represented Waitr's financial statements had been prepared in accordance with GAAP (¶¶117, 134, 137). This was false because Waitr did not, in fact, appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. ¶¶113, 118, 135. The 10(b) Defendants also averred Waitr's "disclosure controls and procedures were effective" (¶¶118, 134). This was false, as Waitr lacked adequate systems of controls and procedures to assure the truth and accuracy of its financials and public disclosures. ¶¶120, 135. Meaux, Pringle, and Yurecko signed Sarbanes Oxley ("SOX") certifications stating that the 10-K and 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements . . . not misleading" and they "fairly present in all material respects the financial condition, results of operations and cash flows" of the Company (¶¶119, 134). But the filings were not true, accurate, or complete. ¶¶120, 135. *See In re OCA, Inc. Sec. & Deriv. Litig.*, 05-2165, 2006 U.S. Dist. LEXIS 90854, at *55 (E.D. La. Dec. 14, 2006) (SOX certifications actionable); *Walker v. Rent-A-Center*, 02-3, 2005 U.S. Dist. LEXIS 63595, at *47-49 (E.D. Tex. July 25, 2005) (upholding claims of breakdown of internal controls).

When 10(b) Defendants spoke about Waitr's financial performance and internal controls, they had a duty to speak the full truth, even as to those facts that undercut their preferred narrative. *See supra* §I.B(1). The 10(b) Defendants argue Plaintiffs fail to explain how the above-referenced statements were misleading. Waitr Br. at 10-11. But it cannot seriously be argued that the information they omitted when they issued Waitr's 2018 10-K and 1Q19 10-Q (¶¶116-19, 134) – that Waitr's take rate was unsustainable, its labor model was inefficient, its growth was slowing, and its technology platform presented no competitive advantages – was "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *TechnipFMC,* 2019 U.S. Dist. LEXIS 44230, at *12. These omissions also violate Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, which "requires . . . disclos[ure] [of] any known trends, events, or uncertainties . . . reasonably expected

14

to have a materially unfavorable impact on revenues or income from operations." *Firefighters Pension & Relief Fund v. Bulmahn*, 147 F. Supp. 3d 493, 509-10 (E.D. La. 2015).

       7.   The PSLSRA Safe Harbor Does Not Apply

The 10(b) Defendants contend certain of their statements (*see* Waitr Br. at 13) are protected by the PSLRA safe harbor, which protects "forward-looking statements" accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u5(c)(1)).

"Statements describing past or present conditions are not forward-looking statements." *Carlton*, 184 F. Supp. 3d at 468 (citing *Plotkin*, 407 F.3d at 699); *see also Stone*, 26 F. Supp. 3d at 597 ("[S]tatements about the present strength of the company and of its product" not forward looking). The representation that integration "*is* moving along nicely" (¶124) is not forward- looking as it refers to the then-*current* status of Bite Squad's integration, as well as implies a *historical* fact – that some integration *already* occurred. *See also* ¶114 (stating Waitr had been "diligently *beginning* the integration process…"). Similarly, statements about *present* similarities between Bite Squad and Waitr are not forward-looking. *See* ¶108 (Bite Squad's "mission, business model and growth profile *share* many similarities to Waitr"). *See In re BP PLC*, 852 F. Supp. 2d 767, 799–800 (S.D. Tex. 2012) ("While tense is not determinative on whether a statement is forward-looking, it is a relevant consideration."). Thus, these statements are not protected by the safe harbor. Further, to the extent any statements are mixed statements of present and future, the present portions are not protected by the safe harbor. *See Spitzberg*, 758 F.3d at 691.[5]

To receive Safe Harbor protection, a forward-looking statement must be accompanied by "meaningful cautionary language," meaning "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate

---

[5] Even for those statements that were forward-looking, the Safe Harbor still would not apply because they were made with "actual knowledge" of their falsity. ¶224; *see Lormand*, 565 F.3d at 244; *see also City of Pontiac Gen. Emps.' Ret. Sys. v. Dell*, 15-374, 2016 U.S. Dist. LEXIS 126219, at *11(W.D. Tex. Sep. 16, 2016) (defendants aware of undisclosed facts undermining forward-looking statements).

litany of generally applicable risk factors." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004); *see also In re Blockbuster Inc. Sec. Litig.*, 03-398, 2004 U.S. Dist. LEXIS 7173, at *14 (N.D. Tex. Apr. 26, 2004) ("[M]eaningful cautionary language . . . must identify important factors that could cause actual results to differ materially from those in the forward-looking statement.").

Waitr, Meaux, Pringle, Yurecko, and Fertitta state conclusorily that *some* of the statements at issue are "cloaked in cautionary language" because they contain generic language such as "expect to achieve," "targeting," "goals," and "opportunities." Waitr Br. at 13. But this language is not "cautionary." *See Blockbuster*, 2004 US. Dist. LEXIS 7173, at *17 (statements that defendants "think the retail business will continue to grow," "feel comfortable in [their] ability to grow [their] business," and "think [they] have figured out how to compete" not cautionary language). Even if it were, it is nowhere near specific enough for safe harbor protection to be applied. *See Lormand*, 565 F3.d at 245 (disclaimer that statements were "not guarantees of future performance . . . and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them" not meaningful cautionary language); *Plotkin*, 407 F.3d at 694 (warnings of "numerous risks, uncertainties and assumptions" and that "actual results could differ materially from anticipated results" were boilerplate). Because the "warnings" pointed to by 10(b) Defendants "failed to correct the false impression created by [their] public statements," and do not "supply the truth that they omitted," they "do not provide sufficiently meaningful caution about clearly present danger that was materializing." *Lormand*, 565 F.3d at 247. Finally, Plaintiffs note 10(b) Defendants only refer to purported cautionary language for five of the seven allegedly forward-looking statements. *See* Waitr Br. at 13 (citing ¶¶102, 108, 109, 114, 126).

8.  None of the Statements Are Mere Puffery

The 10(b) Defendants argue certain of their statements are inactionable puffery. *See* Waitr Br at 13-14. However, statements about the "advantages" of Waitr's labor model, the sustainability of its prices, the strength of its technology, and the strategic rationale for the Bite Squad acquisition contain

specific statements of *fact*, not vague and optimistic statements. *See*, *e.g.*, ¶100 (Waitr's labor model provided an "advantage" is "how we're able to charge 15 percent" to restaurants); ¶108 ("[Bite Squad] acquisition will help us drive additional growth. . . ."); ¶¶109, 114, 139 (strategic rationale for Bite Squad acquisition).  Similarly, the representation that the Bite Squad integration was "moving along nicely" (¶124) was objectively verifiable. As such, these statements are not puffery. *See Lormand*, 565 F.3d at 249 n.14. (puffery only if statements are "vague and optimistic" and contain no "concrete factual or material misrepresentation"); *Stone*, 26 F.Supp. 3d at 599 (statements about company's and product's strength not puffery as material to investors); *BP PLC Sec. Litig.*, 843 F. Supp. 2d at 757–59 ("making good progress" not puffery); *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 660-62 (W.D. Tex. 2006) (company "'well positioned'" not puffery); *see also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) ("While some of the alleged statements, viewed in isolation, may be mere puffery . . . when (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company.").

## C. **The Complaint Adequately Pleads Scienter**

### 1.  Plaintiffs Adequately Plead Circumstantial Evidence of Scienter

In this Circuit, a "strong inference" of scienter is pled by alleging either "intent to deceive" or "severe recklessness." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014). Direct evidence is not required; circumstantial evidence suffices. *See Wieland v. Stone Energy Corp.,* 05-2088, 2007 U.S. Dist. LEXIS 76636, at *17 (W.D. La. Aug. 16, 2007) (citation omitted). A "strong inference" is one a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). An inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.*  Rather, it need only be "at least as compelling" (in "equipoise") as any opposing inference.  *Id.* Where there are competing inferences on scienter, 'a tie favors the plaintiff' on a motion to dismiss." *Spitzberg*, 758 F.3d at 686. "[A]ccept[ing] all factual

17

allegations in the complaint as true," the Court must consider "whether ***all of the facts alleged, taken collectively***, give rise to a strong inference of scienter..." *Tellabs*, 551 U.S. at 322-23 (emphasis added).

Plaintiffs allege circumstantial evidence leading to a strong inference of scienter, which includes: Waitr's public admission, through its current CEO, that Waitr's labor model could never have worked and its service offerings were mispriced; the abrupt and suspiciously-timed departures of CFO Pringle less than ninety days after Waitr began trading publicly and of CEO Meaux on the same day Waitr announced its integration of Bite Squad was not proceeding according to plan and layoffs would be required; and corroborative statements by Confidential Witness 1 ("CW1") that Waitr representatives admitted unilateral increases in the take rate were necessary for Waitr to "continue doing business and be solvent."

***Admissions by Waitr***. Waitr's current CEO Grimstad stated in an interview that when he took over at Waitr on January 3, 2020 – just five months after the end of the Class Period –Waitr "was definitely headed for bankruptcy" because it "had a driver model that could ***never*** work" and its "service offering was mispriced." ¶¶196-97 (emphasis added). He elaborated that, while Waitr's labor model might have worked on paper, "when you dig into the details and it comes to Waitr and Bite Squad, we could never get to that level of efficiency. So on an order-by-order basis, the profit margin would be all over the board or nonexistent depending on the efficiency of the drivers." ¶197. Notably, one of the Grimstad's first efforts to avoid bankruptcy was to abandon Waitr's W-2 labor model and utilize drivers as independent contractors instead. ¶196. Waitr's 2019 10-K filed on March 16, 2020 indicated that it "expect[ed] to complete the process of moving to an independent contractor deriver network by the end of April 2020, after which, we will have no remaining employee drivers." Miller Decl, Ex. 2 at 12/152. The fact that Grimstad was able to come on board at Waitr and immediately recognize that its business model could never work suggests 10(b) Defendants either knew the model could not succeed (despite statements to the contrary) or were severely reckless in failing to "dig into the details," as Grimstad did. These actions by Grimstad demonstrate that Waitr's W-2 labor model was never sustainable and had failed, and support a strong inference that 10(b) Defendants knew, or

18

were severely reckless in not knowing, their misstatements regarding Waitr's labor and pricing models were false or misleading. ¶199; *see Plotkin*, 407 F.3d at 698 (considering certain negative information that came to light after pertinent press releases because they [we]re so temporally connected that they shed light on the financial condition of the companies at the time of the announcements"); *In re McKesson HBOC Inc. Secs. Litig.*, 126 F.Supp.2d 1248, 1263 (N.D. Cal. 2000) (finding strong inference of scienter based on public statements by new CEO that terminated executives knew or should have known of the accounting improprieties at issue in the case); *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("[T]hat the new CEO . . . discovered the accounting violations within months of taking the position is a strong indication [they] were obvious. . . .").

*Urgency for Fertitta and Handler to complete the Going Public Transaction*. Fertitta and Handler were executives together at Landcadia prior to the Going Public Transaction. ¶¶10, 11, 80. Handler was also CEO and Chairman of the Board of Jefferies (a subsidiary of JFG). ¶11. Not only did Fertitta and Handler have a close professional relationship, but they were also close friends. *See* ¶207 (Fertitta: "Rich [Handler] is 'my best friend…Rich is a great friend, a great friend.'"). Jefferies and/or JFG acted as underwriter for both the Going Public Transaction and the Secondary Offering.[6] ¶¶13, 14, 211. Fertitta Entertainment (listed in the Proxy as "FEI Sponsor"), of which Fertitta is the sole shareholder, Chairman and CEO, was one of the sponsors of the Going Public Transaction (along with JFG). ¶¶10, 80; Langdon Decl., Ex. 1 at 10/462. Fertitta Entertainment owned 6.625 million shares of Landcadia stock prior to the Going Public Transaction and was expected to own 4 million shares of Waitr afterwards.  Langdon Decl., Ex. 1 at 230. The Going Public Transaction *had* to be completed before the June 1, 2018 deadline or Jefferies' Defendants' underwriting fees would have been forfeited and Landcadia/Fertitta would have had to redeem their public shares at a huge cost. ¶¶85, 88. Fertitta and Handler awarded Jefferies Defendants the role of underwriter with respect to these transactions on

---

[6] Despite having previously represented that Waitr was well-capitalized and did not need to raise money, on April 4, 2019, Waitr filed a Secondary Offering Registration Statement utilizing a "shelf" registration process authorizing Waitr to sell securities up to $300,000,000 in securities. ¶136. The Secondary Offering closed on May 17, 2019. ¶136.

the strength of their personal relationship, rather than on merit. ¶¶207-11. Because of the pre-existing relationship between Fertitta and Handler, the fact that Handler was an executive at both Landcadia and Jefferies, the tight time frame for the Going Public Transaction, Fertitta was motivated to cram the transaction through and help Jefferies Defendants earn their hefty underwriting commissions, while averting serious financial penalties for himself. As a result, the due diligence that should have been undertaken by Fertitta, Handler, and Jefferies Defendants regarding Waitr's growth prospects and/or business model was either non-existent or recklessly truncated.[7] ¶¶210, 211.

*Executive departures*. The timing and circumstances of Defendant Pringle and Meaux's departures also support a strong inference of scienter. On February 11, 2019, less than three months after Waitr went public, and only weeks after it provided aggressive forward guidance, Waitr abruptly announced that Pringle, then only 53 years old, had it the previous day that he would be "retiring" as CFO, effective March 31, 2019, and would be replaced by Yurecko, Bite Squad's CFO. ¶¶200-02. The reason provided publicly for the "retirement" was that Pringle wanted "to spend more time with his family."[8] ¶200. Then, on August 8, 2019, Waitr suddenly announced that Meaux had "resigned" as CEO, the same day Waitr announced in an earnings call that the Bite Squad integration was not proceeding well. ¶¶53, 158, 175, 204. Waitr further announced that, as a result, its revenues had been negatively impacted, net losses for the quarter had more than tripled from the prior year, it would have to lay off personnel, and it had hired Jefferies again as a financial advisor to "explore strategic alternatives," including "taking the company private or a sale of the business." ¶¶53, 158, 175, 204. Meaux's "resignation" also came only two days after Waitr announced its deal with Olo, which demonstrated abandonment of its own software development strategy. ¶93. Moreover, the

---

[7] While 10(b) Defendants complaint that "Plaintiffs allege no facts concerning [ ] Fertitta's purported involvement in the diligence process" (Waitr Br. at 16-17 n.4), this is a red herring; his scienter is bolstered by the incredibly tight timing of the transaction, his close relationship with Handler, and the substantial money he (and his company) would lose if the transaction did not go through, as well as the harm that would be caused to his professional reputation.

[8] Contrary to 10(b) Defendants' contention (Waitr Br. at 17), Plaintiffs do not "admit" that Pringle retired to spend more time with his family. Plaintiffs simply allege what the Company announced. ¶200. Plaintiffs clearly indicate this appears to be pretextual. *See*, *e.g.*, ¶200 (under heading "Pringle's Early 'Retirement,'" referring to Pringle's 'retirement'"); ¶201 ("Pringle was *purportedly* retiring 'to spend more time with his family'") (emphasis added); ¶202 ("The timing of [ ] Pringle's 'retirement' is especially suspect…"); ¶203 (alleging 'retirement' as evidence of scienter).

20

"resignation" was accompanied by a punitive forfeiture of 166,667 shares of Meaux's Waitr stock, strongly suggesting he did not leave willingly but was forced out. ¶¶205-06. *See Hall v. Rent-A-Ctr., Inc.,* 16-978, 2017 U.S. Dist. LEXIS 205959, at *102 (E.D. Tex. Oct. 19, 2017) (sudden executive departures, "[v]iewed in the context of all the factual allegations . . . support a strong inference of scienter"); *N. Port Firefighters' Pension-Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 754 (N.D. Tex. 2013) ("resignation of high level officials may contribute to an inference of scienter"); *In re BP PLC, Sec. Litig.*, 843 F. Supp. 2d 712, 784 n.36 (S.D. Tex. 2012) ("forced departure is another factor supporting . . . scienter").

*Confidential witness testimony*. Plaintiffs' scienter allegations are also corroborated by the statements of CW1, one of Waitr's former restaurant partners. ¶188. CW1 initially had an agreement with Waitr providing for a take rate of only 3.5%, plus a minimal transaction fee, but after approximately a year, Waitr presented CW1 with an amended contract unilaterally increasing the take rate to 10% with no explanation. ¶¶189-90. On July 18, 2019, Waitr presented CW1 with a second amended contract unilaterally raising the take rate to 18%. ¶191. Then, in early January of 2020, Waitr presented CW1 with a third amended contract that would have raised the take rate to 33% and added a 3.1% credit card processing fee. ¶192.  Concerned about the dramatic and unexplained increases in the take rate, CW1 spoke with two different business development managers at Waitr and asked them why he should sign the contract. ¶¶192-93. One responded, "[So]Waitr can continue doing business and be solvent." ¶193. CW1 then spoke with a regional account manager who confirmed the increase was solely tied to Waitr's profitability and refused to guarantee that it would not unilaterally increase the take rate again in the future. ¶194.

"[C]onfidential source statements are a permissible basis on which to make an inference of scienter" where such sources "are described with sufficient particularity to support the probability that a person in a position occupied by the source would possess the information pleaded." *Hall*, 2017 U.S. Dist. LEXIS 205847, at *27 (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002)). The Complaint does so by alleging CW1 was a longtime Waitr customer and personally

21

spoke to two Waitr representatives about the take rate increases. ¶¶188-94. Therefore, CW1 was in the perfect position to possess the information pleaded. *See* ¶¶188-95; *Carlton v. Cannon*, 184 F. Supp. 3d 428, 473-74 (S.D. Tex. 2016) (crediting employees' "firsthand observations" given industry experience); *Brody v. Zix Corp.*, 04-1931, 2006 U.S. Dist. LEXIS 69302, at *13-14 (N.D. Tex. Sept. 26, 2006) (crediting CW account based on "job title, job description, time-frame employed . . . and specifically what the witness knew in relation to" the allegations). CW1's statements also dovetail with the allegations in the Restaurant Partners Class Action and FLSA Lawsuits (¶¶47, 120, 147), establishing 10(b) Defendants knew or were severely reckless in disregarding that Waitr's pricing was unsustainable, as they led investors to believe, and to be profitable Waitr needed to more than double its take rate. Notably the 10(b) Defendants do not dispute the substance of CW1's statements. *See* Waitr Br. at 18.

***Meaux's purchases in the Secondary Offering***. The Secondary Offering floundered due to a significant lack of demand and Defendants Meaux, Pringle, Yurecko, and Fertitta frantically tried to unload the Secondary Offering shares – including through their own purchases – without alerting the market. ¶213. Shares of Waitr closed at $6.85 the day of the Secondary Offering, well below the $7.40 Secondary Offering price. ¶214. Five days later, Meaux purchased $1 million of Waitr stock at $7.40 per share, with no mention of his intent to do so in Waitr's Form 454(b)(5) Supplemental Prospectus filed on May 17, 2019. ¶¶212-13. Further, Jefferies did not exercise the oversubscription option, which indicates a significant lack of demand. ¶214. Plaintiffs allege that Meaux made those purchases to prop up the Secondary Offering, which was undersubscribed because there was no demand. ¶213. By doing so, Meaux's actions suggested falsely that the stock was a good buy.

2. <u>The Misrepresentations Concern Waitr's Core Operations, Bolstering Scienter</u>

Courts have found that where, as here, a company offers only a single product that is important to its viability, "special circumstances . . . lend themselves to a sufficient inference of scienter." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008). "When a company is a single-product company . . . the gravity of misrepresentations about the product to the public is strong evidence that

22

the 'danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Stone*, 26 F.Supp. 3d at 600.

Waitr's *only* business is food ordering and delivery. *See* ¶12 (Waitr is an "online food ordering and delivery service"); Waitr Br. at 4. Waitr's business model is substantially based on the rates it charges restaurants for its services, the efficiencies of its labor model (which ostensibly contributed to its ability to charge lower rates), and its technology platform. *See*, *e.g.*, ¶141 ("Our continued growth is driven in significant part by our ability to successfully expand our network of restaurants and diners using the Platforms."); *see also* Langdon Decl., Ex. 1 at 45 ("Waitr's financial performance has been and will continue to be significantly determined by Waitr's success in adding, retaining, and engaging Active Diners who make orders for delivery using the Waitr Platform."). Thus, with respect to the executive defendants (Meaux, Pringle, and Yurecko), their scienter is supported by the fact that the misrepresented or omitted information goes to the core of Waitr's business and viability. *See Plotkin*, 407 F.3d at 700 ("It is reasonable to assume, given the importance of these deals to the company, [ ] IPaxess would have familiarized itself with the financial condition of Lynxus/AGNI and would have discovered details about their poor financial condition"); *Nathenson*, 267 F.3d at 425 (where corporation's value depended on single product, CEO knew or should have known key information concerning product); *Holzwasser*, 2006 U.S. Dist. LEXIS 100346, at *10-11 (that misstatements "pertained to [ ] core business" supported scienter); *In re NetSolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001) (scienter where misstatements concerned "lifeblood of the company" and problems "would have been 'obvious' to persons in the defendants' positions").

3. <u>The Inference of Scienter is More Compelling Than Any Opposing Inferences</u>

In the face of these compelling allegations, 10(b) Defendants argue they "believed what they said about Waitr's prospects . . . but their business efforts simply fell short in the face of serious competition," and Grimstad's admissions merely "describe a change in strategic direction and management practices." Waitr Br. at 3, 17. But Plaintiff alleges 10(b) Defendants knew, or were severely reckless in not knowing, that (as Grimstad conceded) Waitr's labor and pricing models *could*

23

*never have worked*, and that its technology provided few or no competitive advantages (as the Olo deal demonstrated). These scienter allegations are "at least as compelling" as the opposing inferences. *Spitzberg*, 758 F. 3d at 686 (tie on scienter goes to plaintiff); *see also Holzwasser*, 2006 U.S. Dist. LEXIS 100346, at *11 ("[T]he strong-inference pleading standard does not license the Court to resolve disputed facts at this stage of the case … Defendants' arguments are fact-based and insufficient to support a motion to dismiss.") (citing *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 258 (5th Cir. 2005)). The 10(b) Defendants aver also Meaux left Waitr because he "did not meet strategic goals." Waitr Br. at 17. This proffered counter-inference is not supported by any facts and is inconsistent with Waitr's public statement that Meaux "resigned." ¶204. Considering all of Plaintiffs' scienter allegations holistically, as this Court must, "a reasonable person would deem an inference of scienter . . . 'at least as compelling as any opposing inference." *Tellabs,* 551 U.S. at 324.[9]

### D. **Plaintiffs Do Not Engage in Impermissible Group Pleading**

Plaintiffs fulfill the PSLRA's requirement to "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud." *Southland*, 365 F.3d at 365. Meaux, Pringle, Yurecko, and Fertitta cherry pick a handful of paragraphs in the Complaint where they claim that Plaintiffs "group plead scienter allegations." Waitr Br. at 16. Plaintiffs plead which individual defendant was responsible for making which allegedly false statement (*see*, *e.g.*, ¶¶98, 100, 102, 104, 108, 114), and allege scienter with respect to each of them. *See* ¶¶183-87, 195, 199, 203, 206, 210, 216. Plaintiffs also attribute statements to each of the individual Defendants. *See* ¶¶98, 116 (Fertitta), ¶¶100, 116 (Meaux), ¶¶116, 119 (Pringle), ¶134 (Yurecko). Moreover, for "corporate documents that have no stated author," like SEC filings, Plaintiffs provide "specific factual allegations link[ing] the individual to the statement at issue . . . such as a signature on the document or particular factual allegations explaining the individual's involvement . . . ." *Southland*, 365 F.3d at 365; *see* ¶¶116, 119, 134.

---

[9] Because Plaintiffs adequately allege scienter on the part of Meaux, Pringle, Yurecko, and Fertitta, scienter can be imputed to Waitr.  *See Ramirez v. Exxon*, 334 F. Supp. 3d 832, 852 (N.D. Tex. 2018) ("[C]orporation has the requisite state of mind when the corporate officer making the statement does so knowing it is false.").

## II.  **PLAINTIFFS ADEQUATELY ALLEGE SECTION 20(a) CLAIMS**

To plead a violation of Section 20(a),[10] plaintiff must plead an underlying securities fraud violation and "actual power over the controlled person" by the controlling person. *Amedisys,* 2016 U.S. Dist. LEXIS 111077, at *48 (citation omitted). The first prong is met. *See supra* §I.C. With respect to control, "[t]he Fifth Circuit has stated that a plaintiff need only show that the alleged control persons possessed 'the power to control [the primary violator], not the exercise of the power to control.'" *Amedisys*, 2016 U.S. Dist. LEXIS 111077, at *48-49 (citation omitted). The PSLRA and 9(b)'s heightened pleading requirements do not apply to 20(a). *See id.* at *49 (citation omitted); the Fifth Circuit applies a "'relaxed' and 'lenient' pleading standard." *One Longhorn Land I, L.P. v. FF Arabian, LLC*, 15-203, 2015 U.S. Dist. LEXIS 158072, at *5 (E.D. Tex. Nov. 23, 2015). Further, "control is a question of fact that will not ordinarily be resolved summarily at the pleading stage." *Amedisys*, 2016 U.S. Dist. LEXIS 111077, at *49 (citation omitted).

Meaux, Pringle and Yurecko, all Waitr executives, signed and certified the pertinent SEC filings, and Fertitta, a Board member, signed, made, and/or assisted in preparing the Secondary Offering Filings. ¶¶77-80, 116, 134. Meaux, Fertitta, Pringle, and Yurecko, "[b]y virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company…had the power to influence and control and did influence and control . . . the decision-making of the Company….," "were provided with or had unlimited access to copies of the . . . statements [at issue] shortly after [they] were issued and had the ability to prevent [their] issuance or cause [them] to be corrected", and had "direct and supervisory involvement in the day-to-day operations of the Company." ¶¶230-31. These allegations are sufficient for Section 20(a). *See Amedisys*, 2016 U.S. Dist. LEXIS 111077, at *50 (that defendants "served as high ranking corporate officers . . . and . . . had either direct or indirect 'control over [company's] business and public

---

[10] Presumably, the reference to "20(A)" (Waitr Br. at 19) was a mistake as Plaintiffs do not plead Section 20(A) claims.

statements'" sufficient); *Moskowitz v. Mitcham Indus.*, 98-1244, <u>1999 U.S. Dist. LEXIS 23293, at \*55</u> (S.D. Tex. Sept. 28, 1999) (allegations of access to information as a result of executives' positions and "power and authority" over company and its filings sufficient).

## III.  <u>PLAINTIFFS ADEQUATELY ALLEGE SECTION 14(a) CLAIMS</u>

### A.  <u>Pleading Standards</u>

Section 14(a) requires pleading (1) a misrepresentation or omission of material fact in the proxy which (2) defendants were at least negligent in distributing, and (3) was an essential link in causing the business combination for which it was issued. *See In re Fossil, Inc. Deriv. Litig.*, <u>713 F. Supp. 2d 644, 654-55</u> (N.D. Tex. 2010). Plaintiffs Welch and Barnard pleads these elements.

### B.  <u>Defendants' Standing Argument is a Red Herring</u>

The 14(a) Defendants feign confusion about "which Landcadia shareholders are included in the putative 14(a) class" and whether Plaintiffs "propose to include Landcadia shareholders who sold their shares prior to the shareholder vote." Waitr Br. at 29-30. However, the Complaint plainly identifies – in the very first paragraph – Welch and Barnard as the Plaintiffs who bring 14(a) claims. ¶1; *see also* ¶58. Both Welch and Barnard held Landcadia stock as of November 15, 2018 and were eligible to vote on the Going Public Transaction. ¶¶6-7; *see also* ¶45.

### C.  <u>The Jefferies Defendants Are Not Immune from Liability</u>

The Jefferies Defendants argue they cannot be liable under Section 14(a) because they did not solicit proxies and did not permit their name to be used in a manner having a "substantial connection" to the Going Public Transaction.  As set forth below, these arguments fail.[11]

---

[11] The Jefferies Defendants argue they did not make the statements and there are no alleged misstatements in the Proxy. Jefferies Br. at 13-14; *see also* Waitr Br. at 20-21 (noting that Proxy does not contain alleged misstatements). Those are red herrings. First, Section 14(a) imposes liability on anyone who solicits proxies or sufficiently associates with a solicitation; there is no "speaking" requirement. *See Fossil*, <u>713 F.Supp. 2d at 654-55</u>. Second, any communications that are "part of 'a continuous plan' intended to end in solicitation and to prepare the way for success" fall within 14(a). *Krauth v. Exec. Telecard*, <u>870 F. Supp. 543, 547</u> (S.D.N.Y. 1994) (citing *Studebaker Corp. v. Gittlin*, <u>360 F.2d 692</u> (2d Cir. 1966)). The statements upon which Plaintiffs' 14(a) claims are based constitute proxy solicitation materials pursuant to Form 14A. ¶¶29, 37, 39, 41, 43; *see Vaitkuviené v. Syneos Health, Inc.*, 18-29, <u>2020 U.S. Dist. LEXIS 176001, at \*11</u>, <u>52-53</u> (E.D.N.C. Aug. 7, 2020) (proxy materials included press release, investor presentations, and conference call transcript filed with SEC).

1. The Jefferies Defendants Were "Participants" in the Proxy Solicitation

The Jefferies Defendants go to great lengths to present a premature factual argument that neither was an "underwriter" of the Going Public Transaction, despite Plaintiffs' well-pleaded allegations to the contrary. ¶¶13, 14. However, under *Twombly*, the question is whether Plaintiffs' claims – construed in Plaintiffs' favor – are "plausible." 550 U.S. at 570; *see also Lormand*, 565 F.3d at 232 (court must "draw all reasonable inferences in the plaintiff's favor"); *In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 833 (S.D. Tex. 2013) (court "cannot decide a factual dispute at the motion to dismiss stage"). But even without the benefit of discovery and before the issue is ripe for consideration, Jefferies' Defendants' fact-based quibbles are contrary to not only the Complaint but to the proxy materials themselves. JFG contends it was merely an "investor," and Jefferies avers it was a "financial advisor." Jefferies Br. at 5-6. But the Proxy states: "Jefferies will be entitled to receive deferred **underwriting** commission and a financial advisory fee upon completion of the business combination." Langdon Decl., Ex. 1 at 10 (emphasis added). JFG is listed as a "sponsor," with no explanation of the role. *See id.* at 5/642. And Jefferies is mentioned over 150 times, and JFG over thirty times, in the Proxy itself. *See id.*

The Jefferies Defendants also attempt to rely upon the language in Instructions 3(a) and 3(b) of Schedule 14A, 17 C.F.R. § 240.14a-101, which lists certain entities and excludes others (*e.g.*, "financial advisors" and "investors") as potential participants in proxy solicitations. *See* Jefferies Br. at 8-9. Yet this argument is premised upon the very facts above that are disputed – *i.e.*, whether Jefferies was a "financial advisor" and whether JFG was merely an "investor."[12] The exclusion for financial advisors is limited to those "whose activities are limited to the duties required to be performed in the course of such employment," 17 C.F.R. §240.14a-101, which is necessarily a fact-specific inquiry. Further, the

---

[12] Even if JFG were merely an investor (which is contrary to the well-pleaded allegations), it is not clear it would be exempt, as "participant" includes "any person who finances or joins with another to finance the solicitation of proxies" and "any person who lends money or furnishes credit . . . for the purpose of financing . . . the purchase, sale, holding or voting of securities of the registrant. . . ." 17 CFR 240.14a-101. Further, "sponsor" is not defined in Section 14(a), the applicable regulations, or the Proxy. *See* Langdon Decl., Ex. 1.

27

Jefferies Defendants' argument is contradicted by the Form 8(k) filed by Landcadia on November 1, 2018, which expressly states, under the bold and italicized heading "***Participants in the Solicitation***": "The Company. . . ***and Jefferies LLC may be deemed participants in the solicitation of proxies from the Company's stockholders with respect to the Business Combination***." *See* Miller Decl., Ex. 4 at 2 (emphasis added); *see also id.* at Ex. 99.1 (November 1, 2018 press release stating same).

The cases cited by Jefferies Defendants merely stand for the proposition that the Court should look to the language of Schedule 14(a) to determine whether a defendant is a proxy "participant," and are substantively inapplicable. *See* Jefferies Br. at 9-10 (citing *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F.Supp. 2d 260, 293 (S.D.N.Y. 2010) (officers not involved, and some not even mentioned, in proxy, not liable); *IBS Fin. Corp. v. Seidman Assocs., LLC*, 954 F.Supp. 980, 989 (D.N.J. 1997) (passive investors involved in financing proxy contest not liable); *Lane v. Page*, 649 F.Supp. 2d 1256, 1287 (D.N.M. 2009) (company's failure to disclose it hired proxy solicitors actionable)).

2. The Jefferies Defendants Permitted Their Names to be Used in a Manner Having a Substantial Connection to the Proxy Solicitation

Courts have found third parties that were sufficiently connected to the transaction in question can be liable for misstatements in a proxy. In *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C. Cir. 1980), the proxy sought shareholder approval of a transaction transferring a majority interest in Falstaff to a third party. The court found him liable for misstatements in the proxy because his name appeared 11 times and his "reputation as a businessman, his plans for [Falstaff], and his other dealings that could create conflicts of interest were important to [ ] shareholders…" *Id.* at 69. And in *Lewis v. Byrnes*, 538 F. Supp. 1221, 1224 (S.D.N.Y. 1982), the court examined a merger between two entities, one owned by Korman, whose involvement the court found "extensive" because of the significant consideration he would receive, and because he would become a director, employee, and debtor of the merged entity. It "was more than a cash sale where the purchaser and seller meet, exchange cash [ ], and go their separate ways. [Rather], [t]he terms of the transaction necessarily entailed a continuing relationship between [the merged entity] and Korman." *Id.* Thus, the court, relying on *Falstaff*,

28

concluded that "information about [Korman] and his plans certainly was material to the shareholder deciding whether to give his proxy . . . ." *Id.* at 1224-25; *cf. Yamamoto v. Omiya*, 564 F.2d 1319, 1322 n.7, 1323 (9th Cir. 1977) (declining to hold purchaser mentioned only twice, in one paragraph, of proxy liable because "[i]t is hardly conceivable that the mere revelation [defendant] was the proposed purchaser could have been an inducing factor in the granting of a shareholder's proxy").

Rather than the "limited role" Jefferies Defendants claim to have played in the Going Public Transaction, Jefferies was adequately alleged to have been a key player. It made a presentation to the Landcadia Board on May 16, 2018 at which it presented a variety of materials and engaged in extensive discussions with the Board, which are summarized in great detail for Landcadia's shareholders in the proxy. These materials included a summary of Waitr's and the restaurant delivery business, a projected financial summary of Waitr, and a comparison of selected financial data of Waitr with four selected publicly traded companies, financial data relating to six selected representative transactions, and a discounted cash flow analysis. *See* Langdon Decl., Ex. 1 at 129-31. Jefferies was hired because of its preexisting relationship with Landcadia; it was the underwriter for Landcadia's IPO (Jefferies Br. at 5-6), Handler was both CEO and Chairman of the Board of Jefferies and Co-Chairman and President of Landcadia, and Fertitta, close friend of Handler, was the CEO of Landcadia. ¶¶10, 11, 13, 80, 207; *see also* Langdon Decl., Ex. 1 at 33 (noting "Jefferies' long-standing relationship with and affiliation with the Company and its Sponsors" as a reason for its retention). Indeed, Fertitta publicly touted the involvement of Jefferies Defendants and Handler in the Going Public Transaction from the very beginning of the Class Period. *See*, *e.g.*, ¶37 (May 17, 2018 CNBC interview: "***Jefferies and myself, Rich and I*** were looking for a company to buy with this special acquisition corp. and we went to them…..") (emphasis added); ¶29 (May 17, 2018 investor call: predicting Waitr would "leverage the tremendous industry knowledge and expertise ***Rich and I*** have") (emphasis added); Miller Decl., Ex. 5 at Ex. 99.2, p.3) ("***Rich*** is a great friend, a great friend… ***Jefferies*** is a great bank and they have great leadership in ***Rich***….")  (emphasis added).

Pursuant to the Going Public Transaction, Jefferies Defendants received at least $10 million in

29

underwriting fees (¶208) and the "sponsors" (including JFG), received certain registration rightsand exchanged 14,000,000 warrants purchased by them in connection with the Landcadia IPO for 1.6 million shares of Waitr common stock. *See* Langdon Decl., Ex. 1 at 10, 64-65. This was also not a transaction after which the parties would "go their separate ways." *Lewis*, 538 F. Supp. at 1224. Rather, there would be a continuing relationship between the parties. Indeed, as disclosed in the Proxy, Fertitta was going to (and did) join Waitr's Board after the Going Public Transaction. ¶10; *see also* Langdon Decl., Ex. 1 at 10. Further, after the Going Public Transaction, the sponsors (including JFG and Fertitta Entertainment), were estimated to own 15% of Waitr. *See* Langdon Decl., Ex. 1 at 29. Additionally, Jefferies was the lead underwriter for the Secondary Offering on May 17, 2019 (¶211), and Waitr announced on August 8, 2019 it had hired Jefferies to "explore strategic alternatives." ¶¶53, 158, 175.

Where "individuals listed in a proxy statement 'hav[e] put their reputations in issue, [they] cannot divorce themselves from improper actions taken in the proxy battle by the participants acting under the banner of their names.'" *Bank of Am. Corp.*, 757 F. Supp. 2d at 294 (citing *Chris-Craft Indus., Inc. v. Indep. Stockholders Comm.*, 354 F. Supp. 895, 915 (D. Del. 1973)). Jefferies Defendants permitted their names to be used in a manner having a "substantial connection" with the Going Public Transaction and accordingly, they can be liable under Section 14(a). *See Falstaff*, *supra*; *Lewis*, *supra*; *cf. Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 184-85 (3d Cir. 1988) (holding bank that submitted fairness opinion in favor of transaction could be liable under 14a(a): "The fairness opinion had independent significance to shareholders, for it was obtained by the disinterested directors for the purpose of determining whether the offer from management was fair. It was, moreover, an opinion of an expert on valuation."). While Jefferies did not issue a fairness opinion, the materials and guidance it provided are functionally the same, because they were intended to be persuasive to, and relied upon by, shareholders in voting on the Going Public Transaction. Indeed, immediately following Jefferies' presentation, Landcadia's Board unanimously approved the merger. *See* Langdon Decl., Ex. 1 at 125.

The cases cited by Jefferies Defendants for the proposition that financial advisors cannot be liable under 14(a) (Jefferies Br. at 11-12) are inapplicable. In *Mendell v. Greenberg*, 612 F.Supp. 1543,

1552 (S.D.N.Y. 1985), the court found that a financial advisor who merely "permitted the use of its name to solicit proxies" was not liable because, unlike in *Falstaff* or *Lewis*, it would not "directly benefit by the shareholders' favorable vote." Here, by contrast, Jefferies Defendants stood to (and did) benefit handsomely from the Going Public Transaction. ¶208. *Gould v. American Hawaiian S.S. Co.*, 351 F.Supp. 853, 865 (D. Del. 1972), involved outside directors (whom the court found *could* be liable under 14(a)) and the language quoted by Jefferies Defendants was *dicta*). Finally, *Madden v. Deloitte & Touche, LLP*, 118 F. App'x 150, 154 (9th Cir. 2004) was decided under Sections 11 and 12 of the Securities Act, not Section 14.

The Jefferies Defendants' arguments that their advice and guidance did not "induce[] shareholders to approve the acquisition" and that their involvement, "as opposed to another advisory firm in the same role, was [not] a material factor that induced [Landcadia] shareholders to vote in favor of the Waitr Acquisition" are premature, fact-based arguments. Further, their speculative argument that certain cautionary language in the Proxy regarding their "limited role" "should have alerted shareholders that [it] had no role…." (Jefferies Br. at 13, 14) strain credulity. *See Lormand*, 565 F.3d at 232 (court must "draw all reasonable inferences in the plaintiff's favor").

### D. Scienter is Not Required for Section 14(a) Claims

Defendants concede that neither the Supreme Court nor the Fifth Circuit has held that scienter is required for Section 14(a). [13] *See* Waitr Br. at 24-25; Jefferies Br. at 15. Defendants fail to acknowledge that the majority of circuits that have considered this issue (four) have held that scienter is *not* required. *See Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (Posner, J.); *Knollenberg v. Harmonic, Inc.*, 152 F.App'x 674, 682-83 (9th Cir. 2005); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988); *Gould*, 535 F.2d at 777.[14] Defendants also neglect to mention that numerous

---

[13] The Supreme Court has reserved ruling on this. *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 n.5 (1991).

[14] The Fourth, Eleventh, and D.C. Circuits have not decided this, but their district courts hold scienter is not required. *See Syneos*, 2020 U.S. Dist. LEXIS 176001, at *50; *Willis Towers*, 439 F.Supp. 3d at 712-13; *Biver v. Nicholas Fin. Inc.*, 14-250, 2014 U.S. Dist. LEXIS 73933, at *11 (M.D. Fla. May 30, 2014); *SEC v. Wills*, 472 F.Supp. 1250, 1268 (D.D.C. 1978). The Tenth Circuit has not decided this but its district courts are split. *Compare Britton v. Parker*, 06-1797, 2008 U.S. Dist.

district courts in this Circuit do not impose a scienter requirement.[15]

"As the Supreme Court has said time and again, any effort to construe a statute, including the securities laws, must begin with the language of the statute itself." *Falstaff,* 629 F.2d at 79 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976)). The language of Section 14(a) "lack[s] any reference to a '*manipulative* or deceptive device or contrivance,' [which is] the language used in Section 10(b) . . . to indicate a requirement of scienter." *McKesson,* 126 F.Supp. 2d at 1263 (citing *Hochfelder*, 425 U.S. at 199); *see also In re Willis Towers Watson PLC Proxy Litig.*, 439 F.Supp. 3d 704, 713 (E.D. Va. 2020) ("[T]he imposition of a scienter requirement in Rule 10b-5 is . . . based on the reference in Rule 10b-5 to a 'manipulative or deceptive device or contrivance,' language absent from Rule 14a-9" [17 C.F.R. §240.14a-9, the implementing regulation of Section 14a]). Further, the Supreme Court has held with respect to substantially similarly-worded statutes "that a simple prohibition of false or misleading statements of material fact does *not* imply scienter." *Willis Towers*, 439 F. Supp. 3d at 712 (emphasis in original) (citing *Omnicare,* 575 U.S. at 179 and *Aaron v. SEC*, 446 U.S. 680, 696 (1980) (construing Sections 11 and 17(a)(2) of the Securities Act, respectively).[16] For this reason, Defendants' argument that the Court should imply scienter into Section 14(a) to "ensure consistency" with Section 14(e) (which contains a scienter requirement) is misplaced.  *See* Waitr Br. at 26; Jefferies Br. at 15. Scienter is required in Section 14(e) because, unlike 14(a), it contains "the fraud-like words found in Rule 10b-5."[17] *In re Digital Island Sec. Litig.*, 357 F.3d 322, 328 (3d Cir. 2004); *Willis Towers*, 439 F.Supp. 3d

---

LEXIS 70430, at *25 (D. Colo. Sept. 5, 2008) (scienter not required) and *Lane v. Page*, 581 F.Supp. 2d 1094, 1109 (D.N.M. 2008) (negligence suffices) *with In re Zagg Secs. Litig.*, 12-852, 2014 U.S. Dist. LEXIS 15783, at *20 (D. Utah Feb. 4, 2004) (scienter required).

[15] *See*, *e.g.*, *Panella v. Tesco Corp.*, 17-cv-02904, 2019 U.S. Dist. LEXIS 65844, at *8 (S.D. Tex. Mar. 29, 2019); *Greenthal v. Joyce,* 16-41, 2016 U.S. Dist. LEXIS 11132, at *5-6 (S.D. Tex. Jan. 29, 2016); *Fossil,* 713 F.Supp. 2d at 654-55; *Steinberg v. BPO Mgmt. Servs.*, 09-cv-02291, 2010 U.S. Dist. LEXIS 34467, at *30 (N.D. Tex. Mar. 12, 2010); *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 341 n.4 (N.D. Tex. 2008). *But see Hohenstein v. Behringer Harvard Reit I, Inc.*, 12-3772, 2014 U.S. Dist. LEXIS 40759, at *25-26 (N.D. Tex. Mar. 27, 2014) (concluding without analysis that "plaintiffs' section 14(a) claim . . . fails to plead scienter").

[16] Both Sections 11 and 17 (15 U.S.C. §§77k, 77q(a)(2)), like Section 14(a), proscribe false or misleading statements or omissions and are devoid of a scienter requirement. *See Willis Towers*, 439 F.Supp. 3d at 712.

[17] *Compare* Section 14(e), 15 U.S.C. §78N(e) ("prohibiting "any *fraudulent, deceptive, or manipulative* acts or practices, in connection with any tender offer") *and*  Rule 10b-5, 17 C.F.R. § 240.10b-5 (prohibiting use of "any device, scheme, or

32

at 713; *see also Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) ("The elements of . . . Section 14(e) . . . are identical to the [ ] 10(b)/Rule 10b-5 elements.") (citation omitted).

Yet Defendants argue this Court should follow the minority position of the Sixth Circuit, which held in *Adams v. Standard Knitting Mills*, 623 F.2d 422, 428-30 (6th Cir. 1980), *cert. denied*, 449 U.S. 1067 (1980), that Section 14 contains a scienter requirement with respect to outside accountants. *See* Waitr Br. at 25; *see also* Jefferies Br. at 15-16 (citing *Adams*; *SEC v. Shanahan*, 646 F.3d 536, 546-47 (8th Cir. 2011) (following *Adams* for claims against outside directors and accountants); *Salit v. Stanley Works*, 802 F.Supp. 728, 733-34 (D. Conn. 1992) (scienter required for 14(a) claims against outside directors)). *Adams* was based on the facts that accountants do not owe fiduciary duties to shareholders and might be penalized for "minor mistakes" under a negligence standard, and Section 14's legislative history evinces a desire to penalize "unscrupulous" and "dishonest" behavior.  623 F.2d at 429-31.

Tellingly, none of Defendants' citations on this point deal with underwriters, who "occup[y]a vital position in a securities offering because investors rely on [their] reputation, integrity, independence, and expertise." *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 641 (D.C. Cir. 2008).[18] More importantly, the interpretation and reasoning in these cases have been roundly criticized. As the *McKesson* court noted, "the *Adams* court's concerns about holding outside auditors liable for minor mistakes seems misplaced, because even under a negligence standard plaintiffs only prevail if they prove that the misstatements were material and that the defendants deviated from an appropriate standard of care." 126 F.Supp. 2d at 1248. Further, "although Congress may have focused on intentional misconduct when it debated Section 14, the statute as enacted casts a wider net. . .." *Id.*

---

artifice to **defraud**, . . . or (c) [ ] engag[ing] in any act . . .which operates or would operate as a **fraud or deceit** upon any person, in connection with the purchase or sale of any security") (emphases added) *with* Rule 14a-9, 17 C.F.R. §240.14a-9 (prohibiting false or misleading statements; no fraud language).

[18] "By participating in an offering, an underwriter makes an implied recommendation about the securities [that it] . . . has a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents used in the offerings." *Dolphin*, 512 F.3d at 641.

(citing *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964)).[19] Plaintiffs respectfully submit this Court should follow the great weight of authority and hold scienter is not required for Section 14(a).

### E.   The Complaint Adequately Pleads Negligence

Defendants fail to point out that the Fifth Circuit has not addressed whether the PSLRA's particularity requirements  (which extend to the required "state of mind" (15 U.S.C. § 78u-4(b)(2)) apply to a showing of negligence, and other courts are split. Plaintiffs respectfully submit that this Court should follow the Seventh Circuit, which has held that "[t]here is no required state of mind for a violation of section 14(a)… negligence is not a state of mind; it is a failure . . .  to come up to the specified standard of care." *Beck*, 559 F.3d at 682  (citations omitted); *see also Jaroslawicz v. M&T Bank Corp.,* 15-897, 2017 U.S. Dist. LEXIS 47242, at *10 (D. Del. Mar. 30, 2017) (PSLRA does not apply to Section 14(a) claims that "sound in negligence");[20] *Bank of Am. Corp.*, 757 F.Supp. 2d at 321 (same); *Willis Towers*, 439 F.Supp. 3d at 715 (following *Beck* and holding that "PSLRA's heightened scienter pleading requirement, relevant only to 'state of minds,' does not require particularized allegations of negligence in Section 14(a) claims.") (citation omitted).[21]

Because the PSLRA does not apply, Plaintiffs do not have to prove "subjective intent or level of diligence or care." *Willis Towers*, 439 F.Supp. 3d at 715. Rather, Plaintiffs "must only demonstrate

---

[19] *See also Herskowitz*, 857 F.2d at 190 ("[S]ince an investment banker rendering a fairness opinion . . . knows full well that it will be used to solicit shareholder approval, and is well paid for the service it performs, we see no convincing reason for not holding it to the same standard of liability as the management it is assisting"); 2E Harold S. Bloomenthal & Samuel Wolff, *Securities and Federal Corporate Law* § 24:63, at 24-121 (2000) (criticizing *Adams* for "cavalier attitude" toward professional responsibilities of outside auditors and predicting it "is not likely to be followed by discerning courts."); *Knurr v. Orbital ATK, Inc.*, 276 F. Supp. 3d 527, 540 (E.D. Va. 2017) ("Put simply, if Congress wanted § 14(a) to require a showing of scienter, it would have included those fraud-related words not just in the legislative history, but in the text of the statute itself.").

[20] Plaintiffs' claims sound in negligence, which 14(a) Defendants do not dispute. First, they are labeled as such. *See* Cplt. p. 2 ("Strict Liability/Negligence Claims under Section 14(a); ¶27 (claims "based in negligence and do not sound in fraud"). Second, Plaintiffs expressly "disclaim any allegations  . . . alleging fraud or intentional misconduct" and any reliance upon or incorporation of the 10(b) allegations into the 14(a) claims. ¶¶27, 58, 94. *See Bank of Am. Corp.*, 757 F.Supp. 2d at 321-22 (holding similar language disavowed fraud; therefore, negligence applied to 14(a) claims).

[21] The cases holding otherwise are not persuasive. *See*, *e.g.*, *Little Gem Life Scis. LLC v. Orphan Med., Inc.*, 637 F.3d 913, 917 (8th Cir. 2008) (characterizing, without analysis, argument that PSLRA does not apply to negligence as "unpersuasive and unsupported by precedent"); *Knollenberg v. Harmonic, Inc.*, 152 Fed. App'x 674, 683 (9th Cir. 2005) (stating conclusorily that "the PSLRA pleading requirements apply to [14(a)] claims and citing *McKesson*, 126 F.Supp.2d at 1267, where plaintiff "concede[d] [ ] the negligence required for [ ] section 14(a) [ ] is a 'state of mind'").

that [14(a) Defendants] were subject to and failed to comply with the applicable legal obligation, specifically, not to associate themselves with a proxy statement that contained false or misleading statements or omissions."[22] *Id.*; *see also Wilson*, 855 F.2d at 995 ("As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the [ ] negligence standard."). Plaintiffs have adequately done so here. *See* ¶¶8-14, 29-44, 59-65 (Proxy filings contain false and/or misleading statements and/or omissions made, reviewed and/or authorized, and disseminated by 14(a) Defendants).

In the alternative, if the Court finds that the heightened pleading standard of the PSLRA applies to the showing of negligence, Plaintiffs meet that standard. The 14(a) Defendants argue Plaintiffs engage in group pleading and fail to make specific allegations with respect to each of them. *See* Waitr Br. at 26-29; Jefferies Br. at 16.  But Plaintiffs allege that Meaux, Pringle, Fertitta, and Handler signed, made, and/or assisted in the preparation of the proxy filings (¶¶8-11); JFG and/or Jefferies served as underwriters for the Going Public Transaction (¶¶13-14), and *all* 14(a) Defendants had a duty to "assure that statements contained in the Going Public Transaction Filings or incorporated therein by reference . . . were true, accurate and reliable and did not contain any untrue statement of a material fact or omi[ssion]." ¶27. Plaintiffs also allege specific false statements made by the individual 14(a) Defendants with respect to the Going Public Transaction.  *See* ¶¶29, 37 (Fertitta); ¶¶31, 33 (Meaux); ¶35 (Pringle), and allege the 14(a) Defendants filed the Going Public Transaction Proxy Filings. ¶¶39, 41, 43. Plaintiffs allege that as underwriters, Jefferies Defendants and Handler had a duty to conduct an adequate and detailed "due diligence investigation . . . into Waitr's operations, accounting, and guidance assumptions" (¶209), and Fertitta and Handler failed to conduct adequate due diligence with respect to the Secondary Offering and the Going Public Transaction. ¶¶210-11. These allegations are "sufficient to permit a reasonable person to draw an inference of negligence that is cogent and at least

---

[22] In this regard, the negligence standard of 14(a) is akin to a strict liability standard. *See Willis Towers*, 439 F.Supp. 3d. at 715 n.7; *see also Beck*, 559 F.3d at 682 ("There is no required state of mind for a violation of section 14(a); a proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials.").

as compelling as any opposing inference one could draw from the facts alleged." *N.J. v. Sprint Corp.*, 531 F.Supp. 2d 1273, 1287 (D. Kan. 2008) (citing *Tellabs*, 127 S. Ct. at 2510).[23]

The 14(a) Defendants argue they neither owed, nor breached, any actionable duty of care. *See* Waitr Br. at 29; Jefferies Br. at 17. But "section 14(a) imposes [ ] on anyone who consents to the use of his name to solicit proxies a duty to…shareholders to review the proxy materials to ensure that they did not contain materially false statements and omissions." *SEC v. Hurgin*, 19-5705, 2020 U.S. Dist. LEXIS 162447, at *36 (S.D.N.Y. Sep. 4, 2020); *see also McKesson*, 126 F. Supp. 2d at 1266 ("[A]nyone who knowingly participates in the distribution a proxy solicitation should therefore expect to be held liable for false statements to all affected shareholders.").

## F. The Complaint Adequately Pleads Materially False and Misleading Statements or Omissions

The Complaint contains detailed allegations of materially[24] false and misleading public statements and omissions made by 14(a) Defendants, which amply satisfy Rule 8.

### 1. Material Misrepresentations and Omissions Regarding Waitr's Pricing Structure

The 14(a) Defendants argue "[t]hat Waitr's models ultimately did not perform as well as hoped does not mean predictions about the competitive advantages they might provide were false at the time they were made." Waitr Br. at 22. But that is not what Plaintiffs allege; they allege that *at the time* the statements were made, they were false because they omitted material facts regarding Waitr's inability to profitably provide its services at the 15% take rate and its unilateral raising of the rate to 18% during the Class Period. ¶¶30, 32, 40, 42. *See Lormand*, 565 F.3d at 248-49; *Amedisys,* 2016 U.S. Dist. LEXIS 111077, at *33; *Stone,* 26 F. Supp. 3d at 586.

### 2. Material Misrepresentations and Omissions Regarding Waitr's Labor Force

Again, 14(a) Defendants argue their statements were not false when made. Waitr Br. at 21-22.

---

[23] The 14(a) Defendants argue Plaintiffs do not allege that any statements were made by Handler. *See* Waitr Br. at 5 n.2. Plaintiffs agree. This is irrelevant, however, as 14(a) requires only that there be a misrepresentation in a proxy for which a defendant is negligently responsible. *See Fossil,* 713 F. Supp. 2d at 654-55.

[24] Materiality means "the omitted information would have influenced a reasonable shareholder against the proposed transaction for which the proxies were sought." *Panella*, 2019 U.S. Dist. LEXIS 65844, at *8 (citation omitted)).

36

But they boasted that Waitr's labor efficiencies allowed it to keep its take rates low. *See* ¶37 (Fertitta claiming Waitr could charge 15% because it "hire[s] their own drivers"). They represented that Waitr's "ability to schedule [its] drivers . . . allow[ed] it to optimize performance and control quality." ¶31. And they touted Waitr's "readily uniformed and identifiable" drivers as a competitive advantage. *Id.* These statements were false and misleading because Waitr's labor model was inefficient, costly, and risky. ¶¶32, 38; *see supra* §III.F(1).

### 3.  Material Misrepresentations and Omissions Regarding Waitr's Technology Platform

The 14(a) Defendants' representations of Waitr as a "first mover in the underpenetrated online space," which they attributed to its "differentiated proprietary technology platform" (¶¶31, 39), were false and misleading because Waitr's technology platform provided little or no competitive advantages, as evidenced by the Olo deal. ¶¶32, 40. The 14(a) Defendants do not specifically challenge the falsity of these statements. *See* Waitr. Br. at 21-22.

### 4.  Material Misrepresentations and Omissions Regarding Waitr's Growth

The 14(a) Defendants' statements touting Waitr's growth and plans for further growth, which they represented would be assisted by Fertitta's expertise and resources (¶¶29, 33, 39, 43) were false and misleading because Waitr was not a growth business, did not have a proven business model or expansion strategy, was not complementary with Fertitta's businesses, and did not materially benefit from Fertitta's guidance and/or oversight. ¶¶30, 34, 40, 44. The 14(a) Defendants do not specifically challenge the falsity of these statements. *See* Waitr Br. at 21-22.

### 5.  Material Misrepresentations and Omissions Regarding Waitr's Financial Performance and GAAP Compliance, and False SOX Certifications

The 14(a) Defendants argue Plaintiffs fail to allege any false or misleading statements. *See* Waitr Br. at 22. But Plaintiffs allege they made statements about Waitr's revenues (¶¶35, 39, 43) that were false and misleading because they failed to disclose: Waitr's financial statements were not true, accurate, or reliable; Waitr did not maintain an adequate system of controls; Waitr had artificially inflated its revenues; and Waitr had no viable path to profitability. ¶¶36, 40, 44.

6.    None of the Statements are Inactionable Opinion

The 14(a) Defendants also argue certain statements are inactionable opinion. *See* Waitr Br. at 21. However, most of them are not opinion because they do not contain any of the language generally indicative of an opinion, such as "believe" or "thought."[25] The 14(a) Defendants' citation to *Virginia Bankshares,* 501 U.S. 1083 (1991) for the proposition that opinions are not actionable "unless they are both objectively false *and* not sincerely held" (Waitr Br. at 21) (emphasis in original)) is puzzling, as this is no longer valid law in light of *Omnicare*. The Supreme Court's *Omnicare* decision "reduced the significance of district courts' classifications of statements as those of fact or opinion" by "increasing the ability of plaintiffs to plead material omissions with respect to statements of opinion." *Abramson v. NewLink Genetic Corp.*, 965 F.3d 165, 175-76 (2d Cir. 2020).  In *Omnicare*, the court held opinions are actionable when (1) "not sincerely held" or (2) "omit[ ] material facts. . . [that] conflict with what a reasonable investor would take from [it]." 575 U.S. at 185-89; *see also Rougier v. Applied Optoelectronics, Inc.*, 17-2399, 2019 U.S. Dist. LEXIS 199050, at *35 (S.D. Tex. Mar. 27, 2019). Thus, even statements that constitute opinion are not protected where material facts are omitted. For example, statements about Waitr's "value proposition" (¶29), "attractive pricing" (¶33), and take rate of "only [ ] 15%" (¶37) omitted that Waitr's take rate was not sustainable. ¶¶30, 34, 38.

7.    The PSLRA Safe Harbor Does Not Apply

The 14(a) Defendants' attempt to seek refuge under the safe harbor (Waitr Br. at 22-23) is unavailing as nearly all of statements are not "forward-looking," but are statements of *present* fact.[26] *See*, *e.g.*, ¶29 ("[Waitr's] business *is* highly complementary"); ¶33 ("We *have* the most attractive pricing in the industry, at 15%. . . .") (emphases added). *See supra* §I.B(7).  The 14(a) Defendants also argue their statements were accompanied by risk disclosures in the November 18, 2018 Proxy. Waitr Br. at 23-24 (citing Proxy at 43, 44, 55).  Yet all but one of the statements at issue were made *months*

---

[25] Only two of 12 sentences in ¶29 contain "believe," no statement in ¶¶33, 37, or 43 contains *any* language indicative of opinion, and ¶¶29 and 37 do not contain the word "thought" as 14(a) Defendants aver. *See* Waitr Br. at 21.

[26] In the alternative, Plaintiffs plead that even if the statements are forward-looking, 14(a) Defendants had knowledge of their falsity (¶60), thus taking them outside of Safe Harbor protection. *See supra* §I.B(7).

*earlier* than the Proxy. *See* ¶¶29, 31, 33, 35, 37 (May 17, 2018), ¶39 (August 2, 2018). Further, nearly all the statements were oral (*id.*); thus, to be protected by the safe harbor, they had to have been contemporaneously "identified as forward-looking," *In re Sec. Litig. Bmc Software*, 183 F. Supp. 2d 860, 910 (S.D. Tex. 2001) (citing 15 U.S.C. § 78u-5(c)(2)), which they were not (nor do 14(a) Defendants claim they were). Moreover, the disclosures to which 14(a) Defendants point were boilerplate and not "meaningful." For example, they generally and generically warned that statements in the Proxy were "based on information available as of the date of this proxy," "should not be relied upon as representing our views as of any subsequent date," Waitr's "ability to diversify beyond current 'revenue sources . . . has not been demonstrated," and there could be "cost increases outside of our control." Waitr Br. at 22-24. These warnings were insufficient. *See supra* §I.B(7).

The 14(a) Defendants try to rely on "clear warnings in the Proxy that future rate increases might be necessary and unsuccessful." Waitr Br. at 23. First, these warnings were vague and not "clear." *See, e.g.*, Langdon Decl., Ex. 1 at 44 ("The acceptable pricing of Waitr's onboarding and services fees . . . has not been tested widely."); *id.* at 45 (Waitr's ability to increase onboarding, services, delivery fees and other revenue does not enjoy long historical data trends"). Second, they were provided on November 18, 2018, *after* Waitr had unilaterally raised its take rate several times. ¶¶¶¶47, 147, 188-90; Miller Decl. Ex. 1. "When risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future.'" *Lormand*, 565 F.3d at 247; *see also Marcus v. J.C. Penney Co.*, 13-736, 2015 U.S. Dist. LEXIS 131613, at *10 (E.D. Tex. Sep. 29, 2015) (warnings that "failed to correct the false impression of success created by their public statements" insufficient).

### 8. None of the Statements Are Mere Puffery

The 14(a) Defendants argue some statements are inactionable puffery. *See* Waitr Br. at 23. However, statements regarding the viability of Waitr's pricing model or strength of its technology contain specific statements of *fact*, not just vague or optimistic statements. *See, e.g.*, ¶¶29, 31, 39 (touting Waitr's "strong value proposition to customers and restaurants" and "differentiated proprietary

39

technology platform"). Thus, they are actionable. *See Lormand*, 565 F.3d at 249 n.14.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motions to Dismiss. If the Court grants any part of them, Plaintiffs request leave to amend. *See Bamburg*, 2009 U.S. Dist. LEXIS 149041, at *4-5 ("substantial reason" needed to deny leave to amend) (citation omitted).

DATED:  January 15, 2021

Respectfully Submitted,

*/s/ Lewis S. Kahn*
**KAHN SWICK & FOTI, LLC**
Lewis S. Kahn (23805)
Melissa H. Harris (33573)
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Lewis.Kahn@ksfcounsel.com
Melissa.Harris@ksfcounsel.com

Kim E. Miller (admitted *pro hac vice*)
**KAHN SWICK & FOTI, LLC**
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Kim.Miller@ksfcounsel.com

*Counsel for Lead Plaintiff the Delivery Investment Group and Additional Plaintiffs Walter Welch and Sean Barnard*

**LUNDY, LUNDY, SOILEAU & SOUTH, LLP**
Matthew E. Lundy (18988)
501 Broad Street
Lake Charles, LA 70601
Telephone: (337) 439-0707
Facsimile: (337) 439-1029
Email: mlundy@lundylawllp.com

*Liaison Counsel*

40

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 15, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing via U.S. first-class mail to any non-CM/ECF participants.

<u>/s/      *Lewis S. Kahn*      </u>