# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| WALTER WELCH, Individually and on Behalf of all Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| CHRISTOPHER MEAUX, DAVID PRINGLE, JEFF YURECKO, TILMAN J. FERTITTA, RICHARD HANDLER, WAITR HOLDINGS, INC. f/k/a LANDCADIA HOLDINGS, INC., JEFFERIES FINANCIAL GROUP, INC., and JEFFERIES, LLC, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

CIVIL ACTION NO. 2:19-cv-01260-TAD-KK

JUDGE: Terry A. Doughty

MAGISTRATE JUDGE: Kathleen Kay

## DECLARATION OF KIM E. MILLER

I, Kim E. Miller, hereby declare as follows, pursuant to 18 U.S.C. §1746:

1.      I am a partner of the firm Kahn Swick & Foti, LLC ("KSF"), counsel for Lead Plaintiff the Delivery Investment Group and Additional Plaintiffs Walter Welch and Sean Barnard in the above-captioned case. I have been admitted *pro hac vice* in this case and have personal knowledge of the facts set forth herein.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the First Amended and Supplemental Class Action Complaint in the matter styled *Bobby's Country Cooking LLC v. Waitr Holdings Inc.*, Case No. 2:19-cv-00552-TAD-KK (W.D. La.).

3.      Attached hereto as **Exhibit 2** is a true find correct copy of Form 10-K for the fiscal year ended December 31, 2019 filed by Waitr with the United States Securities and Exchange Commission ("SEC") on March 16, 2020.

1

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the Final Judgment entered on September 2, 2020 in the matter styled *Halley v. Waitr Holdings, Inc.*, No. 2:19-cv-01800 (E.D. La.), *consolidated with Montgomery v. Waitr Holdings, Inc.*, No. 2:19-cv-02208 (E.D. La.).

5.      Attached hereto as **Exhibit 4** is a true and correct copy of press release filed by Landcadia Holdings Inc. ("Landcadia") with the SEC on Form 8-K on November 1, 2018.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the Agreement and Plan of Merger filed on Form 8-K by Landcadia with the SEC on May 17, 2018.

I declare under penalty of perjury this 14th day of January 2021 that the foregoing is true and correct to the best of my knowledge.

/s/ Kim E. Miller
Kim E. Miller

2

# EXHIBIT 1

Case 2:19-cv-01260-TAD-KK   Document 56-1   Filed 01/21/21   Page 5 of 295 PageID
Case 2:19-cv-00552-TAD-KK   Document 48   Filed 05/19/20   Page 1 of 23 PageID #:913
#: 3298

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

| | |
|---|---|
| **BOBBY'S COUNTRY COOKIN', LLC; CASA MANANA, INC.; QUE PASA TAQUERIA, LLC; and CASA TU SULPHUR, LLC** | |
| **Plaintiffs,** | **Case No.: 2:19-cv-00552-TAD-KK** |
| **v.** | **CLASS ACTION** |
| **WAITR HOLDINGS, INC.** | |
| **Defendant.** | |

## <u>FIRST AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT</u>

Plaintiffs Bobby's Country Cookin', LLC; Casa Manana, Inc.; Que Pasa Taqueria, LLC; and Casa Tu Sulphur, LLC, individually and on behalf of all persons or entities nationwide who are similarly situated, upon personal knowledge as to facts pertaining to it individually and upon information and belief as to all other matters, based on the investigation of its counsel, against the Defendant Waitr Holdings, Inc., states as follows:

### I.     NATURE OF THE CASE

1.     Plaintiffs bring this action to challenge Waitr's systematic, repetitive breaches of the form agreement (what Waitr refers to as a "Master Services Agreement" or "MSA") it enters with its restaurant customers by charging more for its services than agreed.  Waitr made a deal with Plaintiffs and thousands of other restaurants: it would include them in its online ordering platform for a set amount of time in exchange for a fixed percentage of orders, called a "Service Transaction Fee."  Waitr broke the form MSA by instituting a practice whereby it unilaterally and

1

unlawfully raised the Service Transaction Fee for customers a number of times, the latest of which occurred in 2018. That restaurant customers could have terminated their agreements (and forfeited the money they paid to Waitr to join the platform) does alter the fact that Waitr cannot unilaterally ignore the bargain it made and charge whatever it chooses.

2.     Plaintiffs also bring this action to redress Waitr's separate, more recent, unlawful conduct. On July 1, 2019, Waitr notified all of its restaurant customers that it was terminating the all active MSAs and that the only way for Waitr's restaurant customers could remain on the platform was to sign a new MSA. This new, forced-place MSA dramatically increased restaurant customers' costs. And while the existing MSA allowed either party to terminate the agreement with 30-days' notice, Louisiana law mandates that Waitr exercise this discretion in good faith. Waitr violated the duty of good faith and fair dealing because it unscrupulously disregarded the harm it was causing Plaintiffs and class members in favor of its aims to extract more revenue from its restaurant customers and lock them into less favorable terms, all based upon purported justifications that are false.

3.     Further, this case presents a prototypical situation for class treatment. Waitr's conduct is uniform among all customers.  Plaintiffs and all class members entered into the exact same form MSA with Waitr.  The MSA with Plaintiffs and all class members mandates that uniform Louisiana law applies to all class members' claims.  The application of shared law to a common course of conduct will determine liability for the class as a whole, ensuring that the rights of thousands of small businesses are vindicated through the efficiency of a single trial.

2

## II.  JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $5,000,000, the proposed classes consists of more than 100 members, and minimal diversity exists.[1]

5.      This Court has personal jurisdiction over Waitr because Waitr has its registered corporate headquarters in Lake Charles, Louisiana, is authorized to do business and in fact does business in this District, the specific conduct at issue in this case originated in and emanated from this District, and Waitr could reasonably anticipate litigation in this district under traditional notions of fair play and substantial justice. Further, the form, preprinted agreement between at issue contemplates jurisdiction in this Court.

6.      Venue is proper in this Court under 28 U.S.C. § 1391. A substantial portion of the conduct giving rise to Plaintiffs' claims and to the claims of putative class members occurred in this District. The form contract at issue provides for venue for all claims in this District.

## III.    PARTIES

7.      Plaintiff Bobby's Country Cookin', LLC is an Arkansas entity with its principal place of business in Little Rock, Arkansas.

8.      Plaintiff Casa Manana, Inc. is a Louisiana entity with its principal place of business in Lake Charles, Louisiana.

9.      Plaintiff Que Pasa Taqueria, LLC is a Louisiana entity with its principal place of business in Lake Charles, Louisiana.

10.     Plaintiff Casa Tu Sulphur, LLC, is a Louisiana entity with its principal place of

---

[1] Waitr has more than 8,000 "restaurant partners," the majority of which entered into the standard contract at issue, in over 20 states.  Waitr, as a resident of Louisiana, is diverse from Plaintiff Bobby's Country Cookin', LLC, a resident of Arkansas, as well as from unnamed class members.

3

Case 2:19-cv-00352-TAD-KK    Document 48    Filed 05/19/20    Page 4 of 23 PageID #: 9510

business in Sulphur, Louisiana.

11.     Plaintiffs respective experiences with Waitr are typical of the Service Transaction Fee Increase Class in all relevant aspects.  Plaintiffs entered into the MSA at issue with Waitr. Like all MSAs at issue in this case, Plaintiffs' contract provided that Waitr would include them in its online delivery platform in exchange for a fee and that Waitr would receive a fixed percentage of the amount ordered through the platform represented in the Service Transaction Fee in exchange for online ordering services.  It contained a year long term that would auto-renew for successive year long terms unless a party opted-out at least 30 days before renewal.  The MSA also provided that it would be governed under the laws of Louisiana and that it could not be altered in any way except through writing signed by both parties. On multiple occasions, Waitr unilaterally imposed a price increase on what it charged, raising the Service Transaction Fee each time for Plaintiffs. Including from 3.5% to 7%, from 10% to 15%, and from 7% to 15%. Waitr did this to thousands of similarly situated small businesses at the same time.

12.     Additionally, Plaintiffs' Casa Manana's, Que Pasa's, and Casa Tu's respective experiences with Waitr are typical of the Agreement Termination Class in all relevant aspects. Like all MSAs at issue, Casa Manana's, Que Pasa's, and Casa Tu's Waitr contract provided that either party could terminate the MSA with 30-days' notice. Like all MSAs, the terms of the contract were to be interpreted under Louisiana law. Louisiana law provides that a party must exercise a termination clause in good faith. Waitr did not exercise this termination clause in good faith. Waitr terminated the MSAs solely for profit and to lock restaurant customers into more unfavorable terms of the new MSA, and did so for thousands of other small businesses at the same time.

13.     Defendant Waitr Holdings, Inc. is a Delaware entity with its principal place of

4

Case 2:19-cv-01260-TAD-KK   Document 56-1   Filed 01/21/21   Page 9 of 295 PageID
Case 2:19-cv-00352-TAD-KK   Document 48   Filed 05/19/20   Page 5 of 23 PageID #: 9317
#: 3302

business in Lake Charles, Louisiana.  It is the successor entity through merger to Waitr, Inc.,

operates the Waitr platform, and entered into the form contacts at issue.

**IV.     CLASS ACTION ALLEGATIONS**

14.     Plaintiffs bring this action pursuant to Rule 23(a) and (b)(3), and propose the

following classes:

> **The Service Transaction Fee Increase Class**
>
> All persons or entities who reside in the United States who, at any time from
> May 1, 2009 through the date of class certification, entered into a written
> contract with Waitr, Inc., and whose Service Transaction Fee was increased.
>
> **The Agreement Termination Class**
>
> All persons or entities who reside in the United States who received
> notification in July 2019 that Waitr, Inc. was terminating their existing
> agreement effective August 1, 2019, and whose existing agreement was
> subsequently terminated or replaced.

15.     Excluded from the proposed class are members of the judiciary, entities currently

in bankruptcy, entities whose obligations have been discharged in bankruptcy, and governmental

entities. Also excluded from the proposed class are Waitr's employees, subsidiaries, and affiliates.

Further excluded from the class are restaurant customers whose Service Transaction Fee was

increased via a writing signed by both of the parties.

16.     "Waitr, Inc." in the above class definitions includes this entity, and all predecessors,

related entities, successors, and assigns.

17.     Plaintiffs maintain the right to create additional subclasses or classes, if necessary,

and to revise these definitions to maintain cohesive classes which do not require individual inquiry

to determine liability.

5

Case 2:19-cv-00552-TAD-KK Document 48 Filed 03/19/20 Page 6 of 23 PageID #: 3303

**A.      Existence And Predominance Of Common Questions Of Law And Fact.**

18.      By imposing unlawful Service Transaction Fee increases not allowed by the MSA, Waitr engaged in a common course of conduct which gives rise to common questions of law and fact which predominate in this litigation.  This common course of conduct affected class members in the exact same manner.  The amount of damages may differ among class members, but the fact and type of damages is uniform among all class members and flows directly from Waitr's common conduct.  A single, uniform, pre-printed contract will govern all class members' claims.  Louisiana law—mandated by Waitr's own contract—applies to every class member's claims.

19.      Additionally, by terminating the agreement with all restaurant customers in bad faith, Waitr engaged in a common course of conduct which gives rise to common questions of law and fact which predominate in this litigation.  This common course of conduct affected class members in the exact same manner.  The amount of damages may differ among class members, but the fact and type of damages is uniform among all class members and flows directly from Waitr's common conduct.  A single, uniform, pre-printed contract will govern all class members' claims.  Louisiana law—mandated by Waitr's own contract—applies to every class member's claims.

20.      This shared nucleus of facts and law gives rise to numerous questions of law and fact which overwhelm any individual issues which might exist.

21.      For the Service Transaction Fee Increase Class such common questions include, but are not limited to, the following:

a.      Whether Waitr used standard form contracts with customers;

b.      Whether Louisiana law governs the claims of the classes;

c.      Whether Waitr increased its rates on putative class members who entered into the

standard contract;

d. Whether Waitr implemented the rate increases through an automated customer relationship management system;

e. Whether the rate increases Waitr imposed were not authorized by its standard form contracts;

f. Whether the rate increases Waitr were enacted not in good faith; and

g. Whether Waitr was unjustly enriched;

22. For the Agreement Termination Class such common questions include, but are not limited to, the following:

a. Whether Waitr used standard form contracts with customers;

b. Whether Louisiana law governs the claims of the classes;

c. Whether Waitr notified all restaurant customers that it was terminating their agreements;

d. Whether Waitr was required to act in good faith in terminating the agreements with restaurant customers;

e. Whether Waitr acted in good faith in their conduct surrounding termination of the agreements; and

**B. Numerosity.**

23. The total number of members of the putative classes is so numerous that individual joinder is impracticable. Waitr has over 8,000 "restaurant partners" many of which were subjected to the rate increases at issue in this case and all of which were subject to the agreement termination at issue in this case.

**C.      Typicality.**

24.      The claims of the named Plaintiffs are typical of the claims of the classes.  Plaintiffs, like other Service Transaction Fee Class members, entered into the form MSA and were subject to rate increases that were not legally justified. Plaintiffs were subject to, and harmed by, the exact same common policies and practices which effected all Service Transaction Fee Increase Class members.

25.      Plaintiffs Casa Manana, Que Pasa, and Casa Tu, like other Agreement Termination Class members entered into the form MSA and were subject to, and harmed by, the same conduct in the bad-faith termination of its agreement as all other class members. Plaintiffs Casa Manana, Que Pasa, and Casa Tu were subject to, and harmed by, the exact same common policies and practices which affected all Agreement Termination Class members.

**D.      Adequacy.**

26.       Plaintiffs will fairly and adequately protect the interests of the members of the classes and have no interest antagonistic to those of other class members.  Plaintiffs share the same interests and were harmed by the same conduct as each other class member.  Resolution of this case will inherently vindicate and redress the interests of Plaintiffs equally with class members. Plaintiffs have retained class counsel competent and experienced in prosecuting class actions and such class counsel is financially able to represent the classes.

**E.      Superiority and Manageability.**

27.      The class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual joinder of all members of the class is impracticable. While the total amount at issue in this litigation is sizeable, individual damages for a given plaintiff are comparatively small and class members have little incentive to pursue individual claims.  The

8

interests of judicial economy favor adjudicating the claims for the Plaintiff classes in a single forum rather than on an individual basis, thus also ensuring consistent adjudications and a uniformity of decision. The proposed class definitions are objective and class membership is easily determined using customer information and financial records maintained by Waitr in electronic form. Calculation of damages can be accomplished using systematic means and objective criteria. The class action mechanism is administratively feasible and provides the benefit of unitary adjudication, economies of scale and comprehensive supervision by a single court.

**V.      FACTUAL ALLEGATIONS**

28.     Waitr is a rapidly growing food delivery service with annual revenues over $69,000,000. In 2018, Waitr began operating as Waitr Holdings, Inc. and began trading on the NASDAQ stock market.

29.     Plaintiffs are small businesses that own and operate respective restaurants. Like thousands of other small businesses in the United States that Waitr marketed its services to, Plaintiffs agreed to be included in Waitr's online ordering network. In exchange for inclusion in this network, Plaintiffs and class members agreed to pay Waitr a fee calculated as a set percentage of each order made through the platform (called a "Service Transaction Fee") in addition to an initial set up fee (called a "Network Fee"). The agreement that establishes this relationship in a form, written contract of adhesion, known as a Master Services Agreement, which also provided that it is complete and final, and could not be modified except by a subsequent written agreement signed by both parties. The MSA also provided that either party could terminate the agreement with 30-days' notice.

30.     After agreeing to inclusion on Waitr's network and paying the initial costs, Waitr unilaterally increased the Service Transaction Fee it charges Plaintiffs and putative class members

9

with no contractual justification. Waitr did this through a Service Transaction Fee increase program implemented through a centralized system. Upon information and belief, these unilateral increases were intended to glean millions of unearned dollars from Waitr's restaurant customers simply to increase profit and falsely burnish its financials before a public offering. This conduct constitutes a breach of contract, a violation of the duty of good faith and fair dealing, and has resulted in Waitr being unjustly enriched.

31. Additionally, Waitr recently engaged in distinct unlawful conduct again designed to increase profits, as well as lock restaurant customers into new, unfavorable terms. On July 1, 2019, Waitr notified all of its restaurant customers, including Casa Manana, Que Pasa, and Casa Tu, that it was terminating the existing MSA. The only way for restaurant customers to remain on the platform was to sign a new MSA by July 31, 2019. Waitr's purported reason for doing so was so that it could "better serve" its restaurant customers. In truth, the purpose of the new MSA was simply to again increase the amount restaurant customers would pay Waitr, lock restaurant customers into an arbitration agreement and class waiver, and give it the power to change the agreement without a writing signed by both parties in the future. The manner, intent, and result of Waitr's conduct in unilaterally terminating all existing MSAs violates the duty of good faith that is imputed under Louisiana law to any right to terminate a contract.

**A. The Terms Of The Uniform Contracts (MSAs).**

32. Waitr uses effectively identical, form agreements to contract with customers. These are known as Master Services Agreements. Every class member entered into an effectively identical MSA. All relevant terms are pre-printed by Waitr. The first and second pages of the form agreement contain blanks where the restaurant customer name and contact information is entered. "Exhibit A" of the form contract, the Services Order Form, contains a table where the

10

Case 2:19-cv-01260-TAD-KK Document 156-1 Filed 01/21/21 Page 15 of 295 PageID
Case 2:19-cv-00352-TAD-KK Document 48 Filed 05/19/20 Page 11 of 23 PageID #: 3323
#: 3308

amount of the initial Network Fee and the Service Transaction Fee are specified. The Service

Transaction Fee is a set percentage of the dollar amount of each order placed through the Waitr

platform. The Network Fee is substantial, often $1,500 or more.

33. Aside from establishing the Service Transaction Fee, the form contract also

contains other relevant standard provisions which (a) mandate that Louisiana law apply to every

class member's claim, (b) establish a year long, auto-renewing term, (c) allow either party to

terminate with 30-days' notice, (d) prohibit the alteration of the written contract without a writing

signed by both parties and limit waivers of rights to those signed by the party waiving the right,

and (e) integrate the contract and limit its interpretation to the four corners of the document itself:

    a. **"GOVERNING LAW AND FORUM.** This Agreement shall be governed by the laws of the State of Louisiana (without regard to conflicts of law principles) for any dispute between the parties or relating in any way to the subject matter of this Agreement. The sole and exclusive venue, without regard to any statute or choice of law considerations for any suit or legal proceeding arising out of this Agreement shall be exclusively brought in the Federal or state courts for Calcasieu Parish, Louisiana, and Waitr and Customer submit to personal jurisdiction of these courts . . . . The prevailing party in any litigation is entitled to recover from the non-prevailing party all reasonable attorneys' fees and costs incurred as a result of such litigation. "

    b. **"Renewals:** This order renews for additional 1 year periods, unless either party provides the other with written (including email) notice of non-renewal at least 30 days prior to the renewal date."

    c. **"Term.** Either party may terminate this Agreement with 30 days' written notice, subject to all open Orders terminating."

    d. **"Entire Agreement & Changes.** This Agreement and the Order or exhibits hereto constitute the entire Agreement between the parties, and supersedes any prior or contemporaneous negotiations or agreements, whether oral or written, related to this subject matter. Customer is not relying on any representation concerning this subject matter, oral or written, not included in this Agreement. No representation, promise or inducement not included in this Agreement is binding. No modification of this Agreement is effective unless in writing and signed by an authorized representative of each party, and no waiver is effective unless the party waiving the right signs a waiver in writing."

Case 2:19-cv-01260-TAD-KK   Document 156-1   Filed 01/21/21   Page 16 of 295 PageID
Case 2:19-cv-00352-TAD-KK   Document 48   Filed 05/19/20   Page 12 of 23 PageID #: 9324
#: 3309

e. **"Terms** . . . . This order and the agreement are the entire agreement between the parties, and they supersede and replace all prior and contemporaneous negotiations, agreements, representations and discussions regarding this subject matter. Only a signed writing of the parties may amend this order."

34. Notably, the form contract provides no basis by which Waitr can unilaterally change any terms to the agreement or the exhibits incorporated therein. In fact, the contract affirms that the only mechanism through which the agreement may be changed is through a written agreement signed by authorized representatives of both parties.

**B.      Waitr's Unlawful, Unilateral Price Increases.**

35. Despite the express prohibition on unilaterally changing the terms of the MSA, Waitr intentionally carried out systematic and widespread Service Transaction Fee increases without contractual authorization or agreement signed by Plaintiffs and Service Transaction Fee Increase Class members.

36. Waitr induced Plaintiffs and Service Transaction Fee Increase Class members into entering into form contracts with fixed Service Transaction Fees. By its terms, the MSA cannot be changed except by agreement written and signed by both parties. Subsequently, Waitr brazenly and openly violated the clear terms of these agreements by unilaterally increasing the Service Transaction Fee. For example, for Plaintiffs Casa Manana, Que Pasa, and Casa Tu, the Service Transaction Fee was increased form 3.5% to 7%, and from 7% to 10% or 15%. For Plaintiff Bobby's, the Service Transaction Fee was increased from 10% to 15% in 2018. Though the precise percentage of increase of these increases may vary slightly, the Service Transaction Fee increases Waitr imposed were identical in timing, methodology, and intent across its base of customers. This is evidenced by the fact that Waitr told its customers that in 2018 it was "adopting a flat 15% rate for all transactions."

37. Upon information and belief, these Service Transaction Fee increases were directed

Case 2:19-cv-01260-TAD-KK   Document 156-1   Filed 01/21/21   Page 17 of 295 PageID
Case 2:19-cv-00352-TAD-KK   Document 48   Filed 05/19/20   Page 13 of 23 PageID #: 9325
#: 3310

by Waitr's corporate officers as part of a broad strategy to increase revenue and profit prior to the sale and public offering of the company. Waitr began business in 2013, and quickly saw significant growth. By 2018, it claimed to operate across the Southeast and Atlantic regions, with "partner restaurants" in over 30 cities and be experiencing large gains in terms of revenue and customer base. At that time, it began discussions to be bought by an investment group. In November, that group purchased Waitr for $308 million and immediately listed it on the NASDAQ stock exchange. During the negotiations for Waitr's purchase, and before it went public, Waitr implemented the unilateral fee increase in 2018. It then reported increased growth, year-over-year, for the quarter proceeding the public offering and increased its revenue outlook. Since then, Waitr has reported record growth and earnings and has a current valuation of over $750 million.

38.     These unilateral Service Transaction Fee increases imposed by Waitr were not allowable under the MSAs that Plaintiffs and each Service Transaction Fee Increase Class member entered into. There is no legal justification for Waitr's implementation of these increases. The form MSA, which Waitr drafted and presented as a contract of adhesion, does not allow for them. Waitr did not follow the only contractually allowed method for altering the agreement: writing signed by both parties.

39.     The contemplated service to be performed by Waitr were comprehensively understood by the parties and did not present a naturally dynamic situation. Waitr undertook to provide a service to its restaurant customers. Through all of the Service Transaction Fee increases, the service remained the exact same. There were no changes of the nature of the service to be performed that was not contemplated by the parties. Waitr presented supposedly-legitimate reasons for the increases: occasionally citing increased costs or a need to better serve the restaurants. These representations were untrue. The only difference was the Waitr asked to be paid

13

Case 2:19-cv-01360-TAD-KK    Document 56-1    Filed 01/21/21    Page 18 of 295 PageID
Case 2:19-cv-00352-TAD-KK    Document 48    Filed 05/19/20    Page 14 of 23 PageID #: 9326
#: 3311

more for providing the exact same service. Waitr acted arbitrarily in thinly-veiled attempts to reap more revenue from its restaurant customers. It drew Plaintiffs and class members in by offering flat, set Service Transaction Fees, all the while knowing that it would, in breach of the clear contractual language, increase the rates when it required more revenue. This type of baiting and switching represents a bad faith breach of contract. As a direct result of its contractual breach, Waitr has wrongfully taken millions of dollars from its "restaurant partners."

40.    Additionally, Plaintiffs and Service Fee Increase Class members did not waive their rights to demand adherence to the contractual terms. Waitr did not seek, and Plaintiffs and Service Fee Increase Class members give, a written waiver of Waitr's breach as required by the MSA.

**C.    Waitr's Unlawful Agreement Termination.**

41.    On July 1, 2019, Waitr notified all of its restaurant customers that it was terminating their active, automatically-renewing MSA effective August 1, 2019, regardless of when those MSA's began.  In order to continue being included on Wait's platform, all Agreement Termination Class members (including Plaintiffs Casa Manana, Que Pasa, and Casa Tu) were told they had to sign a new MSA before July 31, 2019, or Waitr would remove them from the platform and unilaterally cancel their existing contracts.  Waitr did not replay any of the upfront costs it requires for joining the Waitr platform, including for restaurant customers that had signed up recently.

42.    Waitr carried out an extensive campaign to force customers to sign the new agreements, much of which relied upon half-truths and omissions that represented the customer-wide cancellation as something other than the money grab it actually was. For example, Waitr told customers that the purpose of the agreement was to "better serve" them and help them "grow [their] businesses."

43.    The existing MSA provided either party the right to cancel with 30-day's notice.

Case 2:19-cv-01260-TAD-KK Document 56-1 Filed 01/21/21 Page 19 of 295 PageID
Case 2:19-cv-00352-TAD-KK Document 48 Filed 05/19/20 Page 15 of 23 PageID #:9527
#: 3312

However, any termination under this clause had to be performed in good faith. <u>Louisiana Civil</u> <u>Code art. 1770</u> provides: "A resolutory condition that depends solely on the will of the obligor must be fulfilled in good faith." To exercise their right to terminate in good faith, a party must consider not only his own advantage, but also the hardship to which the other party will be subjected because of the termination.

44. The method, purpose, and result of Waitr's sweeping unilateral termination, demonstrate that this termination was made in bad faith. For example, the new MSA changes the way Waitr is compensated by restaurant customers. As opposed to the fixed Service Transaction Fee in the current MSA, the new MSA provides for Waitr to be paid a "commission." The amount of this "commission" is based on the "calendar month net food sales form the Waitr platform." Apparently, Waitr will now calculate the total dollar amount ordered from the restaurant customer's restaurant through its platform in each month. It will apply that net amount to a chart that is Exhibit A of the new MSA. The percentage of the commission depends upon what range of amounts a restaurant customers' net food sales falls between on that chart. Then, for each app user's food order in the next month, Waitr will receive the percentage yielded by reference to the chart. This commission mechanism differs from the Service Transaction Fee in two key ways. First, it is variable for every restaurant month-to-month. This means that there is no way for a restaurant to know the "commission" it will be paying Waitr month-to-month. Second, for all restaurant customers who do not have net food sales through Waitr of over $20,000 per month, the amount they are paying Waitr through this commission alone is increased significantly. Depending on the range of net food sales these restaurant customers fall into, the increase is between 4% and 10%.

45. Second, in addition to this commission compensation arrangement, Waitr also now

Case 2:19-cv-00352-TAD-KK   Document 48   Filed 05/19/20   Page 16 of 23 PageID #: 3313

charges "credit card processing and a per transaction fee." These fees did not appear in the old MSA and the amount of these fees appears nowhere on the new MSA. Third, Waitr gave itself the ability to change any terms of the new MSA unilaterally, subject to the restaurant customer's right to terminate. This is a change from the old MSA that required a writing signed by both parties to change the agreement. Fourth, Waitr included an arbitration and class waiver in the new MSA. This changes the remedies available to restaurant customers.

46.     Thus, Waitr will be taking a larger fee from essentially all restaurant customers in the form of the "commission" arrangement; every restaurant will be paying more total to Waitr due to the new credit card processing and per transaction fees; restaurant customers (even the best performing) have no certainty over the rate they will be paying Waitr for the same exact service it had under the old MSA because of the month-to-month calculation; restaurant customers further have no certainty over the rate they will be paying Waitr for the same exact service because Waitr can unilaterally change the terms of the agreement; and, restaurant customers purportedly give up remedies to challenge Waitr for future unlawful conduct..

47.     It is clear that Waitr's purported reason for terminating the old MSA, "to better serve" restaurant customers, was not true. Waitr is an expanding company. The termination of the old MSA in favor of the new payment terms was simply the most recent attempt by Waitr to extract more revenue from its restaurant customers and, through the other terms of the new MSA, to make it easier to do so in the future and to chill litigation.

48.     These changes, and the extortive, misleading, and sweeping manner in which Waitr implemented them establishes that the termination was in bad faith and complete disregard of the damage it represented to Plaintiffs Casa Manana, Que Pasa, and Casa Tu, and the Agreement Termination class members. Waitr's motives in disregarding the old MSA and seeking enhanced

profit for providing the same exact service, to the detriment of Plaintiffs Casa Manana, Que Pasa, Casa Tu and the Agreement termination Class members were dishonest, and of questionable morals. Because of the bad faith termination of the old MSA, Plaintiffs Casa Manana, Que Pasa, Casa Tu, and Agreement Termination Class members were unable to realize the benefit of their bargain, surrendered the value of Network Fees paid, and, to the extent they accepted the new MSA under such circumstances, were subjected to increased payments to Waitr in providing the same service.

## VI. CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
**(On Behalf of the Service Transaction Fee Increase Class)**

49. All allegations and paragraphs in this complaint are incorporated by reference.

50. Plaintiffs and each member of the Service Transaction Fee Increase Class entered into form, written agreements with Waitr known as a Master Services Agreements.

51. Plaintiffs and each member of the Service Transaction Fee Increase Class performed on their agreements.

52. As set out herein, through its practice of unilaterally increasing the Service Transaction Fee not allowed by the MSAs, Waitr breached the agreements with Plaintiffs and each Service Transaction Fee Increase Class member.

53. Plaintiffs and each member of the Service Transaction Fee Increase Class have been directly and proximately harmed by Waitr's breach of contract in that each paid more for Waitr's services (that remained unchanged) than agreed upon.

17

Case 2:19-cv-00352-TAD-KK   Document 48   Filed 05/19/20   Page 18 of 23 PageID #: 3315

# COUNT II
## VIOLATION OF THE DUTY OF GOOD FAITH AND FAIR DEALING
## IN THE BREACH OF A CONTRACT
### (On Behalf of the Service Transaction Fee Increase Class)

54. All allegations and paragraphs in this complaint are incorporated by reference.

55. To the extent necessary, this count is pled in the alternative.

56. Plaintiffs and each member of the Service Transaction Fee Increase Class entered into form, written agreements with Waitr known as Master Services Agreements.

57. Plaintiffs and each member of the Service Transaction Fee Increase Class performed on their agreements.

58. As set out herein, through its practice of unilaterally increasing the Service Transaction Fee not in accordance with any contractual provision, Waitr breached the agreements with Plaintiffs and each Service Transaction Fee Increase Class member.

59. Waitr's breach was not simply bad judgment, negligence, or an honest mistake as to the rights and duties of the contract. By intentionally raising the Service Transaction Fee unilaterally, in the face of repeated and clear contractual language that Waitr itself drafted, that provided it could not do so without a written and bilaterally signed agreement, Waitr's conduct evidences dishonesty, ill will, an outright and transparent refusal to fulfill its contractual obligation, intent, and questionable morals.

60. Waitr's motives were dishonest, in ill will, in outright and transparent refusal to fulfill its contractual obligation, and of questionable morals. Despite any thinly-veiled language in the notice letters sent to Plaintiffs and Service Transaction Fee Class members, the Service Transaction Fee increases were made simply to realize extra revenue for providing the exact same service outlined in the MSA. This is not a simply breach based on misunderstanding. Waitr clearly implemented these price increases intentionally, in violation of contractual language it knew

18

existed and that it had drafted, to boost its revenue purely at its restaurant customers' expense.

61.     Plaintiffs and each member of the Service Transaction Fee Increase Class have been directly and proximately harmed by Waitr's breach of the contract and intentional breach of the covenant of good faith and fair dealing in that each paid an unlawfully and unilaterally increased Service Transaction Fee, above what was agreed upon.

## COUNT III
## UNJUST ENRICHMENT
### (On Behalf of the Service Transaction Fee Increase Class)

62.     All allegations and paragraphs in this Complaint are incorporated by reference.

63.     To the extent necessary, this count is pled in the alternative.

64.     Waitr, by increasing the Service Transaction Fee, realized an enrichment. Plaintiffs and Service Transaction Fee Increase Class members, by virtue of the increase of the Service Transaction Fee, suffered an impoverishment.

65.     Because this enrichment and impoverishment resulted from the same conduct, they are connected.

66.     There was no legally recognized justification or cause for this conduct and the resulting enrichment and impoverishment.

67.     There is no other remedy at law available to Plaintiffs and the Service Transaction Fee Increase Class members.

## COUNT IV
## BREACH OF THE DUTY OF GOOD FAITH
### (On Behalf of the Agreement Termination Class)

68.     All allegations and paragraphs in this Complaint are incorporated by reference.

69.     To the extent necessary, this count is pled in the alternative.

70.     Plaintiffs Casa Manana, Que Pasa, Casa Tu, and each member of the Agreement

19

Case 2:19-cv-01260-TAD-KK   Document 156-1   Filed 01/21/21   Page 24 of 295 PageID
#: 3317
Case 2:19-cv-00352-TAD-KK   Document 48   Filed 05/19/20   Page 20 of 23 PageID #: 9352

Termination Class entered into form, written agreements with Waitr known as Master Services Agreements.

71.   These MSAs gave either party the right to terminate the Agreement with 30-days' notice.

72.   Louisiana law, as reflected in La. Civ. Code art. 1770, requires that the right to terminate an agreement must be exercised in good faith.

73.   As described above, Waitr's conduct in terminating the old MSA in favor of the new MSA was motivated by dishonesty, ill will, and questionable morals.  Waitr's conduct in seeking additional profit and favorable terms in a new agreement, forsaking the old automatically-renewing agreement was in bad faith and completely disregarding the damage it represented to Plaintiffs Casa Manana, Que Pasa, Casa Tu, and the Agreement Termination class members, was a termination in bad faith. Waitr's motives in disregarding the old MSA and seeking enhanced profit for providing the same exact service.

74.   Plaintiffs Casa Manana, Que Pasa, Casa Tu, and each member of the Agreement Termination Class have been directly and proximately harmed by Waitr's bad faith termination of the old MSA in that each was unable to realize the benefit of their bargain, surrendered the value of Network Fees paid, and, to the extent they accepted the new MSA under such circumstances, were subjected to increased payments to Waitr in providing the same service.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of the Agreement Termination Class)**

75.   All allegations and paragraphs in this Complaint are incorporated by reference.

76.   To the extent necessary, this count is pled in the alternative.

77.   Waitr, by terminating the MSA, realized an enrichment. Plaintiffs Casa Manana,

Case 2:19-cv-00352-TAD-KK   Document 48   Filed 05/19/20   Page 21 of 23 PageID #: 953

Que Pasa, Casa Tu, and Agreement Termination Class members, by virtue of the termination of their MSAs, suffered an impoverishment.

78.     Because this enrichment and impoverishment resulted from the same conduct, they are connected.

79.     There was no legally recognized justification or cause for this conduct and the resulting enrichment and impoverishment.

80.     There is no other remedy at law available to Plaintiffs Casa Manana, Que Pasa, Casa Tu, and the Agreement Termination Class members.

## VII.    PRAYER FOR RELIEF

81.     Plaintiffs, on behalf of themselves and each member of the putative Classes, demand all remedies and damages available to it, including the sum of all unlawful rate increases paid to Waitr, damages resulting from Waitr's unlawful termination of the old MSA, injunctive relief, restitution, and interest. Plaintiffs, on behalf of themselves and each member of the putative Classes, consistent with the form contract and applicable law, seek the attorneys' fees and costs incurred in bringing this action.

**Plaintiffs request a trial by jury.**

Dated: January 21, 2020                    Respectfully submitted,

                                           *s/ Nicholas W. Armstong*
                                           Nicholas W. Armstrong
                                           Garrett Owens
                                           **PRICE ARMSTRONG, LLC**
                                           2226 First Avenue South, Suite 105
                                           Birmingham, Alabama 35223
                                           Phone: 205.208.9588
                                           Fax: 205.208.9598
                                           nick@pricearmstrong.com
                                           garrett@pricearmstrong.com

Case 2:19-cv-00352-TAD-KK   Document 48   Filed 05/19/20   Page 22 of 23 PageID #:9354

Adras Paul LaBorde, III
Louisiana Bar Number 21580
**DUDLEY DEBOISER, PC**
1075 Government Street
Baton Rouge, Louisiana 70802
Phone: 225.478.4122
Fax: 225.478.4172
PLaborde@dudleydebosier.com

John Rainwater
**RAINWATER, HOLT & SEXTON, P.A.**
P.O. Box 17250
Little Rock, Arkansas  72222
Phone: 501.868.2500
Fax:    501.868.2508
john@rainfirm.com

22

Case 2:19-cv-00352-TAD-KK   Document 48   Filed 05/19/20   Page 23 of 23 PageID #: 3320

**CERTIFICATE OF SERVICE**

I certify that on January 21, 2020, I filed the foregoing using the Court's CM/ECF system

which will send notice of such filing to all counsel of record.

*/s/ Nicholas W. Armstrong*

*/s/ Adras Paul LaBorde, III*

*/s/ John Rainwater*

23

# EXHIBIT 2

10-K 1 wtrh-10k_20191231.htm 10-K

TABLE OF CONTENTS

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2019

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**FOR THE TRANSITION PERIOD FROM            TO**

Commission File Number 001-37788

# WAITR HOLDINGS INC.

(Exact name of Registrant as specified in its Charter)

| **Delaware** | **26-3828008** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **214 Jefferson Street, Suite 200** | |
| **Lafayette, Louisiana** | **70501** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **1-337-534-6881**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, Par Value $0.0001 Per Share | WTRH | The Nasdaq Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☐ NO ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐ NO ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒ NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐ NO ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant, based on the closing price of the shares of common stock on The Nasdaq Stock Market on June 28, 2019, was $482,344,731.

The number of shares of Registrant's Common Stock outstanding as of March 6, 2020 was 76,598,143.

DOCUMENTS INCORPORATED BY REFERENCE

Certain information required to be disclosed in Part III of this report is incorporated by reference from the registrant's definitive proxy statement or an amendment to this report, which will be filed with the SEC not later than 120 days after the end of the fiscal year covered by this report.

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| **PART I** |  |  |  |
| Item 1. | Business |  | 1 |
| Item 1A. | Risk Factors |  | 6 |
| Item 1B. | Unresolved Staff Comments |  | 28 |
| Item 2. | Properties |  | 28 |
| Item 3. | Legal Proceedings |  | 28 |
| Item 4. | Mine Safety Disclosures |  | 28 |
|  |  |  |  |
| **PART II** |  |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities |  | 29 |
| Item 6. | Selected Financial Data |  | 30 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations |  | 31 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk |  | 41 |
| Item 8. | Financial Statements and Supplementary Data |  | 42 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure |  | 42 |
| Item 9A. | Controls and Procedures |  | 42 |
| Item 9B. | Other Information |  | 43 |
|  |  |  |  |
| **PART III** |  |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance |  | 44 |
| Item 11. | Executive Compensation |  | 44 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters |  | 44 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence |  | 44 |
| Item 14. | Principal Accounting Fees and Services |  | 44 |
|  |  |  |  |
| **PART IV** |  |  |  |
| Item 15. | Exhibits, Financial Statement Schedules |  | 45 |
| Item 16. | Form 10-K Summary |  | 49 |
|  |  |  |  |
|  | Signatures |  | 50 |
|  | Index to Financial Statements |  | 51 |

1/13/2021    Case 2:19-cv-01260-TAD-KK    Document 56-1    Filed 01/21/21    Page 32 of 295 PageID
wtrh-10k_20191231.htm
#: 3325

TABLE OF CONTENTS

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K (this "Form 10-K") contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements, other than statements of historical or current facts, that reflect future plans, estimates, beliefs or expected performance are forward-looking statements. In some cases, you can identify forward-looking statements because they are preceded by, followed by or include words such as "may," "can," "should," "will," "estimate," "plan," "project," "forecast," "intend," "expect," "anticipate," "believe," "seek," "target" or similar expressions. These forward-looking statements are based on information available as of the date of this Form 10-K and our management's current expectations, forecasts and assumptions, and involve a number of judgments, risks and uncertainties that may be outside of our control. Accordingly, forward-looking statements should not be relied upon as representing our views as of any subsequent date. We do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws. Our actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those set forth under the section entitled "Risk Factors" below.

## PART I

*The following should be read in conjunction with the audited consolidated financial statements and the notes thereto included elsewhere in this Form 10-K. Throughout this document, we make statements that are classified as "forward-looking." Please refer to the "Forward-Looking Statements" section above for an explanation of these types of statements.*

## Item 1. Business

### Overview

Waitr Holdings Inc. (together with its wholly-owned subsidiaries, the "Company," "Waitr," "we," "our" or "us") operates an online food ordering and delivery platform, connecting local restaurants with hungry diners in cities across the United States. On January 17, 2019, Waitr acquired BiteSquad.com, LLC ("Bite Squad"), an online food ordering and delivery platform with operations similar to those of Waitr. The Company connects diners and restaurants via Waitr's website and mobile application (the "Waitr Platform") and Bite Squad's website and mobile application (the "Bite Squad Platform" and together with the Waitr Platform, the "Platforms"). The Platforms are a convenient way to discover, order and receive great food from local restaurants and national chains. Our strategy is to bring delivery and carryout infrastructure to underserved populations of restaurants and diners and establish market leadership positions in the markets in which we operate. At December 31, 2019, we operated in small and medium sized markets across the United States, spanning more than 640 cities.

Our business has been built with a restaurant-first philosophy by providing differentiated and brand additive services to the restaurants on the Platforms. Restaurants benefit from the online Platforms through increased exposure to consumers for expanded business in the delivery market and carryout sales. For diners, Waitr optimizes the journey from restaurant and food discovery through delivery, while providing a diverse restaurant selection and a great customer experience. The intuitive, easy-to-use Platforms allow consumers to browse local restaurants and menus, track order and delivery status, and securely store previous orders for ease of use and convenience.

We generate revenue primarily when diners place an order on one of the Platforms. Our revenue consists primarily of transaction fees, comprised of fees received from restaurants (determined as a percentage of the total food sales, net of any diner promotions or refunds to diners) and diner fees charged when they request the order be delivered to their location. Revenue from diner orders is recognized when orders are delivered.

### Key Business Metrics

For a description of our key business metrics, including Active Diners, Average Daily Orders and Gross Food Sales, see Part II, Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations* of this Form 10-K.

### The Waitr Solution

We have created differentiated software platforms, purpose-built to serve restaurants, diners and drivers. Our business has been built with a focus on quality through providing brand-additive services to restaurants, which in turn benefits diners by providing a diverse restaurant selection and a great customer experience.

### Restaurant Benefits

We believe that we provide restaurants with the following key benefits:

- *Exposure.* Our Platforms provide restaurants with access to incremental users and the opportunity to grow their consumer base.

- *Incremental channels.* Our Platforms provide restaurants with additional channels through which they can receive more orders, while building brand awareness, as they are discovered by more diners.

- *Deep integration and customization.* We provide menu onboarding and real-time menu customization that restaurants can manage themselves.

- *Restaurant Software Platforms.* The Platforms provide restaurants with actionable data on diners' order history and trends, allowing restaurants to offer more tailored dishes and suggest more add-on items, which increases order values.

- *Competitive Rates.* We provide restaurants with competitive pricing plans.

- *Reliable Delivery.* We provide restaurants with accurate and timely deliveries by connecting them with a dedicated network of drivers.

### Diner Benefits

We believe that we provide diners with the following key benefits:

- *Selection.* The restaurants on our Platforms represent a wide breadth of cuisines, price points and local favorites in each market to best serve the diverse tastes of diners.

- *Quick, Quality Service.* We strive to deliver the right order, quickly and professionally, and have customer support to assist diners, helping to ensure diner success when ordering on the Platforms.

- *Discovery.* The Platforms are designed to showcase menus with professional photography, giving diners a rich understanding of restaurants' offerings; resulting in diners discovering restaurants they would like to visit in person, not just to order on the Platforms, further expanding the potential pool of dine-in customers for restaurants.

- *Personalized Experience.* We allow diners to tailor their orders to various layers of customization through easy-to-use Platforms. Diners can add frequent restaurants as favorites and keep track of past orders.

- *Convenience.* We provide diners with intuitive Platforms that make ordering and delivery simple from any connected device. Diners can track their order and know exactly when to expect their food.

### Business Strategy

We have historically grown our business by increasing the number of quality restaurants available on the Platforms, which has facilitated growth in diners and orders. Leveraging best practices from the launch of prior markets, we continuously refine our processes in onboarding new restaurants, deploying adequate resources to markets, sales and ongoing business development. We intend to pursue the following growth strategies to grow the Platforms:

*Increase sales through further penetration of existing markets*

We plan to continue marketing and actively building our brands in existing markets by improving our restaurant offerings, technology platform depth and customer service.

*Expansion into new markets, development of new products and services and investment in new technology*

While we intend to concentrate our near-term efforts on existing market penetration and adjacent market expansion, our long-term business strategy may include expansion into new cities and geographies, development of new product offerings and services across our marketplace and investment in new technology, all of which will continue to enhance the experience of users of the Platforms.

*Deliver an excellent diner experience*

We believe that by tailoring experiences on our Platforms to the nuances of local or regional markets, we can further improve the user experience and drive growth for our restaurant partners. We plan to invest in our direct sales teams and to add more restaurants and restaurant variety to the Platforms. A significant opportunity exists to expand existing diner spend, add new diners, and further establish and deepen leadership positions within our current markets.

2

*Leverage relationships with our restaurant partners*

We intend to utilize our existing relationships with diverse and high-quality restaurants to grow within our current markets as well as aid in our expansion into new markets.

## Challenges

We face several key challenges in continuing to grow our business and maintain profitability, including the following:

- Long-term growth depends on our ability to expand our marketplace of restaurants and diners in a cost-effective manner;

- The ability to realize the benefits of acquired businesses depends on the successful integration of the operations of the acquired businesses with those of the Company; and

- The continuing trend toward consolidation in the online and mobile app ordering and delivery industry may result in larger companies with greater financial resources and other competitive advantages than Waitr's and could impact our growth rates and profitability.

## Marketing

The Platforms are an important extension of restaurant branding. Most of our marketing efforts to date have been through co-branding with restaurants and generating word-of-mouth adoption. Restaurants promote Waitr and Bite Squad as a feature for their diners through in-restaurant advertising such as door stickers, table tents and push cards in their carryout orders. Our remaining sales and marketing initiatives are paid marketing, which includes: digital media, influencer sponsorships, traditional advertising, and public relations.

## Sales

Our sales team is focused on signing restaurants across our current and target markets. By focusing our sales efforts on recruiting restaurants and showing them the value of the Platforms, restaurants promote themselves on the Platforms to their diners. This increase in diners helps to drive more sales and ultimately more restaurants to the Platforms. After launch, we typically continue the sales efforts with business development representatives, while also conducting sales initiatives at the regional and corporate level with key partners and larger national accounts. After opening new markets, our representatives continue to work with the restaurants to increase overall order volume and ensure a high level of quality control across the Platforms.

## Products and Services

### *Restaurant Products and Services*

We provide restaurants with a high level of service, high-growth, enhanced marketing Platforms and customer support, all at attractive and aligned pricing.

*Pricing Plans*. We offer competitive pricing plans for restaurants on the Platforms, with the option to pay a fee to affect the restaurant's prominence and exposure to diners on the Platforms.

*Restaurant Onboarding*. We offer restaurants a streamlined onboarding process that features direct menu management and high levels of customer service from our market level representatives.

*Product Features*. We provide restaurants with the ability to offer promotions and daily specials, optimize orders through real time analytics and manage restaurant menus. The Platforms include a dedicated mobile application for restaurants which simplifies and aggregates restaurant order and delivery tasks onto a central in-app controller and provides flexibility to edit menus based on inventory or promotions, all through user-friendly hardware that receives orders on-site and integrates them seamlessly into existing kitchen flow.

*Customer Support*. We also provide restaurants with a team of customer support representatives to ensure quality diner and restaurant service to both parties.

*Delivery*.  We provide ordering and delivery Platforms for restaurants through a network of drivers to address the growing demand for delivery services.

3

___

### *Diner Products and Services*

For diners, the Platforms serve as a personalized service that provides discovery, convenience and transparency. Our Platforms feature food ordering and delivery, group ordering capabilities and the ability to create favorites for recurring orders.

*Features.*  The Platforms simplify the online restaurant delivery process to a few steps that include setting location, specifying delivery or takeout, selecting and customizing menu items and tracking orders until delivery or pickup. Diners have search capabilities to locate a certain restaurant or search by cuisine type and can easily view their favorite restaurants and past orders.

*Restaurant Selection and Customization.*  The restaurants on the Platforms offer diners a wide breadth of cuisines and price points in each market. We create a personalized experience for diners, where they can tailor their orders to several layers of customization: getting what they want, when they want it.

### *Driver Products and Services*

Historically, the majority of our drivers have been employees. As part of our recent initiatives to streamline operations, we are currently in the process of shifting our driver base to independent contractors in all markets in which we operate.

### Customers

As of December 31, 2019, we had approximately 18,000 restaurants on the Platforms and served approximately 2.4 million Active Diners. For the years ended December 31, 2019, 2018 and 2017, none of the restaurants on the Platforms or Active Diners accounted for 1% or more of the Company's revenues.

### Competition

Our primary competition has historically been traditional offline options used by the vast majority of restaurants in our markets, including paper menus, telephone orders for delivery or takeout, and local advertising placed by restaurants. Management believes that the Company competes favorably with the traditional ordering process by aggregating restaurant and menu information on the Platforms, making it more convenient for diners to locate restaurants by proximity, cuisine type and/or price point, and efficiently placing a customized order or a repeat order for delivery or takeout, without ever having to interact directly with the restaurant. For restaurants, we offer a more targeted marketing opportunity than traditional, offline, local advertising channels, providing exposure to our network of hungry diners, who typically access our Platforms when they are looking to place a takeout order.

Our competition also consists of other online food ordering and delivery service providers, who compete with us for restaurants, diners and drivers within the markets we serve. Over the last year, we have experienced increased competition from other national delivery service providers. Additionally, some of our competitors have recently started investing more heavily in non-partnered restaurants, which historically has not been our focus.

### Seasonality and Holidays

We observe that diner behavior patterns and demand for the services we provide generally fluctuate during the year on both of our Platforms. Order frequency tends to increase from September to March and we generally experience a relative decrease in diner activity from April to August primarily as a result of weather patterns, summer breaks and other vacation periods. In addition, orders in cities or towns with college campuses tend to fluctuate with the start and end of the school year. Our revenues fluctuate according to these patterns and the timing of certain holidays within each quarter, which may result in quarterly fluctuations.

Diner activity may also be impacted by unusually cold, rainy, or warm weather. Cold and rain typically drive increases in order volume, while unusually warm or sunny weather typically drives decreases in orders. Consequently, our results between quarters, or between periods that include prolonged periods of unusually cold, warm, inclement, or otherwise unexpected weather, may vary.

### Technology & Intellectual Property

Our Platforms use scalable software to provide a consistent and robust user experience as user adoption increases. The internally developed Platforms are purpose-built to streamline online ordering and delivery for consumers and restaurants. The Platforms are 100% hosted in the cloud. Cloud hosting assists us with addressing potential capacity constraints that we may face as we grow our core applications and provide a level of redundancy, fault tolerance and cost-effectiveness.

We protect our intellectual property through a combination of trademarks, trade dress, domain name registrations, trade secrets, patents, and copyrights.

4

As of December 31, 2019, we had registered trademarks covering "Waitr" and "Bite Squad" and the stylistic designs associated with our brands. We have also filed other trademark applications in the United States and may pursue additional trademark registrations to the extent management believes it will benefit the business and be cost-effective.

As of December 31, 2019, we filed two patent applications in the United States, which seek to cover proprietary inventions relating to our products and services. We may pursue further patents to the extent that management believes it will benefit Waitr's business and be cost-effective.

We hold several registrations to domain names relating to our business, including waitrapp.com, bitesquad.com, and others.

Our non-driver employees and contractors are required to sign agreements pursuant to which they agree to keep proprietary and non-public information confidential and to assign any and all inventions or other intellectual property relating to the business to Waitr. The policies and applicable terms of use of the Platforms also contain confidentiality and assignment of intellectual property provisions and restrict the distribution or use of the Company's technology in unauthorized manners.

**Employees**

As of March 6, 2020, we had approximately 10,585 employees, including 10,100 delivery drivers. None of these employees are represented by a labor union with respect to their employment with the Company. We expect to complete the process of moving to an independent contractor driver network by the end of April 2020, after which, we will have no remaining employee drivers.

**Corporate History**

Originally formed on December 5, 2013 as a Louisiana corporation, Waitr Incorporated began operations in 2014 as a restaurant platform for online food ordering and delivery services, and grew quickly, connecting restaurants, diners and delivery drivers in various markets. Landcadia Holdings, Inc. was a special purpose acquisition company whose business was to effect a merger, capital stock exchange, asset acquisition, stock purchase reorganization or similar business combination. It was incorporated in Delaware on November 19, 2008 as Leucadia Development Corporation and changed its name to Landcadia Holdings, Inc. on September 15, 2015.

On November 15, 2018 (the "Closing Date"), Waitr Holdings Inc. (formerly known as Landcadia Holdings, Inc.), a Delaware corporation, completed the acquisition of Waitr Incorporated, pursuant to the Agreement and Plan of Merger, dated as of May 16, 2018 (the " Landcadia Merger Agreement"), by and among the Company, Waitr Inc. (f/k/a Landcadia Merger Sub, Inc.), a Delaware corporation and wholly-owned indirect subsidiary of the Company ("Merger Sub"), and Waitr Incorporated. The transactions contemplated by the Landcadia Merger Agreement are referred to herein as the "Landcadia Business Combination." Upon the consummation of the Landcadia Business Combination, Waitr Incorporated merged with and into Merger Sub, with Merger Sub surviving the merger in accordance with the Delaware General Corporation Law ("DGCL") as a wholly-owned, indirect subsidiary of the Company. In connection with the closing of the Landcadia Business Combination, the Company changed its name from Landcadia Holdings, Inc. to Waitr Holdings Inc.

Prior to the consummation of the Landcadia Business Combination, the common equity of the Company was traded on the Nasdaq Stock Market (the "Nasdaq") under the symbol "LCA". Effective November 16, 2018, the Company's common equity began trading on Nasdaq under the ticker symbol "WTRH". One of the primary purposes of the Landcadia Business Combination was to provide a platform for Waitr Incorporated to gain access to the U.S. public markets.

On January 17, 2019, Waitr completed the acquisition of Bite Squad, a Minnesota limited liability company, pursuant to the Agreement and Plan of Merger, dated as of December 11, 2018 (the "Bite Squad Merger Agreement"), by and among the Company, Bite Squad and Wingtip Merger Sub, Inc., a Delaware corporation and wholly-owned subsidiary of the Company. The transactions contemplated by the Bite Squad Merger Agreement are referred to herein as the "Bite Squad Merger." Upon consummation of the Bite Squad Merger, Wingtip Merger Sub, Inc. merged with and into Bite Squad, with Bite Squad surviving the merger in accordance with the Minnesota Revised Uniform Limited Liability Act as a wholly-owned, indirect subsidiary of the Company. Founded in 2012 and based in Minneapolis, Bite Squad operated an online food ordering and delivery platform with operations similar to those of Waitr.

**Basis of Presentation**

The Landcadia Business Combination was accounted for as a reverse recapitalization, with no goodwill or other intangible assets recorded, in accordance with generally accepted accounting principles in the United States of America ("GAAP"). Under this method of accounting, Landcadia Holdings, Inc. has been treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the Landcadia Business Combination was treated as the equivalent of Waitr Incorporated issuing

stock for the net assets of Landcadia Holdings, Inc., accompanied by a recapitalization. The net assets of Landcadia Holdings, Inc. were stated at historical cost, with no goodwill or other intangible assets recorded. Reported amounts from operations included herein prior to the Landcadia Business Combination are those of Waitr Incorporated. The shares and earnings per share available to holders of the

5

Company's common stock, prior to the Landcadia Business Combination, have been retroactively restated to reflect the exchange ratio established in the Landcadia Business Combination.

The Bite Squad Merger was considered a business combination, in accordance with GAAP, and has been accounted for using the acquisition method. Under the acquisition method of accounting, total merger consideration, acquired assets and assumed liabilities are recorded based on their estimated fair values on the acquisition date. The excess of the fair value of merger consideration over the fair value of the assets less liabilities acquired has been recorded as goodwill. The results of operations of Bite Squad are included in our consolidated financial statements since the acquisition date, January 17, 2019.

**Available Information**

The Company is subject to the informational requirements of the Exchange Act and files or furnishes reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). The Company's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Exchange Act, are filed with the SEC and are available free of charge on the Company's website at investors.waitrapp.com/financial-information/sec-filings at the same time as when the reports are available on the SEC's website. The SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC at http://www.sec.gov. The Company also maintains websites at www.waitrapp.com and www.bitesquad.com. The contents of the websites referenced herein are not incorporated into this filing. Further, the Company's references to the URLs for these websites are intended to be inactive textual references only.

**Item 1A.  Risk Factors**

*An investment in our securities involves a high degree of risk. You should carefully consider the risks described below before making an investment decision. Our business, prospects, financial condition and operating results could be harmed by any of these risks, as well as other risks not currently known to us or that we currently consider immaterial. The trading price of our securities could decline due to any of these risks, and, as a result, you may lose all or part of your investment. As used in the risks described in this subsection, references to "we," "us" and "our" are intended to refer to the Company unless the context clearly indicates otherwise.*

**Risks Related To Our Business**

***Our industry is affected by general economic and business risks that are largely beyond our control.***

Our industry is highly cyclical, and our business is dependent on a number of factors, many of which are beyond our control. We believe that some of the most significant of these factors are economic changes that affect supply and demand in dining out in general, such as:

- changes in diners' dining habits and in the availability of disposable income for ordering food from restaurants;

- excess restaurant capacity in comparison with food order demand;

- downturns in restaurants' business cycles; and

- recessionary economic cycles, downturns or other events (like the coronavirus or similar widespread health/pandemic outbreaks).

The risks associated with these factors are heightened when the U.S. and/or global economy is weakened. Some of the principal risks during such times are as follows:

- We may experience low overall food and beverage order levels, which may impair our driver utilization, because our diners' demand for our services generally correlate with the strength of the U.S. and, to a lesser extent, global economy;

- Certain of the restaurants on our Platforms may face credit issues and cash flow problems, particularly if they encounter increased financing costs or decreased access to capital, which may decrease diner demand for restaurant prepared food, and such issues and problems may affect the number of orders that occur through the Platforms;

- Food ordering and dining out patterns may change as food supply chains are redesigned and customer tastes change, resulting in an imbalance between restaurants' available menu items and the demands of Active Diners;

- Diners may select competitors that offer lower delivery charges, commission rates or other charges from among existing choices in an attempt to lower their costs, and we might be forced to lower our rates or lose restaurants offering food or diners ordering food through the Platforms; and

- Disruptive health events or pandemics, such as the recent coronavirus outbreak, may have significant, negative economic effects on the geographic areas in which we operate, which may include impacts to food ordering, takeout or delivery habits, availability of delivery drivers, and restaurants' ability to receive and prepare food. Additionally, many of our markets include colleges or universities whose populations fluctuate between semesters. Temporary closures or suspension of semesters by colleges and universities in response to pandemics or other health events may have a material adverse effect upon our operations and financial results.

We are also subject to cost increases outside of our control that could materially reduce our profitability if we are unable to increase our rates sufficiently. Such cost increases include, but are not limited to, increases in fuel prices, compensation to drivers, interest rates, taxes, tolls, license and registration fees, insurance, payment processing fees, and the costs of healthcare for our employees.

The business levels of restaurants on the Platforms also may be negatively affected by adverse economic conditions or financial constraints, which could lead to disruptions in the availability of popular order items, reducing use of the Platforms. A significant interruption in our normal order levels could disrupt our operations, increase our costs and negatively impact our ability to serve our diners.

In addition, events outside our control, such as strikes or other work stoppages at our facilities, among our drivers or at our restaurant diners' locations, or actual or threatened armed conflicts or terrorist attacks, efforts to combat terrorism, military action against a foreign state or group located in a foreign state, or heightened security requirements could lead to reduced economic demand, reduced availability of credit or ordering capabilities of the Platforms. Such events or enhanced security measures in connection with such events could impair our operations and result in higher operating costs.

***We have limited operational history; we are subject to developmental risks associated with the development of any new business.***

We lack significant operational history by which future performance may be judged or compared. Any future success that we may enjoy will depend upon many factors, several of which may be beyond our control, or which cannot be predicted at this time, and which could have a material adverse effect upon our financial condition, business prospects and operations and the value of an investment in the Company. As a result, our past quarterly financial results do not necessarily indicate future performance. Investors should take into account the risks and uncertainties frequently encountered by companies in rapidly evolving markets. Investors should not rely upon our past quarterly financial results as indicators of future performance. The numerous factors, which we are unable to predict or are outside of our control, include the following:

- We may not be able to accurately forecast revenues and plan operating expenses;

- We may be unable to fund our working capital requirements or maintain compliance with our debt covenants, particularly if our forecast regarding the sufficiency of our liquidity is inaccurate or our expenses exceed our expectations;

- We may be unable to scale our technological and operational infrastructure to accommodate rapid growth in diners, orders or customer support needs;

- Our management team has had limited experience operating a public company and could be unable to help us successfully transition from a developmental stage business to a larger organization;

- Our growth may depend on acquisitions, our management team does not have significant experience managing acquisitions of other businesses, and we may lack the capital necessary to pursue them;

- Our still relatively recent transition to a public company could pose operational, financial and quality risks that we are unable to manage effectively;

- The development and introduction of new products or services by us or our competitors is uncertain;

- Competing with traditional ordering methods or delivery services provided directly by restaurants (or third parties) to consumers over the phone or through their own websites or other means could pose a risk to our growth and financial performance;

- Our ability to maintain and grow our number of Active Diners, Average Daily Orders, Gross Food Sales and order frequency is not guaranteed;

7

TABLE OF CONTENTS

- Our ability to attract and retain restaurants over long periods of time has not been tested in several markets;

- We may prove unable to attract and retain key employees and personnel to support growth;

- Seasonal and weather-related fluctuations in spending by consumers relating to food delivery can be unpredictable;

- The acceptable pricing of our onboarding and services fees to restaurants and diner fees to consumers and restaurants has not been tested widely;

- Our ability to increase onboarding, services, diner fees and other revenue does not enjoy long historical data trends and any increases in our costs may be met with adverse restaurant response that could materially negatively impact revenue as affected restaurants may withdraw from our Platforms;

- We have yet to demonstrate our ability to diversify and grow revenue sources beyond current onboarding, services and diner fees;

- Increases in marketing, sales, and other operating expenses that we may incur to grow and expand our operations and to remain competitive are unpredictable;

- Our ability to maintain gross margins and operating margins can be difficult to predict and impacted by numerous factors beyond our control (for example, due to transaction charge increases, technology cost increases, competitive pricing and other items);

- We may experience system failures or breaches of security and privacy that could pose a harm on their own and could affect consumers' confidence in our services;

- We may not be able to adequately manage key third-party service providers;

- We may experience changes in diner or restaurant behavior or preferences;

- Payment processing costs could increase, or we could fail to implement our own payment processing solution;

- Given the rapid pace of our evolution into a public company, our internal controls may not be able to keep pace with necessary requirements from a business, accounting or legal point of view; and

- We may experience casualties or safety hazards or issues with our drivers or third parties that come into contact with our drivers, all of which could be difficult to predict and which could impact our operating costs and diner or restaurant use of the Platforms.

***Our business depends on discretionary spending patterns in the areas in which the restaurants on our Platforms operate and in the economy at large. Economic downturns or other events (like coronavirus or similar widespread health/pandemic outbreaks) impacting the U.S. and global economy could materially adversely affect our results of operations.***

Purchases at restaurants and food and beverage hospitality services locations are discretionary for consumers and we are therefore susceptible to changes in discretionary patterns or economic slowdowns in the geographic areas in which restaurants on our Platforms operate and in the economy at large. We believe that consumers generally are more willing to make discretionary purchases, including delivery or takeout of restaurant meals, during favorable economic conditions. Disruptions in the overall economy (including disruptions due to coronavirus or similar health/pandemic events), including high unemployment, financial market volatility and unpredictability, and the related reduction in consumer confidence, could negatively affect food and beverage sales throughout the restaurant industry, including orders through the Platforms. In addition, we believe that a proportion of our weekday revenues, particularly during the lunch hour, are derived from business customers using expense accounts. Our business therefore may be affected by reduced expense account or other business-related dining by business clientele. There is also a risk that if uncertain economic conditions persist for an extended period of time or worsen, consumers might make long-lasting changes to their discretionary spending behavior, including ordering food for delivery or takeout less frequently. The ability of the U.S. economy to handle this uncertainty is likely to be affected by many national and international factors that are beyond our control. These factors, including national, regional and local politics and economic conditions, disposable consumer income and consumer confidence, also affect discretionary consumer spending. If any of these factors cause restaurants to cease operations or cease using the Platforms, it could also significantly harm our financial results, for the reasons set forth elsewhere in these risk factors. Continued uncertainty in or a worsening of the economy, generally or in a number of our markets, and diners' reactions to these trends could adversely affect our business and cause us to, among other things, reduce the number and frequency of new market openings or cease operations in existing markets.

8

***If we fail to retain existing diners or add new diners, or if our diners decrease their number of orders or order sizes on the Platforms, our revenue, financial results, and business may be adversely affected.***

The number of our Active Diners and total Gross Food Sales are critical to our success. Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging Active Diners who make orders for delivery or carryout using the Platforms. We anticipate that our Active Diner growth rate will decline over time as the size of our Active Diner base increases, and as we achieve higher market penetration rates. To the extent our Active Diner growth rate slows, our business performance will become increasingly dependent on our ability to increase the size and frequency of orders in current and new markets. If diners do not perceive the Platforms to be useful, reliable, and trustworthy, we may not be able to attract or retain diners or otherwise maintain or increase the frequency and amount of orders. A decrease in diner retention, growth, or order frequency (or overall order price) could render the Platforms less attractive to restaurants, which may have a material and adverse impact on our revenue, business, financial condition, and results of operations. Any number of factors could potentially negatively affect diner retention, growth, and engagement, thereby adversely affecting our revenue, financial results, and future growth potential, including if:

- diners increasingly order through competing products or services;

- we fail to introduce new and improved services or menu items or if we introduce new services that are not favorably received;

- we are unable to successfully maintain our efforts to provide a satisfactory delivery and ordering experience;

- we are unable to continue to develop products for mobile devices that users find engaging, that work with a variety of mobile operating systems and networks, and that achieve a high level of market acceptance;

- there are changes in diner sentiment about the quality or usefulness of the Platforms, delivery quality, food quality or other products or concerns related to privacy and sharing, safety, security, or other factors;

- we are unable to manage and prioritize information to ensure diners are presented with menu items that are interesting, useful, and relevant to them;

- there are adverse changes in the Platforms, delivery services or restaurant services or products that are mandated by legislation, regulatory authorities, or litigation, including settlements or consent decrees;

- technical or other problems prevent us from delivering food in a rapid and reliable manner or otherwise affect the user experience or enjoyment of food or beverages delivered;

- we adopt policies or procedures related to delivery, ordering or user data that are perceived negatively by our diners or the general public;

- we fail to provide adequate customer service to restaurants, diners, drivers, or advertisers;

- we, our drivers, restaurants on the Platforms, or other companies in the mobile food delivery or ordering industry are the subject of adverse media reports or other negative publicity;

- restaurants develop their own direct-to-consumer applications or online ordering and delivery services; or

- we are unable to maintain and increase our Active Diner base and order frequency or our Average Daily Orders and Gross Food Sales.

***We generate a substantial amount of our revenue from restaurants viewed positively by diners. The loss of restaurants to other platforms could seriously harm our business.***

Substantially all of our revenue is derived from items offered by restaurants to diners on the Platforms. The number of Active Diners, Average Daily Orders and Gross Food Sales depends on the availability of quality items available on the Platforms from restaurants viewed positively by diners. As is typical in our industry, restaurants do not agree to long-term contracts with us, and they are generally free to leave the Platforms with minimal notice or to participate on competing platforms. While no single restaurant accounts for more than 10% of our revenue, many of the restaurants on our Platforms only recently started providing menu items on the Platforms, and they spend a relatively small portion of their overall budget with us. In addition, some restaurants may view the Platforms as experimental and unproven. Restaurants will not continue to do business with us if we do not increase revenues for them or provide delivery or takeout ordering for diners in an effective manner, or if they do not believe that their investment in onboarding for the Platforms will generate a competitive return relative to other alternatives, including from our competitors.

Moreover, we rely heavily on our ability to collect and disclose data and metrics to and for restaurants to attract new restaurants and retain existing restaurants. For example, we present historical data about sales to demonstrate our value to attract new restaurants

to the Platforms. Any restriction, whether by law, regulation, policy, or other reason, on our ability to collect and disclose data that restaurants find useful would impede our ability to attract and retain restaurants.

Growth in the number of restaurants on the Platforms may not continue at historical rates, and the addition of new restaurants to the Platforms and retention of existing restaurants on the Platforms could decline due to a number of factors. First, the cost of adding new restaurants or retaining existing restaurants on the Platforms could increase substantially. Competition to advertise our services to restaurants has been increasing and will likely continue to increase as a result of increasing competition among similar companies for a finite pool of restaurants. In addition, the number of options available to restaurants may result in downward pressure on the prices that restaurants are willing to pay for our services. As more choices become available for diners to order delivery or takeout from restaurants, the number and frequency of our word-of-mouth and/or organic referrals may decline. Our efforts to attract and retain new restaurants in new geographical areas may not be successful.

If we fail to attract new restaurants or retain existing restaurants, especially those restaurants that are most popular with diners, our financial results could materially suffer.

***If our delivery service levels decline or if restaurants do not see increases in business, restaurants could leave the Platforms, reducing revenue and significantly harming our business.***

Restaurants will not continue to do business with us or will be unwilling to pay onboarding or other service fees if we do not deliver food and beverages in a timely, professional and friendly manner or if the restaurants do not believe that their investment in the Waitr Platform or the Bite Squad Platform, as applicable, will produce an increase in revenue from delivery or takeout orders. Our service fees and commission revenue and the availability of restaurants on the Platforms could be negatively impacted by the following factors, among others:

- decreases in the number of Active Diners or Average Daily Orders on the Platforms;

- loss of online or mobile food delivery market share to competitors;

- inability to professionally and accurately display menu items to consumers on the Platforms;

- adverse media reports or other negative publicity involving the Company, our drivers, restaurants on our Platforms or other companies in our industry; and

- the impact of macroeconomic conditions and conditions in the restaurant industry in general.

***We are subject to a variety of risks relating to our relationships with our drivers, including those related to our shift from primarily employee to independent contractor drivers, shortages of available drivers, adverse conditions impacting drivers, and possible increases in driver compensation.***

We are in the process of shifting the composition of our driver base from primarily employee drivers to independent contractor drivers. While we are implementing this change in a way intended to ensure that our drivers are indeed independent contractors under applicable law and regulation, certain state and local governmental authorities have recently initiated efforts to classify independent contractors performing jobs like our drivers as employees. Should regulators in jurisdictions where we operate apply similar efforts, it could result in increased costs and burdens relating to treating drivers as employees and/or disputing such regulatory framework. As of now, we are not aware of any governmental authority pursuing this type of action in any of our markets; however, this could change in the near future.

The change in composition of our driver base could also result in a degradation of service provided by our delivery drivers, an increase in the turnover rates of delivery drivers and potential lawsuits. If we are unable to retain current employee drivers as independent contractor drivers or unable to attract and retain a sufficient number of independent contractor drivers, we could face difficulty meeting consumer order demands or be forced to forego business that would otherwise be available to us, which could adversely affect our profitability and ability to maintain or grow our business.

Shortages of available drivers could require us to spend more to attract and retain drivers and could create shortages at peak order times. We could face a challenge with attracting and retaining qualified drivers primarily due to intense market competition, which may subject us to increased payments for driver compensation and independent contractor driver rates. Also, because of the intense competition for drivers, we may face difficulty maintaining or increasing our number of drivers and may face increased costs for securing the services of drivers, thereby negatively impacting our profitability.

Further, with respect to independent contractor drivers, shortages can result from the absence of long-term contracts along with other contractual terms or company policies that make contracting with us less desirable to certain independent contractor

10

drivers. In addition, the "on-call" or "on-demand" nature of the way that we ask independent contractor drivers to pick up shifts during busy times may result in difficulties procuring such independent contractor drivers when we need that labor most. Such a shortage could result in material harm to our business or reputation.

The financial condition and operating costs of our independent contractor drivers are affected by conditions and events that are beyond our control and may also be beyond their control. Adverse changes in the financial condition of our independent contractor drivers or increases in their car ownership or operating costs could cause them to seek higher revenues or to cease their business relationships with us. The prices that we charge our diners could be impacted by such issues, which may in turn limit pricing flexibility with diners, resulting in fewer delivery orders and decreasing our revenues.

Independent contractor drivers may utilize shirts and food carrier equipment bearing our trade names and trademarks; however, it is not required. If one of our independent contractor drivers is subject to negative publicity, it could negatively reflect on us and have a material and adverse effect on our business, brand and financial performance. Under certain laws, we could also be subject to allegations of liability for the activities of our independent contractor drivers.

As independent business owners, our independent contractor drivers may make business or personal decisions that conflict with our best interests. For example, if an order is unprofitable, route distance is further than desired or personal scheduling conflicts arise, an independent contractor driver may deny orders from time to time. In these circumstances, we must be able to timely deliver food orders to maintain relationships with diners and restaurants on the Platforms. The unwillingness of independent contractor drivers to perform their services when and where they are needed could adversely harm our financial performance and operating results.

***If we are not able to maintain and enhance our brands, or if events occur that damage our reputation and brands, our ability to expand our base of diners and restaurants may be impaired, and our business and financial results may be harmed. Unfavorable media coverage could seriously harm our business.***

Our brands have significantly contributed to the success of our business. We believe that maintaining and enhancing our brands is critical to expanding our base of diners and restaurants. Many of our new diners are referred by existing diners, and, therefore, we strive to ensure that our diners remain favorably inclined towards the Platforms and our online ordering service. Maintaining and enhancing our brands will depend largely on our ability to continue to provide useful, reliable, trustworthy, and innovative services, which we may not do successfully. We may introduce new services, products or terms of service that diners do not like, which may negatively affect our brands.

Additionally, the actions of restaurants that are on our Platforms (or quality and safety of their food), delivery drivers and others may negatively affect our brands if consumers do not have a positive experience interacting with those parties after using the Platforms. We may experience media, legislative, or regulatory scrutiny of our delivery and food safety record, our delivery experience, privacy matters or other issues, which may adversely affect our reputation and brands. We may also fail to provide adequate customer service, which could erode confidence in our brands. Maintaining and enhancing our brands may require us to make substantial investments and these investments may not be successful. We face the potential loss of use of our trade name "Waitr" due to certain litigation (see **Item 3. Legal Proceedings** below). If we fail to successfully promote and maintain our brands, if we lose the right to our trade name, or if we incur excessive expenses in this effort, our business and financial results may be adversely affected.

***We rely on restaurants in our network for many aspects of our business, and their failure to maintain their service levels could harm our business.***

Diners demand quality food at reasonable prices. The ability of diners to obtain such quality food from restaurants they like on a timely basis through the Platforms drives the primary value of the Platforms. Our ability to provide diners with a high-quality and compelling food ordering experience depends, in part, on diners receiving competitive prices, convenience, customer service and responsiveness from restaurants from whom they order. If these restaurants do not meet or exceed diner expectations with competitive levels of convenience, customer service, price and responsiveness, the value of our brands may be harmed, our ability to attract new diners to the Platforms may be limited and the number of diners placing orders through the Platforms may decline, which could have a material adverse effect on our business, financial condition and results of operations. Likewise, if restaurants face challenges or difficulties set forth elsewhere in these risk factors, the number of restaurants on the Platforms could decline, the price of food could increase or customer service levels could suffer, all of which could harm our business and results of operations.

***Seasonality and the impact of inclement weather adversely affect our operations and profitability.***

We observe that diner behavior patterns and demand for the services we provide generally fluctuate during the year on both of our Platforms. For example, order frequency tends to increase from September to March and we generally experience a relative

decrease in diner activity from April to August, primarily as a result of weather patterns, summer breaks and other vacation periods. In addition, orders in cities or towns with college campuses tend to fluctuate with the start and end of the school year, which can comprise a large part of our overall revenue in certain locations. Our revenues fluctuate according to these patterns and due to the

11

timing of certain holidays within each quarter and result in quarterly fluctuations. As a result, diner activity and demand for our services is generally stronger in our first and fourth fiscal quarters as compared to our second and third fiscal quarters. In addition, other seasonality trends may develop and the existing seasonality and diner behavior that we experience may change or become more extreme, including as a result of factors outside of our control.

We sometimes experience large influxes of orders during inclement weather when consumers do not wish to leave their homes to eat restaurant food. Such inclement weather events are unpredictable in many cases. In such events, the availability of drivers could be limited due to unsafe driving conditions or the refusal or unwillingness of drivers to work during such weather events. This can result in substantially delayed delivery times and diner frustration with our services, reducing the willingness of consumers to order using the Platforms in the future. We have in the past experienced increased order volume during certain holidays, while facing a simultaneous shortage in drivers, which can also result in substantial delivery delays and diner frustration. In addition, the likelihood of accidents may increase during inclement weather events, thereby increasing the costs to us of each delivery, exposing us to potential litigation or accident claims and reducing overall driver efficiency. Any of these events could substantially impact our revenue and results of operations and our ability to grow and operate our business.

***We may be unable to continue to grow at historical growth rates or achieve profitability in the future.***

Our revenue has grown substantially year over year, and this growth rate may not be sustainable. We believe that our growth rates of Active Diners and Gross Food Sales will decline over time as the market for our services matures. Historically, our diner growth has been a primary driver of growth in our revenue. We expect that diner growth, the addition of new restaurants to the Platforms and our revenue growth rates will decline as the size of our Active Diner base increases and as we achieve higher market penetration rates. As our growth rates decline, investors' perceptions of our business may be adversely affected and the market price of our common stock could decline. We may not realize sufficient revenue to achieve profitability and may incur losses in the future for several reasons, including insufficient growth in new menu items, declining numbers of Active Diners or orders, increasing competition, costs to scale our business and technology and other risks described elsewhere in this Form 10-K.

***Our inability to manage growth and meet demand could harm our operations and brands.***

Occasions have arisen in the past in which we were not able to adequately meet surges in orders and consumer demand. We may be required to make substantial investments in the future in technology, customer service, sales and marketing infrastructure in order to adequately handle growth, surges in orders and consumer demands. As we continue to grow, we must be able to effectively integrate, develop and motivate a large number of new employees, while maintaining the beneficial aspects of our company culture. We may not be able to manage growth effectively. If we do not manage the growth of our business and operations effectively, the quality of the Platforms and efficiency of our operations could suffer, which could harm our brands, business and results of operations.

***We prioritize the experience of restaurants and diners over short-term profitability at times, which may cause us to forego short-term opportunities and could impact our profitability.***

Our culture prioritizes its long-term diner and restaurant experience and loyalty over short-term financial condition and results of operations at times. We frequently make decisions that may reduce our short-term revenue and profitability if we believe that the decisions benefit the aggregate diner and restaurant experience and will thereby improve our financial performance over the long term. For example, we monitor how restaurant responsiveness to orders affects diners' experiences to ensure long delivery times are not perceived as a problem for hungry diners, and we may decide to remove certain restaurant offerings from the Platforms to ensure our diners' satisfaction in the overall delivery experience. In addition, we may make changes to the Platforms or offerings on the Platforms based on feedback provided by diners and restaurants. These decisions may not produce the long-term benefits that we expect, in which case our growth and engagement, our relationships with diners and restaurants, and our business could be materially adversely affected.

***If use of the Internet via websites, mobile devices and other platforms, particularly with respect to online food ordering, does not continue to increase as rapidly as we anticipate, our business and growth prospects will be harmed.***

Our business and growth prospects substantially depend upon the continued and increasing use of the Internet and mobile telecommunications as an effective medium of transactions by diners. Orders on the Platforms are conducted using the Internet and/or mobile networks. Historical rates of growth and adoption in Internet and mobile wireless communications may not predict future rates of growth or adoption. Diners or restaurants may not continue to use the Internet or mobile networking services to order their food at current or increased growth rates or at all. Consumers in our industry (and in others) may reject the use of the Internet and mobile applications as a viable platform or resource for a number of reasons in the future, including:

- actual or perceived lack of security of information or privacy protection;

- possible disruptions, computer viruses or other damage to Internet servers, users' computers or mobile applications;

- excessive governmental regulation; and

12

- unacceptable delays due to actual or perceived limitations of wireless networks.

***Our operations depend on mobile operating systems, hardware, networks and standards that we do not control. Changes in our products or to those operating systems, hardware, networks or standards may seriously harm our Active Diner growth, retention, and engagement.***

A large percentage of our revenues and growth occur on mobile devices using the Waitr App and the Bite Squad App, or collectively, the "Apps." Because the Apps are used primarily on mobile devices, the Apps must remain interoperable with popular mobile operating systems, Android and iOS, and related hardware, including but not limited to mobile devices. We have no control over these operating systems or hardware, and any changes to these systems or hardware that degrade the functionality of our products, or give preferential treatment to competitive products, could seriously harm the usage of the Apps on mobile devices. Our competitors could attempt to make arrangements with Apple or Google to make interoperability of our products with those mobile operating systems more difficult or display their competitive offerings more prominently than ours. Similarly, our competitors could enter into other arrangements with mobile device manufacturers, wireless network carriers or Internet service providers that diminish the functionality of the Apps. We plan to continue to introduce new products regularly and have experienced that it takes time to optimize such products to function with these operating systems and hardware, impacting the popularity of such products, and we expect this trend to continue.

***The nature of our business and content on the Platforms exposes us to potential liability and expenses for legal claims that could materially affect our results of operations and business.***

We face potential liability, expenses for legal claims and harm to our business relating to the nature of the delivery and takeout food business, including potential claims related to food offerings, delivery and quality. For example, third parties have in the past and could in the future assert legal claims against us in connection with personal injuries related to food poisoning or tampering or accidents caused by the delivery drivers in our network. Alternatively, we could be subject to legal claims relating to the sale of alcoholic beverages by restaurants on our Platforms to underage diners.

Reports of food-borne illnesses, whether true or not, could adversely impact the results of our operations regardless of whether our diners actually suffer such illnesses from orders on the Platforms. Food-borne illnesses and other food safety issues have occurred in the food industry in the past and could occur in the future. In addition, consumer preferences could be affected by health concerns about the consumption of foods provided on the Platforms, even if those concerns do not directly relate to food items available on the Platforms. A negative report or negative publicity, whether related to a restaurant on one of our Platforms or to a competitor in the industry, may have an adverse impact on demand for the restaurants' food and could result in decreased diner orders on the Platforms. A decrease in orders or Active Diners as a result of these health concerns or negative publicity could materially harm our brands, business, financial condition and results of operations.

Furthermore, our reliance on third-party food suppliers and distributors increases the risk that food-borne illness incidents could be caused by factors outside of our control and that multiple markets for our services would be affected rather than a single market. We cannot assure that all food items will be properly maintained during delivery to diners or that our drivers will identify food that is problematic upon pickup. If diners become ill from food-borne illnesses, we and/or restaurants on our Platforms could be forced to temporarily suspend service. Furthermore, any instances of food contamination, whether or not they are related to us, could subject us or restaurants to regulation by applicable governmental authorities.

We face the prospect of liabilities and expenses relating to the content and other information that we publish on the Platforms, third party sites and/or relating to our marketing efforts. We could face claims based on the violation of intellectual property rights, such as copyright infringement claims based on the unauthorized use of menu content or other items. Although we typically obtain a restaurant's consent to publish their menu items prior to posting them on the Platforms, we may not always be successful in obtaining such consent. We could incur significant costs investigating and defending such claims and, if we are found liable, significant damages. If any of these events occur, our business and financial results could be adversely affected.

While historically most of our drivers have been employees, we are now transitioning completely to independent contractor drivers. Almost all of our orders are delivered by drivers of motor vehicles. Some of our drivers have been involved in motor vehicle accidents, and it is almost certain that some of our drivers will be in motor vehicle accidents in the future. Although we maintain insurance policies in an attempt to cover the risks associated with a motor vehicle delivery business, we may be unable to maintain sufficient coverage of all claims relating to such injuries or accidents that foreseeably arise in this line of business. Furthermore, we have in the past and could in the future receive denial of coverage for particular insurance claims relating to injuries, accidents or violations.

We have incurred and expect to continue to incur expenses relating to legal claims. The frequency of such claims is unpredictable. We have experienced diversion of attention by management to address these claims, and such claims can result in significant costs to investigate and defend, regardless of the merits of such claims. The potentially significant number and dollar amount of claims could materially affect our results of operations and harm our business.

13

TABLE OF CONTENTS

***Our business is dependent on our ability to maintain and scale our technical infrastructure, and any significant disruption in our service could damage our reputation, result in a potential loss of diners and engagement, or adversely affect our financial results.***

Our reputation and ability to attract, retain, and serve our diners, drivers and restaurants depends upon the reliable performance of the Platforms and their underlying technical infrastructure. We have experienced service disruptions, and may experience future disruptions, outages or other performance problems due to a variety of factors. As the Platforms grow more complex, store more information and service higher numbers of diners, their technical infrastructure could suffer. We may not be able to identify causes of performance issues or service disruptions.

Our systems may not be adequately designed with the necessary reliability and redundancy to avoid performance delays or outages that could be harmful to our business. If the Platforms are unavailable when diners, drivers or restaurants attempt to access them, or if they do not load as quickly as they expect, these key users may not return to the Platforms as often in the future, or at all. As our Active Diners and restaurants and the amount and types of information shared on the Platforms continue to grow, we will need an increasing amount of technical infrastructure, including network capacity, and computing power, to continue to satisfy the needs of our diners, drivers and restaurants. It is possible that we may fail to effectively scale and grow our technical infrastructure to accommodate these increased demands. In addition, our business is subject to interruptions, delays, or failures resulting from natural disasters, terrorism, or other catastrophic events.

A substantial portion of our network infrastructure is provided by third parties. Substantially all of the communications, network and computer hardware used to operate our websites and mobile applications are located in the United States in Amazon Web Services and Google Cloud Platform data centers. We do not own or control the operation of these facilities. In addition, we may not have sufficient protection or recovery plans in certain circumstances. We may not always maintain redundancy for certain hardware. Any disruption or failure in the services we receive from these providers could harm our ability to handle existing or increased traffic and could significantly harm our business. Any financial or other difficulties these providers face may adversely affect our business, and we exercise little control over these providers, which increases our vulnerability to problems with the services they provide.

We expect to continue to make significant investments to maintain and improve the availability of the Platforms and to enable rapid releases of new features and products. To the extent that we do not effectively address capacity constraints, respond adequately to service disruptions, upgrade our systems as needed or continually develop our technology and network architecture to accommodate actual and anticipated changes in technology, our business and results of operations would be harmed.

We have spent and expect to continue to spend substantial amounts on technology infrastructure and services to handle the traffic on our websites and mobile applications and to help shorten the length of or prevent system interruptions. The operation of these systems is expensive and complex, and we could experience operational failures.

Although we carry business interruption insurance, it may not be sufficient to compensate us for the potentially significant losses, including the potential harm to the future growth of our business that may result from interruptions in our service as a result of system failures.

***Personal data, internet security breaches or loss of data provided by diners, drivers or restaurants on our Platforms could violate applicable law and contracts with key service providers and could result in liability to us, damage to our reputation and brands and harm to our business.***

Mobile malware, viruses, hacking, and phishing attacks have become more prevalent in our industry and may occur on our systems in the future. Although it is difficult to determine what, if any, harm may directly result from an interruption or attack, any failure to maintain performance, reliability, security, and availability of our products and technical infrastructure to the satisfaction of restaurants, drivers or diners may seriously harm our reputation and our ability to retain and attract new Active Diners, drivers and restaurants.

We rely on third-party billing and payment processing providers, many of whom may collect and store sensitive data, including legally-protected personal information. Examples include third parties who process diner orders, payroll and other payments, and service providers who collect and store diner, restaurant or employee information. We may also process and store and use additional third-parties to process and store sensitive intellectual property and other proprietary business information, including that of the restaurants on our Platforms. While we intend to maintain data privacy and security measures that are compliant with applicable privacy laws and regulations, future security breaches could subject us and/or these third-party service providers to liability for violations of various laws, rules or regulations, civil liability, government-imposed fines, orders requiring that we or these third parties change our or their practices, or criminal charges, which could adversely affect our business. Complying with these various laws could

cause us to incur substantial costs or require us to change our business practices, systems and compliance procedures in a manner adverse to our business.

14

***We may become a payment processor at some point in the future and may be unable to comply with applicable law or standards, resulting in harm to our business.***

Although we currently do not directly store or process payments on behalf of restaurants or diners and use third parties to do so, we may choose to do so in the future. We would need to comply with Payment Card Industry ("PCI") and Data Security Standard (the "Standard") if we choose to pursue this possibility. The Standard is a comprehensive set of requirements for enhancing payment account data security that was developed by the PCI Security Standards Council to help facilitate the broad adoption of consistent data security measures. Payment card network rules would require us to comply with the Standard, and our failure to do so may result in fines or restrictions on our ability to accept payment cards if we elected to become a payment processor.

Under certain circumstances specified in the payment card network rules, we could be required in the future to submit to periodic audits, self-assessments or other assessments of our compliance with the Standard. Such activities may reveal that we had failed to comply with the Standard. If an audit, self-assessment or other test determines that we need to take steps to remediate any deficiencies, such remediation efforts may distract our management team and require us to undertake costly and time-consuming remediation efforts. In addition, even if we comply with the Standard, there is no assurance that we will be protected from a security breach. Payment processing businesses involve complex financial, cybersecurity and other factors that may be difficult to us. We cannot ensure that the cost savings or additional revenue from becoming a payment processor would exceed the significant costs associated with that decision. While we are currently PCI compliant on both Platforms, there can be no assurance that we will remain compliant.

***We are subject to a number of risks related to the credit card and debit card payments we accept.***

We accept payments through credit and debit card transactions. For credit and debit card payments, we pay interchange and other fees, which may increase over time. An increase in those fees may require us to increase the prices we charge and would increase our operating expenses, either of which could harm our business, financial condition and results of operations.

We currently rely exclusively on one third-party vendor to provide payment processing services, including the processing of payments from credit cards and debit cards, and our business would be disrupted if this vendor becomes unwilling or unable to provide these services to us and we are unable to find a suitable replacement on a timely basis. If we or our processing vendor fails to maintain adequate systems for the authorization and processing of credit card transactions, it could cause one or more of the major credit card companies to disallow our continued use of their payment products. In addition, if these systems fail to work properly and, as a result, we do not charge our customers' credit cards on a timely basis or at all, our business, revenue, results of operations and financial condition could be harmed.

The payment methods that we offer also subject us to potential fraud and theft by criminals, who are becoming increasingly more sophisticated, seeking to obtain unauthorized access to or exploit weaknesses that may exist in the payment systems. If we fail to comply with applicable rules or requirements for the payment methods we or the restaurants accept, or if payment-related data are compromised due to a breach of data, we may be liable for significant costs incurred by payment card issuing banks and other third parties or subject to fines and higher transaction fees, or our ability to accept or facilitate certain types of payments may be impaired. In addition, our customers could lose confidence in certain payment types, which may result in a shift to other payment types or potential changes to our payment systems that may result in higher costs. If we fail to adequately control fraudulent credit card transactions, we may face civil liability, diminished public perception of our security measures, and significantly higher credit card-related costs, each of which could harm our business, results of operations and financial condition.

We are also subject to payment card association operating rules, certification requirements and rules governing electronic funds transfers, which could change or be reinterpreted to make it more difficult for us to comply. We are required to comply with payment card industry security standards. Failing to comply with those standards may violate payment card association operating rules, federal and state laws and regulations, and the terms of our contracts with payment processors. Any failure to comply fully also may subject us to fines, penalties, damages and civil liability, and may result in the loss of our ability to accept credit and debit card payments. Further, there is no guarantee that such compliance will prevent illegal or improper use of our payment systems or the theft, loss or misuse of data pertaining to credit and debit cards, card holders and transactions.

If we fail to maintain our chargeback rate or refund rates at acceptable levels, our processing vendor may increase its transaction fees or terminate its relationship with us. Any increases in applicable credit and debit card fees could harm our results of operations, particularly if we elect not to raise our rates for our service to offset the increase. The termination of our ability to process payments on any major credit or debit card would significantly impair our ability to operate our business.

15

***We rely on third-party vendors to provide products and services, and we could be adversely impacted if they fail to fulfill their obligations.***

We depend on third-party vendors and partners to provide us with certain products and services, including components of our computer systems, software, data centers, payment processors and telecommunications networks, to conduct our business. For example, we rely on third parties for services such as organizing and accumulating certain daily transaction data on orders. We also rely on third parties for specific software and hardware used in providing our products and services. Some of these organizations and service providers may provide similar services and technology to our competitors, and we do not have long-term or exclusive contracts with them.

Our systems and operations or those of our third-party vendors and partners could be exposed to damage or interruption from, among other things, fire, natural disaster, power loss, telecommunications failure, unauthorized entry, computer viruses, denial-of-service attacks, acts of terrorism, human error, vandalism or sabotage, financial insolvency, bankruptcy and similar events. In addition, we may be unable to renew our existing contracts with our most significant vendors and partners or our vendors and partners may stop providing or otherwise supporting the products and services we obtain from them, and we may not be able to obtain these or similar products or services on the same or similar terms as our existing arrangements, if at all. The failure of our vendors and partners to perform their obligations and provide the products and services we obtain from them in a timely manner for any reason could adversely affect our operations and profitability.

***Our industry is highly competitive and fragmented, and our business and results of operations may suffer if we are unable to adequately address downward pricing and other competitive pressures.***

We compete with many traditional and online and mobile app food ordering and general delivery companies of varying sizes, including some that may have greater access to restaurants, a wider range of services, a wider range of menu or delivery items, greater capital resources, or other competitive advantages. Traditional food ordering techniques involve advertising by restaurants in low cost paper publications, through traditional online and offline media channels, with consumers simply calling restaurants or delivery services to place orders. Traditional takeout or delivery services are often lower cost than the Platforms and are difficult to disrupt. We also compete with smaller, regional and local companies that cover specific locations with specific restaurants or that offer niche services. We also compete, to a lesser extent, with restaurants that hire their own delivery drivers for online, mobile application or telephone orders. Numerous competitive factors could impair our ability to maintain or improve our profitability. These factors include the following:

- Many of our competitors' periodically reduce or eliminate their delivery charges to consumers or commissions that they charge to restaurants to gain business, especially during times of increased competition or reduced growth in the economy, which may limit our ability to maintain or increase our order commissions and delivery charges, may require us to reduce our order commissions and delivery charges or may limit our ability to maintain or expand our business;

- Some restaurants have reduced or may reduce the number of mobile app or online ordering and delivery services and technologies that they use by selecting a single core company or a limited number of providers as approved service providers, and in some instances, we may not be selected;

- Restaurants could solicit bids from multiple service providers for their mobile application or online food ordering and delivery needs, which may depress onboarding fees, service fees, take rates or result in a loss of business to competitors;

- The continuing trend toward consolidation in the online and mobile app ordering and delivery industry may result in larger companies with greater financial resources and other competitive advantages, and we may have difficulty competing with them;

- Advances in technology may require us to increase investments in order to remain competitive, and our restaurant diners and consumers may not be willing to accept higher onboarding fees, service fees, take rates or delivery charges to cover the cost of these investments;

- Higher fuel prices and, in turn, higher fuel surcharges to our drivers may cause some of our drivers to demand higher independent contractor driver rates;

- Competition from "gig economy" companies in general may negatively impact our driver, restaurant customer and/or consumer relationships and service rates;

- We may have higher exposure to litigation risks as compared to other providers of delivery services; and

- Restaurants could develop their own online or mobile app food ordering and delivery technology and hire their own drivers to make their own deliveries, which could reduce demand for our services to restaurants and limit choices for consumers,

reducing the number and frequency of orders using our technology.

16

***We may not be able to successfully compete in technology innovation and distribution. If we are unable to continue to innovate and provide technology desirable to diners and restaurants, our business operations could materially suffer.***

We face significant competition in almost every aspect of our business. We must continuously innovate to improve our existing Platform technology and ensure that our products and services are well received. Mobile applications, internet enabled technology and online e-commerce are constantly changing. We face competition from larger and more established companies such as Uber, GrubHub, Door Dash and others. Smaller companies also provide similar services and technology. Furthermore, larger companies such as Facebook, Google, Apple and others could choose to offer similar services or technology at comparatively little additional costs to themselves. Our competitors may also develop products, features, or services that are similar to ours or that achieve greater market acceptance. These products, features, and services may undertake more far-reaching and successful product development efforts or marketing campaigns or may adopt more aggressive pricing policies.

Our ability to compete effectively in the deployment of innovative products depends on factors outside of our control, including the following:

- usefulness, ease of use, performance and reliability of our products compared to those of our competitors;

- size and composition of base of Active Diners;

- engagement of Active Diners with the Platforms;

- the timing and market acceptance of products, including developments and enhancements to the Platforms or our competitors' products;

- customer service and support efforts;

- acquisitions or consolidation within our industry, which may result in more formidable competitors; and

- our ability to attract, retain, and motivate talented employees, particularly software engineers.

Developing the Platforms, which include the Apps, websites and other technologies, entails significant technical and business risks. We may use new technologies ineffectively, or we may fail to adapt to emerging industry standards. If we face material delays in introducing new or enhanced products or if our recently introduced products do not perform in accordance with our expectations, the restaurants and diners in our network may forego the use of our products in favor of those of our competitors.

***Our exploration and pursuit of strategic alternatives has concluded, and there can be no assurance that an alternative transaction will be identified or consummated.***

On August 8, 2019, we announced the commencement of a review to explore and evaluate potential strategic alternatives to enhance shareholder value. These alternatives could have included, among others, continuing to execute our business plan, including an increased focus on certain standalone strategic initiatives, the disposition of certain assets, a strategic business combination, a transaction that results in private ownership or a sale of the Company, or some combination of these. In early November 2019, our board of directors (the "Board") completed the strategic alternative review process and concluded that we should continue to focus on executing our business plan as an independent public company while remaining open to the possibility of alternatives. However, there can be no assurance that the continued execution of our business plan will enhance shareholder value or that alternative transactions will be identified or consummated or that any such transaction or other outcome will result in enhanced shareholder value.

***As part of our business strategy, we have made acquisitions to grow our business. Failure to pursue and successfully make additional acquisitions could negatively impact our future growth.***

Throughout 2019, our revenue, order growth and cash flow were negatively impacted by changes in market conditions in the online food ordering and delivery industry resulting from increased competition from other national delivery service providers. As a result, and in light of the capital-intensive nature of new market launch activities, we intend to concentrate our near-term efforts on existing market penetration and adjacent market expansion, which may impact our growth. Additionally, the continuing trend toward consolidation in the online and mobile app ordering and delivery industry may result in larger companies with greater financial resources and other competitive advantages than Waitr's and could affect our ability to successfully make additional acquisitions, which may impact our growth rates and ability to maintain profitability.

17

***The terms of the agreements governing our debt contain operating and financial covenants that may restrict our business and financing activities. Our failure to comply with these covenants could result in the acceleration of our outstanding indebtedness.***

We are party to a Credit Agreement and Convertible Notes Agreement (see Part II, Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations* of this Form 10-K). These agreements include a number of customary covenants that, among other things, limit or restrict the ability of the Company and its subsidiaries to incur additional debt, incur liens on assets, engage in mergers or consolidations, dispose of assets, pay dividends or repurchase capital stock and repay certain junior indebtedness. The aforementioned restrictions are subject to certain exceptions including the ability to incur additional indebtedness, liens, dividends, and prepayments of junior indebtedness subject, in each case, to compliance with certain financial metrics and/or certain other conditions and a number of other traditional exceptions that grant Waitr Inc. continued flexibility to operate and develop its business. In certain cases, these covenants may impose limitations or restrictions on the manner in which we conduct our business and could place us at a competitive disadvantage to competitors. Included in these covenants is an affirmative covenant relating to the deliverance of audited annual financial statements to the administrative agent and lenders, accompanied by a report from an independent public accounting firm, which report shall be unqualified as to going concern and scope of audit.

Our ability to comply with these covenants and other restrictions may be affected by events beyond our control, and we may not be able to meet these covenants. From time to time, we may be required to seek waivers or amendments to the Credit Agreement and Convertible Notes Agreement to maintain compliance with these covenants, and there can be no certainty that any such waiver or amendment will be available. Non-compliance with one or more of these covenants could result in any amounts outstanding under the Credit Agreement and Convertible Notes Agreement becoming immediately due and payable. Additionally, upon the occurrence and during the continuance of an event of default, both the Credit Agreement and Convertible Notes Agreement provide for default interest at a rate that is 2% and 5% higher, respectively, than the interest rates otherwise payable under the agreements. If we are unable to generate sufficient cash available to repay our debt obligations when they become due and payable, either when they mature or in the event of a default, we may need to engage in debt or equity financings to secure additional funds. However, additional funds may not be available when we need them, on terms that are acceptable to us, or at all.

Recent adverse changes in market conditions from increased competition have negatively affected the Company's order and revenue growth, which in turn has had a negative impact on our liquidity level. We are actively implementing several initiatives to increase revenue, reduce costs and improve cash flow and liquidity. We currently expect that our cash on hand and estimated cash flows from operating activities will be sufficient to meet our working capital needs beyond twelve months, however, there can be no assurance that we will generate cash flow at the levels we anticipate.

***Additional impairments of the carrying amounts of goodwill or other indefinite-lived assets could negatively affect our financial condition and results of operations.***

We conduct our goodwill and intangible asset impairment test annually in October, or more frequently if indicators of impairment exist, and we review the recoverability of long-lived assets, including acquired technology, capitalized software costs, and property and equipment when events or changes in circumstances occur that indicate that the carrying value of the asset may not be recoverable. For purposes of testing for goodwill impairment, we have one reporting unit. As a result of recent, adverse changes in market conditions from increased competition having negatively affected our order and revenue growth, thereby contributing to a sustained decline in the Company's market capitalization, we conducted the impairment test as of September 30, 2019. The impairment test was conducted in accordance with Accounting Standards Codification ("ASC") 360, *Impairment and Disposal of Long-Lived Assets* for certain long-lived assets including capitalized contract costs, developed technology, customer relationships, and trade names, and in accordance with ASC 350, *Intangibles – Goodwill and Other* for the reporting unit's goodwill. As a result of the ASC 360 and ASC 350 analyses, we recognized a total non-cash pre-tax impairment loss of $191.2 million during the year ended December 31, 2019 to write down the carrying values of goodwill and intangible assets, including capitalized contract costs, customer relationships and developed technology, to their implied fair values. See Part II, Item 8, *Note 7 – Intangible Assets and Goodwill* of this Form 10-K for additional details.

Determining the fair value of a reporting unit and intangible assets requires the use of estimates and significant judgments that are based on a number of factors including actual operating results. It is reasonably possible that the judgments and estimates used could change in future periods. There can be no assurance that additional goodwill or intangible assets will not be impaired and that the carrying value of other indefinite-lived assets will be recoverable in future periods, which could adversely affect our financial results and stockholders' equity.

***Our ability to utilize our net operating loss carryforwards may be delayed or limited.***

As of December 31, 2019, we estimate that we had federal and state net operating loss, or NOL, carryforwards of approximately $138.0 million and $106.4 million, respectively. We may use these NOL carryforwards to offset against future taxable income for U.S. federal and state income tax purposes. However, Section 382 of the Code provides an annual limitation with respect to the ability of a corporation to utilize its NOL carryforwards against future U.S. taxable income in the event of an "ownership change," as defined in Section 382 of the Code.

18

The Landcadia Business Combination resulted in an ownership change, and we estimate that a majority of our existing NOL carryforwards are subject to the annual limitation under Section 382 of the Code. We have not assessed whether an ownership change has occurred since the Landcadia Business Combination. Issuances or sales of our common stock since the Landcadia Business Combination, including by our large stockholders or certain other transactions involving our stock that are outside of our control, could cause an additional ownership change under Section 382 of the Code, and impose additional limitations on our ability to utilize our NOL carryforwards. Any current or future limitation on the use of NOL carryforwards could, depending on the extent of such limitation, result in our retaining less cash after payment of U.S. federal and state income taxes during any year in which we have taxable income than we would be entitled to retain if such limitation did not apply, which could adversely impact our operating results or liquidity.

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our financial condition and results of operations.***

We are subject to income taxes in the United States, and our domestic tax liabilities are subject to the allocation of expenses in differing jurisdictions. Our effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- tax effects of stock-based compensation;

- costs related to intercompany restructurings;

- changes in tax laws, regulations or interpretations thereof; and

- lower than anticipated future earnings in jurisdictions where we have lower statutory tax rates and higher than anticipated future earnings in jurisdictions where we have higher statutory tax rates.

In addition, we may be subject to audits of our income, sales and other transaction taxes by U.S. federal and state authorities. Outcomes from these audits could have an adverse effect on our financial condition and results of operations.

***We depend on search engines, display advertising, social media, email, content-based online advertising and other online sources to attract diners to the Platforms, and if we are unable to attract diners and convert them into Active Diners making orders in a cost-effective manner, our business and financial results may be harmed.***

Our success depends on our ability to attract online diners to the Platforms and convert them into orders in a cost-effective manner. We depend, in part, on search engines, display advertising, social media, email, content-based online advertising and other online sources to generate traffic to our websites and downloads of the Apps. We are included in search results as a result of both paid search listings, where we purchase specific search terms that result in the inclusion of our advertisement, and, separately, organic searches that depend upon the content on websites owned and maintained by us.

Search engines, social media platforms and other online sources often revise their algorithms and introduce new advertising products. If one or more of the search engines or other online sources on which we rely for website traffic were to modify its general methodology for how it displays our advertisements, resulting in fewer consumers clicking through to our websites, our business could suffer. In addition, if our online display advertisements are no longer effective or are not able to reach certain diners due to diners' use of ad-blocking software, our business could suffer.

If one or more of the search engines or other online sources on which we rely for purchased listings modifies or terminates its relationship with us, our expenses could rise, we could lose consumers and traffic to our websites could decrease, any of which could have a material adverse effect on our business, financial condition and results of operations.

***The loss of senior management or key operating personnel could adversely affect our operations. We depend on skilled personnel to grow and operate our business, and our failure to hire, retain or attract key personnel could adversely affect our business.***

We depend on our executive officers, senior management team and other key operating and technology personnel. We have experienced significant turnover in our senior management over the last year and may not be able to continue to recruit and/or retain the services of executive officers, senior management or other key personnel we need to maintain our competitive position. If for any reason the services of our key personnel were to become unavailable, there could be a material adverse effect on our business, financial condition, results of operations, cash flows and prospects. We also anticipate growth in diners and restaurants due to having the benefit

of a relationship with our directors Tilman J. Fertitta and Steven L. Scheinthal and Fertitta Entertainment, Inc., Landry's and other entities or businesses associated with Messrs. Fertitta or Scheinthal. Although we anticipate a great deal of support and

19

TABLE OF CONTENTS

benefit from relationships with these individuals or entities, our results of operations could suffer if contractual relationships fail to materialize from these associations, such relationships are terminated or we lose either individual as a director.

We expect to face significant competition from other companies in hiring such personnel, particularly in larger markets to which we may expand. If we do not succeed in attracting, hiring, and integrating excellent personnel, or retaining and motivating existing personnel, we may be unable to grow effectively.

We plan to continue to base a substantial amount of our operations in Lafayette, Louisiana. It could become difficult to continue to attract or retain to this location key engineering, sales and other talent required to compete with larger competitors whose operations are based in larger cities, where such talent historically may be easier to find. In addition, demographic trends favoring population growth in larger cities and away from smaller cities may make this increasingly difficult. Retaining and attracting key talent is extremely competitive in the high technology industry, particularly in the areas of mobile applications and Internet technology. If we are unable to retain or attract key talent or personnel, our operations could suffer, thereby materially adversely affecting our business.

*Major hurricanes, tropical cyclones, and other instances of severe weather and other natural phenomena would cause significant losses.*

Our services and operations are subject to interruption, decreases in consumer entertainment spending and damage and destruction to company property as a result of severe local weather conditions or other natural phenomena. Our headquarters are located in areas that have historically been and could, in the future, be materially and adversely affected by damage resulting from a major tropical cyclone, significant rain event, a hurricane, or other severe weather phenomena. In addition, we rely on third parties for critical infrastructure and services. Any of these third parties could be subject to disruptions due to similar major weather events, which could adversely affect our business and financial results.

We may also suffer from weather-related or other events, such as tornadoes, hurricanes, blizzards, ice storms, floods, fires, widespread computer viruses, terrorist attacks, acts of war and explosions, which may disrupt fuel supplies, increase fuel costs, disrupt freight shipments or routes, affect regional economies, destroy our assets or the assets of our customers or otherwise adversely affect the business or financial condition of our customers (both restaurant and diner), any of which could adversely affect our results or make our results more volatile. In addition, third parties that provide critical technology, services and infrastructure, such as data centers, telecommunications networks and the like remain vulnerable to these types of events, all of which could disrupt critical services for us, adversely affecting our financial results and operations.

Such adverse weather occurrences could materially impact orders on the Platforms and our delivery capabilities, thus severely decreasing our revenue and increasing costs. Further, in the event of any such weather occurrence, our insurance may not be sufficient to cover the costs of repairing or replacing damaged equipment and we may suffer a significant decline in revenues if any of the restaurants on the Platforms are closed for an extended period of time or these events result in significant disruption to telecommunications systems, including the Internet or mobile phone services. Any such events could materially and adversely affect our business and the results of our operations.

*Increases in food, labor, fuel and other costs could adversely affect our business.*

Changes in food and supply costs are a part of a restaurant's business. The prices of food, labor, fuel or energy could continue to increase in the near future. Restaurants on our Platforms may be unable to absorb higher costs without raising prices or ceasing operations. Restaurant profitability is dependent on, among other things, a restaurant's ability to anticipate and react to changes in the costs of key operating resources, including food and other raw materials, labor, energy and other supplies and services. Substantial increases in costs and expenses, including labor costs incurred as a result of increases in applicable minimum wage regulation, could impact operating results of restaurants on our Platforms to the extent that such increases cannot be passed along to diners using the Platforms (or otherwise). The impact of inflation on food, labor, and energy costs can significantly affect our profitability if such inflation results in fewer restaurants, diners or orders that occur on the Platforms.

Any significant increase in energy costs could adversely affect our business through higher rates and the imposition of fuel surcharges, which could affect our drivers' costs and the amount that we must reimburse such drivers for services. Because most of the restaurants on the Platforms sell moderately priced food, we may choose not to, or be unable to, pass along commodity price increases to diners on the Platforms. Additionally, significant increases in gasoline prices could result in a decrease of deliveries or the available driver labor pool. If delivery time slows as a result, our reputation could be harmed, and the number of diners or orders could decline, harming our business.

The restaurant business is affected by changes in international, national, regional, and local economic conditions, consumer preferences and spending patterns, demographic trends, energy costs, consumer perceptions of food safety, weather, traffic patterns, global health crises (like coronavirus), the type, number and location of competing restaurants, and the effects of war or terrorist

20

activities and any governmental responses thereto. Factors such as inflation, higher costs for each of food, labor, benefits and utilities, the availability and cost of suitable sites, fluctuating insurance rates, state and local regulations and licensing requirements, legal claims, and the availability of an adequate number of qualified management and hourly employees also affect restaurant operations and administrative expenses. If restaurants on our Platforms cannot adequately pass costs along to diners or otherwise finance or pay for these higher costs, they may cease operations, reduce offerings on the Platforms or otherwise demand lower commissions or diner fees from us, thereby reducing revenue and harming our business.

***Acquisitions could disrupt our business, dilute our stockholders and harm our business and results of operations.***

As part of our business strategy, we have made acquisitions to add specialized employees and complementary companies, products, and technologies. Although we do not currently have plans to make any material acquisitions, we may do so in the future. Our ability to acquire and successfully integrate larger or more complex companies, products, and technologies is unproven. In the future, we may not be able to find other suitable acquisition candidates, and we may not be able to complete acquisitions on favorable terms, if at all. Our competitors have large cash reserves and aggressive acquisition strategies, and we may not be able to successfully attract acquisition targets to the same degree as our competitors. Our previous and future acquisitions may not achieve our goals, and any future acquisitions we complete could be viewed negatively by diners, restaurants, drivers or investors. In addition, if we fail to successfully close transactions or integrate new teams, or integrate the products and technologies associated with these acquisitions into our company and culture, our business could be seriously harmed. Any integration process may require significant time and resources, and we may not be able to manage the process successfully. We may not successfully evaluate or use the acquired products, technology, and personnel, or accurately forecast the financial impact of an acquisition transaction, including accounting charges. We may also incur unanticipated liabilities that we assume as a result of acquiring companies. We may have to pay cash, incur debt, or issue equity securities to pay for any acquisition, any of which could seriously harm our business. Selling equity to finance any such acquisitions would also dilute our stockholders. Incurring debt would increase our fixed obligations and could also include covenants or other restrictions that would impede our operations.

***Our storage, processing and use of data, some of which contains personal information, subjects us to complex and evolving federal and state laws and regulations regarding privacy, data protection, and other matters. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in investigations, claims, changes to our business practices, increased cost of operations, and declines in user growth, retention, or engagement, any of which could seriously harm our business.***

We are subject to a variety of laws and regulations in the United States that involve matters central to our business, including user privacy, sweepstakes, rewards or coupons, rights of publicity, data protection, content, intellectual property, distribution, electronic contracts and other communications, e-commerce, competition, protection of minors, consumer protection, taxation, libel, defamation, internet or data usage, and online-payment services. These laws and regulations constantly evolve and remain subject to significant change. In addition, the application and interpretation of these laws and regulations are often uncertain, particularly in the new and rapidly evolving industry in which we operate. Because we store, process, and use data, some of which contains personal information, we are subject to complex and evolving federal and state laws and regulations regarding privacy, data protection, and other matters. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in investigations, claims, changes to our business practices, increased cost of operations, and declines in diner and restaurant growth, orders, retention, or engagement, any of which could adversely affect our business.

***If we cannot protect our intellectual property, the value of our brands and other intangible assets may be diminished, and our business may be adversely affected.***

We rely and expect to continue to rely on a combination of confidentiality and license agreements with our employees, consultants, and third parties with whom we have relationships, as well as trademark, copyright, patent, trade secret, and domain name protection laws, to protect our proprietary rights. In the United States and internationally, we have filed various applications for protection of certain aspects of our intellectual property. We do not currently hold any issued patents. In the future, we may acquire patents or patent portfolios, which could require significant cash expenditures. However, third parties may knowingly or unknowingly infringe our proprietary rights, third parties may challenge proprietary rights held by us, and pending and future trademark and patent applications may not be approved. In addition, effective intellectual property protection may not be available in every country in which we operate or intend to operate our business. In any or all of these cases, we may be required to expend significant time and expense in order to prevent infringement or to enforce our rights. Although we have taken measures to protect our proprietary rights, there can be no assurance that others will not offer products or concepts that are substantially similar to ours and compete with our business.

We have registered the trademark "Waitr," along with its stylized logo, with the U.S. Patent & Trademark Office. Waiter.com, Inc. sued Waitr Incorporated in 2016 in the United States District Court for the Western District of Louisiana alleging, among other

things, trademark infringement based on the use of the name "Waitr." Although we believe that Waiter.com, Inc.'s lawsuit is baseless, there is a risk that the court could find that our use of the name "Waitr" infringes the rights of Waiter.com, Inc. In such event, the court could award Waiter.com, Inc. significant damages and/or order that we discontinue our use of the name "Waitr." Any such adverse

21

TABLE OF CONTENTS

ruling or finding could materially adversely affect our financial results and operations. Having to use a different name could confuse restaurants and/or diners, resulting in fewer orders.

***We are currently, and expect to be in the future, party to patent lawsuits and other intellectual property rights claims that are expensive and time consuming, and, if resolved adversely, could have a significant impact on our business, financial condition and results of operations.***

Companies in the Internet, technology, and mobile application industries own large numbers of patents, copyrights, trademarks, and trade secrets, and frequently enter into litigation based on allegations of infringement, misappropriation, or other violations of intellectual property or other rights. In addition, various "non-practicing entities" that own patents and other intellectual property rights often attempt to aggressively assert their rights in order to extract value from technology companies. Furthermore, from time to time we may introduce new products, including in areas where we currently do not compete, which could increase our exposure to patent and other intellectual property claims from competitors and non-practicing entities.

As a public company, we may receive letters demanding that we cease and desist using certain intellectual property. Some of these may result in litigation against us. Defending patent and other intellectual property litigation costs large amounts of money and time and can impose a significant burden on management and employees. Favorable final outcomes do not occur in all cases. In addition, plaintiffs may seek, and we may become subject to, preliminary or provisional rulings in the course of any such litigation, including potential preliminary injunctions requiring us to cease some or all of our operations. For example, a ruling in the lawsuit filed by Waiter.com, Inc. could require that we stop using the name Waitr. We may decide to settle such lawsuits and disputes on terms that are unfavorable to us. Similarly, if any litigation to which we are a party is resolved adversely, we may be subject to an unfavorable judgment that may not be reversed upon appeal. The terms of such a settlement or judgment may require us to cease some or all of our operations or pay substantial amounts to the other party. In addition, we may have to seek a license to continue practices found to be in violation of a third party's rights, which may not be available on reasonable terms, or at all, and may significantly increase our operating costs and expenses. As a result, we may also be required to develop alternative non-infringing technology, names or practices or discontinue the practices.

The development of alternative non-infringing technology, names or practices could require significant effort and expense or may not be feasible. Our business, financial condition and results of operations could be adversely affected as a result of an unfavorable resolution of the disputes and litigation referred to above.

***Our use of open source software could expose us to "copyleft" claims or otherwise subject us to business or legal risk.***

We use open source software in our products. Our use of open source software in our products may require us to license innovations that are material to our business and may also expose us to increased litigation risk. If the protection of our proprietary rights is inadequate to prevent unauthorized use or appropriation by third parties, the value of our brands and other intangible assets may be diminished and competitors may be able to more effectively mimic our service and methods of operations. Any of these events could have an adverse effect on our business and financial results.

***We may require additional capital to pursue our business objectives and respond to business opportunities, challenges or unforeseen circumstances. Insufficient capital can harm our operating, business and financial results.***

We intend to continue to make investments to support our growth and may require additional capital to pursue our business objectives and respond to business opportunities, challenges or unforeseen circumstances, including to increase our marketing expenditures to improve brand awareness, develop new product and service offerings or further improve the Platforms and existing product and service offerings, enhance our operating infrastructure and acquire complementary businesses and technologies. Accordingly, we may need to engage in equity or debt financings to secure additional funds. However, additional funds may not be available when we need them, on terms that are acceptable to us, or at all. Volatility in the credit markets also may have an adverse effect on our ability to obtain debt financing.

If we raise additional funds through further issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges superior to those of holders of our common stock. If we are unable to obtain adequate financing or financing on terms satisfactory to us, when we require it, our ability to continue to pursue our business objectives and to respond to business opportunities, challenges or unforeseen circumstances could be significantly limited, and our business, operating results, financial condition and prospects could be materially adversely affected.

***If our employees were to unionize, our operating costs could increase and our ability to compete could be impaired.***

None of our employees are currently represented under a collective bargaining agreement; however, we always face the risk that our employees will try to unionize, and if our independent contractors were ever re-classified as employees, the magnitude of this

22

risk would increase. Further, Congress or one or more states could approve legislation and/or the National Labor Relations Board could render decisions or implement rule changes that could significantly affect our business and our relationship with employees, including actions that could substantially liberalize the procedures for union organization. In addition, we can offer no assurance that the Department of Labor will not adopt new regulations or interpret existing regulations in a manner that would favor the agenda of unions.

Any attempt to organize by our employees could result in increased legal and other associated costs and divert management attention, and if we entered into a collective bargaining agreement, the terms could negatively affect our costs, efficiency and ability to generate acceptable returns on the affected operations. In particular, the unionization of our employees could have a material adverse effect on our business, financial condition, results of operations, cash flows and prospects because:

- Restrictive work rules could hamper our efforts to improve and sustain operating efficiency and could impair our service reputation and limit our ability to provide our services;

- A strike or work stoppage could negatively impact our profitability and could damage customer and employee relationships; and

- An election and bargaining process could divert management's time and attention from our overall objectives and impose significant expenses.

***If our independent contractors are deemed by regulators or judicial process to be our employees, then our business and results of operations could be adversely affected.***

Tax and other regulatory authorities have in the past asserted that independent contractors in certain types of food delivery and/or driving positions are employees of the company for which they are delivering or driving, rather than independent contractors. Taxing and other regulatory authorities and courts apply a variety of standards in their determination of independent contractor status. If our independent contractor drivers are determined to be our employees, we would incur additional exposure under federal and state tax, workers' compensation, unemployment benefits, labor, employment, and tort laws, including for prior periods, as well as potential liability for employee benefits and tax withholdings.

***The requirements of being a public company, including compliance with the reporting requirements of the Exchange Act and the requirements of the Sarbanes-Oxley Act, may strain our resources, increase our costs and distract management.***

As a public company, we must comply with certain laws, regulations and requirements, certain corporate governance provisions of the Sarbanes-Oxley Act of 2002, related regulations of the SEC and the requirements of Nasdaq. For example, we have had to:

- institute a more comprehensive compliance function;
- comply with rules promulgated by Nasdaq;
- prepare and distribute periodic public reports in compliance with obligations under the federal securities laws;
- establish new internal policies, such as those relating to insider trading; and
- involve and retain to a greater degree outside counsel and accountants in the above activities.

Complying with statutes, regulations and requirements relating to public companies can occupy a significant amount of time of management and significantly increase our costs and expenses, which could have a material adverse effect on our business, financial condition, results of operations and cash flows. Furthermore, our management may not be able to implement programs and policies to comply with such statutes, regulations and requirements in an effective and timely manner.

***While we are currently continuing to execute strategic initiatives to realize synergies from the Bite Squad Merger and reduce costs, these initiatives may never be successful, and any failure to achieve projected cost savings may adversely affect our business, financial condition and results of operations.***

During the second half of 2019 and into 2020, we executed several initiatives to realize synergies from the Bite Squad Merger and reduce costs. These initiatives included various phases of staff reductions and organizational changes, which included consolidation of operations, support and sales and marketing functions and the discontinuance of the operation of certain under-performing and unprofitable assets. These initiatives are ongoing, and we cannot assure you that we will achieve some or all of the expected benefits of these initiatives. Any such failure may adversely affect our ability to fund our working capital requirements, maintain compliance with our debt covenants and achieve profitability. Furthermore, there can be no assurance that we will have access to financing on terms satisfactory to us, or at all, to alleviate any lack of success in achieving the total annual savings expected.

**Risks Related to Ownership of Our Securities**

***The market price of our common stock may be volatile and could decline.***

The market price of our common stock may fluctuate significantly in response to various factors, some of which are beyond our control. In addition to the factors discussed in this "Risk Factors" section and elsewhere in this Form 10-K, the factors that could affect our stock price are:

- industry or general market conditions;
- domestic and international political and economic factors unrelated to our performance;
- actual or anticipated fluctuations in our quarterly operating results;
- changes in or failure to meet publicly disclosed expectations as to our future financial performance;
- changes in securities analysts' estimates of our financial performance or lack of research and reports by industry analysts;
- action by institutional stockholders or other large stockholders, including sales of large blocks of common stock;
- speculation in the press or investment community;
- changes in investor perception of us and our industry;
- changes in market valuations or earnings of similar companies;
- announcements by us or our competitors of significant products, contracts, acquisitions or strategic partnerships;
- changes in our capital structure, such as future sales of our common stock or other securities;
- changes in applicable laws, rules or regulations, regulatory actions affecting us and other dynamics; and
- additions or departures of key personnel.

In addition, if the benefits of the Landcadia Business Combination and/or Bite Squad Merger do not meet the expectations of investors or securities analysts, the market price of our securities may decline. Prior to the Landcadia Business Combination, trading in our common stock was not active. Accordingly, the valuation ascribed to our common stock in the Landcadia Business Combination may not be indicative of the price that will prevail in the trading market following the business combination. If an active market for our securities develops and continues, the trading price of our securities following the business combination could be volatile and subject to wide fluctuations in response to the various factors, including those listed above.

The stock markets have experienced extreme volatility over time that has been unrelated to the operating performance of particular companies. These broad market fluctuations may adversely affect the trading price of our common stock. In the past, following periods of volatility in the market price of a company's securities, class action litigation has sometimes been instituted against such company. Any litigation of this type brought against us could result in substantial costs and a diversion of our management's attention and resources, which would harm our business, operating results and financial condition.

***Future sales of a substantial number of shares by existing stockholders could cause our share price to decline.***

Sales of substantial amounts of our common stock in the public market, or the perception that these sales could occur, could cause the market price of our common stock to decline. As of March 6, 2020, we had 76,598,143 shares of common stock outstanding. The registration statement registering our securities issued in connection with the Landcadia Business Combination and Bite Squad Merger became effective on February 14, 2019, and all such securities registered thereby, except for shares of common stock subject to transfer restrictions, are eligible to be sold into the public market, subject to compliance with the Company's insider trading policy for such parties that are covered thereby. Significant sales of our common stock could cause our share price to decline.

In the future, we may issue additional shares of common stock or other equity or fixed maturity securities convertible into common stock in connection with a financing, acquisition, and litigation settlement or employee arrangement or otherwise. Any of these issuances could result in substantial dilution to our existing stockholders and could cause the trading price of our common stock to decline.

***If we are unable to maintain compliance with the listing requirements of Nasdaq, our common stock may be delisted from Nasdaq, which could have a material adverse effect on our financial condition and could make it more difficult for you to sell your shares.***

Our common stock is listed on Nasdaq, and we are therefore subject to its continued listing requirements, including requirements with respect to, among other things, certain major corporate transactions, the composition of our Board and committees thereof, the minimum bid price of our common stock and minimum stockholders' equity.

On October 11, 2019, Susan Collyns and Scott Fletcher resigned as directors of the Board. On October 14, 2019, we notified Nasdaq that, as a result of the resignations of Susan Collyns and Scott Fletcher from our Board, we are no longer in compliance with the requirements of Nasdaq Listing Rule 5605 to have (i) a Board comprised of a majority of independent directors, (ii) an Audit Committee

24

comprised of at least three members who satisfy certain criteria and (iii) a Compensation Committee comprised of at least two members who satisfy certain criteria. On October 28, 2019, we received two letters from Nasdaq confirming the above non-compliance. We submitted a plan to Nasdaq on December 11, 2019 regarding our steps to regain compliance. The plan was accepted, granting the Company an extension of up to 180 days from October 28, 2019 to regain compliance. We must satisfy the Audit Committee and Compensation Committee requirements by the earlier of (i) our next annual shareholders' meeting or October 11, 2020 or (ii) if our next annual shareholders' meeting is held before April 8, 2020, no later than April 8, 2020. While we are working to satisfy the Nasdaq Listing Rules relating to the composition of our Board, Audit Committee and Compensation Committee, including actively searching for qualified candidates to join the Board, such efforts may not be successful.

Additionally, Nasdaq listing requirements include the maintenance of a minimum average closing price of at least $1.00 per share during a consecutive 30 trading-day period. On December 2, 2019, we received written notice from Nasdaq indicating that the minimum bid price of our common stock had closed at less than $1.00 per share over the previous 30 consecutive business days, and as a result, did not comply with Listing Rule 5550(a)(2) (the "Bid Price Rule"). In accordance with Listing Rule 5810(c)(3)(A), we are being provided 180 calendar days, or until June 1, 2020, to regain compliance with the Bid Price Rule. If at any time before June 1, 2020, the bid price of our common stock closes at $1.00 per share or more for a minimum of 10 consecutive business days, Nasdaq will provide us with written confirmation of compliance with the Bid Price Rule and the matter will be closed.

If a suspension or delisting of our common stock were to occur, for any of the reasons above or for any other reason, there would be significantly less liquidity in the suspended or delisted securities. In addition, our ability to raise additional necessary capital through equity or debt financing and attract and retain personnel by means of equity compensation, would be greatly impaired. Furthermore, we would expect decreases in institutional and other investor demand, analyst coverage, market making activity and information available concerning trading prices and volume, and fewer broker-dealers would be willing to execute trades of our common stock. A suspension or delisting would likely decrease the attractiveness of our common stock to investors and cause the trading volume of our common stock to decline, which could result in a further decline in the market price of our common stock.

**If securities or industry analysts do not publish research or publish misleading or unfavorable research about our business, our stock price and trading volume could decline.**

The trading market for our common stock depends in part on the research and reports that securities or industry analysts publish about us or our business. We are currently covered by one or more securities analysts, but there is no guarantee such coverage will continue. If one or more of the analysts covering our common stock downgrades our common stock or publishes misleading or unfavorable research about our business, our stock price would likely decline. If one or more of these analysts ceases coverage of our company or fails to publish reports on us regularly, demand for our common stock could decrease, which could cause our stock price or trading volume to decline.

**Future offerings of debt or equity securities that rank senior to our common stock may adversely affect the market price of our common stock.**

If, in the future, we decide to issue debt or equity securities that rank senior to our common stock, it is likely that such securities will be governed by an indenture or other instrument containing covenants restricting our operating flexibility. Additionally, any convertible or exchangeable securities that we issue in the future may have rights, preferences and privileges more favorable than those of our common stock and may result in dilution of the percentage ownership of the holders of our common stock. We and, indirectly, our stockholders, will bear the cost of issuing and servicing such securities. Because our decision to issue debt or equity securities in any future offering will depend on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of our future offerings. Thus, holders of our common stock will bear the risk of our future offerings reducing the market price of our common stock and diluting the value of their shareholdings in us.

**Fulfilling our obligations incident to being a public company, including with respect to the requirements of and related rules under the Sarbanes-Oxley Act of 2002, is expensive and time-consuming, and any delays or difficulties in satisfying these obligations could have a material adverse effect on our future results of operations and our stock price.**

We are required to file annual, quarterly and other reports with the SEC. We are required to prepare and timely file financial statements that comply with SEC reporting requirements. We are also subject to other reporting and corporate governance requirements under the listing standards of Nasdaq and the Sarbanes-Oxley Act of 2002, which impose significant compliance costs and obligations upon us. Being a public company requires a significant commitment of resources and management oversight which increases our operating costs. These requirements also continue to place significant demands on our finance and accounting staff, which may not have prior public company experience or experience working for a newly public company, and on our financial accounting and information systems. We have hired, and in the future may hire, additional accounting and financial staff with public company

reporting experience and technical accounting knowledge. Other expenses associated with being a public company include increases in auditing, accounting and legal fees and expenses, investor relations expenses, increased directors' fees and director and

25

1/13/2021　Case 2:19-cv-01260-TAD-KK　Document 56-1　Filed 01/21/21　Page 80 of 295 PageID
wtrh-10k_20191231.htm
#: 3373

TABLE OF CONTENTS

officer liability insurance costs, registrar and transfer agent fees and listing fees, as well as other expenses. As a public company, we are required, among other things, to:

- prepare and file periodic reports, and distribute other stockholder communications, in compliance with the federal securities laws and Nasdaq listing standards;

- define and expand the roles and the duties of our Board and its committees;

- institute more comprehensive compliance, investor relations and internal audit functions; and

- evaluate and maintain our system of internal control over financial reporting, and report on management's assessment thereof, in compliance with rules and regulations of the SEC and the Public Company Accounting Oversight Board.

In particular, the Sarbanes-Oxley Act of 2002 requires us to document and test the effectiveness of our internal control over financial reporting in accordance with an established internal control framework, and to report on our conclusions as to the effectiveness of our internal controls. In addition, we are required under the Exchange Act to maintain disclosure controls and procedures and internal control over financial reporting. Any failure to implement required new or improved controls, or difficulties encountered in their implementation, could harm our operating results or cause us to fail to meet our reporting obligations. If we are unable to conclude that we have effective internal control over financial reporting, investors could lose confidence in the reliability of our financial statements. This could result in a decrease in the value of our common stock. Failure to comply with the Sarbanes-Oxley Act of 2002 could potentially subject us to sanctions or investigations by the SEC, Nasdaq, or other regulatory authorities.

***Anti-takeover provisions in our third amended and restated certificate of incorporation as currently in effect (the "Charter") discourage, delay or prevent a change in control of our company and may affect the trading price of our common stock.***

Our Charter includes a number of provisions that may discourage, delay or prevent a change in our management or control over us. For example, our Charter includes the following provisions:

- a staggered board providing for three classes of directors, which limits the ability of a stockholder or group to gain control of our Board;

- the ability of our Board to issue preferred stock, which could contain features that delay or prevent a change of control;

- no cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates;

- the right of our Board to elect a director to fill a vacancy created by the expansion of our Board or the resignation, death or removal of a director in certain circumstances, which prevents stockholders from being able to fill vacancies on our Board;

- a prohibition on stockholder action by written consent, which forces stockholder action to be taken at an annual or special meeting of our stockholders;

- a prohibition on stockholders calling a special meeting and the requirement that a meeting of stockholders may only be called by members of our Board, which may delay the ability of our stockholders to force consideration of a proposal or to take action, including the removal of directors;

- the requirement that the removal of directors by the stockholders be approved by the affirmative vote of holders of at least seventy-five percent (75%) of the voting power of all then outstanding shares of capital stock entitled to vote generally in the election of directors, which limits the ability of stockholders to remove directors;

- the requirement that the adoption, amendment, alteration or repeal of the bylaws by stockholders be approved by the affirmative vote of at least seventy-five percent (75%) of the voting power of all then outstanding shares of capital stock entitled to vote generally in the election of directors and the requirement that the amendment or repeal of certain provisions of our certificate of incorporation be approved by the affirmative vote of at least seventy-five percent (75%) of the outstanding shares entitled to vote thereon, which limit the ability of stockholders to effect corporate governance changes; and

- advance notice procedures that stockholders must comply with in order to nominate candidates to our Board or to propose matters to be acted upon at a meeting of stockholders, which may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of the Company.

These provisions may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if the provisions are viewed as discouraging takeover attempts in the future.

Our Charter may also make it difficult for stockholders to replace or remove our management. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

***The Charter designates the Court of Chancery of the State of Delaware and federal court within the State of Delaware as the exclusive forum for certain types of actions and proceedings that the Company's stockholders may initiate, which could limit a stockholder's ability to obtain a favorable judicial forum for disputes with the Company or its directors, officers or employees.***

Our Charter provides that, subject to limited exceptions, the Court of Chancery of the State of Delaware and federal court within the State of Delaware will be exclusive forums for any:

- derivative action or proceeding brought on the Company's behalf;

- action asserting a claim of breach of a fiduciary duty owed by any of the Company's directors, officers or other employees to the Company or its stockholders;

- action asserting a claim against the Company arising pursuant to any provision of the DGCL, our Charter or our Bylaws; or

- other action asserting a claim against the Company that is governed by the internal affairs doctrine.

Any person or entity purchasing or otherwise acquiring any interest in shares of the Company's capital stock shall be deemed to have notice of and to have consented to the provisions of the Company's Charter described above. These choice of forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with the Company or its directors, officers or other employees, which may discourage such lawsuits against the Company and its directors, officers and employees. Alternatively, if a court were to find these provisions of the Charter inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, the Company may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect the Company's business and financial condition.

***The Debt Warrants are exercisable for shares of our common stock and the Notes are convertible into shares of our common stock, which would increase the number of shares eligible for future resale in the public market and result in dilution to our stockholders.***

We issued Debt Warrants to Luxor Capital in connection with the Debt Facility. The Debt Warrants are currently exercisable for 399,726 shares of our common stock with an exercise price of $12.51 per share. In addition, the Notes are convertible into up to 4,886,625 shares of common stock. The shares of common stock issued upon exercise of the Debt Warrants and conversion of the Notes will result in dilution to the then existing holders of common stock of the Company and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of our common stock. See Part II, Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations*, for the definitions of Debt Facility, Notes and Luxor Capital and Part II, Item 8, *Note 16 – Stockholders' Equity*, for the definition of Debt Warrants.

***We are an emerging growth company within the meaning of the Securities Act, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies, this could make our securities less attractive to investors and may make it more difficult to compare our performance with other public companies.***

We are an "emerging growth company" within the meaning of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor internal controls attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, our stockholders may not have access to certain information they may deem important. We could be an emerging growth company for up to five years, although circumstances could cause us to lose that status earlier, including but not limited to, if the market value of our common stock held by non-affiliates exceeds $700 million as of any June 30 before that time, in which case we would no longer be an emerging growth company as of the following December 31. We cannot predict whether investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

27

*We may issue shares of preferred stock in the future, which could make it difficult for another company to acquire us or could otherwise adversely affect holders of our common stock, which could depress the price of our common stock.*

Our Charter authorizes us to issue one or more series of preferred stock. Our Board has the authority to determine the preferences, limitations and relative rights of the shares of preferred stock and to fix the number of shares constituting any series and the designation of such series, without any further vote or action by our shareholders. Our preferred stock could be issued with voting, liquidation, dividend and other rights superior to the rights of our common stock. The potential issuance of preferred stock may delay or prevent a change in control of us, discourage bids for our common stock at a premium to the market price, and materially and adversely affect the market price and the voting and other rights of the holders of our common stock.

## Item 1B.  Unresolved Staff Comments

None.

## Item 2.  Properties

Our properties consist of leased facilities for key administrative, operational and technology functions. Our corporate headquarters are located in Lafayette, Louisiana. We consider our current facilities suitable for their purpose and adequate to support our business. Additional information relative to lease obligations is included in Item 7 of Part II of this Form 10-K.

## Item 3.  Legal Proceedings

On July 14, 2016, Waiter.com, Inc. filed a lawsuit against Waitr Incorporated, the Company's wholly-owned subsidiary, in the United States District Court for the Western District of Louisiana, alleging trademark infringement based on Waitr's use of the "Waitr" trademark and logo, Civil Action No.: 2:16-CV-01041. Plaintiff seeks injunctive relief and damages relating to Waitr's use of the "Waitr" name and logo. A trial date has been set for June 22, 2020. Waitr believes that this case lacks merit and that it has strong defenses to all of the infringement claims alleged. Waitr intends to vigorously defend the suit.

In February 2019, the Company was named a defendant in a lawsuit titled Halley, et al vs. Waitr Holdings Inc. filed in the United States District Court for the Eastern District of Louisiana on behalf of plaintiff and similarly situated drivers alleging violations of the Fair Labor Standards Act ("FLSA"), and in March 2019, the Company was named a defendant in a lawsuit titled Montgomery v. Waitr Holdings Inc. filed in the United States District Court for the Eastern District of Louisiana on behalf of plaintiff and similarly situated drivers, alleging violations of FLSA and Louisiana Wage Payment Act. Waitr believes that this case lacks merit and that it has strong defenses to the claims and is vigorously defending the suit.

On September 26, 2019, Christopher Meaux, David Pringle, Jeff Yurecko, Tilman J. Fertitta, Richard Handler, Waitr Holdings Inc. f/k/a Landcadia Holdings Inc., Jefferies Financial Group, Inc. and Jefferies, LLC were named as defendants in a lawsuit titled Walter Welch, Individually and on Behalf of all Others Similarly Situated vs. Christopher Meaux, David Pringle, Jeff Yurecko, Tilman J. Fertitta, Richard Handler, Waitr Holdings Inc. f/k/a Landcadia Holdings Inc., Jefferies Financial Group, Inc. and Jefferies, LLC, filed in the Western District of Louisiana, Lake Charles Division, on behalf of plaintiff and all others similarly situated alleging, inter alia, that various defendants made false and misleading statements in securities filings, engaged in fraud, and violated accounting and securities rules. Waitr believes that this case lacks merit and that it has strong defenses to all of the infringement claims alleged. Waitr intends to vigorously defend the suit.

In addition to the lawsuits described above, Waitr is involved in other litigation arising from the normal course of business activities. Waitr is involved in various lawsuits involving claims for personal injuries, physical damage and workers' compensation benefits suffered as a result of alleged Waitr drivers, independent contractors, and third-party negligence. Although Waitr believes that it maintains insurance that generally covers its liability for damages, if any, insurance coverage is not guaranteed, and Waitr could suffer material losses as a result of these claims or the denial of coverage for such claims.

## Item 4.  Mine Safety Disclosures

Not applicable.

28

**PART II**

**Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

The Company's common stock began trading on Nasdaq under the symbol "WTRH" on November 16, 2018. As of the close of business on March 6, 2020, there were approximately 451 stockholders of record of the Company's common stock. The number of holders of record is based upon the actual number of holders registered at such date and does not include holders of shares in "street name" or persons, partnerships, associates, corporations or other entities in security position listings maintained by depositories.

Prior to the Landcadia Business Combination, Landcadia Holdings, Inc. had 25,000,000 public warrants (the "Public Warrants") which traded on the over-the-counter markets operated by OTC Markets Group. In the first quarter of 2019, the Company commenced an exchange offer and consent solicitation relating to the Public Warrants. A total of 4,494,889 shares, after adjustments for fractional shares (which were settled in cash in the second quarter of 2019), of the Company's common stock were issued in exchange for such Public Warrants.

**Dividends**

The Company has not paid any cash dividends on its common stock to date. The payment of cash dividends in the future will be dependent upon the Company's revenues and earnings, if any, capital requirements and general financial condition. The payment of any cash dividends will be within the discretion of the Board at such time. The Board is not currently contemplating and does not anticipate declaring any stock dividends in the foreseeable future. Further, if the Company incurs any indebtedness, its ability to declare dividends may be limited by restrictive covenants that may be agreed to in connection therewith.

**Issuer Purchases of Equity Securities**

*Unregistered Sales of Equity Securities*

There were no sales of unregistered equity securities during the three months and year ended December 31, 2019.

*Issuer Purchases of Equity Securities*

During the three months and year ended December 31, 2019, the Company did not repurchase any of its common stock.

29

## Item 6.  Selected Financial Data

The following table sets forth, as of the dates and for the periods indicated, selected financial data which is derived from the Company's audited consolidated financial statements for the respective periods (in thousands, except per share amounts). Reported amounts from operations included herein prior to the Landcadia Business Combination are those of Waitr Incorporated. The following table includes the results of operations of Bite Squad from the acquisition date, January 17, 2019, through December 31, 2019.

The following selected financial data is not necessarily indicative of the results of future operations and should be read in conjunction with Part II, Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations*, and the consolidated financial statements and the related notes thereto included in Part II, Item 8, *Financial Statements and Supplementary Data* of this Form 10-K to fully understand factors that may affect the comparability of the information presented below. Certain 2017 expenses have been reclassified to conform to current period presentation. See Part II, Item 8, *Note 2 – Basis of Presentation and Summary of Significant Accounting Policies*, for further details.

| | | | Years Ended December 31, | | |
|---|---|---|---|---|---|
| $ in thousands, except per share data | 2019 | 2018 | 2017 | 2016 | 2015 |
| REVENUE | $ 191,675 | $ 69,273 | $ 22,911 | $ 5,650 | $ 340 |
| COSTS AND EXPENSES: | | | | | |
| Operations and support | 147,759 | 51,428 | 20,970 | 4,785 | 186 |
| Sales and marketing | 52,370 | 15,695 | 5,661 | 1,359 | 137 |
| Research and development | 7,718 | 3,913 | 1,586 | 395 | 180 |
| General and administrative | 56,862 | 31,148 | 9,437 | 4,161 | 674 |
| Depreciation and amortization | 15,774 | 1,223 | 723 | 267 | 26 |
| Goodwill impairment | 119,212 | — | — | — | — |
| Intangible and other asset impairments | 73,251 | — | 584 | 5 | — |
| Loss on disposal of assets | 36 | 9 | 33 | 3 | — |
| TOTAL COSTS AND EXPENSES | 472,982 | 103,416 | 38,994 | 10,975 | 1,203 |
| LOSS FROM OPERATIONS | (281,307) | (34,143) | (16,083) | (5,325) | (863) |
| OTHER EXPENSES (INCOME) AND LOSSES (GAINS), NET | | | | | |
| Interest expense | 9,408 | 1,822 | 283 | 4,468 | 91 |
| Interest income | (1,037) | (406) | (2) | (1) | — |
| (Gain) loss on derivatives | — | (337) | 52 | (484) | (144) |
| (Gain) loss on debt extinguishment | — | (486) | 10,537 | (599) | — |
| Other expenses (income) | 1,547 | 2 | (52) | 8 | 5 |
| NET LOSS BEFORE INCOME TAXES | (291,225) | (34,738) | (26,901) | (8,717) | (815) |
| Income tax expense (benefit) | 81 | (427) | 6 | 5 | — |
| NET LOSS | $(291,306) | $ (34,311) | $ (26,907) | $ (8,722) | $ (815) |
| LOSS PER SHARE: | | | | | |
| Basic and diluted | $ (4.00) | $ (2.18) | $ (2.69) | $ (1.02) | $ (0.10) |
| CASH FLOW DATA: | | | | | |
| Net cash used in operating activities | $ (73,477) | $ (15,842) | $ (12,411) | $ (4,497) | $ (663) |
| Net cash used in investing activities | (196,576) | (3,761) | (1,874) | (826) | (203) |
| Net cash provided by financing activities | 90,030 | 224,996 | 14,947 | 8,334 | 1,115 |
| BALANCE SHEET DATA (at end of period): | | | | | |
| Total cash | $ 29,317 | $ 209,340 | $ 3,947 | $ 3,285 | N/A |
| Total assets | 178,973 | 226,552 | 11,407 | 7,815 | N/A |
| Total liabilities | 156,065 | 97,061 | 12,917 | 1,432 | N/A |
| Total stockholders' equity (deficit) | 22,908 | 129,491 | (1,510) | 6,383 | N/A |

30

## Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following Management's Discussion and Analysis of Financial Condition and Results of Operations should be read in conjunction with the consolidated financial statements and related notes thereto included elsewhere in this Form 10-K. Dollar amounts in this discussion are expressed in thousands, except as otherwise noted. The following discussion contains forward-looking statements that reflect future plans, estimates, beliefs and expected performance. The forward-looking statements are dependent upon events, risks and uncertainties that may be outside of our control. Our actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those identified below and those discussed elsewhere in this Form 10-K, particularly in Part I, Item 1A, Risk Factors. Waitr does not undertake any obligation to publicly update any forward-looking statements except as otherwise required by applicable law.*

### Overview

Waitr operates an online food ordering and delivery platform, connecting local restaurants and diners in cities across the United States. Our strategy is to bring delivery and carryout infrastructure to underserved populations of restaurants and diners and establish market leadership positions in the markets in which we operate. On January 17, 2019, we completed the acquisition of Bite Squad, an online food ordering and delivery platform with operations similar to those of Waitr. The consideration for the Bite Squad Merger consisted of $197,255 payable in cash (subject to adjustments), the pay down of $11,880 of indebtedness of Bite Squad and an aggregate of 10,591,968 shares of the Company's common stock (par value $0.0001), valued at $11.95 per share. Our business has been built with a restaurant-first philosophy by providing differentiated and brand additive services to the restaurants on the Platforms. Our Platforms allow consumers to browse local restaurants and menus, track order and delivery status, and securely store previous orders for ease of use and convenience. Restaurants benefit from the online Platforms through increased exposure to consumers for expanded business in the delivery market and carryout sales.

The acquisition of Bite Squad expanded our scale and footprint across the United States and resulted in significant increases in Average Daily Orders (as defined below) and revenue for the year ended December 31, 2019 as compared to the same period of 2018 and 2017. Average Daily Orders for the years ended December 31, 2019, 2018 and 2017 were approximately 51,156, 21,860 and 9,315, respectively. Our revenues grew to $191,675 in the year ended December 31, 2019 compared to $69,273 in the year ended December 31, 2018 and $22,911 in the year ended December 31, 2017. As of December 31, 2019, we had approximately 18,000 restaurants on the Platforms across approximately 640 cities.

We started 2019 with a focus on strengthening the business through realization of synergies from the Bite Squad Merger and aligning the teams and cost structure of the combined organization into one set of guiding principles. During the second half of 2019 and into 2020, we executed several initiatives to realize these synergies, implementing various phases of staff reductions and organizational changes, which included consolidation of operations, support and sales and marketing functions and successfully integrating five markets in which Waitr and Bite Squad operations overlapped. We initiated modifications to our fee structure in July 2019 with a majority of restaurants on the Waitr Platform, which became effective in August 2019, and in January 2020, with the majority of our remaining restaurants, which became effective throughout February 2020. Further, in December 2019 and January 2020, we closed approximately 60 unprofitable, non-core markets, which accounted for 7% of our 2019 revenue. The combination of these initiatives has reduced the Company's overall cost structure and resulted in improved revenue per order and cash flow and as of March 13, 2020, our cash on hand was approximately $30,500, essentially flat relative to December 2019.

Furthermore, we are in the process of implementing additional strategic initiatives, with a focus on improving revenue per order, costs per order, cash flow, profitability and liquidity. These initiatives include, among other things, new and enhanced service offerings to our restaurant partners (such as priority placement, payment processing and consumer marketing), a continued focus on increasing restaurant supply on the Platforms, as well as an initiative to change to a contract labor model for delivery drivers. The implementation of the contract labor driver model is expected to be complete early in the second quarter of 2020. These initiatives are ongoing and we intend to continue to make changes to drive efficiencies and improve revenue and profitability. We continue to evaluate additional opportunities to strengthen our liquidity position, fund growth initiatives and/or combine with other businesses to complement our operating cash flows as we pursue our long-term growth plans.

During the third quarter of 2019, we recognized non-cash impairment charges totaling $191,194 to write down the carrying values of goodwill and intangible assets to their implied fair values. See Part II, Item 8, *Note 7 – Intangible Assets and Goodwill* for additional details. The write-downs of goodwill and intangible assets were determined using estimates of fair value, which utilize significant inputs and assumptions such as forecasts (e.g., revenue, operating costs, capital expenditures, etc.), discount rate, long-term growth rate, tax rates, and market-based enterprise value to revenue multiples, among others. Should our estimates or assumptions worsen, or should negative events or circumstances occur, additional impairments may be needed.

31

### *Management Changes*

On August 8, 2019, Christopher Meaux resigned as Chief Executive Officer of the Company, on September 11, 2019, Joseph Stough resigned as President of the Company and on November 1, 2019, Jeff Yurecko resigned as Chief Financial Officer of the Company. Mr. Meaux continued to serve as Chairman of the Board until March 3, 2020, at which time he was appointed as Vice-Chairman of the Board.

On August 8, 2019, the Board appointed Adam Price to the position of Chief Executive Officer, increased the size of the Board to nine members and appointed Mr. Price as a Class II director. Mr. Price previously had been serving as Chief Operating Officer of the Company. Following Mr. Yurecko's departure on November 1, 2019, Karl Meche, the Company's Chief Accounting Officer, assumed the role of principal financial officer. On December 27, 2019, Mr. Price resigned as Chief Executive Officer of the Company and as a member of the Board.

On January 3, 2020, the Board appointed Carl A. Grimstad to the position of Chief Executive Officer of the Company, and a member of the Board. Mr. Grimstad, age 52, is currently the chief manager of C. Grimstad Associates, LLC, a family private investment entity formed in 2006, and the managing partner of GS Capital, LLC, a family private investment company formed in 1995. In 1999, Mr. Grimstad co-founded iPayment Inc. ("iPayment") and acted as the President of iPayment until 2011, when he became the Chairman and Chief Executive Officer of the company until 2016. On March 3, 2020, the Board appointed Mr. Grimstad as Chairman of the Board.

### *Nasdaq Compliance*

On October 14, 2019, the Company notified Nasdaq that, as a result of the resignations of Susan Collyns and Scott Fletcher from its Board on October 11, 2019, the Company was no longer in compliance with the requirements of Nasdaq Listing Rule 5605 to have (i) a Board comprised of a majority of independent directors, (ii) an Audit Committee comprised of at least three members who satisfy certain criteria and (iii) a Compensation Committee comprised of at least two members who satisfy certain criteria. We submitted a plan to Nasdaq on December 11, 2019 regarding our steps to regain compliance. The plan was accepted, granting the Company an extension of up to 180 days from October 28, 2019 to regain compliance.

We must satisfy the Audit Committee and Compensation Committee requirements by the earlier of (i) our next annual shareholders' meeting or October 11, 2020 or (ii) if our next annual shareholders' meeting is held before April 8, 2020, no later than April 8, 2020. We are committed to satisfying the Nasdaq Listing Rules relating to the composition of our Board, Audit Committee and Compensation Committee and are actively searching for qualified candidates to join our Board.

Additionally, on December 2, 2019, we received written notice from Nasdaq indicating that the minimum bid price of our common stock had closed at less than $1.00 per share over the previous 30 consecutive business days and, as a result, did not comply with Listing Rule 5550(a)(2) (the "Bid Price Rule"). In accordance with Listing Rule 5810(c)(3)(A), we are being provided 180 calendar days, or until June 1, 2020, to regain compliance with the Bid Price Rule. If at any time before June 1, 2020, the bid price of our common stock closes at $1.00 per share or more for a minimum of 10 consecutive business days, Nasdaq will provide us with written confirmation of compliance with the Bid Price Rule and the matter will be closed.

## Significant Accounting Policies and Critical Estimates

The preparation of financial statements in accordance with GAAP requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period, along with related disclosures. We regularly assess these estimates and record changes to estimates in the period in which they become known. We base our estimates on historical experience and various other assumptions believed to be reasonable under the circumstances. Changes in the economic environment, financial markets, and any other parameters used in determining these estimates could cause actual results to differ from estimates. Significant estimates and judgements relied upon in preparing these consolidated financial statements affect the following items:

- determination of the nature and timing of satisfaction of revenue-generating performance obligations and the standalone selling price of performance obligations;
- variable consideration;
- other obligations such as product returns and refunds;
- allowance for doubtful accounts and chargebacks;
- incurred loss estimates under our insurance policies with large deductibles or retention levels;
- income taxes;

- useful lives of tangible and intangible assets;
- depreciation and amortization;
- equity compensation;

32

- contingencies;
- goodwill and other intangible assets, including the recoverability of intangible assets with finite lives and other long-lived assets;
- impairments; and
- fair value of assets acquired and liabilities assumed as part of a business combination.

For a description of our significant accounting policies, see Part II, Item 8, *Note 2 – Basis of Presentation and Summary of Significant Accounting Policies*, to our consolidated financial statements in this Form 10-K.

For a description of accounting standards adopted during the year ended December 31, 2019, see Part II, Item 8, *Note 2 – Basis of Presentation and Summary of Significant Accounting Policies*, to our consolidated financial statements in this Form 10-K. Also described in Note 2 are pending standards and their estimated effect on our consolidated financial statements.

We qualify as an "emerging growth company" pursuant to the provisions of the JOBS Act. For as long as we are an "emerging growth company," we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies," including not being required to comply with the auditor attestation requirements of Section 404(b) of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, reduced disclosure obligations relating to the presentation of financial statements in *Management's Discussion and Analysis of Financial Condition and Results of Operations*, exemptions from the requirements of holding advisory "say-on-pay" votes on executive compensation and stockholder advisory votes on golden parachute compensation. We have availed ourselves of the reduced reporting obligations and executive compensation disclosures in this Form 10-K. In addition, an emerging growth company can delay its adoption of certain accounting standards until those standards would otherwise apply to private companies. Although we have the ability to "opt out" of this extended transition period, we are choosing not to do so. Section 107 of the JOBS Act provides that a decision to opt out of the extended transition period for complying with new or revised accounting standards is irrevocable.

## Factors Affecting the Comparability of Our Results of Operations

*The Landcadia Business Combination and Public Company Costs.* The Landcadia Business Combination was accounted for as a reverse recapitalization, with no goodwill or other intangible assets recorded, in accordance with GAAP. Under this method of accounting, Landcadia Holdings, Inc. was treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the Landcadia Business Combination was treated as the equivalent of Waitr Incorporated issuing stock for the net assets of Landcadia Holdings, Inc., accompanied by a recapitalization. The net assets of Landcadia Holdings, Inc. were stated at historical cost, with no goodwill or other intangible assets recorded. Reported amounts from operations included herein prior to the Landcadia Business Combination are those of Waitr Incorporated. Waitr Incorporated is Landcadia Holdings, Inc.'s accounting predecessor and the Landcadia Business Combination required us to hire additional staff and implement procedures and processes to address regulatory and customary requirements applicable to public companies.

In connection with the closing of the Landcadia Business Combination in 2018, Waitr Incorporated's convertible promissory notes (the "Waitr Convertible Notes") were either ultimately converted into shares of our post-combination common stock or redeemed for cash. The redemption of the Waitr Convertible Notes for cash resulted in a gain on debt extinguishment of $952, representing the carrying value of the redeemed Waitr Convertible Notes as of the redemption date. In addition, immediately after the consummation of the Landcadia Business Combination, we repaid a line of credit, plus origination fees and accrued interest, resulting in a loss on debt extinguishment of $466, representing the balance of the unamortized debt issuance costs on the date of repayment.

In 2017, we recorded a non-cash loss on debt extinguishment of $10,537 as a result of a Waitr Convertible Notes amendment that modified the conversion ratio, resulting in the application of extinguishment accounting and representing the difference between the fair value of the amended Waitr Convertible Notes and their carrying amount. The conversion and cash redemption of the Waitr Convertible Notes and the exercise of warrants by the lenders under the aforementioned line of credit impacted our statements of operations and stockholders' equity (deficit) in reporting periods that include the Landcadia Business Combination.

*Bite Squad Merger.* The Bite Squad Merger was considered a business combination in accordance with ASC 805, and has been accounted for using the acquisition method. Under the acquisition method of accounting, total merger consideration, acquired assets and assumed liabilities are recorded based on their estimated fair values on the acquisition date. The excess of the fair value of merger consideration over the fair value of the assets less liabilities acquired has been recorded as goodwill. The results of operations of Bite Squad are included in our consolidated financial statements beginning on the acquisition date, January 17, 2019.

In connection with the Bite Squad Merger, we incurred direct and incremental costs through December 31, 2019, of approximately $6,956, consisting of legal and professional fees, which are included in general and administrative expenses in the

consolidated statement of operations in 2019. Although we expect the elimination of duplicative costs and other cost synergies over time, we may not achieve this result as quickly as anticipated, resulting in materially higher general and administrative expenses in future periods.

33

TABLE OF CONTENTS

***Changes in Fee Structure.*** We have made several modifications to our fee structure during the fiscal periods presented in this Form 10-K. Since 2017, our fee structure evolved gradually from a per transaction fee plus a percentage of the food sale amount to one based exclusively on a percentage of the food sale amount. In early 2018, we also established a multi-tier fee structure, allowing restaurants to elect to pay a higher fee rate in lieu of paying a one-time set-up and integration fee. We initiated modifications to our fee structure in July 2019 with a majority of restaurants on the Waitr Platform, which became effective in August 2019, and in January 2020, with the majority of our remaining restaurants, which became effective throughout February 2020. We continue to review and update our rate structure, as we look to offer new and enhanced value-adding services to our restaurant partners.

The July 2019 modified fee structure was performance-based and tiered such that restaurants with higher sales through the Waitr Platform were subject to a rate at the lower end of the range, whereas restaurants with lower sales through the Waitr Platform were subject to a rate at the upper end of the range. With the introduction of the July 2019 modifications, we discontinued offering fee arrangements with the upfront, one-time setup and integration fee. Upon acceptance of the performance-based fee agreement, in certain cases, the Company waived uncollected portions of the setup and integration fee and refunded portions of previously paid setup and integration fees (see Part II, Item 8, *Note 2 – Basis of Presentation and Summary of Significant Accounting Policies*) . The changes from the July 2019 modifications resulted in modestly higher revenue per transaction, but also resulted in the loss of approximately 22% of the restaurants on the Waitr Platform. Additionally, the contract modifications and the effect of such modifications on our measure of progress towards the performance obligations, resulted in a cumulative adjustment in the third quarter of 2019 to setup and integration fee revenue of $3,005, which was previously included in deferred revenue as of August 1, 2019. Further, we recognized an $852 impairment loss during the third quarter of 2019 for capitalized contract costs pertaining to or allocable to terminated restaurant contracts.

***Goodwill and Intangible Asset Impairments.*** During the year ended December 31, 2019, we recognized non-cash impairment charges totaling $191,194 to write down the carrying values of goodwill and intangible assets to their implied fair values, as a result of our annual goodwill impairment analysis, which concluded that the fair value of the reporting unit (the Company) was less than its carrying amount. The primary factor contributing to the decline in fair value of the reporting unit was the negative impacts on the Company's estimated order volumes and revenue resulting from adverse changes in market conditions from increased competition. Determining the fair value of a reporting unit and intangible assets requires the use of estimates and significant judgments that are based on a number of factors including actual operating results. It is reasonably possible that the judgments and estimates used could change in future periods. There can be no assurance that additional goodwill or intangible assets will not be impaired in future periods. Significant goodwill and intangible asset impairments may impact the comparability of our results from period to period.

***Seasonality and Holidays.*** Our business tends to follow restaurant closure and diner behavior patterns. In many of our markets, we generally experience a relative increase in order frequency from September to March and a relative decrease in diner activity from April to August primarily as a result of weather patterns, summer breaks and other vacation periods. In addition, restaurants tend to close on certain holidays, including Thanksgiving and Christmas Eve-Day, in our key markets. Further, diner activity may be impacted by unusually cold, rainy, or warm weather. Cold weather and rain typically drive increases in order volume, while unusually warm or sunny weather typically drives decreases in orders. Consequently, our results between quarters, or between periods may vary as a result of prolonged periods of unusually cold, warm, inclement, or otherwise unexpected weather and the timing of certain holidays.

***Acquisition Pipeline.*** We actively maintain and evaluate a pipeline of potential acquisitions and may be acquisitive in the future. Potentially significant future business acquisitions may impact the comparability of our results in future periods with those for prior periods.

## Key Factors Affecting Our Performance

***Efficient Market Expansion and Penetration.*** Our continued revenue growth and path to improved cash flow and profitability is dependent on successful penetration of our markets and achieving our targeted scale in current and future markets. Delay or failure in achieving positive market-level operating margins (exclusive of indirect and corporate overhead costs) could adversely affect our working capital, which in turn, could slow our growth plans.

We typically target markets that we estimate could achieve sustainable, positive market-level operating margins that support market operating cash flows and profits, improve efficiency, and appropriately leverage the scale of our advertising, marketing, research and development, and other corporate resources. Our financial condition, cash flows, and results of operations depend, in significant part, on our ability to achieve and sustain our target profitability thresholds in our markets.

***Waitr's Restaurant and Diner Network.*** Our continued growth is driven in significant part by our ability to successfully expand our network of restaurants and diners using the Platforms. If we fail to retain existing restaurants and diners using the

Platforms, or to add new restaurants and diners to the Platforms, our revenue, financial results and business may be adversely affected.

34

## Key Business Metrics

Defined below are the key business metrics that we use to analyze our business performance, determine financial forecasts, and help develop long-term strategic plans:

*Active Diners.* The number of diner accounts from which an order has been placed through the Platforms during the past twelve months (as of the end of the relevant period).

*Average Daily Orders.* The number of orders during the period divided by the number of days in that period.

*Gross Food Sales.* The total food and beverage sales, sales taxes, prepaid gratuities, and diner fees processed through the Platforms during a given period. Gross Food Sales are different than the order value upon which we charge our fee to restaurants, which excludes gratuities and diner fees. Prepaid gratuities, which are not included in our revenue, are determined by diners and may differ from order to order. Gratuities other than prepaid gratuities, such as cash tips, are not included in Gross Food Sales.

*Average Order Size.* Gross Food Sales for a given period divided by the number of orders during the same period.

| | Years Ended December 31, | | | | | |
| Key Business Metrics (1) | | 2019 | | 2018 | | 2017 |
| --- | --- | --- | --- | --- | --- | --- |
| Active Diners (as of period end) | | 2,352,007 | | 989,000 | | 419,430 |
| Average Daily Orders | | 51,156 | | 21,860 | | 9,315 |
| Gross Food Sales (dollars in thousands) | $ | 663,919 | $ | 278,833 | $ | 121,081 |
| Average Order Size (in dollars) | $ | 36.15 | $ | 34.95 | $ | 35.61 |

(1)  The key business metrics include the operations of Bite Squad beginning on the acquisition date, January 17, 2019.

## Basis of Presentation

### Revenue

We generate revenue primarily when diners place an order on one of the Platforms. We recognize revenue from diner orders when orders are delivered. Our revenue consists primarily of transaction fees, comprised of fees received from restaurants (determined as a percentage of the total food sales, net of any diner promotions or refunds to diners) and diner fees. During a portion of the periods presented in this Form 10-K, we also generated revenue from setup and integration fees collected from certain restaurants to onboard them onto the Platforms (these are recognized on a straight-line basis over the anticipated period of benefit) and subscription fees from restaurants that opt to pay a monthly fee in lieu of a lump sum setup and integration fee. Additionally, we sell gift cards and recognize revenue upon gift card redemption. Revenue also includes fees for restaurant marketing and data services.

### Cost and Expenses:

*Operations and Support.* Operations and support expense consists primarily of salaries, benefits, stock-based compensation, and bonuses for employees and contractors engaged in operations and customer service, including drivers, who are mainly full-time and part-time employees and comprised a substantial majority of our employee base at December 31, 2019, as well as city/market managers, restaurant onboarding, photography, and driver logistics personnel, and payment processing costs for customer orders.

*Sales and Marketing.* Sales and marketing expense consists primarily of salaries, commissions, benefits, stock-based compensation and bonuses for sales and sales support personnel, including restaurant business development managers, marketing employees and contractors, and third-party marketing expenses such as social media and search engine marketing, online display, team sponsorships (the costs of which are recognized on a straight line basis over the useful period of the contract) and print marketing.

*Research and Development.* Research and development expense consists primarily of salaries, benefits, stock-based compensation and bonuses for employees and contractors engaged in the design, development, maintenance and testing of the Platforms.

*General and Administrative.* General and administrative expense consists primarily of salaries, benefits, stock-based compensation and bonuses for executive, finance and accounting, human resources and administrative employees, third-party legal, accounting, and other professional services, insurance (including workers' compensation, auto liability and general liability), travel, facilities rent, and other corporate overhead costs.

TABLE OF CONTENTS

*Depreciation and Amortization.* Depreciation and amortization expense consists primarily of amortization of capitalized costs for software development, trademarks and customer relationships and depreciation of leasehold improvements, furniture, and equipment, primarily tablets deployed in restaurants. We do not allocate depreciation and amortization expense to other line items.

*Intangible and Other Asset Impairments.* Intangible and other asset impairments include write-downs of intangible assets and minor impairments related to the replacement of internally developed software code as well as the impairment of capitalized contract costs of obtaining and fulfilling contracts.

*Other Expenses (Income) and Losses (Gains), Net.* Other expenses (income) and losses (gains), net, primarily includes interest expense on outstanding debt and interest income on cash and money market deposits, as well as (gains)/losses on debt extinguishment and derivatives.

## Results of Operations

The following table sets forth our results of operations for the periods indicated, with line items presented in thousands of dollars and as a percentage of our revenue:

| (in thousands, except percentages (1)) | 2019 | % of Revenue | 2018 | % of Revenue | 2017 | % of Revenue |
|---|---|---|---|---|---|---|
| Revenue | $ 191,675 | 100% | $ 69,273 | 100% | $ 22,911 | 100% |
| **Costs and expenses:** | | | | | | |
| Operations and support (2) | 147,759 | 77% | 51,428 | 74% | 20,970 | 92% |
| Sales and marketing (2) | 52,370 | 27% | 15,695 | 23% | 5,661 | 25% |
| Research and development | 7,718 | 4% | 3,913 | 6% | 1,586 | 7% |
| General and administrative (2) | 56,862 | 30% | 31,148 | 45% | 9,437 | 41% |
| Depreciation and amortization | 15,774 | 8% | 1,223 | 2% | 723 | 3% |
| Goodwill impairment | 119,212 | 62% | — | 0% | — | 0% |
| Intangible and other asset impairments | 73,251 | 38% | — | 0% | 584 | 3% |
| Loss on disposal of assets | 36 | 0% | 9 | 0% | 33 | 0% |
| **Total costs and expenses** | 472,982 | 247% | 103,416 | 149% | 38,994 | 170% |
| **Loss from operations** | (281,307) | (147%) | (34,143) | (49%) | (16,083) | (70%) |
| **Other expenses (income) and losses (gains), net:** | | | | | | |
| Interest expense | 9,408 | 5% | 1,822 | 3% | 283 | 1% |
| Interest income | (1,037) | (1%) | (406) | (1%) | (2) | 0% |
| (Gain) loss on derivatives | — | 0% | (337) | 0% | 52 | 0% |
| (Gain) loss on debt extinguishment | — | 0% | (486) | (1%) | 10,537 | 46% |
| Other expenses (income) | 1,547 | 1% | 2 | 0% | (52) | 0% |
| **Net loss before income taxes** | (291,225) | (152%) | (34,738) | (50%) | (26,901) | (117%) |
| Income tax expense (benefit) | 81 | 0% | (427) | (1%) | 6 | 0% |
| **Net loss** | $ (291,306) | (152%) | $ (34,311) | (50%) | $ (26,907) | (117%) |

(1) Percentages may not foot due to rounding

(2) Certain prior period amounts have been reclassified to conform to current period presentation. These reclassifications had no impact on our reported total costs and expenses, loss from operations or net loss for the period. See Part II, Item 8, *Note 2 – Basis of Presentation and Summary of Significant Policies* of this Form 10-K for further details.

The following is a discussion of the results of operations of the Company for the years ended December 31, 2019 and 2018. Details of results of operations for the year ended December 31, 2017 can be found under Part II, Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations* in the Company's 2018 Annual Report on Form 10-K.

The results of operations of Bite Squad are included in our consolidated financial statements beginning on the acquisition date, January 17, 2019 (see Part II, Item 8, *Note 3 – Business Combinations* of this Form 10-K).

*Revenue*

Revenue increased by $122,402, or 177%, to $191,675 in the year ended December 31, 2019 from $69,273 in the year ended December 31, 2018. The increase was primarily due to the Bite Squad Merger and related increase in transaction volume, as well as continued adoption in existing markets and contribution from markets launched in late 2018 and early 2019.

36

TABLE OF CONTENTS

Additionally, the modifications to our fee structure in July 2019 with a majority of restaurants on the Waitr Platform resulted in modestly higher revenue per transaction, but also resulted in the loss of approximately 22% of the restaurants on the Waitr Platform at that time (Bite Squad restaurants were unaffected, since it had not previously offered the lower rate, upfront fee option to restaurants). The contract modifications and the effect of such modifications on our measure of progress towards the performance obligations, resulted in a cumulative adjustment in the third quarter of 2019 to setup and integration fee revenue of $3,005, which was previously included in deferred revenue as of August 1, 2019. The cumulative adjustment to revenue was partially offset by write-offs of uncollected setup and integration fees within accounts receivable of $797 and refunds of previously paid setup and integration fees of $320.

Average Daily Orders and Gross Food Sales increased in the year ended December 31, 2019 to 51,156 and $663,919, respectively, from 21,860 and $278,833, respectively, in the year ended December 31, 2018. Average Order Size for the year ended December 31, 2019 was $36.15, compared to $34.95 for the year ended December 31, 2018.

### Operations and Support

Operations and support expenses increased by $96,331, or 187%, to $147,759 in the year ended December 31, 2019 from $51,428 in the year ended December 31, 2018, due to increased business volume and the inclusion of results of operations from the Bite Squad Merger. As a percentage of revenue, operations and support expenses increased to 77% in 2019 from 74% in 2018.

### Sales and Marketing

Sales and marketing expense increased by $36,675, or 234%, to $52,370 in the year ended December 31, 2019 from $15,695 in the year ended December 31, 2018, primarily due to the inclusion of results of operations from the Bite Squad Merger, increased digital and traditional advertising spend of approximately $10,219 and increased headcount and sales commissions for business development managers attributable to our entry into and expansion of new and existing new markets. As a percentage of revenue, sales and marketing expense increased to 27% in 2019 from 23% in 2018.

### Research and Development

Research and development expense increased by $3,805, or 97%, to $7,718 in the year ended December 31, 2019 from $3,913 in the year ended December 31, 2018, primarily due to the inclusion of results of operations from the Bite Squad Merger and the addition of personnel focused on research and development activities. As a percentage of revenue, research and development expense was 4% for the year ended December 31, 2019 and 6% for the year ended December 31, 2018.

### General and Administrative

General and administrative expense increased by $25,714, or 83%, to $56,862 in the year ended December 31, 2019 from $31,148 in the year ended December 31, 2018, due primarily to increased headcount as a result of the Bite Squad Merger, business combination-related professional and other costs, costs associated with reductions in force and departures of certain executives, as well as increased auto liability and workers' compensation insurance costs related to increased headcount, business volume and loss claims. As a percentage of revenue, general and administrative expense decreased to 30% in 2019 compared to 45% in 2018, primarily due to the corporate synergies associated with the Bite Squad Merger.

### Depreciation and Amortization

Depreciation and amortization expense increased to $15,774 in the year ended December 31, 2019 from $1,223 in the year ended December 31, 2018, primarily as a result of the Bite Squad Merger. Depreciation and amortization expense associated with the Bite Squad Merger and related acquired intangible assets totaled $13,488 from the acquisition date through December 31, 2019. Additionally, the increase was also attributable to the increase in restaurants on the Platforms and the corresponding increase in depreciable property and equipment (namely, tablets). As a percentage of revenue, depreciation and amortization expenses increased to 8% in 2019 from 2% in 2018, primarily driven by the amortization of acquired intangible assets from the Bite Squad Merger.

### Goodwill Impairment

During the year ended December 31, 2019, we recognized a non-cash goodwill impairment charge of $119,212, as a result of our annual goodwill impairment analysis, which concluded that the fair value of the reporting unit (the Company) was less than its carrying amount. The primary factor contributing to the decline in fair value of the reporting unit was the negative impacts on our

estimated order volumes and revenue resulting from adverse changes in market conditions from increased competition. See Part II, Item 8, *Note 7 – Intangible Assets and Goodwill* for additional details.

37

*Intangible and Other Asset Impairments*

The decline in fair value of the reporting unit, described above, resulted in a non-cash intangible asset impairment charge in the year ended December 31, 2019 of $71,982 to write down the carrying value of certain intangible assets to their implied fair values. The impairment charge included the write-offs of capitalized contracts costs of $3,815, customer relationships of $57,295 and developed technology of $10,872. Additionally, during the year ended December 31, 2019, intangible and other asset impairment expense included $852 in impairment charges related to non-recoverable capitalized costs to obtain and fulfill contracts as a result of the termination by certain restaurants of their contracts in connection with the modified fee structure introduced by the Company in July 2019, $83 in impairment charges associated with the cancelation of a grocery delivery service that was part of the GoGoGrocer asset acquisition and $334 of impairment charges related to previously capitalized software development costs.

*Other Expenses (Income) and Losses (Gains), Net*

Other expenses (income) and losses (gains), net totaled $9,918 for the year ended December 31, 2019, reflecting $9,408 of interest expense associated with the Term Loans, Notes and promissory notes, a $2,000 accrual for a legal contingency and $1,037 of interest income. Other expenses (income) and losses (gains), net totaled $595 for the year ended December 31, 2018, reflecting $1,822 of interest expense associated with convertible notes, interest income of $406, a $337 gain on derivatives and $486 gain on debt extinguishment. See "**Liquidity and Capital Resources**" below for definitions of Term Loans and Notes.

*Income Tax Expense (Benefit)*

Income tax expense was $81 for the year ended December 31, 2019, entirely related to taxes required on gross margins in Texas. Income tax benefit was $(427) for the year ended December 31, 2018, largely due to the reversal of Landcadia Holdings, Inc.'s previously estimated income tax payable, which upon consummation of the Landcadia Business Combination, the Company succeeded to Waitr Incorporated's net operating loss carryforwards, portions of which can be utilized against current and future taxable income. We have historically generated net operating losses; therefore, a valuation allowance has been recorded on our net deferred tax assets.

*Net Loss*

Net loss increased by $256,995, to $291,306 in the year ended December 31, 2019 from $34,311 in the year ended December 31, 2018, for the reasons discussed above.

**Liquidity and Capital Resources**

*Overview*

As of December 31, 2019, we had cash on hand of approximately $29,317, consisting primarily of cash and money market deposits. As of December 31, 2019, approximately $3,448 of our cash balance was reserved under compensating balance arrangements with our banks, pertaining to an outstanding letter of credit and as collateral under a corporate credit card program. Our primary sources of liquidity to date have been proceeds from the issuance of stock, long-term convertible debt, term loans and the cash assumed in connection with the Landcadia Business Combination. As of December 31, 2019, we had total outstanding long-term debt of $130,961, consisting of $69,545 of Term Loans, $61,132 of Notes and $284 of promissory notes. Outstanding short-term debt as of December 31, 2019 totaled $3,612. See "*Indebtedness*" below for additional details of the Term Loans, Notes and promissory notes.

During the second half of 2019 and into 2020, we executed several initiatives to realize synergies from the Bite Squad Merger and to align the combined Company's cost structure. These initiatives included the implementation of various staff reductions and organizational changes, which included consolidation of operations, support and sales and marketing functions, and the successful integration of five markets in which Waitr and Bite Squad operations overlapped. We initiated modifications to our fee structure in July 2019 with a majority of restaurants on the Waitr Platform, which became effective in August 2019, and in January 2020, with the majority of our remaining restaurants, which became effective throughout February 2020. Further, in December 2019 and January 2020, we closed approximately 60 unprofitable, non-core markets. The combination of these initiatives has resulted in improved revenue per order and cash flow and as of March 13, 2020, our cash on hand was approximately $30,500, essentially flat relative to December 2019.

We are in the process of implementing additional strategic initiatives, with a focus on improving revenue per order, costs per order, cash flow, profitability and liquidity. These initiatives include, among other things, new and enhanced service offerings to our restaurant partners (such as priority placement, payment processing and consumer marketing), a continued focus on increasing

restaurant supply on the Platforms, as well as an initiative to change to a contract labor model for delivery drivers, the implementation of which we expect to complete early in the second quarter of 2020.

We currently expect that our cash on hand and estimated cash flow from operations will be sufficient to meet our working capital needs beyond twelve months, however, there can be no assurance that we will generate cash flow at the levels we anticipate. We

38

1/13/202 Case 2:19-cv-01260-TAD-KK    Document 56-1  Filed 01/21/21    Page 102 of 295 PageID
wtrh-10k_20190231.htm
#: 3395

TABLE OF CONTENTS

continually evaluate additional opportunities to strengthen our liquidity position, fund growth initiatives and/or combine with other businesses by issuing equity or equity-linked securities (in public or private offerings) and/or incurring additional debt. However, market conditions, our future financial performance or other factors may make it difficult or impossible for us to access sources of capital, on favorable terms or at all, should we determine in the future to raise additional funds.

### *Indebtedness*

#### *Term Loans under the Debt Facility*

On November 15, 2018, Waitr Inc., a Delaware corporation and wholly-owned indirect subsidiary of the Company, as borrower, entered into the Credit and Guaranty Agreement, dated as of November 15, 2018 (as amended or otherwise modified from time to time, the "Credit Agreement") with Luxor Capital Group, LP ("Luxor Capital"), as administrative agent and collateral agent, the various lenders party thereto, Waitr Intermediate Holdings, LLC, a Delaware limited liability company and wholly-owned direct subsidiary of the Company, and certain subsidiaries of Waitr Inc. as guarantors. The Credit Agreement provided for a senior secured first priority term loan facility (the "Debt Facility") to Waitr Inc. in the aggregate principal amount of $25,000 (the "Original Term Loans"). An amendment to the Credit Agreement on January 17, 2019 provided an additional $42,080 under the Debt Facility (the "Additional Term Loans" and together with the Original Term Loans, the "Term Loans"), the proceeds of which were used to consummate the Bite Squad Merger. The September 30, 2019 and December 31, 2019 interest payments were paid in-kind, resulting in an aggregate principal amount of the Term Loans at December 31, 2019 of $69,545. For additional details on the Term Loans and the Debt Facility, see Part II, Item 8, *Note 9 – Debt*, to our consolidated financial statements in this Form 10-K. We believe that we were in compliance with all covenants under the Credit Agreement as of December 31, 2019.

#### *Notes*

On November 15, 2018, the Company entered into the Credit Agreement, dated as of November 15, 2018 (as amended or otherwise modified from time to time, the "Convertible Notes Agreement"), pursuant to which the Company issued unsecured convertible promissory notes to Luxor Capital Partners, LP, Luxor Capital Partners Offshore Master Fund, LP, Luxor Wavefront, LP and Lugard Road Capital Master Fund, LP (the "Luxor Entities") in the aggregate principal amount of $60,000 (the "Notes"). The quarterly interest payments due on June 30, September 30 and December 31, 2019, were paid in-kind, resulting in an aggregate principal amount of the Notes at December 31, 2019 of $61,132. For additional details on the Notes, see Part II, Item 8, *Note 9 – Debt*, to our consolidated financial statements in this Form 10-K. We believe that we were in compliance with all covenants under the Convertible Notes Agreement as of December 31, 2019.

#### *Promissory Notes*

On September 27, 2019, the Company entered into an interest-free promissory note to fund a portion of an acquisition (see Part II, Item 8, *Note 3 – Business Combinations,* to our consolidated financial statements in this Form 10-K). The principal amount of the promissory note was initially $500, payable in 24 monthly installments, with payments expected to begin shortly after integration of the acquired assets onto the Company's platform. The Company recorded the promissory note at its fair value of $452 and will impute interest over the life of the note using an interest rate of 10%, representing the estimated effective interest rate at which the Company could obtain financing. On February 13, 2020, the Company entered into an amendment to the asset purchase agreement, whereby the promissory note was amended to $600, payable in 30 monthly installments, commencing on March 1, 2020. The current portion of the promissory note of $215 is included in other current liabilities in the consolidated balance sheet at December 31, 2019.

On October 1, 2019, the Company entered into an interest-free promissory note to fund a portion of an additional acquisition (see Part II, Item 8, *Note 3 – Business Combinations,* to our consolidated financial statements in this Form 10-K). The principal amount of the promissory note is $100, payable in 24 monthly installments. Payments commenced on January 15, 2020. The Company recorded the promissory note at its fair value of $90 and will impute interest over the life of the note using an interest rate of 10%, representing the estimated effective interest rate at which the Company could obtain financing. The current portion of the promissory note of $43 is included in other current liabilities in the consolidated balance sheet at December 31, 2019.

#### *Short-Term Loans*

On June 26, 2019, the Company entered into a loan agreement with First Insurance Funding to finance a portion of its annual insurance premium obligation. The principal amount of the loan is $5,032, payable in monthly installments, until maturity. The loan matures on April 1, 2020 and carries an annual interest rate of 4.08%. As of December 31, 2019, $1,834 was outstanding under such loan.

On November 15, 2019, the Company entered into a loan agreement with BankDirect Capital Finance to finance a portion of its annual directors and officers insurance premium obligation. The principal amount of the loan is $1,993, payable in monthly installments,

until maturity. The loan matures on August 15, 2020 and carries an annual interest rate of 4.15%. As of December 31, 2019, $1,778 was outstanding under such loan.

### Capital Expenditures

Our main capital expenditures relate to the purchase of tablets for restaurants on the Platforms and investments in the development of the Platforms, which are expected to increase as we continue to grow our business. Our future capital requirements and the adequacy of available funds will depend on many factors, including those set forth under Part I, Item 1A, *Risk Factors* in this Form 10-K. If we are unable to obtain needed additional funds, we will have to reduce our operating costs, which would impair our growth prospects and could otherwise negatively impact our business.

### Cash Flow

The following table sets forth our summary cash flow information for the periods indicated:

| (in thousands) | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Net cash used in operating activities | $ (73,477) | $ (15,842) | $ (12,411) |
| Net cash used in investing activities | (196,576) | (3,761) | (1,874) |
| Net cash provided by financing activities | 90,030 | 224,996 | 14,947 |

#### Cash Flows Used In Operating Activities

For the year ended December 31, 2019, net cash used in operating activities was $73,477, compared to $15,842 for the same period in 2018, primarily reflecting an increase in new market launch activities in 2019 relative to 2018. Business combination-related expenses totaled $6,956 and $5,768 for the years ended December 31, 2019 and 2018, respectively.

For the year ended December 31, 2018, net cash used in operating activities was $15,842 compared to $12,411 for the year ended December 31, 2017, primarily reflecting the payment of the above referenced business combination-related expenses of $5,768 in 2018.

#### Cash Flows Used In Investing Activities

For the year ended December 31, 2019, net cash used in investing activities was $196,576, consisting primarily of $192,568 for the acquisition of Bite Squad, $1,805 for internally developed software, $695 for the acquisition of intangible assets and $1,636 for the purchase of property and equipment. For the years ended December 31, 2018 and 2017, net cash used in investing activities was $3,761 and $1,874, respectively, consisting primarily of the purchase of property and equipment.

Property and equipment is comprised primarily of computer tablets for restaurants on the Platforms. The tablets remain our property. We control software applications and updates on the tablets, and the tablets are devoted exclusively to the Platforms. We also periodically purchase office furniture, equipment, computers and software and leasehold improvements.

#### Cash Flows Provided By Financing Activities

For the year ended December 31, 2019, net cash provided by financing activities was $90,030, primarily reflecting gross proceeds from the issuance of common stock of $50,002, proceeds from the issuance of Additional Term Loans of $42,080 and $7,875 of proceeds from short-term loans for the Company's annual insurance premium financing, less $4,179 of equity issuance costs. Payments under short-term loans totaled $4,931 for the year ended December 31, 2019.

For the year ended December 31, 2018, net cash provided by financing activities was $224,996, primarily reflecting net cash assumed from the Landcadia Business Combination of $143,648 and proceeds from the issuance of the Term Loans and Notes of $85,000, less $3,050 of related debt issuance costs. During the year ended December 31, 2018, we borrowed $5,000 under an unsecured line of credit and repaid in full the $5,000 of borrowings. Additionally, we borrowed $2,172 under a short-term loan to finance a portion of our insurance premium obligations and made repayments of $1,514 on such loan during the year ended December 31, 2018. Also included in net cash provided by financing activities for the year ended December 31, 2018 was $1,470 of proceeds related to the issuance of the Waitr Convertible Notes in the first quarter of 2018 and payments of $3,207 for the redemption of certain of the Waitr Convertible Notes in connection with the Landcadia Business Combination.

Net cash provided by financing activities totaled $14,947 for the year ended December 31, 2017, which primarily reflected proceeds from the issuance of Series AA preferred stock in the first quarter of 2017 of $7,224 and proceeds from the issuance of Waitr Convertible Notes of $7,684.

40

1/13/202   Case 2:19-cv-01260-TAD-KK   Document 56-1   Filed 01/21/21   Page 106 of 295 PageID
wtrh-10k_20191231.htm
#: 3399

TABLE OF CONTENTS

**Contractual Obligations and Other Commitments**

At December 31, 2019, we had corporate offices in Lake Charles, Louisiana, Lafayette, Louisiana and Minneapolis, Minnesota, as well as smaller offices across the United States. Our office leases expire on various dates through August 2026. We recognize rent expense on a straight-line basis over the relevant lease period.

Our debt and interest payments, future minimum payments under non-cancellable operating leases for equipment and office facilities and workers' compensation obligation payments were as follows as of December 31, 2019:

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| (in thousands) | Less than 1 Year | 1 to 3 Years | 3 to 5 Years | Thereafter | Total |
| Debt (1) | $ — | $ 130,677 | $ — | $ — | $ 130,677 |
| Loan agreements (2) | 3,902 | 258 | — | — | 4,160 |
| Interest due on debt (3) | 8,810 | 16,384 | — | — | 25,194 |
| Operating lease obligations | 1,126 | 1,608 | 945 | 780 | 4,459 |
| Workers' compensation liability (4) | 178 | 29 | 29 | 404 | 640 |
| **Total** | **$ 14,016** | **$ 148,956** | **$ 974** | **$ 1,184** | **$ 165,130** |

(1)   Debt includes amounts due under the Debt Facility and Notes as of December 31, 2019. See Part II, Item 8, *Note 9 – Debt* of this Form 10-K for additional details.

(2)   Loan agreements include short-term loans to finance certain insurance premiums and promissory notes related to two acquisitions. See Part II, Item 8, *Note 9 – Debt* of this Form 10-K for additional details.

(3)   Interest due on debt assumes all interest payments are paid in cash. Interest on the Notes assumes no conversion prior to the maturity of the Notes.

(4)   On November 27, 2017, Guarantee Insurance Company ("GIC"), our former workers' compensation insurer, was ordered into receivership for purposes of liquidation by the Second Judicial Circuit Court in Leon County, Florida. At the time of the court order, GIC was administering our outstanding workers' compensation claims. Upon entering receivership, the guaranty associations of the states where GIC operated began reviewing outstanding claims administered by GIC for continued claim coverage eligibility based on guaranty associations' eligibility criteria. Our net worth exceeded the threshold of $25,000 established by the Louisiana Insurance Guaranty Association ("LIGA") when determining eligibility for claims coverage. As such, LIGA assessed our outstanding claim as ineligible for coverage and we executed a promissory note in January 2019 for the repayment of the $588 paid by LIGA with respect to our claim. The terms of the promissory note provide for equal monthly payments of $32 over 17 months. As of December 31, 2019, we estimate that we have $478 in additional workers' compensation liabilities outstanding with respect to the GIC claims, excluding the LIGA promissory note, which we expect will be recognized ratably over approximately 40 years.

Contractual commitment amounts in the table above are associated with agreements that are enforceable and legally binding, while obligations under other contracts that we can cancel without a significant penalty are not included.

We are also a party to certain ordinary course multi-year sponsorship agreements, but have no material long-term purchase obligations outstanding with any vendors or other third parties.

**Off-Balance Sheet Arrangements**

We did not have any off-balance sheet arrangements as of December 31, 2019.

**Item 7A.  Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to interest rate risk and certain other market risks in the ordinary course of our business.

*Interest Rate Risk*

As of December 31, 2019, we had outstanding interest-bearing long-term debt totaling $130,677, consisting of $69,545 of Term Loans and $61,132 of Notes, both of which bear interest at fixed rates. As a result, we were not exposed to interest rate risk on our outstanding debt at December 31, 2019. If we enter into variable-rate debt in the future, we may be subject to increased sensitivity to interest rate movements.

We invest excess cash primarily in bank accounts and money market accounts, on which we earn interest. Our current investment strategy is to preserve principal and provide liquidity for our operating and market expansion needs. Since our investments have been

41

and are expected to remain mainly short-term in nature, we do not believe that changes in interest rates would have a material effect on the fair market value of our investments or our operating results.

### *Inflation Risk*

We do not believe that inflation has had a material effect on our business, results of operations or financial condition.

### Item 8.  Financial Statements and Supplementary Data

Information concerning this Item begins on Page F-1.

### Item 9.  Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

There have been no disagreements with our independent registered public accounting firm on our accounting or financial reporting that would require our independent registered public accounting firm to qualify or disclaim its report on our financial statements or otherwise require disclosure in this Form 10-K.

### Item 9A.  Controls and Procedures

### *Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a-15(b) of the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Form 10-K. Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. Based upon the evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures were effective as of December 31, 2019 at the reasonable assurance level.

### *Management's Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Internal control over financial reporting should be designed under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and include those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of our company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect errors or misstatements in our financial statements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Management assessed the effectiveness of our internal control over financial reporting at December 31, 2019 using the criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) (2013 framework). Based on our assessments and those criteria, management determined that we maintained effective internal control over financial reporting as of December 31, 2019.

This Form 10-K does not include an attestation report of internal controls from our independent registered public accounting firm due to our status as an emerging growth company under the JOBS Act.

wtrh-10k_20191231.htm

42

TABLE OF CONTENTS

***Changes in Internal Controls Over Financial Reporting***

There has not been any change in our internal control over financial reporting that occurred during the quarter ended December 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B.  Other Information

None.

43

---

**PART III**

## Item 10.  Directors, Executive Officers and Corporate Governance

In accordance with General Instruction G(3) to Form 10-K, the Company intends to file with the SEC the information required by this item not later than 120 days after the end of the fiscal year covered by this Form 10-K.

*Code of Conduct*. The Company has adopted a code of business conduct and ethics (the "Code of Conduct") that applies to all employees, officers and directors of the Company. The Code of Conduct is available on the Company's website at investors.waitrapp.com under "Corporate Governance." The Company intends to post on its website all disclosures that are required by law or Nasdaq listing rules regarding any amendment to, or a waiver of, any provision of the Code of Conduct for the principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions.

## Item 11.  Executive Compensation

In accordance with General Instruction G(3) to Form 10-K, the Company intends to file with the SEC the information required by this item not later than 120 days after the end of the fiscal year covered by this Form 10-K.

## Item 12.  Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

In accordance with General Instruction G(3) to Form 10-K, the Company intends to file with the SEC the information required by this item not later than 120 days after the end of the fiscal year covered by this Form 10-K.

## Item 13.  Certain Relationships and Related Transactions, and Director Independence

In accordance with General Instruction G(3) to Form 10-K, the Company intends to file with the SEC the information required by this item not later than 120 days after the end of the fiscal year covered by this Form 10-K.

## Item 14.  Principal Accounting Fees and Services

In accordance with General Instruction G(3) to Form 10-K, the Company intends to file with the SEC the information required by this item not later than 120 days after the end of the fiscal year covered by this Form 10-K.

44

**PART IV**

## Item 15.  Exhibits, Financial Statement Schedules

**(a) 1. Financial Statements:**

The following Consolidated Financial Statements, notes to the Consolidated Financial Statements and the Report of Independent Registered Public Accounting Firm thereon are included beginning on page F-1 of this Form 10-K:

Report of Independent Registered Public Accounting Firm

Consolidated Balance Sheets as of December 31, 2019 and 2018

Consolidated Statements of Operations for the three years in the period ended December 31, 2019

Consolidated Statements of Cash Flows for the three years in the period ended December 31, 2019

Consolidated Statements of Changes in Stockholders' Equity (Deficit) for the three years in the period ended December 31, 2019

Notes to the Consolidated Financial Statements

**2. Financial Statement Schedules:**

All schedules are omitted because the required information is inapplicable or the information is presented in the Consolidated Financial Statements or the notes thereto.

45

TABLE OF CONTENTS

**3. Exhibits:**

| Exhibit No. | Description |
|---|---|
| 3.1 | Third Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 of the Form 8-A/A (File No. 001-37788) filed by the Company on November 19, 2018). |
| 3.2 | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.2 of the Form 8-A/A (File No. 001-37788) filed by the Company on November 19, 2018). |
| 4.1 | Description of Registrant's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934. |
| 4.2 | Specimen Common Stock Certificate (incorporated by reference to Exhibit 4.1 of the Form 8-A/A (File No. 001-37788) filed by the Company on November 19, 2018). |
| 4.3 | Specimen Warrant Certificate (incorporated by reference to Exhibit 4.2 of the Form 8-A/A (File No. 001-37788) filed by the Company on November 19, 2018). |
| 4.4 | Warrant Agreement, dated May 25, 2016, between the Company and Continental Stock Transfer &Trust Company, as warrant agent (incorporated by reference to Exhibit 4.4 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on June 1, 2016). |
| 4.5 | Amendment No. 1 to Warrant Agreement, dated as of February 25, 2019, by and between the Company and Continental Stock Transfer & Trust Company (incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on February 25, 2019). |
| 4.6 | Form of Warrant (incorporated by reference to Exhibit 4.3 of the Form 8-A/A (File No. 001-37788) filed by the Company on November 19, 2018). |
| 10.1 | Convertible Promissory Note, dated August 21, 2018, issued to Fertitta Entertainment, Inc. (incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on August 23, 2018). |
| 10.2 | Commitment Letter, dated as of October 2, 2018, by and among the Company, Landcadia Merger Sub, Inc. and Luxor Capital Group, LP (incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on October 3, 2018). |
| 10.3 | Commitment Letter, dated as of December 11, 2018, by and among Luxor Capital Group, LP, the Company and Waitr Inc. (incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on December 12, 2018). |
| 10.4 | Credit and Guaranty Agreement, dated as of November 15, 2018, by and among Waitr Inc., as Borrower, Waitr Intermediate Holdings, LLC, certain subsidiaries of Waitr Inc., as Guarantors, various lenders and Luxor Capital Group, LP, as Administrative Agent, Collateral Agent and Lead Arranger (incorporated by reference to Exhibit 10.3 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 10.5 | Amendment No. 1 to Credit and Guaranty Agreement, dated as of January 17, 2019, by and among Waitr Inc., as Borrower, Waitr Intermediate Holdings, LLC, the various lenders and Luxor Capital Group, LP, as Administrative Agent and Collateral Agent (incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on January 18, 2019). |

46

| Exhibit No. | Description |
|---|---|
| 10.6 | Amendment No. 2 to Credit and Guaranty Agreement, dated as of May 21, 2019, by and among Waitr Inc., Waitr Intermediate Holdings, LLC, Luxor Capital, LLC, as a Lender, and Luxor Capital Group, LP, as administrative agent and collateral agent for the Lenders (incorporated by reference to Exhibit 1.2 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on May 24, 2019). |
| 10.7 | Pledge and Security Agreement, dated as of November 15, 2018, by and among Waitr Inc., Waitr Intermediate Holdings, LLC and certain subsidiaries of Waitr Inc., as Grantors, and Luxor Capital Group, LP, as Collateral Agent (incorporated by reference to Exhibit 10.4 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 10.8 | Credit Agreement, dated November 15, 2018, by and among the Company, as Borrower, various lenders and Luxor Capital Group, LP, as Administrative Agent and Lead Arranger (incorporated by reference to Exhibit 10.5 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 10.9 | Amendment No. 1 to Credit Agreement, dated as of January 17, 2019, by and among the Company, as Borrower, the lenders party thereto and Luxor Capital Group, LP, as Administrative Agent (incorporated by reference to Exhibit 10.2 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on January 18, 2019). |
| 10.10 | Amendment No. 2 to Credit Agreement, dated as of May 21, 2019, by and among Waitr Holdings Inc., Luxor Capital, LLC, as a Lender, and Luxor Capital Group, LP, as administrative agent for the Lenders (incorporated by reference to Exhibit 1.1 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on May 24, 2019). |
| 10.11 | Form of Convertible Promissory Note (incorporated by reference to Exhibit 10.6 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 10.12 | Form of Amended and Restated Registration Rights Agreement by and among the Company and the investors listed on the signature pages thereto (incorporated by reference to Exhibit 10.1 of the Form 8-A/A (File No. 001-37788) filed by the Company on November 19, 2018). |
| 10.13 | Registration Rights Agreement, dated November 15, 2018, by and among the Company and the parties listed on the signature pages thereto (incorporated by reference to Exhibit 10.2 of the Form 8-A/A (File No. 001-37788) filed by the Company on November 19, 2018). |
| 10.14 | Form of Registration Rights Agreement by and among Waitr Holdings Inc. and the parties listed on the signature pages thereto (incorporated by reference to Exhibit 10.3 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on January 18, 2019). |
| 10.15 | Letter Agreement, dated November 15, 2018, by and among the Company, Luxor Capital Group, LP, Luxor Capital Partners, LP, Luxor Capital Partners Offshore Master Fund, LP, Luxor Wavefront, LP and Lugard Road Capital Master Fund, LP. (incorporated by reference to Exhibit 10.9 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 10.16* | Employment Agreement, dated January 3, 2020, by and between Waitr Holdings Inc. and Carl A. Grimstad (incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on January 3, 2020). |
| 10.17* | Option Agreement, dated January 3, 2020, by and between Waitr Holdings Inc. and Carl A. Grimstad (incorporated by reference to Exhibit 10.2 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on January 3, 2020). |
| 10.18* | Independent Contractor Agreement, dated November 8, 2019, by and between Waitr Inc. and Joseph Stough (incorporated by reference to Exhibit 10.6 of the Quarterly Report on Form 10-Q for the quarter ended September 30, 2019 (File No. 001-37788) filed by the Company on November 12, 2019). |
| 10.19* | Offer Letter, dated February 1, 2019, by and between the Company and Damon Schramm (incorporated by reference to Exhibit 10.22 of the Annual Report on Form 10-K for the year ended December 31, 2018 (File No. 001-37788) filed by |

the Company on March 14, 2019).

47

1/13/202 Case 2:19-cv-01260-TAD-KK    Document 56-1   Filed 01/21/21    Page 116 of 295 PageID
wtrh-10k_20191231.htm
#:  3409
TABLE OF CONTENTS

| Exhibit No. | Description |
|---|---|
| 10.20* | Consulting Agreement, dated November 15, 2018, by and between the Company and Steven L. Scheinthal (incorporated by reference to Exhibit 10.17 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 10.21* | Consulting Agreement, dated November 15, 2018, by and between the Company and Richard H. Liem (incorporated by reference to Exhibit 10.18 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 10.22 | Form of Lockup Agreement (incorporated by reference to Exhibit 10.19 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 10.23 | Form of Lockup Agreement (incorporated by reference to Exhibit 10.4 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on January 18, 2019). |
| 10.24 | Form of Indemnification Agreement (incorporated by reference to Exhibit 10.20 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 10.25* | Waitr Holdings Inc. 2018 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.21 of the Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 10.26* | Letter Agreement, dated May 25, 2016, by and among the Company, Tilman J. Fertitta, Richard Handler, Richard H. Liem, Steven L. Scheinthal, Nicholas Daraviras, Jefferies Financial Group Inc. (f/k/a Leucadia National Corporation) and Fertitta Entertainment, Inc. (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K (File No. 001-37788) filed by the Company on June 1, 2016). |
| 10.27* | Letter Agreement, dated May 25, 2016, by and among the Company and Mark Kelly (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K (File No. 001-37788) filed by the Company on June 1, 2016). |
| 10.28* | Letter Agreement, dated August 23, 2016, by and between the Company and G. Michael Stevens (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K (File No. 001-37788) filed by the Company on August 23, 2016). |
| 10.29* | Letter Agreement, dated May 8, 2017, by and between the Company and Michael S. Chadwick (incorporated by reference to Exhibit 10.2 to Current Report on Form 8-K (File No. 001-37788) filed by the Company on May 10, 2017). |
| 10.30* | Amendment to Letter Agreement, dated as of May 31, 2018, by and among the Company, Jefferies Financial Group Inc., Fertitta Entertainment, Inc., Tilman J. Fertitta, Richard Handler, Richard H. Liem, Steven L. Scheinthal and Nicholas Daraviras (incorporated by reference to Exhibit 10.3 to Current Report on Form 8-K (File No. 001-37788) filed by the Company on June 1, 2018). |
| 10.31* | Amendment to Letter Agreement, dated as of May 31, 2018, by and between the Company and Mark Kelly (incorporated by reference to Exhibit 10.4 to Current Report on Form 8-K (File No. 001-37788) filed by the Company on June 1, 2018). |
| 10.32* | Amendment to Letter Agreement, dated as of June 11, 2018, by and between the Company and G. Michael Stevens (incorporated by reference to Exhibit 10.5 to Quarterly Report on Form 10-Q (File No. 001-37788) filed by the Company on August 9, 2018). |
| 10.33* | Amendment to Letter Agreement, dated as of June 11, 2018, by and between the Company and Michael S. Chadwick (incorporated by reference to Exhibit 10.6 to Quarterly Report on Form 10-Q (File No. 001-37788) filed by the Company on August 9, 2018). |

48

| Exhibit No. | Description |
| --- | --- |
| 16.1 | Letter from Marcum LLP to the SEC, dated November 21, 2018 (incorporated by reference to Exhibit 16.1 to Current Report on Form 8-K (File No. 001-37788) filed by the Company on November 21, 2018). |
| 21.1 | Subsidiaries of the Registrant (incorporated by reference to Exhibit 21.1 to Registration Statement on Form S-4 (File No. 333-229380) filed by the Company on January 25, 2019). |
| 23.1 | Consent of Moss Adams LLP |
| 31.1 | Certification of the Principal Executive Officer required by Rule 13a-14(b) or Rule15d-14(a). |
| 31.2 | Certification of the Principal Financial Officer required by Rule 13a-14(b) or Rule15d-14(a). |
| 32.1 | Certification of the Principal Executive Officer required by Rule 13a-14(b) or Rule15d-14(b) and 18 U.S.C. Section 1350. |
| 32.2 | Certification of the Principal Financial Officer required by Rule 13a-14(b) or Rule15d-14(b) and 18 U.S.C. Section 1350. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

\* Indicates a management contract or compensatory plan

**Item 16.  Form 10-K Summary**

None.

49

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

By: _____/s/ Karl D. Meche_____
Karl D. Meche
Chief Accounting Officer
(Principal Financial Officer and Principal Accounting Officer)
March 16, 2020

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 16, 2020.

| Signature | Title |
| --- | --- |
| /s/ Carl A. Grimstad<br>Carl A. Grimstad | Chief Executive Officer and Chairman of the Board<br>(Principal Executive Officer) |
| /s/ Karl D. Meche<br>Karl D. Meche | Chief Accounting Officer<br>(Principal Financial Officer and Principal Accounting Officer) |
| /s/ Christopher Meaux<br>Christopher Meaux | Vice-Chairman of the Board of Directors |
| /s/ Tilman J. Fertitta<br>Tilman J. Fertitta | Director |
| /s/ Jonathan Green<br>Jonathan Green | Director |
| /s/ Pouyan Salehi<br>Pouyan Salehi | Director |
| /s/ Steven L. Scheinthal<br>Steven L. Scheinthal | Director |
| /s/ William Gray Stream<br>William Gray Stream | Director |

50

TABLE OF CONTENTS

**INDEX TO FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets | F-2 |
| Consolidated Statements of Operations | F-3 |
| Consolidated Statements of Stockholders' Equity (Deficit) | F-4 |
| Consolidated Statements of Cash Flows | F-6 |
| Notes to the Consolidated Financial Statements | F-8 |

51

1/13/202 Case 2:19-cv-01260-TAD-KK    Document 56-1   Filed 01/21/21    Page 120 of 295 PageID
wtrh-10k_20191231.htm
#: 3413

TABLE OF CONTENTS

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of

Waitr Holdings Inc.

### *Opinion on the Financial Statements*

We have audited the accompanying consolidated balance sheets of Waitr Holdings Inc. (the "Company") as of December 31, 2019 and 2018, and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for each of the three years in the period ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the consolidated financial position of the Company as of December 31, 2019 and 2018, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

### *Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures to respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Moss Adams LLP

Los Angeles, California
March 16, 2020

We have served as the Company's auditor since 2018.

F-1

**WAITR HOLDINGS INC.**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share and per share data)**

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash | $ 29,317 | $ 209,340 |
| Accounts receivable, net | 3,272 | 3,687 |
| Capitalized contract costs, current | 199 | 1,869 |
| Prepaid expenses and other current assets | 8,329 | 4,548 |
| **TOTAL CURRENT ASSETS** | **41,117** | **219,444** |
| Property and equipment, net | 4,072 | 4,551 |
| Capitalized contract costs, noncurrent | 772 | 827 |
| Goodwill | 106,734 | 1,408 |
| Intangible assets, net | 25,761 | 261 |
| Other noncurrent assets | 517 | 61 |
| **TOTAL ASSETS** | **$ 178,973** | **$ 226,552** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES:** | | |
| **CURRENT LIABILITIES** | | |
| Accounts payable | $ 4,384 | $ 1,827 |
| Restaurant food liability | 5,612 | 208 |
| Accrued payroll | 5,285 | 3,055 |
| Short-term loans | 3,612 | 658 |
| Deferred revenue, current | 414 | 3,314 |
| Income tax payable | 51 | 25 |
| Other current liabilities | 12,630 | 4,508 |
| **TOTAL CURRENT LIABILITIES** | **31,988** | **13,595** |
| Long-term debt | 123,244 | 80,985 |
| Accrued workers' compensation liability | 463 | 908 |
| Deferred revenue, noncurrent | 45 | 1,356 |
| Other noncurrent liabilities | 325 | 217 |
| **TOTAL LIABILITIES** | **156,065** | **97,061** |
| Commitment and contingencies (Note 13) | | |
| **STOCKHOLDERS' EQUITY:** | | |
| Common stock, $0.0001 par value; 249,000,000 shares authorized and 76,579,175 and 54,035,538 shares issued and outstanding at December 31, 2019 and December 31, 2018, respectively | 8 | 5 |
| Additional paid in capital | 385,137 | 200,417 |
| Accumulated deficit | (362,237) | (70,931) |
| **TOTAL STOCKHOLDERS' EQUITY** | **22,908** | **129,491** |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | **$ 178,973** | **$ 226,552** |

The accompanying notes are an integral part of these consolidated financial statements.

F-2

TABLE OF CONTENTS

**WAITR HOLDINGS INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except share and per share data)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| **REVENUE** | $ 191,675 | $ 69,273 | $ 22,911 |
| **COSTS AND EXPENSES:** | | | |
| Operations and support | 147,759 | 51,428 | 20,970 |
| Sales and marketing | 52,370 | 15,695 | 5,661 |
| Research and development | 7,718 | 3,913 | 1,586 |
| General and administrative | 56,862 | 31,148 | 9,437 |
| Depreciation and amortization | 15,774 | 1,223 | 723 |
| Goodwill impairment | 119,212 | — | — |
| Intangible and other asset impairments | 73,251 | — | 584 |
| Loss on disposal of assets | 36 | 9 | 33 |
| **TOTAL COSTS AND EXPENSES** | 472,982 | 103,416 | 38,994 |
| **LOSS FROM OPERATIONS** | (281,307) | (34,143) | (16,083) |
| **OTHER EXPENSES (INCOME) AND LOSSES (GAINS), NET** | | | |
| Interest expense | 9,408 | 1,822 | 283 |
| Interest income | (1,037) | (406) | (2) |
| (Gain) loss on derivatives | — | (337) | 52 |
| (Gain) loss on debt extinguishment | — | (486) | 10,537 |
| Other expenses (income) | 1,547 | 2 | (52) |
| **NET LOSS BEFORE INCOME TAXES** | (291,225) | (34,738) | (26,901) |
| Income tax expense (benefit) | 81 | (427) | 6 |
| **NET LOSS** | $ (291,306) | $ (34,311) | $ (26,907) |
| **LOSS PER SHARE:** | | | |
| Basic and diluted | $ (4.00) | $ (2.18) | $ (2.69) |
| Weighted average common shares outstanding – basic and diluted | 72,404,020 | 15,745,065 | 9,995,031 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

TABLE OF CONTENTS

**WAITR HOLDINGS INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**(in thousands, except share data)**

| | Preferred Seed I | | Preferred Seed II | | Preferred Seed AA | | Common stock | | Additional paid in capital | Accumulated deficit | Total stockholders' equity (deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | | | |
| **Balances at December 31, 2016** | 3,413,235 | $ — | 3,301,326 | $ — | 5,131,956 | $ — | 9,688,630 | $ — | $ 16,096 | $ (9,713) | $ 6,383 |
| Net loss | — | — | — | — | — | — | — | — | — | (26,907) | (26,907) |
| Stock-based compensation | — | — | — | — | — | — | — | — | 1,199 | — | 1,199 |
| Equity issued in exchange for services | — | — | — | — | — | — | 262,964 | — | 120 | — | 120 |
| Exercise of stock options | — | — | — | — | — | — | 98,586 | — | 5 | — | 5 |
| Issuance of stock | — | — | — | — | 2,100,528 | — | — | — | 7,224 | — | 7,224 |
| Debt premium recorded to equity | — | — | — | — | — | — | — | — | 10,444 | — | 10,444 |
| Conversion of convertible notes to Preferred Seed AA stock | — | — | — | — | 32,005 | — | — | — | 22 | — | 22 |
| **Balances at December 31, 2017** | 3,413,235 | — | 3,301,326 | — | 7,264,489 | — | 10,050,180 | — | 35,110 | (36,620) | (1,510) |
| Net loss | — | — | — | — | — | — | — | — | — | (34,311) | (34,311) |
| Exercise of stock options | — | — | — | — | — | — | 562,028 | — | 97 | — | 97 |
| Vested Waitr options exchanged for common stock | — | — | — | — | — | — | 3,018,553 | — | — | — | — |
| Line of Credit Warrant exercises | — | — | — | — | — | — | 37,735 | — | 380 | — | 380 |
| 2014 Warrants exchanged for common stock | — | — | — | — | — | — | 405,884 | — | — | — | — |
| Conversion of preferred stock to common stock | (3,413,235) | — | (3,301,326) | — | (7,264,489) | — | 13,979,050 | — | — | — | — |
| Debt Warrants issued in connection with Luxor term loan | — | — | — | — | — | — | — | — | 1,569 | — | 1,569 |
| Conversion of convertible notes to common stock | — | — | — | — | — | — | 2,062,354 | — | 5,360 | — | 5,360 |
| Waitr shares redeemed for cash | — | — | — | — | — | — | (7,168,303) | — | (71,683) | — | (71,683) |

1/13/202 Case 2:19-cv-01260-TAD-KK    Document 56-1  Filed 01/21/21    Page 124 of 295 PageID
#: 3417
wtrh-10k_20191231.htm

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Merger recapitalization (see Note 3) | — | — | — | — | — | — | 31,203,841 | 5 | 214,853 | — | 214,858 |
| Stock-based compensation | — | — | — | — | — | — | — | — | 9,580 | — | 9,580 |
| Stock issued as consideration in GoGoGrocer asset acquisition | — | — | — | — | — | — | 16,311 | — | 142 | — | 142 |
| Cancellation of stock | — | — | — | — | — | — | (132,095) | — | — | — | — |
| Equity compensation on Requested Amendment | — | — | — | — | — | — | — | — | 3,359 | — | 3,359 |
| Equity issued in exchange for services | — | — | — | — | — | — | — | — | 120 | — | 120 |

F-4

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Discount on convertible notes due to beneficial conversion feature | — | — | — | — | — | — | — | — | 1,530 | — | 1,530 |
| **Balances at December 31, 2018** | — | — | — | — | — | — | 54,035,538 | 5 | 200,417 | (70,931) | 129,491 |
| Net loss | — | — | — | — | — | — | — | — | — | (291,306) | (291,306) |
| Gain on debt extinguishment | — | — | — | — | — | — | — | — | 1,897 | — | 1,897 |
| Exercise of stock options and vesting of restricted stock units | — | — | — | — | — | — | 496,654 | — | 4 | — | 4 |
| Taxes paid related to net settlement on stock-based compensation | — | — | — | — | — | — | (121,874) | — | (811) | — | (811) |
| Stock-based compensation | — | — | — | — | — | — | — | — | 7,238 | — | 7,238 |
| Equity issued in exchange for services | — | — | — | — | — | — | — | — | 120 | — | 120 |
| Issuance of common stock in connection with Additional Term Loans | — | — | — | — | — | — | 325,000 | — | 3,884 | — | 3,884 |
| Public Warrants exchanged for common stock | — | — | — | — | — | — | 4,494,889 | 1 | (610) | — | (609) |
| Stock issued as consideration in Bite Squad Merger | — | — | — | — | — | — | 10,591,968 | 1 | 126,573 | — | 126,574 |
| Issuance of common stock | — | — | — | — | — | — | 6,757,000 | 1 | 46,425 | — | 46,426 |
| **Balances at December 31, 2019** | — | $ — | — | $ — | — | $ — | 76,579,175 | $ 8 | $385,137 | $(362,237) | $ 22,908 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

TABLE OF CONTENTS

**WAITR HOLDINGS INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (291,306) | $ (34,311) | $ (26,907) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Non-cash interest expense | 5,674 | 1,206 | 125 |
| Non-cash advertising expense | 397 | 603 | — |
| Stock-based compensation | 7,238 | 12,939 | 1,199 |
| Equity issued in exchange for services | 120 | 120 | 120 |
| Loss on disposal of assets | 36 | 9 | 33 |
| Depreciation and amortization | 15,774 | 1,223 | 723 |
| Goodwill impairment | 119,212 | — | — |
| Intangible and other asset impairments | 73,251 | — | 584 |
| Amortization of capitalized contract costs | 1,637 | 1,513 | 589 |
| (Gain) loss on derivatives | — | (337) | 52 |
| (Gain) loss on debt extinguishment | — | (486) | 10,537 |
| Other non-cash (income) expense | (68) | 75 | — |
| Changes in assets and liabilities: | | | |
| Accounts receivable | 2,143 | (1,563) | (1,362) |
| Capitalized contract costs | (4,579) | (2,785) | (1,498) |
| Prepaid expenses and other current assets | (2,676) | (3,789) | (324) |
| Accounts payable | 1,604 | 1,580 | 188 |
| Restaurant food liability | 4,475 | 170 | 38 |
| Deferred revenue | (4,210) | 2,312 | 1,449 |
| Income tax payable | 26 | (427) | 1 |
| Accrued payroll | 1,104 | 2,105 | 638 |
| Accrued workers' compensation liability | (446) | (342) | 1,250 |
| Other current liabilities | (3,012) | 4,213 | 154 |
| Other noncurrent liabilities | 129 | 130 | — |
| **Net cash used in operating activities** | **(73,477)** | **(15,842)** | **(12,411)** |
| **Cash flows from investing activities:** | | | |
| Purchases of property and equipment | (1,636) | (3,750) | (1,769) |
| Acquisition of Bite Squad, net of cash acquired | (192,568) | — | — |
| Other acquisitions | (695) | (11) | — |
| Collections on notes receivable | 94 | — | — |
| Internally developed software | (1,805) | — | (105) |
| Proceeds from sale of property and equipment | 34 | — | — |
| **Net cash used in investing activities** | **(196,576)** | **(3,761)** | **(1,874)** |
| **Cash flows from financing activities:** | | | |
| Proceeds from line of credit | — | 5,000 | — |
| Payments on line of credit | — | (5,000) | — |
| Proceeds from convertible notes issuance | — | 1,470 | 7,684 |
| Repayment of Series 2017 and Series 2018 notes | — | (3,207) | — |
| Cash received from Landcadia Holdings | — | 215,331 | — |
| Waitr shares redeemed for cash | (10) | (71,683) | — |
| Proceeds from issuance of stock | 50,002 | — | 7,224 |
| Equity issuance costs | (4,179) | — | — |
| Proceeds from Notes and Term Loans | 42,080 | 85,000 | — |
| Debt issuance costs | — | (3,050) | — |
| Proceeds from warrant exercises | — | 380 | — |
| Proceeds from short-term loans | 7,875 | 2,172 | — |
| Payments on short-term loans | (4,931) | (1,514) | — |

| Proceeds from exercise of stock options | 4 | 97 | 5 |

F-6

---

1/13/202 Case 2:19-cv-01260-TAD-KK    Document 56-1    Filed 01/21/21    Page 128 of 295 PageID
#: 3421
wtrh-10k_20190231.htm

TABLE OF CONTENTS

| | | | | | |
|---|---|---|---|---|---|
| Taxes paid related to net settlement on stock-based compensation | | (811) | | — | — |
| Other proceeds from financing activities | | — | | — | 34 |
| **Net cash provided by financing activities** | | **90,030** | | **224,996** | **14,947** |
| **Net change in cash** | | (180,023) | | 205,393 | 662 |
| Cash, beginning of period | | 209,340 | | 3,947 | 3,285 |
| **Cash, end of period** | $ | **29,317** | $ | **209,340** | $ **3,947** |
| **Supplemental disclosures of cash flow information:** | | | | | |
| Cash paid during the period for state income taxes | $ | 74 | $ | 31 | $ 5 |
| Cash earned during the period for interest | | 969 | | 406 | 2 |
| Cash paid during the period for interest | | 3,734 | | 616 | 158 |
| **Supplemental disclosures of non-cash investing and financing activities:** | | | | | |
| Stock issued as consideration in Bite Squad acquisition | $ | 126,574 | $ | — | $ — |
| Stock issued in connection with Additional Term Loans | | 3,884 | | — | — |
| Non-cash gain on debt extinguishment | | 1,897 | | — | — |
| Seller-financed payables related to other acquisitions | | 868 | | — | — |
| Non-cash investments in other acquisitions | | 868 | | 142 | — |
| Debt assumed in IndiePlate asset acquisition | | — | | 60 | — |
| Bifurcated embedded derivatives | | — | | 87 | — |
| Discount on convertible notes due to beneficial conversion feature | | — | | 1,530 | — |
| Premium on convertible notes | | — | | — | 10,444 |
| Warrants issued | | — | | 1,612 | — |
| Conversion of convertible notes to preferred stock | | — | | 8,681 | 22 |

The accompanying notes are an integral part of these consolidated financial statements.

F-7

**WAITR HOLDINGS INC.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(In thousands, except share and per share data)**

## 1. Organization

Waitr Holdings Inc., a Delaware corporation, together with its wholly-owned subsidiaries (the "Company," "Waitr," "we," "us" and "our"), operates an online food ordering and delivery platform, connecting restaurants and diners in cities across the United States. On January 17, 2019, Waitr acquired BiteSquad.com, LLC ("Bite Squad"), which also operates an online food ordering and delivery platform. The Company connects diners and restaurants via Waitr's website and mobile application (the "Waitr Platform") and Bite Squad's website and mobile application (the "Bite Squad Platform" and together with the Waitr Platform, the "Platforms"). The Company's Platforms allow consumers to browse local restaurants and menus, track order and delivery status, and securely store previous orders for ease of use and convenience. Restaurants benefit from the online Platforms through increased exposure to consumers for expanded business in the delivery market and carryout sales.

## 2. Basis of Presentation and Summary of Significant Accounting Policies

### Basis of Presentation

The consolidated financial statements and accompanying notes have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and in accordance with the rules and regulations of the United States Securities and Exchange Commission ("SEC").

### Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and all wholly-owned subsidiaries. Intercompany transactions and balances have been eliminated upon consolidation.

### Reclassifications

Certain prior period amounts included in the consolidated statements of operations have been reclassified to conform to the current period's presentation. The Company has revised the classification of certain employee-related wages and payroll taxes associated with such wages for the year ended December 31, 2017 to better align the statement of operations line items with departmental responsibilities and management of operations. These reclassifications had no effect on the Company's reported total costs and expenses, loss from operations, net loss or loss per share for the year ended December 31, 2017.

The table below summarizes the financial statement line items impacted by these reclassifications (in thousands):

| | Year Ended December 31, 2017 | | |
| | As Previously Reported | Reclassification | As Reclassified |
|---|---|---|---|
| Operations and support expenses | $ 17,668 | $ 3,302 | $ 20,970 |
| Sales and marketing expenses | 5,617 | 44 | 5,661 |
| General and administrative expenses | 12,601 | (3,164) | 9,437 |
| Related party expenses | 182 | (182) | — |

Certain prior period amounts included in the consolidated balance sheets, consolidated statements of cash flows and accompanying notes to the financial statements have been reclassified to conform to the current period's presentation.

*Restaurant Food Liability*

All transactions processed through the Bite Squad Platform and certain transactions processed through the Waitr Platform result in the Company receiving all of the transaction proceeds. The Company records as a restaurant food liability the net balance owed to the restaurant, after deducting the commissions and other fees charged to the restaurant. Our restaurant food liability as of December 31, 2018 has been reclassified from other current liabilities to a separate line on the consolidated balance sheet to conform to the current period's presentation. The Company remits payments to the restaurants twice a month, generally on the 1st and 15th.

F-8

TABLE OF CONTENTS

**Use of Estimates**

The preparation of the consolidated financial statements in accordance with GAAP requires the Company to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Significant estimates and judgments relied upon in preparing these consolidated financial statements affect the following items:

- determination of the nature and timing of satisfaction of revenue-generating performance obligations and the standalone selling price of performance obligations;
- variable consideration;
- other obligations such as product returns and refunds;
- allowance for doubtful accounts and chargebacks;
- incurred loss estimates under our insurance policies with large deductibles or retention levels;
- income taxes;
- useful lives of tangible and intangible assets;
- depreciation and amortization;
- equity compensation;
- contingencies;
- goodwill and other intangible assets, including the recoverability of intangible assets with finite lives and other long-lived assets;
- impairments; and
- fair value of assets acquired and liabilities assumed as part of a business combination.

The Company regularly assesses these estimates and records changes to estimates in the period in which they become known. The Company bases its estimates on historical experience and various other assumptions believed to be reasonable under the circumstances. Changes in the economic environment, financial markets, and any other parameters used in determining these estimates could cause actual results to differ from those estimates.

**Liquidity and Capital Resources**

The accompanying consolidated financial statements were prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Company has sustained losses since its inception and experienced declines in working capital since early 2019. Throughout 2019, revenue, order growth and cash flow were negatively impacted by changes in market conditions in the online food ordering and delivery industry, particularly increased competition from other national delivery service providers. In addition, with its primary focus on new market expansion, the Company invested heavily in sales and marketing efforts in 2019, further reducing its working capital and liquidity, until the suspension of such efforts in the fourth quarter of 2019. The Company's working capital and liquid asset (cash on hand) positions as of December 31, 2019 and 2018 are as follows (in thousands):

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Working capital | $ 9,129 | $ 205,849 |
| Liquid assets | 29,317 | 209,340 |

During the second half of 2019 and through the first quarter of 2020, management has implemented plans to improve the liquidity of the Company, including several initiatives to realize synergies from the Bite Squad Merger and to align the combined Company's cost structure. These initiatives included staff reductions in November 2019 and January 2020 and the consolidation of operations, support and sales and marketing functions, as well as the integration of five markets in which Waitr and Bite Squad operations overlapped. Additionally, the Company initiated modifications to its fee structure in July 2019 with a majority of restaurants on the Waitr Platform, which became effective in August 2019, and in January 2020, with the majority of the remaining restaurants on its Platforms, which became effective throughout February 2020. Further, in December 2019 and January 2020, the Company closed approximately 60 unprofitable, non-core markets. The combination of these initiatives has reduced the Company's overall cost structure and resulted in improved revenue per order and cash flow through February 2020. As of January 31 and February 29, 2020, cash on hand was approximately $30,300 and $29,900, respectively. Additionally, as of March 13, 2020, cash on hand was approximately $30,500, essentially flat relative to December 2019.

Management is in the process of implementing additional initiatives, with a focus on continued improvements to revenue per order, costs per order, cash flow, profitability and liquidity. These initiatives include, among other things, new and enhanced service offerings to restaurant partners (such as priority placement, payment processing and consumer marketing), a continued focus on

increasing restaurant supply on the Platforms, as well as an initiative to change to a contract labor model for delivery drivers, the implementation of which is expected to be completed early in the second quarter of 2020.

F-9

We currently expect that our cash on hand and estimated cash flow from operations will be sufficient to meet our working capital needs beyond twelve months, however, there can be no assurance that we will generate cash flow at the levels we anticipate. We continually evaluate additional opportunities to strengthen our liquidity position, fund growth initiatives and/or combine with other businesses by issuing equity or equity-linked securities (in public or private offerings) and/or incurring additional debt. However, market conditions, our future financial performance or other factors may make it difficult or impossible for us to access sources of capital, on favorable terms or at all, should we determine in the future to raise additional funds.

## Business Combinations

The Company accounts for business combinations under the acquisition method of accounting, in accordance with Accounting Standards Codification ("ASC") Topic 805, *Business Combinations*, recording any assets acquired and liabilities assumed based on their respective fair values. Any excess of the fair value of merger consideration over the fair value of the assets acquired less liabilities assumed is recorded as goodwill. The Company uses management estimates based on historically similar transactions to assist in establishing the acquisition date fair values of assets acquired, liabilities assumed, and contingent consideration granted, if any. These estimates and valuations require the Company to make significant assumptions, including projections of future events and operating performance.

## Cash

Cash consists of demand deposits with financial institutions, as well as cash owed to restaurants on the Platforms. The Company has compensating balance arrangements with its financial institutions related to the Company's corporate credit card program and a letter of credit. As of December 31, 2019, cash supporting an outstanding letter of credit was $3,191 and cash supporting the Company's credit card program was $257.

Certain restaurants on the Platforms elect to receive their portion of payments collected through the Company's Platforms less frequently than daily. Upon receipt of the restaurants' cash, the Company records an offsetting liability. As of December 31, 2019, our restaurant liability was $5,612.

The Company regularly maintains cash in excess of federally insured limits at financial institutions. The Company makes such deposits with entities it believes are of high credit quality and has not incurred any losses related to these balances. Management believes its credit risk, with respect to these financial institutions, to be minimal.

## Accounts Receivable and Allowance for Doubtful Accounts and Chargebacks

Accounts receivable is comprised of setup and integration fees due from restaurants and credit card receivables due from the credit card processor. Credit card payments on orders made through the Platforms are generally remitted to the Company three business days after the transaction resulting from the sale and delivery of food.

Accounts receivable are stated net of an allowance for doubtful accounts, determined by management through an evaluation of specific accounts, considering historical experience, aging of accounts receivable, and information regarding the creditworthiness of the customers. When it becomes probable that the receivable will not be collected, the balance is written off. The Company performs periodic credit evaluations of the financial condition of customers, monitors collections and payments from customers, and generally does not require collateral.

Additionally, the Company is liable for uncollected credit card receivables (or "chargebacks"), including fraudulent orders, when a consumer's card is authorized but fails to process and for other unpaid credit card receivables. Chargebacks are recorded as a reduction of the revenue recorded for the transaction.

## Property and Equipment, net

Property and equipment, net is stated at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets.

Useful lives of each asset class are as follows:

| | |
|---|---|
| Equipment | 3 years |
| Furniture | 5 years |
| Leasehold improvements | 7 years |

F-10

TABLE OF CONTENTS

Maintenance and repair costs are expensed as incurred. Major improvements, which extend the useful life of the related asset, are capitalized. When these assets are sold or otherwise disposed of, the asset and related depreciation are relieved and any gain or loss is included in the consolidated statements of operations for the period of sale or disposal.

**Intangible Assets**

*Internally Developed Software*

The Company incurs expenses associated with software development, which includes wages, employee benefits, and other compensation-related expenses. Additionally, the Company may periodically incur third-party development and programming costs.

*Costs of Software to Be Sold, Leased, or Marketed*

The Company accounts for costs incurred to develop its externally-marketed platform in accordance with ASC Topic 985-20, *Software — Costs of Software to Be Sold, Leased, or Marketed*. Internal and external costs incurred after technological feasibility has been established are capitalized. Technological feasibility is established upon completion of planning, designing, coding, and testing activities necessary to establish that the product can be produced to meet its design specifications, including functions, features, and technical performance requirements. The Company's software products generally reach technical feasibility shortly before the products are released to production. Capitalized software costs are amortized on a product-by-product basis. The Company amortizes capitalized software costs using the straight-line method over the estimated economic life of the product, which is 3 years.

*Internal Use Software*

The Company also capitalizes costs to develop or purchase internal-use software in accordance with ASC Topic 350-40, *Intangibles, Goodwill and Other — Internal-Use Software*. Costs are capitalized as incurred after the preliminary project stage is completed, the Company authorizes and commits funding to the project, and it is probable that the project will be completed and used for intended function. The Company amortizes capitalized software costs on a straight-line basis over the estimated useful term, which is 3 years.

**Impairment of Long-Lived and Other Intangible Assets**

The Company reviews the recoverability of its long-lived assets, including acquired technology, capitalized software costs, and property and equipment, when events or changes in circumstances occur that indicate that the carrying value of the asset may not be recoverable. Recoverability of finite and other long-lived assets is measured by comparing the carrying amount of an asset group to the future undiscounted net cash flows expected to be generated by that asset group. The Company groups assets for purposes of such review at the lowest level for which identifiable cash flows of the asset group are largely independent of the cash flows of the other groups of assets and liabilities. The amount of impairment to be recognized for finite and indefinite-lived intangible assets and other long-lived assets is calculated as the difference between the carrying value and the fair value of the asset group, generally measured by discounting estimated future cash flows based in part on financial results and the Company's expectation of future performance.

**Goodwill**

Goodwill represents the excess purchase price over tangible and intangible assets acquired, less liabilities assumed arising from business combinations. The Company conducts its goodwill impairment test annually in October or more frequently if indicators of impairment exist. When performing the annual impairment test, the Company has the option of performing a qualitative or quantitative assessment to determine if an impairment has occurred. If a qualitative assessment indicates that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, the Company would be required to perform a quantitative impairment two-step test for goodwill.

In the first step, the fair value of each reporting unit is determined and compared to the reporting unit's carrying value, including goodwill. If the fair value of a reporting unit is less than its carrying value, the second step of the goodwill impairment test is performed to measure the amount of impairment, if any. In the second step, the fair value of the reporting unit is allocated to the assets and liabilities of the reporting unit as if it had been acquired in a business combination and the purchase price was equivalent to the fair value of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is referred to as the implied fair value of goodwill. If the implied fair value of goodwill at the reporting unit level is less than its carrying value, an impairment loss is recorded to the extent that the implied fair value of goodwill at the reporting unit is less than its carrying value.

**Leases**

The Company accounts for leases under the provisions of ASC Topic 840, *Leases*, which requires that leases be evaluated and classified as operating or capital leases for financial reporting purposes. The terms used for the evaluation include renewal option periods

F-11

in instances in which the exercise of the renewal option can be reasonably assured and failure to exercise such option would result in an economic penalty. Leases are classified as capital leases whenever the terms of the lease transfer substantially all of the risks and rewards of ownership to the lessee. All other leases are recorded as operating leases. As of December 31, 2019, 2018, and 2017, all of the Company's material leases were operating leases.

The Company's lease agreements provide for rental payments that increase on an annual basis. The Company recognizes rent expense on operating leases on a straight-line basis over the non-cancellable lease term. Operating leases with landlord-funded leasehold improvements are considered tenant allowances and are amortized as a reduction of rent expense over the non-cancellable lease term. Deferred rent liability, which is calculated as the difference between contractual lease payments and the rent expense, is recorded in other noncurrent liabilities in the consolidated balance sheets.

**Stock-Based Compensation**

The Company measures compensation expense for all stock-based awards, including stock options, restricted stock units and restricted stock awards, in accordance with ASC Topic 718, *Compensation — Stock Compensation*. Stock-based compensation is measured at fair value on grant date and recognized as compensation expense ratably over the course of the requisite service period for awards expected to vest.

The Company uses an option-pricing model to determine the fair value of stock options. Determining the fair value of stock-based awards at the grant date requires judgment. The determination of the grant date fair value of options using an option-pricing model is affected by the Company's estimated common stock value, as well as assumptions regarding a number of other complex and subjective variables. These assumptions include:

*Risk-free rate:*    Risk-free interest rates are derived from U.S. Treasury securities as of the option grant date.

*Volatility:*    Volatility of the Company's stock price is estimated based on a combination of published historical volatilities of comparable publicly traded companies.

*Expected term:*    The expected term calculation for option awards considers a combination of the Company's historical and estimated future exercise behavior.

*Forfeiture rate:*    The Company elects to recognize actual forfeitures of stock-based awards as they occur in accordance with Accounting Standards Update ("ASU") No. 2016-09, *Compensation — Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*.

If any of the assumptions used in the option-pricing model change significantly, stock-based compensation for future awards may differ materially compared to the awards granted. The expense resulting from stock-based payments is recorded as expense in the accompanying consolidated statements of operations based on the relevant headcount.

**Debt Issuance Costs**

The Company incurs debt issuance costs in connection with its debt facilities and related amendments. Amounts paid directly to lenders are classified as issuance costs and are recorded as a reduction of the carrying value of the debt. Debt issuance costs are amortized using the effective interest rate method to interest expense on the Company's consolidated statements of operations. See *Note 9 – Debt* for additional details.

**Convertible Notes**

The Company accounts for convertible notes in accordance with ASC Topic 470-20, *Debt with Conversion and Other Options*. Convertible notes are classified as liabilities measured at amortized cost, net of debt discounts from the allocation of proceeds. Interest expense is recognized using the effective interest method over the expected term of the debt instrument pursuant to ASC Topic 835, *Interest*.

F-12

*Embedded Derivatives*

ASC Topic 815-15, *Embedded Derivatives*, requires each contract that is not a derivative in its entirety be assessed to determine whether it contains embedded derivatives that are required to be bifurcated and accounted for as a derivative financial instrument. The embedded derivative is bifurcated from the host contract and accounted for as a freestanding derivative if the combined instrument is not accounted for, in its entirety, at estimated fair value, with changes in estimated fair value recorded in earnings, the terms of the embedded derivative are not clearly and closely related to the economic characteristics of the host contract, and if the same terms on a separate instrument would qualify that instrument as a derivative instrument. Embedded derivatives are measured at fair value and re-measured at each subsequent reporting period.

*Beneficial Conversion Feature*

If the amount allocated to the convertible notes results in an effective per share conversion price that is less than the fair value of the Company's common stock on the commitment date, the intrinsic value of this beneficial conversion feature is recorded as a discount to the convertible notes, with a corresponding increase to additional paid in capital. The beneficial conversion feature discount is equal to the difference between the effective conversion price and the fair value of the Company's common stock at the commitment date, unless limited by the remaining proceeds allocated to the convertible notes.

**Equity-Based Payments to Non-Employees**

Under the provisions of ASC Topic 505-50, *Equity-Based Payments to Non-Employees,* the Company measures stock-based compensation to a non-employee on the earlier of the date at which a commitment is reached for performance by the counterparty and the date at which the counterparty's performance is complete ("Measurement Date"). A commitment for performance is deemed to have been reached when performance by the counterparty to earn the equity instruments is probable. The value of the award is measured based on an estimate of the fair value of the equity instruments to be issued or the fair value of the goods or services received, whichever can be measured more reliably. The estimated fair value is recognized as expense over the contractual term of the arrangement with the non-employee. If the Measurement Date is not established, the Company measures the cost of the award in each reporting period at the then-current lowest aggregate fair value until the performance condition is met.

**Earnings per Common Share**

Under GAAP, certain instruments granted in stock-based payment transactions are considered participating securities prior to vesting and are therefore required to be included in the earnings allocation in calculating earnings per share under the two-class method. Companies are required to treat unvested stock-based payment awards with a right to receive non-forfeitable dividends as a separate class of securities in calculating earnings per share, except in cases where the effect of the inclusion of the participating securities would be antidilutive.

**Fair Value Measurements**

The Company records the fair value of assets and liabilities in accordance with ASC Topic 820, *Fair Value Measurement*. ASC 820 defines fair value as the price received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date and in the principal or most advantageous market for that asset or liability. The fair value should be calculated based on assumptions that market participants would use in pricing the asset or liability, not on assumptions specific to the entity.

In addition to defining fair value, ASC 820 expands the disclosure requirements around fair value and establishes a fair value hierarchy for valuation inputs. The hierarchy prioritizes the inputs into three levels based on the extent to which inputs used in measuring fair value are observable in the market. Each fair value measurement is reported in one of the three levels, which is determined by the lowest level input that is significant to the fair value measurement in its entirety. These levels are:

Level 1 — Quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2 — Quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration, for substantially the full term of the financial instrument.

Level 3 — Unobservable inputs reflecting the Company's own assumptions about the inputs used in pricing the asset or liability at fair value.

TABLE OF CONTENTS

**Concentration of Credit Risk**

Financial instruments that potentially subject the Company to concentration of credit risk consist primarily of accounts receivable. From time to time, the Company assesses the credit worthiness of its payment processing service provider and restaurants on the Platforms. Credit risk on accounts receivable is minimized through use of a reputable payment processing service provider as well as a diverse group of restaurants dispersed across several geographic areas. The Company has not experienced material losses related to receivables from individual restaurants or groups of restaurants and is not expecting a change from this historical norm, as current economic conditions are relatively stable.

Additionally, the Company regularly maintains cash in excess of federally insured limits at financial institutions. The Company makes such deposits with entities it believes are of high credit quality and has not incurred any losses related to these balances. Management believes its credit risk, with respect to these financial institutions, to be minimal.

**Segments**

The Company operates in a single segment. Operating segments are identified as components of an enterprise about which separate discrete financial information is available for evaluation by the chief operating decision maker ("CODM") in making decisions regarding resource allocation and assessing performance. The Company has determined that its Chief Executive Officer is the CODM. To date, the Company's CODM has made such decisions and assessed performance at the Company-level.

**Revenue**

The Company generates revenue ("transaction fees") primarily when diners place an order on one of the Platforms. In the case of diner subscription fees for unlimited delivery, revenue is recognized when payment for the monthly subscription is received. Revenue consists of the following for the periods indicated (in thousands):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Transaction fees | $ 186,189 | $ 65,930 | $ 21,406 |
| Setup and integration fees | 5,270 | 2,882 | 1,214 |
| Other | 216 | 461 | 291 |
| **Total Revenue** | **$ 191,675** | **$ 69,273** | **$ 22,911** |

Transaction fees represent the revenue recognized from the Company's obligation to process orders on the Platforms. The performance obligation is satisfied when the Company successfully processes an order placed on one of the Platforms and the restaurant receives the order at their location. The obligation to process orders on the Platforms represents a series of distinct performance obligations satisfied over time that the Company combines into a single performance obligation. Consistent with the recognition objective in ASC Topic 606, *Revenue from Contracts with Customers*, the variable consideration due to the Company for processing orders is recognized on a daily basis. As an agent of the restaurant in the transaction, the Company recognizes transaction fees earned from the restaurant on the Platform on a net basis. Transaction fees also include a fee charged to the end user customer when they request the order be delivered to their location. Revenue is recognized for diner fees once the delivery service is completed. The contract period for substantially all restaurant contracts is one month as both the Company and the restaurant have the ability to unilaterally terminate the contract by providing notice of termination.

During the periods presented in this Annual Report on Form 10-K the Company has received non-refundable upfront setup and integration fees for onboarding certain restaurants. Setup and integration activities primarily represent administrative activities that allowed the Company to fulfill future performance obligations for these restaurants and do not represent services transferred to the restaurant. However, the non-refundable upfront setup and integration fees charged to restaurants resulted in a performance obligation in the form of a material right related to the restaurant's option to renew the contract each day rather than provide a notice of termination. Upfront non-refundable fees were generally due shortly after the contract was executed; however, the Company could provide installment payment options for up to six months. Revenue related to setup and integration fees has historically been recognized ratably over a two-year period.

In July 2019, the Company modified its fee structure with a majority of restaurants on the Waitr Platform. The new, modified fee structure was performance-based and tiered such that restaurants with higher sales through the Waitr Platform were subject to a rate at the lower end of the range, whereas restaurants with lower sales through the Waitr Platform were subject to a rate at the upper end of the range. The performance-based fees became effective for August 2019, upon acceptance of the new agreements by the restaurants. Approximately 22% of the restaurants on the Waitr Platform did not accept the new agreements, resulting in the termination of their

contracts (Bite Squad restaurants were unaffected, since it had not previously offered the lower rate, upfront fee option to restaurants). Additionally, with the introduction of the July 2019 modifications, the Company discontinued offering fee arrangements with the upfront, one-time setup and integration fee. Upon acceptance of the new performance-based fee agreement, in certain cases, the

F-14

Company waived uncollected portions of the setup and integration fee and refunded portions of previously paid setup and integration fees.

The contract modifications and the effect of such modifications on our measure of progress towards the performance obligations resulted in accelerated recognition of deferred revenue related to the modified contracts. Included in revenue during the year ended December 31, 2019 is a cumulative adjustment to setup and integration fee revenue of $3,005, which was previously included in deferred revenue as of August 1, 2019. The cumulative adjustment to revenue was partially offset by write-offs of uncollected setup and integration fees within accounts receivable of $797 and refunds of previously paid setup and integration fees of $320. Further, a portion of our capitalized contract costs pertaining to or allocable to terminated restaurant contracts was recognized in the year ended December 31, 2019, resulting in an impairment loss of $852. For additional details, see "*Costs to Obtain a Contract with a Customer*" and "*Costs to Fulfill a Contract with a Customer*" below.

The Company sells gift cards on the Bite Squad Platform and recognizes revenue upon gift card redemption. Gift cards that have not yet been utilized amounted to $657 as of December 31, 2019 and are included on the consolidated balance sheet in other current liabilities.

*Significant Judgment*

Most of the Company's contracts with restaurants contain multiple performance obligations as described above. For these contracts, the Company accounts for individual performance obligations separately if they are both capable of being distinct, and distinct in the context of the contract. Determining whether products and services are considered distinct performance obligations that should be accounted for separately may require significant judgment.

Judgment is also required to determine the standalone selling price for each distinct performance obligation. The Company used the alternative approach in ASC 606 to allocate the upfront fee between the material right obligation and the transaction fee obligation, which resulted in all of the upfront non-refundable payment at inception of the contract being allocated to the material right obligation. When contracts with customers include other performance obligations, such as ancillary equipment, the Company establishes a single amount to estimate the standalone selling price for the goods or services. In instances where the standalone selling price is not directly observable, it is determined using observable inputs.

*Contract Balances*

The timing of revenue recognition may differ from the timing of invoicing to restaurants. The Company records a receivable when it has an unconditional right to the consideration. Setup and integration fees were due at inception of the contract; in certain cases, extended payment terms may have been provided for up to six months and are included in accounts receivable. The opening balance of accounts receivable, net was $3,687 and $2,124 as of January 1, 2019 and 2018, respectively. As discussed above, in connection with the modified fee structure introduced in July 2019, the Company waived $797 of outstanding setup and integration fees in accounts receivable from certain restaurants that accepted the new agreement and remained on the Waitr Platform.

Payment terms and conditions on setup and integration fees varied by contract type, although terms typically included a requirement of payment within six months. The Company recorded a contract liability in deferred revenue for the unearned portion of the upfront non-refundable fee. In instances where the timing of revenue recognition differs from the timing of invoicing, the Company has determined its contracts do not include a significant financing component.

*Costs to Obtain a Contract with a Customer*

The Company recognizes an asset for the incremental costs of obtaining a contract with a restaurant and recognizes the expense over the course of the period when the Company expects to recover those costs. The Company has determined that certain internal sales incentives earned at the time when an initial contract is executed meet these requirements. Capitalized sales incentives are amortized to sales and marketing expense on a straight-line basis over the period of benefit. The Company applies a practical expedient to expense costs as incurred for costs to obtain a contract with a customer when the amortization period would have been one year or less.

As a result of the changes in the terms of the contracts related to the modified fee structure introduced in July 2019, we changed our estimate of the useful life of the asset for costs to obtain a contract to better reflect the estimated period in which the asset will remain in service. Effective August 1, 2019, the estimated useful life of the asset for costs to obtain a contract from customers, previously estimated at two years, was increased to five years. The change in estimate had no material impact on the Company's results of operations for the year ended December 31, 2019.

In connection with the modified fee structure and the related changes in the contract terms, certain restaurants elected to terminate their contracts, resulting in an impairment charge for the portion of capitalized contract costs of obtaining a contract which was deemed to be non-recoverable. The impairment was calculated based on a pro rata allocation of the carrying value of the asset as of July 31, 2019

F-15

between the restaurants remaining on the Waitr Platform and those terminating their contracts. The capitalized contract costs allocated to the terminated restaurants totaled $341 and was recognized as an impairment loss during the year ended December 31, 2019 in the consolidated statement of operations. Additionally, during the year ended December 31, 2019, we recognized an impairment loss for deferred costs related to obtaining contracts with restaurants at September 30, 2019 in connection with the Company's goodwill and intangible asset impairment analysis (see *Note 7 – Intangible Assets and Goodwill*).

Deferred costs related to obtaining a contract with a customer totaled $701 and $986 as of December 31, 2019 and 2018, respectively, out of which $143 and $679, respectively, was classified as current. Amortization of expense for the costs to obtain a contract were $606, $541, and $211 for the years ended December 31, 2019, 2018, and 2017, respectively.

*Costs to Fulfill a Contract with a Customer*

The Company also recognizes an asset for the costs to fulfill a contract with a restaurant when they are specifically identifiable, generate or enhance resources used to satisfy future performance obligations, and are expected to be recovered. The Company has determined that certain costs related to setup and integration activities meet the capitalization criteria under ASC Topic 340-40, *Other Assets and Deferred Costs*. Costs related to these implementation activities are deferred and then amortized to operations and support expense on a straight-line basis over a period of benefit.

As a result of the changes in the terms of the contracts related to the modified fee structure introduced in July 2019, we changed our estimate of the useful life of the asset for costs to fulfill a contract to better reflect the estimated period in which the asset will remain in service. Effective August 1, 2019, the estimated useful life of the asset for costs to fulfill a contract from customers, previously estimated at two years, was increased to five years. The change in estimate had no material impact on the Company's results of operations for the year ended December 31, 2019.

The changes in the terms of the contracts in July 2019 and the related termination of contracts by certain restaurants resulted in a $511 impairment charge for the portion of capitalized contract costs to fulfill a contract that were deemed to be non-recoverable, based on the pro rata allocation described above. Additionally, during the year ended December 31, 2019, we recognized an impairment loss for deferred costs related to fulfilling contracts with restaurants at September 30, 2019 in connection with the Company's goodwill and intangible asset impairment analysis (see *Note 7 – Intangible Assets and Goodwill*). The impairment losses were recognized during the year ended December 31, 2019 in the consolidated statement of operations.

Deferred costs related to fulfilling a contract with a customer totaled $270 and $1,710 as of December 31, 2019 and 2018, respectively, out of which $56 and $1,190 was classified as current. Amortization of expense for the costs to fulfill a contract were $1,030, $972, and $378 for the years ended December 31, 2019, 2018, and 2017, respectively.

**Income Taxes**

The Company files federal and state income tax returns in each of the jurisdictions in which it operates. The Company accounts for income taxes using the asset and liability method. Under this method, deferred tax assets and liabilities are calculated based upon the temporary differences between the financial statement and income tax bases of assets and liabilities using the enacted tax rates applicable in a given year. A valuation allowance is provided when it is more likely than not that all or some portion of the deferred tax assets will not be realized. The Company did not consider future book income as a source of taxable income when assessing if a portion of the deferred tax assets is more likely than not to be realized. However, scheduling the reversal of existing deferred tax liabilities indicated that a portion of the deferred tax assets are not likely to be realized. Therefore, valuation allowances were established against some, but not all, of the Company's deferred tax assets. In the event the Company determines that it would be able to realize deferred tax assets that have valuation allowances established, an adjustment to the deferred tax assets would be recognized as a component of income tax expense through continuing operations.

The calculation of income tax liabilities involves significant judgment in estimating the impact of uncertainties and complex tax laws. The Company's tax returns are subject to examination by the various federal and state income-taxing authorities in the normal course of business. Such examinations may result in future assessments of additional tax, interest, and penalties. The Company utilizes a two-step approach in recognizing and measuring uncertain tax positions ("tax contingencies"). The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit. The second step is to measure the tax benefit as the largest amount, which is more than 50% likely to be realized upon ultimate settlement. The Company accounts for income taxes related to tax contingencies and recognizes interest and penalties related to tax contingencies in income tax expense in the consolidated statements of operations. The Company has not recorded any tax contingencies as of December 31, 2019 and December 31, 2018.

The Tax Cuts and Jobs Act (the "Tax Act") was signed into law on December 22, 2017. In accordance with the Tax Act, the Company revalued its deferred tax assets and liabilities as of December 31, 2017 using the new corporate income tax rate of 21% instead of the prior statutory rate of 34%. The change in tax rate is effective for taxable income earned beginning on January 1, 2018.

F-16

**Recent Accounting Pronouncements**

Changes to GAAP are established by the Financial Accounting Standards Board (the "FASB"), in the form of ASUs, to the FASB's ASCs.

The Company considered the applicability and impact of all ASUs. ASUs not listed below were assessed and determined to be either not applicable or are expected to have minimal impact on these consolidated financial statements. As an emerging growth company, the Company has elected to use the extended transition period for complying with new or revised financial accounting standards provided pursuant to Section 13(a) of the Securities Exchange Act of 1934, as amended.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes*, which simplifies the accounting for income taxes by removing certain exceptions to the general principles for income taxes and also improves consistent application by clarifying and amending existing guidance. ASU 2019-12 is effective for public business entities for fiscal years, and interim periods within those years, beginning after December 15, 2020. For all other entities, the amendments are effective for fiscal years beginning after December 15, 2021, and interim periods within fiscal years beginning after December 15, 2022. Early adoption is permitted, with the amendments to be applied on a retrospective, modified retrospective or prospective basis, depending on the specific amendment. The Company is currently evaluating the impact that adopting this ASU will have on the consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820) – Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement*, which removes, modifies or adds disclosure requirements regarding fair value measurements. The amendments in this ASU are effective for all entities beginning after December 15, 2019, with amendments on changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements, and narrative description of measurement uncertainty requiring prospective adoption and all other amendments requiring retrospective adoption. Early adoption is permitted. The Company is currently evaluating the impact of the adoption of ASU 2018-13 on its related disclosures and does not expect it to have a material impact on the consolidated financial statements.

In June 2018, the FASB issued ASU No. 2018-07, *Compensation – Stock Compensation (Topic 718),* to simplify the accounting for share-based payments to non-employees by aligning it with the accounting for share-based payments to employees, with certain exceptions. Under the new standard, equity-classified non-employee awards will be initially measured on the grant date and re-measured only upon modification, rather than at each reporting period. Measurement will be based on an estimate of the fair value of the equity instruments to be issued. ASU 2018-07 is effective for public business entities in fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. For all other entities, the standard is effective in fiscal years beginning after December 15, 2019 and interim periods within fiscal years beginning after December 15, 2020. Early adoption is permitted, including in an interim period for which financial statements have not been issued or made available for issuance but not before an entity adopts ASC 606. As an emerging growth company, the Company will not be subject to the requirements of ASU 2018-07 until fiscal year 2020. The Company's adoption of this ASU will not have a material impact on the consolidated financial statements.

In July 2017, the FASB issued ASU No. 2017-11, *Earnings Per Share (Topic 260), Distinguishing Liabilities from Equity (Topic 480) and Derivatives and Hedging (Topic 815): I. Accounting for Certain Financial Instruments with Down Round Features; II. Replacement of the Indefinite Deferral for Mandatorily Redeemable Financial Instruments of Certain Nonpublic Entities and Certain Mandatorily Redeemable Noncontrolling Interests with a Scope Exception*. Part I of ASU 2017-11 addresses the complexity of accounting for certain financial instruments with down round features. Down round features are features of certain equity-linked instruments (or embedded features) that result in the strike price being reduced based on the pricing of future equity offerings. Current accounting guidance creates cost and complexity for entities that issue financial instruments (such as warrants and convertible instruments) with down round features that require fair value measurement of the entire instrument or conversion option. Part II of ASU 2017-11 addresses the difficulty of navigating ASC Topic 480, *Distinguishing Liabilities from Equity,* because of the existence of extensive pending content in ASC 480. This pending content is the result of the indefinite deferral of accounting requirements about mandatorily redeemable financial instruments of certain nonpublic entities and certain mandatorily redeemable noncontrolling interests. Part II of ASU 2017-11 does not have an accounting effect. ASU 2017-11 is effective for public business entities for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. For all other entities, the standard is effective for fiscal years beginning after December 15, 2019 and interim periods within fiscal years beginning after December 15, 2020. Early adoption is permitted. As an emerging growth company, the Company will not be subject to the requirements of ASU 2017-11 until fiscal year 2020. The Company is currently evaluating the impact that adopting this ASU will have on the consolidated financial statements.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments,* to replace the incurred loss impairment methodology under current GAAP with a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates. The Company will be required to use a forward-looking expected credit loss model for accounts receivables, loans, and other financial instruments. ASU 2016-13 is effective for public business entities for fiscal years beginning after December 15, 2019,

F-17

including interim periods within those fiscal years. For all other entities, the standard is effective for fiscal years beginning after December 15, 2020, including interim periods within fiscal years beginning after December 15, 2021. Early adoption is permitted for all entities beginning after December 15, 2018, including interim periods within those fiscal years. As an emerging growth company, the Company will not be subject to the requirements of ASU 2016-13 until fiscal year 2020. The Company is currently evaluating the impact that adopting this ASU will have on the consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*. The Company has not completed the process of evaluating the effects that will result from adopting ASU 2016-02. The principal objective of ASU 2016-02 is to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the consolidated balance sheet. ASU 2016-02 continues to retain a distinction between finance and operating leases but requires lessees to recognize a right-of-use asset representing its right to use the underlying asset for the lease term and a corresponding lease liability on the balance sheet for all leases with terms greater than twelve months. ASU 2016-02 is effective for annual periods beginning after December 15, 2020 due to the Company's emerging growth election under Section 107(b) of the Jumpstart Our Business Startups Act of 2012. The Company therefore has not yet determined the effects that this standard may have on its consolidated financial statements and the related expansion of its footnote disclosures upon adoption of this ASU.

## 3. Business Combinations

### *Bite Squad Merger*

On January 17, 2019, the Company completed the acquisition of Bite Squad, a Minnesota limited liability company, pursuant to the Agreement and Plan of Merger, dated as of December 11, 2018 (the "Bite Squad Merger Agreement"), by and among the Company, Bite Squad and Wingtip Merger Sub, Inc., a Delaware corporation and wholly-owned subsidiary of the Company. The transactions contemplated by the Bite Squad Merger Agreement are referred to herein as the "Bite Squad Merger." Upon consummation of the Bite Squad Merger, Wingtip Merger Sub, Inc. merged with and into Bite Squad, with Bite Squad surviving the merger in accordance with the Minnesota Revised Uniform Limited Liability Act as a wholly-owned, indirect subsidiary of the Company. Founded in 2012 and based in Minneapolis, Bite Squad operated an online food ordering and delivery platform, similar to Waitr's Platform, through the Bite Squad Platform. The consideration for the Bite Squad Merger consisted of $197,255 payable in cash (subject to adjustments), the pay down of $11,880 of indebtedness of Bite Squad and an aggregate of 10,591,968 shares of the Company's common stock, par value $0.0001 per share ("common stock"), valued at $11.95 per share. On June 18, 2019, the Company finalized the adjustments contemplated by the Bite Squad Merger Agreement, resulting in the payment of an additional $149 of cash consideration to the Bite Squad members, recorded as additional goodwill. The following represents the total merger consideration:

| (in thousands, except per share amount) | | |
|---|---|---|
| Shares transferred at closing | | 10,592 |
| Value per share | $ | 11.95 |
| **Total share consideration** | $ | 126,574 |
| Plus: cash transferred to Bite Squad members | | 197,255 |
| Plus: pay down of debt | | 11,880 |
| Plus: working capital payment to seller | | 149 |
| **Total merger consideration** | $ | 335,858 |

The Bite Squad Merger was considered a business combination in accordance with ASC 805, and has been accounted for using the acquisition method. Under the acquisition method of accounting, total merger consideration, acquired assets and assumed liabilities are recorded based on their estimated fair values on the acquisition date. The excess of the fair value of merger consideration over the fair value of the assets less liabilities acquired has been recorded as goodwill.

F-18

The fair value of assets acquired and liabilities assumed in the Bite Squad Merger consists of the following (in thousands):

| | |
|---|---:|
| Cash and cash equivalents | $ 11,819 |
| Settlements due from credit card processors | 1,097 |
| Accounts receivable | 632 |
| Inventory | 940 |
| Prepaid expenses and other | 562 |
| Intangible assets | 104,400 |
| Loans receivable | 336 |
| Other noncurrent assets | 163 |
| Restaurant food liability | (930) |
| Accounts payable | (953) |
| Accrued payroll | (1,125) |
| Accrued taxes | (1,818) |
| Other accruals | (3,803) |
| Total assets acquired and liabilities assumed | 111,320 |
| Goodwill | 224,538 |
| Total merger consideration | $ 335,858 |

The Company engaged a third-party to assist management in estimating the fair value of the assets and liabilities. The goodwill recorded in the Bite Squad Merger represents future anticipated economic benefits from combining operations of Waitr and Bite Squad, including, but not limited to, future growth into new markets, future enhancements to the Platforms, future customer relationships and the workforce in place. Approximately 81% of the goodwill is expected to be deductible for U.S. federal income tax purposes given the federal tax treatment of the transaction.

The acquired identifiable intangible assets include customer relationships, trade name and developed technology. The developed technology asset was valued using the "with & without" methodology which considers the direct replacement and opportunity costs associated with the underlying technology. The developed technology acquired represents a Level 3 measurement as it was based on unobservable inputs reflecting the Company's assumptions used in pricing the asset at fair value. These inputs required significant judgments and estimates at the time of the valuation.

The acquired customer relationships were valued using the income approach, specifically, the multi-period excess earnings method, which measures the after-tax cash flows attributable to the existing customer relationships after deducting the operating costs and contributory asset charges associated with economic rents associated with supporting the existing customer relationships. The customer relationships acquired represent a Level 3 measurement as it was based on unobservable inputs reflecting the Company's assumptions used in pricing the asset at fair value. These inputs required significant judgments and estimates at the time of the valuation.

The acquired trade name was valued using the income approach, specifically, the relief from royalty rate method, which measures the cash flow streams attributable to the trade name in the form of royalty payments that would be paid to the owner of the trade name in return for the rights to use the trade name. The trade name acquired represents a Level 3 measurement as it was based on unobservable inputs reflecting the Company's assumptions used in pricing the asset at fair value. These inputs required significant judgments and estimates at the time of the valuation.

As a result of recent, adverse changes in market conditions from increased competition having negatively affected the Company's order and revenue growth, thereby contributing to a sustained decline in the Company's market capitalization, the Company conducted an impairment test as of September 30, 2019, including a fair value analysis of the goodwill and intangible assets acquired in the Bite Squad Merger. See *Note 7 – Intangible Assets and Goodwill* for further details.

The results of operations of Bite Squad are included in our consolidated financial statements beginning on the acquisition date, January 17, 2019. Revenue and net loss of Bite Squad included in the consolidated statement of operations in the year ended December 31, 2019 totaled approximately $95,079 and $213,497, respectively.

Identifiable intangible assets acquired from Bite Squad consisted of the following (in thousands):

| | Amortizable Life (in years) | Value |
|---|---:|---:|
| Customer Relationships | 7.5 | $ 81,000 |

| | | |
|---|---|---|
| Trade name | 3.0 | 5,400 |
| Developed technology | 4.0 | 18,000 |
| **Total** | | **$ 104,400** |

F-19

The acquired identifiable intangible assets are amortized on a straight-line basis to reflect the pattern in which the economic benefits of the intangible assets are consumed.

In connection with the Bite Squad Merger, the Company incurred direct and incremental costs of $6,956, including debt modification expense of $375, consisting of legal and professional fees, which are included in general and administrative expenses in the consolidated statement of operations in the year ended December 31, 2019.

*Pro-Forma Financial Information (Unaudited)*

The supplemental condensed consolidated results of the Company on an unaudited pro forma basis as if the Bite Squad Merger had been consummated on January 1, 2018 are as follows (in thousands):

|  | Years Ended December 31, | |
|  | 2019 | 2018 |
| --- | --- | --- |
| Net Revenue | $ 195,961 | $ 152,642 |
| Net Loss | 292,419 | 59,565 |

These pro forma results were based on estimates and assumptions, which the Company believes are reasonable. They are not the results that would have been realized had the Company been a consolidated company during the periods presented and are not indicative of consolidated results of operations in future periods. The pro forma results include adjustments primarily related to acquisition accounting adjustments and interest expense associated with the related Additional Term Loans (see *Note 9 - Debt*) in connection with the Bite Squad Merger. Acquisition costs and other non-recurring charges incurred are included in the period presented.

### Other Acquisitions

During the year ended December 31, 2019, the Company completed three separate acquisitions pursuant to asset purchase agreements dated September 5, 2019, September 27, 2019 and October 1, 2019. The total consideration for the acquisitions amounted to $1,645 and included approximately $545 in cash at closing, $450 payable after integration of systems takes place (ranging from three months to approximately one year), $600 in promissory notes (see *Note 9 – Debt*) and $50 withheld as indemnity for up to a twelve-month period. On February 13, 2020, one of these asset purchase agreements was amended to lower the integration payment by $100 in exchange for increasing the promissory note by $100.

The transactions were accounted for as business combinations, with the fair values allocated primarily to customer relationships (restaurants and end consumers) and software. The results of operations of the acquired businesses are included in our consolidated financial statements beginning on their acquisition dates and were immaterial. Pro forma results were immaterial to the operations of the Company.

The acquired customer relationship intangible assets were valued at $1,343 and will be amortized on a straight-line basis over 7.5 years and the acquired software was valued at $250 and will be amortized on a straight-line basis over three years. The amortization periods reflect the pattern in which the economic benefits of the acquired assets are consumed (see *Note 7 – Intangible Assets and Goodwill*).

### Landcadia Business Combination

On November 15, 2018, the Company (f/k/a Landcadia Holdings, Inc.) completed the acquisition of Waitr Incorporated (the "Landcadia Business Combination"). Waitr Incorporated began operations in 2014 as a restaurant platform for online food ordering and delivery services. Landcadia Holdings, Inc. was a special purpose acquisition company whose business was to effect a merger, capital stock exchange, asset acquisition, stock purchase reorganization or similar business combination. The Landcadia Business Combination was accounted for as a reverse recapitalization, with no goodwill or other intangible assets recorded, in accordance with GAAP. Landcadia Holdings, Inc. was treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the Landcadia Business Combination was treated as the equivalent of Waitr Incorporated issuing stock for the net assets of Landcadia Holdings, Inc., accompanied by a recapitalization. The net assets of Landcadia Holdings, Inc. were stated at historical cost, with no goodwill or other intangible assets recorded. Reported amounts from operations included herein prior to the Landcadia Business Combination are those of Waitr Incorporated. The shares and earnings per share available to holders of the Company's common stock, prior to the Landcadia Business Combination, have been retroactively restated to reflect the exchange ratio established in the Landcadia Business Combination (0.8970953 Waitr Holdings Inc. shares to 1.0 Waitr Incorporated share). The pro forma information of the Landcadia Business Combination has been excluded as the amounts are not material.

The aggregate consideration for the Landcadia Business Combination was $300,000, consisting of $71,680 in cash and 22,831,697 shares of the Company's common stock valued at $10.00 per share.

F-20

The aggregate consideration for the Landcadia Business Combination was $300,000, consisting of $71,680 in cash and 22,831,697 shares of the Company's common stock valued at $10.00 per share.

TABLE OF CONTENTS

## 4. Accounts Receivable, Net

Accounts receivable consist of the following (in thousands):

| | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Credit card receivables | $ | 2,803 | $ | 1,871 |
| Receivables from restaurants and customers | | 950 | | 1,991 |
| Accounts receivable | $ | 3,753 | $ | 3,862 |
| Less: allowance for doubtful accounts and chargebacks | | (481) | | (175) |
| **Accounts receivable, net** | **$** | **3,272** | **$** | **3,687** |

Additionally, the activity in the allowance for doubtful accounts and chargebacks is as follows (in thousands):

| | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| **Balance, beginning of the year** | $ | 175 | $ | 50 |
| Additions to expense | | 481 | | 128 |
| Write-offs, net of recoveries and other adjustments | | (175) | | (3) |
| **Balance, end of the year** | **$** | **481** | **$** | **175** |

During the year ended December 31, 2019, the Company recognized the write-off of $797 of accounts receivable for uncollected setup and integration fees as a reduction of setup and integration fee revenue. See *Note 2 – Basis of Presentation and Summary of Significant Accounting Policies* for additional details.

## 5. Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets consist of the following (in thousands):

| | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Prepaid insurance expense | $ | 5,859 | $ | 3,618 |
| Other current assets | | 2,470 | | 930 |
| **Prepaid expenses and other current assets** | **$** | **8,329** | **$** | **4,548** |

## 6. Property and Equipment, Net

Property and equipment are stated at cost less accumulated depreciation and consist of the following (in thousands):

| | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Computer equipment | $ | 6,052 | $ | 4,818 |
| Furniture and fixtures | | 1,182 | | 668 |
| Leasehold improvements | | 344 | | 184 |
| Construction in process | | — | | 556 |
| | $ | 7,578 | $ | 6,226 |
| Less: Accumulated depreciation | | (3,506) | | (1,675) |
| **Property and equipment, net** | **$** | **4,072** | **$** | **4,551** |

F-21

On March 14, 2018, the Company entered into an asset purchase agreement with IndiePlate LLC, a Louisiana limited liability company, to acquire inventory, furniture and fixtures, and certain other equipment in exchange for $71 of consideration. Consideration consisted of net cash paid of $11 and $60 of Series 2018 Notes (as defined in *Note 9 – Debt*). Acquired assets have been recorded in property and equipment, net.

The Company recorded depreciation expense for property and equipment for the years ended December 31, 2019, 2018, and 2017 of $2,048, $1,096, and $499, respectively.

## 7. Intangibles Assets and Goodwill

*Intangible Assets*

Intangible assets with finite useful lives are amortized using the straight-line method over their useful lives and include internally developed software, as well as software to be otherwise marketed, and trademarks/trade name/patents and customer relationships. The Company has determined that the Waitr trademark intangible asset is an indefinite-lived asset and therefore is not subject to amortization but is evaluated annually for impairment. The Bite Squad trade name asset, however, is being amortized over its estimated useful life.

Intangible assets are stated at cost or acquisition-date fair value less accumulated amortization and consist of the following (in thousands):

| | As of December 31, 2019 | | | |
| | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment | Intangible Assets, Net |
|---|---|---|---|---|
| Software | $ 21,223 | $ (4,113) | $ (11,795) | $ 5,315 |
| Trademarks/Trade name/Patents | 5,405 | (1,725) | — | 3,680 |
| Customer Relationships | 82,343 | (8,199) | (57,378) | 16,766 |
| **Total** | **$ 108,971** | **$ (14,037)** | **$ (69,173)** | **$ 25,761** |

| | As of December 31, 2018 | | | |
| | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment | Intangible Assets, Net |
|---|---|---|---|---|
| Software | $ 1,239 | $ (536) | $ (589) | $ 114 |
| Trademarks/Trade name/Patents | 5 | — | — | 5 |
| Customer Relationships | 142 | — | — | 142 |
| **Total** | **$ 1,386** | **$ (536)** | **$ (589)** | **$ 261** |

On January 17, 2019, the Company acquired intangible assets in connection with the acquisition of Bite Squad, including customer relationships of $81,000, trade names valued at $5,400 and developed technology of $18,000. Additionally, during the year ended December 31, 2019, the Company acquired customer relationship intangible assets valued at $1,343 and software valued at $250 in connection with three separate acquisitions. See *Note 3 – Business Combinations* for additional details.

The Company recorded amortization expense for the years ended December 31, 2019, 2018, and 2017 of $13,726, $127, and $224, respectively.

Estimated future amortization expense of intangible assets is as follows (in thousands):

| | Amortization |
|---|---|
| 2020 | $ 6,447 |
| 2021 | 6,421 |
| 2022 | 4,021 |
| 2023 | 2,634 |
| 2024 | 2,634 |
| Thereafter | 3,599 |
| **Total future amortization** | **$ 25,756** |

*Goodwill*

The Company's goodwill balance is as follows as of December 31, 2019 and 2018 (in thousands):

|  | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| **Balance, beginning of period** | $ | 1,408 | $ | 1,408 |
| Acquisitions during the period | | 224,538 | | — |
| Impairments during the period | | (119,212) | | — |
| **Balance, end of period** | $ | 106,734 | $ | 1,408 |

The Company recorded $224,538 of goodwill during the year ended December 31, 2019 as a result of the allocation of the purchase price over assets acquired and liabilities assumed in the Bite Squad Merger (see *Note 3 – Business Combinations*). A goodwill impairment charge of $119,212 was recognized during the year December 31, 2019 (see *Impairments* below). There were no accumulated goodwill impairment charges at December 31, 2018.

*Impairments*

The Company conducts its goodwill and intangible asset impairment test annually in October, or more frequently if indicators of impairment exist. For purposes of testing for goodwill impairment, the Company has one reporting unit. As a result of recent, adverse changes in market conditions from increased competition having negatively affected the Company's order and revenue growth, thereby contributing to a sustained decline in the Company's market capitalization, the Company conducted its impairment test as of September 30, 2019. The impairment test was conducted in accordance with ASC Topic 360, *Impairment and Disposal of Long-Lived Assets*, for certain long-lived assets, including capitalized contract costs, developed technology, customer relationships, and trade names, and in accordance with ASC Topic 350, *Intangibles – Goodwill and Other*, for the reporting unit's goodwill. The Company engaged a third-party to assist management in estimating the fair values of long-lived assets and the reporting unit for purposes of impairment testing under ASC 360 and ASC 350.

ASC 360 requires long-lived assets to be tested for impairment using a three-step impairment test. Step 1 of the test is giving consideration to whether indicators of impairment of long-lived assets are present. Given the sustained decline in the Company's market capitalization, indications were that an impairment may exist and the Company proceeded to Step 2 to determine whether an impairment loss should be recognized. As a part of Step 2, the Company performed a recoverability test by comparing the sum of the estimated undiscounted future cash flows attributable to the long-lived assets in question to their carrying amounts. Given that the undiscounted cash flows for the long-lived assets were below the carrying amounts, the Company proceeded to perform Step 3 of the test by measuring the amount of impairment to the long-lived assets. An impairment loss is measured by the excess of the carrying amount of the long-lived asset over its implied fair value. As a result of this analysis, the Company recognized non-cash pre-tax impairment losses for the long-lived assets of $71,982, described in more detail below.

ASC 350 requires goodwill and other indefinite lived assets to be tested for impairment at the reporting unit level. For ASC 350 testing purposes, the Company compared the fair value of the reporting unit with its carrying amount. The fair value of the reporting unit was estimated giving consideration to the Income Approach, including the discounted cash flow method, and the Market Approach, including the similar transactions method and guideline public company method. Significant inputs and assumptions in the ASC 350 analysis included forecasts (e.g., revenue, operating costs, capital expenditures, etc.), discount rate, long-term growth rate, tax rates, etc. for the reporting unit under the Income Approach and market-based enterprise value to revenue multiples under the Market Approach.

As a result of the ASC 360 and ASC 350 analyses, the Company recognized a total non-cash pre-tax impairment loss of $191,194 during the year ended December 31, 2019 to write down the carrying values of goodwill and intangible assets, including capitalized contract costs, customer relationships and developed technology, to their implied fair values. See below for additional details related to the methodology taken to estimate the fair value for the long-lived assets for purposes of the ASC 360 impairment testing.

The developed technology asset was valued using the replacement cost methodology which considers the direct replacement and opportunity costs associated with the underlying technology. The developed technology analysis represents a Level 3 measurement as it was based on unobservable inputs reflecting the Company's assumptions used in pricing the asset at fair value. These inputs required significant judgments and estimates at the time of the valuation.

The customer relationships were valued using the Income Approach, specifically, the multi-period excess earnings method, which measures the after-tax cash flows attributable to the existing customer relationships after deducting the operating costs and contributory asset charges associated with supporting the existing customer relationships. The customer relationships analysis represents a Level 3 measurement as it was based on unobservable inputs reflecting the Company's assumptions used in developing a fair value estimate. These inputs required significant judgments and estimates at the time of the valuation.

F-23

The trade names were valued using the Income Approach, specifically, the relief from royalty rate method, which measures the cash flow streams attributable to the trade names in the form of royalty payments that would be paid to the owner of the trade names in return for the rights to use the trade names. The trade names analysis represents a Level 3 measurement as it was based on unobservable inputs reflecting the Company's assumptions used in developing a fair value estimate. These inputs required significant judgments and estimates at the time of the valuation.

The total non-cash impairment loss of $191,194 resulting from the ASC 360 and ASC 350 analyses included goodwill and intangible asset impairment losses of $119,212 and $71,982, respectively, which are included in the consolidated statement of operations under the captions "goodwill impairment" and "intangible and other asset impairments," respectively, during the year ended December 31, 2019. The intangible asset impairment loss of $71,982 included $57,295 for the impairment of customer relationships and $10,872 for the impairment of developed technology. Additionally, $3,815 of capitalized contracts costs, related to future revenue generation that was effectively subsumed in the customer relationship value, were impaired.

Determining the fair value of a reporting unit and intangible assets requires the use of estimates and significant judgments that are based on a number of factors including actual operating results. It is reasonably possible that the judgments and estimates described above could change in future periods. There can be no assurance that additional goodwill or intangible assets will not be impaired in future periods.

In July 2019, the Company ceased the operations of a grocery delivery service related to the GoGoGrocer asset acquisition and concluded that the carrying value of the acquired customer relationship asset was non-recoverable, resulting in an impairment loss of $83. The loss is included in intangible and other asset impairments in the consolidated statement of operations in the year ended December 31, 2019. Additionally, intangible and other asset impairments during the year ended December 31, 2019 include impairment losses of $334 for the portion of previously capitalized software that was replaced due to the release of new software developed during 2019.

## 8. Other Current Liabilities

Other current liabilities consist of the following (in thousands):

|  | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Accrued advertising expenses | $ | 451 | $ | 887 |
| Accrued insurance expenses | | 949 | | 703 |
| Accrued estimated workers' compensation expenses | | 2,355 | | 769 |
| Accrued legal contingency | | 2,000 | | — |
| Accrued sales tax payable | | 681 | | — |
| Other accrued expenses | | 3,469 | | 1,720 |
| Other current liabilities | | 2,725 | | 429 |
| **Total other current liabilities** | **$** | **12,630** | **$** | **4,508** |

## 9. Debt

The Company's outstanding debt obligations are as follows (in thousands):

|  | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Term Loans | $ | 69,545 | $ | 25,000 |
| Notes | | 61,132 | | 60,000 |
| Promissory notes | | 284 | | — |
| | $ | 130,961 | $ | 85,000 |
| Less: unamortized debt issuance costs on Term Loans | | (5,115) | | (2,268) |
| Less: unamortized debt issuance costs on Notes | | (2,602) | | (1,747) |
| **Total long-term debt** | **$** | **123,244** | **$** | **80,985** |
| Short-term loans | | 3,612 | | 658 |
| **Total outstanding debt** | **$** | **126,856** | **$** | **81,643** |

F-24

Maturities of outstanding debt, net of discounts are as follows (in thousands):

|  | Debt Maturity |
| --- | ---: |
| 2020 | $         3,612 |
| 2021 | 284 |
| 2022 | 122,960 |
| **Total debt** | **$         126,856** |

The following discussion includes a description of the Company's outstanding debt at December 31, 2019 and 2018. Interest expense related to the Company's outstanding debt totaled $9,408, $1,822 and $283 for the years ended December 31, 2019, 2018 and 2017, respectively. Interest expense includes interest on outstanding borrowings and amortization of debt issuance costs.

*Debt Facility*

On November 15, 2018, Waitr Inc., a Delaware corporation and wholly-owned indirect subsidiary of the Company, as borrower, entered into the Credit and Guaranty Agreement, dated as of November 15, 2018 (as amended or otherwise modified from time to time, the "Credit Agreement") with Luxor Capital Group, LP ("Luxor Capital"), as administrative agent and collateral agent, the various lenders party thereto, Waitr Intermediate Holdings, LLC, a Delaware limited liability company ("Intermediate Holdings") and wholly-owned direct subsidiary of the Company, and certain subsidiaries of Waitr Inc. as guarantors. The Credit Agreement provided for a senior secured first priority term loan facility (the "Debt Facility") to Waitr Inc. in the aggregate principal amount of $25,000 (the "Original Term Loans"). An amendment to the Credit Agreement on January 17, 2019 provided an additional $42,080 under the Debt Facility (the "Additional Term Loans" and together with the Original Term Loans, the "Term Loans"), the proceeds of which were used to consummate the Bite Squad Merger. The Term Loans are guaranteed by certain subsidiaries of the Company and will mature on November 15, 2022.

Interest on borrowings under the Debt Facility accrued at a rate of 7.0% per annum prior to the January 17, 2019 amendment to the Credit Agreement. Effective January 17, 2019, interest on borrowings under the Debt Facility accrues at a rate of 7.125% per annum, payable quarterly, in cash or, at the election of the borrower, as a payment-in-kind. The interest payments due on September 30, 2019 and December 31, 2019 were paid-in-kind, resulting in an aggregate principal amount of the Term Loans at December 31, 2019 of $69,545. The effective interest rate for borrowings on the Debt Facility, after considering the allocated discount, is approximately 10.46%.

The Credit Agreement includes a number of customary covenants that, among other things, limit or restrict the ability of each of Intermediate Holdings, Waitr Inc. and its subsidiaries to incur additional debt, incur liens on assets, engage in mergers or consolidations, dispose of assets, pay dividends or repurchase capital stock and repay certain junior indebtedness. The aforementioned restrictions are subject to certain exceptions including the ability to incur additional indebtedness, liens, dividends, and prepayments of junior indebtedness subject, in each case, to compliance with certain financial metrics and/or certain other conditions and a number of other traditional exceptions that grant Waitr Inc. continued flexibility to operate and develop its business. Pursuant to an amendment to the Credit Agreement on May 21, 2019 in connection with the Company's underwritten follow-on public offering of common stock (the "Offering"), the $15,000 minimum consolidated liquidity requirement that existed under the Credit Agreement was removed. The Credit Agreement also includes customary affirmative covenants, representations and warranties and events of default. We believe that we were in compliance with all covenants under the Credit Agreement as of December 31, 2019.

In connection with the Debt Facility, the Company issued to Luxor Capital warrants which are currently exercisable for 399,726 shares of the Company's common stock. See *Note 16 – Stockholders' Equity* for additional details.

*Notes*

On November 15, 2018, the Company entered into the Credit Agreement, dated as of November 15, 2018 (as amended or otherwise modified from time to time, the "Convertible Notes Agreement"), pursuant to which the Company issued unsecured convertible promissory notes to Luxor Capital Partners, LP, Luxor Capital Partners Offshore Master Fund, LP, Luxor Wavefront, LP and Lugard Road Capital Master Fund, LP (the "Luxor Entities") in the aggregate principal amount of $60,000 (the "Notes").

The Notes originally had an interest rate of 1.0% per annum, paid quarterly in cash. Pursuant to an amendment to the Convertible Notes Agreement on May 21, 2019, the interest rate of the Notes was revised to 6.0% (half payable in cash and half as payment-in-kind) and the minimum consolidated liquidity covenant under the Convertible Notes Agreement was removed. Portions of the interest payments due on June 30, 2019, September 30, 2019 and December 31, 2019 were paid in-kind, resulting in an aggregate principal amount of the Notes at December 31, 2019 of $61,132. The revisions in the May 21, 2019 amendments to the Convertible

Notes Agreement and Credit Agreement resulted in the application of debt extinguishment accounting (see *Debt Extinguishment* below).

F-25

The Notes will mature on November 15, 2022, unless earlier converted at the election of the holder. Upon maturity, the outstanding Notes (and any accrued but unpaid interest) will be repaid in cash or converted into shares of common stock, at the holder's election. The effective interest rate for borrowings on the Notes, after considering the allocated discount, is approximately 7.77%.

The Notes include customary anti-dilution protection, including broad-based weighted average adjustments for issuances of additional shares (down-round features). In connection with the Offering, the down-round provision in the conversion option of the Notes was triggered, resulting in an adjustment to the conversion rate, with each Note now convertible at the holder's election into shares of the Company's common stock at a rate of $12.51 per share.

The Company's payment obligations on the Notes are not guaranteed. The Convertible Notes Agreement contains negative covenants, affirmative covenants, representations and warranties and events of default that are substantially similar to those that are set forth in the Credit Agreement and applicable to Waitr Inc. and Intermediate Holdings (except those that relate to collateral and related security interests, which are not contained in the Convertible Notes Agreement or otherwise applicable to the Notes). We believe that we were in compliance with all covenants under the Convertible Notes Agreement as of December 31, 2019.

*Debt Extinguishment*

To apply the debt extinguishment assessment, management determined that the Term Loans and Notes should be viewed as one instrument, as both are held by the same lender (Luxor Capital, along with the Luxor Entities) before and after the May 21, 2019 amendments and they were amended concurrently. The revisions to the interest rate and the conversion rate in the May 21, 2019 amendment to the Convertible Notes Agreement were deemed substantial, resulting in the application of debt extinguishment accounting. The Company recorded a gain on debt extinguishment of $1,897 based on (a) the difference between the fair value of the amended Notes of $56,894 and the carrying amount of the original Notes of $58,421 on May 21, 2019 and (b) the difference between the fair value of the amended Term Loans of $61,014 and the carrying amount of the original Term Loans of $61,385 on May 21, 2019. Based on management's determination that the sole lender under the Term Loans and Notes (Luxor Capital, along with the Luxor Entities) is a related party to the Company, in accordance with ASC 470-50, the Company recorded the gain on debt extinguishment as a capital contribution in the consolidated statement of stockholders' equity. For purposes of calculating net loss per share attributable to common stockholders (see *Note 17 – Loss Per Share Attributable to Common Stockholders*), the gain on debt extinguishment was added to net loss.

*Promissory Notes*

On September 27, 2019, the Company entered into an interest-free promissory note to fund a portion of an acquisition (see *Note 3 – Business Combinations*). The principal amount of the promissory note was initially $500, payable in 24 monthly installments, with payments expected to begin shortly after integration of the acquired assets onto the Company's platform. The Company recorded the promissory note at its fair value of $452 and will impute interest over the life of the note using an interest rate of 10%, representing the estimated effective interest rate at which the Company could obtain financing. On February 13, 2020, the Company entered into an amendment to the asset purchase agreement, whereby the promissory note was amended to $600, payable in 30 monthly installments, commencing on March 1, 2020. The current portion of the promissory note of $215 is included in other current liabilities in the consolidated balance sheet at December 31, 2019.

On October 1, 2019, the Company entered into an interest-free promissory note to fund a portion of an additional acquisition (see *Note 3 – Business Combinations*). The principal amount of the promissory note is $100, payable in 24 monthly installments. Payments commenced on January 15, 2020. The Company recorded the promissory note at its fair value of $90 and will impute interest over the life of the note using an interest rate of 10%, representing the estimated effective interest rate at which the Company could obtain financing. The current portion of the promissory note of $43 is included in other current liabilities in the consolidated balance sheet at December 31, 2019.

*Short-Term Loans*

On June 26, 2019, the Company entered into a loan agreement with First Insurance Funding to finance a portion of its annual insurance premium obligation. The principal amount of the loan is $5,032, payable in monthly installments, until maturity. The loan matures on April 1, 2020 and carries an annual interest rate of 4.08%. As of December 31, 2019, $1,834 was outstanding under such loan.

On November 15, 2019, the Company entered into a loan agreement with BankDirect Capital Finance to finance a portion of its annual directors and officers insurance premium obligation. The principal amount of the loan is $1,993, payable in monthly

installments, until maturity. The loan matures on August 15, 2020 and carries an annual interest rate of 4.15%. As of December 31, 2019, $1,778 was outstanding under such loan.

F-26

On June 4, 2018, the Company entered into a loan agreement with First Insurance Funding to finance a portion of its annual insurance premium obligation. The loan had a principal amount of $ 2,172, payable in monthly installments, until maturity, and carried an annual interest rate of 3.39%. As of December 31, 2018, $658 was outstanding under such loan. The loan was paid in full on March 21, 2019.

*Convertible Promissory Notes*

On various dates in 2016, 2017 and 2018, the Company issued convertible promissory notes (the "Series 2016 Notes," "Series 2017 Notes" and "Series 2018 Notes," together, the "Waitr Convertible Notes") to various investors with maturity dates of 24 months from the dates of issuance. The Series 2016 Notes had an aggregate principal amount of $2,043, the Series 2017 Notes had an aggregate principal amount of $7,484, and the Series 2018 Notes had an aggregate principal amount of $2,470, of which $1,410 was received in cash, $1,000 in advertising services receivable, and $60 was debt assumed in the IndiePlate LLC asset acquisition (see *Note 6 – Property and Equipment, Net*).

The Series 2016 Notes accrued interest at a rate of 9% per annum, and the Series 2017 and Series 2018 Notes accrued interest at a rate of 8% per annum, that was due and payable at maturity, unless otherwise converted prior to maturity. In connection with the Landcadia Business Combination, the Waitr Convertible Notes were either ultimately converted into common stock of the post-combination company or redeemed for cash.

The Company determined that the feature in the Waitr Convertible Notes providing for conversion into shares sold in the next financing at a stated discount, and the ability for holders to redeem their notes at a substantial premium, represented an embedded derivative requiring separate accounting recognition in accordance with subtopic ASC 815-15. The fair value on the date of issuance was recorded as bifurcated embedded derivatives on convertible notes, with an offset to the discount on the convertible note payable. Changes in estimated fair value of the derivatives were reported as gain/loss on derivatives in the consolidated statements of operations (see *Note 10 – Derivatives*).

On December 15, 2017, the Company amended the Series 2017 Notes to add a substantive conversion feature. The amendments were deemed substantial, resulting in the application of extinguishment accounting. During the year ended December 31, 2017, the Company recorded a loss on debt extinguishment of $10,537 based on the difference between the fair value of the amended convertible promissory notes of $18,308, and the carrying amount of the original Series 2017 Notes of $7,771. In accordance with ASC 470-20, the Company recorded the premium in excess of the fair value of the amended notes over the sum of (i) par, (ii) accrued interest, and (iii) the bifurcated embedded derivatives on convertible notes, or $10,444, to additional paid in capital.

## 10.  Derivatives

As described in *Note 9 — Debt*, the Company identified certain embedded derivatives related to contingent requirements to repay its Waitr Convertible Notes at a substantial premium to par. In connection with the Landcadia Business Combination, the Waitr Convertible Notes were either ultimately converted into common stock of the post-combination company or redeemed for cash. These embedded derivatives were carried on the Company's consolidated balance sheets as bifurcated embedded derivatives on the Waitr Convertible Notes at estimated fair value. Changes in the estimated fair value of the derivatives are reported as gain/loss on derivatives in the accompanying consolidated statements of operations. The embedded derivatives were not designated as hedging instruments.

The amount of (gain) loss recognized in the consolidated statements of operations on derivatives not designated as hedging instruments are as follows (in thousands):

|  | Years Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| (Gain) loss on derivatives | $         — | $      (337) | $        52 |

## 11.  Deferred Revenue

Deferred revenue is comprised of unearned setup and integration fees. The Company's opening deferred revenue balance was $4,670 and $2,358 as of January 1, 2019 and January 1, 2018, respectively. The Company recognized $3,062 and $2,883 of setup and integration revenue during the years ended December 31, 2019 and 2018, respectively, which was included in the deferred revenue balances at the beginning of the respective years. Additionally, during the year ended December 31, 2019, the Company recognized a cumulative adjustment to setup and integration revenue of $3,005, which was previously included in deferred revenue as of August 1,

2019. The cumulative adjustment to revenue was partially offset by write-offs of uncollected setup and integration fees within accounts receivable of $797. See *Note 2 – Basis of Presentation and Summary of Significant Accounting Policies* for additional details.

F-27

*Transaction Price Allocated to the Remaining Performance Obligations*

As of December 31, 2019, $459 of revenue is expected to be recognized from remaining performance obligations for setup and integration fees. The Company expects to recognize revenue of approximately $414 on these remaining performance obligations over the next 12 months.

## 12. Income Taxes

The Company provides for income taxes using an asset and liability approach under which deferred income taxes are provided for based upon enacted tax laws and rates applicable to periods in which the taxes become payable.

The provision for federal and state income taxes consists of the following (in thousands):

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2019 | 2018 | 2017 |
| **Current** | | | |
| Federal | $ — | $ (477) | $ — |
| State | 81 | 50 | 6 |
| **Deferred** | | | |
| Federal | — | — | — |
| State | — | — | — |
| **Income tax expense (benefit)** | $ 81 | $ (427) | $ 6 |

The differences between income taxes expected by applying the U.S. federal statutory tax rate of 21% (34% with respect to 2017) and the amount of income taxes provided for are as follows (in thousands):

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2019 | 2018 | 2017 |
| Tax at statutory rate | $ (61,077) | $ (7,295) | $ (9,120) |
| State income taxes | (7,863) | (995) | (442) |
| Stock-based compensation | 1,418 | 366 | 396 |
| Non-deductible expenses | 481 | 125 | 56 |
| Interest expense | — | 48 | 3,606 |
| Tax credits | (2,410) | (611) | (15) |
| Change in U.S. tax rates | — | — | 2,663 |
| Goodwill and acquired intangibles | 8,434 | — | — |
| Other | (1,060) | — | — |
| Change in valuation allowance | 62,158 | 7,935 | 2,862 |
| **Income tax expense (benefit)** | $ 81 | $ (427) | $ 6 |

On December 22, 2017, the Tax Act was signed into law, resulting in significant modifications to existing tax law. The Company recognized the income tax effects of the Tax Act in its 2017 financial statements in accordance with Staff Accounting Bulletin No. 118, which provides SEC staff guidance for the application of ASC Topic 740, *Income Taxes*, in the reporting period in which the Tax Act was signed into law. As such, the Company's financial results reflect the income tax effects of the Tax Act for which the accounting under ASC Topic 740 is complete and provisional amounts for those specific income tax effects of the Tax Act for which the accounting under ASC Topic 740 is incomplete, but a reasonable estimate could be determined.

The Tax Act reduced the corporate statutory income tax rate from 34% to 21%, among other changes. As a result of the Tax Act, the Company revalued its deferred tax assets and liabilities at the 21% corporate income tax rate, which resulted in a tax benefit of $2,663 in the year ended December 31, 2017. The Company included provisional estimates of the income tax effects of the Tax Act in its 2017 financial statements. However, due to the valuation allowance on the Company's net deferred tax assets, there was no impact on the Company's income tax expense.

F-28

The tax effects of temporary differences giving rise to deferred income tax assets and liabilities are as follows (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **Deferred tax assets:** | | |
| Stock-based compensation | $ 226 | $ 149 |
| Bad debt reserve | 119 | 44 |
| Charitable contribution carryover | 33 | 22 |
| Unearned revenue | 114 | 1,154 |
| Workers' compensation reserve | 473 | 277 |
| Deferred rent | 80 | — |
| Non-deductible goodwill | 21,088 | — |
| Non-deductible other intangibles | 14,584 | — |
| Net operating losses | 33,357 | 11,929 |
| Work opportunity tax credit | 3,817 | 767 |
| Interest expense carryforward | 2,098 | 169 |
| Total deferred tax assets | 75,989 | 14,511 |
| Valuation allowance | (75,406) | (13,248) |
| Net deferred tax assets | 583 | 1,263 |
| **Deferred tax liabilities:** | | |
| Fixed assets | (339) | (572) |
| Capitalized contract costs | (239) | (666) |
| Prepaid sponsorship | (5) | (25) |
| Total deferred tax liabilities | $ (583) | $ (1,263) |
| **Net deferred tax asset (liability)** | $ — | $ — |

A partial valuation allowance of $75,406 and $13,248 has been recorded as of December 31, 2019 and 2018, respectively, as the Company has historically generated net operating losses, and the Company did not consider future book income as a source of taxable income when assessing if a portion of the deferred tax assets is more likely than not to be realized.

The Company has the following net operating loss carryforwards and tax credit carryforwards (in thousands):

| | As of December 31, | | Beginning Year of Expiration |
| --- | --- | --- | --- |
| | 2019 | 2018 | |
| Federal net operating losses | $ 138,001 | $ 48,434 | 2034 |
| State net operating losses | 106,384 | 40,451 | 2034 |
| Tax credit carryforwards | 3,817 | 767 | 2037 |
| **Total carryforwards** | $ 248,202 | $ 89,652 | |

Since the Company has net operating losses carrying forward, all of the Company's federal and state income tax returns, which were filed beginning with the 2014 tax year, are subject to examination by the respective taxing authorities. Additionally, Internal Revenue Code (IRC) Section 382 provides an annual limitation with respect to the ability of a corporation to utilize its tax attributes, as well as certain built-in-losses, against future U.S. taxable income in the event of a change in ownership. The Landcadia Business Combination resulted in a change in ownership for purposes of IRC Section 382. Accordingly, we estimate that a majority of our net operating loss carryforwards will be subject to the annual IRC Section 382 limitation.

F-29

### 13. Commitments and Contingencies

*Lease Commitments*

As of December 31, 2019, the Company leases offices in Lake Charles and Lafayette, Louisiana, Minneapolis, Minnesota, as well as smaller offices throughout the United States. The office leases expire on various dates through August 2026. The terms of the lease agreements provide for rental payments that periodically increase. The Company recognizes rent expense on a straight-line basis over the lease term. For the majority of the Company's lease agreements, the Company may renew its leases at fair value after the initial lease term. The rent expenses for the years ended December 31, 2019, 2018, and 2017 were $726, $423, and $440, respectively. Future minimum lease payments are as follows (in thousands):

| Year ended December 31, | Amount |
|---|---|
| 2020 | $ 1,126 |
| 2021 | 968 |
| 2022 | 640 |
| 2023 | 477 |
| 2024 | 468 |
| Thereafter | 780 |
| **Total minimum lease payments** | **$ 4,459** |

*Sales Tax Contingent Liability*

The Company received an assessment from the State of Mississippi Department of Revenue (the "MDR"), in connection with their audit of Waitr for the period from April 2017 through January 2019, claiming additional sales taxes due. The assessment relates to the MDR's assertion that sales taxes are due on the delivery fees charged to end user customers when an order is placed on the Waitr Platform. The total asserted claim, plus estimated accrued interest and penalties, amounts to approximately $300 at December 31, 2019. We disagree with the MDR's assertion that our delivery fees are subject to sales tax and that we are liable for such sales taxes. We are in the process of appealing the MDR's assessment.

*Workers' Compensation Claim*

On November 27, 2017, Guarantee Insurance Company ("GIC"), the Company's former workers' compensation insurer, was ordered into receivership for purposes of liquidation by the Second Judicial Circuit Court in Leon County, Florida. At the time of the court order, GIC was administering the Company's outstanding workers' compensation claims. Upon entering receivership, the guaranty associations of the states where GIC operated began reviewing outstanding claims administered by GIC for continued claim coverage eligibility based on guaranty associations' eligibility criteria. The Company's net worth exceeded the threshold of $25,000 established by the Louisiana Insurance Guaranty Association ("LIGA") when determining eligibility for claims coverage. As such, LIGA assessed the Company's outstanding claim as ineligible for coverage. As of December 31, 2019 and 2018, the Company had $641 and $1,317, respectively, in workers' compensation liabilities associated with the GIC claims. The Company recorded no general and administrative expense related to these liabilities during the year ended December 31, 2019 and $157 of general and administrative expense related to these liabilities during the year ended December 31, 2018.

*Legal Matters*

In February 2019, the Company was named a defendant in a lawsuit titled <u>Halley, et al vs. Waitr Holdings Inc</u>. filed in the United States District Court for the Eastern District of Louisiana on behalf of plaintiff and similarly situated drivers alleging violations of the Fair Labor Standards Act ("FLSA"), and in March 2019, the Company was named a defendant in a lawsuit titled <u>Montgomery v. Waitr Holdings Inc</u>. filed in the United States District Court for the Eastern District of Louisiana on behalf of plaintiff and similarly situated drivers, alleging violations of FLSA and Louisiana Wage Payment Act. Waitr believes that this case lacks merit and that it has strong defenses to the claims and is vigorously defending the suit.

On September 26, 2019, Christopher Meaux, David Pringle, Jeff Yurecko, Tilman J. Fertitta, Richard Handler, Waitr Holdings Inc. f/k/a Landcadia Holdings Inc., Jefferies Financial Group, Inc. and Jefferies, LLC were named as defendants in a lawsuit titled Walter Welch, Individually and on Behalf of all Others Similarly Situated vs. Christopher Meaux, David Pringle, Jeff Yurecko, Tilman J. Fertitta, Richard Handler, Waitr Holdings Inc. f/k/a Landcadia Holdings Inc., Jefferies Financial Group, Inc. and Jefferies, LLC, filed in the Western District of Louisiana, Lake Charles Division, on behalf of plaintiff and all others similarly situated alleging, inter alia,

wtrh-10k_20191231.htm

that various defendants made false and misleading statements in securities filings, engaged in fraud, and violated accounting and securities rules. Waitr believes that this case lacks merit and that it has strong defenses to all of the infringement claims alleged. Waitr intends to vigorously defend the suit.

F-30

In addition to the lawsuits described above, Waitr is involved in other litigation arising from the normal course of business activities. Waitr is involved in various lawsuits involving claims for personal injuries, physical damage and workers' compensation benefits suffered as a result of alleged Waitr drivers, independent contractors, and third-party negligence. Although Waitr believes that it maintains insurance that generally covers its liability for damages, if any, insurance coverage is not guaranteed, and Waitr could suffer material losses as a result of these claims or the denial of coverage for such claims. The Company accrued a $2,000 liability in connection with the above suits. The accrued legal contingency is included in other current liabilities in the consolidated balance sheet at December 31, 2019 and in other expenses in the consolidated statement of operations for the year ended December 31, 2019.

## 14. Fair Value Measurement

Certain financial instruments are required to be recorded at fair value. Other financial instruments, including cash, are recorded at cost, which approximates fair value. Additionally, accounts receivable, accounts payable and accrued expenses approximate fair value because of the short-term nature of these financial instruments.

During 2018, the Company held certain financial instruments which were required to be measured at fair value on a recurring basis in the consolidated balance sheets, including warrants related to an unsecured line of credit (the "Line of Credit Warrants") and embedded derivatives on convertible notes (see *Note 9 – Debt*). The Company determined the fair value of bifurcated embedded derivatives on convertible notes and the Line of Credit Warrants using Level 3 inputs, including expected maturity or conversion date, discount rate, and exercise or strike price. Strike price on the bifurcated embedded derivatives was based on the estimated next financing round price as of the respective valuation date and the contractual terms of the notes, whereby the conversion price was the lower of (i) 80.0% of the next financing round price or (ii) a value based on a contractually-specified value divided by fully diluted stock. Exercise price on the Line of Credit Warrants was based on the contractual terms of the warrants, whereby the exercise price was either (1) $8.022, in the event that closing took place under the Landcadia Merger Agreement, or (2) the price that was eighty percent of the price per share of the Company's equity securities issued in the next preferred equity financing of at least $10,000. In connection with the Landcadia Business Combination, the Company repaid the unsecured line of credit in full, and the Waitr Convertible Notes were either ultimately converted into shares of post-combination company common stock or redeemed for cash.

Significant increases (decreases) in the discount rate or the forecasted financial information would have resulted in different fair value measurements for the embedded features. For all significant unobservable inputs used in the fair value measurement of the Level 3 liabilities, a change in one of the inputs would not necessarily result in a directionally similar change in another.

As of December 31, 2019 and 2018, the Company held no financial instruments required to be measured at fair value on a recurring basis. There have been no transfers between levels during the years presented in the accompanying consolidated financial statements. The beginning and ending balances of net assets and liabilities classified as Level 3, for which a reconciliation is required, are as follows (in thousands):

| | As December 31, | |
| | 2019 | 2018 |
|---|---|---|
| **Balance, beginning of the year** | $ — | $ 250 |
| Increases/additions | — | 87 |
| Reductions/settlements | — | (337) |
| **Balance, end of the year** | $ — | $ — |

In addition to assets and liabilities that are recorded at fair value on a recurring basis, the Company is required to record certain assets and liabilities at fair value on a non-recurring basis.

On November 15, 2018, the Company estimated the fair value of the Debt Warrants to be approximately $1,569 using the Black-Scholes Model. The inputs used in the calculation primarily represent Level 3 inputs, including a 46% volatility assumption. See *Note 16 – Stockholders' Equity* for further discussion of the Debt Warrants.

The Company generally applies fair value concepts in recording assets and liabilities acquired in acquisitions. See *Note 3 – Business Combinations*, for further discussion of the fair value of assets and liabilities associated with acquisitions. Fair value concepts are also generally applied in estimating the fair value of long-lived assets and a reporting unit in connection with impairment analyses. See *Note 7 – Intangible Assets and Goodwill*, for further discussion of the fair value of long-lived assets and the reporting unit associated with impairment testing conducted at September 30, 2019.

In connection with the May 21, 2019 amendments to the Credit Agreement and the Convertible Notes Agreement and the related debt extinguishment accounting (see *Note 9 – Debt*), the Company estimated the fair values of the amended Term Loans and Notes on

such date. On May 21, 2019, the estimated fair values of the Notes and Term Loans were approximately $56,894 and $61,014, respectively. The fair value of the Notes was estimated using a Goldman Sachs convertible bond model, the inputs for which primarily represent Level 3 inputs, including a 54% volatility assumption and an estimated yield of approximately 13.29%. The fair value of the

F-31

Term Loans was estimated using a Black-Derman-Toy Lattice Bond Pricing Model, the inputs for which primarily represent Level 3 inputs, including an estimated yield of approximately 10.72%.

## 15.  Stock-Based Compensation

The Company currently maintains the 2018 Omnibus Incentive Plan (the "2018 Incentive Plan"), which was approved by the stockholders on November 16, 2018 in connection with the Landcadia Business Combination. The 2018 Incentive Plan permits the granting of awards in the form of incentive stock options, non-qualified stock options, stock appreciation rights, restricted stock, restricted stock units, performance-based awards, and other stock-based or cash-based awards. A maximum aggregate amount of 5,400,000 shares of the common stock of the Company are reserved for issuance under the 2018 Incentive Plan, with 1,614,018 shares remaining available for issuance as of December 31, 2019. The Company also has outstanding equity awards under the 2014 Stock Plan (as amended in 2017, the "Amended 2014 Plan"). Effective November 16, 2018, no further grants will be made under the Company's Amended 2014 Plan.

The Company records stock-based compensation expense for stock-based compensation awards based on the fair value on the date of grant. The stock-based compensation expense is recognized in our statement of operations ratably over the course of the requisite service period and is recorded in either operations and support, sales and marketing, research and development, or general and administrative expense, depending on the department of the recipient. Because of the non-cash nature of share-based compensation, it is added back to net income in arriving at net cash provided by operating activities in our statement of cash flows.

Total compensation expense related to the Amended 2014 Plan and the 2018 Incentive Plan (the "Incentive Plans") was $7,240, $9,580, and $1,199 for the years ended December 31, 2019, 2018, and 2017, respectively.

*Stock Options*

The options granted under the Amended 2014 Plan generally vest over a period of approximately four years and have a ten-year exercise term. The options granted under the 2018 Incentive Plan generally vest over a period of three years and have a ten-year exercise term. The options are generally subject to graded vesting whereby twenty-five to thirty-three percent of the options vest on the first anniversary of the issuance start date, and subsequently, the remaining vest ratably each month until 100% of the options are vested or in certain cases the options vest ratably over a three year period on each anniversary of the issuance start date. Once vested, the recipients are allowed to purchase the Company's common stock at a fixed and specified exercise price that varies depending on the stock options' strike price.

In connection with the Landcadia Business Combination, all vested, outstanding stock options to purchase Waitr Incorporated common stock under the Amended 2014 Plan, immediately prior to closing, were converted to shares of post-combination company common stock and are included as option exercises in the table of stock option activity below in the year ended December 31, 2018. As a result, all unrecognized compensation cost related to such stock options was recognized. Holders of unvested, outstanding and unexercised stock options to purchase Waitr Incorporated common stock were issued stock options of the Company.

The Company recognized compensation expense for stock options of $1,257, $9,008, and $1,193 for the years ended December 31, 2019, 2018, and 2017, respectively. As of December 31, 2019, there was $1,142 of unrecognized compensation cost related to nonvested stock options under the Incentive Plans, with a current weighted average remaining vesting period of approximately 1.95 years.

There were 301,419, 947,966, and 2,650,354 options granted during the years ended December 31, 2019, 2018, and 2017, respectively, under the Incentive Plans.

The fair value of each stock option grant was estimated as of the grant date using an option-pricing model with the following ranges of assumptions and resulting weighted-average fair value per share for the years ended December 31, 2019, 2018 and 2017:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Weighted-average fair value at grant | $ 5.08 | $ 5.06 | $ 3.69 |
| Risk free interest rates | 2.53% - 2.58% | 2.1% - 3.1% | 1.1% - 1.8% |
| Expected volatility | 50.5% - 51.3% | 44.6% - 47.03% | 40.3% - 48.9% |
| Expected option life (years) | 6.0 | 0.75 - 6.0 | 0.5 - 3.0 |

Case 2:19-cv-01260-TAD-KK Document 56-1 Filed 01/21/21 Page 172 of 295 PageID #: 3465

The stock option activity under the Incentive Plans during the years ended December 31, 2019, 2018 and 2017 is as follows:

F-32

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| **Balance, January 1, 2017** | **2,221,912** | **$ 0.06** | **$ 0.48** |
| Granted | 2,650,354 | 0.86 | 3.69 |
| Exercised | (109,895) | 0.03 | 0.19 |
| Forfeited | (272,355) | 0.21 | 1.07 |
| **Balance, December 31, 2017** | **4,490,016** | **$ 0.53** | **$ 2.35** |
| Granted | 947,966 | 5.19 | 5.06 |
| Modified | (64,329) | 1.90 | 4.06 |
| Exercised | (4,224,983) | 0.52 | 2.39 |
| Forfeited | (267,837) | 0.35 | 1.74 |
| **Balance, December 31, 2018** | **880,833** | **$ 5.53** | **$ 5.20** |
| Granted | 301,419 | 10.13 | 5.08 |
| Exercised | (12,040) | 0.36 | 2.95 |
| Forfeited | (650,963) | 9.10 | 5.37 |
| Expired | (73,528) | 4.82 | 4.61 |
| **Balance, December 31, 2019** | **445,721** | **$ 3.66** | **$ 5.04** |

The 64,329 of options modified in the above table represent the share conversion to reflect the exchange ratio established in the Landcadia Business Combination (see *Note 3 – Business Combinations)*.

The outstanding stock options, which were fully vested and expected to vest and exercisable are as follows:

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2019** | | **2018** | |
| | **Options Fully Vested and Expected to Vest** | **Options Exercisable** | **Options Fully Vested and Expected to Vest** | **Options Exercisable** |
| Number of Options | 445,721 | 220,446 | 880,833 | 56,429 |
| Weighted-average remaining contractual term (years) | 7.88 | 7.47 | 5.60 | 8.61 |
| Weighted-average exercise price | $ 3.66 | $ 2.26 | $ 5.53 | $ 0.77 |
| Aggregate Intrinsic Value (in thousands) | $ 6 | $ 6 | $ 8,905 | $ 586 |

The aggregate intrinsic value in the table above represents the total pre-tax intrinsic value (the difference between the fair value of the common stock and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders had all option holders exercised their in-the-money options on each date. This amount will change in future periods based on the fair value of the Company's stock and the number of options outstanding. The aggregate intrinsic value of awards exercised during the years ended December 31, 2019, 2018 (excluding option exercises related to the Landcadia Business Combination) and 2017 was $52, $5,250 and $593, respectively. Upon exercise, the Company issued new common stock.

*Restricted Stock Units ("RSUs") and Restricted Stock Awards ("RSAs")*

The Company has granted RSUs and RSAs under the Amended 2014 Plan and the 2018 Incentive Plan. The fair value of restricted shares is typically determined based on the closing price of the Company's common stock on the date of grant.

Under the Amended 2014 Plan, RSAs were granted under agreements entered into with certain employees in 2014. The RSAs were subject to a continuous employment clause and had an initial vesting period of approximately four years. As of December 31, 2017, there were no remaining nonvested RSAs or related unrecognized compensation cost for RSAs under the Amended 2014 Plan. The Company recorded compensation expense for the RSAs under the Amended 2014 Plan of $6 during the year ended December 31, 2017.

During the year ended December 31, 2018, 550,000 RSAs were granted under the 2018 Incentive Plan to certain employees of the Company and non-employee consultants from Landcadia Holdings, Inc., with an aggregate grant date fair value of $6,567, based on a per share grant date fair value of $11.94. These RSAs were scheduled to vest, in some cases, in three equal installments over a

three-year period following the grant date and in other cases, the RSAs vested one year from date of grant. All RSAs were either vested or forfeited as of December 31, 2019.

F-33

During the year ended December 31, 2019, 5,004,664 RSUs were granted under the 2018 Incentive Plan to certain employees and board of directors of the Company, with an aggregate grant date fair value of $11,443. The RSU grants to employees vest in various manners, including (i) over a two-year period following grant date, (ii) over a three-year period following grant date and (iii) in other cases, the RSUs vested in full at December 31, 2019. RSU grants to the board of directors typically vest over a one-year period following grant date.

The Company recognized compensation expense for RSUs and RSAs of $5,983 and $572 during the years ended December 31, 2019 and 2018, respectively. As of December 31, 2019, there was $3,666 of unrecognized compensation cost related to nonvested RSUs under the 2018 Incentive Plan, with a current weighted average remaining vesting period of approximately 2.16 years.

The restricted stock award activity under the Incentive Plans is as follows:

| | Number of Shares | | Weighted Average Grant Date Fair Value | Weighted Average Remaining Contractual Term (years) |
|---|---|---|---|---|
| Nonvested at January 1, 2017 | 260,770 | $ | 0.02 | 0.92 |
| Shares vested | (260,770) | | 0.02 | |
| Nonvested at December 31, 2017 | — | | — | — |
| Granted | 550,000 | | 11.94 | |
| Shares vested | — | | — | |
| Nonvested at December 31, 2018 | 550,000 | $ | 11.94 | 1.78 |
| Granted | 5,004,664 | | 2.29 | |
| Shares vested | (484,614) | | 11.75 | |
| Forfeitures | (1,887,411) | | 4.13 | |
| Nonvested at December 31, 2019 | 3,182,639 | $ | 1.42 | 2.16 |

## 16. Stockholders' Equity

### Common Stock

At December 31, 2019 and 2018, there were 249,000,000 shares of common stock authorized and 76,579,175 and 54,035,538 shares of common stock issued and outstanding, respectively, with a par value of $0.0001. The Company did not hold any shares as treasury shares as of December 31, 2019 or December 31, 2018. The Company's common stockholders are entitled to one vote per share.

### Preferred Stock

At December 31, 2019 and 2018, the Company was authorized to issue 1,000,000 shares of preferred stock ($0.0001 par value per share). There were no issued or outstanding preferred shares as of December 31, 2019 or December 31, 2018.

### Follow-on Public Offering

On May 21, 2019, the Company completed an underwritten follow-on public offering of 6,757,000 shares of its common stock at a price of $7.40 per share resulting in gross proceeds of $50,002.

### Bite Squad Merger

A portion of the consideration for the Bite Squad Merger was paid in the form of common shares of the Company. Common shares transferred at closing totaled 10,591,968. Additionally, the Company issued 325,000 shares of common stock of the Company in a private placement on January 17, 2019 in connection with an amendment to the Credit Agreement at the time of the Bite Squad Merger.

### Warrants

#### Public Warrants

Prior to the consummation of the Landcadia Business Combination, Landcadia Holdings, Inc. had 25,000,000 public warrants outstanding (the "Public Warrants"). In the first quarter of 2019, the Company commenced an exchange offer and consent solicitation relating to the Public Warrants. A total of 4,494,889 shares, after adjustments for fractional shares (which were settled in cash in the second quarter of 2019), of the Company's common stock were issued in exchange for such Public Warrants.

F-34

*Line of Credit Warrants*

On July 2, 2018, the Company entered into a loan agreement with a group of lenders for an unsecured line of credit. In connection with advances made under the loan agreement, Waitr Incorporated was required to issue the Line of Credit Warrants to the lenders, providing the lenders the right to purchase 37,735 shares of the Company's common stock. In November of 2018, the lenders exercised their Line of Credit Warrants, receiving 37,735 shares of common stock, for which we received $337 in cash, pursuant to the terms of the warrants.

*Debt Warrants*

In connection with the Debt Facility, the Company issued to Luxor Capital warrants initially exercisable for 384,615 shares of the Company's common stock with an exercise price of $13.00 per share (the "Debt Warrants"). The Debt Warrants became exercisable after the consummation of the Landcadia Business Combination and will expire four years from the closing date of the Landcadia Business Combination. The Debt Warrants include customary anti-dilution protection, including broad-based weighted average adjustments for issuances of additional shares (down-round features) and holders of the Debt Warrants have customary registration rights with respect to the shares underlying the Debt Warrants. In connection with the Offering, the down-round provision in the Debt Warrants was triggered and the conversion rate was adjusted. The Debt Warrants are now exercisable for 399,726 shares of the Company's common stock with an exercise price of $12.51 per share. The effect of the triggered down-round feature on the value of the Debt Warrants was immaterial.

**17.  Loss Per Share Attributable to Common Stockholders**

Basic loss per share is computed by dividing net loss attributable to common stockholders by the weighted-average number of common stock outstanding during the period, without consideration for common stock equivalents. Diluted loss per share attributable to common stockholders is computed by dividing net loss by the weighted-average number of common stock outstanding during the period and potentially dilutive common stock equivalents, including stock options, restricted stock awards, restricted stock units and warrants, except in cases where the effect of the common stock equivalent would be antidilutive.

The Landcadia Business Combination was accounted for as a reverse recapitalization in accordance with GAAP (see *Note 3 – Business Combinations*). Accordingly, the weighted average shares outstanding for purposes of the earnings per share calculation for the years ended December 31, 2018 and 2017 have been retroactively restated to reflect the exchange ratio established in the Landcadia Business Combination (0.8970953 Waitr Holdings Inc. shares to 1.0 Waitr Incorporated share).

The calculation of basic and diluted loss per share attributable to common stockholders for the years ended December 31, 2019, 2018 and 2017 is as follows (in thousands, except share and per share data):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2018** | **2017** |
| **Numerator:** | | | |
| Net loss – basic and diluted | $ (291,306) | $ (34,311) | $ (26,907) |
| Gain on debt extinguishment recorded as a capital contribution (see Note 9) | 1,897 | — | — |
| Net loss attributable to participating securities – basic and diluted | — | — | — |
| Net loss attributable to common stockholders – basic and diluted | $ (289,409) | $ (34,311) | $ (26,907) |
| **Denominator:** | | | |
| Weighted-average number of shares outstanding – basic and diluted | 72,404,020 | 15,745,065 | 9,995,031 |
| **Loss per share – basic and diluted** | $ (4.00) | $ (2.18) | $ (2.69) |

Excluded from the calculation of weighted-average number of diluted shares outstanding is the effect of the Waitr Convertible Notes, which have historically converted to preferred shares. In connection with the Landcadia Business Combination, we issued Notes which are convertible into shares of the Company's common stock. See *Note 9 – Debt* for additional details on the Notes and Waitr Convertible Notes.

The following table includes potentially dilutive common stock equivalents as of December 31, 2019 and 2018. The Company generated a net loss attributable to the Company's common stockholders for each of the years ended December 31, 2019, 2018, and 2017. Accordingly, the effect of dilutive securities is not considered in the loss per share for such periods because their effect would be antidilutive on the net loss.

F-35

| | As of December 31, | |
|---|---|---|
| | **2019** | **2018** |
| **Potentially dilutive securities:** | | |
| Stock Options | 445,721 | 880,833 |
| Restricted Stock Units | 3,182,639 | — |
| Warrants (1) | 399,726 | 25,399,726 |
| **Potentially dilutive securities at period end** | **4,028,086** | **26,280,559** |

(1) Includes 399,726 Debt Warrants as of December 31, 2019 and 2018 and 25,000,000 Public Warrants as of December 31, 2018. See *Note 16 – Stockholders' Equity* for additional details on warrants.

## 18. Reductions in Force

During 2019, we implemented various phases of reductions in force affecting approximately 400 corporate employees in connection with strategic initiatives to realize synergies from the Bite Squad Merger and to align the combined Company's cost structure, which included the consolidation of operations, support and sales and marketing functions. The reductions in force resulted in severance charges of approximately $2,504, which are included in general and administrative expenses in the consolidated statement of operations for the year ended December 31, 2019.

## 19. Nasdaq Non-Compliance

On October 14, 2019, we notified the Nasdaq Stock Market ("Nasdaq") that, as a result of the resignation of two board members from our Board of Directors (the "Board") on October 11, 2019, the Company was no longer in compliance with the requirements of Nasdaq Listing Rule 5605 to have (i) a Board comprised of a majority of independent directors, (ii) an Audit Committee comprised of at least three members who satisfy certain criteria and (iii) a Compensation Committee comprised of at least two members who satisfy certain criteria. We submitted a plan to Nasdaq on December 11, 2019 regarding our steps to regain compliance. The plan was accepted, granting the Company an extension of up to 180 days from October 28, 2019 to regain compliance. We must satisfy the Audit Committee and Compensation Committee requirements by the earlier of (i) our next annual shareholders' meeting or October 11, 2020 or (ii) if our next annual shareholders' meeting is held before April 8, 2020, no later than April 8, 2020.

Additionally, on December 2, 2019, we received written notice from Nasdaq indicating that the minimum bid price of our common stock had closed at less than $1.00 per share over the previous 30 consecutive business days and, as a result, did not comply with Listing Rule 5550(a)(2) (the "Bid Price Rule"). In accordance with Listing Rule 5810(c)(3)(A), we are being provided 180 calendar days, or until June 1, 2020, to regain compliance with the Bid Price Rule. If at any time before June 1, 2020, the bid price of our common stock closes at $1.00 per share or more for a minimum of 10 consecutive business days, Nasdaq will provide us with written confirmation of compliance with the Bid Price Rule and the matter will be closed.

## 20. Related-Party Transactions

As of December 31, 2017, certain board members of Waitr Incorporated participated in the Company's issuance of Series 2017 Notes. Out of $7,484 principal amount issued as Series 2017 Notes, approximately $694 was funded by the board members. Additionally, certain board members of Waitr Incorporated were lenders under the Company's line of credit. Out of $5,000 borrowed under the line of credit, $3,030 was funded by the board members. Interest expense for the year ended December 31, 2018 included $401 of amounts paid to the board members.

On November 15, 2018, in connection with the Landcadia Business Combination, the Company entered into the Credit Agreement, and on January 17, 2019, in connection with the Bite Squad Merger, the Company entered into an amendment to the Credit Agreement with Luxor Capital and an amendment to the Convertible Notes Agreement with the Luxor Entities. On May 21, 2019, in connection with the Offering, the Company entered into a second amendment to the Credit Agreement with Luxor Capital and a second amendment to the Convertible Notes Agreement with the Luxor Entities. See *Note 9 – Debt* for additional details regarding these transactions. Jonathan Green, a board member of the Company, is a partner at Luxor Capital.

At the closing of the Landcadia Business Combination, the Company entered into a consulting agreement with Steven L. Scheinthal, a board member of the Company, pursuant to which he received 150,000 restricted shares under the Waitr Holdings Inc. 2018 Omnibus Incentive Plan.

F-36

# EXHIBIT 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JUALEIA HALLEY and HEATHER GONGAWARE, individually and on behalf of all others similarly situated, | * * * * | CIVIL ACTION NO. 19-01800 c/w (19-02208) |
| | * | (Reference to All Cases) |
| | * | |
| Plaintiffs, | * | SECTION "L" |
| | * | JUDGE FALLON |
| VERSUS | * | |
| | * | |
| WAITR HOLDINGS, INC. F/K/A | * | MAG. DIV. (2) |
| LANDCADIA HOLDINGS, INC. | * | MAG. JUDGE CURRAULT |
| and WAITR INCORPORATED, | * | |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

**FINAL JUDGMENT**

WHEREAS, Jualeia Halley, Heather Gongaware, Autumn Montgomery, and Nateshus Jackson and Defendant Waitr Holdings Inc. (collectively, the "Parties") entered into a Confidential Class and Collective Settlement Agreement and Release (the "Settlement Agreement").

WHEREAS, on April 28, 2020, the Court entered an Order that, among other things, (a) preliminarily certified, pursuant to Federal Rule of Civil Procedure 23 and 29 U.S.C. 216(b), a class and collective action for the purposes of settlement only; (b) approved the form of notice to Settlement Class Members,[1] and the method of dissemination thereof;

---

[1] "Settlement Class Members" and "Settlement Class" is defined in the Settlement Agreement and the Restated and Amended Settlement Agreement as all individuals within the scope of the representative actions proposed by Plaintiffs in the Litigation, which include, more specifically, all current and former delivery drivers who worked for or were engaged by Waitr throughout the United States from February 13, 2017 through April 28, 2020.

Case 2:19-cv-01260-TAD-KK Document 56-1 Filed 01/21/21 Page 183 of 295 PageID
Case 2:19-cv-02208-EEF-DMD Document 86 Filed 09/02/20 Page 2 of 8
#: 3476

(c) directed that appropriate notice of the settlement be given to the Settlement Class Members; and (d) set a hearing date for the settlement fairness hearing. [R. Doc. No. 93].

WHEREAS, the Court-approved notice to the Settlement Class Members has been provided, as attested to in the Declaration of Bruce Holman, Settlement Administrator with A. B. Data. [R. Doc. No. 108-2].

WHEREAS, on August 19, 2020, a hearing was held on whether the settlement set forth in the Settlement Agreement was fair, reasonable, adequate, and in the best interests of the Settlement Class Members (the "August 19, 2020 Fairness Hearing"), such a hearing date being set an appropriate number of days after the Court-approved notice to the Settlement Class Members.

WHEREAS, at the August 19, 2020 Fairness Hearing no objectors appeared and, in fact, no objections were received that complied with requirements set forth in Section 2.7 of the Settlement Agreement as relayed to the Settlement Class in the Court-approved notice.

WHEREAS, on August 21, 2020 and August 26, 2020, additional hearings were held by the Court, [R. Doc. Nos. 125 & 127], on whether the settlement as set forth in the Settlement Agreement was fair, reasonable, adequate, and in the best interests of the Settlement Class Members, and the Parties were directed to revise the terms of the Settlement Agreement in accordance with instruction received by the Court.

NOW THEREFORE, the Court, having reviewed and considered the submissions presented with respect to the settlement set forth in the Settlement Agreement and the record in these proceedings, having heard and considered the evidence presented by the parties and the argument of counsel at the August 19, 2020 Fairness Hearing and at the additional hearings on August 21, and 26, 2020, having determined that the settlement as now set forth in the Amended

Case 2:19-cv-01260-TAD-KK  Document 56-1  Filed 01/21/21  Page 184 of 295 PageID
Case 2:19-cv-02208-EEF-DMD  Document 86  Filed 09/02/20  Page 3 of 8 PageID
#: 3477

and Restated Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Settlement Class Members, therefore orders as follows,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED:

1.      The Court incorporates by reference the definitions set forth in the Amended and Restated Settlement Agreement.

2.      This Court has personal jurisdiction over the Plaintiffs, the Settlement Class Members, the Qualified Class Members, and the FLSA Collective Action Members, and has subject matter jurisdiction over all claims asserted in the First Amended Class/Collective Action Complaint.  In addition, venue in the Eastern District of Louisiana is proper.

3.      The Amended and Restated Settlement Agreement is approved as fair, reasonable, and adequate, consistent and in compliance with the applicable provisions of the United States Constitution and the Federal Rules of Civil Procedure, and in the best interest of the Settlement Class.  The Amended and Restated Settlement Agreement is binding on and will have *res judicata* and preclusive effect in all pending and future lawsuits or other proceedings encompassed by the Amended and Restated Settlement Agreement and the releases set forth therein.

4.      The Court-approved Notice of Collective and Class Action Settlement, Claim Form and Release, and Opt-Out Statement provided to the Settlement Class Members pursuant to the April 28, 2020 Order Granting Preliminary Approval of Class Settlement:

(a) Constituted the best practicable notice, under the circumstances;

(b) Constituted notice that was reasonably calculated to apprise the Settlement Class Members of the pendency of this Litigation[2], their right to object or exclude themselves from the proposed settlement, and their right to appear at the Fairness Hearing;

(c) Was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to receive notice and the subsequent amendment and restatement of the Settlement Agreement regarding the additional shares of Waitr's Common Stock to be issued to Qualified Class Members who timely filed claims does not affect the efficacy of the notice issued in accordance with this Court's April 28, 2020 Order Granting Preliminary Approval of Class Settlement; and

(d) Met all applicable requirements of the Federal Rules of Civil Procedure and the Due Process Clause of the United States Constitution because it stated in plain, easily understood language the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a Settlement Class Member may enter an appearance through an attorney if the member so desires; that the Court will exclude from the Settlement Class any member who requests exclusion; the time and manner for requesting exclusion; and the binding effect of a class judgment on Settlement Class Members under Rule 23(c)(3).

5.      For settlement purposes only, that the Settlement Class and the FLSA Collective satisfy the applicable standards for certification under Fed. R. Civ. P. 23 and 29 U.S.C. § 216(b).

6.      The Amended and Restated Settlement Agreement in this action warrants final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure because it is fair, adequate, and reasonable to those it affects, and resulted from vigorously contested litigation,

---

[2] "**Litigation**" is defined in the Settlement Agreement and Restated and Amended Settlement Agreement to mean, collectively, the *Halley* Litigation and the *Montgomery* Litigation.

Case 2:19-cv-01260-TAD-KK Document 56-1 Filed 01/21/21 Page 186 of 295 PageID
Case 2:19-cv-02203-EEF-DMD Document 86 Filed 03/02/20 Page 5 of 8
#: 3479

including motion practice and, and extensive good-faith arm's length negotiations between the parties, and is in the public interest considering the following factors:

    (a)    the strength of the Plaintiffs' case;

    (b)    the risk, expense, complexity and likely duration of further litigation;

    (c)    the risk of litigation through trial;

    (d)    the amount offered in settlement;

    (e)    the extent of discovery completed, and the stage of the proceedings;

    (f)    the experience and views of counsel; and

    (g)    the reaction of the class members to the proposed settlement.

7.    Plaintiffs' Counsel and the Named Plaintiffs adequately represented the Settlement Class for purposes of entering into and implementing the settlement.

8.    In total, Waitr shall issue an aggregate of 873,720 shares of Waitr Common Stock, with 454,914 shares of Waitr's Common Stock distributed to the Qualified Class Members who timely submitted a claim form (inclusive of service awards for Named Plaintiffs) and 418,806 shares of Waitr's Common Stock distributed to Plaintiffs' Counsel as compensation for their attorneys' fees and costs.

9.    Plaintiffs' Counsel's requested fees and expenses under the Settlement Agreement, totaling 418,806 shares of Waitr's Common Stock, are fair and were reasonably and necessarily incurred, and shall be apportioned with 62% of the common benefit fee owed to ANDERSON ALEXANDER, PLLC and 38% of the common benefit fee owed to CHRISTOPHER ZAUNBRECHER, LLC and BRINEY FORET CORRY, LLP.

10.    The Service Awards for the Named Plaintiffs are approved and shall be allocated among the recipients as follows: 3,891 shares of Waitr's Common Stock for each Named

Plaintiff, being Jualeia Halley, Heather Gongaware, Autumn Montgomery, and Nateshus Jackson, respectively, for a total of 15,564 shares of Waitr's Common Stock to compensate them for their unique services in initiating and/or maintaining this Litigation.

11.    Nothing relating to this Order, or any communications, papers, or orders related to the Settlement Agreement or the Amended and Restated Settlement Agreement, shall be cited to as, construed to be, admissible as, or deemed an admission by Defendant or Releasees of any liability, culpability, negligence, or wrongdoing toward the Named Plaintiffs, the Settlement Class Members, or any other person, or that class or collective action certification is appropriate in this or any other matter.  There has been no determination by any Court as to the merits of the claims asserted by Plaintiffs against Defendant or as to whether a class or collective should be certified, other than for settlement purposes only.  Furthermore, nothing in the Parties' Settlement Agreement or Amended and Restated Settlement Agreement shall be cited to as, construed to be, admissible as, or considered any form of waiver of any alternative dispute resolution agreements, provisions, or policies by Defendant or Releasees.

12.    In consideration of the issuance of the Settlement Shares, and for the good and valuable consideration set forth in the Amended and Restated Settlement Agreement, each Qualified Class Member shall, by operation of this Judgment, have fully, finally, and forever released, relinquished, and discharged all Released Claims against Defendant and Releasees in accordance with the terms of the Amended and Restated Settlement Agreement.

13.    In the event that the Effective Date does not occur, this Judgment shall be rendered null and void and shall be vacated, *nunc pro tunc*, and without prejudice to the status *quo ante rights* of the Named Plaintiffs, the Plaintiffs, the Settlement Class Members, the FLSA Collective, and Defendant.

Case 2:19-cv-02205-EEF-DMD Document 86 Filed 09/02/20 Page 7 of 8

14. All Qualified Class Members (*i.e.*, any Settlement Class Member who did not timely opt out of the Settlement under the circumstances and in accordance with the procedures set forth in Section 2.4 of the Settlement Agreement and the Amended and Restated Settlement Agreement) are permanently barred and enjoined from bringing, filing, commencing, prosecuting, maintaining, intervening in, participating in (as class members or otherwise), or receiving any benefits from any other lawsuit (including putative class action lawsuits), arbitration, administrative, regulatory, or other proceeding, order, or cause of action in law or equity in any jurisdiction that is in any way related to the Litigation and the Released Claims.

15. The objector who filed a noncompliant objection is hereby deemed to have waived his objection(s) to this Order, including any right of appeal.

16. Each issued Settlement Share shall be freely tradeable and, pursuant to Section 3(a)(10) of the United States Securities Act of 1933, as amended, are exempt from the registration requirements otherwise imposed by that act, and are exempt from any analogous provisions of applicable state securities laws and Defendant may choose to distribute the Settlement Shares exempt from registration and compliance with the prospectus delivery requirements of the U.S. securities laws or any analogous state securities laws based on the Court's findings.

17. The notice requirements of the Class Action Fairness Act, 28 U.S.C. § 1715(d) have been satisfied.

18. The Court retains jurisdiction over all proceedings arising out of or related to the Amended and Restated Settlement Agreement.

Case 2:19-cv-02208-EEP-DMD    Document 56    Filed 09/02/20    Page 8 of 8
#:  3482

19.    This Litigation (including all individuals claims, class, and collective presented

thereby) is dismissed on the merits and with prejudice, without fees or costs to any party, except

as provided above and/or in the Amended and Restated Settlement Agreement.


IT IS SO ORDERED.

Dated: September 2nd , 2020


                                                    _____
                                                    The Honorable Eldon E. Fallon
                                                    United States District Court Judge

# EXHIBIT 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): November 1, 2018

———————————

# LANDCADIA HOLDINGS, INC.
(Exact name of registrant as specified in its charter)

———————————

| **Delaware** | **001-37788** | **26-3828008** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1510 West Loop South, Houston, Texas 77027**
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: **713-850-1010**

**Not Applicable**
(Former name or former address, if changed since last report)

———————————

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐     Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01**        **Other Events.**

On November 1, 2018, Landcadia Holdings, Inc., a Delaware corporation (the "***Company***"), issued a press release announcing that it has established November 15, 2018 as the date of its special meeting of stockholders (the "***Special Meeting***") to be held with respect to its previously announced business combination (the "***Business Combination***") with Waitr Incorporated ("***Waitr***"). The Company also announced that it has filed its definitive proxy statement for the Special Meeting that it will mail on or about November 2, 2018 to stockholders of record as of October 16, 2018, the record date for the Special Meeting. A copy of the press release is filed as Exhibit 99.1 to this Current Report on Form 8-K and incorporated herein by reference.

**Item 9.01**        **Financial Statements and Exhibits.**

(d)  Exhibits

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release, dated November 1, 2018. |

***Important Information About the Business Combination and Where to Find It***

In connection with the proposed Business Combination, the Company has filed a definitive proxy statement with the SEC. **The Company's stockholders and other interested persons are advised to read the definitive proxy statement and any amendments or supplements thereto and any documents incorporated by reference therein filed in connection the Business Combination, as these materials contain important information about Waitr, the Company and the Business Combination.** The definitive proxy statement and other relevant materials for the Business Combination will be mailed to stockholders of the Company as of October 16, 2018, the record date established for voting on the Business Combination. Stockholders may obtain copies of the definitive proxy statement and other documents filed with the SEC that will be incorporated by reference therein, without charge, at the SEC's web site at www.sec.gov, or by directing a request to: Landcadia Holdings, Inc., 1510 West Loop South, Houston, Texas 77027, Attention: General Counsel, (713) 850-1010.

***Participants in the Solicitation***

The Company, its directors and executive officers, and Jefferies LLC may be deemed participants in the solicitation of proxies from the Company's stockholders with respect to the Business Combination. A list of the names of those directors and executive officers and a description of their interests in the Company is contained in the Company's definitive proxy statement, which was filed with the SEC and is available free of charge at the SEC's web site at www.sec.gov, or by directing a request to Landcadia Holdings, Inc., 1510 West Loop South, Houston, Texas 77027, Attention: General Counsel, (713) 850-1010.

Waitr and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of the Company in connection with the Business Combination. A list of the names of such directors and executive officers and information regarding their interests in the Business Combination is included in the proxy statement for the Business Combination.

*Forward-Looking Statements*

This Current Report on Form 8-K includes "forward-looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. The Company's and Waitr's actual results may differ from their expectations, estimates and projections and consequently, you should not rely on these forward looking statements as predictions of future events. Words such as "expect," "estimate," "project," "budget," "forecast," "anticipate," "intend," "plan," "may," "will," "could," "should," "believes," "predicts," "potential," "continue," and similar expressions are intended to identify such forward-looking statements. These forward-looking statements include, without limitation, the Company's and Waitr's expectations with respect to future performance and anticipated financial impacts of the Business Combination, the satisfaction of the closing conditions to the Business Combination and the timing of the completion of the Business Combination. These forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Most of these factors are outside the Company's and Waitr's control and are difficult to predict. Factors that may cause such differences include, but are not limited to: (1) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement relating to the Business Combination (the "***Merger Agreement***") or could otherwise cause the Business Combination to fail to close; (2) the outcome of any legal proceedings that may be instituted against the Company and Waitr following the announcement of the Merger Agreement and the transactions contemplated therein; (3) the inability to complete the Business Combination, including due to failure to obtain approval of the stockholders of the Company or other conditions to closing in the Merger Agreement; (4) the receipt of an unsolicited offer from another party for an alternative business transaction that could interfere with the Business Combination; (5) the inability to obtain or maintain the listing of the shares of common stock of the post-acquisition company on The Nasdaq Stock Market following the Business Combination; (6) the risk that the announcement and consummation of the Business Combination disrupts current plans and operations; (7) the ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, competition, the ability of the combined company to grow and manage growth profitably and retain its key employees; (8) costs related to the Business Combination; (9) changes in applicable laws or regulations; (10) the possibility that Waitr or the combined company may be adversely affected by other economic, business, and/or competitive factors; and (11) other risks and uncertainties indicated from time to time in the proxy statement relating to the Business Combination, including those under "Risk Factors" therein, and in the Company's other filings with the SEC. The Company cautions that the foregoing list of factors is not exclusive. The Company cautions readers not to place undue reliance upon any forward-looking statements, which speak only as of the date made. The Company does not undertake or accept any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements to reflect any change in its expectations or any change in events, conditions or circumstances on which any such statement is based.

*No Offer or Solicitation*

This Current Report on Form 8-K shall not constitute a solicitation of a proxy, consent or authorization with respect to any securities or in respect of the Business Combination. This Current Report on Form 8-K shall also not constitute an offer to sell or the solicitation of an offer to buy any securities, nor shall there be any sale of securities in any states or jurisdictions in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offering of securities shall be made except by means of a prospectus meeting the requirements of section 10 of the Securities Act of 1933, as amended, or an exemption therefrom.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**LANDCADIA HOLDINGS, INC.**

Date: November 1, 2018

By: /s/ Richard H. Liem
Name: Richard H. Liem
Title: Vice President and Chief Financial Officer

**Exhibit 99.1**

**LANDCADIA HOLDINGS INC. ANNOUNCES SPECIAL MEETING DATE TO APPROVE PROPOSED BUSINESS COMBINATION WITH WAITR INCORPORATED**

*Special meeting to be held on November 15, 2018*

HOUSTON, TX, November 1, 2018 – Landcadia Holdings Inc. (Nasdaq: LCA) (the "Company") today announced that it has scheduled the special meeting of its stockholders (the "Special Meeting") to approve the proposed business combination (the "Business Combination") between the Company and Waitr Incorporated ("Waitr") for November 15, 2018. The Company also announced that it has filed its definitive proxy statement for the Special Meeting and expects to mail the proxy statement on or about November 2, 2018 to its stockholders of record as of October 16, 2018, the record date (the "Record Date") for the Special Meeting. The closing of the Business Combination is subject to approval by Landcadia's stockholders and the satisfaction of other customary closing conditions and is expected to close promptly after the Special Meeting.

**About Landcadia Holdings, Inc.**

Landcadia Holdings, Inc. is a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

*Important Information About the Business Combination and Where to Find It*

In connection with the proposed Business Combination, the Company has filed a definitive proxy statement with the SEC. **The Company's stockholders and other interested persons are advised to read the definitive proxy statement and any supplements or amendments thereto and any documents incorporated by reference therein filed in connection the Business Combination, as these materials contain important information about Waitr, the Company and the Business Combination.** The definitive proxy statement and other relevant materials for the Business Combination will be mailed to stockholders of the Company as of the Record Date. Stockholders may obtain copies of the definitive proxy statement and other documents filed with the SEC that will be incorporated by reference therein, without charge, at the SEC's web site at www.sec.gov, or by directing a request to: Landcadia Holdings, Inc., 1510 West Loop South, Houston, Texas 77027, Attention: General Counsel, (713) 850-1010.

*Participants in the Solicitation*

The Company, its directors and executive officers, and Jefferies LLC may be deemed participants in the solicitation of proxies from the Company's stockholders with respect to the Business Combination. A list of the names of those directors and executive officers and a description of their interests in the Company is contained in the Company's definitive proxy statement, which was filed with the SEC and is available free of charge at the SEC's web site at www.sec.gov, or by directing a request to Landcadia Holdings, Inc., 1510 West Loop South, Houston, Texas 77027, Attention: General Counsel, (713) 850-1010.

Waitr and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of the Company in connection with the Business Combination. A list of the names of such directors and executive officers and information regarding their interests in the Business Combination is included in the proxy statement for the Business Combination.

*Forward-Looking Statements*

This press release includes "forward-looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. The Company's and Waitr's actual results may differ from their expectations, estimates and projections and consequently, you should not rely on these forward looking statements as predictions of future events. Words such as "expect," "estimate," "project," "budget," "forecast," "anticipate," "intend," "plan," "may," "will," "could," "should," "believes," "predicts," "potential," "continue," and similar expressions are intended to identify such forward-looking statements. These forward-looking statements include, without limitation, the Company's and Waitr's expectations with respect to future performance and anticipated financial impacts of the Business Combination, the satisfaction of the closing conditions to the Business Combination and the timing of the completion of the Business Combination. These forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Most of these factors are outside the Company's and Waitr's control and are difficult to predict. Factors that may cause such differences include, but are not limited to: (1) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement relating to the Business Combination (the "Merger Agreement") or could otherwise cause the Business Combination to fail to close; (2) the outcome of any legal proceedings that may be instituted against the Company and Waitr following the announcement of the Merger Agreement and the transactions contemplated therein; (3) the inability to complete the Business Combination, including due to failure to obtain approval of the stockholders of the Company or other conditions to closing in the Merger Agreement; (4) the inability to obtain or maintain the listing of the shares of common stock of the post-acquisition company on The Nasdaq Stock Market following the Business Combination; (5) the risk that the announcement and consummation of the Business Combination disrupts current plans and operations; (6) the ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, competition, the ability of the combined company to grow and manage growth profitably and retain its key employees; (7) costs related to the Business Combination; (8) changes in applicable laws or regulations; (9) the possibility that Waitr or the combined company may be adversely affected by other economic, business, and/or competitive factors; and (10) other risks and uncertainties indicated from time to time in the proxy statement relating to the Business Combination, including those under "Risk Factors" therein, and in the Company's other filings with the SEC. The Company cautions that the foregoing list of factors is not exclusive. The Company cautions readers not to place undue reliance upon any forward-looking statements, which speak only as of the date made. The Company does not undertake or accept any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements to reflect any change in its expectations or any change in events, conditions or circumstances on which any such statement is based.

*No Offer or Solicitation*

This press release shall not constitute a solicitation of a proxy, consent or authorization with respect to any securities or in respect of the Business Combination. This press release shall also not constitute an offer to sell or the solicitation of an offer to buy any securities, nor shall there be any sale of securities in any states or jurisdictions in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offering of securities shall be made except by means of a prospectus meeting the requirements of section 10 of the Securities Act of 1933, as amended, or an exemption therefrom.

**Contacts:**

Investors
WaitrIR@icrinc.com
or
Media
WaitrPR@icrinc.com

# EXHIBIT 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): May 16, 2018

# LANDCADIA HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **001-37788** | **26-3828008** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1510 West Loop South, Houston, Texas 77027**
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: **713-850-1010**

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01          Entry into a Material Definitive Agreement.**

*Agreement and Plan of Merger*

On May 16, 2018, Landcadia Holdings, Inc., a Delaware corporation (the "Company"), entered into an Agreement and Plan of Merger (the "Merger Agreement") with Landcadia Merger Sub, Inc., a Delaware corporation ("Merger Sub"), and Waitr Incorporated, a Louisiana corporation ("Waitr"), pursuant to which, subject to the satisfaction or waiver of certain conditions set forth therein, Waitr will merge with and into Merger Sub, with Merger Sub surviving the merger in accordance with the Delaware General Corporation Law as a wholly owned direct subsidiary of the Company (the transactions contemplated by the Merger Agreement, the "Business Combination"). Upon the consummation of the Business Combination, the Company will change its name to Waitr Holdings Inc.

*Merger Consideration*

The aggregate consideration for the Business Combination will be comprised of $300.0 million payable in the form of cash and shares of the Company's common stock valued at $10.00 per share plus approximately $8.0 million payable in the form of Company stock options to be issued to holders of options to purchase Waitr shares that are unvested, outstanding and unexercised as of immediately prior to the effective time of the Business Combination (the "Effective Time").

The cash portion of the consideration will be an aggregate amount equal to the sum of (i) $50.0 million (the "Minimum Cash Consideration Amount") plus (ii) the Additional Cash Amount (as defined in the Merger Agreement), if any, which together with the Minimum Cash Consideration Amount will not exceed a maximum of $75.0 million (the "Cash Consideration"). The remainder of $300.0 million less the Cash Consideration will be paid in the form of shares of the Company's common stock valued at $10.00 per share (the "Stock Consideration"). In addition, all options to purchase Waitr shares that are unvested, outstanding and unexercised as of immediately prior to the Effective Time, valued at approximately $8.0 million, will be assumed by the Company.

*Representations, Warranties and Covenants*

The parties to the Merger Agreement have made customary representations, warranties and covenants in the Merger Agreement, including, among others, covenants with respect to the conduct of Waitr during the period between execution of the Merger Agreement and the completion of the Business Combination. The Company and Waitr have each agreed to use commercially reasonable efforts to cause the Business Combination to be consummated.

*Conditions to Closing*

The closing of the Business Combination is subject to certain conditions, including, among others, (i) approval by the Company's stockholders of the extension of the time by which the Company has to complete a business combination (the "Extension"), (ii) approval by the Company's stockholders of the Merger Agreement, the Business Combination and certain other actions related thereto, (iii) approval by Waitr's stockholders of the Business Combination, (iv) approval of the listing of the Company's common stock to be issued in connection with the Business Combination on The Nasdaq Stock Market ("Nasdaq"), (v) completion of any redemptions of shares by the Company's stockholders in connection with the Business Combination, (vi) delivery of lockup agreements from each stockholder of Waitr receiving Stock Consideration pursuant to the Merger Agreement and from the Company's founders with respect to their private placement warrants, (vii) delivery by the Company of evidence that after the closing of the Business Combination, the Company will have at least $75.0 million in cash or investments in government securities or money market funds that invest only in direct United States Treasury obligations, and (viii) the expiration or termination of the applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

*Termination*

The Merger Agreement may be terminated by the Company and Waitr under certain circumstances, including, among others, (i) by mutual written consent of the Company and Waitr, (ii) by the Company or Waitr if the closing of the Business Combination has not occurred on or prior to November 30, 2018 for any reason other than delay and/or non-performance of the party seeking such termination, (iii) by the Company or Waitr if the Company's stockholders do not approve the Extension, (iv) by the Company or Waitr if the Company's stockholders do not approve the Merger Agreement, (v) by Waitr if there exists any Nasdaq listing rule deficiency that causes a de-listing of the Company from Nasdaq prior to the closing of the Business Combination and (vi) by Waitr if the aggregate dollar amount of any shares redeemed by the Company's stockholders in connection with the Extension and the Business Combination equals or exceeds an amount that would cause (x) the combined company to fail to maintain a minimum cash balance of at least $75 million at closing or (y) Waitr's stockholders to receive an aggregate amount of Cash Consideration less than the Minimum Cash Consideration Amount.

The foregoing description of the Merger Agreement and the Business Combination does not purport to be complete and is qualified in its entirety by the terms and conditions of the Merger Agreement, a copy of which is attached hereto as Exhibit 2.1 and is incorporated herein by reference. The Merger Agreement contains representations, warranties and covenants that the respective parties made to each other as of the date of such agreement or other specific dates. The assertions embodied in those representations, warranties and covenants were made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating such agreement. The Merger Agreement has been attached to provide investors with information regarding its terms. It is not intended to provide any other factual information about the Company, Waitr or any other party to the Merger Agreement. In particular, the representations, warranties, covenants and agreements contained in the Merger Agreement, which were made only for purposes of such agreement and as of specific dates, were solely for the benefit of the parties to the Merger Agreement, may be subject to limitations agreed upon by the contracting parties (including being qualified by confidential disclosures made for the purposes of allocating contractual risk between the parties to the Merger Agreement instead of establishing these matters as facts) and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors and reports and documents filed with the U.S. Securities and Exchange Commission (the "SEC"). Investors should not rely on the representations, warranties, covenants and agreements, or any descriptions thereof, as characterizations of the actual state of facts or condition of any party to the Merger Agreement. In addition, the representations, warranties, covenants and agreements and other terms of the Merger Agreement may be subject to subsequent waiver or modification. Moreover, information concerning the subject matter of the representations and warranties and other terms may change after the date of the Merger Agreement, which subsequent information may or may not be fully reflected in the Company's public disclosures.

**Item 3.02        Unregistered Sales of Equity Securities.**

The disclosure set forth above in Item 1.01 of this Current Report on Form 8-K with respect to the issuance of the Company's common stock pursuant to the Merger Agreement is incorporated by reference herein. The common stock issuable in connection with the transactions contemplated by the Business Combination will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.

**Item 7.01.        Regulation FD Disclosure.**

On May 17, 2018, the Company hosted a conference call at 9:00 a.m. ET to discuss the Business Combination. A copy of the transcript of the call is furnished as Exhibit 99.1 hereto.

Also on May 17, 2018, in connection with the Business Combination, Tilman J. Fertitta, the Company's Co-Chairman and Chief Executive Officer, was interviewed by CNBC.  A copy of the transcript of this interview is furnished as Exhibit 99.2 hereto.

The information in this Item 7.01 and Exhibits 99.1 and 99.2 attached hereto shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act or the Exchange Act, except as expressly set forth by specific reference in such filing.

***Important Information About the Business Combination and the Extension and Where to Find It***

In connection with the proposed Business Combination, the Company intends to file a preliminary proxy statement and a definitive proxy statement with the SEC. In addition, the Company has filed a preliminary proxy statement and intends to file a definitive proxy statement to be used at its special meeting of stockholders to approve the Extension. The Company will mail the definitive proxy statement relating to the Extension to its stockholders of record as of May 10, 2018. **The Company's stockholders and other interested persons are advised to read, when available, the preliminary proxy statements and the amendments thereto and the definitive proxy statements and documents incorporated by reference therein filed in connection the Extension and the Business Combination, as these materials will contain important information about the Extension, Waitr, the Company and the Business Combination.** When available, the definitive proxy statement and other relevant materials for the Business Combination will be mailed to stockholders of the Company as of a record date to be established for voting on the Business Combination. Stockholders will also be able to obtain copies of the preliminary proxy statements, the definitive proxy statements and other documents filed with the SEC that will be incorporated by reference therein, without charge, once available, at the SEC's web site at www.sec.gov, or by directing a request to: Landcadia Holdings, Inc., 1510 West Loop South, Houston, Texas 77027, Attention: General Counsel, (713) 850-1010.

*Participants in the Solicitation*

The Company and its directors and executive officers may be deemed participants in the solicitation of proxies from the Company's stockholders with respect to the Business Combination and the Extension. A list of the names of those directors and executive officers and a description of their interests in the Company is contained in the Company's annual report on Form 10-K for the fiscal year ended December 31, 2017, which was filed with the SEC and is available free of charge at the SEC's web site at www.sec.gov, or by directing a request to Landcadia Holdings, Inc., 1510 West Loop South, Houston, Texas 77027, Attention: General Counsel, (713) 850-1010. Additional information regarding the interests of such participants will be contained in the proxy statement for the Business Combination and the Extension when available.

Waitr and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of the Company in connection with the Business Combination. A list of the names of such directors and executive officers and information regarding their interests in the Business Combination will be included in the proxy statement for the Business Combination when available.

*Forward-Looking Statements*

This Current Report on Form 8-K includes "forward-looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. The Company's and Waitr's actual results may differ from their expectations, estimates and projections and consequently, you should not rely on these forward looking statements as predictions of future events. Words such as "expect," "estimate," "project," "budget," "forecast," "anticipate," "intend," "plan," "may," "will," "could," "should," "believes," "predicts," "potential," "continue," and similar expressions are intended to identify such forward-looking statements. These forward-looking statements include, without limitation, the Company's and Waitr's expectations with respect to future performance and anticipated financial impacts of the Business Combination, the satisfaction of the closing conditions to the Business Combination and the timing of the completion of the Business Combination. These forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Most of these factors are outside the Company's and Waitr's control and are difficult to predict. Factors that may cause such differences include, but are not limited to: (1) the occurrence of any event, change or other circumstances that could give rise to the termination of the Merger Agreement, (2) the outcome of any legal proceedings that may be instituted against the Company and Waitr following the announcement of the Merger Agreement and the transactions contemplated therein; (3) the inability to complete the Business Combination, including due to failure to obtain approval of the stockholders of the Company or other conditions to closing in the Merger Agreement; (4) the occurrence of any event, change or other circumstance that could give rise to the termination of the Merger Agreement or could otherwise cause the transaction to fail to close; (5) the receipt of an unsolicited offer from another party for an alternative business transaction that could interfere with the proposed Business Combination; (6) the inability to obtain or maintain the listing of the shares of common stock of the post-acquisition company on Nasdaq following the business combination; (7) the risk that the Business Combination disrupts current plans and operations as a result of the announcement and consummation of the Business Combination; (8) the ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, competition, the ability of the combined company to grow and manage growth profitably and retain its key employees; (9) costs related to the Business Combination; (10) changes in applicable laws or regulations; (11) the possibility that Waitr or the combined company may be adversely affected by other economic, business, and/or competitive factors; and (12) other risks and uncertainties indicated from time to time in the proxy statement relating to the Business Combination, including those under "Risk Factors" therein, and in the Company's other filings with the SEC. The Company cautions that the foregoing list of factors is not exclusive. The Company cautions readers not to place undue reliance upon any forward-looking statements, which speak only as of the date made. The Company does not undertake or accept any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements to reflect any change in its expectations or any change in events, conditions or circumstances on which any such statement is based.

*No Offer or Solicitation*

This Current Report on Form 8-K shall not constitute a solicitation of a proxy, consent or authorization with respect to any securities or in respect of the Business Combination. This Current Report on Form 8-K shall also not constitute an offer to sell or the solicitation of an offer to buy any securities, nor shall there be any sale of securities in any states or jurisdictions in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offering of securities shall be made except by means of a prospectus meeting the requirements of section 10 of the Securities Act, or an exemption therefrom.

**Item 9.01**         **Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit No. | Description |
| --- | --- |
| 2.1* | Agreement and Plan of Merger, dated as of May 16, 2018, by and between the Company, Landcadia Merger Sub Inc. and Waitr Incorporated. |
| 99.1 | Transcript of Investor Call held on May 17, 2018. |
| 99.2 | Transcript of CNBC Interview held on May 17, 2018. |

\*    The exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(b)(2). The Company agrees to furnish supplementally a copy of any omitted exhibit or schedule to the SEC upon its request.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**LANDCADIA HOLDINGS, INC.**

By:   /s/ Richard H. Liem
         Name: Richard H. Liem
         Title: Vice President and Chief Financial Officer

Dated: May 17, 2018

**Exhibit 2.1**

**EXECUTION VERSION**

**AGREEMENT AND PLAN OF MERGER**

by and among

**LANDCADIA HOLDINGS, INC.,**

**LANDCADIA MERGER SUB, INC.,**

and

**WAITR INCORPORATED**

**Dated May 16, 2018**

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| I. | DEFINITIONS |  | 1 |
|  | Section 1.1 | Definitions | 1 |
|  | Section 1.2 | Construction | 15 |
| II. | Merger; CLOSING |  | 15 |
|  | Section 2.1 | The Merger | 15 |
|  | Section 2.2 | Effects of the Merger | 16 |
|  | Section 2.3 | Closing | 16 |
|  | Section 2.4 | Effective Time | 16 |
|  | Section 2.5 | Certificate of Incorporation and Bylaws of the Surviving Corporation | 16 |
|  | Section 2.6 | Directors and Officers of the Surviving Corporation | 16 |
|  | Section 2.7 | Directors and Officers of Landcadia | 17 |
| III. | MERGER CONSIDERATION; EFFECTS ON THE CAPITAL STOCK |  | 17 |
|  | Section 3.1 | Closing Date Statements | 17 |
|  | Section 3.2 | Merger Consideration | 18 |
|  | Section 3.3 | Conversion of Waitr Capital Stock | 19 |
|  | Section 3.4 | Treatment of Waitr Options | 19 |
|  | Section 3.5 | Treatment of Waitr Warrants | 21 |
|  | Section 3.6 | Payment of the Merger Consideration | 21 |
|  | Section 3.7 | Procedures Regarding Waitr Capital Stock | 22 |
|  | Section 3.8 | Treatment of Waitr Convertible Notes | 24 |
|  | Section 3.9 | Withholding Rights | 24 |
| IV. | REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANY |  | 24 |
|  | Section 4.1 | Organization and Authority | 25 |
|  | Section 4.2 | Authorization and Enforceability | 25 |
|  | Section 4.3 | Noncontravention | 25 |
|  | Section 4.4 | Subsidiaries | 25 |
|  | Section 4.5 | Governmental Authorities; Consents | 26 |
|  | Section 4.6 | Capitalization | 26 |
|  | Section 4.7 | Financial Statements | 27 |
|  | Section 4.8 | Indebtedness | 27 |
|  | Section 4.9 | Undisclosed Liabilities | 28 |
|  | Section 4.10 | Litigation and Proceedings | 28 |
|  | Section 4.11 | Compliance with Laws; Permits | 28 |
|  | Section 4.12 | Contracts | 28 |
|  | Section 4.13 | Real Property | 30 |
|  | Section 4.14 | Title to Assets; Condition and Sufficiency | 31 |
|  | Section 4.15 | Employee Benefits | 32 |
|  | Section 4.16 | Labor and Employment | 33 |
|  | Section 4.17 | Taxes. | 34 |
|  | Section 4.18 | Intellectual Property | 36 |

| | | |
|---|---|---:|
| Section 4.19 | Insurance | 39 |
| Section 4.20 | Absence of Changes | 40 |
| Section 4.21 | Interested Party Transactions | 40 |
| Section 4.22 | Change of Control Payments | 40 |
| Section 4.23 | Information Supplied | 41 |
| Section 4.24 | No Brokers' Fees | 41 |
| Section 4.25 | No Additional Representations and Warranties | 41 |
| **V.** | **REPRESENTATIONS AND WARRANTIES OF LANDCADIA AND MERGER SUB** | **41** |
| Section 5.1 | Organization and Authority | 41 |
| Section 5.2 | Authorization and Enforceability | 41 |
| Section 5.3 | Noncontravention | 42 |
| Section 5.4 | Litigation and Proceedings | 43 |
| Section 5.5 | Governmental Authorities; Consents | 43 |
| Section 5.6 | Financial Ability; Trust Account | 43 |
| Section 5.7 | No Brokers' Fees | 44 |
| Section 5.8 | Solvency | 44 |
| Section 5.9 | SEC Reports; Financial Statements | 44 |
| Section 5.10 | Business Activities | 45 |
| Section 5.11 | Proxy Statement | 45 |
| Section 5.12 | No Landcadia Material Adverse Effect | 45 |
| Section 5.13 | Capitalization | 46 |
| Section 5.14 | Reporting Company | 46 |
| Section 5.15 | Listing | 46 |
| Section 5.16 | Sarbanes-Oxley Act | 46 |
| Section 5.17 | Investment Company | 46 |
| Section 5.18 | Application of Takeover Protections | 46 |
| Section 5.19 | No Market Manipulation | 46 |
| Section 5.20 | No Disagreements with Accountants and Lawyers | 47 |
| Section 5.21 | DTC Status | 47 |
| Section 5.22 | Section 368 | 47 |
| Section 5.23 | No Additional Representations and Warranties | 47 |
| **VI.** | **COVENANTS** | **48** |
| Section 6.1 | Conduct of the Business | 48 |
| Section 6.2 | Signing Form 8-K | 51 |
| Section 6.3 | Financial Statements and Related Information | 51 |
| Section 6.4 | Proxy Solicitation; Proxy Statement; Other Actions | 52 |
| Section 6.5 | Landcadia's Special Meeting | 53 |
| Section 6.6 | Closing Form 8-K; Closing Press Release | 54 |
| Section 6.7 | Access to Information | 54 |
| Section 6.8 | Commercially Reasonable Efforts; Consents | 54 |
| Section 6.9 | Publicity | 55 |
| Section 6.10 | Non-Solicitation | 56 |
| Section 6.11 | Directors' and Officers' Indemnification | 56 |
| Section 6.12 | No Landcadia Stock Transactions | 58 |

ii

|  |  |  |  |
|---|---|---|---|
| | Section 6.13 | Trust Account | 58 |
| | Section 6.14 | Tax Matters | 58 |
| | Section 6.15 | Notification of Certain Matters | 59 |
| | Section 6.16 | Section 280G | 59 |
| | Section 6.17 | Landcadia's Long-Term Incentive Plan | 60 |
| | Section 6.18 | Employment Agreements | 60 |
| | Section 6.19 | Consulting Agreements | 60 |
| | Section 6.20 | Nasdaq Matters | 60 |
| | Section 6.21 | Tax Opinion | 60 |
| | Section 6.22 | Waitr Stockholder Approval | 60 |
| | Section 6.23 | Registration of Shares Subject to Vested Rollover Options | 61 |
| | Section 6.24 | Post-Closing Cooperation; Further Assurances | 61 |
| VII. | CONDITIONS TO CLOSING | | 61 |
| | Section 7.1 | Conditions to Obligations of all Parties | 61 |
| | Section 7.2 | Conditions to Obligations of Landcadia and Merger Sub | 61 |
| | Section 7.3 | Conditions to Obligations of Waitr | 63 |
| | Section 7.4 | Frustration of Closing Conditions | 64 |
| VIII. | TERMINATION | | 64 |
| | Section 8.1 | Termination | 64 |
| | Section 8.2 | Effect of Termination | 66 |
| IX. | MISCELLANEOUS | | 66 |
| | Section 9.1 | Modification or Amendment | 66 |
| | Section 9.2 | Waiver | 66 |
| | Section 9.3 | Notices | 67 |
| | Section 9.4 | Entire Agreement | 68 |
| | Section 9.5 | Assignment | 68 |
| | Section 9.6 | Counterparts | 68 |
| | Section 9.7 | No Third-Party Beneficiaries | 68 |
| | Section 9.8 | Governing Law | 68 |
| | Section 9.9 | CONSENT TO JURISDICTION | 69 |
| | Section 9.10 | WAIVER OF TRIAL BY JURY | 69 |
| | Section 9.11 | Severability | 69 |
| | Section 9.12 | Expenses | 69 |
| | Section 9.13 | Specific Performance | 70 |
| | Section 9.14 | Non-Recourse | 70 |
| | Section 9.15 | Publicity | 70 |
| | Section 9.16 | Non-Survival | 70 |
| | Section 9.17 | Trust Account Waiver | 70 |

**Exhibits**

| | |
|---|---|
| Exhibit A | Form of Registration Rights Agreement |
| Exhibit B | Form of Stockholder Lockup Agreement |
| Exhibit C | Form of Third Amended and Restated Articles of Incorporation of Landcadia |
| Exhibit D-1 | Form of Delaware Certificate of Merger |
| Exhibit D-2 | Form of Louisiana Articles of Merger |

**AGREEMENT AND PLAN OF MERGER**

This Agreement and Plan of Merger (this "<u>Agreement</u>") is made and entered into as of May 16, 2018, by and among Landcadia Holdings, Inc., a Delaware corporation ("<u>Landcadia</u>"), Landcadia Merger Sub, Inc., a Delaware corporation and a direct wholly owned Subsidiary of Landcadia ("<u>Merger Sub</u>"), and Waitr Incorporated, a Louisiana corporation ("<u>Waitr</u>"). All capitalized terms used in this Agreement shall have the meanings ascribed to such terms in <u>Section 1.1</u> hereof or as otherwise defined elsewhere in this Agreement. Landcadia, Merger Sub and Waitr are referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

**RECITALS**

A.    Landcadia is a blank check company incorporated to acquire one or more operating businesses through a Business Combination.

B.    Waitr is in the business of providing restaurant ordering and food delivery services using its technology platform.

C.    The Parties desire that Waitr merge with and into Merger Sub, a direct, wholly owned Subsidiary of Landcadia, with Merger Sub being the Surviving Corporation (the "<u>Merger</u>"), on the terms and subject to the conditions of this Agreement.

D.    Each of the Parties intends that, for United States federal income tax purposes, (i) the Merger qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>") and the Treasury Regulations promulgated thereunder to which each of Landcadia and Waitr are parties under Section 368(b) of the Code and (ii) this Agreement constitute a "plan of reorganization" within the meaning of Sections 354, 361 and 368 of the Code.

NOW, THEREFORE, in consideration of the foregoing, and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

**I. DEFINITIONS**

Section 1.1    <u>Definitions</u>. Any capitalized terms used in this Agreement and not defined elsewhere in this Agreement have the meanings ascribed to such terms in this <u>Section 1.1</u>.

"<u>Acquisition Proposal</u>" means any contract, proposal, offer or indication of interest in any form, written or oral, relating to any transaction or series of related transactions (other than transactions with Landcadia or Merger Sub) involving any acquisition, merger, amalgamation, share exchange, recapitalization, consolidation, liquidation or dissolution involving the acquisition of all or any material portion of Waitr or its businesses or assets or any material portion of Waitr Capital Stock or other equity interests.

"Additional Cash Amount" means an amount equal to the lesser of (a) $25,000,000 and (b) an amount equal to (i) the Merger Consideration minus (ii) the Minimum Cash Consideration Amount, minus (iii) the Minimum Cash Balance minus (iv) the Redemption Amount minus (v) the Transaction Expenses; provided, however, that if the Additional Cash Amount calculation results in a negative number, then the Additional Cash Amount shall be deemed to be zero.

"Additional Landcadia Filings" has the meaning set forth in Section 6.4(a).

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by, or under common control with, such specified Person.

"Affiliated Group" means an affiliated group as defined in Section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law) of which Waitr is or has been a member.

"Aggregate In-the-Money Vested Option Exercise Price" means the aggregate cash exercise price payable upon the exercise in full of all In-the-Money Vested Options outstanding as of immediately prior to the Effective Time.

"Agreement" has the meaning set forth in the Preamble.

"Applicable State Law" means the DGCL and the LBCA.

"Business Combination" has the meaning set forth in the Second Amended and Restated Articles of Incorporation.

"Business Day" means any day except Saturday, Sunday or any days on which banks are generally not open for business in Houston, Texas, New Orleans, Louisiana or Wilmington, Delaware.

"Cash Consideration" has the meaning set forth in Section 3.2(b)(i).

"Cash Percentage" means the percentage derived by dividing (a) the Cash Consideration by (b) the Merger Consideration.

"Cash Portion" means an amount in cash (rounded up to the nearest whole cent) equal to the product of (a) the Per Share Merger Consideration multiplied by (b) the Cash Percentage.

"Certificates of Merger" has the meaning set forth in Section 2.1.

"Change in Recommendation" has the meaning set forth in Section 6.5.

"Closing" has the meaning set forth in Section 2.3.

"Closing Date" has the meaning set forth in Section 2.3.

"Closing Form 8-K" has the meaning set forth in Section 6.6.

"Closing Net Working Capital" has the meaning set forth in Section 3.1(a)(ix).

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code, and any similar state Law.

2

"Code" has the meaning set forth in the Recitals.

"Consulting Agreements" has the meaning set forth in Section 6.19.

"Contract" means any contract, agreement, instrument, lease, sublease, license, deed, mortgage, purchase order, commitment or similar arrangement or undertaking.

"Delaware Certificate of Merger" has the meaning set forth in Section 2.1.

"DGCL" means the Delaware General Corporation Law.

"Disclosure Schedules" means the Disclosure Schedules delivered by Waitr and Landcadia concurrently with the execution and delivery of this Agreement.

"Effective Time" has the meaning set forth in Section 2.4.

"Employment Agreements" has the meaning set forth in Section 6.18.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity (whether or not incorporated) which together with Waitr would be treated as a "single employer" under Section 414(b), (c), (m), or (o) of the Code.

"Excess Cash Portion Amount" has the meaning set forth in Section 3.6(c).

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"Exchange Agent" means Continental Stock Transfer & Trust Company.

"Exchange Agent Agreement" means an agreement, in a form reasonably acceptable to Landcadia and Waitr, between Waitr and the Exchange Agent (subject to any modifications thereto required by the Exchange Agent).

"Exchange Agent Fund" has the meaning set forth in Section 3.6(b).

"Exchange Ratio" means (a) the Per Share Merger Consideration divided by (b) the Reference Price.

"Extension Stockholders' Meeting" means a special meeting of Landcadia Common Stockholders scheduled for May 30, 2018.

"Federal Securities Laws" means the Exchange Act, the Securities Act and the rules and regulations promulgated thereunder.

"Financial Statements" has the meaning set forth in Section 4.7(a).

"FIRPTA Certificate" has the meaning set forth in Section 6.14(d).

3

"FLSA" means the United States Fair Labor Standards Act of 1938, as amended.

"Fully-Diluted Shares" means, as of the time of determination, the number of shares equal to (a) the aggregate number of shares of Waitr Common Stock, plus (b) the aggregate number of shares of Waitr Common Stock issuable upon the conversion or redemption of all Waitr Preferred Stock pursuant to the terms of the Waitr Articles of Incorporation (including accrued dividends thereon), plus (c) the aggregate number of shares of Waitr Common Stock subject to In-the-Money-Vested Options, plus (d) the aggregate number of shares of Waitr Common Stock that are issuable upon the full exercise of the Waitr Warrants, minus (e) the aggregate number of shares of Waitr Capital Stock that will be cancelled pursuant to Section 3.3(c), in the case of each of (a) through (e), as issued and outstanding as of such time of determination.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authority" means any of the following: (a) the United States of America or any other country, (b) any state, commonwealth, province, territory or possession of any of the foregoing and any political subdivision thereof (including counties and municipalities), and (c) any agency, authority or instrumentality of any of the foregoing, including any court, tribunal, department, bureau, commission, board, arbitrator or panel of arbitrators.

"Governmental Order" means any order, judgment, injunction, decree, writ, stipulation, determination or award, in each case, entered by or with any Governmental Authority.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"In-the-Money Vested Option" means a Vested Option outstanding immediately prior to the Effective Time having a per share exercise price less than the Per Share Merger Consideration.

"In-the-Money Vested Option Holders" means the holders of any In-the-Money Vested Options.

"Indebtedness" means, without duplication and with respect to Waitr, all (a) indebtedness for borrowed money, (b) obligations for the deferred purchase price of property or services, (c) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments, (d) obligations under any interest rate, currency swap or other hedging agreement or arrangement, (e) capital lease obligations, (f) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions, (g) guarantees made by Waitr on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (a) through (f), and (h) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (a) through (g).

"Indemnified Person" has the meaning set forth in Section 6.11(a).

"Insurance Policies" has the meaning set forth in Section 4.19(a).

4

"Intellectual Property" means all worldwide (a) patents, industrial designs, utility models and applications for any of the foregoing, including all provisionals, continuations, continuations-in-part, divisions, reissues, re-examinations and extensions thereof, (b) trademarks, service marks, certification marks, logos, trade dress, trade names, domain names, social media accounts and other source or business identifiers, whether registered or unregistered, all registrations and applications for any of the foregoing, all renewals and extensions thereof and all common law rights in and goodwill associated with any of the foregoing, (c) works of authorship (including Software, websites, photographs, drawings and menus), copyrights, mask work rights, database rights and design rights, whether registered or unregistered, registrations and applications for any of the foregoing, renewals and extensions thereof and all moral rights associated with any of the foregoing, (d) trade secrets and other proprietary and confidential information, including inventions (whether or not patentable), invention disclosures, ideas, developments, improvements, know-how, designs, drawings, algorithms, Software, methods, processes, techniques, formulae, research and development, compilations, compositions, manufacturing and production processes, devices, technical data, specifications, reports, analyses, data analytics, customer lists, supplier lists, pricing and cost information and business and marketing plans and proposals (collectively, "Trade Secrets"), and (e) any rights recognized under applicable Law that are equivalent or similar to any of the foregoing.

"Interim Financial Statements" has the meaning set forth in Section 4.7(a).

"IT Assets" means Software, systems, servers, computers, hardware, firmware, middleware, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation, in each case, owned, leased or licensed (including as a cloud service) by Waitr for use in the operation of the business of Waitr.

"Landcadia" has the meaning set forth in the Preamble.

"Landcadia 2018 LTIP" has the meaning set forth in Section 6.17.

"Landcadia Board" means the board of directors of Landcadia.

"Landcadia Business Combination Approval" has the meaning set forth in Section 5.2(b).

"Landcadia Business Combination Proxy Statement" has the meaning set forth in Section 6.3(a).

"Landcadia Capital Stock" means, collectively, the Landcadia Class A Common Stock and the Landcadia Class F Common Stock.

"Landcadia Class A Common Stock" means Landcadia's Class A common stock, par value $0.0001 per share.

"Landcadia Class F Common Stock" means Landcadia's Class F common stock, par value $0.0001 per share.

5

"Landcadia Common Stock" means the common stock of Landcadia, par value $0.0001, per share, following the reclassification of all shares of Landcadia's Class A Common Stock into common stock and the conversion of all shares of Landcadia's Class F Common Stock into common stock in connection with the Closing pursuant to the Landcadia Organizational Documents.

"Landcadia Common Stockholders" means, collectively, the holders of Landcadia Class A Common Stock and Landcadia Class F Common Stock.

"Landcadia Extension Approval" means the approval of Landcadia Common Stockholders at a special meeting of Landcadia Common Stockholders scheduled for May 30, 2018, of the proposals set forth in the Landcadia Extension Proxy Statement.

"Landcadia Extension Proxy Statement" means Landcadia's proxy statement for the Extension Stockholders' Meeting, the preliminary form of which was filed with the SEC on May 7, 2018.

"Landcadia Material Adverse Effect" means (a) any change, event or effect that would prevent or materially delay the ability of Landcadia to perform its obligations under this Agreement or (b) any change, event or effect relating to Landcadia that would have a material adverse effect on the business, results of operations, workforce, prospects, properties, assets, liabilities or condition (financial or otherwise) of the Surviving Corporation.

"Landcadia Organizational Documents" means the Organizational Documents of Landcadia.

"Landcadia Record Date" means the record date used for determining the Landcadia Common Stockholders entitled to attend the Special Meeting.

"Landcadia SEC Filings" means the forms, reports, schedules and other documents filed by Landcadia with the SEC, including the Landcadia Extension Proxy Statement, Landcadia Business Combination Proxy Statement, Additional Landcadia Filings, the Signing Form 8-K and the Closing Form 8-K, and all amendments, modifications and supplements thereto.

"Landcadia Stock Redemption" means the election of an eligible holder of Landcadia Class A Common Stock (as determined in accordance with Landcadia Organizational Documents and the Trust Agreement) to redeem all or a portion of such holder's shares of Landcadia Class A Common Stock, at the per-share price, payable in cash, equal to such holder's pro rata share of the Trust Account (as determined in accordance with Landcadia Organizational Documents and the Trust Agreement) in connection with Landcadia Extension Approval or Landcadia Business Combination Approval.

"Landcadia Warrants" means the issued and outstanding warrants to purchase Landcadia Class A Common Stock.

"Law" means any common law, statutes, rules, codes, regulations, ordinances, determinations or orders of, or issued by, a Governmental Authority.

"LBCA" means the Louisiana Business Corporation Act.

"Leased Real Property" has the meaning set forth in Section 4.13(b).

"Lien" means any mortgage, pledge, easement, security interest, charge, claim, option, conditional sale or other title retention agreement, lien or other encumbrance or right of any third party.

"Louisiana Articles of Merger" has the meaning set forth in Section 2.1.

"Material Contracts" has the meaning set forth in Section 4.12(a).

"Merger" has the meaning set forth in the Recitals.

"Merger Consideration" has the meaning set forth in Section 3.2(a).

"Merger Sub" has the meaning set forth in the Preamble.

"Minimum Cash Balance" means $75,000,000.

"Minimum Cash Consideration Amount" means an amount equal to (a) $50,000,000, minus (b) the aggregate Waitr Convertible Note Cash Out Amount payable to the Waitr Convertible Note Holders, minus (c) the aggregate Substitute Cash Amount payable to the Non-Accredited Waitr Stockholders.

"Nasdaq" means The Nasdaq Stock Market LLC.

"Nasdaq Listing Rule 5620(a) Deficiency" means any deficiency under or failure to comply with Nasdaq Listing Rule 5620(a).

"Net Working Capital" means the difference between (a) the current assets of Waitr minus (b) the current liabilities of Waitr, in each case as calculated in accordance with GAAP consistently applied and in accordance with past practice.

"Non-Accredited Waitr Stockholder" has the meaning set forth in Section 3.6(d).

"Nondisclosure Agreement" means that certain Nondisclosure Agreement, dated April 16, 2018, by and between Waitr and Landcadia.

"Notice" has the meaning set forth in Section 9.3.

"Option Agreement" means an option certificate or other agreement pursuant to which a holder of Waitr Options has been granted such Waitr Options, a complete list of which is set forth on Schedule 4.6(b).

"Organizational Documents" means (a) the certificate of incorporation, (b) bylaws, (c) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person, (d) any limited liability company, partnership or shareholder agreement, and (e) any amendment to any of the foregoing.

"Outside Date" has the meaning set forth in Section 8.1(f).

7

"Owned Intellectual Property" means all Intellectual Property owned or purported to be owned by Waitr.

"Party" and "Parties" has the meaning set forth in the Preamble.

"PCAOB" means the United States Public Company Accounting Oversight Board.

"PCAOB Audited Financial Statements" has the meaning set forth in Section 6.3(a).

"Permits" means all permits, licenses, certificates of authority, authorizations, approvals, registrations and other similar consents issued by or obtained from a Governmental Authority.

"Permitted Liens" means (a) Liens for Taxes not yet due and payable, (b) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business consistent with past practice or amounts that are not delinquent and which are not, individually or in the aggregate, material to the business of Waitr, (c) easements, rights of way, zoning ordinances and other similar encumbrances affecting real property that are not, individually or in the aggregate, material to the business of Waitr, or (d) liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business consistent with past practice which are not, individually or in the aggregate, material to the business of Waitr.

"Per Share Merger Consideration" means an amount equal to (a)(i) the Merger Consideration plus (ii) the Aggregate In-the-Money Vested Option Exercise Price divided by (b) the number of Fully-Diluted Shares.

"Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, governmental agency or instrumentality or other entity of any kind.

"Personal Information" means information that, alone or in combination with other information, allows the identification of an individual or can be used to contact an individual, including without limitation, names, addresses, email addresses, account usernames, Internet Protocol (IP) addresses or other information that is regulated by one or more Privacy Laws.

"PPACA" has the meaning set forth in Section 4.15(j).

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"Privacy and Security Requirements" means (a) all applicable Laws relating to the Processing of Personal Information, (b) all applicable Privacy Contracts and (c) all applicable Privacy Policies.

"Privacy Contracts" means all Contracts between Waitr and any Person that are applicable to the Processing of Personal Information.

8

"Privacy Laws" means any Laws or Governmental Orders applicable to the Processing of Personal Information including, without limitation, Health Insurance Portability and Accountability Act of 1996 (HIPAA), the Children's Online Privacy Protection Act (COPPA), the Controlling the Assault of Non-Solicited Pornography And Marketing Act of 2003 (CAN-SPAM Act), the Telephone Consumer Protection Act (TCPA), all United States state telemarketing laws, and all Laws related to breach notification.

"Privacy Policies" means all written policies applicable to Waitr relating to the Processing of Personal Information, including all website and mobile application privacy policies.

"Private Placement Warrants" has the meaning set forth in Section 5.13.

"Process" or "Processing" means creation, collection, use, storage, maintenance, processing, recording, transfer, transmission, receipt, import, export, protection (including safeguarding and security measures), access, disposal or disclosure or other activity regarding data (whether electronically or in any other form or medium).

"Publicly Available Software" means (a) any Software that contains, or is derived in any manner (in whole or in part) from, any Software that is distributed as free software or open source software (for example, Software distributed under the GNU General Public License, the GNU Lesser General Public License, the Affero General Public License, or the Apache Software License), or pursuant to open source, copyleft or similar licensing and distribution models and (b) any Software that requires as a condition of use, modification and/or distribution of such software that such Software or other Software incorporated into, derived from or distributed with such Software (i) be disclosed or distributed in source code form, (ii) be licensed for the purpose of making derivative works or (iii) be redistributable at no or minimal charge.

"Redemption Amount" means any amounts paid to Landcadia Common Stockholders in connection with Landcadia Stock Redemption.

"Reference Price" means $10.00.

"Registered Intellectual Property" has the meaning set forth in Section 4.18(a).

"Registration Rights Agreement" means the Amended and Restated Registration Rights Agreement, by and among Landcadia and each investor party thereto, substantially in the form set forth on Exhibit A.

"Reviewed Interim Financial Statements" has the meaning set forth in Section 6.3(a).

"SEC" the United States Securities and Exchange Commission.

"SEC Reports" has the meaning set forth in Section 5.9(a).

"Second Amended and Restated Certificate of Incorporation" means that certain Second Amended and Restated Certificate of Incorporation of Landcadia, dated May 25, 2016.

9

"Section 409A" has the meaning set forth in Section 4.15(i).

"Security Breach" means any breach, security breach, or breach of Personal Information under applicable Laws.

"Security Incident" means any attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations of IT Assets.

"Securities Act" means the United States Securities Act of 1933, as amended.

"Self Help Code" means any back door, time bomb, drop dead device, or other Software routine designed to disable a computer program automatically with the passage of time or under the positive control of a Person other than the user of the program.

"Series AA Preferred Stock" means the Series AA Preferred Shares of Waitr with such designations, rights, powers and privileges, and the qualifications, limitations and restrictions thereof as provided in the Waitr Articles of Incorporation.

"Series Seed I Preferred Stock" means the Series Seed I Preferred Shares of Waitr with such designations, rights, powers and privileges, and the qualifications, limitations and restrictions thereof as provided in the Waitr Articles of Incorporation.

"Series Seed II Preferred Stock" means the Series Seed II Preferred Shares of Waitr with such designations, rights, powers and privileges, and the qualifications, limitations and restrictions thereof as provided in the Waitr Articles of Incorporation.

"Signing Form 8-K" has the meaning set forth in Section 6.2.

"Software" means all computer software and databases, including source code and object code, development tools, comments, user interfaces, menus, buttons and icons, and all files, data, scripts, application programming interfaces, manuals, design notes, programmers' notes, architecture, algorithms and other items and documentation related thereto or associated therewith, and any derivative works, foreign language versions, fixes, upgrades, updates, enhancements, new versions, previous versions, new releases and previous releases thereof; and all media and other tangible property necessary for the delivery or transfer thereof.

"Special Meeting" has the meaning set forth in Section 6.5.

"Stock Consideration" has the meaning set forth in Section 3.2(b)(ii).

"Stock Consideration Value" means the difference of (a) the Merger Consideration minus (b) the Cash Consideration.

"Stock Percentage" means the percentage equal to (a) the Stock Consideration Value divided by (b) the Merger Consideration.

"Stock Portion" means the number of shares of Landcadia Common Stock equal to (a)(i) the Per Share Merger Consideration multiplied by (ii) the Stock Percentage divided by (b) the Reference Price.

"Stockholder Lockup Agreement" means a lockup agreement substantially in the form of Exhibit B.

"Subsidiary" with respect to any Person, means any corporation, limited liability company, limited partnership, partnership, trust or other entity with respect to which such Person has the power, directly or indirectly through one or more intermediaries, to vote or direct the voting of sufficient securities or interests to elect a majority of the directors or management committee or similar governing body.

"Subsidiary Equity Interests" has the meaning set forth in Section 4.4.

"Substitute Cash Amount" has the meaning set forth in Section 3.6(d).

"Surviving Corporation" has the meaning set forth in Section 2.1.

"Surviving Provisions" has the meaning set forth in Section 8.2.

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Tax" means any United States or foreign, state or local income, gross receipts, sales, licenses, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, use, transfer, value added, alternative or add-on minimum, estimated or other tax, including any interest, penalty, or addition thereto.

"Terminating Landcadia Breach" has the meaning set forth in Section 8.1(e).

"Terminating Waitr Breach" has the meaning set forth in Section 8.1(b).

"Third Amended and Restated Certificate of Incorporation" means the Third Amended and Restated Certificate of Incorporation of Landcadia, substantially in the form attached hereto as Exhibit C.

"Trade Secrets" has the meaning set forth in the definition of "Intellectual Property."

"Transaction Expenses" means the legal, accounting, financial advisory, and other advisory, transaction or consulting fees and expenses incurred and paid by Landcadia (on its behalf or on behalf of Waitr) in connection with the transactions contemplated by this Agreement, including, without limitation, (a) any fees and expenses related to the termination of any Contract with an Affiliate, (b) all severance, transaction-related bonuses, stay and pay bonuses, retention awards, change in control payments or other similar payments or benefits to the extent triggered by the transactions contemplated hereby and payable by Waitr in connection with the consummation of the transactions contemplated by this Agreement, and (c) the employer's share of payroll, social security, Medicare and unemployment Taxes and other similar assessments arising out of the provision of the items under clause (b) and the payments in respect of the In-the-Money Vested Options, in each case, to the extent not paid at or prior to the Closing (or during Waitr's regular payroll run, as the case may be) by Waitr.

11

"Transaction Proposals" has the meaning set forth in Section 6.5.

"Trust Account" has the meaning set forth in Section 5.6(a).

"Trust Agreement" has the meaning set forth in Section 5.6(a).

"Trustee" has the meaning set forth in Section 5.6(a).

"Unauthorized Code" means any virus, Trojan horse, worm, or other software routines or hardware components designed to permit unauthorized access, to disable, erase, or otherwise harm Software, hardware or data.

"Unvested Option" has the meaning set forth in Section 3.4(d).

"Unvested Option Holder" has the meaning set forth in Section 3.1(a).

"Vested Cash Option" means the portion of an In-the-Money Vested Option (rounded down to the nearest whole share) equal to the product of (a) the number of shares of Waitr Common Stock subject to such In-the-Money Vested Option multiplied by (b) the Cash Percentage.

"Vested Share Option" means the portion of an In-the-Money Vested Option (rounded down to the nearest whole share) equal to the product of (a) the number of shares of Waitr Common Stock subject to such In-the-Money Vested Option multiplied by (b) the Stock Percentage.

"Vested Option" means any portion of a Waitr Option that is vested, unexercised and outstanding prior to the Effective Time.

"Vested Option Cash Amount" means, for each Vested Cash Option, an amount of cash (rounded up to the nearest whole cent) equal to the product of (a) the excess, if any, of the Per Share Merger Consideration over the applicable exercise price per share of Waitr Common Stock subject to a Vested Cash Option multiplied by (b) the number of shares of Waitr Common Stock subject to such Vested Cash Option.

"Vested Option Holder" has the meaning set forth in Section 3.1(a).

"Vested Option Stock Amount" means, for each Vested Share Option, a number of shares of Landcadia Common Stock equal to the product of (a)(i) the Per Share Merger Consideration multiplied by (ii) the number of shares of Waitr Common Stock subject to such Vested Option divided by (b) the Reference Price.

---

12

"Vested Rollover Option" has the meaning set forth in Section 3.4(b).

"Waitr" has the meaning set forth in the Preamble.

"Waitr Articles of Incorporation" means those certain Articles of Amendment and Restatement of Articles of Incorporation of Waitr, dated as of December 23, 2016.

"Waitr Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of ERISA) and each other employment, consulting, bonus, deferred compensation, incentive compensation, equity or equity-based award, tip pooling, retention, relocation, vacation, change in control, transaction bonus, salary continuation, severance or termination pay, hospitalization, medical, dental, vision, life insurance, disability or sick leave benefit, supplemental unemployment benefit, profit-sharing, pension or retirement or other fringe benefit or compensatory plan, program, agreement or arrangement, in each case (a) that is maintained, sponsored or contributed to by Waitr in respect of any current or former directors, officers or employees of Waitr or (b) to which Waitr has any liability.

"Waitr Capital Stock" means, collectively, Waitr Common Stock and Waitr Preferred Stock.

"Waitr Cashing Out Convertible Notes" has the meaning set forth in Section 3.8.

"Waitr Closing Schedule" has the meaning set forth in Section 3.1(a).

"Waitr Common Stock" means the common shares of Waitr, par value $0.00001 per share.

"Waitr Convertible Note Cash Out Amount" has the meaning set forth in Section 3.8.

"Waitr Convertible Note Holder" has the meaning set forth in Section 3.1(a)(viii).

"Waitr Convertible Notes" means the convertible promissory notes issued by Waitr listed on Schedule 1.1.

"Waitr Converting Convertible Notes" has the meaning set forth in Section 3.8.

"Waitr Dissenting Shares" means any shares of Waitr Capital Stock that are issued and outstanding immediately prior to the Effective Time and in respect of which appraisal rights have been properly demanded in accordance with the LBCA in connection with the Merger.

"Waitr Intellectual Property" has the meaning set forth in Section 4.18(a).

"Waitr Letter of Transmittal" has the meaning set forth in Section 3.7(a).

13

"<u>Waitr Material Adverse Effect</u>" means, with respect to any change, event, fact or condition, individually or in the aggregate, together with all other changes, events, facts and conditions that have occurred prior to the date of determination, any material adverse effect upon (a) the business, results of operations, workforce, prospects, properties, assets, liabilities or condition (financial or otherwise) of Waitr, or (b) the ability of Waitr to consummate the transactions contemplated by this Agreement or to perform its obligations hereunder; <u>provided</u>, <u>however</u>, that the following shall not be deemed either alone or in combination to constitute, and no adverse change, event, fact or condition directly resulting from any of the following shall be taken into account in determining whether any change, event, fact or condition has had or would reasonably be expected to have a Waitr Material Adverse Effect: (i) changes in general economic conditions, to the extent that they do not have a materially disproportionate effect on Waitr; (ii) changes generally affecting the specific industry in which Waitr operates, to the extent that they do not have a materially disproportionate effect on Waitr relative to other industry participants; and (iii) any act of terrorism, war, calamity or act of God, to the extent that such act does not have a materially disproportionate effect on Waitr.

"<u>Waitr Option Plan</u>" has the meaning set forth in <u>Section 4.6(b)</u>.

"<u>Waitr Options</u>" has the meaning set forth in <u>Section 4.6(b)</u>.

"<u>Waitr Parties</u>" means, collectively, Waitr and each of its Subsidiaries.

"<u>Waitr Preferred Stock</u>" means the preferred shares of Waitr, par value $0.00001 per share, designated as the Series AA Preferred Shares, the Series Seed I Preferred Shares and the Series Seed II Preferred Shares, and any other equity securities of Waitr with preferential rights to Waitr Common Stock.

"<u>Waitr Stockholder</u>" means a holder of Waitr Capital Stock.

"<u>Waitr Stockholder Approval</u>" means the consent of the holders of at least a majority of each of (a) the Waitr Common Stock, (b) the Series AA Preferred Stock, (c) the Series Seed I Preferred Stock and (d) the Series Seed II Preferred Stock, in each instance entitled to vote at a meeting of the stockholders of Waitr and voting separately as a series approving the Merger, as provided for in the Waitr Articles of Incorporation.

"<u>Waitr Warrants</u>" has the meaning set forth in <u>Section 4.6(a)</u>.

"<u>Waitr Warrant Holder</u>" has the meaning set forth in <u>Section 3.1(a)(vii)</u>.

"<u>Waitr Web Site</u>" means any public or private website (including mobile apps) owned, maintained, or operated at any time by or on behalf of Waitr.

"<u>Waitr's Knowledge</u>," "<u>Knowledge of Waitr</u>" or similar phrases," means the actual knowledge of each of Chris Meaux and Dave Pringle and the knowledge that such individuals would have after reasonable investigation and inquiry by such individuals.

"<u>Warrant Cash Amount</u>" means, for each Waitr Warrant, an amount of cash (ro unded up to the nearest whole cent) equal to the product of (a) the excess, if any, of the Per Share Merger Consideration over the applicable exercise price per share of Waitr Common Stock subject to such Waitr Warrant <u>multiplied by</u> (b) the number of shares of Waitr Common Stock subject to such Waitr Warrant <u>multiplied by</u> (c) the Cash Percentage.

14

"Warrant Stock Amount" means, for each Waitr Warrant, a number of shares of Landcadia Common Stock equal to the product of (a)(i) the excess, if any, of the Per Share Merger Consideration over the applicable exercise price per share of Waitr Warrant multiplied by (ii) the number of shares of Waitr Common Stock subject to such Waitr Warrant multiplied by (iii) the Stock Percentage, divided by (b) the Reference Price.

"Working Capital Line of Credit" means an unsecured line of credit, credit facility or term loan with a maximum principal amount not to exceed $3,000,000.

"Year-End Financial Statements" has the meaning set forth in Section 4.7(a).

Section 1.2    Construction. The Parties have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. Each gender-specific term used herein has a comparable meaning whether used in a masculine, feminine or gender-neutral form. As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The section headings contained in this Agreement are inserted for convenience or reference only and shall not affect in any way the meaning or interpretation of this Agreement. The Disclosure Schedules and Exhibits identified in this Agreement are incorporated herein by reference and made a part hereof. Any capitalized terms used in any Disclosure Schedule or Exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement (or, in the absence of any ascribed meaning, the meaning customarily ascribed to any such term in the applicable industry or in general commercial usage). Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether the action in question is taken directly or indirectly by such Person. All references to dollars (or the symbol "$") contained herein shall be deemed to refer to United States dollars. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

## II. MERGER; CLOSING

Section 2.1    The Merger. On the terms and subject to the conditions set forth in this Agreement, and in accordance with Applicable State Law, at the Effective Time, (a) Waitr shall merge with and into Merger Sub, and (b) the separate corporate existence of Waitr shall cease and Merger Sub shall continue its corporate existence under the DGCL as the surviving corporation in the Merger (the "Surviving Corporation"). The Merger shall be consummated in accordance with this Agreement and Applicable State Law and evidenced by a Certificate of Merger between Merger Sub and Waitr to be filed in Delaware in the form of Exhibit D-1 (the "Delaware Certificate of Merger") and Articles of Merger to be filed in Louisiana in the form of Exhibit D-2 (the "Louisiana Articles of Merger" and, together with the Delaware Certificate of Merger, the "Certificates of Merger").

15

Section 2.2    Effects of the Merger. At the Effective Time, the effect of the Merger shall be as provided in this Agreement, the Certificate of Merger and Applicable State Law. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all the property, rights, privileges, powers and franchises of Merger Sub and Waitr shall vest in the Surviving Corporation, and all debts, liabilities and duties of Merger Sub and Waitr shall become debts, liabilities and duties of the Surviving Corporation.

Section 2.3    Closing. Upon the terms and subject to the conditions set forth in this Agreement, the closing of the Merger (the "Closing") shall take place at the offices of Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166, commencing at 10:00 a.m. NY time on the date that is two (2) Business Days after the date on which all conditions set forth in Article VII shall have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver thereof) or such other time and place as Landcadia and Waitr may mutually agree. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.4    Effective Time. Promptly after the Closing, Merger Sub and Waitr shall cause the Certificates of Merger to be filed with the Secretary of State of the State of Delaware, in accordance with the relevant provisions of the DGCL, and the Secretary of State of the State of Louisiana, in accordance with the relevant provisions of the LBCA, as the case may be (the date and time of acceptance by the Secretary of State of the State of Delaware and the Secretary of State of the State of Louisiana of such filings or such later time as may be agreed to by Landcadia and Waitr (and set forth in the Certificates of Merger) being referred to herein as the "Effective Time").

Section 2.5    Certificate of Incorporation and Bylaws of the Surviving Corporation. At the Effective Time, (a) the certificate of incorporation of Merger Sub as in effect immediately prior to the Effective Time shall be the certificate of incorporation of the Surviving Corporation until thereafter amended in accordance with the terms thereof or as provided by applicable Law, and (b) the bylaws of Merger Sub as in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation until thereafter amended in accordance with the terms thereof, the certificate of incorporation of the Surviving Corporation or as provided by applicable Law; provided, however, that, in each case, the name of the corporation set forth therein shall be changed to "Waitr Inc."

Section 2.6    Directors and Officers of the Surviving Corporation. At the Effective Time, the directors and officers set forth in Schedule 2.6 shall become the directors and officers of the Surviving Corporation and shall remain the directors and officers of the Surviving Corporation after the Merger, in each case until their respective successors are duly elected or appointed and qualified, or their earlier death, resignation or removal.

16

Section    2.7    <u>Directors and Officers of Landcadia</u>. At the Effective Time, the Parties shall cause to be elected to the Landcadia Board and nominated as officers of Landcadia, certain designated individuals provided in the manner set forth in <u>Schedule 2.7</u>, who shall become the directors and officers of Landcadia and shall remain the directors and officers of Landcadia after the Merger, in each case until their respective successors are duly elected or appointed and qualified, or their earlier death, resignation or removal.

### III. MERGER CONSIDERATION; EFFECTS ON THE CAPITAL STOCK

Section 3.1    <u>Closing Date Statements</u>.

( a )    Not less than two (2) Business Days prior to the Closing Date, Waitr shall deliver to Landcadia a statement (the "<u>Waitr Closing Schedule</u>"), signed by the Chief Financial Officer of Waitr, which sets forth the following, as of immediately prior to the Effective Time (or at such other time as specified herein):

(i)    the Per Share Merger Consideration and Exchange Ratio;

(ii)    the Stock Portion;

(iii)    the Cash Portion;

(iv)    (A) the name and address of each Waitr Stockholder, (B) the number and type of shares of Waitr Capital Stock held by each Waitr Stockholder, (C) where applicable, the respective certificate numbers held by each Waitr Stockholder, (D) the Cash Portion to be paid to each Waitr Stockholder at the Closing in respect of each type of shares of Waitr Capital Stock held by such Waitr Stockholder, and (E) the Stock Portion to be paid to each Waitr Stockholder at the Closing in respect of each type of shares of Waitr Capital Stock held by such Waitr Stockholder, with respect to (D) and (E), in each case, pursuant to <u>Section 3.3</u>;

( v )    (A) the name and address of each holder of Vested Options (each, a "<u>Vested Option Holder</u>"), (B) the number of shares of Waitr Common Stock underlying each Vested Option held by each such Vested Option Holder, (C) the grant date, expiration date and exercise price per share of each Vested Option held by each such holder, (D) the Aggregate In-the-Money Vested Option Exercise Price, (E) the Vested Option Cash Amount to be paid to each holder of a Vested Cash Option at the time such Vested Cash Option is cancelled, and (F) the Vested Option Stock Amount to be paid to each holder of a Vested Share Option at the time of exercise of such Vested Share Option, with respect to (E) and (F), in each case, pursuant to <u>Section 3.4(a)</u>;

( v i )    (A) the name and address of each holder of Unvested Options (each, an "<u>Unvested Option Holder</u>"), (B) the grant date, expiration date and exercise price per share and vesting schedule of each Unvested Company Option held by each such Unvested Option Holder and (C) for each Unvested Option Holder, the Rollover Option Amount;

17

(vii)    (A) the name and address of each holder of Waitr Warrants (each, a "Waitr Warrant Holder"); (B) the number of shares of Waitr Common Stock underlying the Waitr Warrants held by each such Waitr Warrant Holder, (C) the grant date, expiration date, exercise price per share, vesting schedule and vested status of each Waitr Warrant held by each Waitr Warrant Holder, (D) the Warrant Cash Amount to be paid to each Waitr Warrant Holder at the Closing, and (E) the Warrant Stock Amount to be paid to each Waitr Warrant Holder at the Closing, with respect to (D) and (E), in each case, pursuant to Section 3.5;

(viii)    (A) the name and address of each holder of Waitr Convertible Notes (each, a "Waitr Convertible Note Holder"), (B) the principal amount outstanding and accrued interest, as of the Closing Date, for each Convertible Note held by such Waitr Convertible Note Holder, (C) the number of shares of Series AA Preferred Stock into which such Waitr Convertible Note, if a Waitr Converting Convertible Note, will be converted immediately prior to the Effective Time, and (D) the Waitr Convertible Note Cash Out Amount for each Waitr Convertible Note that is a Waitr Cashing Out Convertible Note; and

(ix)    a good faith estimate of (A) the Net Working Capital, as of 11:59 p.m. New York time on the day immediately preceding the Closing Date (the "Closing Net Working Capital"), and (B) the Transaction Expenses of Waitr as of immediately prior to the Closing.

(b)    Not less than two (2) Business Days prior to the Closing Date, Landcadia shall deliver to Waitr a statement signed by the Chief Financial Officer of Landcadia, which sets forth the following:

(i)    (A) the name of each holder of record of Landcadia Capital Stock on the books and records of Landcadia, (B) the number of shares of Landcadia Capital Stock owned by each such stockholder, (C) the name of each holder of Landcadia Warrants and the number of shares of Landcadia Class A Common Stock that are issuable upon the full exercise of the Landcadia Warrants , and the exercise price payable with respect thereto; and

(ii)    a good faith estimate of (A) the Redemption Amount, as of 11:59 p.m. New York time on the day immediately preceding the Closing Date, (B) the Transaction Expenses of Landcadia as of immediately prior to the Closing; and (C) the Additional Cash Amount, if any.

Section 3.2    Merger Consideration.

(a)    At the Effective Time, Landcadia shall pay, or cause to be paid, with respect to the Waitr Capital Stock and Vested Options outstanding at the Effective Time, an aggregate amount equal to $300,000,000 (the "Merger Consideration"), in accordance with this Article III.

(b)    The Merger Consideration shall be allocated between cash and Landcadia Common Stock, as follows:

18

(i)      cash (the "Cash Consideration") in an aggregate amount equal to the sum of (A) the Minimum Cash Consideration Amount plus (B) the Additional Cash Amount, if any; and

(ii)      a number of shares of Landcadia Common Stock (the "Stock Consideration") equal to the number derived by dividing (A) the Stock Consideration Value by (B) the Reference Price.

Section 3.3      Conversion of Waitr Capital Stock.

( a )      Conversion of Waitr Preferred Stock. At the Effective Time, each share of Waitr Preferred Stock (including all shares of Waitr Preferred Stock issued upon conversion of any Waitr Converting Convertible Notes but excluding (i) shares of Waitr Preferred Stock to be canceled pursuant to Section 3.3(c) and (ii) any shares of Waitr Preferred Stock that are Waitr Dissenting Shares) shall, by virtue of the Merger and without any action on the part of Landcadia, Merger Sub, Waitr or any Waitr Stockholder, be canceled and convert automatically into the right to receive that portion of the Cash Consideration and Stock Consideration as set forth on the Waitr Closing Schedule, in each case, payable, without interest, to the applicable Waitr Stockholder in accordance with Section 3.6 and Section 3.7.

( b )      Conversion of Waitr Common Stock. At the Effective Time, by virtue of the Merger and without any action on the part of Landcadia, Merger Sub, Waitr or any Waitr Stockholder, each issued and outstanding share of Waitr Common Stock, excluding (i) shares of Waitr Common Stock to be canceled pursuant to Section 3.3(c) and (ii) any shares of Waitr Common Stock that are Waitr Dissenting Shares, shall be canceled and convert automatically into the right to receive that portion of the Cash Consideration and Stock Consideration as set forth on the Waitr Closing Schedule, in each case, payable, without interest, to the applicable Waitr Stockholder in accordance with Section 3.6 and Section 3.7. Each issued and outstanding share of Waitr Common Stock that is subject to a repurchase right in favor of Waitr that lapses or vests over time that has not otherwise been accelerated and waived by Waitr as of the Effective Time shall continue to be subject to the same repurchase right in favor of Landcadia upon the conversion of such Waitr Common Stock into Landcadia Common Stock.

( c )      Cancellation of Treasury Stock and Waitr-Owned Stock. At the Effective Time, without any action on the part of Waitr, each share of Waitr Capital Stock held in the treasury of Waitr shall be cancelled and extinguished automatically and shall cease to exist, without any conversion thereof, and no consideration shall be delivered in exchange for such shares of Waitr Capital Stock.

Section 3.4      Treatment of Waitr Options.

( a )      Vested Cash Options. As of the Effective Time, by virtue of the Merger and without any action on the part of the holders thereof, each Vested Cash Option shall be cancelled and each holder of a Vested Cash Option that is so cancelled shall receive a cash payment equal to the Vested Option Cash Amount.

19

(b)    <u>Vested Share Options</u>. Immediately prior to the Effective Time, by virtue of the Merger and without any action on the part of the holders of the Waitr Options, Landcadia shall assume (i) the Waitr, Inc. 2014 Stock Plan and (ii) each Vested Share Option, and upon such assumption, each Vested Share Option shall be modified (as so modified, a "<u>Vested Rollover Option</u>") so that each such Vested Rollover Option represents the right to acquire, upon exercise of such Vested Rollover Option, in full satisfaction of the rights of the applicable holder thereof, the Vested Option Stock Amount. The exercise price per share of Landcadia Common Stock with respect to the Vested Rollover Options shall be equal to the quotient obtained by <u>dividing</u> (i) the exercise price per share of Waitr Common Stock of such Vested Option <u>by</u> (ii) the Exchange Ratio; <u>provided</u>, <u>however</u>, the exercise price and the number of shares that may be purchased under each such Vested Rollover Option shall be further adjusted to the extent required to remain in compliance with, or exempt from, the requirements of Section 409A of the Code and the Treasury Regulations promulgated thereunder, and in the case of each option that is intended to qualify as an "incentive stock option" within the meaning of Section 422 of the Code, the exercise price and the number of shares subject to the Vested Rollover Option shall be adjusted in a manner consistent with the requirements of Section 424 of the Code and the Treasury Regulations promulgated thereunder. Immediately following the Effective Time, each Vested Rollover Option shall be deemed to have been exercised, automatically and without any action of any party, on a "net exercise" basis and each holder of a Vested Rollover Option shall receive a number of shares of Landcadia Common Stock equal to the difference between (i) the number of shares of Landcadia Common Stock subject to such Vested Rollover Option <u>minus</u> (ii) a number of shares of Landcadia Common Stock equal to (A) the aggregate exercise price of such Vested Rollover Option <u>divided by</u> (B) the Reference Price.

(c)    <u>Cancellation of Certain Vested Options</u>. Each Vested Option that is not an In-the-Money Vested Option shall automatically, as of the Effective Time, by virtue of the Merger and without any action on the part of the holders thereof, be cancelled.

(d)    <u>Unvested Waitr Options</u>. As of the Effective Time, by virtue of the Merger and without any action on the part of the holders thereof, Landcadia shall assume each Waitr Option that is unvested, outstanding and unexercised as of immediately prior to the Effective Time (each, an "<u>Unvested Option</u>") and each Unvested Option shall be converted into an option under the assumed Waitr, Inc. 2014 Stock Plan to acquire a number of whole shares of Landcadia Common Stock (rounded down to the nearest whole share) determined by <u>multiplying</u> (A) the number of shares of Waitr Common Stock subject to such Unvested Option as of immediately prior to the Effective Time <u>by</u> (B) the Exchange Ratio, at an exercise price per share of Landcadia Common Stock (rounded up to the nearest whole cent) equal to the quotient obtained by <u>dividing</u> (A) the exercise price per share of Waitr Common Stock of such Unvested Option <u>by</u> (B) the Exchange Ratio, and with the same vesting schedule to which such Unvested Option was subject as of immediately prior to the Effective Time; <u>provided</u>, <u>however</u>, that the exercise price and the number of shares that may be purchased under each Unvested Option shall be further adjusted to the extent required to remain in compliance with, or exempt from, the requirements of Section 409A of the code and the Treasury Regulations promulgated thereunder, and that each such Unvested Option that is an "incentive stock option" (as defined in Section 422 of the Code) shall be adjusted in accordance with the foregoing in a manner consistent with the requirements of Section 424 of the Code and the Treasury Regulations promulgated thereunder. The Parties intend that the adjustments in this <u>Section 3.4(d)</u> are in accordance with Treasury Regulation Section 1.409A-1(B)(5)(v)(D) and shall not subject any Unvested Option to Section 409A.

20

Section   3.5      Treatment of Waitr Warrants. As of the Effective Time, by virtue of the Merger and without any action on the part of the holders thereof, each Waitr Warrant outstanding and unexercised as of immediately prior to the Effective Time shall automatically be converted into the right to receive, in full satisfaction of the rights of the applicable holder thereof the Warrant Cash Amount and the Warrant Stock Amount, as set forth on the Waitr Closing Schedule.

Section 3.6      Payment of the Merger Consideration.

(a)      At the Effective Time, Landcadia shall deposit, or shall cause to be deposited, with the Exchange Agent, in each case as set forth on the Waitr Closing Statement, in trust for the benefit of the Waitr Stockholders, Waitr Warrant Holders and In-the-Money Vested Option Holders:

(i)      evidence of book-entry shares representing a number of whole shares of Landcadia Common Stock equal to the aggregate Stock Consideration deliverable to Waitr Stockholders, Waitr Warrant Holders and In-the-Money Vested Option Holders pursuant to this Article III, which shares of Landcadia Common Stock shall be subject to a Stockholder Lockup Agreement;

(ii)      the Cash Consideration; and

(iii)      an aggregate amount of cash payable to Waitr Stockholders and Vested Option Holders in lieu of fractional shares pursuant to Section 3.7(c).

(b)      Any such shares of Stock Consideration, Cash Consideration or other cash deposited with the Exchange Agent, together with any interest or other earnings thereon shall hereinafter be referred to as the "Exchange Agent Fund." The Exchange Agent Fund shall be subject to the terms of this Agreement and the Exchange Agent Agreement.

(c)      Subject to Section 3.7, as soon as reasonably practicable after the Effective Time, Landcadia shall cause to be issued or paid from the Exchange Agent Fund to each Waitr Stockholder that holds Waitr Capital Stock (other than shares of Waitr Common Stock to be canceled pursuant to Section 3.3(c) and any Waitr Dissenting Shares), Waitr Warrant Holder and In-the-Money Vested Option Holder, immediately prior to the Effective Time and as set forth in the Waitr Closing Statement, (A) evidence of book-entry shares representing the number of whole shares of the aggregate Stock Portion payable to such Waitr Stockholder, Waitr Warrant Holder and In-the-Money Vested Option Holder, which shares shall be subject to the Stockholder Lockup Agreement, and (B) an amount of cash equal to (1) the aggregate Cash Portion payable to payable to such Waitr Stockholder, Waitr Warrant Holder and In-the-Money Vested Option Holder, plus (2) any cash in lieu of fractional shares that such payable to such Waitr Stockholder, Waitr Warrant Holder and In-the-Money Vested Option Holder has the right to receive pursuant to  Section 3.7(c), by wire transfer of immediately available funds to the account such Waitr Stockholder identified in the Waitr Letter of Transmittal for such Waitr Stockholder. Notwithstanding anything in this Agreement to the contrary, the aggregate Cash Portion payable to the Waitr Stockholders, Waitr Warrant Holders and In-the-Money Vested Option Holders listed on Schedule 3.6(c) shall be subject to the limitations set forth on Schedule 3.6(c) and, to the extent the aggregate Cash Portion payable to such Waitr Stockholders, Waitr Warrant Holders and In-the-Money Vested Option Holders exceeds the limitations set forth on Schedule 3.6(c), such excess (the "Excess Cash Portion Amount") shall be deemed not payable in cash under this Agreement and shall be paid in shares of Landcadia Common Stock to such Waitr Stockholders, Waitr Warrant Holders and In-the-Money Vested Option Holders in a number equal to (i) the Excess Cash Portion Amount attributable to such Waitr Stockholder, Waitr Warrant Holder and In-the-Money Vested Option Holder divided by (ii) the Reference Price.

21

(d)        Notwithstanding anything in this Agreement to the contrary, Landcadia shall not be obligated to issue shares of Landcadia Common Stock to any Waitr Stockholder that Landcadia, in its sole discretion, does not reasonably believe is an "accredited investor" within the meaning of Regulation D promulgated by the SEC under the Securities Act (each, a "Non-Accredited Waitr Stockholder"). In lieu of issuing the shares of Landcadia Common Stock to which such Non-Accredited Waitr Stockholder would otherwise be entitled under this Article III, Landcadia may, in its sole discretion, elect to pay to such Non-Accredited Waitr Stockholder an amount in cash (the "Substitute Cash Amount") equal to the product of (i) the Stock Portion payable to such Non-Accredited Waitr Stockholder, as set forth on the Waitr Closing Statement, multiplied by (ii) the Reference Price.

Section 3.7        Procedures Regarding Waitr Capital Stock.

(a)        Payment Procedures. Prior to the Closing, Waitr shall mail or otherwise deliver, or shall cause the Exchange Agent to mail or otherwise deliver, to each Waitr Stockholder entitled to receive the Stock Consideration pursuant to Section 3.3(b), a letter of transmittal to be agreed upon by the Parties and the Exchange Agent prior to the Closing (the "Waitr Letter of Transmittal") together with any notice required pursuant to Section 262 of the DGCL or Part 13 of the LBCA. Subject to the satisfaction of the conditions in Article VII, in the event that at least three (3) Business Days prior to the Closing Date, a Waitr Stockholder does not deliver to the Exchange Agent a duly executed and completed Waitr Letter of Transmittal, then such failure shall not alter, limit or delay the Closing; provided, that such Waitr Stockholder shall not be entitled to receive its respective Stock Consideration until such Person delivers a duly executed and completed Waitr Letter of Transmittal to the Exchange Agent. Upon delivery of such duly executed Waitr Letter of Transmittal by such Waitr Stockholder to the Exchange Agent, such Waitr Stockholder shall be entitled to receive, subject to the terms and conditions of this Agreement, the Merger Consideration in respect of his, her or its shares of Waitr Common Stock referenced in such Waitr Letter of Transmittal. Until surrendered as contemplated by this Section 3.7, each share of Waitr Common Stock shall be deemed at all times after the Effective Time to represent only the right to receive upon such surrender the Merger Consideration to which such Waitr Stockholder is entitled pursuant to this Article III.

22

( b )    <u>No Further Rights</u>. All Merger Consideration paid upon the surrender of Waitr Capital Stock in accordance with the terms of this <u>Article III</u> shall be deemed to have been exchanged and paid in full satisfaction of all rights pertaining to the securities represented by such Waitr Capital Stock and there shall be no further registration of transfers on the stock transfer books of Waitr Surviving Subsidiary of the shares of Waitr Capital Stock that were issued and outstanding immediately prior to the Effective Time. From and after the Effective Time, holders of Waitr Capital Stock shall cease to have any rights as stockholders of Waitr, except as provided in this Agreement or by applicable Law.

( c )    <u>Fractional Shares</u>. Notwithstanding anything to the contrary contained herein, no evidence of book-entry shares representing fractional shares of Landcadia Common Stock shall be issued in exchange for Waitr Capital Stock or shares subject to Vested Options. In lieu of the issuance of any such fractional share, Landcadia shall pay to each former Waitr Stockholder or and Vested Option Holders that otherwise would be entitled to receive such fractional share an amount in cash (rounded up to the nearest whole cent) equal to the product of (i) the Reference Price <u>multiplied by</u> (ii) the fraction of a share (rounded to the nearest thousandth when expressed in decimal form) of Landcadia Common Stock that such Waitr Stockholder or and Vested Option Holders would otherwise be entitled to receive pursuant to this <u>Article III</u>.

(d)    <u>Dividends</u>. No dividends or other distributions declared with respect to Landcadia Common Stock, the record date for which is at or after the Effective Time, shall be paid to any Waitr Stockholder that has not delivered a properly completed, duly executed Waitr Letter of Transmittal. After the delivery of a duly executed Waitr Letter of Transmittal, Waitr Stockholder shall be entitled to receive any such dividends or other distributions, without any interest thereon, which had become payable with respect to Landcadia Common Stock issuable to such Waitr Stockholder.

(e)    <u>Waitr Dissenting Shares</u>. Notwithstanding any provision of this Agreement to the contrary, any Waitr Dissenting Share shall not be converted into the right to receive its applicable portion of the Merger Consideration but shall instead be converted into the right to receive such consideration as may be determined to be due with respect to any such Waitr Dissenting Share pursuant to the LBCA. Each holder of Waitr Dissenting Shares who, pursuant to the LBCA, becomes entitled to payment thereunder for such shares shall receive payment therefor in accordance with the LBCA (but only after the value therefor shall have been agreed upon or finally determined pursuant to the LBCA). If, after the Effective Time, any Waitr Dissenting Share shall lose its status as a Waitr Dissenting Share, then any such share shall immediately be converted into the right to receive its applicable portion of the Merger Consideration as if such share never had been a Waitr Dissenting Share, and Landcadia shall deliver, or cause to be delivered in accordance with the terms of this Agreement, to the holder thereof, following the satisfaction of the applicable conditions set forth in this <u>Section 3.7</u>, its applicable portion of the Merger Consideration as if such share had never been a Waitr Dissenting Share. Waitr shall give Landcadia prompt notice of any demands for appraisal received by Waitr, withdrawals of such demands, and any other instruments served pursuant to the LBCA and received by Waitr. Waitr shall not, except with the prior written consent of Landcadia, voluntarily make any payment or offer to make any payment with respect to, or settle or offer to settle, any claim or demand with respect to any Waitr Dissenting Share. Waitr shall enforce any contractual waivers that any holders of its equity securities have granted regarding appraisal rights that would apply to the Merger.

23

Section  3.8    <u>Treatment of Waitr Convertible Notes</u>. At least five (5) days prior to the Closing Date, in accordance with the terms of each Waitr Convertible Note, Waitr shall notify each Waitr Convertible Note Holder of such holder's option to (a) to have all outstanding principal and accrued interest under its respective Waitr Convertible Notes automatically converted to shares of Waitr Series AA Preferred Stock immediately prior to the Effective Time pursuant to the terms of the Waitr Convertible Notes (such Waitr Convertible Notes to be so converted, " <u>Waitr Converting Convertible Notes</u>") or (b) receive an amount equal to 1.5 times the amount of principal outstanding and accrued interest under such Waitr Convertible Notes as of the Closing Date (such non-converting Waitr Convertible Notes, the "<u>Waitr Cashing Out Convertible Notes</u>" and such amount for each Waitr Cashing Out Convertible Note, the "<u>Waitr Convertible Note Cash Out Amount</u>"). At the Effective Time, Landcadia shall pay to each holder of a Waitr Cashing Out Convertible Note an amount in cash equal to the Waitr Convertible Note Cash Amount and, upon receipt thereof, the applicable Waitr Cashing Out Convertible Note shall be terminated without any further action by Waitr or the holder of the Waitr Cashing Out Convertible Note.

Section    3.9    <u>Withholding Rights</u>. Waitr, Landcadia and the Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable to any Person pursuant to this Agreement, any amounts that are required to be withheld or deducted with respect to such consideration under the Code, or any applicable provisions of state, local or non-U.S. tax Law. To the extent that amounts are so withheld and timely remitted to the appropriate Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

**IV. REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANY**

Except as set forth in the Disclosure Schedules (each of which qualifies (a) the correspondingly numbered representation, warranty or covenant if specified therein and (b) such other representations, warranties or covenants where its relevance as an exception to (or disclosure for purposes of) such other representation, warranty or covenant is reasonably apparent), Waitr represents and warrants to Landcadia and Merger Sub, as follows:

24

Section 4.1       Organization and Authority. Waitr is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Louisiana and (b) has all requisite corporate power and authority to own, lease or operate its assets and to conduct its business as it is now being conducted. The copies of the Organizational Documents of Waitr previously made available by Waitr to Landcadia and its representatives, are true, accurate and complete and are in effect as of the date of this Agreement. Waitr is duly licensed or qualified and in good standing as a foreign corporation in all jurisdictions in which its ownership of property or the character of its activities is such as to require it to be so licensed or qualified, except where failure to be so licensed or qualified has not had and would not reasonably be expected to have, individually or in the aggregate, a Waitr Material Adverse Effect on the ability of Waitr to enter into and perform its obligations under this Agreement.

Section 4.2       Authorization and Enforceability. Waitr has all requisite corporate or entity power and authority to execute, deliver and perform this Agreement and, upon receipt of Waitr Stockholder Approval, to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized and approved by the board of directors of Waitr, and except for Waitr Stockholder Approval, no other corporate proceeding on the part of Waitr is necessary to authorize this Agreement. This Agreement has been duly and validly executed and delivered by Waitr and assuming due authorization and execution by each other Party hereto, this Agreement constitutes a legal, valid and binding obligation of Waitr, enforceable against Waitr in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

Section 4.3       Noncontravention. The execution, delivery and performance of this Agreement by Waitr and, upon receipt of Waitr Stockholder Approval, the consummation of the transactions contemplated hereby do not and will not (a) conflict with or violate any provision of, or result in the breach of Waitr's Organizational Documents, (b) conflict with or result in any violation of any provision of any Law or Governmental Order applicable to Waitr, or any of its properties or assets, (c) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the termination or acceleration of, or a right of termination, cancellation, modification, acceleration or amendment under, accelerate the performance required by, or result in the acceleration or trigger of any payment, posting of collateral (or right to require the posting of collateral), time of payment, vesting or increase in the amount of any compensation or benefit payable pursuant to, any of the terms, conditions or provisions of any Material Contract, or (d) result in the creation of any Lien upon any of the material properties or assets of Waitr, except in the case of clauses (b), (c) and (d), where any such conflict has not had and would not reasonably be expected to have, individually or in the aggregate, a Waitr Material Adverse Effect.

Section 4.4       Subsidiaries. Schedule 4.4 lists for each Subsidiary of Waitr (a) its authorized (i) common stock, preferred stock or other equity interests, (ii) securities entitled to convert into or be exchanged for any security described in clause (i), and (iii) any option, warrant or other right to purchase or otherwise acquire any security described in clauses (i) and (ii) (collectively, the "Subsidiary Equity Interests"), (b) the number and type of Subsidiary Equity Interests issued and outstanding, and (c) the identity of each owner (of record and beneficially) of such Subsidiary Equity Interests and number held by each holder. All outstanding Subsidiary Equity Interests are owned of record by one or more of the Waitr Parties, free and clear of all Liens. All the outstanding Subsidiary Equity Interests of each Subsidiary of Waitr have been duly authorized and validly issued. No Subsidiary of Waitr has any outstanding subscription, option, warrant, call or exchange right, convertible security, or other obligations in effect giving any Person the right to acquire any Subsidiary Equity Interests.

25

Section    4.5    <u>Governmental Authorities; Consents</u>. No consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority or notice, approval, consent waiver or authorization from any third party (other than Waitr Stockholder Approval) is required on the part of Waitr with respect to Waitr's execution, delivery or performance of this Agreement or the consummation of the transactions contemplated hereby, except for (a) applicable requirements of the HSR Act, (b) any consents, approvals, authorizations, designations, declarations, waivers or filings, the absence of which would not, individually or in the aggregate, reasonably be expected to materially impair or materially delay the ability of Waitr to perform its obligation under this Agreement or to consummate the transactions contemplated hereby, and (c) the filings of the Certificates of Merger in each of Delaware and Louisiana in accordance with the DGCL and the LBCA, respectively.

Section 4.6    <u>Capitalization</u>.

( a )    The authorized capital stock of Waitr consists of (i) 34,280,128 shares of Waitr Common Stock, of which 11,076,475 shares of Waitr Common Stock are issued and outstanding as of the date of this Agreement, (ii) 15,655,918 shares of Waitr Preferred Stock, designated as consisting of 8,171,138 shares of Series AA Preferred, of which 8,171,138 shares of Series AA Preferred are issued and outstanding as of the date of this Agreement, 3,804,763 shares of Series Seed I Preferred, of which 3,804,763 shares of Series Seed I Preferred are issued and outstanding as of the date of this Agreement, and 3,680,017 shares of Series Seed II Preferred, of which 3,680,017 shares of Series Seed II Preferred, and (iii) warrants to purchase an aggregate of 452,947 shares of Waitr Common Stock (the "<u>Waitr Warrants</u>"). All of the issued and outstanding shares of Waitr Capital Stock (x) have been duly authorized and validly issued and are fully paid and nonassessable, (y) were issued in compliance in all material respects with applicable Law, and (z) were not issued in breach or violation of any preemptive rights or Contract. All shares of Waitr Common Stock are fully vested and not otherwise subject to a substantial risk of forfeiture within the meaning of Code Section 83. Set forth on <u>Schedule 4.6(a)</u> is a true, accurate and complete list of each of the holder of Waitr Capital Stock and the number of shares held by each stockholder as of the date hereof. Except as set forth on <u>Schedule 4.6(a)</u>, there are no other shares of common stock, preferred stock or other equity interests of Waitr authorized, reserved, issued or outstanding.

26

(b)        Waitr's 2014 Share Plan (the "Waitr Option Plan") authorized the issuance of up to 6,746,354 shares of Waitr Common Stock pursuant to awards granted under Waitr Option Plan, of which options to purchase 4,980,325 shares of Waitr Common Stock have been granted under Waitr Option Plan and are outstanding as of the date hereof (the "Waitr Options"). Schedule 4.6(b) sets forth, as of the date of this Agreement, all outstanding or authorized (i) Waitr Options (and related Option Agreements), (ii) Waitr Warrants and (iii) any other warrants, convertible securities (including, the Waitr Convertible Notes and any convertible notes or other convertible debt instruments) or other rights, agreements, arrangements or commitments of any character relating to Waitr Capital Stock or obligating Waitr to issue or sell any shares of Waitr Capital Stock of, or any other interest in, Waitr, in each case, including the name of the holder of any such instruments set forth in (i), (ii) and (iii), above, and the date of grant, the number and kind of securities reserved for issuance on exercise or conversion of any such securities or other rights, the exercise or conversion price of any such securities or other rights and any applicable vesting schedule for any such securities or other rights. Except as set forth on Schedule 4.6(b), there are no outstanding options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that would require Waitr to issue, sell or otherwise cause to become outstanding any of its equity securities. There are no outstanding or authorized stock appreciation, phantom stock or similar rights with respect to the shares of capital stock of Waitr or other equity securities of Waitr.

(c)        Except as set forth on Schedule 4.6(c), there are no voting trusts, stockholder agreements, proxies or other agreements, understandings or obligations in effect with respect to the voting, transfer or sale (including any rights of first refusal, rights of first offer or drag-along rights), issuance (including any pre-emptive or anti-dilution rights), redemption or repurchase (including any put or call or buy-sell rights), or registration (including any related lock-up or market standoff agreements) of any shares of capital stock or other securities of Waitr.

Section 4.7        Financial Statements.

(a)        Attached as Schedule 4.7(a)(i) are true, accurate and complete copies of the unaudited consolidated balance sheet and statements of income and cash flow of Waitr as of and for the twelve-months ended December 31, 2016 and 2017 (collectively, the "Year-End Financial Statements") and an unaudited balance sheet and statements of income and cash flow of Waitr as of and for the three (3)-month period ended March 31, 2018 (the "Interim Financial Statements" and together with the Year-End Financial Statements, the "Financial Statements"). The Financial Statements have been prepared in accordance with the modified cash basis method of accounting. The Financial Statements present fairly, in all material respects, the financial position, results of operations and cash flows of Waitr as of the dates and for the periods indicated in such Financial Statements in accordance with past practice (except, for normal year-end adjustments the impact of which is not material) and were derived from, and accurately reflect in all material respects, the books and records of the Waitr Parties. The Waitr Parties' books and records are complete and accurate in all material respects.

(b)        As of the Closing, Waitr will have a positive Closing Net Working Capital.

Section 4.8        Indebtedness. Except as set forth on Schedule 4.8, no Waitr Party has any Indebtedness, other than accounts payable incurred in the ordinary course of business consistent with past practice.

27

Section 4.9    Undisclosed Liabilities. There is no liability, debt or obligation against any Waitr Party that would be required to be set forth or reserved for on a balance sheet of such Waitr Party (and the notes thereto) prepared in accordance with GAAP consistently applied and in accordance with past practice, except for liabilities and obligations (i) reflected or reserved for on the Financial Statements or disclosed in the notes thereto (if any) (other than any such liabilities not reflected, reserved or disclosed as are not and would not be, in the aggregate, material to the Waitr Parties, taken as a whole) or (ii) that have arisen since the date of the most recent balance sheet included in the Interim Financial Statements in the ordinary course of business consistent with past practice.

Section 4.10    Litigation and Proceedings. Except as set forth on Schedule 4.10, there are (a) no pending or, to Waitr's Knowledge, threatened, Actions against any Waitr Party, or otherwise affecting any Waitr Party or its assets, that, individually or in the aggregate, would be material to the Waitr Parties, taken as a whole, and (b) to Waitr's Knowledge, no facts or circumstances exist that would reasonably be expected to give rise to any such Actions. No Waitr Party or any property, asset or business of any Waitr Party is subject to any Governmental Order, or, to Waitr's Knowledge, any continuing investigation by, any Governmental Authority, in each case that, individually or in the aggregate, would be material to any Waitr Party. There is no unsatisfied judgment or any open injunction binding upon any Waitr Party that would, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of Waitr to enter into and perform its obligations under this Agreement.

Section 4.11    Compliance with Laws; Permits.

( a )    Each Waitr Party has complied, and is now complying, in each case in all material respects, with all Laws applicable to it or its business, properties or assets.

( b )    All material Permits required for each Waitr Party to conduct its business have been obtained by it and are valid and in full force and effect. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any material Permit of any Waitr Party.

Section 4.12    Contracts.

( a )    Schedule 4.12(a) contains a true, accurate and complete list of each of the following written or oral Contracts (collectively, the "Material Contracts") to which a Waitr Party is a party or otherwise bound that is currently in effect:

(i)    each Contract that involves aggregate consideration in excess of $50,000 and that, in each case, cannot be cancelled by the Waitr Party party thereto without penalty or without more than thirty (30) days' notice;

( i i )    each Contract or group of related Contracts with the same party for the purchase by any Waitr Party of products or services (A) under which the undelivered balance exceeds $50,000, or (B) which based on monthly payments prior to the Effective Date, involves a payment obligation of any Waitr Party in excess of $50,000 individually or in the aggregate;

28

(iii)    each Contract or group of related Contracts with the same party for the sale of products or services by any Waitr Party (A) under which the undelivered balance exceeds $50,000, or (B) which based on monthly payments prior to the Effective Date, involves a payment obligation to any Waitr Party in excess of $50,000 individually or in the aggregate;

(iv)    each Contract that requires a Waitr Party to purchase its total requirements of any product or service from a third party or that contain "take or pay" provisions;

(v)    each Contract that (A) prohibits any Waitr Party from engaging in any line of business or competing with any Person or in any geographic area or (B) restricts the Persons to whom a Waitr Party may sell products or deliver services, which prohibition or restriction set forth in (A) or (B) respectively, is material to the Waitr Parties, taken as a whole;

(vi)    each Contract that grants any rights of first refusal, rights of first offer or other similar rights to any Person (other than a Waitr Party) with respect to any material asset of a Waitr Party;

(vii)    each Contract pursuant to which a Waitr Party has acquired or disposed of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(viii)    each Contract for the employment of any officer or individual employee, any Contract for the provision of consulting services by any individual person or any Contract for the provision of services by any independent contractor;

(ix)    all Contracts related to Indebtedness;

(x)    all Contracts that provide for the indemnification by a Waitr Party of any Person or the assumption of liability of any Person

(xi)    each lease or agreement under which a Waitr Party is lessee of, or holds or operates, any tangible personal property or Leased Real Property owned by any other person;

(xii)    each lease or agreement under which a Waitr Party is lessor of, or permits any third party to hold or operate, any tangible property, real or personal, owned by any Waitr Party;

29

(xiii)    all Contracts with any Governmental Authority;

(xiv)    any Contracts that provide for any joint venture, partnership or similar arrangement by any Waitr Party;

(xv)    all collective bargaining agreements or Contracts with any union or other labor organization;

(xvi)    all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts;

(xvii)    each Contract pursuant to which a Waitr Party may be required to pay commissions or royalty payments;

(xviii)    all Contracts relating to the development, ownership, use, license of, registration, enforcement of or exercise of any rights under any Intellectual Property, excluding licenses of commercially available off-the-shelf software having a replacement cost of less than $25,000 and non-exclusive licenses granted by any Waitr Party to its customers in the ordinary course of business consistent with past practice;

(xix)    each master services agreement that materially deviates from the form of Waitr Master Services Agreement set forth on Schedule 4.12(a)(xix);

(xx)    each Privacy Contract; and

(xxi)    any other Contract that is material to a Waitr Party and not previously disclosed pursuant to this Section 4.12.

(b)    Each Material Contract is valid and binding on the Waitr Party party thereto in accordance with its terms and is in full force and effect. No Waitr Party or, to Waitr's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Waitr has made available to Purchase true, accurate and complete copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder).

Section 4.13    Real Property.

(a)    No Waitr Party currently owns, or has ever owned, any interest in real property.

30

(b)   Schedule 4.13(b) sets forth a true, accurate and complete list of all leasehold or subleasehold estates and other rights to hold, use, possess or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by each Waitr Party as of the Effective Time (the "Leased Real Property").

(c)   The Leased Real Property constitutes all of the facilities used or occupied by the Waitr Parties in the conduct of its business as currently conducted. With respect to the Leased Real Property: (i) to Waitr's Knowledge, each Waitr Party has all easements and rights necessary to conduct its business, as currently conducted; (ii) no portion thereof is, to Waitr's Knowledge, subject to any pending or threatened condemnation proceeding or proceeding by any Governmental Authority; (iii) no Waitr Party has received written notice, and to Waitr's Knowledge, there are no leases, subleases, licenses, concessions or other agreements, written or oral, granting to any other party or parties the right of use or occupancy of any portion of any parcel of Leased Real Property; (v) no Waitr Party has received any written notice of, and to Waitr's Knowledge there are no, any outstanding options or rights of first refusal held by any other person to purchase any parcel of Leased Real Property, or any portion or interest therein; (vi) no Waitr Party has received written notice of, and to Waitr's Knowledge there are no parties (other than a Waitr Party) in possession of any parcel of Leased Real Property, other than tenants under any leases of the Leased Real Property who are in possession of space to which they are entitled; and (vii) the Leased Real Property has been supplied with utilities and other services reasonably sufficient for the operation of each Waitr Party's business as currently conducted and as proposed to be conducted.

Section 4.14   Title to Assets; Condition and Sufficiency.

(a)   The Waitr Parties have good and valid title to, or a valid leasehold or sub-leasehold interest in, all of the tangible properties and assets reflected in the Financial Statements, free and clear of any and all Liens, other than Permitted Liens. Other than this Agreement, there are no agreements with, options or rights granted in favor of, any person to directly or indirectly acquire any Waitr Party's business, or any interest therein or any tangible properties or assets of a Waitr Party, other than in the ordinary course of business consistent with past practices. No tangible assets or properties used by each Waitr Party in the conduct of its business, as currently conducted, are held in the name or in the possession of any person or entity other than such Waitr Party.

(b)   The buildings, structures, furniture, fixtures, machinery, equipment and other items of tangible personal property of each Waitr Party are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, structures, furniture, fixtures, machinery, equipment and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The buildings, structures, furniture, fixtures, machinery, equipment and other items of tangible personal property currently owned or leased by the Waitr Parties, together with all other properties and assets of the Waitr Parties, are sufficient for the continued conduct of each Waitr Party's business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the business of the Waitr Parties as currently conducted.

31

Section 4.15    Employee Benefits.

(a)    Schedule 4.15(a) sets forth, as of the date of this Agreement, a complete list of all Waitr Benefit Plans. With respect to each Waitr Benefit Plan, Waitr has made available to Landcadia a current, true, accurate and complete copy of each such Waitr Benefit Plan (or if no such copy exists, a written description) and, to the extent applicable, (i) any amendment, (ii) employee handbooks, summary plan description and summary of material modification, (iii) trust agreement or other funding instrument, (iv) most recent three (3) years of Form 5500 and attachments, audited financial statements, actuarial reports and non-discrimination testing results.

(b)    Except as set forth on Schedule 4.15(b), all amounts owed by the Waitr Parties under the terms of any Waitr Benefit Plan have been timely paid in full when and as required to be paid. Except as set forth on Schedule 4.15(b), each Waitr Benefit Plan that provides health or welfare benefits is fully insured, and any incurred but not reported claims under each such Waitr Benefit Plan that is not fully insured have been accrued in accordance with GAAP. Each Waitr Party has paid in full all required insurance premiums, subject only to normal retrospective adjustments in the ordinary course of business, with regard to each Waitr Benefit Plan.

(c)    Each Waitr Benefit Plan has been established, maintained, administered and operated in accordance with its terms and in compliance with the applicable terms of ERISA, the Code, and any other applicable Law, in each case in all material respects. Each required report and description of an Waitr Benefit Plan (including Form 5500 annual reports, summary annual reports and summary plan descriptions, and summaries of material modifications) have been (to the extent required) timely filed with the Internal Revenue Service, the United States Department of Labor, or other Governmental Authority and distributed as required, and all notices required by ERISA or the Code or any other applicable Law with respect to each Waitr Benefit Plan have been given.

(d)    Each Waitr Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received, or is based on a form of plan that has received, a favorable determination or opinion letter from the Internal Revenue Service, and nothing has occurred, whether by action or failure to act, that could be expected to cause such determination letter to be revoked.

(e)    Except as set forth on Schedule 4.15(e), neither the execution and delivery of this Agreement nor the consummation or performance of the transactions contemplated herein shall accelerate the time of vesting for, change the time of payment to, result in severance pay or cause an increase in severance pay upon any termination of employment after the date hereof, or increase the amount of compensation due to, any director, employee or officer, of any Waitr Party, or result in the loss of deduction pursuant to Section 280G of the Code. No individual has a right to receive from any Waitr Party any gross-up payment in respect of taxes that may be imposed under Section 409A or Section 4999 of the Code.

32

( f )        No Waitr Party or any ERISA Affiliate contributes to, or has any obligation to contribute to, or has ability liability (contingent or otherwise) with respect to, any plan that is subject to Title IV of ERISA.

(g)        There are no Waitr Benefit Plans that include, nor are there any current or former employees, officers, directors or consultants of any Waitr Party eligible for, any retiree medical or other post-employment health or welfare benefits, other than those receiving or eligible to receive COBRA continuation coverage under Section 4980B of the Code.

( h )        With respect to any Waitr Benefit Plan, including any assets of any such Waitr Benefit Plan or any fiduciary to any such Waitr Benefit Plan, (i) no Actions (other than routine claims for benefits in the ordinary course) are pending or, to Waitr's Knowledge, threatened, and (ii) no administrative investigation, audit or other administrative proceeding by the United States Department of Labor, the Internal Revenue Service or other Governmental Authority is pending, or, to Waitr's Knowledge, threatened. There has been no non-exempt "prohibited transaction" (and there will be none as a result of any of the transactions contemplated hereby) within the meaning of Section 4975(c) of the Code or Section 406 of ERISA involving the assets of any Waitr Benefit Plan.

( i )        Each Waitr Benefit Plan that is subject to Section 409A of the Code has been operated in material compliance with the applicable provisions of Section 409A of the Code, the regulations thereunder and other official guidance issued thereunder (collectively, "Section 409A"), and is in documentary compliance with the applicable provisions of Section 409A.

(j)        Each Waitr Benefit Plan, to the extent subject to the provisions of the Patient Protection and Affordable Care Act (" PPACA"), is and has been administered in all material respects in accordance with the requirements of PPACA, the Code, ERISA and other applicable Laws. No event has occurred with respect to any Waitr Benefit Plan that is subject to PPACA that would subject a Waitr Party or any ERISA Affiliate, to any material Tax, fine, Lien, penalty or other liability imposed by PPACA, ERISA, the Code or other applicable Laws.

( k )        With respect to each Waitr Benefit Plan that is subject to coverage, nondiscrimination and/or top-heavy testing, each such Waitr Benefit Plan has passed each such applicable test for each plan year for which the statute of limitations under the Code has not expired and/or has taken the appropriate actions to correct any failure of any such test within the applicable time limits.

Section 4.16        Labor and Employment.

(a)        No Waitr Party is a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union or other labor organization representing any of its employees, and there is no union organizing effort pending or threatened against any Waitr Party with respect to any employees. There has not been, nor to Waitr's Knowledge, has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor activity or dispute affecting any Waitr Party.

(b)     Except as set forth on Schedule 4.16(b), each Waitr Party is and has been in compliance, in all material respects, with all applicable Laws pertaining to employment and employment practices to the extent they relate to employees, independent contractors and consultants of such Waitr Party, including hiring, termination, discrimination, workplace safety, workers' compensation, payment of taxes, immigration, terms and conditions of employment, wages and hours, classification (exempt/nonexempt and independent contractor/employee) and the Workers Adjustment and Retraining Notification Act. Except as set forth on Schedule 4.16(b), there are no Actions against any Waitr Party pending, or to Waitr's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former employee, consultant or independent contractor of any Waitr Party, including, without limitation, any charge, investigation or claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay or any other employment-related matter arising under applicable Laws, in each case that would otherwise subject any Waitr Party to any material liability.

( c )     Notwithstanding anything to the contrary in this Agreement, each Waitr Party is in compliance with the FLSA, in all material respects, including, but not limited to, its requirements concerning tip-credits and tip-pooling. To the extent a Waitr Party is operating in any jurisdiction that contains laws, statutes, or ordinances concerning such Waitr Party's wage and hour practices, including, without limitation, any requirements concerning tipped employees, tip-credits and tip-pooling, that are more restrictive than the FLSA, this representation expressly includes such Waitr Party's compliance with such laws, statutes, or ordinances.


Section 4.17     Taxes.

(a)     All material Tax Returns required by Law to be filed by each Waitr Party have been timely filed, and all such Tax Returns are true, accurate and complete in all material respects.

(b)     All material amounts of Taxes due and owing by each Waitr Party have been paid.

( c )     Each Waitr Party has (i) withheld all material amounts required to have been withheld by it in connection with amounts paid or owed to any employee, independent contractor, creditor, shareholder or any other third party, (ii) remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Authority; and (iii) complied in all material respects with applicable Law with respect to Tax withholding.

34

( d )        No Waitr Party is engaged in any material audit or other administrative proceeding with a taxing authority or any judicial proceeding with respect to Taxes. No Waitr Party has received any written notice from a taxing authority of a dispute or claim with respect to a material amount of Taxes, other than disputes or claims that have since been resolved, and to Waitr's Knowledge, no such claims have been threatened. With respect to each Waitr Party, no written claim has been made, and to Waitr's Knowledge, no oral claim has been made, since such Waitr Party's incorporation by any Governmental Authority in a jurisdiction where such Waitr Party does not file Tax Returns that it is or may be subject to Taxes by that jurisdiction. There are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, material Taxes of such Waitr Party and no written request for any such waiver or extension is currently pending.

(e)        No Waitr Party has constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying for tax-free treatment under Section 355 of the Code in the two (2) years immediately preceding the date of this Agreement.

(f)        No Waitr Party has been a party to any "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b).

(g)        No Waitr Party shall be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period (or portion thereof) ending on or prior to the Closing Date and made prior to the Closing; (ii) any written agreement with a Governmental Authority executed on or prior to the Closing; (iii) installment sale or open transaction disposition made on or prior to the Closing; (iv) prepaid amount received on or prior to the Closing; (v) any election under Section 108(i) of the Code (or any corresponding or similar provision of state, local or foreign income Tax Law); or (vi) intercompany transaction or excess loss accounts described in the Treasury Regulations promulgated under Section 1502 of the Code (or any corresponding or similar provision of state, local or foreign income Tax Law) that existed prior to the Closing.

(h)        There are no Liens with respect to Taxes on any of the assets of any Waitr Party, other than Liens for Taxes not yet due and payable.

( i )        No Waitr Party has ever (i) been a member of an Affiliated Group or (ii) had any liability for the Taxes of any Person (other than such Waitr Party) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law) or as a transferee or successor, by contract or otherwise.

( j )        No Waitr Party is a party to or bound by, and does not have any obligation to any Governmental Authority or other Person under any Tax allocation, Tax sharing, Tax indemnification or similar agreements.

35

( k )    No Waitr Party has granted any power of attorney that is currently in force with respect to any material Taxes or material Tax Returns.

(1)    No Waitr Party is or has ever been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code.

Section 4.18    Intellectual Property.

(a)    The Waitr Parties own all right, title and interest in, or has a valid and enforceable written license or right to use, all the Intellectual Property used in connection with, or otherwise necessary for, conducting the business of the Waitr Parties as currently conducted and as proposed to be conducted (the "Waitr Intellectual Property"). Waitr is the sole and exclusive owner of all Owned Intellectual Property, free and clear of all Liens. To Waitr's Knowledge, all Owned Intellectual Property is valid and enforceable.

( b )    Schedule 4.18(b) contains a true, accurate and complete list of all of the Owned Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued by, filed with or recorded by any Governmental Authority, quasi-governmental authority or registrar (the "Registered Intellectual Property"), including (i) the jurisdictions in which each such item of Registered Intellectual Property has been issued or registered or in which any such application for issuance or registration has been filed; (ii) the registration or application date, as applicable, for each such item of Registered Intellectual Property; and (iii) the record owner of each such item of Registered Intellectual Property. All Registered Intellectual Property has been maintained effective by the filing of all necessary filings, maintenance and renewals and timely payment of requisite fees. Schedule 4.18(b) also sets forth all material unregistered Owned Intellectual Property. Except as set forth on Schedule 4.18(b), no loss or expiration of any Owned Intellectual Property is threatened, pending or reasonably foreseeable, except for patents expiring at the end of their statutory terms (and not as a result of any act or omission by any Waitr Party, including failure by a Waitr Party to pay any required maintenance fees).

( c )    The Waitr Parties have taken all commercially reasonable action to maintain and protect all of Waitr Intellectual Property. The Waitr Parties have taken commercially reasonable measures to protect the confidentiality of all Trade Secrets and any other confidential information of the Waitr Parties (and any confidential information owned by any Person to whom a Waitr Party has a confidentiality obligation). No Trade Secrets or any other confidential information of the Waitr Parties or of any Person to whom a Waitr Party owes a duty of confidentiality has been disclosed by any Waitr Party to any Person other than pursuant to a written agreement restricting the disclosure and use of such Trade Secrets or any other confidential information by such Person. No current or former founder, officer, director, shareholder, employee, contractor, or consultant of a Waitr Party has any right, title or interest, directly or indirectly, in whole or in part, in any Waitr Intellectual Property. Each Waitr Party has obtained from all Persons (including all current and former founders, officers, directors, shareholders, employees, contractors, consultants and agents) who have created any Intellectual Property for a Waitr Party valid and enforceable written assignments of any such Intellectual Property to such Waitr Party and Waitr has made available true, accurate and complete forms of such assignments to Landcadia. To Waitr's Knowledge, no Person is in violation of any such written confidentiality or assignment agreements.

36

(d)     Schedule 4.18(d) sets forth a true, accurate and complete list of all Software that is Owned Intellectual Property. All such Software (i) conforms in all material respects with all specifications, representations, warranties and other descriptions established by the Waitr Parties or conveyed thereby to its customers or other transferees, (ii) is operative for its intended purpose free of any material defects or deficiencies and does not contain any Self-Help Code, Unauthorized Code or similar programs, (iii) has been upgraded as necessary so that the Software is fully functional in every material respect on currently available platforms, and (iv) has been maintained by the Waitr Parties on their own behalf or on behalf of their customers and other transferees to their reasonable satisfaction and in accordance with industry standards. The Waitr Parties have taken all commercially reasonable actions to make such Software and other third-party Software used in connection therewith scalable and sufficient in all material respects for the current and anticipated future needs of the business of Waitr and Waitr's technology and product roadmap as currently planned and reasonably foreseeable.

(e)     All copies of source and object codes relating to all of the Software that is Owned Intellectual Property, and all derivative works or improvements thereof are complete and correct, except for minor deviations that would not have a material adverse effect on the function or use of any of such Software or cause such Software to malfunction. No Person other than a Waitr Party possesses a copy, in any form (print, electronic or otherwise), of any source code for such Software, and all such source code is in the sole possession of Waitr and has been maintained strictly confidential. No Waitr Party has any obligation to afford any Person access to any such source code. Waitr is in possession of all other material relating to the Software, including installation and user documentation, engineering specifications, flow charts and know-how reasonably necessary for the use, maintenance, enhancement, development and other exploitation of such Software as used in, or currently under development for, Waitr's business.

(f)     Except as set forth on Schedule 4.18(f), no product or service of any Waitr Party (including any product or service of any Waitr Party currently under development) contains or otherwise uses any code that is, in whole or in part, subject to the provisions of any license to Publicly Available Software. All Publicly Available Software used by the Waitr Parties has been used in its entirety and without modification.

(g)     None of the Waitr Parties nor any of their consultants has used Publicly Available Software in whole or in part in the former or current development of any part of the Owned Intellectual Property, nor licensed or distributed to any third party any combination of Publicly Available Software and Owned Intellectual Property in a manner that may (i) require, or condition the use or distribution of any Owned Intellectual Property on, the disclosure, licensing or distribution of any source code for any portion of such Owned Intellectual Property or (ii) otherwise impose any limitation, restriction or condition on the right or ability of the Waitr Parties to use, distribute or enforce any Owned Intellectual Property in any manner.

37

(h)     The IT Assets are operational, fulfill the purposes for which they were acquired or developed, have security, back-ups and disaster recovery arrangements in place and hardware and Software support, maintenance and trained personnel that are sufficient in all material respects for the current and anticipated future needs of the business of the Waitr Parties. Waitr has disaster recovery and security plans, procedures and facilities and has taken reasonable steps to safeguard the availability, security and integrity of the IT Assets and all data and information stored thereon, including from unauthorized access and infection by Unauthorized Code. Waitr has maintained in the ordinary course of business all required licenses and service contracts, including the purchase of a sufficient number of license seats for all Software, with respect to the IT Assets. The IT Assets have not suffered any security breach or material failure within the past five (5) years.

(i)     Each Waitr Party, the former and current conduct of the business of each Waitr Party and all products and services of the Waitr Parties and the use thereof have not infringed or otherwise violated, and do not infringe or otherwise violate, any Intellectual Property rights of any Person. Except as set forth on Schedule 4.18(i), no Waitr Party is the subject of any pending legal proceeding that (i) alleges a claim of infringement, misappropriation, dilution or violation of any Intellectual Property rights of any Person, and no such claim has been asserted or threatened against any Waitr Party at any time since the date incorporation of such Waitr Party or (ii) challenges the ownership, use, patentability, registration, validity or enforceability of any Owned Intellectual Property. Except as set forth on Schedule 4.18(i), no Person has notified a Waitr Party that any of such Person's Intellectual Property rights are infringed, misappropriated or otherwise violated by a Waitr Party or that a Waitr Party requires a license to any of such Person's Intellectual Property rights in order for such Waitr Party to continue activities that are material to such Waitr Party's business as currently conducted or as proposed to be conducted. Except as set forth on Schedule 4.18(i), to Waitr's Knowledge, there is no actual unauthorized use, interference, disclosure, infringement, misappropriation or violation by any Person of any of the Owned Intellectual Property, and no written or oral claims alleging such infringement, violation or misappropriation have been made since Waitr's incorporation against any Person by Waitr.

(j)     No Waitr Party has agreed to indemnify any Person for or against any interference, infringement, misappropriation or other conflict with respect to any of Waitr Intellectual Property or any Intellectual Property that was formerly Waitr Intellectual Property.

(k)     The consummation of the transactions contemplated by this Agreement will not, pursuant to any Contract to which a Waitr Party is a party, result in the loss or impairment of any Waitr Party's right to own or use any Waitr Intellectual Property. Immediately subsequent to the Closing, the Waitr Intellectual Property shall be owned or available for use by the Waitr Parties on terms and conditions identical to those under which the Waitr Parties own or use the Waitr Intellectual Property immediately prior to the Closing, without payment of additional fees.

38

(l)      Except as set forth on <u>Schedule 4.18(l)</u>, no Waitr Party has experienced any Security Breaches or material Security Incidents, and no Waitr Party has received any written or oral notices or complaints from any Person regarding such a Security Breach or material Security Incident. No Waitr Party has received any written or oral complaints, claims, demands, inquiries or other notices, including without limitation a notice of investigation, from any Person (including any governmental authority or self-regulatory authority or entity) regarding such Waitr Party's Processing of Personal Information or compliance with applicable Privacy and Security Requirements. Each Waitr Party maintains systems and procedures reasonably intended to receive and respond to complaints regarding such Waitr Party's Processing of Personal Information.

(m)      Each Waitr Party is and always has been in material compliance with all applicable Privacy and Security Requirements. Waitr has made available to Landcadia true, accurate and complete copies of all Privacy Policies and Privacy Contracts. Each Waitr Party has a valid and legal right (whether contractually, by law or otherwise) to access or use all Personal Information and any other information of any Person that is Processed by or on behalf of such Waitr Party in connection with the use and/or operation of its products, services and business. Each Privacy Policy (i) is incorporated into the User Agreement, (ii) states that Personal Information and other data may be transferred in a merger, acquisition, reorganization, or sale of assets, and (iii) states how Personal Data and other data are Processed by any Waitr Web Site or any Software. Waitr requires each user of Waitr Web Site and Software to agree and consent to the applicable Privacy Policy.

( n )      Each Waitr Party has implemented reasonable physical, technical and administrative safeguards designed to protect Personal Information in its possession or control from unauthorized access by any Person, including such Waitr Party's employees and contractors, and to ensure compliance in all material respects with all applicable Privacy and Security Requirements. Each Waitr Party contractually requires all third parties who have access to or receive Personal Information from such Waitr Party to materially comply with all applicable Privacy and Security Requirements, and to use commercially reasonable efforts consistent with industry standards to store and secure all Personal Information to protect against unauthorized Processing of the Personal Information.

( o )      The execution, delivery, or performance of this Agreement and the consummation of the contemplated transactions shall not violate any applicable Privacy and Security Requirements or result in or give rise to any right of termination or other right to impair or limit any Waitr Party's rights to own or Process any Personal Information used in or necessary for the conduct of the Business.

(p)      The Waitr Parties have implemented business continuity and disaster recovery plans and have arranged for back-up data processing services adequate to meet their data processing needs in the event that the information systems material to the Waitr Parties (or any of their material components) are rendered temporarily or permanently inoperative as a result of a natural or other disaster.

Section 4.19      <u>Insurance</u>.

( a )      <u>Schedule 4.19(a)</u> sets forth a true, accurate and complete list of all insurance policies maintained by each Waitr Party, specifying the type of coverage, the amount of coverage, the insurer, the policy number and the expiration date of each such policy (collectively, the "<u>Insurance Policies</u>"). The insurance coverage that each Waitr Party carries is adequate and appropriate for its business as presently conducted and proposed to be conducted.

39

(b)    With respect to each Insurance Policy: (i) the policy is legal, valid, binding, enforceable, and in full force and effect; (ii) the policy will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms immediately following the execution of this Agreement and the consummation of the transactions contemplated hereby; (iii) no Waitr Party or any other party to the policy is in breach or default (including with respect to the payment of premiums or the giving of notices), and no event has occurred that, with notice or the lapse of time, or both, would constitute such a breach or default, or permit termination, modification, or acceleration, under the policy; and (iv) no party to the policy has repudiated any provision thereof.

Section 4.20    Absence of Changes.

( a )    Since the date of the most recent balance sheet included in the Interim Financial Statements, each Waitr Party has operated its business in the ordinary course, consistent with its past practices, and there has not been any been any change, development, condition, occurrence, event or effect relating to such Waitr Party that, individually or in the aggregate, resulted in, or would reasonably be expected to result in, a Waitr Material Adverse Effect.

(b)    From the date of the most recent balance sheet included in the Interim Financial Statements through the date of this Agreement, no Waitr Party has taken any action that (i) would be prohibited from being freely taken by Section 6.1 if such action had been taken after the date hereof and (ii) is material to the Waitr Parties, taken as a whole.

Section 4.21    Interested Party Transactions. Except as set forth on Schedule 4.21, no current officer or director of any Waitr Party or, to Waitr's Knowledge, any current stockholder or employee, or any "affiliate" or "associate" (as those terms are defined in Rule 405 promulgated under the Securities Act) of any such person, has had, either directly or indirectly, a material interest in: (a) any person or entity that purchases from, or sells, licenses or furnishes to, any Waitr Party any goods, property, technology, intellectual or other property rights or services; or (b) any Contract to which a Waitr Party is a party or by which it may be bound.

Section 4.22    Change of Control Payments. Except as set forth on Schedule 4.22, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby shall result in any payment (including, without limitation, severance, unemployment compensation, golden parachute, bonus or otherwise) becoming due from a Waitr Party to any stockholder, director, officer or employee of any Waitr Party, or any such payment materially increasing or accelerating (except as contemplated by this Agreement or the effect of which is contingent upon the consummation of the Merger).

40

Section 4.23    <u>Information Supplied</u>. None of the information relating to the Waitr Parties supplied by any Waitr Party, or by any other Person acting on behalf of a Waitr Party, in writing for inclusion in the Landcadia Business Combination Proxy Statement shall, as of the date the Landcadia Business Combination Proxy Statement (or any amendment or supplement thereto) is first mailed to the Landcadia Common Stockholders, at the time of the Special Meeting, or at the Effective Time, contain any statement that, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or omit to state any material fact necessary in order to make the statements therein not false or misleading in any material respect.

Section 4.24    <u>No Brokers' Fees</u>. Except as set forth on <u>Schedule 4.24</u> (which fees shall be the sole responsibility of Waitr), no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by this Agreement based upon arrangements made by Waitr or any of its Affiliates.

Section 4.25    <u>No Additional Representations and Warranties</u>. Except as provided in this <u>Article IV</u>, none of Waitr or any of its directors, officers, employees, stockholders, partners, members or representatives has made, or is making, any representation or warranty to Landcadia, Merger Sub or their Affiliates.

<b>V. REPRESENTATIONS AND WARRANTIES OF LANDCADIA AND MERGER SUB</b>

Except as set forth on the Disclosure Schedules (each of which qualifies (a) the correspondingly numbered representation, warranty or covenant if specified therein and (b) such other representations, warranties or covenants where its relevance as an exception to (or disclosure for purposes of) such other representation, warranty or covenant is reasonably apparent) or in the SEC Reports, Landcadia represents and warrants to Waitr as of the date of this Agreement as follows:

Section 5.1    <u>Organization and Authority</u>. Each of Landcadia and Merger Sub (a) is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and (b) has all requisite corporate power and authority to own, lease or operate its assets and to conduct its business as it is now being conducted. Each of Landcadia and Merger Sub is duly licensed or qualified and in good standing as a foreign corporation in all jurisdictions in which its ownership of property or the character of its activities is such as to require it to be so licensed or qualified, except where failure to be so licensed or qualified has not and would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of Landcadia or Merger Sub to enter into this Agreement or consummate the transactions contemplated hereby.

Section 5.2    <u>Authorization and Enforceability</u>.

( a )    Each of Landcadia and Merger Sub has all requisite corporate or entity power and authority to execute, deliver and perform this Agreement and, upon receipt of Landcadia Business Combination Approval, to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized and approved by the board of directors of Landcadia and Merger Sub, and except for Landcadia Business Combination Approval, no other corporate proceeding on the part of Landcadia or Merger Sub is necessary to authorize this Agreement (assuming, if such consummation and performance, as applicable, would occur after May 24, 2018, that Landcadia Extension Approval has been obtained). This Agreement has been duly and validly executed and delivered by each of Landcadia and Merger Sub and assuming due authorization and execution by each other Party hereto, this Agreement constitutes a legal, valid and binding obligation of each of Landcadia and Merger Sub, enforceable against Landcadia and Merger Sub in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

41

(b)       The affirmative vote of holders of a majority of the outstanding shares of Landcadia Class A Common Stock and Landcadia Class F Common Stock, voting as a single class, entitled to vote at the Special Meeting, assuming a quorum is present, to approve the Transaction Proposals are the only votes of any of Landcadia's capital stock necessary in connection with the entry into this Agreement by Landcadia, and the consummation of the transactions contemplated hereby, including the Closing (the "Landcadia Business Combination Approval").

( c )       At a meeting duly called and held, the Landcadia Board unanimously: (i) determined that this Agreement and the transactions contemplated hereby are fair to and in the best interests of Landcadia Common Stockholder; (ii) determined that the fair market value of Waitr is equal to at least 80% of the amount held in the Trust Account (excluding any deferred underwriting commissions and taxes payable on interest earned on the Trust Account) as of the date hereof; (iii) approved the transactions contemplated by this Agreement as a Business Combination; and (iv) resolved to recommend to Landcadia Common Stockholders the approval of the transactions contemplated by this Agreement.

Section     5.3     Noncontravention. Subject to Landcadia Extension Approval, the execution, delivery and performance of this Agreement by Landcadia and Merger Sub and, upon receipt of Landcadia Business Combination Approval, the consummation of the transactions contemplated hereby do not and will not (a) conflict with or violate any provision of, or result in the breach of Landcadia Organizational Documents or any organizational documents of any Subsidiaries of Landcadia (including Merger Sub), (b) conflict with or result in any violation of any provision of any Law or Governmental Order applicable to Landcadia or Merger Sub, or any of their respective properties or assets, (c) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the termination or acceleration of, or a right of termination, cancellation, modification, acceleration or amendment under, accelerate the performance required by, or result in the acceleration or trigger of any payment, posting of collateral (or right to require the posting of collateral), time of payment, vesting or increase in the amount of any compensation or benefit payable pursuant to, any of the terms, conditions or provisions of any Contract to which Landcadia or any Subsidiaries of Landcadia (including Merger Sub) is a party or by which any of them or any of their respective assets or properties may be bound or affected, or (d) result in the creation of any Lien upon any of the properties or assets of Landcadia (including Merger Sub), except (in the case of clauses (b), (c) or (d) above) for such violations, conflicts, breaches or defaults which would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of Landcadia or Merger Sub to enter into and perform its respective obligations under this Agreement.

42

Section   5.4   <u>Litigation and Proceedings</u>. There are no pending or, to the knowledge of Landcadia, threatened, Actions against Landcadia or Merger Sub, or otherwise affecting Landcadia or Merger Sub or their assets, which, if determined adversely, could, individually or in the aggregate, reasonably be expected to have a Landcadia Material Adverse Effect.

Section   5.5   <u>Governmental Authorities; Consents</u>. Subject to receipt of Landcadia Business Combination Approval, no consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority is required on the part of Landcadia or Merger Sub with respect to Landcadia or Merger Sub's execution or delivery of this Agreement or the consummation of the transactions contemplated hereby, except for applicable requirements of the HSR Act and Federal Securities Laws.

Section 5.6   <u>Financial Ability; Trust Account</u>.

( a )   There is at least $250,000,000 (less, as of the Closing, the Redemption Amount payable to the holders of Landcadia Class A Common Stock who have validly exercised their right to receive payment pursuant to Landcadia Stock Redemption) invested in a trust account (the "<u>Trust Account</u>"), maintained by Continental Stock Transfer & Trust Company, acting as trustee (the "<u>Trustee</u>"), pursuant to that certain Investment Management Trust Agreements, dated May 25, 2016, by and between Landcadia and the Trustee (the "<u>Trust Agreement</u>"). Prior to the Closing, none of the funds held in the Trust Account may be released except in accordance with the Trust Agreement and Landcadia Organizational Documents. Amounts in the Trust Account are invested in United States Government securities or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act of 1940, as amended. Landcadia has performed all material obligations required to be performed by it to date under, and is not in material default or delinquent in performance or any other respect (claimed or actual) in connection with, the Trust Agreement, and no event has occurred that, with due notice or lapse of time or both, would constitute such a default thereunder. There are no claims or proceedings pending with respect to the Trust Account. Since May 25, 2016, Landcadia has not released any money from the Trust Account. As of the Effective Time, the obligations of Landcadia to dissolve or liquidate pursuant to Landcadia Organizational Documents shall terminate, and as of the Effective Time, Landcadia shall have no obligation whatsoever pursuant to Landcadia Organizational Documents to dissolve and liquidate the assets of Landcadia by reason of the consummation of the transactions contemplated hereby.

43

(b)    As of the date hereof, and assuming the rights of Landcadia Common Stockholders to cause Landcadia to redeem their shares of Landcadia Class A Common Stock for cash pursuant to Landcadia Organizational Documents are not exercised, available cash in the Trust Account is sufficient for Merger Sub and the Surviving Company to complete the transactions contemplated by this Agreement and to pay all fees, prepayment premiums, costs (including breakage costs and termination amounts) and expenses required to be paid by Landcadia or Merger Sub in connection with the transactions contemplated by this Agreement. As of the date hereof, assuming the accuracy of the representations and warranties of Waitr contained herein and the compliance by Waitr with its obligations hereunder, none of Landcadia or Merger Sub has any reason to believe that any of the conditions to the use of funds in the Trust Account will not be satisfied or funds available in the Trust Account will not be available to Landcadia and Merger Sub on the Closing Date.

Section 5.7    No Brokers' Fees. Except as set forth on Schedule 5.7 (which fees shall be the sole responsibility of Landcadia), no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by this Agreement based upon arrangements made by Landcadia or any of its Affiliates.

Section 5.8    Solvency. Assuming that the representations and warranties of Waitr contained in this Agreement are true, accurate and complete in all material respects, and after giving effect to the Merger, at and immediately after the Effective Time, each of Landcadia and the Surviving Company (a) will be solvent, (b) will have adequate capital and liquidity with which to engage in its business and (c) will not have incurred and does not plan to incur debts beyond its ability to pay as they mature or become due.

Section 5.9    SEC Reports; Financial Statements.

(a)    Landcadia has filed all required registration statements, reports, schedules, forms, statements and other documents required to be filed by it with the SEC since May 25, 2016 (collectively, as they have been amended since the time of their filing and including all exhibits thereto, the "SEC Reports"). None of the SEC Reports, as of their respective dates (or if amended or superseded by a filing prior to the date of this Agreement or the Closing Date, then on the date of such filing), contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. The audited financial statements and unaudited interim financial statements (including, in each case, the notes and schedules thereto) included in the SEC Reports complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto, were prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto and except with respect to unaudited statements as permitted by Form 10-Q of the SEC) and fairly present (subject, in the case of the unaudited interim financial statements included therein, to normal year-end adjustments and the absence of complete footnotes) in all material respects the financial position of Landcadia as of the respective dates thereof and the results of their operations and cash flows for the respective periods then ended.

( b )      Landcadia has established and maintains disclosure controls and procedures (as defined in Rule 13a-15 under the Exchange Act) that are designed to ensure that material information relating to Landcadia is made known to Landcadia's principal executive officer and its principal financial officer, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared. To Landcadia's knowledge, such disclosure controls and procedures are effective in timely alerting Landcadia's principal executive officer and principal financial officer to material information required to be included in Landcadia's periodic reports required under the Exchange Act.

( c )      Landcadia has established and maintained a system of internal controls and, to Landcadia's knowledge, such internal controls are sufficient to provide reasonable assurance regarding the reliability of Landcadia's financial reporting and the preparation of Landcadia's financial statements for external purposes in accordance with GAAP.

Section 5.10      Business Activities.

( a )      Since its respective organization, neither Landcadia nor Merger Sub has conducted any business activities other than activities directed toward completing a Business Combination. Except as set forth in the Landcadia Organizational Documents, there is no agreement, commitment, or Governmental Order binding upon Landcadia or Merger Sub or to which Landcadia or Merger Sub is a party that has or would reasonably be expected to have the effect of prohibiting or impairing any business practice of Landcadia, any acquisition of property by Landcadia or the conduct of business by Landcadia as currently conducted or as contemplated to be conducted as of the Closing, other than such effects, individually or in the aggregate, which have not had and would not reasonably be expected to have a material adverse effect on the ability of Landcadia or Merger Sub to enter into and perform their obligations under this Agreement.

( b )      Except for Merger Sub, Landcadia does not own directly or indirectly any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity.

Section 5.11      Proxy Statement. None of the information to be included in the Landcadia Business Combination Proxy Statement (other than any information provided by or on behalf of the Waitr Parties) shall, as of the date the Landcadia Business Combination Proxy Statement (or any amendment or supplement thereto) is first mailed to Landcadia Common Stockholders, at the time of the Special Meeting, or at the Effective Time, contain any statement that, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or omit to state any material fact necessary in order to make the statements therein not false or misleading in any material respect.

Section 5.12      No Landcadia Material Adverse Effect. Since the date of the latest Form 10-Q of Landcadia filed with the SEC, there has not been any change, development, condition, occurrence, event or effect relating to Landcadia that, individually or in the aggregate, resulted in, or would reasonably be expected to result in, a Landcadia Material Adverse Effect.

---

Section 5.13    Capitalization. The authorized capital stock of Landcadia consists of (i) 20,000,000 shares of Landcadia Class F Common Stock, par value $0.0001 per share, of which 6,250,000 shares are issued and outstanding as of the date of this Agreement, (ii) 200,000,000 shares of Landcadia Class A Common Stock, par value $0.0001 per share, of which 25,000,000 are issued and outstanding as of the date of this Agreement, (iii) 1,000,000 shares of preferred stock, par value $0.0001 per share, of which none are issued and outstanding as of the date of this Agreement, (iv) warrants to purchase 12,500,000 shares of Landcadia Class A Common Stock at a price of $11.50 per share, and (v) warrants to purchase 14,000,000 shares of Landcadia Class A Common Stock at the price of $11.50 per share (the "Private Placement Warrants"). Except as set forth in this Section 5.13 or as set forth on Schedule 5.13, there are no other shares of common stock, preferred stock or other equity interests of Landcadia authorized, reserved, issued (or planned to be issued) or outstanding.

Section    5.14    Reporting Company. Landcadia is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Exchange Act, and the Landcadia Class A Common Stock is registered pursuant to Section 12(g) of the Exchange Act.

Section 5.15    Listing. The Landcadia Class A Common Stock is listed on Nasdaq. Landcadia has not received any oral or written notice that the Landcadia Class A Common Stock is ineligible or will become ineligible for listing on Nasdaq nor that the Landcadia Class A Common Stock does not meet all requirements for the continuation of such listing. Landcadia satisfies all the requirements for the continued listing of the Landcadia Class A Common Stock on Nasdaq. Landcadia is in material compliance with all applicable Nasdaq listing and corporate governance rules.

Section 5.16    Sarbanes-Oxley Act. Landcadia is in compliance with applicable requirements of the Sarbanes-Oxley Act of 2002 and applicable rules and regulations promulgated by the SEC thereunder in effect as of the date of this Agreement, except where such noncompliance could not be reasonably expected to have, individually or in the aggregate, a Landcadia Material Adverse Effect.

Section 5.17    Investment Company. Landcadia is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 5.18    Application of Takeover Protections. Landcadia and the Landcadia Board have taken all necessary action to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Second Amended and Restated Certificate of Incorporation (or similar charter documents) or the Laws of the State of Delaware that are or could become applicable to Waitr as a result of Waitr, Landcadia and Merger Sub fulfilling their respective obligations or exercising their respective rights under this Agreement, including without limitation as a result of Landcadia's issuance of the Stock Consideration.

Section 5.19    No Market Manipulation. Neither Landcadia nor its Affiliates have taken, and will not take, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of the Landcadia Class A Common Stock to facilitate the sale or resale of the Landcadia Class A Common Stock or affect the price at which the Landcadia Class A Common Stock may be issued or resold; provided, however, that this provision shall not prevent Landcadia from engaging in investor relations or public relations activities consistent with past practices.

46

Section 5.20    No Disagreements with Accountants and Lawyers. To Landcadia's knowledge, there are no disagreements of any kind presently existing, or reasonably anticipated by Landcadia to arise, between Landcadia and the accountants and lawyers formerly or presently employed by Landcadia, including, disputes or conflicts over payment owed to such accountants and lawyers.

Section 5.21    DTC Status. Landcadia's transfer agent is a participant in, and the Landcadia Class A Common Stock is eligible for transfer pursuant to, the Depository Trust Company Automated Securities Transfer Program. The name, address, telephone number, contact person and email address of Landcadia's transfer agent is set forth on Schedule 5.21.

Section 5.22    Section 368. Neither Landcadia nor Merger Sub has taken any action and neither has knowledge of any fact, agreement, plan or other circumstance that is reasonably likely to prevent the Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code. Without limiting the foregoing: (a) Merger Sub has no plan or intention to issue additional shares of stock, warrants, options, convertible securities, or any other type of right pursuant to which any Person could acquire stock in Merger Sub, that, if exercised or converted, would result in Landcadia losing control of Merger Sub within the meaning of Section 368(c) of the Code; (b) Landcadia has no plan or intention to liquidate Merger Sub, to merge Merger Sub with another corporation unless Merger Sub is the surviving corporation in such merger, or to sell or otherwise dispose of any of the stock of Merger Sub, or to cause Merger Sub to sell or otherwise dispose of any of the assets of Waitr acquired in the Merger, except for dispositions made in the ordinary course of business or transfers described in Section 368(a)(2)(c) of the Code; (c) no shares of Landcadia Common Stock have been or will be transferred to Merger Sub in connection with the Merger; (d) no stock of Merger Sub will be issued in the Merger; (e) neither Landcadia nor any person related to Landcadia (with the meaning of Treasury Regulation Section 1.368-1(e)(3)) has any plan or intention to reacquire, either directly or indirectly through an Affiliate, any of the Landcadia Common Stock issued in the Merger, and Landcadia has no plan or intention to make any distribution (other than regular dividends) with respect to such stock;  (f) following the Merger, Landcadia and Merger Sub intend to continue Waitr's historic business; and (g) neither Landcadia nor Merger Sub are investment companies as defined in Section 368(a)(2)(F) of the Code.

Section 5.23    No Additional Representations and Warranties . Except as provided in this Article V, none of Landcadia or Merger Sub or any of their respective directors, officers, employees, stockholders, partners, members or representatives has made, or is making, any representation or warranty whatsoever to Waitr or its Affiliates.

47

## VI.   COVENANTS

Section   6.1   <u>Conduct of the Business</u>. Waitr agrees that, during the period commencing on the date of this Agreement and ending as of the earlier of (x) termination of this Agreement in accordance with <u>Article VIII</u>, and (y) the Closing, except as otherwise contemplated by this Agreement or as consented to in writing by Landcadia (which consent shall not be unreasonably withheld, conditioned or delayed), each Waitr Party shall (i) conduct its business in the ordinary course of business consistent with past practice, (ii) use commercially reasonable efforts to maintain the business, properties, physical facilities and operations of each Waitr Party, preserve intact the current business organization of the Waitr Parties, keep available the services of the current officers, key employees and agents of each Waitr Party and maintain the relations and goodwill with suppliers, customers, lessors, and licensors, (iii) take the actions set forth on <u>Schedule 6.1</u> and (iii) not, directly or indirectly, effect any of the following:

(a)   make any change in or amendment to its Organizational Documents;

( b )   (i) make, declare or pay any dividend or distribution to Waitr Stockholders in their capacities as stockholders (which expressly shall not include any repurchases of Waitr Capital Stock from employees or other service providers pursuant to the express terms of repurchase rights contained in written agreements with such service providers), (ii) effect any recapitalization, reclassification, split or other change in its capitalization or (iii) authorize for issuance, issue, sell, transfer, pledge, encumber, dispose of or deliver any additional shares of its capital stock or securities convertible into or exchangeable for shares of its capital stock, or issue, sell, transfer, pledge, encumber or grant any right, option or other commitment for the issuance of shares of its capital stock (other than the issuance of shares of Waitr Common Stock upon the exercise of any Waitr Option outstanding on the date of this Agreement or assign or transfer any of its repurchase rights with respect to shares of Waitr Common Stock held by any employee or former employee, in each case as disclosed on <u>Schedule 4.6(b)</u>), or split, combine or reclassify any shares of its capital stock;

(c)   enter into, assume, assign, partially or completely amend any material term of, modify any material term of or voluntarily terminate (excluding any expiration in accordance with its terms) any Material Contract, any lease related to the Leased Real Property or any collective bargaining or similar agreement to which any Waitr Party is a party or by which it is bound, other than entry into such agreements in the ordinary course consistent with past practice;

( d )   incur any Indebtedness (other than (i) a Working Capital Line of Credit and (ii) accounts payable and accrued liabilities in the ordinary course of business consistent with past practice);

( e )   sell, lease, license, permit to lapse, abandon or otherwise dispose of any of its properties or assets that are material to its business, except for sales or dispositions of items or materials in an amount not in excess of $100,000 in the aggregate;

48

( f )    (i) grant or agree to grant to any employee or other independent contractor of any Waitr Party, who has annual compensation in excess of $100,000, any increase in wages or bonus, severance, profit sharing, retirement, insurance or other compensation or benefits except for annual cost of living increases in the ordinary course of business consistent with past practice, or (ii) adopt or establish any new compensation or employee benefit plans or arrangements, or amend, terminate, or agree to amend or terminate any existing Waitr Benefit Plans, or (iii) except with respect to the acceleration of the Waitr Options held by the persons set forth on Schedule 4.22, accelerate the time of payment, vesting or funding of any compensation or benefits under any Waitr Benefit Plan (including any plan or arrangement that would be a Waitr Benefit Plan if it was in effect on the date hereof), or (iv) make or agree to make any bonus or incentive payments to any individual outside of the currently effective bonus plan as has been made available to Landcadia, or (v) enter into any new collective bargaining agreement or employment, consulting or other compensation agreement (A) for which the annual compensation to be paid is greater than $100,000 or (B) that is not terminable upon notice and without liability to any Waitr Party, except (1) as may be required under applicable Law, (2) as required pursuant to Waitr Benefit Plans in accordance with their existing terms as in effect on the date hereof, (3) for payment of any accrued or earned but unpaid compensation, or (4) pursuant to employment, retention, change-of-control or similar type Contracts existing as of the date hereof, provided to Landcadia prior to the date hereof and set forth on Schedule 4.15(a) or (vi) modify in any respect the terms of any existing employment, consulting or other compensation agreement or (vi) make any change to the key management structure of the Waitr Parties, including the hiring and firing of additional officers or termination of existing officers (other than for "cause");

( g )    (a) make, change or rescind any Tax election, (b) settle or compromise any claim, notice, audit report or assessment in respect of Taxes, (c) change any Tax period, (d) adopt or change any method of Tax accounting, (e) file any amended Tax Return or claim for a Tax refund, (f) surrender any right to claim a refund of Taxes, (g) enter into any Tax allocation agreement, Tax sharing agreement, Tax indemnity agreement, pre-filing agreement, advance pricing agreement, cost sharing agreement, or closing agreement related to any Tax, or (h) request any Tax ruling from a competent authority;

(h)    cancel or forgive any Indebtedness owed to any Waitr Party;

( i )    except as may be required by applicable Law or GAAP, make any material change in the financial or tax accounting methods, principles or practices of any Waitr Party (or change an annual accounting period);

( j )    unless required by applicable Law, (i) enter into any collective bargaining agreement, works council agreement or any other labor-related Contract with any labor union, labor organization or works council, or (ii) recognize or certify any labor union, labor organization, works council, or group of employees as the bargaining representative for any employees of the Waitr Parties;

( k )    implement any employee layoffs that would, independently or in connection with any layoffs occurring prior to the date hereof, implicate the Worker Adjustment and Retraining Notification Act of 1988, as amended;

(l)    grant or otherwise create or consent to the creation of any Lien (other than a Permitted Lien) on any of its material assets or Leased Real Property;

( m )    make any material change to any of the cash management practices of the Waitr Parties, including materially deviating from or materially altering any of its practices, policies or procedures in paying accounts payable or collecting accounts receivable;

49

(n)     make any material change to the marketing strategy of the Waitr Parties (it being understood that implementation of television advertising pursuant to agreements with strategic partners in effect as of the date of this Agreement shall not be considered to be a material change to the marketing strategy of the Waitr Parties);

(o)     make any change to any tip-pooling arrangement or to any practices of any Waitr Party with respect to tips and gratuities as in effect as of the date hereof, unless required by applicable Law;

(p)     waive, release, compromise, settle or satisfy any pending or threatened material claim (which shall include, but not be limited to, any pending or threatened Action) or compromise or settle any liability, other than in the ordinary course of business or that otherwise do not exceed $100,000 individually or $200,000 in the aggregate;

(q)     make or incur any capital expenditures, except for capital expenditures (A) in the ordinary course of business or (B) other than capital expenditures in an amount not to exceed $100,000 individually or $200,000 in the aggregate;

(r)     (i) fail to maintain its existence or acquire by merger or consolidation with, or merge or consolidate with, or purchase substantially all of the assets of, any corporation, partnership, association, joint venture or other business organization or division thereof, (ii) make any acquisition of any assets, business, stock or other properties in excess of $100,000 individually or $200,000 in the aggregate, (iii) sell, transfer, license, assign or otherwise dispose of or encumber any of the material assets or Intellectual Property pertaining to the business of any Waitr Party with a value in excess of $200,000, or acquire any assets in excess of $200,000 or (iv) adopt or enter into a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of any Waitr Party (other than the Merger);

(s)     enter into any agreement that restricts the ability of any Waitr Party to engage or compete in any line of business, or enter into any agreement that restricts the ability of any Waitr Party to enter a new line of business;

(t)     make any loans or advances to any Person, except for advances to employees or officers of any Waitr Party in the ordinary course of business consistent with past practice;

(u)     fail to maintain, cancel or materially change coverage under any Insurance Policy in form and amount equivalent in all material respects to the insurance coverage currently maintained with respect to each Waitr Party and its assets and properties; and

(v)     authorize any of, or commit or agree to take any of, the foregoing actions in respect of which it is restricted by the provisions of this Section 6.1.

Section   6.2   <u>Signing Form 8-K</u>. As promptly as practicable, Landcadia shall prepare and file a Current Report on Form 8-K pursuant to the Exchange Act to report the execution of this Agreement (the "<u>Signing Form 8-K</u>"), and Waitr and Landcadia shall jointly issue a mutually agreeable press release announcing the execution of this Agreement.

Section 6.3   <u>Financial Statements and Related Information</u>.

( a )   Waitr shall provide to Landcadia as promptly as practicable after the date of this Agreement (i) audited consolidated financial statements of the Waitr Parties, including audited consolidated balance sheets, statements of operations and comprehensive income (loss) and statements of changes in stockholders' equity (deficit) and statements of cash flows as of and for the years ended December 31, 2017, and 2016 and 2015, together with all related notes and schedules thereto, prepared in accordance with GAAP applied on a consistent basis throughout the covered periods and Regulation S-X, accompanied by a signed report of Waitr's independent auditor with respect thereto, which report shall refer to the standards of the PCAOB (the "<u>PCAOB Audited Financial Statements</u>") and shall be unqualified, (ii) unaudited consolidated financial statements of the Waitr Parties, including consolidated balance sheets, statements of operations and comprehensive income (loss) and statements of changes in stockholders' equity (deficit) and statements of cash flows as of and for the three (3) month period ended March 31, 2018 and the comparable period in the prior year, together with all related notes and schedules thereto, prepared in accordance with GAAP applied on a consistent basis throughout the covered periods and Regulation S-X and a review by Waitr's independent auditor in accordance with PCAOB Auditing Standard 4105 (the "<u>Reviewed Interim Financial Statements</u>") and (iii) all selected financial data of the Waitr Parties required by Item 301 of Regulation S-K, in each case to be included in a proxy statement for the purpose of soliciting proxies from the Landcadia Common Stockholders to vote at the Special Meeting in favor of the Transaction Proposals (the "<u>Landcadia Business Combination Proxy Statement</u>").

( b )   Waitr shall provide to Landcadia the unaudited consolidated financial statements of the Waitr Parties, including consolidated balance sheets, statements of operations and comprehensive income (loss) and statements of changes in stockholders' equity (deficit) and statements of cash flows, together with all related notes and schedules thereto, prepared in accordance with GAAP applied on a consistent basis throughout the covered periods and Regulation S-X and a review by Waitr's independent auditor in accordance with PCAOB Auditing Standard 4105, for each fiscal quarter of the Waitr Parties after March 31, 2018 (and the comparable period in the prior year) and at least forty (40) days prior to the Closing Date, in each case within forty (40) days following the end of each such fiscal quarter.

Section 6.4    <u>Proxy Solicitation; Proxy Statement; Other Actions</u>.

( a )    As promptly as practicable (provided that Waitr has provided to Landcadia all of the information described in <u>Section 6.3</u> and this <u>Section 6.4(a)</u>), Landcadia and Waitr shall prepare and Landcadia shall file with the SEC the Landcadia Business Combination Proxy Statement, which shall comply as to form, in all material respects, with the relevant provisions of the Exchange Act. Landcadia and Waitr shall each use commercially reasonable efforts to have any comments to the Landcadia Business Combination Proxy Statement received from the SEC "cleared" as promptly as reasonably practicable after receipt of any such comments, and Landcadia shall thereafter, in compliance with the relevant requirements of the Exchange Act, mail or deliver to the Landcadia Common Stockholders the definitive Landcadia Business Combination Proxy Statement. Landcadia shall notify Waitr promptly after the filing of the Landcadia Business Combination Proxy Statement with the SEC, when any supplement or amendment thereto has been filed, any request by the SEC for amendment of or comments thereon and responses thereto, or requests by the SEC for additional information. Each of Waitr and Landcadia acknowledges that a substantial portion of the Landcadia Business Combination Proxy Statement and certain other forms, reports and other filings required to be made by Landcadia under the Exchange Act in connection with the Merger (collectively, "<u>Additional Landcadia Filings</u>") will include disclosure regarding the Waitr Parties and their respective businesses, and their management, operations and financial condition. Accordingly, Waitr shall, and shall cause the Waitr Parties to, as promptly as reasonably practicable, provide Landcadia with all information concerning the Waitr Parties, their respective businesses, management, operations and financial condition, in each case, that is reasonably required to be included in any Landcadia SEC Filing. Waitr shall make, and shall cause the Waitr Parties to make, their Affiliates, directors, officers, managers, employees, accountants and auditors reasonably available to Landcadia and its counsel in connection with the drafting of the Landcadia Business Combination Proxy Statement and Additional Landcadia Filings and responding in a reasonably timely manner to any comments thereto from the SEC. Without limiting the generality of the foregoing, Waitr shall cooperate with Landcadia in connection with the preparation for inclusion in the Proxy Statement of pro forma financial statements that comply with the requirements of Regulation S-X under the rules and regulations of the SEC (as interpreted by the staff of the SEC). Landcadia, acting through the Landcadia Board, shall include in the Landcadia Business Combination Proxy Statement the recommendation of the Landcadia Board that the Landcadia Common Stockholders vote in favor of the Transaction Proposals, as provided in <u>Section 6.5</u>; <u>provided</u>, <u>however</u>, that the Landcadia Board may withdraw or modify such recommendation if the Landcadia Board determines in good faith, after consultation with outside counsel, that failure to do so could be inconsistent with its fiduciary obligations under applicable Law.

( b )    Each of Waitr and Landcadia shall ensure that none of the information supplied by or on its behalf for inclusion or incorporation by reference in the Landcadia Business Combination Proxy Statement will, as of the date the Landcadia Business Combination Proxy Statement (or any amendment or supplement thereto) is first mailed to the Landcadia Common Stockholders, at the time of the Special Meeting, or at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading.  If at any time prior to the Closing any information relating to Waitr, Landcadia, Merger Sub or any of their respective Subsidiaries, Affiliates, directors or officers is discovered by Waitr or Landcadia that is required to be set forth in an amendment or supplement to the Landcadia Business Combination Proxy Statement so that such document would not include any misstatement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the Party that discovers such information shall promptly notify the other Party and an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and, to the extent required by Law, disseminated to Landcadia Common Stockholders.

Section    6.5    Landcadia's Special Meeting. Landcadia shall, as promptly as practicable after the Landcadia Business Combination Proxy Statement is "cleared" by the SEC's staff (a) give notice of and (b) convene and hold a special meeting of its stockholders (the "Special Meeting") in accordance with the Landcadia Organizational Documents, for the purposes of obtaining Landcadia Business Combination Approval and, if applicable, any approvals related thereto and providing its stockholders with the opportunity to elect to effect a Landcadia Stock Redemption. Landcadia shall, through the Landcadia Board, recommend to its stockholders the (A) adoption and approval of this Agreement in accordance with applicable Law and exchange rules and regulations, (B) approval of the issuance of shares of Landcadia Common Stock in connection with the Merger, if required under exchange rules and regulations, (C) adoption and approval of the Third Amended and Restated Certificate of Incorporation, (D) adoption and approval of any other proposals as the SEC (or staff member thereof) may indicate are necessary in its comments to the Landcadia Business Combination Proxy Statement or correspondence related thereto, (E) approval of the adoption of the Landcadia 2018 LTIP, (F) adoption and approval of any other proposals as reasonably agreed by Landcadia and Waitr to be necessary or appropriate in connection with the transactions contemplated hereby, and (G) adjournment of the Special Meeting, if necessary, to permit further solicitation of proxies because there are not sufficient votes to approve and adopt any of the foregoing (such proposals in (A) through (G), collectively, the "Transaction Proposals"). Landcadia shall promptly notify Waitr in writing of any determination to make any withdrawal of such recommendation or amendment, qualification or modification of such recommendation in a manner adverse to Waitr (a "Change in Recommendation"). Landcadia agrees that its obligation to establish the Landcadia Record Date for, duly call, give notice of, convene and hold the Special Meeting shall not be affected by any Change in Recommendation, and Landcadia agrees to establish the Landcadia Record Date for, duly call, give notice of, convene and hold the Special Meeting, regardless of whether or not there shall be any Change in Recommendation. Notwithstanding anything to the contrary contained in this Agreement, Landcadia shall be entitled to postpone or adjourn the Special Meeting (a) to ensure that any supplement or amendment to the Landcadia Business Combination Proxy Statement that the board of directors of Landcadia has determined in good faith is required by applicable Law is disclosed to Landcadia Common Stockholders and for such supplement or amendment to be promptly disseminated to Landcadia Common Stockholders prior to the Special Meeting, (b) if, as of the time for which the Special Meeting is originally scheduled (as set forth in the Landcadia Business Combination Proxy Statement), there are insufficient shares of Landcadia Class A Common Stock and Landcadia Class F Common Stock to constitute a quorum necessary to conduct the business to be conducted at the Special Meeting, or (c) by ten (10) Business Days in order to solicit additional proxies from stockholders in favor of the adoption of the Transaction Proposals; provided, that in the event of a postponement or adjournment pursuant to clauses (a) or (b) above, the Special Meeting shall be reconvened as promptly as practicable following such time as the matters described in such clauses have been resolved.

53

Section  6.6       Closing Form 8-K; Closing Press Release. At least five (5) days prior to Closing, Landcadia shall begin preparing, in consultation with Waitr, a draft Current Report on Form 8-K in connection with and announcing the Closing, together with, or incorporating by reference, such information that is required to be disclosed with respect to the Merger pursuant to Form 8-K (the "Closing Form 8-K"). Prior to the Closing, Waitr and Landcadia shall prepare a mutually agreeable press release announcing the consummation of the Merger ("Closing Press Release"). Concurrently with the Closing, Landcadia shall distribute the Closing Press Release, and as soon as practicable thereafter, file the Closing Form 8-K with the SEC.

Section     6.7       Access to Information. Subject to confidentiality obligations and similar restrictions that may be applicable to information furnished to Waitr by third parties that may be in Waitr's possession from time to time, and except for any information that in the opinion of legal counsel of Waitr would result in the loss of attorney-client privilege or other privilege from disclosure, Waitr shall afford to Landcadia and its representatives reasonable access during the period commencing on the date hereof and ending as of the Closing, during normal business hours and with reasonable advance notice, in such manner as to not interfere with the normal operation of Waitr, to all of Waitr's properties, books, Contracts, commitments, Tax Returns, records and appropriate officers and employees of Waitr, and shall furnish such representatives with all financial and operating data and other information concerning the affairs of Waitr as such representatives may reasonably request. The Parties shall use commercially reasonable efforts to make alternative arrangements for such disclosure where the restrictions in the preceding sentence apply. All information obtained by Landcadia and Merger Sub and their respective representatives under this Agreement shall be subject to the Nondisclosure Agreement prior to the Effective Time.

Section 6.8       Commercially Reasonable Efforts; Consents.

(a)       Each of the Parties shall cooperate, and use their respective commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate the transactions contemplated by this Agreement reasonably promptly after the date hereof, including obtaining all licenses, consents, approvals, authorizations, qualifications and Governmental Orders necessary to consummate the transactions contemplated by this Agreement; provided, that in no event shall any Party be required to pay any material fee, penalty or other consideration to obtain any license, permit, consent, approval, authorization, qualification or waiver required under any Contract for the consummation of the transactions contemplated hereby. Each of Waitr and Landcadia shall pay fifty percent (50%) of the applicable filing fees due under the HSR Act.

54

(b)    Without limiting the generality of the foregoing, each Party shall promptly after execution of this Agreement (but in no event later than fifteen (15) Business Days after the date hereof) make all filings or submissions as are required under the HSR Act. Each Party shall promptly furnish to the other such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act and will take all other commercially reasonable actions necessary to cause the expiration or termination of the applicable waiting periods as soon as practicable. Each Party shall promptly provide the other with copies of all written communications (and memoranda setting forth the substance of all oral communications) between each of them, any of their Affiliates or any of its or their representatives, on the one hand, and any Governmental Authority, on the other hand, with respect to this Agreement or the transactions contemplated hereby. Without limiting the generality of the foregoing, and subject to applicable Law, each Party shall: (i) promptly notify other Parties of any written communication made to or received by them, as the case may be, from any Governmental Authority regarding any of the transactions contemplated hereby; (ii) permit each other to review in advance any proposed written communication to any such Governmental Authority and incorporate reasonable comments thereto; (iii) not agree to participate in any substantive meeting or discussion with any such Governmental Authority in respect of any filing, investigation or inquiry concerning this Agreement or the transactions contemplated hereby unless, to the extent reasonably practicable, it consults with the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to attend and (iv) furnish each other with copies of all correspondence, filings (except for filings made under the HSR Act) and written communications between such Party and their Affiliates and their respective representatives, on one hand, and any such Governmental Authority, on the other hand, in each case, with respect to this Agreement and the transactions contemplated hereby.

( c )    No Party shall take any action that could reasonably be expected to adversely affect or materially delay the approval of any Governmental Authority of any of the aforementioned filings. The Parties further covenant and agree, with respect to a threatened or pending preliminary or permanent injunction or other order, decree or ruling or statute, rule, regulation or executive order that would adversely affect the ability of the Parties to consummate the transactions contemplated hereby, to use commercially reasonable efforts to prevent or lift the entry, enactment or promulgation thereof, as the case may be.

Section 6.9    Publicity. None of the Parties shall and, each Party shall cause its Affiliates not to, make or issue any public announcement or press release to the general public with respect to this Agreement or the transactions contemplated by this Agreement without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that no such consent or prior notice shall be required in connection with any public announcement or press release the content of which is consistent with that of any prior or contemporaneous public announcement or press release by any Party in compliance with this Section 6.9. Nothing in this Section 6.9 shall limit any Party from making any announcements, statements or acknowledgments that such Party is required by applicable Law or the requirements of any national securities exchange to make, issue or release (including in connection with the exercise of the fiduciary duties of the board of directors of Landcadia); provided, that, to the extent practicable, the Party making such announcement, statement or acknowledgment shall provide such announcement, statement or acknowledgment to the other Parties prior to release and consider in good faith any comments from such other Parties.

55

Section 6.10    Non-Solicitation.

( a )    From the date of this Agreement until the earlier of (x) the Effective Time or (y) the date on which this Agreement is terminated, other than in connection with the transactions contemplated hereby, Landcadia agrees that it shall not, and shall not authorize or (to the extent within its control) permit any of its directors, officers, employees, agents or representatives (including investment bankers, attorneys and accountants), to, directly or indirectly, (i) initiate, solicit, or facilitate, or make any offers or proposals related to, a Business Combination, (ii) enter into, engage in or continue any discussions or negotiations with respect to a Business Combination with, or provide any non-public information, data or access to employees to, any Person that has made, or that is considering making, a proposal with respect to a Business Combination, or (iii) enter into any agreement relating to a Business Combination. Landcadia shall promptly notify Waitr of any submissions, proposals or offers made with respect to a Business Combination as soon as practicable following Landcadia's awareness thereof.

( b )    From the date of this Agreement until the earlier of (x) the Effective Time or (y) the date on which this Agreement is terminated, other than in connection with the transactions contemplated hereby, Waitr agrees that it shall not, and shall not authorize or (to the extent within its control) permit any of its directors, officers, employees, agents or representatives (including investment bankers, attorneys and accountants) or other Waitr Parties to, directly or indirectly, (i) initiate, solicit, or facilitate, or make any offers or proposals related to, an Acquisition Proposal, (ii) engage in any discussions or negotiations with respect to an Acquisition Proposal with, or provide any non-public information or data to, any Person that has made, or informs Waitr that it is considering making, an Acquisition Proposal, or (iii) enter into any agreement relating to an Acquisition Proposal. Waitr shall give notice of any Acquisition Proposal to Landcadia as soon as practicable following its awareness thereof.

Section 6.11    Directors' and Officers' Indemnification.

( a )    Landcadia shall and shall cause the Surviving Corporation immediately following the Closing to ensure, that all rights to indemnification now existing in favor of any individual who, at or prior to the Effective Time, was a director, officer, employee or agent of Waitr or who, at the request of Waitr, served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise (collectively, with such individual's heirs, executors or administrators, the "Indemnified Persons") solely to the extent as provided in the respective governing documents and indemnification agreements to which Waitr is a party or bound, shall survive the Merger and shall continue in full force and effect for a period of not less than six (6) years from the Effective Time and indemnification agreements and the provisions with respect to indemnification and limitations on liability set forth in such governing documents shall not be amended, repealed or otherwise modified in any manner that would adversely affect the rights of the Indemnified Persons thereunder; provided, that in the event any claim or claims are asserted or made within such six (6) year period, all rights to indemnification in respect of any such claim or claims shall continue until final disposition of any and all such claims. Neither Landcadia nor the Surviving Corporation shall settle, compromise or consent to the entry of judgment in any action, proceeding or investigation or threatened action, proceeding or investigation without the written consent of such Indemnified Person.

56

(b)       On or prior to the Closing Date, Waitr shall purchase, through a broker of Waitr's choice, and maintain in effect for a period of six (6) years thereafter, (i) a tail policy to the current policy of directors' and officers' liability insurance maintained by Waitr, which tail policy shall be effective for a period from the Closing through and including the date six (6) years after the Closing Date with respect to claims arising from facts or events that occurred on or before the Closing, and which tail policy shall contain substantially the same coverage and amounts as, and contain terms and conditions no less advantageous than, but not materially more advantageous than, in the aggregate, the coverage currently provided by such current policy, and (ii) "run off" coverage as provided by Waitr's fiduciary and employee benefit policies, in each case, covering those Persons who are covered on the date hereof by such policies and with terms, conditions, retentions and limits of liability that are no less advantageous than, but not materially more advantageous than, the coverage provided under Waitr's existing policy; provided, however, that the amount paid by Waitr per annum under this Section 6.11(b) shall not exceed 200% of Waitr's current annual premium for Waitr's current policy of directors' and officers' liability insurance, and; provided, further that if the annual premium exceeds such amount, then Waitr shall obtain such insurance with the greatest coverage available but not materially more advantageous than the existing policy for a cost not exceeding such amount.

(c)       From and after the Effective Time, Landcadia shall and hereby agrees to cause the Surviving Corporation to indemnify, defend and hold harmless, as set forth as of the date hereof in the Organizational Documents of Waitr and to the fullest extent permitted under applicable Law, all Indemnified Persons with respect to all acts and omissions arising out of such individuals' services as officers, directors, employees or agents of Waitr or as trustees or fiduciaries of any plan for the benefit of employees of Waitr, occurring prior to the Effective Time, including the execution of, and the transactions contemplated by, this Agreement. Without limitation of the foregoing, in the event any such Indemnified Person is or becomes involved, in any capacity, in any action, proceeding or investigation in connection with any matter, including the transactions contemplated by this Agreement, occurring prior to, on or after the Effective Time, Landcadia and the Surviving Corporation, jointly and severally, from and after the Effective Time, shall pay, as incurred, such Indemnified Person's legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith. The Surviving Corporation shall pay, within thirty (30) days after any request for advancement, all expenses, including attorneys' fees, which may be incurred by any Indemnified Person in enforcing this Section 6.11 or any action involving an Indemnified Person resulting from the transactions contemplated by this Agreement subject to an undertaking by such Indemnified Person to return such advancement if such Indemnified Person is ultimately determined to not be entitled to indemnification hereunder.

(d)       Notwithstanding any other provisions hereof, the obligations of Landcadia and the Surviving Corporation contained in this Section 6.11 shall be binding upon the successors and assigns of Landcadia and the Surviving Corporation. In the event Landcadia or the Surviving Corporation, or any of their respective successors or assigns, (i) consolidates with or merges into any other Person, or (ii) transfers all or substantially all of its properties or assets to any Person, then, and in each case, proper provision shall be made so that the successors and assigns of Landcadia or the Surviving Corporation, as the case may be, honor the indemnification and other obligations set forth in this Section 6.11

57

( e )    The obligations of Landcadia and the Surviving Corporation under this Section 6.11 shall survive the Closing and shall not be terminated or modified in such a manner as to affect adversely any Indemnified Person to whom this Section 6.11 applies without the written consent of such affected Indemnified Person (it being expressly agreed that the Indemnified Persons to whom this Section 6.11 applies shall be third party beneficiaries of this Section 6.11, each of whom may enforce the provisions of this Section 6.11).

(f)    Nothing in this Agreement is intended to, shall be construed to or shall release, waive or impair any rights to directors' and officers' insurance claims under any policy that is or has been in existence with respect to Waitr or any of its directors or officers, it being understood and agreed that the indemnification provided for in this Section 6.11 is not prior to or in substitution for any such claims under such policies.

Section 6.12    No Landcadia Stock Transactions. From and after the date of this Agreement until the Effective Time, no Waitr Party or any of its Affiliates, directly or indirectly, shall engage in any transactions involving the securities of Landcadia. Waitr shall use commercially reasonable efforts to require each of its representatives, to comply with the foregoing sentence.

Section 6.13    Trust Account. Upon satisfaction or waiver of the conditions set forth in Article VII and provision of notice thereof to the Trustee (which notice Landcadia shall provide to the Trustee in accordance with the terms of the Trust Agreement), (a) in accordance with and pursuant to the Trust Agreement, at the Closing, Landcadia (i) shall cause the documents, opinions and notices required to be delivered to the Trustee pursuant to the Trust Agreement to be so delivered, and (ii) shall use reasonable commercial efforts to cause the Trustee to (A) pay as and when due all amounts payable to Landcadia Common Stockholders who shall have previously validly elected to redeem their shares of Landcadia Class A Common Stock or Landcadia Class F pursuant to Landcadia Organizational Documents, and (B) immediately thereafter, pay all remaining amounts then available in the Trust Account in accordance with this Agreement and the Trust Agreement, and (b) thereafter, the Trust Account shall terminate, except as otherwise provided therein.

Section 6.14    Tax Matters.

(a)    Tax Returns.

(i)    Waitr shall prepare and timely file, or cause to be prepared and timely filed, all Tax Returns required to be filed by it that are due on or before the Closing Date (taking into account any extensions), and shall timely pay all Taxes that are due and payable on or before the Closing Date (taking into account any extensions). Any such Tax Return shall be prepared in a manner consistent with past practice (unless otherwise required by Law).

58

(ii)     Landcadia shall prepare and timely file, or cause to be prepared and timely filed, all Tax Returns required to be filed by Waitr after the Closing Date with respect to a Pre-Closing Tax Period and shall timely pay all Taxes that are due and payable by Waitr after the Closing Date, including Taxes with respect to Pre-Closing Tax Periods.

(b)     <u>Tax Sharing Agreements</u>. Any and all existing Tax sharing agreements (whether written or not) binding upon Waitr shall be terminated as of the Closing Date. After such date neither Waitr nor any of its representatives shall have any further rights or liabilities thereunder.

(c)     <u>Transfer Taxes</u>. Notwithstanding anything to the contrary contained herein, Landcadia shall pay all transfer, documentary, sales, use, stamp, registration, value added or other similar Taxes incurred in connection with the Merger. Landcadia shall, at its own expense, file all necessary Tax Returns with respect to all such Taxes.

(d)     <u>FIRPTA Certificate</u>. At or prior to the Closing, Waitr shall have delivered to Landcadia a certificate (a "<u>FIRPTA Certificate</u>") pursuant to Treasury Regulation §1.1445-2(c)(3) and 1.897-2(h) certifying that Waitr has not been a "United States real property holding corporation" within the meaning of Code §897(c)(2) during the five (5) year period ending on the Closing Date, in a form reasonably acceptable to Landcadia.

Section 6.15     <u>Notification of Certain Matters</u>. Each of Waitr and Landcadia shall provide the other Parties with prompt written notice of (a) any failure to comply with or satisfy, in any material respect, any covenant, condition or agreement hereunder, or (b) any event, fact or circumstance that (i) would reasonably be expected to cause any of such Party's representations and warranties to become untrue or misleading or which would affect its ability to consummate the Merger, (ii) would have been required to be disclosed under this Agreement had it existed or been known on the date hereof, (iii) gives such Party any reason to believe that any of the conditions set forth in <u>Article VII</u> would reasonably be expected not to be satisfied, or (iv) is of a nature that is or would reasonably be expected to result in a Waitr Material Adverse Effect or a Landcadia Material Adverse Effect.

Section 6.16     <u>Section 280G</u>. To the extent applicable, Waitr shall, no later than thirty (30) days prior to the Closing, (a) solicit waivers of any excess parachute payment (as described below) from each person who has or may have a right to any payments and/or benefits as a result of or in connection with the transactions contemplated hereby that would be deemed to constitute "excess parachute payments" (within the meaning of Section 280G of the Code), and (b) solicit the approval of Waitr Stockholders in a manner intended to comply with Sections 280G(b)(5)(A)(ii) and 280G(b)(5)(B) of the Code of all payments and/or benefits (including payments and benefits waived pursuant to the preceding clause) that would, as a result of, or in connection with, the transactions contemplated hereby, be deemed to constitute "excess parachute payments." To the extent required to comply with the provisions of the preceding sentence, Waitr shall deliver, among other items, to its equity holders a disclosure statement intended to satisfy the shareholder approval requirements of Section 280G(b)(5)(B) of the Code. The form of waiver, solicitation of approval, and disclosure materials shall be subject to the approval of Landcadia, such approval not to be unreasonably withheld, conditioned or delayed.

59

Section 6.17    Landcadia's Long-Term Incentive Plan. Prior to the Closing Date, the Landcadia Common Stockholders shall approve and adopt a long-term incentive plan (the "Landcadia 2018 LTIP"). From and after the date of this Agreement until such time as the Landcadia 2018 LTIP is approved and adopted, Landcadia shall consult with Waitr in good faith as to the contents of the Landcadia 2018 LTIP, the key terms of which are set forth on Schedule 6.17. The Landcadia 2018 LTIP will satisfy the requirements for the assumption and conversion of options to qualify as a "substitution or assumption" and not a "modification" of such options as set forth in Code Sections 409A and 424, and the Treasury Regulations promulgated thereunder.

Section   6.18    Employment Agreements. Prior to the Closing, Waitr shall use commercially reasonable efforts to cause each of the individuals listed on Schedule 6.18(a) to execute and deliver to Landcadia an employment agreement (collectively, the "Employment Agreements") setting forth the respective terms of each such individual's employment with Landcadia, effective upon the Closing. The material terms for the employees set forth on Schedule 6.18(b) shall be those set out in the corresponding section of Schedule 6.18(b) for each such individual.

Section   6.19    Consulting Agreements. Prior to the Closing, Landcadia shall use commercially reasonable efforts to cause each of the individuals listed on Schedule 6.19 to execute and deliver to Landcadia a consulting agreement (collectively, the "Consulting Agreements"), setting forth the respective terms of each such individual's consulting arrangement with Landcadia, effective upon the Closing, which material terms shall be those set out in the corresponding section of Schedule 6.19 for each such individual.

Section 6.20    Nasdaq Matters. Landcadia shall take all actions necessary to maintain its listing on Nasdaq.

Section   6.21    Tax Opinion. Each of Landcadia and Waitr shall cooperate with counsel engaged by Landcadia, in Landcadia's sole discretion, so that such counsel can deliver the tax opinion referenced in Section 7.1(f), with such cooperation to include providing Landcadia's counsel with the representations, information and certifications (including the delivery of an officer's certificate regarding such representations and information) that such counsel reasonably requests.

Section   6.22    Waitr Stockholder Approval . Waitr shall use best efforts to obtain, and then deliver as promptly as practicable, but in no event more than two (2) days after the date of this Agreement, to Landcadia, the Waitr Stockholder Approval. To the extent required by the LBCA, Waitr shall promptly (and, in any event, within ten (10) days of the date of the Waitr Stockholder Approval) deliver to any Waitr Stockholder who has not executed the Waitr Stockholder Approval (a) a notice of the taking of the actions described in the Waitr Stockholder Approval in accordance with Section 1-704 of the LBCA, and (b) such notice shall be in accordance with Section 1-1320 of the LBCA.

Section  6.23    <u>Registration of Shares Subject to Vested Rollover Options</u>. Landcadia shall use commercially reasonable efforts to include in the first Form S-8 that Landcadia files with the SEC after the Closing a re-offer prospectus covering the resale of Landcadia Common Stock that is issuable to the holders of Vested Rollover Options in respect of such holders' Vested Rollover Options.

Section  6.24    <u>Post-Closing Cooperation; Further Assurances</u>. Each Party shall, on the request of any other Party, execute such further documents, and perform such further acts, as may be reasonably necessary or appropriate to give full effect to the allocation of rights, benefits, obligations and liabilities contemplated by this Agreement and the transactions contemplated hereby.

### VII. CONDITIONS TO CLOSING

Section    7.1    <u>Conditions to Obligations of all Parties</u>. The obligations of Landcadia, Merger Sub and Waitr to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following conditions, any one or more of which may be waived (if legally permitted) in writing by all of such parties:

(a)    <u>HSR Act</u>. The applicable waiting periods under the HSR Act shall have expired or been terminated.

(b)    <u>No Governmental Order</u>. There shall not be in force any Governmental Order, statute, rule or regulation enjoining or prohibiting the consummation of the Merger.

(c)    <u>Requisite Votes</u>. The Landcadia Extension Approval, Landcadia Business Combination Approval and Waitr Stockholder Approval shall have been obtained.

(d)    <u>Nasdaq</u>. The Landcadia Common Stock to be issued in connection with the Merger shall have been approved for listing on Nasdaq.

( e )    <u>Landcadia Stock Redemption</u>. The Landcadia Stock Redemption shall have been completed in accordance with the terms hereof, the Landcadia Extension Proxy Statement and the Landcadia Business Combination Proxy Statement.

( f )    <u>Tax Opinion</u>. Landcadia shall have caused its counsel to deliver a tax opinion, in a form reasonably acceptable to Waitr, opining that the Merger will be treated as a reorganization within the meaning of Section 368(a) of the Code; <u>provided</u>, <u>however</u>, that such opinion shall rely upon representations of officers of each of Landcadia and Waitr that such counsel reasonably requires.

Section 7.2    <u>Conditions to Obligations of Landcadia and Merger Sub</u>. The obligations of Landcadia and Merger Sub to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by Landcadia and Merger Sub:

61

(a)      Representations and Warranties.

( i )      The representations and warranties of Waitr contained in Section 4.1 (Organization and Authority), Section 4.2 (Authorization and Enforceability), Section 4.3 (Noncontravention), Section 4.4 (No Subsidiaries), Section 4.6 (Capitalization) and Section 4.24 (No Brokers; Fees) shall be true and correct in all respects as of the Closing Date as if made at and as of such time (except for representations and warranties that speak as of a specific date prior to the Closing Date, in which case such representations and warranties need only be true and correct in all respects as of such earlier date); and

(ii)      the other representations and warranties of Waitr contained in Article IV shall be true and correct as of the Closing Date as if made at and as of such time (except for representations and warranties that speak as of a specific date prior to the Closing Date, in which case such representations and warranties need only be true and correct as of such earlier date); provided, that this condition shall be deemed satisfied unless any and all inaccuracies in such representations and warranties, in the aggregate, result in a material adverse effect upon (A) the business, results of operations, workforce, prospects, properties, assets, liabilities or condition (financial or otherwise) of Waitr or (B) the ability of Waitr to consummate the transactions contemplated by this Agreement or to perform its obligations hereunder, in each case without giving effect to any limitation as to materiality or Waitr Material Adverse Effect set forth therein.

(b)      Performance of Obligations. Each of the covenants of Waitr to be performed as of or prior to the Closing shall have been performed in all material respects.

(c)      Officer's Certificate. Landcadia shall have received a certificate signed on behalf of Waitr by a senior executive officer of Waitr to the effect that the conditions set forth in Section 7.2(a) and Section 7.2(b) as they relate to Waitr have been satisfied.

( d )      No Waitr Material Adverse Effect . Since the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any change, event or effect that, individually or when taken together with all other changes, events or effect, constitutes a Waitr Material Adverse Effect.

(e )      Employment Agreements. Waitr shall have delivered or caused to be delivered to Landcadia Employment Agreements for each of the individuals listed on Schedule 7.2(e), duly executed by each employee party thereto.

(f)      Waitr Stockholder Approval. Landcadia shall have received a copy of Waitr Stockholder Approval, which shall remain in full force and effect.

( g )      Lockup Agreements. Waitr shall have delivered to Landcadia duly executed Stockholder Lockup Agreements from each Waitr Stockholder receiving Stock Consideration under this Agreement.

62

(h)      Financial Statements. Neither the PCAOB Audited Financial Statements nor the Reviewed Interim Financial Statements shall, with respect to Waitr's revenue only, and specifically not taking into account any reconciliation adjustments and other adjustments required to convert the Financial Statements from a modified cash accounting method to GAAP (including, without limitation, adjustments due to set up revenue), materially deviate from the Financial Statements for each of (i) the twelve (12) month-period ended December 31, 2017, and (ii) the three (3) month period ended March 31, 2018, in the case of (i) and (ii), as determined in good faith by Landcadia.

(i)      Registration Rights Agreement. Waitr shall have delivered or caused to be delivered to Landcadia the Registration Rights Agreement, duly executed by each investor party thereto.

(j)      Secretary's Certificate. Waitr shall have delivered to Landcadia a certificate executed by the secretary of Waitr or another authorized executive officer certifying, as of the Closing Date, (i) the Organizational Documents of Waitr, (ii) the authorizing resolutions of Waitr and the holders of Waitr Capital Stock and (iii) the incumbency and signatures of the Persons signing this Agreement or any agreement delivered in connection herewith on behalf of Waitr.

(k)      Good Standing. Waitr shall have delivered, or caused to be delivered, to Landcadia, a certificate of good standing (or equivalent document) for Waitr, issued by the Secretary of State for the State of Louisiana and any other jurisdiction in which Waitr is required to be qualified to do business, dated not more than ten (10) Business Days prior to the Closing Date.

(l)      FIRPTA Certificate. Waitr shall have delivered, or caused to be delivered, to Landcadia the FIRPTA Certificate.

Section 7.3      Conditions to Obligations of Waitr. The obligations of Waitr to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by Waitr:

(a)      Representations and Warranties. The representations and warranties of Landcadia contained in Article V shall be true and correct (without giving effect to any limitation as to materiality or Landcadia Material Adverse Effect set forth therein) in all respects as of the Closing Date, as though made on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case of as such earlier date), except where the failure of all such representations of Landcadia to be so true and correct would not, individually or in the aggregate, have a Landcadia Material Adverse Effect.

(b)      Performance of Obligations. Each of the covenants of Landcadia and Merger Sub to be performed as of or prior to the Closing shall have been performed in all material respects.

(c)      Officer's Certificate. Waitr shall have received at the Closing a certificate signed on behalf of each of Landcadia and Merger by a senior executive officer of Landcadia and Merger Sub, as the case may be, to the effect that the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied.

63

(d)   No Landcadia Material Adverse Effect. Since the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any change, event or effect that, individually or when taken together with all other changes, events or effect, constitutes a Landcadia Material Adverse Effect.

(e)   Certificate of Incorporation. The Third Amended and Restated Certificate of Incorporation of Landcadia shall have been filed with the Secretary of State of the State of Delaware.

(f)   Landcadia Assets. Landcadia shall have delivered to Waitr evidence that, immediately after the Closing (and following any Landcadia Stock Redemption and payment of any expenses related to the transactions contemplated under this Agreement), that Landcadia will have no less than an aggregate amount of $75,000,000 in cash or investments in government securities or money market funds that invest only in direct United States treasury obligations, in each case as permitted under the Trust Agreement.

(g)   Waitr Cashing Out Convertible Notes. Landcadia shall have delivered or caused to be delivered to Waitr evidence of payment of the Waitr Convertible Note Cash Out Amount to each holder of a Waitr Cashing Out Convertible Note.

(h)   Lockup Agreements. Landcadia shall have delivered to Waitr duly executed lockup agreements signed by Landcadia and its founders with respect to the Private Placement Warrants that will provide for a six-month lockup period on terms otherwise consistent with the Stockholder Lockup Agreement.

(i)   Employment Agreements. Landcadia shall have delivered or caused to be delivered to Waitr each of the Employment Agreements, duly executed by Landcadia.

(j)   Registration Rights Agreement. Landcadia shall have delivered or caused to be delivered to each investor party thereto the Registration Rights Agreement, duly executed by Landcadia.

Section 7.4   Frustration of Closing Conditions. No Party may rely on the failure of any condition set forth in this Article VII to be satisfied to excuse such Party's obligation to effect the Closing if such failure was caused by such Party's breach of a covenant, agreement, representation or warranty of this Agreement by such Party.

**VIII. TERMINATION**

Section 8.1   Termination. This Agreement may be terminated and the transactions contemplated hereby abandoned:

(a)   by written consent of Waitr and Landcadia;

(b)   by written notice of Landcadia if Waitr has not obtained and delivered to Landcadia within two (2) days after the date of this Agreement the Waitr Stockholder Approval;

( c )      by written notice of Landcadia if Waitr does not deliver to Landcadia the PCAOB Audited Financial Statements and Reviewed Interim Financial Statements on or before September 15, 2018;

(d)      by the written notice of Landcadia if the condition set forth in Section 6.3(f) cannot be satisfied or if there has been a breach of any representation, warranty, covenant or other agreement made by Waitr in this Agreement, or any such representation and warranty shall have become untrue or inaccurate after the date of this Agreement, in each case which breach, untruth or inaccuracy (i) would reasonably be expected to result in Section 7.2(a) or Section 7.2(b) not being satisfied as of the Closing Date (a "Terminating Waitr Breach"), and (ii) shall not have been cured within thirty (30) days after written notice from Landcadia of such Terminating Waitr Breach is received by Waitr (such notice to describe such Terminating Waitr Breach in reasonable detail), or which breach, untruth or inaccuracy, by its nature, cannot be cured prior to the Outside Date; provided, that Landcadia is not then in material breach of any of their respective representations, warranties, covenants or other obligations under this Agreement, which breach would give rise to a failure of a condition set forth in Section 7.3(a) or Section 7.3(b); provided, further, that the thirty (30) day cure period for Waitr to cure a Terminating Waitr Breach set forth in subclause (ii) above shall not apply if such Terminating Waitr Breach is a result of a breach of Section 7.1;

( e )      by written notice of Waitr if there has been a breach of any representation, warranty, covenant or other agreement made by Landcadia or Merger Sub, or any such representation and warranty shall have become untrue or inaccurate after the date of this Agreement, in each case which breach, untruth or inaccuracy (i) would reasonably be expected to result in Section 7.3(a) or Section 7.3(b) not being satisfied as of the Closing Date (a "Terminating Landcadia Breach"), and (ii) shall not have been cured within thirty (30) days after written notice from Waitr of such Terminating Landcadia Breach is received by Landcadia (such notice to describe such Terminating Landcadia Breach in reasonable detail), or which breach, untruth or inaccuracy, by its nature, cannot be cured prior to the Outside Date; provided, that Waitr is not then in material breach of any of its representations, warranties, covenants or other obligations under this Agreement, which breach would give rise to a failure of a condition set forth in in Section 7.2(a) or Section 7.2(b); provided, further, that the thirty (30) day cure period for Landcadia to cure a Terminating Landcadia Breach set forth in subclause (ii) above shall not apply if such Terminating Landcadia Breach is a result of a breach of Section 7.1;

( f )      by written notice of Waitr or Landcadia if the Closing has not occurred on or prior to November 30, 2018 (the "Outside Date") for any reason other than delay and/or non-performance of the Party seeking such termination, in which case the non-terminating Party shall be deemed to be in breach of this Agreement;

( g )      by written notice from either Waitr or Landcadia to the other Party if the Landcadia Extension Approval shall have not been obtained by reason of the failure to obtain the required vote at the Extension Stockholder's Meeting duly convened therefor or at any adjournment or postponement thereof;

65

( h )      by written notice from either Waitr or Landcadia to the other Party if this Agreement shall fail to receive Landcadia Business Combination Approval at the Special Meeting (subject to any adjournment or recess of the meeting);

( i )      by written notice from Waitr if there exists a Nasdaq Listing Rule 5620(a) Deficiency after June 1, 2018, or any other deficiency which causes a de-listing from Nasdaq or Landcadia prior to the Closing;

(j)      by written notice from Waitr if there has been a Change in Recommendation; and

( k )      by written notice from Waitr if the aggregate dollar amount of Landcadia Stock Redemptions equals or exceed an amount that would cause (i) the Surviving Corporation to fail to maintain the Minimum Cash Balance at Closing or (ii) the Waitr Stockholders to receive an aggregate amount of Cash Consideration less than the Minimum Cash Consideration at the Closing.

Section    8.2      Effect of Termination. Except as set forth in this Section 8.2 or Section 9.13, in the event of the termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and have no effect, without any liability on the part of any Party or its respective Affiliates, officers, directors or stockholders, other than liability of any Party for any intentional and willful breach of this Agreement by such party occurring prior to such termination. The provisions of Section 6.13, this Section 8.2, Section 9.7, Section 9.8, Section 9.9, Section 9.10, Section 9.12, Section 9.14 and Section 9.16 (collectively, the "Surviving Provisions") and the Nondisclosure Agreement, and any other Section or Article of this Agreement referenced in the Surviving Provisions that are required to survive in order to give appropriate effect to the Surviving Provisions, shall in each case survive any termination of this Agreement.

## IX. MISCELLANEOUS

Section    9.1      Modification or Amendment. This Agreement may be amended or modified in whole or in part, only by a duly authorized agreement in writing executed in the same manner as this Agreement and which makes reference to this Agreement. The approval of this Agreement by the stockholders of any of the Parties shall not restrict the ability of the board of directors of any of the parties to terminate this Agreement in accordance with Section 8.1 or to cause such Party to enter into an amendment to this Agreement pursuant to this Section 9.1.

Section    9.2      Waiver. Any Party may, at any time prior to the Closing, by action taken by its board of directors, or officers thereunto duly authorized, waive any of the terms or conditions of this Agreement or agree to an amendment or modification to this Agreement in the manner contemplated by Section 9.1 and by an agreement in writing executed in the same manner (but not necessarily by the same Persons) as this Agreement.

66

Section 9.3 <u>Notices</u>. To be valid for purposes hereof, any notice, request, demand, waiver, consent, approval or other communication (any of the foregoing, a "<u>Notice</u>") that is required or permitted hereunder shall be in writing. A Notice shall be deemed given only as follows: (a) on the date delivered personally; (b) three (3) Business Days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or (c) one (1) Business Day following deposit with a nationally recognized overnight courier service for next day delivery, charges prepaid, and, in each case, addressed to the intended recipient as set forth below:

(a)     If to Landcadia (prior to Closing):

Landcadia Holdings, Inc.
1510 West Loop South
Houston, Texas 77027
Attention: General Counsel

with a copy (which shall not constitute notice) to:

Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
Attention: Joel Rubinstein

(b)     If to Merger Sub (prior to Closing):

Landcadia Merger Sub, Inc.
c/o Landcadia Holdings, Inc.
1510 West Loop South
Houston, Texas 77027
Attention: General Counsel

with a copy (which shall not constitute notice) to:

Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
Attention: Joel Rubinstein

(c)     If to Waitr (prior to the Closing):

Waitr Incorporated
844 Ryan Street, Suite 300
Lake Charles, LA 70601
Attention: Chief Executive Officer

with a copy (which shall not constitute notice) to:

Cara Stone, LLP
650 Poydras Street, Suite 1130
New Orleans, LA 70130
Attention: Mark Graffagnini

67

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

Section    9.4        Entire Agreement. This Agreement (including the Disclosure Schedules and Exhibits hereto) and the Nondisclosure Agreement constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof. No representations, warranties, covenants, understandings, agreements, oral or otherwise, relating to the transactions contemplated by this Agreement exist among the Parties, except as expressly set forth in this Agreement and the Nondisclosure Agreement.

Section  9.5        Assignment. No Party shall assign this Agreement or any part hereof without the prior written consent of the other Parties. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. Any attempted assignment in violation of the terms of this Section 9.5 shall be null and void, *ab initio*.

Section  9.6        Counterparts. This Agreement may be executed in multiple counterparts, each of which when executed and delivered shall thereby be deemed to be an original and all of which taken together shall constitute one and the same instrument. Any Party may deliver this Agreement to the other Parties by means of facsimile or portable document format (.PDF) signature.

Section  9.7        No Third-Party Beneficiaries. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties, any right or remedies under or by reason of this Agreement; provided, however, that, notwithstanding the foregoing (a) in the event the Closing occurs, the present and former officers and directors of Waitr (and their successors, heirs and representatives) are intended third-party beneficiaries of, and may enforce, Section 6.11, and (b) the past, present and future directors, officers, employees, incorporators, members, partners, stockholders, Affiliates, agents, attorneys, advisors and representatives of the Parties, and any Affiliate of any of the foregoing (and their successors, heirs and representatives), are intended third-party beneficiaries of, and may enforce, Section 9.14.

Section  9.8        Governing Law. This Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

Section 9.9    CONSENT TO JURISDICTION. EACH OF LANDCADIA, MERGER SUB AND WAITR HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE APPLICABLE STATE OR FEDERAL COURTS SITTING IN THE STATE OF DELAWARE, FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND EACH OF LANDCADIA, MERGER SUB AND WAITR HEREBY AGREE NOT TO COMMENCE ANY LEGAL PROCEEDING RELATED THERETO EXCEPT IN SUCH COURTS. EACH OF LANDCADIA, MERGER SUB AND WAITR IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH COURT OR THAT SUCH ACTION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 9.10    WAIVER OF TRIAL BY JURY. TO THE EXTENT PERMITTED BY LAW, LANDCADIA, MERGER SUB AND WAITR EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH. WAITR HEREBY EXPRESSLY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR LANDCADIA TO ENTER INTO THIS AGREEMENT.

Section 9.11    Severability. If any portion or provision hereof is to any extent declared illegal or unenforceable by a court of competent jurisdiction, then the remainder hereof, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by Law.

Section 9.12    Expenses. Except as otherwise provided in this Agreement, each Party shall bear its own expenses incurred in connection with this Agreement and the transactions contemplated hereby, whether or not such transactions are consummated, including all fees of its legal counsel, financial advisers and accountants; provided, however, that Landcadia shall promptly reimburse Waitr for any and all expenses, including, reasonable attorneys' fees, in the event that Landcadia fails to cure any Nasdaq Listing Rule 5620(a) Deficiency, or obtain Landcadia Extension Approval or Landcadia Business Combination Approval. Any available working capital not in the Trust Account shall be applied first to make such reimbursement to Waitr.

Section 9.13    <u>Specific Performance</u>. The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that any Party does not perform its obligations under the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate the Merger) in accordance with its specified terms or otherwise breach such provisions. The Parties acknowledge and agree that (a) the Parties shall be entitled to an injunction, specific performance, or other equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, without proof of damages, prior to the valid termination of this Agreement in accordance with <u>Section 8.1</u>, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific enforcement is an integral part of the transactions contemplated by this Agreement and without that right, neither Waitr nor Landcadia would have entered into this Agreement. Each Party agrees that it shall not oppose the granting of specific performance and other equitable relief on the basis that the other Parties have an adequate remedy at Law or that an award of specific performance is not an appropriate remedy for any reason at Law or equity. The Parties acknowledge and agree that any Party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section shall not be required to provide any bond or other security in connection with any such injunction.

Section 9.14    <u>Non-Recourse</u>. Without limiting the rights of Waitr under and to the extent provided under <u>Section 9.13</u>, this Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby may only be brought against, the entities that are expressly named as Parties hereto and then only with respect to the specific obligations set forth herein with respect to such Party. Without limiting the rights of Waitr under and to the extent provided under <u>Section 9.13</u>, except to the extent a named Party to this Agreement (and then only to the extent of the specific obligations undertaken by such named Party in this Agreement), (i) no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney, advisor or representative or Affiliate of any named Party to this Agreement and (ii) no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney, advisor or representative or Affiliate of any of the foregoing shall have any liability (whether in contract, tort, equity or otherwise) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of any one or more of Waitr or Landcadia under this Agreement of or for any claim based on, arising out of, or related to this Agreement or the transactions contemplated hereby.

Section 9.15    <u>Publicity</u>. All press releases or other public communications of any nature whatsoever relating to the transactions contemplated by this Agreement, and the method of the release for publication thereof, shall prior to the Closing be subject to the prior mutual approval of Landcadia and Waitr, in writing, which approval shall not be unreasonably withheld by any Party.

Section 9.16    <u>Non-Survival</u>. None of the representations, warranties, covenants and agreements in this Agreement or in any instrument, document or certificate delivered pursuant to this Agreement shall survive the Effective Time and shall expire upon the occurrence of the Effective Time, except for those covenants and agreements contained herein and therein which by their terms expressly apply in whole or in part after the Effective Time and then only to such extent.

Section 9.17    <u>Trust Account Waiver</u>.  Waitr acknowledges and agrees that Landcadia is a blank check company with the power and privileges to effect a merger, asset acquisition, reorganization or similar business combination involving Waitr and one or more businesses or assets. Waitr acknowledges and agrees that Landcadia's sole assets consist of the cash proceeds of Landcadia's initial public offering and private placements of its securities, and that substantially all of these proceeds have been deposited in the Trust Account for the benefit of its public stockholders. For and in consideration of Landcadia entering into this Agreement, the receipt and sufficiency of which are hereby acknowledged, Waitr its Affiliates, managers, directors, officers, affiliates, members, stockholders and trustees, do hereby irrevocably waive any right, title, interest or claim of any kind they have or may have in the future in or to any monies in the Trust Account, and waives any claim it has or may have as a result of, or arising out of, the Transaction or any negotiations, contracts or agreements with Landcadia, and Waitr shall not, and shall cause its Affiliates not to, seek recourse against the Trust Account for any reason whatsoever.

[Signature page follows.]

70

IN WITNESS WHEREOF, the Parties hereto have each executed and delivered this Agreement and Plan of Merger as of the day and year first above written.

**LANDCADIA HOLDINGS, INC.**

By:    /s/ Steven L. Scheinthal
        Name: Steven L. Scheinthal
        Title: Vice President, General Counsel and Secretary

**LANDCADIA MERGER SUB, INC.**

By:    /s/ Steven L. Scheinthal
        Name: Steven L. Scheinthal
        Title: Vice President and Secretary

**WAITR INCORPORATED**

By:    /s/ Chris Meaux
        Name: Chris Meaux
        Title: Chief Executive Officer

[Signature page to Agreement and Plan of Merger]

**Exhibit A**

**Form of Registration Rights Agreement**

[See attached.]

**Exhibit B**

**Form of Stockholder Lockup Agreement**

[See attached.]

**Exhibit C**

**Form of Third Amended and Restated Articles of Incorporation of Landcadia**

[See attached.]

**Exhibit D-1**

**Form of Delaware Certificate of Merger**

[See attached.]

**Exhibit D-2**

**Form of Louisiana Articles of Merger**

[See attached.]

Exhibit 99.1



**Landcadia Holdings – Waitr Conference Call and Webcast, May 17, 2018**

## CORPORATE PARTICIPANTS

**Steven Scheinthal,** *Vice President, General Counsel and Secretary*

**Tilman Fertitta,** *Co-Chairman and Chief Executive Officer*

**Chris Meaux,** *Founder and Chief Executive Officer, Waitr, Inc.*

**Dave Pringle,** *Chief Financial Officer, Waitr, Inc.*

## PRESENTATION

**Operator:**

Good morning, ladies and gentlemen. Thank you for standing by and welcome to the Landcadia Holdings and Waitr Conference Call and Webcast. We appreciate everyone joining us today. Please note that this morning's press release and related SEC documents can be found on the Landcadia Holdings website at www.landcadiaholdings.com.

In addition, the investor deck that will be presented as part of today's discussion has been posted to the website and is available for download. Please review our forward-looking statements found on Slide 1 of the investor deck at your earliest convenience.

Today's presentation is for informational purposes only and does not constitute an offer to sell, a solicitation of an offer to buy or a recommendation to purchase any equity, debt or other financial instruments of Waitr Inc. or Landcadia Holdings or any of Waitr's or Landcadia's affiliates, securities as such term is defined under U.S. federal securities laws. The investor presentation has been prepared to assist interested parties in making their own evaluation of the proposed investment and for no other purpose. The information contained herein does not purport to be all inclusive. We refer you to the cautionary language regarding forward-looking statements that can be found on Slide 1 for a more detailed review of the risks and uncertainties contained here.

The presentation includes non-generally accepted accounting, or non-GAAP financial measures such as contribution margin. Our non-GAAP financial measures should not be considered as alternatives to generally accepted accounting principles in the United States of America, or GAAP measures such as net income, operating income, net cash flows provided by operating activities or any other GAAP measures of liquidity or financial performance.

Hosting today's call from Landcadia Holdings are Tilman Fertitta, Co-Chairman and Chief Executive Officer, and Steve Scheinthal, Vice President, General Counsel and Secretary, and from Waitr, Chris Meaux, Founder and Chief Executive Officer, and Dave Pringle, Chief Financial Officer.

I will now turn the conference over to Mr. Scheinthal. Please go ahead.

ViaVid has made considerable efforts to provide an accurate transcription. There may be material errors, omissions, or inaccuracies in the reporting of the substance of the conference call. This transcript is being made available for information purposes only.
1-888-562-0262 1-604-929-1352 www.viavid.com

1

**Landcadia Holdings – Waitr Conference Call and Webcast, May 17, 2018**

**Steven Scheinthal:**

Thank you, Operator. Welcome, everybody, to the Landcadia Waitr conference call. Under the terms of our definitive agreement, Landcadia will acquire Waitr for $308 million in total consideration. Landcadia will pay a minimum of $50 million in cash to the current equityholders, with the remainder paid in rollover equity interest in the combined public company, subject to customary adjustments. The net cash proceeds from this transaction, in excess of those distributed to Waitr's shareholders, will be used to fund Waitr's growth into new markets, as it executes on its long-term expansion plan for opportunistic acquisitions to grow its footprint and for general corporate purposes. A minimum of $75 million in net proceeds will be funded to Waitr's balance sheet. For remaining cash following redemptions, transaction expenses, minimum cash consideration and minimum funding to the balance sheet, the first $25 million will be used to pay additional cash consideration to selling Waitr's shareholders and the balance shall remain on the Waitr's balance sheet.

I would now like to turn the call over to Tilman Fertitta.

**Tilman Fertitta:**

Thank you, everyone. Today I'm happy to announce that Landcadia Holdings is going to acquire Waitr Inc. For those of you who know me and the history of Landry's, this deal is a natural fit. Let me just give you a little bit of background.

Landcadia Holdings is an acquisition vehicle that Rich and I formed for the purpose of conducting a business combination. In May of 2016, Landcadia Holdings completed its IPO, raising approximately $250 million. Our mission was to find an investment opportunity in the dining, hospitality, entertainment or gaming industry. After reviewing so many opportunities, we found Waitr in our own backyard, and we believe this transaction really delivers on our investment thesis.

Waitr is a restaurant ordering and food delivery technology platform based in Louisiana. Unlike many of the companies that we looked at, Waitr is a growth business with a huge potential and a tremendous complementary relationship with my existing businesses. They will also be able to leverage the tremendous industry knowledge and expertise Rich and I have. We believe we have an incredible opportunity to create the next leader in the fast-growing online food delivery market. Waitr is currently a delivery partner for Landry's and Golden Nugget, and we have seen firsthand the impact Waitr has had on our businesses.

Based on our own personal experience, we believe they are the best-in-class, on-demand food delivery partner for our customers and restaurants. The incremental sales growth that they have been driving and the positive feedback we've received from our customers has exceeded expectations, and other competitors that we deal with. Let me highlight a few key things why we are so excited to be partnering with the impressive management team.

We believe, number one, there is a massive unpenetrated market for online delivery, particularly in the secondary markets. Number two, Waitr has already shown tremendous organic growth since their founding in 2013. Number three, there are many acquisition opportunities that can help drive additional growth and scale throughout the U.S. Remember, the consumer has realized they would rather order food from a restaurant and know exactly what they're getting instead of having it home delivered and then you have to make it, which was a fad a couple of years ago. They provide, number four, a great customer experience and have differentiated the value proposition for restaurant partners, which I have experienced firsthand.

ViaVid has made considerable efforts to provide an accurate transcription. There may be material errors, omissions, or inaccuracies in the reporting of the substance of the conference call. This transcript is being made available for information purposes only.
1-888-562-0262 1-604-929-1352 www.viavid.com

**Landcadia Holdings – Waitr Conference Call and Webcast, May 17, 2018**

Number five, they have a very capital efficient model, with strong unit economics and a proven track record. Six, they have significant operating leverage, on par with industry leaders. Number seven, their business is highly complementary with the businesses we run at Fertitta Entertainment. Number eight, as a preferred food and delivery partner for Landry's and the Golden Nugget, Waitr will have brand exposure to our over four million loyalty customers; and number nine, finally as a sponsor with the Houston Rockets, Waitr's brand will be exposed to over nine million Facebook followers.

At the close of this transaction, I will join the Board and tremendously give them the guidance of being a public company from '93 to 2010, besides all my expertise in growth and the hospitality and restaurant industry.

I'm now going to turn it over to Chris and he'll tell you more about Waitr. Thank you, Chris.

**Chris Meaux:**

Thank you, Tilman. I would like to first say how excited we are to partner with Tilman and the Landcadia team. We think this is going to be a great opportunity for both companies.

Let me tell you a little bit more about Waitr. We founded the company in 2013 in Lake Charles, Louisiana. In January of 2017, we hit our first one million aggregate orders. Since January of 2017, we have done an additional six million orders and are currently in over 24 markets throughout the southeastern part of the United—excuse me, 31 markets throughout the southeastern part of the United States. By the end of this year, we hope to be in over 45 markets, and by the end of 2019, in over 70 markets.

As you guys know, the restaurant delivery market is massive, and we are a first mover in the underpenetrated online space. We currently operate in underserved markets throughout the southeast. We have a strong value proposition to both customers and to restaurants, and we have a very differentiated proprietary technology platform in which we operate. Our business to date has had to be very capital efficient, and we have proven our ability to grow and expand in strategic markets and entrench our competitive positioning in the market.

The restaurant industry is a very large industry. In fact, the off-premise part of the industry is over $220 billion in 2016. The online portion of that market in 2016 was only $13 billion, or 6%. It's projected to be over $32 billion by the year 2022, or over 11%, and we're positioned well to take advantage of being one of the leaders there.

We currently operate in markets that are of size, about 51 to 500, not the top 10 or so, not the top 50 markets. The markets in which we operate make up over 35% of all U.S. markets, and today, about 88% of our business comes from those markets. Our business is essentially a three-pronged marketplace platform. It takes diners, it takes consumers and it takes restaurants. The more diners we get, the more orders, the more orders we have attracts more drivers and allows for a more efficient delivery, which drives more volume to our restaurants, which allows us to sign up more restaurants. We currently have over 540,000 active diners on our platform and they use our platform not just for ordering but for discovery and convenience as well.

We have over 5,000 restaurants on our platform and over 5,800 drivers. Our drivers are W2 employees, which gives us some flexibility and control over the user experience. In fact, when we hire drivers, we interview each driver specifically with our city team, so we know our drivers when we hire them. In addition, we do extensive background checks for both motor vehicle and criminal backgrounds. We have the ability to schedule our drivers, which allows us to optimize performance and control quality. Our drivers are readily identifiable and uniformed when they show up at the customer's door, and they like the stable job environment that being an employee of Waitr provides, as well as the community, of being a part of something real.

ViaVid has made considerable efforts to provide an accurate transcription. There may be material errors, omissions, or inaccuracies in the reporting of the substance of the conference call. This transcript is being made available for information purposes only.
1-888-562-0262 1-604-929-1352 www.viavid.com

3

**Landcadia Holdings – Waitr Conference Call and Webcast, May 17, 2018**

Our consumer side of our app is a unique experience in that we provide food photography for all of the items in our menus. So, a consumer selects a restaurant, they can personalize that experience by adding restaurants to their favorites that they frequent. They can use it for discovery, to find restaurants that they want to visit in person. They can use it to look at the menu, along with the food photography when they're sitting down at the table at those restaurants. But if they select it for delivery, once they select an order, they can customize that order up to seven levels deep. Once they place the order, we allow them to track the order through the app, and the order shows up at the door with one of our uniformed drivers.

Our platform is further differentiated through our relationship with our restaurant partners. In fact, we charge our restaurant partners an upfront fee to onboard onto the Waitr platform, and there's a reason that we do that. For one, they get the food photography. They get the menu onboarding using our team to onboard their menu, and they get the equipment installed in the restaurant that they need to receive the orders. But most importantly, it creates an investment on that restaurant's part in our partnership, and we have found that that investment in the partnership is an important part of solidifying the relationship and it gets restaurants to promote Waitr inside of their stores, or promote their restaurant on Waitr as well.

We have the most attractive pricing in the industry, at 15% take rate, compared to our competitors, which are much higher. We partner with the restaurants on in-store marketing. We give them collateral to put table tents on the tables, pushcards in their to-go orders. They also put Waitr in their print marketing, their radio advertising and on their billboards, which further solidifies the relationships. We give them a dedicated support line so that they have access to a live customer support person when the restaurant needs customer support. We also man a live consumer support line, which keeps the calls from going to the restaurant. So customers contact Waitr if they have a question about their order, and what we've found is that restaurants—the longer they're on the platform, they see more benefits from this partnership. In fact, our 2015 restaurants that signed up with us there have seen almost a twofold increase in the average amounts of their orders on Waitr on a monthly basis.

We partner with some of the biggest brands in the country, both on the independent side, as well as on the chain restaurant side. Those are restaurants just like the Landry's Group that's part of Landcadia, and we use these relationships as influencers when we launch new markets. It allows us to accelerate the growth of moving through these new markets, and in fact, our markets are phased over a three-phased approach, our market launch. When we go into a new market, we first sign up new restaurants, these influencers that we have in contiguous markets and the partnership with Landry's will be critical in this regard. It will allow us to go in with restaurants that are already influencers in those markets.

Once we've signed up over 40-plus restaurants, then we're ready to take that market live. Once we take that market live, our first measure of success in the market is 100 orders per day. At this 100 orders per day, this is where the viral coefficients kick in in those markets and we start to see scalable growth. Between 100 and 1,000 orders a day is where we achieve profitability, and that's important because breaking even in that market on a standalone basis drives profitability in that market, and at over 1,000 orders per day, we're at sustained profitability. This entire approach averages about six months for a new market launch.

We've identified over 200 markets within our current operating territory that we can expand into. This partnership with Landcadia is going to give us the additional capital we need to expand into those markets more quickly and beyond just the 11-state area in which we operate today. If we look at how we've improved our launch process over time, when we launched our first market in late 2014, it took us about 76 days to hit 1,000 cumulative orders. Since then, we have steadily improved the playbook and now, within six days, we hit 1,000 cumulative orders. This has allowed us to become the leader in 29 of the 31 markets that we serve, and we have proven that this model is scalable to multiple markets.

ViaVid has made considerable efforts to provide an accurate transcription. There may be material errors, omissions, or inaccuracies in the reporting of the substance of the conference call. This transcript is being made available for information purposes only.
1-888-562-0262 1-604-929-1352 www.viavid.com

4

**Landcadia Holdings – Waitr Conference Call and Webcast, May 17, 2018**

The leadership team that has been a part of this is a combination of both grizzled veterans and what I will call youthful exuberance. My four co-founders were college students when we started the Company but have matured into great managers and leaders within our Company, but we've added some grizzled veterans in Dave Pringle, our CFO; Joe Stough, our Chief Strategy Officer; Sonny Mayugba, our Chief Marketing Officer; and Travis Boudreaux, our Head of Engineering. Together, we've built the Company to this point and I'd like for Dave to share with you some of the financial highlights of the Company that we've built.

So I'll kick it over to you, Dave. Dave Pringle, our CFO.

**Dave Pringle:**

Okay, great. Thanks, Chris. Now I'd like to walk our folks through some financial highlights for Waitr.

We're experiencing massive growth quarter-over-quarter. We have proven economics and over 80% of our current markets are producing positive contribution margin. We have an overall gross profit that's very, very strong, and a gross margin in excess of 30%. We've experienced a 10x ROI on our customer acquisition costs, and we've done all this very efficiently, with only raising $26 million of capital to date.

We're all about rapid growth and scale, and what that means for us is increased gross food sales and increased net revenue to Waitr, and the way that we get those items are increased order volume, and order volume is a result of active diners and contracted restaurants on the platform. Our order volumes for the first quarter of 2018 were in excess of $1.5 million. That's almost three times as many as we did in the first quarter of 2017. Also, at the end of 2000—or the first quarter of 2018, we had over 541,000 active diners on the platform and over 4,500 contracted restaurants on the platform.

Chris mentioned a reference to our market cohorts a little bit earlier, and what I'd like to illustrate for you is that our most recent market cohorts, so our 2017 market cohorts, are getting to higher orders per quarter, higher order volume much more rapidly than our previous cohorts.

Now I'd like to walk you through our projections for gross food sales and net revenues going forward, and these numbers that I present to you are based upon our current rollout plan, which is to launch two new markets per month, and that rollout plan is what is anticipated to move forward throughout these projections. First, I'll start with our actual results for 2017. We had $120 million worth of gross food sales come through the network, resulting in $27 million worth of net revenue to Waitr. For 2018, we're projecting somewhere between $265 million and $275 million of gross food sales going through the platform. That would result in somewhere between $60 million and $65 million of net revenue to Waitr.

For 2019, we're projecting over $500 million worth of gross food sales through the platform, resulting in about $125 million worth of net revenue to Waitr. If we carry on out to 2020, again, still at the two markets per month rollout plan, we're projecting over $850 million worth of gross food sales through the platform, resulting in somewhere between $200 million and $220 million of net revenue to Waitr. So we're very excited about the future here and the capital that's going to be available to us through this transaction would allow us to accelerate that launch plan and perhaps get to those numbers even more rapidly.

So thanks for your attention today. As you can tell, we're incredibly excited about the partnership between Waitr and Landcadia. If you have any questions regarding the presentation, please contact Dara Dierks at ICR, and her number is 646-277-1212, or she can be reached at dara.dierks@icrinc.com. Thanks again for your time.

ViaVid has made considerable efforts to provide an accurate transcription. There may be material errors, omissions, or inaccuracies in the reporting of the substance of the conference call. This transcript is being made available for information purposes only.
1-888-562-0262 1-604-929-1352 www.viavid.com

5

Landcadia Holdings – Waitr Conference Call and Webcast, May 17, 2018

**Operator:**

Ladies and gentlemen, thank you for your participation. This concludes today's conference. You may disconnect your lines at this time and have a wonderful day.

ViaVid has made considerable efforts to provide an accurate transcription. There may be material errors, omissions, or inaccuracies in the reporting of the substance of the conference call. This transcript is being made available for information purposes only.
1-888-562-0262 1-604-929-1352 www.viavid.com

6

Exhibit 99.2



Landcadia Holdings, Inc. – CNBC'S Power Lunch – Tilman Fertitta Interview, May 17, 2018

## C O R P O R A T E P A R T I C I P A N T S

**Tyler Mathisen**

**Tilman Fertitta**

## P R E S E N T A T I O N

**Tyler Mathisen:**

CNBC's *Billion-Dollar Buyer,* Tilman Fertitta, announcing that he is adding a new item to his business empire menu today. In addition to the Rockets, his restaurants, his casinos, he will now get into the food delivery business, buying a company called Waitr, and doing it through a venture he started with Rich Handler of Jefferies, that company called Landcadia. Waitr is a food delivery startup based in Louisiana. They've got more than 5,000 restaurant partners in more than 200 cities in the Southeast, and here is Tilman Fertitta.

Tilman Fertitta, welcome, good to have you with us.

**Tilman Fertitta:** Hi, guys. How you all today?

**Tyler Mathisen:** We're great. As I understand it, there was a time when you were a little cool on the food delivery business. Tell us why and what changed your mind and why this one is the one to go after.

**Tilman Fertitta:** You know, it's really funny how things change, and we all know we are in just a different world today, and the Internet is changing our world. I was never a believer that people would stay home and watch Netflix and Hulu and not want to go eat at a restaurant, but what's happening is we're having to designate parking places and have people just handle all of our to-go orders. What's happening now is the software is coming in with all these companies and their ability to deliver it to the customer, and what's happened, also, is that I've really thought that, like, Blue Apron and Sunflower, and all of those, were going to have a huge hit on us in the restaurant industry, and they didn't, because as the ingredients starting coming in and people still had to cook for 45 minutes, and then they still had to clean up, I think people realized why "Why am I not just ordering food from my favorite restaurant and having it delivered?" So, hey, I'm converted, I'm changed. I mean, I've seen it happen at my hundreds of restaurants around the country, so—

**Tyler Mathisen:** Yes, you're following the customer there.

**Tilman Fertitta:** I am, and that's what you have to do. The consumer tells us what to do and the companies that don't do what the consumer tells them are the companies that aren't here again in a few years.

**Tyler Mathisen:** Yeah. How do you scale it from its now strong position in the South and Southeast to a national brand? Competing with, for example, GrubHub or Uber Eats, what's your edge?

**Tilman Fertitta:** Well, one of edges is, is that the restaurant only hits 15%, where I will not use GrubHub because they want 25%, or, you know, different parts 20%, 30%. We can't afford to do it, the quality of food that we serve, and so one of the things that attracted us to Waitr that got them in our restaurants was the 15%, because they hire their own drivers and they can do more deliveries, and we won't use Uber Eats because of the cost to us. So, it kind of started getting our attention, and then Jefferies and myself, Rich and I were looking for a company to buy with this special acquisition corp. and we went to them and —and, you know, they kind of liked the idea, because they already had a tie-in with Landry's, and we started talking. I didn't think we were going to make a deal. As I watched their sales, you know, last year $125 million, they're going to do around $250 million this year, and projected to do $500 million next year. I mean, the growth is there, and what I like about them is they're in the smaller markets. We're the only company out that's going to be public, besides GrubHub. So, I'm excited about it. I wanted a real growth company and I think this is it.

ViaVid has made considerable efforts to provide an accurate transcription. There may be material errors, omissions, or inaccuracies in the reporting of the substance of the conference call. This transcript is being made available for information purposes only.
1-888-562-0262 1-604-929-1352 www.viavid.com

**Landcadia Holdings, Inc. – CNBC'S Power Lunch – Tilman Fertitta Interview, May 17, 2018**

**Female Speaker:** But, Tilman, to Tyler's point, there's so many competitors and it's really hard to see where this industry is going, it seems so fragmented, and as a consumer, what are we going to do, have like seven different apps for restaurant delivery, depending on what we want for the night? Is there going to be one that's going to come in and dominant, or are restaurants going to have to go at it on their own? Panera is doing delivery right now by itself.

**Tilman Fertitta:**

Yes, Panera is Panera and they have enough outlets that they can do it, but the independents and the smaller chains—you know, I have so many different chains, but they're still smaller chains, but they have national recognition. It's going to be like any other industry, the airline industry, the television industry, the iPhone—we call it an iPhone, but that's not what it is. Something happened to all those other competitors. All we're going to try to do is apply the same business model that I did in acquiring restaurants, is you've got to get out there, you want to be the Pacman and you want to eat up all the small companies and see what happens. You know, it's a plan, we know how to do it, we've been there before. We're going to have $150 million on the balance sheet after this deal, and so we're going to be in the acquisition mode and we want to eat up a lot of the competition and see what happens.

**Female Speaker:**

You're on cable, so you've got to have a pun. You're going to eat up the competition, of course. So, it's been a couple of days since we've seen this decision from the Supreme Court, when it comes to gambling. Now that we've got a couple of days under our belt, any more assessment about what the impact is going to be either directly on your businesses when it comes to the casinos that you own or the rest of the business, the online market?

**Tilman Fertitta:**

Well, I think online is going to be huge. When somebody is able to be at a game and go make a bet on the third quarter or the fourth quarter—you know, I've said this over and over, you know, think about squares for the Super Bowl, and you have people that aren't even sports fans or even know what's going on, but the idea of betting a square and watching to see if you could have an opportunity to win that bet at the end of each quarter is what's going to happen in sports gaming. So, what's going to happen is you're going bring a lot more eyeballs to the games, because it's going to happen so fast.

From a casino standpoint, what it's going to do for me is, you're going to have the sportsbook in the casino, but then people that are betting online for sports all of a sudden are going to start betting online blackjack, slots, and everything else, and as you start opening it up in all these other states, it's going to have, I think, a good windfall for the casinos, but it's not just the sports betting, it's the exposure.

ViaVid has made considerable efforts to provide an accurate transcription. There may be material errors, omissions, or inaccuracies in the reporting of the substance of the conference call. This transcript is being made available for information purposes only.
1-888-562-0262 1-604-929-1352 www.viavid.com

Then, on the sports side, like owning the Houston Rockets, because you have more eyeballs, your teams are going to be worth more than they are today. So, when your television contracts come up, your radio contracts, because you have more people watching and listening, you should make more money.

Once again, it's just like Waitr, though, it's just a plan, let's see what happens in the future.

**Tyler Mathisen:** Let's talk about last night's game. You needed that one and you got a big win, and you asked me yesterday am I just saying I'm for the Rockets because I like you. No. My son has a signed James Harden jersey hanging in his room, and your friend, Mr. Handler, got a little excited there last night, didn't he?

**Tilman Fertitta:**

You know, Rich is a huge Rockets fan, he's my best friend, and we—he came in yesterday, he brought a bunch of Rochester Scholarship students all the way from New York, came to the game, got back on the plane and went back to Rochester last night. Rich is a great friend, a great friend, and he definitely gets into it. Sometimes I had to nudge him and say, "I am trying to watch the game." But, Jefferies is a great bank and they have great leadership in Rich, but he does know how to have a good time.

**Tyler Mathisen:** Well, we wish you continued good luck in your quest for Houston and the Rockets. Tilman, great to see you.

**Tilman Fertitta:**

Thanks, Tyler, and thank, guys, look forward to it.

**Female Speaker:**

Good luck.

ViaVid has made considerable efforts to provide an accurate transcription. There may be material errors, omissions, or inaccuracies in the reporting of the substance of the conference call. This transcript is being made available for information purposes only.
1-888-562-0262 1-604-929-1352 www.viavid.com