1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION


WALTER WELCH, Individually   ) CIVIL ACTION NO. 2:19-CV-1260
and on behalf of all others  )
similarly situated,          )
                             )                                    )
        vs.                  ) JUDGE DOUGHTY
                             )
CHRISTOPHER MEAUX, DAVID     )
PRINGLE, JEFF YURECKO, TILMAN)
J. FERTITTA, RICHARD HANDLER,)
WAITR HOLDINGS, INC., F/K/A  )
LANDCADIA HOLDINGS, INC.,    )
JEFFERIES FINANCIAL GROUP,   )
INC., and JEFFERIES, LLC.    )  MAGISTRATE JUDGE KAY



MOTIONS HEARING


        Transcript of Proceedings before The Honorable

    Kathleen Kay, United States Magistrate Judge,

    Lafayette, Lafayette Parish, Louisiana, commencing

    on May 12, 2021.


Appearances of Counsel:

    For the Plaintiffs:          CRAIG JOHN GERACI, JR.
                                 MELISSA H. HARRIS
                                 Kahn Swick & Foti
                                 1100 Poydras St., Ste. 3200
                                 New Orleans, LA 70163



        *****************************************

            Cathleen E. Marquardt, RMR, CRR
            Federal Official Court Reporter
                Phone:  (337) 593-5223

2

Appearances of Counsel Continued:

    For the Defendants,
    Christopher Meaux, David
    Pringle, Jeff Yurecko,
    Tilman J. Fertitta,
    and Richard Handler:            GEORGE DENEGRE, JR.
                                    Liskow & Lewis
                                    701 Poydras St., Ste. 5000
                                    New Orleans, LA 70139

                                    JAMES K. LANGDON
                                    Dorsey & Whitney
                                    50 S. 6th St., Ste. $1,500
                                    Minneapolis, MN 55042

    For the Defendants,
    Jefferies Financial Group,
    Inc., and Jefferies, LLC:       ADAM SELIM HAKKI
                                    KATHERINE MALLORY BRENNAN
                                    Shearman & Sterling
                                    599 Lexington Ave.
                                    New York, NY 10022

                                    ERIN LUTKEWITTE KILGORE
                                    Kean Miller
                                    P. O. Box 3513
                                    Baton Rouge, LA 70821–3513

3

(Lafayette, Lafayette Parish, Louisiana; May 12, 2021, in open court.)

THE CSO:  All rise.

THE COURT:  Have a seat, please.

All right.  So this is 19-cv-1260, Welch versus Meaux. We are here today on a motion to dismiss for failure to state a claim by Jefferies Financial Group and Jefferies, LLC, as well as a motion to dismiss for failure to state a claim by Tilman Fertitta and related defendants.

So let's start off by doing a roll call.  Who is here for Plaintiff Welch and related defendants, or plaintiffs rather.

MR. GERACI:  Your Honor, Craig Geraci of Kahn, Swick & Foti for the plaintiffs.

MS. HARRIS:  Good morning -- good afternoon, Your Honor.  Melissa Harris from Kahn Swick & Foti also for the plaintiffs.

MR. LUNDY:  Good afternoon, Your Honor, Matt Lundy also here on behalf of plaintiffs.

THE COURT:  All right.  And who is going to be doing the talking?

MR. LUNDY:  If it's okay, Your Honor, we were going to divide up -- Melissa Harris and I were going to divide up the argument.

THE COURT:  All right.  And what specific -- what topics were each of you going to cover, just so I can keep track.

4

MR. LUNDY:  Yeah, sure.  So I was going to -- I was going to handle the 10(b) argument, and then she was going to handle most of the legal argument with respect to the 14(a) claims.

THE COURT:  Okay.

MR. LUNDY:  And there's some overlap between the misleading statements, so I'll probably just handle both of those if that's okay.

THE COURT:  All right.  Is there anybody here for De La Cruz?

MS. HARRIS:  I'm sorry, Your Honor, for who?

THE COURT:  De La Cruz, Plaintiff De La Cruz.  Isn't that in the consolidated case?

MS. HARRIS:  I'm sorry, Your Honor.

THE COURT:  They were the ones that were involved in the dispute over who was to be the lead.

MR. LUNDY:  Oh, yes, Your Honor.  So typically what happens in these cases is, after it's consolidated and a lead plaintiff is appointed, just the lead counsel appears.

THE COURT:  All right.  So we're not going to have anyone here for Coker or Sarver or De La Cruz who all have separately listed counsel; is that right?

MR. LUNDY:  That's correct.

THE COURT:  Okay.  So who's here for Defendant Meaux and related defendants?

MR. LANGDON: Your Honor, James Langdon here on behalf of Defendants Waitr, Inc. and the individual defendants, Mr. Meaux, Mr. Pringle, Mr. Yurecko.

THE COURT: That would be Meaux.

MR. LANGDON: Meaux, Mr. Meaux.

THE COURT: Welcome to Lafayette.

MR. LANGDON: I stand corrected, for Mr. Meaux, Mr. Pringle, Mr. Yurecko, Mr. Fertitta, and Mr. Handler.

THE COURT: All right.

MR. DENEGRE: George Denegre for the same defendants, Your Honor.

THE COURT: All right. And Jefferies?

MR. HAKKI: Good afternoon, Your Honor. Adam Hakki of Shearman & Sterling for the Jefferies Defendants.

MS. BRENNAN: And Mallory Brennan also of Sherman & Sterling on behalf of the Jefferies Defendants.

MS. KILGORE: And Erin Kilgore of Kean Miller on behalf of the Jefferies Defendants.

THE COURT: All right. So who is speaking for Jefferies?

MR. HAKKI: I am, Your Honor, Mr. Hakki.

THE COURT: Okay. All right. So normally, of course, I would ask that counsel come to the podium and speak, but in this COVID enriched environment, we are not encouraging that. If for any reason we're having some difficulty hearing, I'm going to

6

ask that the court reporter give me an indication if you're having trouble hearing. And if I'm having trouble hearing, I'll also let you know. We've been curing that typically by just asking you to remove your mask while you're speaking.

If you do come to the podium, and there's all sorts of hygienic things that have to happen after somebody has been at the podium and they go sit down. So for right now, we're going to suspend our normal rules of decorum and ask that everyone just sit at your table and we'll handle it accordingly.

All right. So let's see, I am not going to pretend to be as learned as everyone else here on these topics. This has been a nice, but not unwelcome learning curve for me. I've read quite a lot. I've tried to do some general research on my end just to become familiar with the terminology and things of that nature.

So if I sound kind of quiet, it's not because I'm not listening and it's not because I'm not absorbing what you're saying. It's because I'm trying very hard not to sound stupid. So do me a favor, and if I get a quizzical look on my face, then start speaking slowly and using very small words. Maybe we can get through this relatively unscathed.

The first motion that was filed was the one filed by Jefferies Financial. And let me ask plaintiffs' group, I'm going to leave it up to you. Would you like to let Jefferies and then the Meaux group go, and then you would reply, or would you rather

do it one at a time?

MS. HARRIS:  Do you have a preference?  I think one at a time would work.

THE COURT:  Okay.  Well, then, let's start -- since it was filed first, let's start with the Jefferies Group.

MR. HAKKI:  Your Honor, Adam Hakki for Jefferies Defendants.  Defendants would obviously be happy to proceed on that -- in that sequence.  We had, Your Honor, planned to actually let the Meaux Group go first because they are defendants in both the Section 10(b) and Section 14 claims so they --

THE COURT:  Yes, that makes sense.  That makes sense.

MR. HAKKI:  So I'll defer to my colleague.

THE COURT:  All right.  Let's go with the Meaux Group.

MR. LANGDON:  Thank you, Your Honor.  James Langdon on behalf of the Meaux Group.  Before I start, Your Honor, if I could, we have a handful of demonstrative exhibits, some colorful charts that we thought might be helpful to Your Honor.  I provided them to counsel for the other side, and with Your Honor's permission I would approach and hand them -- copies to Lisa, your courtroom deputy.

THE COURT:  Any objection?

MR. LUNDY:  Your Honor, all I would say is that we just received a copy just before the hearing.  We didn't really have much time to review it, so with that being said.

THE COURT:  Well, and I do note that in your reply you

8

had a -- I think it was you.  Yeah, of course it was you -- had kind of an overarching objection to the attachments to the memo or, I guess, the reply memo, or excuse me, the opposition memo.

When this is all said and done, we will discuss whether we will have additional briefing and if there's any particular area that needs to be particularly brief, and that obviously would include an opportunity to allow the plaintiffs to respond to any of the submissions if you feel a response is necessary. Okay?

Now let me just -- can I put an eyeball on them and see what we're talking about?

MR. LANGDON:  Absolutely, Your Honor, if I may approach.

THE COURT:  Yes, please.  Are they all for me?

MR. LANGDON:  They are all the same, yes.  There's a copy for the court reporter, for you, Your Honor, and for your deputy clerk, and we have another one if the clerk would like one.

THE COURT:  I bet the clerk doesn't really care.  Do you want this on the record?  You want it in the record?

MR. LANGDON:  No, they are demonstrative exhibits, Your Honor.

THE COURT:  Yeah, okay.

(Court conferring with courtroom deputy.)

THE COURT:  Okay.  Demonstratives are always welcome.

We love spreadsheets and similar documents that we're able to sort and try to collate information, so that's very helpful.

MR. LANGDON:  That's the purpose, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. LANGDON:  All right.  Thank you very much, Your Honor.  As you know from having read the materials and done some studying yourself, these are serious claims with serious consequences for the Meaux Defendants, as well as the Jefferies Defendants.  We've been accused by plaintiffs of lying to investors and lying repeatedly.

Because the federal securities laws govern this, the pleading standard -- unlike in most cases where we're dealing with Rule 8, the pleading standard is the heart of the matter here, and we think it will drive the outcome of these motions and of the case itself.

As Your Honor knows, the federal securities laws impose a higher pleading standard, and they do it because, in the wisdom of Congress back in 1995, they determined that it had become far too easy to assert claims against companies when their stock price dropped, that the clarity of hindsight was all too easy, and so they passed the PSLRA, the Private Securities Litigation Reform Act, in order to, among other things, create some bars, some hurdles that plaintiffs must overcome rather than simply being able to make a claim of essentially fraud based on hindsight.  The stock dropped, therefore you knew something bad

had happened and you lied to investors about it.

So we think that the pleading standard, and about which I'll speak more in just a few minutes, is at the heart of this matter.

As Your Honor knows, Waitr is an online and mobile based food ordering and delivery company headquartered here that was started in 2013 and grew, and in 2018 became the object of interest from Landcadia, a then public company, special purpose acquisition company that had been formed by some wealthy persons interested in essentially a new form of venture capital.

Landcadia became interested in Waitr and made an offer to acquire it.  In November of 2018, that offer was consummated. Waitr was acquired by Landcadia which then changed its name to Waitr and began trading as a public stock.  Landcadia had been public since 2016.  And this lawsuit focuses on that time period leading up to the acquisition, and then for the nine or so months following the acquisition until in August of 2019 Waitr's then CEO and founder, Mr. Meaux, resigned.

Waitr continues to exist today.  It is in business and making all sorts of progress, but this lawsuit is focused on the 2018-2019 time period.

Now plaintiffs contend that Waitr and the individual defendants, and Jefferies as well in one instance, violated the federal securities laws, the Securities and Exchange Act of 1934. There are three sections of that Act at issue in this case and in

these motions.  Essentially they fall into two neat categories which the parties have -- on both sides have agreed make sense to split those categories.

The first that I'll speak about primarily is Section 10(b) and Rule 10(b)(5) thereunder.  That's commonly known as securities fraud.  And the second, which is related to Section 10(b) and Rule 10(b)(5) is Section 20(a) which is control person liability.  Because it in our judgment rises and falls on the 10(b) claim, we won't speak about it much today.  It's addressed briefly in all the parties' submissions, but it doesn't separately justify time.

The second category and the third claim is under Section 14(a).  14(a) has to do with proxy solicitation.  The communications from Landcadia to its shareholders leading up to its acquisition of Waitr.  So we're going to end up talking about two time frames.  The 10(b)(5) is after Waitr is acquired and has been publicly trading, and the 14(a) has to do with before Waitr is acquired when Landcadia is soliciting its shareholders to vote to approve that transaction.

So plaintiffs claim that the defendants violated each of those three statutory sections essentially by -- by lying to them about the status of the business, about the prospects of the business, about the likelihood of success as a business.

But as we'll talk about, Your Honor, this is not a typical securities fraud case.  Not typical in the sense that

there is no underlying wrongdoing claim.  There is no fraud.  Books were not cooked here.  Guidance was not given about future performance, knowing that it was false.  Executives did not wildly enrich themselves.  There was no insider trading.  There was no antitrust violation.  There was no bribery scheme.  There were none of the things that courts typically find when they entertain securities fraud cases.

Instead this is a situation in which a business was founded.  Its founders and early investors were optimistic about its prospects, and those prospects didn't come to fruition.  It is at -- at best this is a case of arguable mismanagement by Mr. Meaux and others at the time.  At worst it's simply a case of fraud by hindsight; that is, you're telling us that this was a good business, and it didn't turn out to be a good business.  Therefore, you've defrauded us.

But the securities laws, Your Honor, are clear that they are not meant to be a guarantee of performance.  There is no guarantee when it comes to investing.  The federal securities laws are modeled on and built on the idea of disclosure of facts, of truth, and leaving the investors to make decisions whether to purchase or sell.  And for every purchaser there's a seller and vice versa.

What turns a case from a simple unfortunate business investment into a securities fraud is when you have that kind of underlying wrongdoing or you have the company specifically lying

to investors about certain facts.  The financials that are reported as part of being a public company on a regular basis are wrong.  They have misapplied accounting standards.  They have cheated and hid things on the books that should have been disclosed.  You won't find any of those allegations of anything like that in the amended complaint.

And frankly that's the overall basis for our motions here because, in the absence of that kind of specific misreporting of financial performance, misreporting of specific facts, then you don't have fraud.  You don't have misrepresentation.  You don't have omission.  And those are the kind of things that are necessary in order to state a claim for securities fraud.

So what I'd like to do is quickly take a look at using the demonstrative exhibits if the Court would like to look at them.  Just take a look at the claims for a moment.  Then talk a little bit more about what this different pleading standard is, and then talk about why the -- particularly in the context of the 10(b)(5) claim, why the amend complaint does not meet the standards necessary in order to state a claim.

So first of all, if you look at Tab 1, Your Honor, it's a busy document, but that shows -- each flag reflects an alleged misrepresentation or omission.  Those that are in red are the alleged misrepresentations and omissions in connection with the 14(a) claims.  Those in blue are with respect to the

14

10(b)(5) claims.

And we'll see that those allegations fall into categories.  Plaintiffs and defendants both make use of those categories in the way they talk about the allegations in their briefs.

THE COURT:  Stand by one second.  Plaintiff, if I require the defendants to provide you with this lovely graphic, would you be able to then insert your own counters into that same graphic?

MR. LANGDON:  We'd be happy, Your Honor, to give them the electronic version.

THE COURT:  Well, it's going to get kind of busy there, but we've got more colors in the color box than these two, and this really is a very nice little graphic here.  I'm not going to make you do that.  It's just an option that I'm going to offer to you.

MR. LUNDY:  Yes, Your Honor, if the Court would find that helpful, then of course we would be willing to do so.

THE COURT:  Okay.  And listen, just because I'm giving you the opportunity, if you do it and it ends up being way too much, it gets too busy and unreadable, don't feel like you have to do it, or do one of your own.  Go ahead, I'm sorry.

MR. LANGDON:  Absolutely, Your Honor, and we will do that.

So moving on from Tab Number 1, the very busy one,

you'll see we tried different ways to break down the same concepts.  Tab Number 2, Your Honor, is a focus on the 10(b) and 10(b)(5) claim, and what we've tried to do there is tell you who are the defendants because different defendants are implicated with respect to the different claims.

So you have on the left column the defendants, you have in the middle the elements, and in the third column, the standard of review.  This motion, looking at the middle column, the elements, this motion focuses on just a few of those elements.

We have not at this point in the case raised any challenges to several of these elements, but we do challenge whether, number one, there's a misstatement or omission; number two, of a material fact; and number four, whether it's made with scienter, that is, with malice and evil intent.

So with respect to the 10(b) claim, to start to look at whether the amended complaint has adequately pleaded to meet the high bars of the securities law requirements, a misstatement or omission of a material fact on the one hand and that it was made with scienter on the other hand.  You have to get back to that pleading standard.

And this is often part of a case that really doesn't matter much, and both sides put a paragraph or so into the beginning of their argument section about what the -- what the governing law is, what the standard of review under, you know, Rule 8, for example, or Rule 56 as a summary judgment motion.

Here we have very different views apparently of what the pleading standard is.  The plaintiffs have suggested that it is what is certainly very familiar to you, Your Honor, the Twombly/Iqbal standard, and that that's all they have to meet.

What we're suggesting and we think is the law is that the PSLRA imposes an entirely different standard on pleadings for securities cases, and the amended complaint has to be reviewed in the context of that different set of pleading standards which have a higher bar.

And as I mentioned at the outset, the reason for that is Congress thought that this was one way, at least, to attempt to winnow out sort of the wheat from the chaff in securities law cases and require that cases with -- be brought only with merit rather than frivolous cases.

And so the way that they have done that is to say that you need to have particularized allegations of facts, concrete facts, corroborating details backing up your allegations about misrepresentations and omissions and backing up your allegations about scienter, that is, evil intent.  You can't just intone the magic words and do the trick like it would under Rule 8.  You have to put some meat on those bones, and we believe that the amended complaint is bones only with no meat, and so it doesn't satisfy that standard.

The requirements of the PSLRA are that the pleadings, the allegations be of quality, not quantity.  And you might be

tempted to say, Well, wait a minute, Counsel, this is a 95-plus page amended complaint here.  There's a lot of words in this book, and you're telling me that that doesn't state a claim?  And I am respectfully saying that is exactly what I'm telling you.

THE COURT:  You wouldn't believe how many times I see a hundred pages of word salad.  So I'm able to kind of differentiate between what's just, you know, there, and actually that's what my role is going to be in this case, is to make a report and recommendation to the district judge about whether those words that were used make the appropriate allegations so that it can survive a motion to dismiss under the standard that you've discussed with respect to 8(a) and 9(b) and 12(b)(6) and Twombly and so forth, but keep going.

MR. LANGDON:  Absolutely, Your Honor, that's exactly what we are asking you to do in this circumstance.  And as the Fifth Circuit noted in Southland case which is one of the two key cases we recommend for your consideration.  It's cited in our brief in a number of places.

THE COURT:  I've read the Southland case.

MR. LANGDON:  Yes.  You know then the Southland court noted that it's often that you find that the very prolix complaints, the very hundred-page complaints are often a mask for the absence of supporting details, and we think frankly that's exactly what's happened here.

So under the PSLRA standards, you have to have

18

particularized facts.  You have to have -- you can't rely on challenging mere opinions.  You can't -- you can't get by on what the courts call mere puffery, that is, vaguely optimistic comments like "The company is going great.  We're really happy with the company's performance."  Comments like that which are very similar to a lot of what forms the basis for the allegations in this complaint aren't sufficient.

And if it's a forward looking comment, if the speaker is talking about the future performance, then the requirement is that plaintiffs have to plead particularized facts, showing that the speaker knew that he was lying or she was lying.  He knew actual knowledge that it was a false statement.

So in the context of this case, to drill down and look at their allegations, the many flags on Chart 1, let's first take a look at Tab 3, Your Honor.  It's a little less busy, the same -- same blue flags from the first page, but made perhaps a little more user friendly here.  This is the various allegations, the statements on various days on which the 10(b)(5) claim is based.

And if you look at Tab 4, it's an effort to put that into language in a chart that's perhaps a little more usable.  We have used here the categories into which plaintiffs placed their -- the various, the 30-some-odd allegations or statements that they are challenging, and those fall into the six categories represented on the left side under the alleged misrepresentation

or omission column.

And what I'd like to do is just very briefly talk about each of these six, and you see that we have the middle column, actual facts alleged regarding the falsity blank, and we have that for a reason because we don't think they allege in the amended complaint any actual facts, any concrete details, any corroboration. And then the various paragraphs in the complaint itself on which plaintiffs rely for each of those categories.

So with the respect to the first, the pricing model, this is the category on which plaintiffs contend that, in their words, the 15 percent take rate was not sustainable. That's how much Waitr charged restaurants for delivering their food to people, 15 percent. And as Your Honor knows, that at the time, and it still is, rather on the low end of what these kind of services, such as Grubhub, DoorDash, and the like, charge.

And this was a way -- one of the ways in which Mr. Meaux thought that he was differentiating Waitr from the pack of other competitors because it would enable him to penetrate more deeply into the market of smaller communities and smaller restaurants.

And the allegation is that 15 percent being a --

THE COURT: Can I just ask a question real quick?

MR. LANGDON: Absolutely.

THE COURT: It's kind of an overarching question. I think the plaintiffs -- well, I know that the plaintiffs have

alleged that -- or brought up the lack of experience or the lack of capability of Mr. Meaux.

What in your opinion would be the responsibility of anyone involved in this process to make it clear to prospective investors that the person speaking about these particular issues really doesn't have -- well, in the words of the plaintiff, was going to be a high school teacher until two days before whatever happened.

What would be the responsibility of the promoters, if you will, to make sure that the potential investors understand that the person making these proclamations may not know what he's talking about?

MR. LANGDON:  I appreciate that, Your Honor, and I think the short answer is that they absolutely endeavor in the communications made to the public, and I'll refer you particularly with respect --

THE COURT:  Well, what I'm asking you to acknowledge right now is that there is a responsibility to do that, right?

MR. LANGDON:  There is a responsibility to provide relevant material facts, background information.

THE COURT:  And that would be a relevant material fact, right?

MR. LANGDON:  The person's background who is going to be the C -- who is the CEO of the company --

THE COURT:  Uh-huh.

21

MR. LANGDON: -- absolutely. Now, whether it should use the words "he was an inch away from being a high school teacher" is a whole nother thing.

THE COURT: Well, I was just trying to use a shorthand version, but -- and again, I don't want to speak for the plaintiff or make its argument, but that is what I think one of the issues that we're talking about and that is the extent to which Mr. Meaux, and it's not intended to be, you know, a derogatory comment toward him personally, but the extent to which he probably or may not have had the background to be making any kind of representation about future performance being an inexperienced -- I mean, Mr. Meaux knew what he had done in the past with Waitr, right?

MR. LANGDON: He did.

THE COURT: He had been operating Waitr for a while before that. I think his take rate was 3 percent for Waitr -- or excuse me, Acadia -- what is it, Acadia Land?

MR. LANGDON: Landcadia, Your Honor?

THE COURT: Landcadia, thank you. Before Landcadia had become involved, it was 3 percent, and at some point between Landcadia's announcement and the actual offering, public offering of Waitr, then it went up to a 15 percent. Again, what we're talking about is the extent to which Mr. Meaux's understanding of how to speak about the future of Waitr, or not, is something that the investors would need to know, potential investors would need

to know.

MR. LANGDON:  And the short answer is, yes.  And in the context of the more important thing that investors would need to know and did know here were provided information regarding is the company's financial performance, what it has actually accomplished, and what the real numbers show, expenses, revenue, profit, and the like.  All of that was reported on a regular basis.

Mr. Meaux's background was reported in the definitive proxy statement, the several hundred page document which was provided to all Landcadia shareholders, in order to enable them to make their decision whether to vote on the proxy to have Landcadia acquire Waitr.  We believe that all of that information like that was disclosed and was repeatedly disclosed in the company's regular filings.

And frankly, that the market, the group of sophisticated investors that essentially determine the pricing of a stock is primarily focused on the numbers.  And that's part of what the problem here we believe in this amended complaint, Your Honor, is, is they don't assail the numbers.  They don't challenge anything about the numbers.  The numbers were accurate you.  And you don't typically find that in securities fraud cases that actually have legs.

So with respect to the pricing rate itself, plaintiffs do not allege any facts which would support an allegation that

23

Waitr or Mr. Meaux or anyone who spoke in any respect about the pricing model of the company knew that what they were saying was false, believed that what they were saying was false, that they were hiding anything that they hadn't done, X, Y, or Z, in order to vet it beforehand.  There are no specific facts with respect to any of that.

All we have are broad conclusory statements that essentially say, He was very optimistic, and others speaking on behalf of the company were optimistic, but they accurately reported all their numbers, and the market could take from that what it would and what it did.

But accurately reporting your numbers and being optimistic about your company's prospects, even if the optimism doesn't turn out to be well-founded, is not securities fraud.  It may or may not be mismanagement, but it's not fraud and so that --

THE COURT:  Well, let me back up and raise another point that goes to your point here, that this is not your typical securities fraud case in that there's no theft, there's no this, there's no insider dealing or whatever.  I'm assuming that the reason that the plaintiffs gave us the background that they did about the timing of the acquisition of Waitr and the fact that the -- Do you call it SPAC or the S-P-A-C?

MR. LANGDON:  We'll go with either one, Your Honor.

THE COURT:  SPAC.  All right.  It was done when it was

done in the fashion that it was done so that the sponsors, if that's the correct word, okay, weren't going to have to give back $250 million.  I mean, that's something of value there, correct?

MR. LANGDON:  Well, it is except for the allegation is absolutely and demonstrably incorrect based on --

THE COURT:  The dates are correct.  What their motives are -- I mean, you know, obviously, your clients know better what their motives are, but the dates line up, right?

MR. LANGDON:  Well, they do, but what I meant when I said it's absolutely incorrect is the fact that it could not be extended.  It's standard practice -- you know, unfortunately we're going outside the record here, but it's standard practice for SPACs to be extended.  The prospect of having to give back $250 million was nonexistent, frankly.

THE COURT:  Well --

MR. LANGDON:  As I understand all the papers.

THE COURT:  We're going outside the -- well, to the extent that plaintiffs have alleged that that was a causative factor in what occurred, I guess it is in the pleadings.  Whether it's relevant to any material fact, I guess, is another issue.

MR. LANGDON:  And whether it meets the pleading standard.  Whether it's sufficiently specific, whether it's not an opinion, not puffery, whether it's backed up by, you know, material corroborating facts, and we think that it's not.

I could go through in the same fashion, Your Honor,

each of the six categories here, but the bottom line of all of it is that for none of these do we have anything other than either very generalized statements or opinions or forward-looking statements that are future expectations and nothing more, all of the Fifth Circuit in Southland and in the Rosenzweig case, both of which are cited in our briefs, have made clear are insufficient to state a claim for securities fraud.

There aren't specific facts here to back it up.  You don't see the allegations of there was accounting fraud, and they misapplied this GAP standard, or this FASB standard.  There was insider trading.  There was the CEO selling a million shares of his stock on the QT and making a bundle of money.  You don't have any of those kinds of allegations here, and without those you don't state a claim for securities fraud.  It is too vague, it is too ambiguous, it is -- so that it's not sufficiently material.  That's what the standard was imposed by Congress to do, and that's frankly what the application of it does here.

So as a result, we say they haven't pleaded sufficiently a misrepresentation or an omission of a material fact on the one hand.  On the other hand, they haven't pleaded -- they haven't pleaded sufficient facts to establish scienter.  Congress has said you have to have strong facts showing a strong -- permitting a strong inference of scienter.  Supreme Court --

THE COURT:  Congress said that?

26

MR. LANGDON:  Congress said that in the PSLRA.  The Supreme Court then said, To have a strong inference, the facts pleaded have to be compelling.  They have to be at least as compelling as the innocent explanation.  Not more compelling, but not less compelling than the innocent explanation.

And so we don't have those kinds of facts here to show a strong inference of scienter.  We don't have any indication of why these individuals, Mr. Meaux, Mr. Yurecko, Mr. Pringle, and the others, would have any motive to do what they did.  There's no financial gain on their part.  Why they would promote a company that they knew would fail; why they would say things they absolutely knew to be false; there's no explanation of why that could be.  Nor is there any, any factual allegation to show that they knew that.

And so in the absence of those kind of things, what plaintiffs point to is the fact that new management said previous -- we're going to do things differently than previous management did.

THE COURT:  It also said that the W-2 aspect of it would never work.

MR. LANGDON:  Right, absolutely.

THE COURT:  It goes back to my point of, okay, so here comes somebody who really knows what they are doing, and they are going, "that will never work."  And I don't think he was talking about as of the day he became CEO.  I think he was talking about

from the get-go.

MR. LANGDON:  Well, he's looking back, but from the get-go, you know what?  All of the material facts with respect to that model, the W-2 employees, all of the expenses associated, everything was disclosed to the market.  It's -- Hindsight is incredibly easy, Your Honor.  It's a big difference, though, between --

THE COURT:  I understand that, but I think there's something a little compelling with the thought that, you know, here comes the new CEO who obviously knows what he's doing, and he looked at it supposedly, according to the pleading, or he's quoted as saying it publicly anyway, you know, "that thing would never work," which would imply to me that anybody who knew what they were doing, which may not include Mr. Meaux, would also have known that back at the time of the public offering, which is where you get to -- where I think the plaintiffs are trying to get to the misrepresentation.  That's one element of it anyway.  That's not the whole ball of wax, obviously.

MR. LANGDON:  Well, but I -- Let's, if we could respectfully, Your Honor, stick with that for a minute.  I would say that that is not -- the fact that "this could never work" is not the kind of particularized fact that we are talking about, that to create -- It's on opinion.

THE COURT:  Well, what about the fact that the previous CEO wasn't competent enough to adequately assess whether it would

work?

MR. LANGDON:  Well, that's an assumption and, frankly, an opinion as well, Your Honor.  He is who he is.  He had this high school background.  He had this education.  He had this previous work experience.  Whether he's competent enough is in the eye of the beholder, and it's too easy after the fact when it's not successful to say, Oh, he wasn't competent.

THE COURT:  Well, but when you prop him up by putting him next to Mr. Fertitta, then what does that add to the mix?  Nobody knew who Mr. Meaux was other than the four high school students that he was dealing with.  And again, I'm not trying to denigrate Mr. Meaux.  I'm from Lake Charles.  I know what Waitr is.  In the interest of disclosure, I've used Waitr before.  All right?

MR. LANGDON:  Understood, Your Honor.

THE COURT:  But, you know, if you bring somebody in who has a reputation for being, you know, a Midas in the investment world, I mean, to the point where I believe he had a reality show, right?  Again, we're going beyond the pleadings, but it's not anything everybody doesn't know.  Well, I think the allegation has been made that his reputation was a factor.

MR. LANGDON:  Mr. Fertitta.

THE COURT:  Mr. Fertitta, yes, even though he really had no involvement.  That's the allegation.

MR. LANGDON:  I agree that's the allegation, Your

Honor.

THE COURT:  All right.

MR. LANGDON:  And so -- But to stick with that for a moment.  There is no fact pleaded to show that Mr. Fertitta, for example, knowingly associated himself with a nincompoop and propped him up knowing that he --

THE COURT:  You said "nincompoop," not me.

MR. LANGDON:  I understand.  Knowingly associated himself with Mr. Meaux, knowing that Mr. Meaux would fail.  That -- if they pleaded facts showing that Mr. Fertitta did that, we would be in a different situation, Your Honor.  But the mere fact, looking back saying, Mr. Fertitta picked Mr. Meaux to invest with and that wasn't such a good pick, that's not the stuff of securities fraud.  That's something entirely different, and whether it states any cause of action is a different question, but it clearly doesn't state a securities fraud cause of action and why?  Not because -- Because essentially it's irrelevant whether or not Mr. Meaux failed.  What's important from a securities law point of view is what your disclosure was.

THE COURT:  Well, but your new CEO said he would never have succeeded.

MR. LANGDON:  Well --

THE COURT:  Now he said it after the fact, obviously, cause he came in after the fact.  And again, you know, this is difficult because we are having to, you know, try to stick with

what the pleadings are, but the pleadings, again, it's merely, you know, it's stating what the current CEO said about this business model, and it did not appear that he was -- And it appeared as though, from the way I read it, that he was talking about the viability of that aspect of the business model from the get-go.

MR. LANGDON:  Absolutely.

THE COURT:  And so if you have someone -- I mean, I think that it makes for an interesting combination of factors that have been pled, and of course, then the question is, that we're here to determine is whether that falls under an actual allegation of fraud cognizable under the wand which they are proceeding.

MR. LANGDON:  That's exactly right, Your Honor.  The issue here is all of the things that they are complaining about are opinions, after-the-fact opinions about facts which were fully disclosed.  The market exists because one person looks at an investment and says, "time to sell," and the other person looks at it and says, "time to buy."  They each have different views of the likelihood of what's happening in the future.

And here, so long as there was full disclosure of this business's background, its performance and the like, then it's not securities fraud.  To say that it didn't work out after the fact and that the new CEO coming in and looking at a situation said, in a manner in which a CEO might, I would have done things

differently and I don't see how this could have worked.

THE COURT:  But he didn't say that.  He said it would have never worked.

MR. LANGDON:  Okay.  Well, the new CEO comes in and says it would never work, but the "it" was fully disclosed to the world, and the world made its own decision.

THE COURT:  But how is the world supposed to determine viability?  I mean, don't you rely on people who are expert in the field when they give -- when they make their -- when they give their opinions, you are relying on their expertise, and so --

And again, we're kind of juxtaposing factors here, you know, the extent to which the CEO initially who was the source of the statements or the puffery, if you want to call it that, didn't -- was not sophisticated enough to even understand what he was talking about.

And then you slide Mr. Fertitta into the picture who has a reputation for not hanging out with nincompoops -- your word, not mine -- you know, it's -- it would be a lot easier if we did find somebody who was, you know, out and out lying, but I don't think it's going to be as easy for us to absolutely throw this thing out without doing a serious consideration of the extent to which those factors might play a role.

You know, just because there's no case out there just like this doesn't mean that this can't be a case.  They are all

factual, very factually driven, right?

MR. LANGDON: They are very factually driven, but I would suggest that the Southland and Rosenzweig cases in particular give you a framework in which to work as you assess this case. Respectfully, I continue to believe that the kinds of things about which plaintiffs have based the amended complaint on and that Your Honor is talking about now are not indications of securities fraud.

THE COURT: No court yet has declared that to be an indication of a securities fraud.

MR. LANGDON: Well, for good reason, because it doesn't meet the elements. There was no nondisclosure. There was nothing hidden. Whether or not someone is sufficiently experienced or successful is a matter of opinion about which people differ wildly. Look at what happened with all the big tech companies and the Mark Zuckerbergs of the world, you know. With no experience at all, they create something that works. This is in that ilk. It didn't work.

THE COURT: We don't want to go down that lane, do we?

MR. LANGDON: Pardon me?

THE COURT: We don't want to go down that lane, do we? We'll stick to Waitr.

MR. LANGDON: All right. We'll stick to Waitr, Your Honor. But my point is that there is no concrete fact pled from which one can draw a strong inference of scienter. Somebody knew

33

when they said it that they were lying. Mr. Fertitta knew standing up on that stage next to Mr. Meaux that he was perpetrating a lie, and in the absence of that, this is not a securities fraud case. This is not well pled under --

THE COURT: If Mr. Fertitta knew he was a nincompoop, does that make it a lie?

MR. LANGDON: Not necessarily, no, because nincompoops can be successful, and as long as the company's financials from which the market derives the pricing of a stock and on which the market primarily relies, not so much on what CEOs say, but on what they do and on what their performance brings.

THE COURT: Well, if we're talking about future stuff, though, then it is on what they say, right?

MR. LANGDON: It is, but it's based on not so much of what they say, but their track record and the investors' determination about how reasonable what they say about the future is based on what they have done in the past.

THE COURT: Okay. Well, I'm going to stop interrupting you because we do need to --

MR. LANGDON: I appreciate that.

THE COURT: We need to let the plaintiff have its opportunity to respond. Please keep going.

MR. LANGDON: We do. Let me just very briefly move to Section 14(a), and then I will hand that off to Mr. Hakki, if Your Honor permits, and then we will hear from the plaintiffs.

34

The difference with respect to 14(a) is -- between that and 10(b)(5) is a difference in time frame, the different portions of the timeline.  And you see at Tabs 5 and 6, the smaller timeline and the chart reflecting the elements. Mr. Hakki may talk to you about those more.

But 14(a) is focused on the disclosure to Landcadia shareholders in connection with the proxy solicitation, and it essentially is subject to the same kind of analysis with respect to the lack of underlying factual detail.  There aren't specific material facts going to the basis for arguing that the speaker's opinion is false, and that would show that the omission or the statement made makes the opinion misleading.  And in the absence of that kind of information, then the opinions and the statements aren't actionable.

There's also, we believe, that the same scienter standard applies, but fundamentally, regardless of that, the absence of specific facts showing concrete misrepresentations, it really dooms the 14(a) claim as well.

It really is, Your Honor, the amended complaint can be boiled down to "you told me this was a good company and it wasn't," but that's not enough for securities fraud.  So as a result, based on the PSLRA and on the Supreme Court's interpretations of it, we believe respectfully that you should dismiss the amended complaint.  Thank you.

MR. HAKKI:  Your Honor, would you like me to speak next

with respect to the Section 14 claims?

THE COURT:  If you like.

MR. HAKKI:  I'm happy to, Your Honor.

THE COURT:  Wait.  Okay.

MR. HAKKI:  Sorry.

THE COURT:  Yeah, go ahead, go ahead.

MR. HAKKI:  So because Your Honor asked questions about a couple of points.

THE COURT:  Please understand, too, though, I'm still learning this stuff.  Okay.  I mean, I've been culling through these cases and trying very hard to get everything compartmentalized the way it needs to be, so that's why I kind of prefaced this by saying I'm probably not going to say a lot cause I don't want to sound stupid, but I do need help from both sides finding the right pigeonhole.  Go ahead.

MR. HAKKI:  Of course, Your Honor, and very much appreciate the questions.  And with regard to the allegation or the suggestion that had Landcadia not consummated the merger by the two-year deadline, the sponsors would have had to themselves gone out of pocket and given back $250 million, that -- to the extent that's alleged, that's not quite right, and I just want to walk through that very briefly because I think it's important and it is in the record.

THE COURT:  Okay.

MR. HAKKI:  If one were to look at page 32 of the

definitive proxy statement which talks about interests of certain persons in the business combination, it describes how the redemption feature of SPACs works, which by the way is common to all SPACs which there are not that many SPAC cases out there.

THE COURT:  Right.

MR. HAKKI:  We don't have that much case law to look at.  There's not that many of Section 14 cases out there.

THE COURT:  I think that's why my office has gotten many phone calls about this hearing.

MR. HAKKI:  Yes, Your Honor.

THE COURT:  There aren't that many SPAC cases out there, so.

MR. HAKKI:  There aren't, and I think it's an important thing because the way SPACs work, first they do an IPO.  They become a public company on the promise that the public company will look for a company to acquire, right?

THE COURT:  Right.

MR. HAKKI:  They will take the funds raised in the IPO -- here I think it was 250 million -- and go look for a company to acquire that has not yet been identified.

One of the attractive features to invest in SPAC, right, at that stage is that there's a promise built into the SPAC that you can always get your $10 back.  The SPACs's IPO at $10 per share.

THE COURT:  Or 250 million as the case may be.

MR. HAKKI: Right. It adds up, right? It's $10 a share, and it's a lot of shares to get to 250 million, but investors in the SPAC IPO, the people who buy the SPAC shares before the merger closes, they can always get the $10 back, that's the promise, $10 per share, okay, if you want to be clear. So they can always get the 250 million back. If they don't like the merger, even if they like the merger, it's their option. That's the way SPACs are set up. It's all explained in the proxy.

In order to facilitate the performance of that promise, i.e., you can get your money back if you don't want to stay in the merged company, right, there is what's called a trust account, and it's described in both the IPO documents as well as the proxy statement. That effectively is a lockbox where the money goes while the company is looking for a target. It has to sit there. It accumulates interest. And if the company can't find a target, the money is there to go back to the investors.

If the company finds a target but a lot of the investors don't like it, or they do like it but they were never in it for the investment in the first place, they just wanted the interest, they can redeem.

The liability of the sponsors is a joint and several liability to go out of pocket if for some reason the assets in the trust account disappeared. Like, if they lost the money somehow, there can be liability to the sponsors. That's what the

proxy statement is talking about.

THE COURT:  Well now I understand -- I understood that point to be that the money would be just going back to the people who had given it in the first place if the SPAC dissolved or whatever.

MR. HAKKI:  Right.

THE COURT:  If it did not live up to its terms.  I'm not suggesting that any one person had to come up with that money although there's been an allegation that Jefferies Financial Group would lose -- I don't know -- you'd have to pay back monies for underwriting services or something of that nature, but anyway, go ahead.

MR. HAKKI:  Right.  Fair enough, Your Honor.  So I wanted to make sure that was clear.  And I'm not aware of any SPACs where it's happened that, like, the trust account had disappeared.  The issue is really what you would lose as a sponsor if you didn't consummate a transaction is the upside, right, of the fees, et cetera, and the economics of owning the combined company that would come from a successful merger.

But I think just, again, from the sort of plausibility perspective, when you think about, you know, which would be more attractive, you know, if you didn't believe in the CEO and the target, having the company be a failure, you know, the sponsor is going to own 16 percent of it after the merger, you know.  It's their name that would be associated with a failed -- with an

unsuccessful merger.

It's difficult to see, if one is weighing inferences as the Supreme Court's decision in Tellabs says one does in that motion to dismiss and the Section 10(b) case, it's difficult to see the inference for wanting to go out with a bad deal that you thought was bad.

And if you look at, Your Honor, going beyond that, the disclosures, I mean, there is -- and I'm going to focus on my issue which is Section 14.  If you look at the disclosures, I mean, there's a detailed statement of Mr. Meaux's biography at page 206 of the definitive proxy statement listing all the different jobs he had held, et cetera, and -- but it's not -- it's not presenting it as if he's a wizard who's got, you know, sort of unfailing expertise with respect to companies.  In fact, quite the opposite.  There's a specific risk factor at page 44 of the definitive proxy statement that says in bold text.

(Reading):  Waitr has limited operational history.  Waitr is subject to developmental risks associated with the development risk of any new business.  It says that Waitr may not be able to accurately forecast revenues.  It says that the management of Waitr has limited experience operating a public company and could be unable to transition from a developmental stage business to a large organization.

So the warnings of the fact that these things could happen, that this is a company that's transitioning from a

40

start-up that has only lost money and only lost more money each year that it went on to a public company that would be successful are there.  That's what the securities laws require.  You know, many entrepreneurs, and I'm not going to make analogies to any big tech companies, but many entrepreneurs, Your Honor, before they finally have their very successful idea work for a range of startups.  And what investors are betting on is the idea.  And, you know, it's a premise of securities fraud or even a Section 14 case on the fact that the CEO was not infallible, particularly have these types of disclosures --

THE COURT:  How is the -- again, I swore I wasn't going to ask another question, but I'm going to do it anyway.  How is a common investor supposed to know if a W-2 scenario for employees is going to be better for the success of the company than a contract worker or whether the ability to develop the software that allegedly is -- was one of the selling points of Waitr is actually sustainable?  I mean, where do they get that information from?

MR. HAKKI:  So they can't -- they can read the disclosures which are not wanting for detail.  They are very detailed, but they can't know for sure.

THE COURT:  They can't know for sure, but where do they get the inkling that it would?  What gives them the inkling that it would lead to a successful venture?

MR. HAKKI:  The company's belief, and --

THE COURT:  That would have to --

MR. HAKKI:  Sorry.

THE COURT:  I would imagine that that would have to be based on somehow the reputation of the speaker or the ability of the speaker or the knowledge of the speaker that he knows what he's talking about.

MR. HAKKI:  Right, and I don't think that the complaint alleges anything to suggest that the speaker was not in a position to have a sincere belief, an objectively reasonable belief that this business model would work.

THE COURT:  Well, I'm going to let the plaintiff address that point.

MR. HAKKI:  Yeah, but that --

THE COURT:  I've said a lot that I felt as though the plaintiff, that's where he was going, but I'm going to shut up now and give the plaintiff an opportunity to speak for themselves.

MR. HAKKI:  So let me then turn to section -- what I really -- I'm going to focus on, which are the Section 14 claims, which don't really turn on, on the issues we've been talking about, Your Honor.

You know, as the complaint is set up, it's basically two books under one cover.  You've got the Section 10(b) and then you've got the Section 14(a) case.  And if you look at slide 5 in the handout you were given, there's a discussion of the Section

42

14(a) claim there.

The 10(b) case focuses on what happened after the merger. The 14(a) case focuses on what Landcadia said to its investors in connection with the shareholder vote with respect to the merger. You've got a different set of named plaintiffs for the two sets of cases. You have a different class. You have a different, although overlapping, roster of defendants.

My clients, the Jefferies Defendants, are only part of the Section 14(a) case. There are really some important differences and then there are some important similarities. So in terms of important differences, 14(a) is not a general antifraud provision, Your Honor. Rather it's a section that focuses entirely on statements made in the proxy materials in connection with the shareholder vote.

In this case we're talking about a vote of Landcadia shareholders to proceed with the merger with Waitr. It's also a very sort of technical claim. They're not -- plaintiffs are not claiming investment loss. What they are claiming, rather, is that they didn't receive accurate information, totally accurate information in connection with the vote they were asked to make.

And it's especially technical in the context of a to SPAC because of this redemption right which I've already discussed and I won't belabor.

Another substantial difference is who can be a defendant. For Section 10(b) it's relatively simple. The maker

43

of an alleged material misrepresentation is liable provided all the other elements are met.

Section 14(a) is fundamentally different.  The liability lies with, first of all, there has to be a material misstatement or omission in proxy solicitation materials that were an essential link, quote, unquote, to the shareholder vote, but liability is not necessarily a person making a misstatement or even assisting in the making of a misstatement.  Liability applies only in two cases.  One, where you actually solicited proxies, and two, where you permitted the use of your name to solicit a proxy.

Plaintiffs don't dispute that it's their burden to show on the basis of well-pleaded facts on a defendant-by-defendant basis, and that becomes very, very important in this case.  That each Section 14(a) defendant actually participated in the solicitation of a proxy or permitted its name to be used to solicit proxies in a way that created a substantial connection to the outcome of the shareholder vote.

So as applied, Your Honor, I have three arguments.  The first is, whether the plaintiffs have adequately alleged the material misstatements or omissions in the proxy solicitations.  Mr. Langdon has largely covered that, but I have a couple of specific points to the Jefferies defendants.

My second topic is whether the plaintiffs have adequately alleged that the Jefferies Defendants are proper

44

Section 14 defendants in the first place, and third, what's the standard required mental state for the cause of action.  Is it scienter as the Jefferies Defendants argue, and defendants argue, or is it negligence, and even if it is negligence, have they pleaded negligence.  So it's a lot, Your Honor, but it's a long complaint.

The first thing I want to emphasize that I think is very important, Your Honor, is that plaintiffs make lots of arguments in their opposition brief, but what controls is what they actually allege in their amended complaint, and they have a very specific section of their amended complaint that purports to lay out what the misstatements were that they say are actionable under Section 14(a).  That's Section E of the amended complaint. It runs from paragraph 27 at page 10 to paragraph 44 at page 23. And it sets forth, according to the complaint, the totality of plaintiffs misstatement and omission allegations under 14(a).

Those are five specific disclosures.  The first is the May 17, 2018, conference call announcing the merger.  The second is a May 17, 2018, interview with CNBC and Mr. Fertitta.  The third is an August 2nd, 2018, press release filed by Landcadia on form 8-K.  The fourth is an October 1, 2018, investor presentation, and the last is a November 8, 2018, press release by Landcadia.

Importantly, Your Honor, the complaint does not allege that the central document in any proxy disclosure and shareholder

vote, the proxy statement itself was materially misleading.  They instead focus on these five, essentially, press releases that were put out into the market by Landcadia.

I don't think -- and I could be corrected when it's plaintiffs turn to speak.  I don't think the plaintiffs -- I didn't understand them to be arguing that they are not required to identify with particularity what they believe the misstatements to be consistent with the PSLRA.  What I understand them to be arguing is that they don't have to plead negligence with particularity.  So I don't want to, you know, have an argument over something where, you know, basically we're not --

THE COURT:  Well, that's kind of the rub between a negligent -- pleading negligence and pleading fraud, right?

MR. HAKKI:  I think arguably, Your Honor, and that's their position anyway, and we can talk about that.  But I think that's what I understood the arguments to be, so I'm going to take them in that spirit.

So looking at, you know, these five categories of statements and -- which I think plaintiffs concede they do have to be particular about what the misstatement was, you know, looking at the first one which is this May 17, 2018, conference call.  First of all, as to my clients, the Jefferies Defendants, there's no allegation that they even participated in that conference call, much less used it to solicit proxies.  It was not their call, according to the complaint.

46

There's no mention of the Jefferies Defendants in the seven paragraphs of the complaint, 29 to 36, that address that call.  And accordingly, Your Honor, that misstatement should be out as to the Jefferies Defendants.

This would be consistent with Judge Castel's opinion in the Bank of America Merrill Lynch merger litigation which was also under Section 14, which we've cited in the papers which was a lengthy opinion which required a substantial connection with the disclosures that actually involve the defendant before you could make them a Section -- a proper Section 14 defendant.

THE COURT:  Wait, say that one more time.

MR. HAKKI:  What was required in that decision was, you know, the Court looked at it statement by statement and defendant by defendant and said, Okay, which defendants were involved with this statement.  If there was no involvement, as I'm arguing was the case here -- at least it's not pleaded that there was an involvement -- that shouldn't be enough to say that you are a proper Section 14 defendant because it's hard to say that you were soliciting a proxy in a role where you were not speaking, okay, and where nothing is alleged to have been said about you. Again, I'm just going based on what's in the paragraphs -- these paragraphs of the complaint.

The same argument would apply equally, Your Honor, to the second misstatement, which is the alleged misstatement, which is the May 17th interview with Mr. Fertitta.  That was just

Mr. Fertitta.  You know, the statements that he's talking about, I think if you look at them, it starts with things like "we believe," and those are classic statements of opinion which even as to he should not be actionable.  We would argue under the opinion standard for liability, absent a showing that he had a -- he subjectively didn't believe what he was saying.

But as to the Jefferies Defendants it's more simple, you know.  There's no suggestion that they were a party to that statement, and that's number 2 of 5, or that it was about them as such.  There's a reference to Mr. Handler, but not in his capacity as a -- as an executive of the SPAC, but there's no reference to the Jefferies Defendants.

And then there's three more categories, which I won't go one by one, Your Honor.  I can lump them together.  The three remaining alleged misstatements are at paragraph 39 to 44. There's no -- those are all press releases that Landcadia filed including one that included the investor presentation.  There's no substantive reference to Jefferies in any of those paragraphs in the complaint.

All that the plaintiffs have done is commence each of those paragraphs by saying -- and then they list all the defendants, including the Jefferies Defendants, filed those misstatements.  Your Honor, that's not correct, and you are entitled to look at the filings that they reference, and I would invite the Court to do so.  Those are all filings by Landcadia

48

and no one else.  And there's no filing of any kind by Jefferies, LLC, or Jefferies Financial Group, which are the two Jefferies Defendants.  This is, Your Honor, just, you know, bold group pleading which is not permitted in a circumstances where, as plaintiffs concede, they have to particularize the misstatements.  You just can't do it.

And there is no particularized pleading that the Jefferies Defendants made any of the five misrepresentations that make up the totality of the alleged misrepresentations in the amended complaint with respect to the Section 14(a) claim.  And, you know, under the arguments that we've put forth, including the Bank of America decision which looked at these issues in detail, that should be the dismissal of the case against the Jefferies Defendants because they are only sued under 14(a), and it's plaintiffs that chose to line up those statements in that fashion and identify five of them, none of which they even allege involve Jefferies in those paragraphs.

Now turning to my second point for dismissal, Your Honor, whether the Jefferies Defendants are proper Section 14 defendants at all.  The analysis is a little different for Jefferies Financial Group than it is for Jefferies, LLC, and I'll explain why, but the standard is the same, Your Honor.

The parties agree that plaintiffs must plead facts showing that the Jefferies Defendants actually participated in the solicitation of proxies or affirmatively allowed their names

to be used in doing so in a way that connected to the shareholder vote.

Here as the Jefferies Defendants, I would argue we have a complete pleading failure. First it's essentially undisputed at this point that the Jefferies Defendants did not themselves participate in the solicitation of a proxy. We've already gone over the five misstatements. I'm not going to do that again. You also have the proxy statement, Your Honor, and the proxy card in the file of materials that are incorporated by reference in the complaint.

The proxy statement is an SEC filing by Landcadia and nobody else. That is not a Jefferies filing. Plaintiffs don't allege otherwise. The fundamental thing that the proxy statement actually does is set forth the Landcadia Board of Directors' -- which again is not Jefferies -- recommendation that the shareholders approve the merger.

The proxy card, Your Honor, is even more clear. It states expressly that the proxy solicitation is on the behalf of Landcadia's Board of Directors, no one else.

I was going to -- I know we've been going for quite awhile, and if I can get away with not needing to hand it out I will. There is specific instructions from the SEC, which are cited in the parties' papers, as to who is a participant in a proxy statement solicitation and who is not. They are actually very, very important in this case. They are obviously available

to the Court and with the Code of Federal Regulation cites that the parties have put in, but I did put together just simple excerpts from them that I think make the discussion easier.  So I would be happy to hand it up if it's convenient for the Court.

THE COURT:  Have you shared that with everybody?

MR. HAKKI:  I can.  It's merely a printout of the SEC rules.  It's not embellished in any way.

THE COURT:  I'm probably the only one in this room who hasn't looked at it.  Well, I've maybe looked at it.  I don't know.  You can hand it to me and we'll see.  I thought SEC stood for Southeastern Conference.

MR. HAKKI:  I think first and foremost it does, Your Honor.

THE COURT:  This is literally just a printout of the CFR?

MR. HAKKI:  Yeah, this is a printout straight from the CFR.  This is what's referred to as -- this is an SEC regulation, and it's what's referred to as Section -- as Schedule 14(a) which is a schedule of what you put in a proxy statement which is filed on Form 14(a), and that's what this is.  It's got instructions, and it's quite detailed on who is a participant in the solicitation of a proxy and who isn't.

The -- I'd like to start with item 4, which is at the bottom of page 5, Your Honor, where it says "Persons Making The Solicitation."  And it says that the filing party should state

who is making the solicitation. The proxy statement and the proxy card did. They said it was Landcadia's Board of Directors. They did not say it was the Jefferies Defendants or anybody else. So that's point one.

The -- there's then a discussion, Your Honor, at page 6 and 7 which is more specific, guidance from the SEC on who is a participant in a solicitation of a proxy, and this is really at page 7. There's item 3, and it says (reading): The terms 'participant' and 'participant solicitation' include the registrant, which is Landcadia, not the Jefferies Defendants; any director of the registrant or nominee for election of the board. Jefferies is neither of those things. A committee or a group which solicits proxies, et cetera. It also is not the Jefferies Defendants. Person who finances the solicitation of proxies. It's also not the Jefferies Defendants, although I think the plaintiffs may have some argument that they make with respect to that, and then any person who solicits proxies, which is obviously somewhat circular. And I'm going to talk about why I don't believe the plaintiffs have alleged that the Jefferies Defendants solicited any proxies.

But the key point here, Your Honor, is what I've highlighted, which is instruction 3(b). It says, "The terms 'participant' and 'participant in a solicitation' do not include:

"Any person employed by a participant in the capacity of attorney, accountant, or advertising, public relations, or

52

financial adviser..."

The Jefferies Defendants and in particular, Jefferies, LLC, is here because it was a financial adviser to Landcadia with respect to the merger. That's exactly the role that the SEC's very instructions say does not make you a participant in the solicitation of a proxy.

And just to crystallize a little bit the different Jefferies entities and their roles. You've got Jefferies Financial Group which is the entity that was a sponsor of SPAC of Landcadia. It, you know, is alleged to have had that role. That comes with certain rights and obligations. There's nothing more there with respect to Jefferies Financial Group.

You then have Jefferies, LLC, which is a broker-dealer. It had multiple roles. It was an underwriter of the IPO of the SPAC.

THE COURT: Wait, you are back to the LLC now?

MR. HAKKI: Yes.

THE COURT: Okay.

MR. HAKKI: So Jefferies, LLC, you sort of think about it, one is the investor and one is the investment banker/adviser. The investor is Jefferies Financial Group who was an actual sponsor of the SPAC itself, right?

Then you have the investment bank financial adviser which is Jefferies, LLC. I think we call it JLLC in our brief. That party had a couple of different roles. It was an IPO

53

underwriter of the SPAC when the SPAC itself went public.  There are no allegations that anything was done wrong with that IPO, that there were any misstatements in the IPO prospectus.  If there were, this would be a different case.  Then you'd have a case under the 33 Act instead of 34 Act.

The Securities Act of 1933 is the one that deals with underwriters and registration statements and public offerings of securities.  In theory, Jefferies, LLC, could have been sued in that capacity.  It wasn't.  There's no 33 Act claim in this case. What we've got is a 34 Act claim with respect to a merger.  That is not a securities offering.  So there's not an underwriter liability claim in this case, nor could there be.

THE COURT:  So when you refer to the IPO, you're talking about the formation of the SPAC?

MR. HAKKI:  Yes, when the SPAC went public.

THE COURT:  So then there's the issue of whether the merger should itself be considered a SPAC.

MR. HAKKI:  Well, I think whether the merger should itself be considered --

THE COURT:  I'm sorry.

MR. HAKKI:  -- an offering.

THE COURT:  An IPO.

MR. HAKKI:  Right.

THE COURT:  Whether the merger itself should be considered an IPO.

54

MR. HAKKI:  Right, right.  And one could, you know, that argument could be made by someone because there is a private company going public.  We're not -- we disagree with that, but my point is, basically, that's not this case.  Jefferies is not sued as an underwriter.  If it was, it would be under the 33 Act, and there would be all sorts of problems with that claim, but it's not.

And the only role that its role as an underwriter of the SPAC IPO has at all with respect to the merger, which to make this even more complicated is usually called the deSPAC, is they get a deferred fee upon consummation of the merger.  Basically, a portion of the SPAC underwriting fee is paid up front.

There's a second part that becomes payable if there's ever a merger, but that is all attendant to being an underwriter of the SPAC IPO.  It doesn't make you an underwriter of the deSPAC, nor could there be one.  The deSPAC is a merger, a public company buying a private company.  That's what's happening when this proxy statement gets filed.  That's why an IPO prospectus is not being filed at that time, but rather a proxy statement is being filed.

So to get back to my point on that is simply that Jefferies Financial Group's role with respect Waitr's acquisition -- I'm sorry -- Landcadia's acquisition of Waitr which is the subject matter of this litigation was as financial adviser.  That was the role that played with respect to the

merger.  And the SEC's instructions say, that is not a solicitation role.

Now plaintiffs argue that, okay, maybe, but its name appears a lot in the proxy statement, so it must have allowed its name to be used in the solicitation of a proxy which is another way you could theoretically be liable under Section 14.

That, Your Honor, does not work either.  There are cases on this.  So first of all, if you took the view that mentioning the financial adviser in the proxy statement would be enough to have them be liable under Section 14 because their name was used, that would render this SEC regulation I handed up to you pointless because it always mentions the financial adviser and that it conducted analyses in the proxy statement.  And if that were enough to make you a Section 14 defendant, there would be no reason for the SEC to have taken the time to put out a regulation saying that a financial adviser in a merger is not a participant in the proxy solicitation process.  That's point one.

The second is, we've cited a case, Your Honor -- there are not many -- but we cited a case, Mendell, in our brief. That's 612 F.Supp. 1543, where the financial adviser had even issued a fairness opinion in connection with a shareholder vote on a merger, and the Court -- which Jefferies, LLC, did not do here -- which the Court concluded even that was not enough to make the financial adviser a proper Section 14 defendant, and dismissed the claim.

Plaintiffs cite other cases, such as Falstaff, but that case which is a D. C. Circuit -- F-A-L-S-T-A-F-F -- that case didn't relate to a financial adviser.

The case that plaintiffs cite that does relate to a financial adviser is Herskowitz. It's a Nutri/System case. In that case the fairness opinion itself which the financial adviser issued was alleged to have been fraudulent and to have been at the center of the fraud.

In this case, Jefferies, LLC, gave no fairness opinion. There's no fairness opinion to allege that it was fraudulent. What Jefferies -- what advice Jefferies gave with respect to the merger is not even alleged to be false at all. I mean, if you look at the Section 14(a) allegations, which are that range of paragraphs I went over before, there's nothing about the Jefferies' financial advice in there.

So there's just not a basis to say that Jefferies acting as a financial adviser and the fact that that was summarized in the proxy statement makes Jefferies, LLC, a proper Section 14 defendant. It isn't, and that argument is leading to a place where, you know, it just is not consistent with the law at all.

And when you look at Jefferies Financial Group, JFG, it's slightly different. There -- okay, it's not a financial adviser. What is it? It's an investor, sponsor of the SPAC. If you look at what is actually said in the proxy statement about

it, it's very little.  It says, Jefferies Financial Group is a sponsor.  Here's what it gets if the merger happens.  Here's what it doesn't get.  Here are its conflict of interest.  It doesn't say in the proxy statement and plaintiffs don't allege so, you know, you ought to invest in this because Jefferies Financial Group is a sponsor.  That's not what the proxy says.  That's the inference of some of their arguments, but the proxy itself -- at least I don't read them to be alleging that it actually said anything like that.

Ultimately, it's a bit of a attempt to disregard the corporate forum, right?  Landcadia is a company.  It's a Delaware company.  It's a public company.  It has a board of directors.  They recommended this transaction.  They stepped up and said, we are soliciting your proxy, okay, and that is the party that is responsible for the part -- the proxy solicitation.

Yes, Jefferies Financial Group was an investor in Landcadia.  It was the sponsoring investor, but that doesn't mean you look through the corporate entity and treat it as a Section 14 defendant.  That is essentially piercing the corporate veil.  You need more.  You need something that would cause you to be deemed a participant which the plaintiffs do not have under this SEC regulation or a clear usage of the name that's clearly, you know, for the purpose of soliciting a proxy.  So they don't have it.

And, you know, with that, Your Honor, unless you have

questions, I'll just finish off with the state of mind issue which I think I can be quite brief.

THE COURT:  Okay.

MR. HAKKI:  So Your Honor only needs to consider the state of mind issue if you conclude, one, that there is a misstatement in the proxy directed allegations in the complaint, and that, you know, each defendant is a proper Section 14 defendant, and I've argued that in the case of Jefferies, at least, that shouldn't be the case on either of those first two questions.

But if we nonetheless get to the third question, you know, we've argued in our papers that -- correctly that neither the Supreme Court nor the Fifth Circuit has declared whether scienter is required for a Section 14(a) claim.  We know from Virginia Bankshares, as well as TSC/Northrop [sic] which are two Supreme Court decisions that, in both of those cases, the Supreme Court drops a footnote saying, We're not addressing whether or not scienter is required for a 14(a) claim.  So it's an open -- it's a blank slate with the Supreme Court.

There was a case that almost got up and then it didn't, the Anulex case, although that was 14(e).  And then the Fifth Circuit hasn't spoken on this issue at all, which is obviously the relevant circuit.

THE COURT:  Is there anything pending before the Fifth Circuit that would address it?

MR. HAKKI:  I don't believe so, Your Honor, but I don't know definitively.

THE COURT:  Maybe about a year or so.

MR. HAKKI:  Yeah, could be.  And you know, but the Fifth Circuit has addressed 14(e) which is the tender offer, sort of half of Section 14 cause you can basically effectuate mergers by a shareholder vote or a tender offer and the -- in public companies, and the Fifth Circuit was, you know, very clear in saying that scienter is required for 14(e).

Now, to be clear, the language of 14(e) and 14(a) and the implementing SEC rules are not identical, and a number of circuits have said, We do not believe scienter is required for 14(a).  So we're not here to say, you know, oh, there's like a massive circuit split in our favor or anything like that.

What I'm saying is, it's an open question in the Fifth Circuit.  It's an open question in the Supreme Court.  There are cogent arguments for why scienter ought to be required entirely or if not entirely, especially with respect to secondary actors like Jefferies, LLC, and I'm going to explain why.  So I've already covered the fact that it's an open question.  I've already covered the fact that the Fifth Circuit wanted scienter for 14(e).

You then have the Standard Knitting case, Your Honor, which is the Sixth Circuit we cited.  That's the one that holds that at least as to an accounting firm, a third-party accountant,

60

scienter was required for a 14(a) claim.  And the Court looks at the legislative history and the policies behind why we have 14(a) in the first place and concludes that it's a bridge too far to say that just being negligent as an accountant can, you know, make you liable to shareholders on a shareholder vote who are basically one or two or three steps removed from you.  You would really need scienter for something like that.

And that's exact -- that fits the situation with respect to Jefferies, LLC, at least like a glove.  Jefferies, LLC, is a financial adviser.  We already know that the SEC says financial advisers are not supposed to be viewed as participants.  It's a third-party professional being paid a fee, just like the accountant.  Now it does have an affiliate, right, that's a sponsor investor in the SPAC; but, again, unless we're going to disregard the corporate forum, which we don't do in corporate law, that doesn't matter.

The issue is what did Jefferies, LLC, the broker-dealer do?  And it was just like the accountant in Standard Knitting. It was a third party providing professional services, and I think the Sixth Circuit's reasoning is compelling.  And in light of the approach the Fifth Circuit has generally taken in securities cases, and you can look at Southland, you can look at ENRON, you can look at a number of cases.  There's lots of reasons to believe that the Fifth Circuit would agree with the Sixth Circuit on that.  So I'll say no more on that.

61

With respect to negligence, even if it is negligence as to all defendants, you know, we believe even the negligence would need to be pleaded with particularity because of the way the statute is worded.  The parties disagree about that.  I don't want to belabor it.

You know, the rationale for why particularity would be needed for pleading negligence is, you know, essentially the fact that the PSLRA pleading requirements require that a strong inference be pleaded, that each defendant acted with the required state of mind.  We say negligence is a required state of mind. Plaintiffs say there can be no such required state of mind.

I think we're right.  I mean, negligence is a mens rea. At least that's what I was taught in law school and -- but even if plaintiffs are right that they don't have to plead negligence with particularity, they do have to plead it plausibly under Twombly.  I'd like to walk through briefly why it's not plausible to find negligence --

THE COURT:  Well, why wouldn't there be a particularity requirement if you are dealing with negligence?  We don't have to -- if you have a mens rea, if there is a scienter, then you are not in negligence anymore, you are into an intentional act, right?

MR. HAKKI:  Yes, although ironically if you accept plaintiffs' arguments that negligence is the standard, you have liability for unintentional acts under a statute that also

62

requires pleading with particularity as to the state of mind.  So it's tricky.

THE COURT:  Yeah.

MR. HAKKI:  You know, I'll be candid or try to be, but I think we're right, and -- but I think it doesn't matter, Your Honor, and I want to walk through briefly why.  I mean, they do have to plead plausibly.  And Twombly and Bell Atlantic is not a notice, a pure notice pleading standard by any means.  It's got to be plausible, and I think the words of the proxy statement itself, which are the heart and soul of a Section 14 case, or at least they should be, make the claim of negligence on Jefferies part, at least, totally implausible.

First, the complaint simply fails to explain how either Jefferies, LLC, or Jefferies Financial Group was negligent in connection with the proxy solicitation process.  We went over all those five allegations.  They don't deal with Jefferies, either Jefferies entity.

Beyond that, you know, the proxy statement is circumspect.  It accurately describes Jefferies Financial Group's role.  It doesn't make comments really beyond that.  And it doesn't -- And then as to Jefferies, LLC, it's accurately described in the proxy statement as a financial -- I'm sorry.

THE COURT:  Why don't you just give her what you're saying and she can just type it right in the record.

MR. HAKKI:  I'm changing it.  You know, Jefferies, LLC,

63

is -- some of this I have to quote.  I mean, it is accurately described as a financial and capital markets adviser -- it's Landcadia -- in the proxy statement, as well as the historical underwriter of Landcadia's IPO.

The plaintiffs don't allege that any of that is false.  So from where do they get the negligence?  From where do they get the duty?  From where do they get the breach of the duty?  Let's look at what, Your Honor, the proxy statement actually said about what Jefferies, LLC, was doing or not doing.  It's very important.

First of all, the heading of the whole section it says that Jefferies played a limited role.  Okay.  I believe in capital letters.  So they were not trying to oversell Jefferies, LLC, role.  Quite the opposite.  They said it's limited.

They then say right off the bat, and this is at page 129, Your Honor, of the proxy statement, that -- and I am going to read here, quoting, Jefferies did not render any report opinion or appraisal about Waitr or the merger.  Full stop, close quote.  Okay.  It says, Jefferies was not providing a fairness opinion or any opinion at all.

It says that Jefferies was retained to, quote, act as a financial and capital markets adviser to our board.  And that's the Board of Landcadia, and this is at page 129.  Jefferies was not, Your Honor, advising the shareholders, only the board, the company.  If Landcadia were unhappy with the financial advice it

received from Jefferies, LLC, it has whatever rights it has, but the plaintiffs have no basis for a negligence claim. No duty was accepted as to these investors. They weren't issued a fairness opinion, and I'm not saying that that creates a duty, and they weren't.

And what Jefferies did was very limited. It says on the same page (Reading): With the consent of the Board of Landcadia, Jefferies, quote, assumed and relied upon without independent verification the accuracy and completeness of the information provided to it.

So far from saying, rely on us, we're taking care of this, it says, "we're basically accepting without independent verification what Waitr is giving us. They are being transparent. This is a securities law case, not a fiduciary case. It's about disclosure. They are being transparent.

They say they didn't make any independent evaluation or appraisal of any assets or liabilities. Again, very transparent. They say, quote, Jefferies did not recommend any specific amount or type of consideration, close quote, for the merger.

And then they say that they, quote, unquote, assumed that Waitr's financial projections were, quote, unquote, reasonably prepared. Okay. So what I'm saying is, the document which they have to live with because they have incorporated it in their complaint. It's the central document in this case, affirmatively disclaims the very duty that they are suing on. It

makes clear what Jefferies was doing, what it wasn't doing.  They don't allege that anything that's said about Jefferies work is inaccurate, or it wasn't performed earnestly or in good faith.

So where does the negligence come from?  Where does the duty come from?  Where does the breach come from?  It can't be squared with the document upon which they have premised their case.  They need something more, and it isn't in the complaint.  They can't amend the complaint with arguments that they have put in their reply brief or that comes up today.  It's not in the complaint, and it's contravened by the very document upon which the whole case has to be based.

And you know, with regard to Jefferies Financial Group, there's no recommendation -- this is the corporate forum issue again.  There's no recommendation from JFG at all or advice from JFG at all to investors in the proxy statement or anywhere else.  Landcadia board makes the recommendation.  So where is the duty?  Where is the common law negligence which is the analogy you are looking to here, Your Honor, duty that connects Jefferies Financial Group with these investors?  It doesn't work.

Just to close, Your Honor, with a comment about just the slides that are put in front of you, and in particular the 14(a) slide.  And this is just intended to be illustrative of basics, including like who the defendants are on the Section 14(a) claim which is not disputed.  On the selected elements that are laid out, there are obviously lots of elements.  I don't

believe there's a dispute as to those elements. I'll stand corrected if the plaintiffs say otherwise.

On the standard of review, I do think there are some disagreements. I think we've clarified, or at least I believe we have, that the plaintiffs agree that the misstatements have to be alleged with particularity. There's a disagreement about whether the state of mind needs to in the event that it's negligence.

You know, we have a disagreement about whether opinion liability can be premised on the Virginia Bankshares standard, which means you have to subjectively be knowing you are saying something false versus the Omnicare standard which could theoretically allow liability where you don't disclose information that would be very relevant to assessing your opinion, right? There's a disagreement there, but I don't think it matters at all if you look at the actual allegations.

And there's obviously a disagreement on whether scienter applies. We've tried to be, you know, forthright in explaining where the pieces are on the board on that in terms of the holdings of the circuits, but we think that there's a cogent argument that the Fifth Circuit would adopt scienter at least as to the Jefferies Defendants.

They concede that there is no scienter allegations as to the Jefferies Defendants. It makes it easier. So, Your Honor, whatever the Court decides with respect to the overall misrepresentations in the case and the 10(b) claims which we

believe should be dismissed, but whatever the Court decides, there's no basis to hold the Jefferies Defendants in the case. It's inconsistent with the proxy statement. It's inconsistent with the SEC guidance. It's inconsistent with what's really alleged by the plaintiffs which is not nearly enough. And with that I will yield the floor.

THE COURT: Okay. Thank you.

MR. HAKKI: Thank you, Your Honor.

THE COURT: All right. We're going to be at ease for 15 minutes. We'll reconvene at 3:30. I'm not going anywhere, though. I'm just going to sit right here cause it's more trouble to go back to my office.

(Recess taken.)

THE COURT: Do we have everybody back? It's two minutes early, but why don't we go ahead and start. Are you ready?

MR. LUNDY: Yes. Thank you, Your Honor. I think before I kind of dive into all the details that we just heard, it's important to sort of step back and kind of take a look at what was happening from a 30,000-foot point of view. And you have this company Waitr who is sort of plucked from obscurity by Mr. Fertitta and Mr. Handler for a transaction in order to go public. And as part of that transaction, you heard earlier that there was $250 million that was invested, that if the transaction did not go through, would have to be returned. And that's in the

68

proxy statement itself.

But there were also some other benefits that the sponsors, Mr. Fertitta and Mr. Handler, would get, and that they wouldn't get if the transaction did not go through as well, and it was things that included what were called founder shares.

THE COURT:  Are these in the pleadings?

MR. LUNDY:  These are in the proxy statements which are incorporated into the pleadings.

THE COURT:  Okay.

MR. LUNDY:  And a couple of those things are, they could pay $25,000 for founder shares, and what it says in the proxy statement is that those founder shares are worth approximately $70 million, and although it does say that the -- those founder shares do have some restrictions on them and they think they are worth less value, it notably doesn't say how much less.

They were also able to purchase what are called stock warrants, 14 million stock warrants for $7 million, and I think we heard about the underwriter fees that Jefferies wouldn't get if the transaction didn't go through.

THE COURT:  What is a stock warrant?

MR. LUNDY:  A stock warrant is the right to be able to purchase a common share of stock at a later time.

THE COURT:  Okay.  So the stock has to have value for that to be something of value?

69

MR. LUNDY:  Correct, yes, Your Honor.

THE COURT:  Which would incentivize anyone who is subscribing to do that, to have it be a venture that's going to work.

MR. LUNDY:  Well, that's right.  In our view it incentivizes them to also push the transaction through because if the transaction doesn't go through, all of that disappears.

THE COURT:  Well, but if the transaction goes through and it was bust, like this one was, then that really doesn't give them anything of value, right?  It would seem to me that that would actually incentivize them to only participate along those lines with something that it believes to be -- will be successful.

MR. LUNDY:  Yeah, I do think that's an inference that you can take, but I also think the -- at least an inference that's at least as likely is one that it incentivizes them to push through the transaction regardless of the result, because even now with Waitr far below where it launched at $10, it still has value.

THE COURT:  Okay.  Go ahead.

MR. LUNDY:  So then in order to get investors to approve the proxy, you have the 14(a) defendants and then subsequently the Section 10(b) defendants who repeatedly hype Waitr as a high growth company with a proven business model, and they basically say it's a better business model than competitors,

and then nine months after going public after investors approve the transaction, you have Waitr announcing that it's exploring strategic alternatives already.

And in my experience when companies announce they are exploring strategic alternatives, internally they have started those discussions prior to that.  They don't just wake up one day and say, we're exploring strategic alternatives.

And then of course we touched on it a little bit earlier, and I have the actual article here that's cited in the complaint.  Investors learn after the class period that the current CEO of Waitr comes out in an interview and says that the W-2 model could never work.  And if I may, I would like to -- may I approach, Your Honor?

THE COURT:  Has the other side gotten whatever you are giving me?

MR. LUNDY:  Yes.  And this article is cited at the complaint, at 196 through 199 of the complaint, and you'll see at the bottom of page 1 is where we got the driver model that could never work, but more importantly what I would like to focus on, and unfortunately, I'll admit it's not in the complaint, it's not quoted in the complaint, but this article is incorporated by reference into the complaint.

If you go to the top of page 3, I think there's a statement by Mr. Grimstad that's even more important than "the W-2 model could never work," and what he says there is he says --

basically, when he got there he says, open quote, There was no analysis in the past with how the service offering was priced, close quote.

So what I would submit is –- I guess, let me talk about a couple of the statements that they made just to sort of give some context. So Defendant Fertitta says things like, Waitr had a proven track record. Mr. Meaux said things like, we have the most attractive pricing in the industry at a 15 percent take rate compared to other competitors. We have proven that this model is scalable to multiple markets.

And then one more they say (Reading): We believe that our strong position in our current markets, proven expansion strategy, strong value proposition to customers and restaurants, differentiated proprietary technology platform, and high growth business model built in a capital efficient manner has positioned us well for the long term.

THE COURT: Now who is speaking there?

MR. LUNDY: That was –- so the first one, "the proven track record" was Mr. Fertitta. "The most attractive pricing in the industry" was Mr. Meaux. "The proven that this model is scalable" was also Mr. Meaux, and then the last one with "we believe that our strong position" was also Mr. Meaux.

THE COURT: Okay.

MR. LUNDY: And as the case law teaches us, once defendants choose to speak about a topic, they have a duty to

speak fully and accurately and to disclose a mix of information that was not misleading.  And what we argue is that by not telling investors that they had this model that could never work and what we just looked at, that there was no analysis in the past with how the offering was priced is misleading because there's no basis to say to investors that we have this proven business model and that all these things set us apart and make us more advantageous than our competitors.

And I know defendants made some arguments about literal truth that, well, we did charge 15 percent, and the case law also says that, regardless of literal truth, it's the message that's conveyed to investors, and we view whether a statement is misleading by looking through the lens of a reasonable investor. So what would a reasonable investor take from the statement.  And I would submit that when viewing these statements, a reasonable investor would conclude that the message trying to be conveyed to them was that they had a sustainable and better business model than their competitors.  And there was just no basis for that. And that's confirmed by Mr. Grimstad who is not a low level employee of Waitr.  He's the current CEO.

I also heard some arguments about opinion statements. I think one counsel said opinion statements aren't actionable. But you'll see in the briefing that we think Omnicare superseded Virginia Bankshares, and there have been some circuits to opine on this, particularly, the NewLink case out of the Second Circuit

recently found that Omnicare applies to 10(b), and there was also another case out of the Ninth Circuit that came out after we briefed this motion called Gigamon, and that is 2021 U.S. App. Lexis 11380, and that was a case where the Ninth Circuit found that Omnicare applies to Section 14(a) claims as well.

The other thing I would point out -- and there's one more case that came out after we briefed.  It's a McDermott case, and it also held Omni applies to Section 14(a).  I think I have the cite to that somewhere.  And the cite to that is 2021 U.S. District, Lexis 71758.

And I would also point out that, even sort of putting aside those circuit court cases, it's sort of telling that the Fifth Circuit in Spitzberg found -- doesn't even cite Virginia Bankshares as the controlling standard when looking to opinions. And there was also an unpublished case in Plains All American Pipeline at 777 Fed. Appx. 726 that seems to suggest Omni -- Omnicare applies to 10(b) as well.

So -- and the reason I bring that up is because, if Omnicare applies, then we look to whether -- we have to look into facts about an inquiry that the speaker did or did not conduct to determine whether the statement is misleading because when a speaker gives an opinion, most of the time they are implying certain facts, and in Omnicare the Supreme Court said, they gave the example of someone saying, "We believe our conduct is legal," and what that conveys to an investor is not just that the person

making the statement personally believes that their conduct is legal, but an investor takes from that, that that person making that opinion, assuming they are not a lawyer or something like that, has actual basis for that. They got a legal opinion. They spoke to their general counsel or there's some basis to support it.

And the reason that's relevant here, of course, is for the statement where they say, we believe that our business model, you know, is -- we have a high growth business model and things like that. Is then you would look to what message does that convey, and whether they actually did an inquiry and had facts to support those statements. And I would submit here that there were no facts to support that. In fact, Mr. Grimstad said, No analysis in the past with how the service offering was priced, and I just don't see how a reasonable investor would have thought that there was never any analysis to support these statements that we charge 15 percent, and we use a W-2 business model, and that gives us advantages over our competitors.

Investors are looking to these things to figure out if this is an investment that they want to make or don't want to make. So it's important when these things are communicated that there is a basis for them or that they are true.

I also heard some things about these statements perhaps being puffery, and in the briefs defendants basically cite a bunch of cases and say, Well, similar language in other cases

have been held to be puffery.  But context matters when you are considering puffery, because basically what you're saying is that a statement is so immaterial that a reasonable investor would not rely on it.

And there's a Davis case out of the Southern District of New York that sort of gives a good example of why something can be puffery in one case and not in another.  And the example is where someone says, I have a high quality asset, and if the asset is worth, you know, a substantial amount, then perhaps it's just a matter of degree, and courts have found that perhaps that's puffery.

But if you were to say, I have a high quality asset and the asset is worth zero, well, then, it's no longer puffery. It's a materially misleading statement.  And so that's -- I only bring that up to say that there aren't -- there's no per se puffery rule.  It's have to look at all the context to determine whether a particular statement is corporate puffery or just optimism.

With respect to the PSLRA Safe Harbor, we have submitted some additional not briefing.  We have submitted an additional statement from Mr. Coates of the SEC, and it's not the position of the SEC.  It's just his personal opinion where he raises the question of whether the PSLRA Safe Harbor even applies in a Section 14(a) deSPAC case.  But even if it does apply, I'll submit that the defendants don't meet the safe harbor

76

requirements. If you look at the statements themselves, most are of present fact, and for the ones that are forward looking, there's no cautionary language. It's not sufficiently meaningful. Nowhere will you find in the disclosure of risk do they say, we have no analysis in the past with respect to pricing. This model could never work. And without those types of things, then they are not warning of the specific risks that's materializing.

And I think finally I would just like to touch on scienter for the Section 10(b) claims. In the Fifth Circuit, it's severe recklessness or actual knowledge, as I'm sure Your Honor saw when reading some of the cases. It's a holistic analysis. It's not, we don't look at each individual allegation and sort of say, this one doesn't meet, so I'm kicking that one out. You sort of look at the entire picture as a whole, and then also again as with falsity, reviewing this element through the lens of a reasonable investor. Would a reasonable investor find plaintiffs' inference of scienter at least as compelling as defendants opposing inference. And a tie goes to the plaintiff.

We think Mr. Grimstad's admissions alone are enough to satisfy an inference of scienter. As I've said repeatedly, I mean, if you said things like, the company was headed for bankruptcy when he came in. He immediately abandoned the W-2 model when he came in. He said, There's no analysis in the past without the service offering was priced. He said the driver

model that could never work.

And with respect to the Bite Squad acquisition he said, When you dig into the details which suggests prior management didn't dig into the details, he said, We could never get to that level of efficiency.

We've also alleged motive which is not even required to prove scienter, but we've alleged motive at least with respect to Mr. Fertitta. We've alleged that he was desperate to complete the merger so he didn't have to return the $250 million investment. We allege there were other financial awards, and there were also reputational issues at stake as to whether he would be seen as having failed if he didn't push this transaction through.

THE COURT: What allegation is there that that is something that would be beneficial to him?

MR. LUNDY: Well, I think you place it on the scale, and as I said before --

THE COURT: You are asking me to assume that that would be a consideration of his?

MR. LUNDY: I'm sorry, Your Honor?

THE COURT: I mean, you've made no factual allegation that he personally has an interest or has a -- what's the right way to say it? I don't want to make your allegation for you, but, you know, that he personally would find it of benefit not to have a failure. I mean, you know, the guy is a businessman.

MR. LUNDY:  Right.

THE COURT:  It's not as though -- I mean, I don't think there are any people out there who do the kinds of things that he does that don't expect to have a failure.  So how would -- how am I to determine whether that would be an incentive for him to go through with this even if it were not -- well, I don't even want to say that.  What allegation is there that this was a valid consideration for him?

MR. LUNDY:  So I don't think there's anywhere specifically in the complaint where we say this was a valid consideration for him.  I think we allege it as potential.  A motive for him for pushing the transaction through without doing proper due diligence, and I understand Your Honor is pushing back on that and saying, yes, but it also could have been, and I think that is what I was talking about when I said the Court -- I understand the Court does have to weigh inferences of scienter and find out whether overall our inference is at least as compelling as defendant's inference.  So that would just be one drop in the bucket to consider.

THE COURT:  Okay.

MR. LUNDY:  There were some other things that we alleged with respect to scienter.  We alleged that Mr. Meaux purportedly resigned, but that he had to immediately forfeit two-thirds of his restricted stock which in our view suggests a punitive measure for wrongful conduct.

There is -- also there was some argument in the briefs about whether the core operations inference applies here.  And in the Fifth Circuit it's not called specifically the core operations inference, but if you look to the Nathanson and Dorsey cases, they refer to what is a special circumstances, and what they say is there are -- in certain cases there are special circumstances which taken together with an officer's position supports scienter.

And typically where those cases are found, and I submit that this case is one of those is where it's a company with one product where that product is the key product for the future success of the company.

And the logic behind that is that, because there's one product, there's no way that certain defendants or certain people in high positions, executives at companies, wouldn't know what was going on with respect to that product.

So given all that -- I think given that Waitr has one product, the number of times they touted the business model to investors that they controlled the information, would have known what they did or hadn't done regarding the business model or what research or analysis they had or hadn't done I think is plausible here to infer that defendants knew their statements were false when made or at least they were severely reckless in not knowing that the statements were false and misleading.

THE COURT:  Well, what obligation would the investors

have to go look at the documentation that was required to be filed that would include Mr. Meaux's resume.

MR. LUNDY: Sure. I wholeheartedly agree that investors are, I believe, assumed to have read everything, and that's why I was saying earlier the context matters. We have to look at everything would a reasonable investor have been misled here. And so it does matter what was disclosed and what wasn't disclosed. I don't think an investor can turn a blind eye to certain things and say, Well, I know you disclosed it, but I didn't read it, so I was misled.

And here the opposing inference of the nonculpable inference put forth by defendants is simply that Mr. Grimstad, the new CEO of Waitr, came in and just believed his strategy was better. But Your Honor recognized earlier that's not what he said. What he said is, when he came in, he said the W-2 model could never work. That means from the beginning would never work. I know I'm beating a dead horse here I think it's really important and he said there was no analysis in the past with how the service offering was priced. So those two statements really cut against what the defendants opposing nonculpable inference here and sort of, you know, their inference sort of ignores the plain language of what Mr. Grimstad said.

And I would also submit, I'm not going to get into Section 20 because counsel is correct that, in order to have a Section 20(a) claim, you do have to find that the predicate

Section 10(b) claim survives. So if the Court makes it to there, I think it's briefed well enough that Your Honor can make a decision with respect to seven -- I mean, Section 20(a). So I won't bore the Court with any of that.

And unless Your Honor has any questions, I would -- I'll pass the -- pass it over to my colleague.

THE COURT: All right.

MS. HARRIS: Thank you. Great now. Okay. Good? Great. Okay. Well, I have a lot of ground to cover, but I thought it might make sense to start with the pleading standards and then move into Jefferies specifically if that works for Your Honor.

THE COURT: Sure.

MS. HARRIS: Okay. So regarding -- and again, I'm just talking about 14(a) now. So regarding 14(a) and scienter, I think we all agree that the Supreme Court has not ruled on it. Fifth Circuit has not ruled on it either. We would submit that the wealth of authority is actually in our favor, that most courts that have looked at the issue have held that scienter is not required for a 14(a) claim, and that includes circuits that regularly deal with, you know, huge volumes of securities fraud cases like the Second Circuit, Third Circuit, and the Ninth Circuit.

It's also true that there's no district court in the Fifth Circuit that has held that scienter is required. And

82

actually I'd like to point out to Your Honor a case that was decided -- this was after we submitted our briefing so it couldn't have been cited in it, but it's out of the Southern District of Texas, Judge Hanks, who expressly held that plaintiffs in Section 14(a) actions are not required to comply with the PSLRA scienter pleading requirements.  That case is Camelot v. Alta Mesa Resources, Inc., 2021 U. S. District Lexis 71757.

I'll also note that that case involves a SPAC which I'll get into in a minute, but -- so that same day Judge Hanks also, not surprisingly, issued a decision in another case called Edwards v. McDermott where he said 14(a) requires at least negligence.  So --

THE COURT:  You know that Judge Hanks is from Lake Charles.

MS. HARRIS:  I did not.

THE COURT:  He is.

MS. HARRIS:  Well, there you go.  I will also refer to the statement that we submitted that my colleague referenced from John Coates who noted in his statement that courts and the SEC have generally applied a negligence standard to 14(a) claims.

Now the defendants in their briefing really hang their hat on the Fifth Circuit's 1980 decision in Adams versus Standard Knitting.  And, you know, we think that decision was wrongly decided, and so do a lot of courts that have followed it.  But

even if the Court were inclined to follow it, the decision was expressly limited to outside accountants.  The Court said, We are not deciding the standard of liability of corporate issuers, so we don't think Adams would apply to any of the 14(a) defendants and not even the Jefferies Defendants because, of course, they are not accountants.

And at the risk of citing more case law that wasn't in our brief, a case came out yesterday, as a matter of fact, out of the Southern cricket of Ohio which, of course, is within the Sixth Circuit, and there the Court held -- it's called Employees Retirement System of St. Louis versus Jones, 2021 U.S. District Lexis 89282.  And the chief judge of the Southern District of Ohio actually issued the decision.  And he said, (reading): Adams was a narrow holding that required scienter only against outside accountants, and in fact, the Court seemed to, although it didn't have to decide it because it was only dealing with insiders, they seem to suggest that, you know, that Adams basically is an outlier and that the Sixth Circuit would probably change its view with the benefit of all the jurisprudence that has come since.

But at any rate, you know, we don't think -- so I guess what I'm saying is, you know, if the Court were inclined to follow Adams, you know, it would only apply to outside accountants which we don't think applies to any of the defendants, but we don't frankly think Adams should be followed by this Court at all for a few reasons.

84

And like I said, I think it's telling that every circuit court after Adams, except the Eighth, has held that it's not required, that scienter is not required. And the reason we don't think Adams should be followed because it -- the Court misconstrued the clear language of the statute and went to legislative history and policy concerns that it never should have considered because the statute is clear, and we all know that the basic blackletter law principle that, when a statute is clear, you don't look to legislative history, and you can't use legislative history to create ambiguities that don't exist.

And we also know that there are many cases that say, you know, Congress says what it says, and in the absence of an ambiguity, we have to go with the language of the statute. So the starting point is the language of the statute, and I think, you know, when you look at it -- I'm not going to read it; but, you know, 14(a) of the Exchange Act and its implementing Rule 14a-9 do not contain any of the language that courts traditionally associate with requirement of scienter.

THE COURT: Why don't we just --

MS. HARRIS: Sure.

THE COURT: -- when it comes to 14(a) and the -- hold on one second -- Okay. 14(a) and the Jefferies Group. All right. Let's say scienter isn't an element, and we're just talking about plain old negligence.

MS. HARRIS: Uh-huh.

THE COURT:  What about the point that was made by counsel that there's been no duty alleged, no breach of duty, no --

MS. HARRIS:  Sure.

THE COURT:  -- statements that have been identified that involve the Jefferies Group, where would the Jefferies Group fall in?

MS. HARRIS:  Sure.  And just to be clear, do you want me to address -- cause we also disagree on the standard of pleading negligence as well, but --

THE COURT:  Well, you can cover that, but then answer the --

MS. HARRIS:  Sure.

THE COURT:  Okay.

MS. HARRIS:  Well, I'll answer it first.  We allege in our complaint that all the 14(a) defendants had a duty to assure that statements contained in the going public transaction filings, or incorporated therein by reference, were true, accurate, and reliable and do not contain any untrue statement of a material fact or omission.  I'm citing from paragraph 27 of our complaint.

THE COURT:  What duty did the Jefferies Group have?

MS. HARRIS:  So there is case law that talks about a duty under 14(a) to review proxy materials to ensure that they do not contain materially false statements or omissions, and that

86

applies to anyone who is the solicitor or has consented to have their name associated with the solicitation.

That case I'm citing to is SEC v. Hurgin which is cited in the parties briefs. The Northern District of California has talked about if you are knowingly participating in the distribution of a proxy solicitation, that you are liable for false statements.

And in the In re: Willis Towers case, also cited in the parties' brief, the Eastern District of Virginia articulated the pleading standard as plaintiffs must only demonstrate that 14(a) defendants, quote, were subject to and failed to comply with the applicable legal obligation, specifically not to associate themselves with a proxy statement that contains false or misleading statements or omissions.

And then one more case out of the Eastern District of Virginia which is also cited in our brief, Knurr v. Orbital, talks about plaintiff demonstrating that defendants failed to exercise reasonable care in assessing the accuracy of the proxy statement, and whether a prudent defendant would have looked more closely into the issue.

So we believe that the law is clear that there is a duty not to, like I said, associate oneself with a proxy statement that contains false and misleading statements.

And while I'm on the negligence piece, like I said -- and counsel for Jefferies is correct. We do not contend that we

don't have to comply with the PSLRA pleading requirement for the statements.  What we contend is that we do not have to comply with the heightened plea requirement for the state of mind.

And just to make it kind of -- I know even the cases kind of confuse the two, but under the PSLRA, there's two heightened pleading standards.  There's what I call the Subsection B1 which just talks about the statements themselves and why they are false and misleading, and then there's Subsection B2 which says -- which requires the plaintiff to state with particularity facts giving rise to a strong inference that the defendant acted with the, quote, required state of mind.  Right?  And that applies when a plaintiff is trying to seek money damages on proof that the defendant acted with a particular state of mind.

So the question kind of boils down to is negligence a state of mind, right?  And that's what the cases look at when they are trying to suss this out.  There's no Fifth Circuit case on this, in this context, and the few district court cases that are coming out of Texas don't really get into an analysis, but in another context, the Fifth Circuit has held that negligence is not a state of mind.

In Howard v. Fortenberry, a 1984 case, 723 F.2d 1206, the court said, no particular -- this is in a Section 1983 civil rights case, so obviously a different scenario, but the Court stated that no particular state of mind is required to state a

cause of action under 1983.  Negligence will suffice.

And, you know, while this is admittedly in a different context, there are other courts -- there's a couple in California which I'll mention that have taken that reasoning from that Section 1983 context and have applied it within the context of 14(a).

I'll also note, and this was definitely cited in the briefing.  Judge Posner's decision in Beck v. Drobrowski, Seventh Circuit case from 2009 where this court held specifically in the 14(a) context that negligence is not a state of mind with a failure to come up to the specified standard of care and therefore in that case he held that the PSLRA, Subsection B2, heightened pleading for state of mind does not apply.  Same holding by In re Willies Towers Watson case in the Eastern District of Virginia from last year which we cite.

You know, other courts are split.  Most cases haven't addressed it.  We think, you know, I actually spent a very long time looking at all the cases, and I can tell you that, you know, for the most part, we think certainly in the Second Circuit and the Third Circuit, the cases tend to be trending in our direction, but I mean, I will, you know, state that they are -- they are mixed.

We think the better conclusion is that it is not a state of mind, and if it's not a state of mind, then we don't have to plead it with particularity.

THE COURT:  Okay.  Well, let me just --

MS. HARRIS:  Sure.

THE COURT:  Let me just throw this out at you.

I can actually understand what we're talking about when it comes to whatever standard of pleading is applicable to 14(a).  With respect to Landcadia Holdings, you know, that company which actually had the merger, I'm just having a hard time seeing how Jefferies fits into that.

MS. HARRIS:  Sure.  And I'll get to that now.  So, you know, we -- we agree with -- I mean, obviously the statute and the regs say what they say, which is to say that, you know, they define who the participants are in a solicitation.  We submit that the Jefferies Defendants meet -- meet that.  In other words --

THE COURT:  Both of them?

MS. HARRIS:  I'm sorry?

THE COURT:  Both of them?

MS. HARRIS:  Yes, we do.

THE COURT:  Well, what about the argument, though, that if you make Jefferies, LLC, part of that, then you are basically rendering ineffective the definition of what a participant is not to include, as defined or as set forth by the SEC --

MS. HARRIS:  Right.

THE COURT:  Any person in the capacity of an attorney, accountant, advertising, public relations, and financial adviser,

how do they get in there when actually I don't even recall specifically what the allegation was of the relationship of the -- of Jefferies, LLC, to the endeavor.  I just remember their name being lumped in there with everybody else, and they are not in the same category.

MS. HARRIS:  Okay.  Right.  So Jefferies, LLC, which is a subsidiary of Jefferies Financial Group, was the underwriter for the initial IPO, the Landcadia IPO, right?  And they also served as a financial and capital markets adviser to Landcadia in the second part, in the Waitr acquisition portion.

THE COURT:  So their obligation was to -- I'm having the hardest time remembering the name, but their obligation was to Landcadia, right?

MS. HARRIS:  Their obligation was to -- well, I mean, there are cases that talk about obligations to both sets of shareholders, but our 14(a) claims are being brought by holders of Landcadia shares who received Waitr shares in exchange.  So the duty that we're articulating is as to those plaintiffs, and they were Landcadia shareholders.

You know, a couple of points.  First, the exception for financial advisers says, (Reading): Financial advisers who's activities are limited to the duties required to be performed in the course of such employment.

We would submit that -- well, first of all, you know, I know Jefferies goes to great lengths to characterize itself as

91

merely, you know, we were just a financial adviser.  We made some fees and then we went on our way.  Well, that's not what happened.

THE COURT:  What are the allegations of what happened though?

MS. HARRIS:  I'm sorry?

THE COURT:  What were the allegations --

MS. HARRIS:  The allegations are that they were the underwriter of the going public transaction.

THE COURT:  Hold on.

MS. HARRIS:  I'm sorry.

THE COURT:  What are the allegations?  What were the allegations?

MS. HARRIS:  Right.  So they were the underwriter of the going public transaction.  In connection with that transaction, they earned a large amount, millions of dollars of underwriting fees many of which were deferred until the consummation of --

THE COURT:  I know, but what did they do wrong?  What did they do wrong?

MS. HARRIS:  Our allegation is that they did not meet their duty to ensure that the statements that were in the proxy solicitation materials with which they were associated were truthful.

THE COURT:  Okay.

92

MS. HARRIS:  So they also -- okay.  So hang on, let me just -- I lost my train of thought.

Right.  We also, you know, so the exception talks about being -- about financial adviser, that you're doing what's sort of the normal course of a financial adviser.  We would submit that Jefferies, LLC, was not in fact -- we would submit that this type of transaction is not really -- and like you said, you know, just because there are no cases out there doesn't mean that there isn't a case, right?

This is not your garden variety Section 14 type of case, and SPACs are a very new development.  The whole way that a SPAC is structured is new.  And so while, you know -- well, Jefferies, LLC, may have been on paper, you know, oh, they were just the financial adviser; they were all over this transaction from the very beginning, and I'll get a little more into that.

THE COURT:  But all I care about really is what are your allegations against them?

MS. HARRIS:  Right.  Well, our allegations against them are that --

THE COURT:  What they did not collectively as a whole with Landcadia.

MS. HARRIS:  Right.  So our allegations are that they -- we allege that they served as underwriters for the going public transaction, and I understand that there's a factual dispute about that.  We think it's a factual dispute that's

premature at this stage.  They earned deferred underwriting commissions.  So we argue that they had a duty stemming from that.

We argue that they had a duty to assure that statements contained in the filings were accurate, and that they weren't; that false statements were made.  They may have been filed by Landcadia, but that doesn't matter.  There are plenty of cases that say that you don't have to be the one who makes the statement.

You know, there's the SEC v. Hurgin case, again, cited in the briefing, where the Court, Southern District of New York in 2020 said that the Court agreed with the SEC and rejected the defendant's argument and said (Reading): it is not required to allege that the defendant personally made or disseminated the allegedly misleading statements to plead claims under 14(a).  You just have to show negligence.

Same thing happened in Falstaff, by the way.  The defendant didn't make the actual statements, but the Court permitted liability.  And another --

THE COURT:  What was the connection between what they didn't say and what harm was suffered?  That's kind of where, you know, you are saying, well, we don't have -- literally you are saying, you don't have to plead that they said it?  You don't have to plead that they said it.

MS. HARRIS:  We don't have to plead that they said it,

not for 14(a).  You don't have to be the actual speaker of the statement.  Right?  You have to either be the one soliciting the proxy or you have to be permitting your name to be used in connection with the solicitation.

THE COURT:  Okay.

MS. HARRIS:  Yeah.  So -- and that brings me back to a point I wanted to make which is, you know, in an effort to downplay their involvement, you know, they say, Oh, well -- we cited this in our brief that they -- in the November 1, 2018, Form 8K that was filed, it identifies Jefferies as a party that may be deemed a participant in the solicitation of proxies.

And by the way, they said it in other filings which we referenced in the complaint as well.  In their brief they say, Well, we're just telling people we might be a participant.  We don't necessarily believe we were, and that's, you know, our position is that's irrelevant.  You were being held out to be as a potential participant in multiple filings.

You know, the fact that it may not have been in the final proxy, you know, is not relevant, and again, we're here on a motion to dismiss, so we're drawing all these little inferences in plaintiffs' favor.

You know, the fact they may or may not have been an underwriter of the Waitr transaction is not relevant.  14(a) applies to any person on its face.  You know, the fact that Jefferies Financial Group, you know, they say they were just an

investor or a sponsor in the initial transaction.  There's no specific exclusion for sponsor in those rules we looked at.

So, you know, at any rate, whether or not the Court thinks that they solicited proxies, we still believe they can be liable because they permitted their names to be used.  We cite to a number of cases in our briefs, you know, on that point.  We cite to the Falstaff case, you know, the Court -- and by the way -- let me just back up.

You know, we're not saying that because their names appear in the proxy that that means that they were involved. I mean, that's not the argument, but it's certainly relevant, and the cases that we cite look to that as a factor.  Like in the Falstaff case where the individual in question, his name appeared 11 times.

And where the Court found that his reputation as a businessman, his plans for the company and his other dealings were important to shareholders in deciding whether to vote on a transaction, and we would submit that the same situation is here, right, because we know that the -- as we allege, the defendants were hyping up the involvement of Mr. Handler and Jefferies, you know, and Fertitta.  They were all -- they started this together and they were, you know, the success of this really depended on it.

And another case I'll mention which was cited in their reply brief, actually, it's SEC v. Hurgin, Southern District of

New York, last year.  This was a SPAC case, actually, and it's a SPAC case where the proxy solicitation materials touted the defendant's credentials and experience, and the SEC was alleging that that was essential to securing the shareholders vote and the Court agreed.

The defendants also stood to make millions and millions of dollars from the deal.  Proxy statement mentioned their names like 30 times, and the Court denied defendant's motion to dismiss based on those facts.  And so we submit that the involvement of the Jefferies Defendants was equally important to investors here and that they did permit their names to be used in connection with the solicitation.

THE COURT:  Okay.  Let's move on.

MS. HARRIS:  Sure.  Let me see, you know, one of the cases that they cited to in their argument, Mendell v. Greenberg, Southern District of New York, for the point that, you know, financial advisers can't be liable under 14(a).  That case is distinguishable.  You know, among other things, that was a regular garden variety financial adviser who, you know, drafted a -- who gave a fairness opinion, and the Court actually distinguished that individual from the situation in Falstaff because there the defendant didn't directly benefit from the transaction, and here of course, you know, the Jefferies Defendants benefited quite handsomely from the transaction.

Let me see what else. I know that I stopped in the

middle of scienter before, but I don't know if you have any desire for me to continue on that point or not.

THE COURT:  I think I've heard enough about scienter.

MS. HARRIS:  Okay.  The one thing I just would want to mention, if you don't mind, is just that, you know, Jefferies has argued that, even if you think scienter is required for the other defendants, it shouldn't be required for them.  They should be held to some separate, special standard of liability, and we would submit that not only is there nothing in the statute to suggest that.  It just says "any person," but multiple courts have rejected this, you know, fact of the matter, if Congress wanted -- if Congress wanted scienter to be an element, it would have put the words in the statute that it uses in other statutes where scienter is required.  And if Congress had wanted there to different standards of liability, depending on the --

THE COURT:  Slow down a little bit.

MS. HARRIS:  Sorry.  If Congress had wanted there to be different standards depending on the party's role, it also could have made that explicit, and it didn't.

So I think with that, is there anything else?  I think, unless you have any questions, I think I've covered everything I wanted to cover.

THE COURT:  Okay.  Well, so I'm going to allow the Meaux Defendants 10 minutes, and then I'm going to allow the Jefferies Defendants 10 minutes to respond to what they had to

98

say, but I'm really going to limit you because it's 4:15 right now.  And listen, everybody has done a fine job.  Everybody, obviously, is very knowledgeable about this subject area, and I really appreciate, you know, the courtesy each of you are showing each other and all of that, but it has been going on for a while.  So let's try to wrap it up, and I actually have a stopwatch.  Are you ready?

MR. LANGDON:  I am absolutely ready, Your Honor, and I will be far less than 10 minutes.

THE COURT:  Okay.

MR. LANGDON:  And you can hold me to that.  Just a handful of points.  Number one, and I know you know this and will keep it in mind, but it's the amended complaint that controls here.  It is what is alleged in the complaint.

Number two, the amended complaint does not allege particularized facts to show that the defendants who were speaking the various statements challenged under -- both under 10(b) and under 14(a) didn't believe the accuracy of the statements or hadn't done sufficient inquiry to have a good basis to make the statement.

Those -- it's one thing just to say those words, and the complaint does say those words, but it's another thing to allege facts to back it up and to -- from which the Court can confirm that the pleading standard has been met.  The complaint doesn't do that.

Number three, as the Rosenzweig Court, the Fifth Circuit in Rosenzweig said, It's very difficult to form a strong inference of scienter when the plaintiffs concede that numbers, the reported numbers were correct, and we think that that's a very apt statement to reflect what has happened here.

And number four, and finally, because they are considered part of the complaint, I urge the Court to take a look at the heft and the variety of subjects covered by the definitive proxy statement on the one hand and by the public filings, the 10-Ks, the 10-Qs, the 8Ks that are referenced. When Your Honor sees those, they will provide the full context that counsel was talking about.

And finally, in that context, the full context, the article that counsel handed up to Your Honor from which the complaint referenced at least one quote of what Mr. Grimstad said when he came in and assessed the situation, I would urge Your Honor to read the entire article.

THE COURT: I will.

MR. LANGDON: Because in context he says -- what he says is not quite what he -- what one statement taken out of context means. So with that, and knowing the time, Your Honor, I will cede the rest of my time to Mr. Hakki.

THE COURT: Well, he gets his own 10 minutes.

MR. LANGDON: Okay. He can't have more?

THE COURT: No. I appreciate your brevity, though.

MR. HAKKI:  Your Honor, I'm Hakki for the Jefferies Defendants.  I certainly appreciate being able to argue this fully, and I'll try to be even more brief than Mr. Langdon was in my final remarks.  So, you know, I think at the end of the day, the questions that Your Honor asked about the allegations with respect to the Jefferies Defendants and Jefferies, LLC, in particular, you know, plaintiff essentially responded with a series of legal conclusions that are recited in their complaint. You know, their belief that there's a duty or that there should be a duty is not a pleading of fact sufficient to state a claim.

The -- when you look at the SEC regulation, it basically presumes that a financial adviser will not be a Section 14 defendant by way of participation in the solicitation of a proxy.  They have got to come up with an actual pleading of fact to work their way around that.

What they have come back with is a novel legal theory that somehow being an underwriter of the SPAC IPO could turn you into some sort of full purpose underwriter for a transaction that happens two years ago, you know, that type of argument would sort of upend the way the statute works.  You've got a very, very carefully wrought regulatory structure.  That's a legal argument. That's not a factual allegation as to what Jefferies did.

You know, I went through in a lot of detail what the proxy statement actually says about what Jefferies did, and I think the plaintiffs were offered an opportunity to explain

exactly how that translates into negligence, even on the part of Jefferies.

You know, what is it that Jefferies said that wasn't true?  What statements were attributed to Jefferies that weren't true?  How was it participating, you know, in even a negligent fashion, a careless fashion in misleading people?

It's not in the complaint beyond the generalized allegation that everyone had a duty.  Your Honor, that's a legal conclusion.  That's boilerplate.  That's what courts don't accept in these cases.  And they need more, and they don't have it because Jefferies, LLC's role was very limited.

And I should mention just on this IPO underwriter point, I mean, that deferred underwriting fee is due even if you don't have any participation at all in the deSPAC transaction and the merger.  That's just the way it's structured.

So the notion that you have like this continuing lifetime duty by virtue of having been an IPO underwriter to do more than a typical financial adviser, it's just not true.  It's not true under the documents, it's not true under the disclosures, and it's not true under the law.

So I just wanted to make sure that, you know, that point was clear.  And I think that, Your Honor, I don't think I have anything further to say about that.

Oh, just that Jefferies Financial Group who spent less time on that.  I'm sorry.  They spent less time on that.  Again,

I really do want to emphasize, the mere fact that it was a sponsor of Landcadia, you know, there's nothing in that SEC regulation that says, oh, that's automatically a proper Section 14 defendant.  There needs to be more.  And it hasn't been alleged, and it's certainly not contained in the proxy other than bald legal conclusions, Your Honor, which ought not to be enough as to either Jefferies Defendant.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

All right.  I don't find the need for there to be any post argument briefing.  If there is a particular issue as we're developing this, as we are continuing to develop this, and continuing to get into the weeds of this.  If there is a particular issue that we feel we would be -- we would get a benefit out of additional briefing, then we'll issue a notice, a briefing notice, and ask you to address a particular issue.

I would ask that you stick to the one issue that we talk about.  If you want to do something else, then you need to seek leave of court to do that.

But anyway, again, I do appreciate everybody's participation.  You're all very knowledgeable.  This has been very interesting.  I'm glad to know there's some SEC other than the Southeastern Conference, and we're obviously going to take it under advisement, but we'll try to get it -- we'll get it wrapped up just as soon as we can.  Okay?

All right.  Thank you everybody.

103

MR. LANGDON:  Thank you, Your Honor.

MS. HARRIS:  Thank you, Your Honor.

(Hearing concluded.)


*  *  *  *  *  *


**C E R T I F I C A T E**

I, Cathleen E. Marquardt, RMR, CRR, Federal Official Court Reporter, do hereby certify this 27th day of May, 2021, that the foregoing pages 1-103 constitute a true transcript of proceedings had in the above-entitled matter.

*/s/ Cathleen E. Marquardt*
Federal Official Court Reporter