# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

**WALTER WELCH, et al.** : **NO. 19-cv-1260 (LEAD)**
**NO. 19-cv-1427 (MEMBER)**

**VERSUS** : **JUDGE TERRY A. DOUGHTY**

**CHRISTOPHER MEAUX, ET AL.** : **MAGISTRATE JUDGE KAY**

## REPORT AND RECOMMENDATION

Before the court is a Motion to Dismiss [doc. 47] filed by Defendants Christopher Meaux ("Meaux"), David Pringle ("Pringle"), Jeff Yurecko ("Yurecko"), Tilman J. Fertitta ("Fertitta"), Richard Handler ("Handler"), and Waitr Holding, Inc. ("Waitr") f/k/a Landcadia Holdings, Inc. (collectively, "Waitr Defendants"). The motion is opposed by Court-appointed Lead Plaintiff, the Delivery Investment Group ("DIG"), together with individual plaintiffs Walter Welch ("Welch") and Sean Barnard ("Barnard").[1] Doc. 56. The motion has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636.

After careful consideration of these motion, the responses and replies thereto, and the applicable law, and for the reasons that follow,

---

[1] This action results from the consolidation of two putative class actions. Walter Welch filed this lawsuit on September 26, 2019, on behalf of similarly situated shareholders. Doc. 1, p. 20. On November 4, 2019, Kelly Bates filed a nearly identical lawsuit on behalf of the same class and covering the same class period. *Bates v. Meaux*, No. 2:19-cv-1427 (W.D. La.). After the first lawsuit was filed, counsel for Welch published a notice pursuant to 15 U.S.C. § 78u-4(a)(3)(A)(i) advising members of the proposed class of their right to move the court to serve as lead plaintiff no later than 60 days from that date, or November 26, 2019. Doc. 13, att. 13, pp. 2-4. On November 26, 2019, motions were filed by various class members seeking appointment as lead plaintiff and consolidation of the two cases. Docs. 11, 12, 13, 14, 15, and 16. Sean Barnard and DIG joined Walter Welch in moving for DIG to be appointed as lead plaintiff. Doc. 13. The court granted the motion of Welch, Barnard, and DIG, consolidated the two matters, and appointed DIG as lead plaintiff on August 17, 2020. Doc. 35. DIG consists of Andrew Brown, William Moore, Daniel Sinor, and Thomas Colangelo. Doc. 13, att. 3.

**IT IS RECOMMENDED** that the motion be **GRANTED.**

## I.
### BACKGROUND

Defendants seek dismissal of plaintiffs' claims in the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim on which relief can be granted. The 99-page Amended Complaint alleges that Defendants violated federal securities laws in connection with activity leading up to and following defendant Waitr's becoming a publicly traded entity by making misleading statements or omissions about certain features of Waitr's business model and outlook, such that stockholders in the putative classes were misled to their detriment.  Defendants acknowledge that Waitr underperformed expectations, but they respond that the allegedly misleading statements were spoken with sincerity, that defendants made accurate disclosures of material facts and risks, and that their business efforts simply fell short in the face of serious competition.

Before proceeding to the analysis of plaintiffs' claims, we provide a brief factual history, including a description of Waitr's early business model, followed by a description of the parties and the nature of plaintiffs' claims.

### A.  Factual History

Waitr.com is a platform for online mobile food delivery service that uses a web-based application or "app" to connect consumers, participating restaurants, and delivery drivers.  Doc. 1, p. 2.   Defendant Christopher Meaux ("Meaux") and four others founded Waitr in its original form in 2013.  Doc. 37, p. 9, ¶ 15.  After undergoing a series of conceptual modifications, the Waitr.com app debuted in Lafayette, Louisiana in mid-2015.  Doc. 37, p. 9, ¶ 16.

### 1. *Waitr's business model*

After its 2015 debut, Waitr experienced a period of early growth.  At the end of 2016, Waitr serviced 1,000 orders per day in 11 cities, primarily in Louisiana.  Doc. 37, p. 9, ¶ 16.  By 2017, it had expanded to 150 cities in 6 states, servicing 5,000 orders per day.  *Id.*

At the same time Waitr was expanding, the popularity of other online food delivery "apps" was also growing.  Competitors Grubhub, DoorDash, and UberEats had emerged in larger urban markets but would eventually begin to move into secondary markets such as those occupied by Waitr. Doc. 1, p. 2.

Waitr attempted to differentiate itself from its competitors by highlighting certain features of its business model.  Taking the allegations of the Amended Complaint as true, as the court must for the purposes of this motion,[2] these features were both responsible for Waitr's early success and unsustainable.  The features touted by Waitr that, according to plaintiffs, later proved to be a hindrance included Waitr's low "take rate," its positioning as an early mover in a secondary market, and its full-time fixed labor force, which are described in more depth as follows:

### a. *Low "Take Rate"*

Early on, Waitr made itself attractive to restaurant partners by offering a low "take rate." Similar to a commission, the "take rate" is the figure that Waitr takes from a participating restaurant as its fee.  For some period, Waitr maintained a 15% "take rate," which made it possible for smaller restaurants with tighter margins to participate in the app-based restaurant delivery while keeping the service affordable for consumers.  Doc. 37, p. 17, ¶ 33.  According to the Amended Complaint, although Waitr described its low take rate as "a significant market differentiator that

---

[2] *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)).

would enable Waitr to grow and succeed," the defendants knew the low take rate was not sustainable.[3]

### b.   "First mover" advantage in a smaller "tertiary market"

The Amended Complaint suggests that Waitr's early years were marked by quick expansion because it served smaller "tertiary" markets that did not yet face strong competition from services that had begun in larger urban markets (*e.g.,* DoorDash, Grubhub, Uber Eats). *See* Doc. 37, p. 17, ¶ 33.  The Amended Complaint asserts, however, that the company's location was also one of its primary disadvantages, making Meaux's publicly-stated goal of becoming a "leading platform" unrealistic because of "its lack of access to high-level programmers and engineers in or near Lake Charles, Louisiana [ . . . ]." *Id.*, ¶ 92 (omission added).

### c.   Full time fixed labor force

In contrast to its competitors, Waitr hired its delivery drivers as W-2 employees, as opposed to independent contractors. Doc. 37, ¶¶ 31, 114.  Although Waitr promoted this as a positive aspect of its business  model, the Amended Complaint asserts that Waitr's labor model was inefficient, resulting in costs that could not be sustained.   Doc. 37, ¶¶ 32, 38, 101, 125, 127, 142, 144.  The Amended Complaint also alleges that the labor model created unique risks for Waitr, as demonstrated by two class action lawsuits filed by Waitr drivers in February and March of 2019. *Halley v. Waitr Holdings, Inc.*, No. 2:19-cv-01800 (E.D. La.) and *Montgomery v. Waitr Holdings, Inc.*, No. 2:19-cv-02208 (E.D. La.); ¶120.

Having described relevant features of Waitr's business model, we provide a timeline of events leading up to this litigation.

---

[3] As evidence that the take rate was not sustainable, the Amended Complaint points to the fact that, Waitr "initially contracted at a 10% rate" and had to abandon that rate and "breach[] certain customer contracts to force customers" to adopt the 15% rate.  Doc. 37, p. 15, ¶ 30.  The Amended Complaint also alleges that Waitr charged restaurants new to its platform "onboarding fees,"  which were "effectively subsidizing" the low take rate.  Doc. 37, p. 18, ¶ 34.

## 2. *Landcadia's acquisition of Waitr*

After Waitr's first three years in operation, Landcadia Holdings, Inc. ("Landcadia") acquired and merged with Waitr in 2018.   Doc. 37, p. 8, ¶ 12.  Landcadia had been founded a decade earlier in 2008 as a Special Purpose Acquisition Company ("SPAC") whose sole purpose was to effect a merger or similar business combination and to acquire the assets of another company.   Doc. 37, p. 9, ¶ 17.  In 2016, Landcadia completed an initial public offering ("IPO") selling shares to the public, raising $250 million.  Doc. 37, ¶ 17.  In SEC filings from that time, Landcadia indicated its intent to identify a target business in the dining, hospitality, entertainment, and gaming industries.  Doc. 37, p. 10, ¶ 17.  After the IPO, Landcadia was required to complete an acquisition within two years, by June 1, 2018.  Doc. 37, ¶ 18.  Toward the end of that two-year period, shareholders approved an extension to December 14, 2018, to complete the transaction. Doc. 37, pp. 10-11, ¶ 19-21.

On May 16 or 17, 2018, Landcadia announced that it had entered into an agreement and plan of merger with Waitr Holdings, Inc.  Doc. 37, p. 7, ¶ 19; *see also* ¶ 29, 86.  Following this announcement, Landcadia filed a proxy statement seeking approval of the acquisition from Landcadia shareholders and made a series of related disclosures about Waitr.  Doc. 47, att. 2, p. 192-251 (Proxy Statement at 159-218).  The Amended Complaint suggests that Landcadia's decision to acquire Waitr was rushed because it was made in the last remaining weeks before a deadline that, if missed, would have required Landcadia to disgorge the $250 million raised via the IPO and financial advisor (defendant Jefferies, LLC) to forfeit over $10 million in Underwriter fees.  Doc. 37, pp. 11-12, ¶ 22-24.  The Amended Complaint also alleges that Handler's and Fertitta's professional reputations would have been tarnished had Landcadia not completed an acquisition in the extended timeframe.  *Id.,* ¶¶ 22, 89.

After Landcadia acquired Waitr on November 16, 2018, Landcadia changed its name to Waitr and shares of the new entity began trading on the NASDAQ under the symbol "WTRH." Doc. 37, ¶12.  The transaction by which Waitr became a publicly traded company is referred to hereafter as the "Going Public Transaction."  A central allegation of the Amended Complaint is that Defendants promoted the positive aspects of the Waitr business model in the months leading up to and following the Going Public Transaction, while at the same time concealing the downsides and unsustainability of those features.

### 3.  *Waitr's post-merger operations*

#### a.  *Bite Squad acquisition*

On December 11, 2018, shortly after the Landcadia acquisition, Waitr announced its acquisition of Bite Squad, another online restaurant delivery service based in Minnesota, for a combined $321.3 million in consideration. Doc. 37, p. 46, ¶ 106. Bite Squad was a conglomeration of 17 restaurant-delivery companies across the country, with a presence in 350 cities across 20 states. *Id.* ¶ 107.  The press release announcing the acquisition noted that the Bite Squad "mission, business model, and growth profile share many similarities to Waitr," such that the acquisition would "drive additional growth . . . ." *Id.* ¶ 108.  Jefferies was the financial advisor for this transaction. *Id.* ¶107.

After consummation of the Bite Squad merger on January 17, 2019, Waitr announced fourth quarter and fiscal year 2018 financial results on February 11, 2019.  *Id.* ¶ 200. At the same time, Waitr announced Pringle's retirement as Chief Financial Officer to "spend more time with his family" and that Yurecko would step into the role.  *Id.*

On February 27, 2019, a former Waitr driver sued Waitr for violations of the Fair Labor Standards Act in a putative class action, alleging Waitr did not pay drivers mileage expenses, such

that drivers' net pay actually fell below the minimum wage.  *Halley v. Waitr Holdings, Inc.*, No. 2:19-cv-01800 (E.D. La.).  The Amended Complaint posits that the allegations of the driver litigation lend credence to the plaintiffs' claims in this matter that defendants knew or should have known of the weaknesses of their labor model.  Doc. 37, p. 53, ¶ 120.

### b.  *Secondary offering and subsequent events*

On April 4, 2019, Waitr filed a Secondary Offering Registration Statement (the "Secondary Offering") with the SEC, authorizing Waitr to sell securities up to an aggregate price offering of $300 million. Doc. 37, ¶ 136. On May 16 and 17, 2019, Waitr filed its preliminary and final prospectus supplements to the Secondary Offering.  *Id.*  In a Form 4 filed with the SEC on May 21, 2019, Meaux reported purchasing $1 million in Secondary Offering shares. *Id.,* ¶ 212.  The Amended Complaint suggests that Meaux did so primarily to create the appearance of demand for Waitr's stock.  *Id.*, ¶ 213.

On April 30, 2019, certain restaurants filed a class action against Waitr in this Court, alleging that Waitr breached its contracts with certain restaurant customers by unilaterally raising their take rates beginning in 2018, "as part of a broad strategy to increase revenue and profit prior to [its] sale and public offering." Doc. 37, ¶¶ 47, 147-49; *Bobby's Country Cookin', LLC v. Waitr Holdings, Inc.*, No. 2:19-cv-00552 (W.D. La.).

On July 5, 2019, Waitr announced a price increase that raised commissions from 15% to 25% for restaurants generating less than $20,000 in delivery per month. Doc. 37, ¶¶ 49, 150-52.  The take rate increase affected approximately 35% of Waitr's restaurant base and caused Waitr to anticipate a loss of restaurants whose margins could not support the higher take rate.  Doc. 37, p. 76, ¶ 163.   On August 6, 2019, Waitr announced that it would be working with third-party

developer Mobo Systems, Inc. d/b/a Olo ("Olo") on software development. *Id.* ¶¶ 26, 51, 93, 156-57.

On August 7, 2019, Waitr issued a press release disclosing that Meaux would resign as CEO, integration of Bite Squad was not proceeding according to plan, Waitr would lay off personnel, and that the company's net losses were higher than anticipated. *Id.,* ¶¶ 53, 158-59.

On September 26, 2019, DIG, Welch, and Barnard filed this Class Action Complaint against Defendants Waitr Holdings, Inc. ("Waitr") and certain officers, directors, and other individuals and entities associated with Waitr for violations of federal securities laws.  Doc. 1.  Another putative class action was filed on November 4, 2019.  *Bates v. Meaux et al.*, No. 2:19-cv-1427 (W.D. La.).  The two were consolidated [doc. 36] and, after consolidation, the Amended Complaint was filed on October 16, 2020.  Doc. 37.

## B.  The Parties

### 1.  *Defendants*

Defendants are individuals and entities who played various roles leading up to and following the Waitr/Landcadia business combination.  As noted above, Waitr is the surviving entity following the Waitr/Landcadia business combination.  Doc. 37, p. 8, ¶ 12.

Jefferies Financial Group, Inc. ("JFG") and Jefferies, LLC ("Jefferies") are a financial services company and its subsidiary broker-dealer, respectively.  Doc. 37, pp. 8-9, ¶ 13-14.  JFG and/or Jefferies served as Underwriter(s) for the Going Public Transaction.  Doc. 37, p.8, ¶ 13.  Jefferies acted as a financial and capital markets advisor in connection with the acquisition, providing advisory services to Landcadia related to the acquisition. *See Id.* ¶¶ 53, 107, 158, 175;

*see also* Doc. 47, att. 2, p. 97 (Proxy Statement, p. 64).[4]   Jefferies also served as the financial advisor for the Bite Squad acquisition. Doc. 37, p. 46, ¶ 107.

As we mention in the previous section, Meaux was CEO, Chairman of the Board of Directors, and co-Founder of Waitr until he stepped down on August 8, 2019.  Doc. 37, pp. 6-7, ¶ 2.  Pringle was the CFO of Waitr until his departure in April 2019.  Doc. 37, p. 7, ¶ 9.  Yurecko was the CFO of Waitr beginning in April 2019, replacing Pringle.  Doc. 37, p. 36, ¶ 79.

Fertitta was CEO and Co-Chairman of the Board of Directors of Landcadia from 2015 to November 2018 and a member Waitr's Board of Directors after its acquisition by Landcadia. Doc. 37, p. 7, ¶ 10.   The Amended Complaint notes that he is also the "sole owner and currently serves as CEO, Chairman of the Board, and President of Golden Nugget, Inc., Landry's, and Fertitta Entertainment, Inc., and is also the owner of the NBA Houston Rockets."  *Id.*  Handler was the President and Co-Chairman of the Board of Directors of Landcadia up until its acquisition of Waitr. Doc. 37, p. 7, ¶ 11.  Handler is also the CEO and Chairman of JFG.  *Id.*

### 2.  *Plaintiffs*

In the Amended Complaint, plaintiffs fall into two groups.  The first group consists of those who held shares of Landcadia stock at the time it acquired Waitr.  Welch and Barnard held shares of Landcadia stock as of the date of the Waitr acquisition, November 15, 2018, and were eligible to vote on the merger.[5]  Doc. 37, p. 6, ¶ 6-7.  Welch and Barnard assert claims against Waitr, Jefferies, JFG, Handler, Meaux, Fertitta, and Pringle for alleged misleading statements and

---

[4] Soley for the purpose of determining what statements it contains, the court takes notice of the contents of the Proxy Statement pursuant to *Callinan v. Lexicon Pharms., Inc.*, No. CV H-19-0301, 2020 WL 4740487 (S.D. Tex. Aug. 14, 2020), aff'd, 858 F. App'x 162 (5th Cir. 2021).

[5] Defendants note that the Amended Complaint does not clearly define the purported class associated with the Section 14(a) Claims, stating that "To the extent Plaintiffs propose to include Landcadia shareholders who sold their shares prior to the shareholder vote on Landcadia's acquisition of Waitr, such shareholders would not have had the right to vote on the Waitr Acquisition and thus have no standing for a Section 14(a) claim. Doc. 47, att. 1, p. 38 (citing *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 230 (5th Cir. 1994)).

omissions in proxy and prospectus materials[6] associated with Waitr's going public transaction and combination with Landcadia.  Doc. 37, p. 5, ¶ 2.   The claims of Welch and Barnard arise under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), ("Section 14(a)") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 CFR 240.14a-9.  Welch and Barnard are referred to collectively hereafter as the "Section 14(a) Plaintiffs," and their claims as the "Section 14(a) Claims."  The Section 14(a) Claims are contained at Count I of the Amended Complaint.  Doc. 37, pp. 31-32.  The Section 14(a) Claims period runs from May 17, 2018, when Fertitta, Meaux, and Pringle announced Landcadia's intention to acquire Waitr, until November 15, 2018, when Landcadia acquired Waitr. Doc. 37, p. 31

The second plaintiff group consists of individuals who bought the common stock of Waitr in the period after its going public at allegedly artificially high prices caused by certain defendants' alleged misrepresentations and/or omissions.  DIG and Welch assert claims against Waitr, Meaux, Fertitta, Pringle and Yureko.  These claims arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  DIG and Welch are referred to collectively hereafter as the "Section 10(b) Plaintiffs," and their claims as the "Section 10(b) Claims."  The Section 10(b) Plaintiffs also bring claims under Section 20(a) of the Exchange Act, which provides for joint and several liability for "controlling persons" who are found to have induced violations of the Exchange Act (the "Section 20(a) Claims").

The Section 10(b) claims assert that the defendants carried out a course of conduct, including making public statements and SEC filings, that overstated Waitr's market potential and

---

[6] The documents from which the Amended Complaint quotes the alleged misleading statements include are: transcripts of a May 17, 2018 conference call and May 17, 2018 interview, August 2, 2018 press release, October 1, 2018 investor presentation, and the November 8, 2018 Form 8-K, all filed with the SEC pursuant to Schedule 14A. Doc. 37, p._, ¶¶ 29-43.

strengths and led to the over inflation of Waitr's market price during the claim period.  Plaintiffs assert that they directly or indirectly relied on these representations, bought the securities at inflated prices, and were harmed when the truth about Waitr's weaknesses was revealed, and the share prices fell.  See Count II (Doc. 37, p. 93).  The Section 14(a) Claims period runs from May 17, 2018, when Fertitta, Meaux & Pringle announced Landcadia's intention to acquire Waitr, until November 15, 2018, when Landcadia acquired Waitr.  The Section 10(b)/Section 20(a) Claims period begins on November 16, 2018 (following the Landcadia/Waitr combination) and runs through August 8, 2019, when Meaux resigned as CEO.

## II.
### LAW AND ANALYSIS

This court exercises jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331.

### A.  Standard for Motion to Dismiss

A motion filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure challenges the sufficiency of a plaintiff's allegations.  When ruling on a 12(b)(6) motion, the court accepts the plaintiff's factual allegations as true, and construes all reasonable inferences in a light most favorable to the plaintiff or nonmoving party.  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1960 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged [ . . . ] Determining

whether a complaint states a plausible claim for relief [ . . . is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1949-50.

Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to legal conclusions.  *Id.*  Courts will not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc*., 407 F.3d 690, 696 (5th Cir. 2005)); *see also Iqbal*, 129 S. Ct. at 1950 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In *Lormand v. U.S. Unwired, Inc*., 565 F.3d 228 (5th Cir. 2009), the Fifth Circuit held that neither *Twombly* nor *Ashcroft* created a heightened pleading standard for complaints, and that these cases instead only "explicate" Rule 8(a)(2), particularly because *Twombly* recognized that pleading requirements could only be changed through amendment of the Federal Rules.  *Id.* at 258-59 (citing *Twombly*, 127 S. Ct. at 1964-65, 1973 n. 14).   Accordingly, Rule 8(a)(2) continues to only require a "'short and plain statement of the claim showing that the pleader is entitled to relief.'  Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007)(quoting *Twombly*, 127 S. Ct. at  1959)(omissions original).  This standard is met by the "reasonable inference" the court must make, with or without discovery, that the facts set forth a plausible claim for relief under a particular theory of law, provided there is a reasonable expectation that discovery will reveal relevant evidence of each element of the claim.  *Lormand*, 565 F.3d at 257.

Although a court's review is generally limited to the pleadings in deciding a motion to dismiss, the court may also consider documents attached to the complaint and the motion to dismiss, provided such documents are central to the plaintiff's claim and are referred to in the complaint. *Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citations omitted). "In securities cases courts may take judicial notice of the contents of public disclosure documents that are required by law to be filed with the SEC and are actually filed with the SEC, with the caveat that these documents may be considered only for the purpose of determining the statements they contain; not for proving the truth of their contents." *Callinan v. Lexicon Pharms., Inc.*, No. CV H-19-0301, 2020 WL 4740487 (S.D. Tex. Aug. 14, 2020), *aff'd*, 858 F. App'x 162 (5th Cir. 2021) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996)).

**B. Standard for Pleading False or Misleading Proxy Statements—Section 14(a) Claims**

Section 14(a) of the Exchange Act creates an implied private right of action imposing liability for obtaining shareholder authorization for deceptive or inadequate disclosure in a proxy statement. *KBR v. Chevedden*, 478 Fed.Appx. 213, 215 (5th Cir. 2012). The relevant language makes it unlawful to solicit proxies "in contravention of" relevant SEC Rules:

> It shall be unlawful for any person [ . . . ], in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

15 U.S.C. § 78n(a)(1)(omission added). Courts typically apply Section 14(a) with SEC Rule 14a-9, which prohibits material misstatements and omissions in the proxy statements and related materials for SEC-registered securities. The relevant text provides:

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 CFR § 240.14a-9(a).[7]

To state a claim under Section 14(a), plaintiffs must allege that "proxies necessary to approval of the merger were obtained by means of a materially misleading solicitation." *Mills v. Electric Auto-Lite Co.*, 90 S. Ct. 616, 622 (1970).

The elements of a section 14(a) claim are: (1) defendants misrepresented or omitted a material fact in a proxy statement, [ . . . ] (2) defendants acted at least negligently in distributing the proxy statement, [ . . . ] and (3) the false or misleading proxy statement was an essential link in causing the corporate actions [ . . . ].

*Braun v. Eagle Rock Energy Partners*, L.P., 223 F. Supp. 3d 644, 649-50 (S.D. Tex. 2016) (internal citations omitted).   An omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *TSC Indus., Inc. v. Northway, Inc.*, 96 S. Ct. 2126, 2132 (1976).  "Although materiality is a mixed question of law and fact, cases

---

[7] Rule 14a-9 provides "examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this section.

a. Predictions as to specific future market values.

b. Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation.

c. Failure to so identify a proxy statement, form of proxy and other soliciting material as to clearly distinguish it from the soliciting material of any other person or persons soliciting for the same meeting or subject matter.

d. Claims made prior to a meeting regarding the results of a solicitation.

e. Failure to disclose material information regarding proxy voting advice covered by § 240.14a–1(l)(1)(iii)(A), such as the proxy voting advice business's methodology, sources of information, or conflicts of interest.

may be properly dismissed on the pleadings for lack of materiality." *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 650 (S.D. Tex. 2016). "The text of SEC Rule 14a-9 makes it clear that vague allegations about the gestalt of a proxy statement will not suffice. Even for omission-based claims, the plaintiff must identify specific 'statements therein' that are rendered 'false or misleading' by the alleged omissions. *Heinze v. Tesco Corp.*, 971 F.3d 475, 480 (5th Cir. 2020). "[S]tatements of reasons, opinions, or beliefs" can be material and actionable under Section 14(a) if "knowingly false or misleadingly incomplete, even when stated in conclusory terms." *Virginia Bankshares, Inc. v. Sandberg*, 111 S. Ct. 2749, 277-58 (1991).

### 1. Requirements of the PSLRA

Congress amended the Exchange Act in 1995 via the PSLRA. 15 U.S.C. § 78u-4(b) (1). The PSLRA and Fed. R. Civ. P. 9(b) together "impose a heightened pleading requirement for the misrepresentation and scienter elements of a Section 10(b) claim[,]" and are discussed in greater detail in the discussion of the Section 10(b) claims below. "Section 14(a) actions are not required to comply with the PSLRA's scienter pleading requirement, but they must comply with the PSLRA's particularity requirement." *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, No. 4:19-CV-957, 2021 WL 1416025, at *10 (S.D. Tex. Apr. 14, 2021). The PSLRA's particularity requirement requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... all facts on which that belief is formed." *Edwards v. McDermott Int'l, Inc.*, No. 4:18-CV-4330, 2021 WL 1421603, at *5 (S.D. Tex. Apr. 13, 2021).

### 2. State of Mind

The Section 14(a) Plaintiffs state that the "claims related to the false statements made in the Company's proxy prospectus and solicitation materials related to the Going Public Transaction are based in negligence and do not sound in fraud." Doc. 37, p. 13, ¶ 27. Defendants note that

The Fifth Circuit has not yet addressed whether scienter is required for Section 14(a) claims.  Doc. 47, att. 1, p. 32.  Circuit courts have split on the requisite state of mind for Section 14(a) claims, with some concluding that scienter is required and others applying a negligence standard.  The Supreme Court has not ruled on the question.  *Virginia Bankshares, Inc. v. Sandberg*, 111 S. Ct. 2749, 2757 n.5 (1991).

Defendants urge the court to follow the rule applied by the Fifth Circuit in Section 14(e) claims [*see Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 606 (5th Cir. 1974)] and conclude that scienter is required for a Section 14(a) claim, adopting the reasoning set forth in the Sixth Circuit's opinion in *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428-30 (6th Cir. 1980), *cert. denied*, 449 U.S. 1067 (1980).  Doc. 47, att. 1, p. 33.  Alternately, Defendants urge that even if the pleading standard is negligence, Plaintiffs still fail to state a claim because the Amended Complaint does not meet the PSLRA's heightened pleading standards, the group pleading of the Amended Complaint results in no particularized allegations of negligence, and the Amended Complaint does not adequately identify the legal or fiduciary duties the individual Section 14(a) Defendants are supposed to have breached.  Doc. 47, att. 1, pp. 34-37.

## C.  Application – Section 14(a) claims

Section 14(a) Plaintiffs allege that, in the months leading up to the Landcadia business combination, Meaux, Fertitta, and Pringle made public statements and Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle made SEC filings that were materially misleading.  Defendants assert that plaintiffs do not meet the basic requirement of identifying a misleading statement of omission in the Proxy Statement and related materials and other pleading defects Doc. 47, att. 1, p. 20-48 (Proxy Statement).

On the occasions identified below, the Section 14(a) Plaintiffs assert that Waitr and its representatives made materially misleading statements as to one of the following seven subject

areas 1) Waitr was a "growth business" with a "proven expansion strategy," that 2) provided a good value for restaurants and customers because of its low 15% take rate.  It was a 3) "first mover" in a "tertiary market" that would 4) benefit from Fertitta's expertise and partnership with his portfolio of companies.  Waitr's 5) proprietary technology platform and 6) W-2 employee drivers differentiated it from the competition and allowed it to gain advantages in efficiency, flexibility, and control.  In certain communications Waitr's representatives provided 7) financial statements and growth projections.  The 99-page Amended Complaint repeats the same language as to why each of these categories of statement was false or misleading; therefore although this opinion addresses each statement, the statements are grouped into the seven categories set out above and addressed accordingly.

At the outset of this analysis of the Section 14(a) Claims, we note Defendants' argument that the Section 14(a) Plaintiffs do not criticize statements in the Proxy Statement itself, and that all of the highlighted statements were made outside the Proxy Statement.  Doc. 47, att. 1, p. 28. We also note that the Proxy Statement itself contained cautionary language relevant to the seven categories of allegedly misleading statements.  For example, the Proxy Statement warned that forward-looking statements "are based on information available as of the date of this proxy statement" and "should not be relied upon as representing our views as of any subsequent date." Doc. 47, att. 2, p. 37 (Proxy Statement, p. 5).  The Proxy Statement warned, *inter alia* of "the inability to profitably expand into new markets;" adverse effects from "competitive factors;" [*id.*] that future rate increases might be both necessary and unsuccessful, that Waitr's increased restaurant membership and growth of revenue did "not enjoy long historical data trends," that "Waitr's growth may depend on acquisitions;" that its ability to diversify beyond current "revenue sources [ . . . ] has not been demonstrated."  *Id.*, pp. 77-78 (Proxy Statement, p. 44-45).  The Proxy

Statement also warned of "cost increases outside of its control that could materially reduce its profitability if it is unable to increase its rates sufficiently." *Id.* at 43. Similarly, optimism about Waitr's technology was tempered by clear warnings that the Company "faces substantial competition in technology innovation and distribution" and that inability "to continue to innovate and provide technology desirable to diners and restaurants" could cause the business to "materially suffer." *Id.* at 88.

### 1. *Statements describing Waiter as a growth business with proven expansion strategy*

The first category of objectionable statements involves descriptions of Waitr as a "growth business" with a "proven expansion strategy."  According to the allegations in the Section 14(a) Claims, on the following three occasions, various defendants made these statements concerning the growth and expansion of Waitr.

On May 17, 2018, Landadia announced its intention to acquire Waitr.  Doc. 37, ¶ 29.  On that date, in a conference call with analysts and investors, Meaux, Fertitta, and Pringle discussed Landcadia's decision.  Fertitta stated that Waitr differs from other companies because "Waitr is a growth business with a huge potential and a tremendous complementary relationship with my existing businesses." Doc. 37, p. 14, ¶ 29.  On the same call, Meaux stated that Waitr has "proven our ability to grow and expand in strategic markets and entrench our competitive positioning in the market[,]" and "This partnership with Landcadia is going to give us the additional capital we need to expand into those markets more quickly."  Doc. 37, p. 15-16, ¶ 31, 33.

Also on May 17, 2018, Fertitta appeared on financial news network CNBC's Power Lunch. Doc. 37, p. 20, ¶ 37.  A transcript is attached to Waitr's Form 8-K announcing the Going Public Transaction pursuant to Form 14A as proxy solicitation materials.  *Id.*  In that interview, Fertita addressed the regarding 15% take rate, growth, and sales projections, stating

> "As I watched their sales, you know, last year $125 million, they're going to do around $250 million this year, and projected to do $500 million next year. I mean, the growth is there, and what I like about them is they're in the smaller markets. We're the only company out that's going to be public, besides GrubHub. So, I'm excited about it. I wanted a real growth company and I think this is it."

Doc. 37, p. 20, ¶ 37.

On August 2, 2018, Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle filed with the SEC pursuant to Schedule 14A, additional information required in the Going Public Transaction Proxy/Prospectus Filings that attached the Company's Form 8-K filing of Waitr's release of 2018 second quarter business highlights for the period ended June 30, 2018. This Form 8-K quoted Defendant Meaux, in part, as follows:

> ["]We are very pleased with the results in the second quarter," [ . . . ]. "These results exceeded our expectations, allowing us to increase our outlook for the year. We believe that our strong position in our current markets, proven expansion strategy, strong value proposition to customers and restaurants, differentiated proprietary technology platform and high growth business model built in a capital efficient manner has positioned us well for the long term.

Doc. 37, p. 22, ¶ 39 (alteration added, emphasis omitted).

In the language quoted above, various defendants state that "Waitr is a growth business with a huge potential[,]" "a real growth company[,]" or a "high growth business  model[,]" and that past performance has "proven our ability to grow and expand," and that the "partnership with Landcadia is going to give us the additional capital we need to expand into those markets more quickly."  The Amended Complaint asserts that this language was misleading because Waitr

> did not have a proven business model and expansion strategy, its revenues would not sustain its operations, and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, something which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures.

Doc. 37, ¶ 30, 34, 40, 44.

To the extent these descriptions are statements of opinion, they are not actionable under Section 14(a) unless they are both objectively false and not sincerely held. *See Virginia Bankshares, Inc. v. Sandberg*, 111 S. Ct. 2749, 2757-58 (1991).  In using the term "growth business" and "proven expansion strategy," the statements are not objectively false because Waitr had, in fact, been growing and expanding as of May 2018. *See* Doc. 37, p. 9, ¶ 16.  The Amended Complaint later describes this period of growth, relative to the company's situation after the Bite Squad acquisition, as "Waitr's contiguous growth model, whereby the Company grew in an orderly regionally contiguous expansion." *Id.* at ¶ 122, 125.  Further, where as here the projections were based on accurate historical trends, and corollary risks and uncertainties were identified in the proxy statement [doc. 47, att. 2, pp. 76-79], any omissions these statements contain is immaterial. *See Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 651 (S.D. Tex. 2016).  We therefore recommend the court determine that the foregoing statements are not actionable under Section 14(a).

### 2.  *Statements suggesting that Waitr provided a good value for restaurants and customers because of its low 15% take rate.*

In the second category of statements underlying the Section 14(a) Claims, Waitr's representatives suggest that Waitr provided a good value for restaurants and customers because of its industry-low 15% take rate on the following four occasions.  In the May 17, 2018 Waitr acquisition announcement, Fertita spoke positively of Waitr's organic growth since 2013 and stated that "[t]hey provide,  [ . . . ] a great customer experience and have differentiated the value proposition for restaurant partners, which I have experienced firsthand."   Doc. 37, p. 15-16, ¶ 31, 33.  Meaux stated that, "We have a strong value proposition to both customers and to restaurants," and "the most attractive pricing in the industry, at 15% take rate."   Doc. 37, p. 15-16, ¶ 31, 33.  In Fertitta's CNBC interview, he stated (discussing his own portfolio of restaurants) that,

> Well, one of edges is, is that the restaurant only hits 15%, where I will not use GrubHub because they want 25%, or, you know, different parts 20%, 30%. We can't afford to do it, the quality of food that we serve, and so one of the things that attracted us to Waitr that got them in our restaurants was the 15%, because they hire their own drivers and they can do more deliveries, and we won't use Uber Eats because of the cost to us.

Doc. 37, p. 20, ¶ 37.  Waitr's Form 8-K quoted Meaux as describing Waitr's "*strong value proposition to customers and restaurants*."  Doc. 37, p. 22, ¶ 39 (emphasis original).  On October 1, 2018, Defendants Waitr, JFG, Jefferies, Handler, Meaux,  Fertitta, and Pringle filed with the SEC pursuant to Schedule 14A an Investor Presentation, dated October 2018, which claimed Waitr provided the "[m]ost attractive transaction pricing," charging only a "15% commission versus ~30% at competitors." Doc. 37, p. 23, ¶ 41.

In the language quoted above, various speakers described Waitr as, "a great customer experience [with a] differentiated the value proposition for restaurant partners," as providing a "value proposition to both customers and to restaurants," and having the " most attractive pricing in the industry, at 15% take rate."  The Amended Complaint asserts that this category of statement was misleading because Waitr had already abandoned a 10% take rate as unsustainable and because it would soon increase the take rate to 18%:

> it was not true that the Company was providing its services at a sustainable low take rate established at 15%. While the Company repeatedly stressed to investors that its 15% take rate was a significant market differentiator that would enable Waitr to grow and succeed, Defendants omitted to state the following material facts necessary in order to make the aforementioned statement(s) not  misleading: Waitr had already breached certain customer contracts to force customers who had  initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was  necessary to immediately raise take rates as soon as Waitr created a public market for Waitr  shares. As recounted by Confidential Witness 1 ("CW1") herein (see infra at ¶¶ 188-95), Waitr unilaterally raised its take rate to 18% during the Class Period, and thereafter raised its take rate  to 33% (plus an additional 3.1% credit card processing fee), after

> admitting to CW1 that the  increase was necessary for Waitr to "continue doing business and be solvent."

Doc. 37, ¶ 30, 32, 34, 42.  We find no basis in the Amended Complaint to infer falsity in the description of Waitr as a value proposition with an industry-low 15% take rate when these statements were made in May to October, 2018.[8]  The Amended Complaint alleges that Waitr publicly announced that its take rate would increase to 25% on July 5, 2019.  Doc. 37, p. 72.  The Confidential Witness who recounted being told that Waitr needed to increase the take rate to "continue doing business and be solvent" had the quoted conversation in January 2020 [doc. 37, p. 85, ¶ 193].  The reasoning quoted above assumes that because Waitr eventually raised its take rate, the speakers must have known in May to October, 2018 that the 15% take rate was unsustainable.  This reasoning is undermined by the Risk Factors outlined in the Proxy Statement itself, which points to a lack of long-term data on revenue streams, onboarding fees, and service and delivery fees.  Doc. 47, att. 2, pp. 77-78.  The Amended Complaint pleads no facts giving rise to the strong inference that defendants were negligent in describing Waitr as the low cost leader in May to October, 2018.   These statements therefore fall short of the PSLRA requirement that plaintiffs plead specific facts give rise to a "strong inference" that each defendant acted with the requisite state of mind of at least negligence.   *Hohenstein v. Behringer Harvard Reit I, Inc.*, No. 3:12-CV-3772-G, 2014 WL 1265949, at *10 (N.D. Tex. Mar. 27, 2014) (not reported).

Plaintiffs also assert that statements describing Waitr as a value proposition were materially misleading because Waitr had been using "onboarding fees" to subsidize its low take rate:

> Waitr had achieved its sales growth by partnering with local restaurants and charging them less than the take rates charged by GrubHub and other larger competitors, but Waitr was effectively subsidizing these sales with "onboarding" fees. This was not sustainable, and Waitr could not achieve

---

[8] The court takes notice of the fact that restaurant plaintiff in *Bobby's Country Cookin', LLC v. Waitr Holdings LLC* alleges that Waitr unilaterally increased its take rate from 10% to 15% in 2018.  No. 2:19-cv-0552 (W.D. La., Doc. 1, p. 2).

> profitability with its existing contracts.  Thus, Waitr was already in the process of drastically increasing its prices in a desperate attempt to raise revenue by imposing draconian price increases on small independent restaurants. These price increases were evidence that Waitr's model of providing low-cost services to remote markets was not viable, and the huge price increases were a cynical attempt to get customers to abandon their contracts so that Waitr did not have to return any of the thousands of dollars paid in "onboarding" fees by each restaurant.

Doc. 37, ¶ 34.  The Amended Complaint provides no other facts regarding the use of "onboarding" fees" by Waitr, nor does the Amended Complaint assert that the defendants omitted to mention the onboarding fees in the Proxy Statement itself or at other appropriate moments.  It would be unreasonable to expect a speaker to detail every aspect of the business model in using an optimistic descriptor such as "value proposition" or "industry low."  *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) (statements of "corporate cheerleading" are not actionable if not false or misleading when made).  Given the cautionary language provided in the Proxy Statement itself and the fact that the Amended Complaint does not suggest that the Proxy Statement omitted mention of onboarding fees,[9] the reasoning above does not change our assessment that the Amended Complaint does not adequately allege that statements about Waitr as a "value proposition" were not materially misleading when made in May to October, 2018.  We therefore recommend the court determine that the foregoing statements are not actionable under Section 14(a).

### 3.  Statements describing Waitr as a "first mover" in a "tertiary market"

In the third category of statement underlying the Section 14(a) Claims, Waitr representatives suggest that Waitr is a "first mover" in "small" or "underserved markets."  In connection with the Waitr acquisition announcement, Meaux stated that, "we are a first mover in

---

[9] In identifying unknowns associated with Waitr's "limited operational history," the Proxy Statement notes that, "The acceptable pricing of Waitr's onboarding and services fees to restaurants and delivery fees to consumers and restaurants has not been tested widely."  Doc. 47, att. 2, p. 77.

the underpenetrated online space. We currently operate in underserved markets throughout the southeast." Doc. 37, p. 15-16, ¶ 31, 33.  In his CNBC interview, Fertitta, stated that, "what I like about them is they're in the smaller markets." Doc. 37, p. 20, ¶ 37.  In the Form 8-K, Meaux was quoted as stating that Waitr is well-positioned because of its "strong position in our current markets." Doc. 37, p. 22, ¶ 39.

Discussing the allegedly misleading nature of these communications, the Amended Complaint reasons that,

> Whatever "first mover" advantage the Company claimed existed was quickly squandered by its inability to obtain sophisticated high-level programmers and software engineers who could enable Waitr to refine and develop the software necessary to stay competitive in its market[.]

Doc. 37, ¶ 32, 129.  Even taken as true, this reasoning does not allege that there was anything materially misleading about describing Waitr as a first mover in a smaller markets.  In fact, the Amended Complaint itself all but uses those terms by describing the company as having been "unchallenged" by larger competitors in its early markets.  Doc. 37, ¶ 36 ("national competitors like GrubHub (public), DoorDash (backed by SoftBank), and UberEats were already expanding into Waitr's once unchallenged markets").  Accordingly, we recommend the court determine these statements are not actionable.

### 4. Statements describing the benefits from Fertitta's experience and partnerships with his portfolio of holdings.

In the fourth category of statement underlying the Section 14(a) claims, Waitr representatives suggest that the company will benefit from Fertitta's expertise and partnership with his portfolio of companies.  The only such statement among the Section 14(a) Claims took place during the May 17, 2018, Waitr acquisition announcement and conference call.  In that call, Fertitta referenced his holdings and experience as the owner of entertainment and hospitality businesses, stating that Waitr would enjoy a "tremendous complementary relationship with my existing

-24-

businesses." Doc. 37, p. 14, ¶ 29.  He also noted that "as a preferred food and delivery partner for Landry's and the Golden Nugget, Waitr will have brand exposure to our over four million loyalty customers."   Doc. 37, pp. 14, ¶ 29.   The Amended Complaint alleges that this language is materially false and misleading because "Defendant Fertitta did little or nothing to promote the Company, and Fertitta's guidance and/or oversight did not materially benefit Waitr in any way." Doc. 37, ¶ 30.

To the extent Fertitta's statements are statements of opinion, they are not actionable under Section 14(a) unless they are both objectively false and not sincerely held. *See Virginia Bankshares, Inc. v. Sandberg*, 111 S. Ct. 2749, 2757-58 (1991) ("We therefore hold disbelief or undisclosed motivation, standing alone, insufficient to satisfy the element of fact that must be established under § 14(a).").  The Amended Complaint makes no allegation that Fertitta was insincere when he spoke of the synergy between Waitr and his existing portfolio.  The Amended Complaint also pleads no facts suggesting that it was objectively false to describe a "complimentary relationship" between Waitr  and Fertitta's other business.   The Amended Complaint provides no basis to assume that Fertitta made these statements negligently and, therefore, we recommend the court conclude they are not actionable.

### 5.   *Statements regarding Waitr's proprietary technology platform*

The fifth category of statement underlying the Section 14(a) Claims concerns Waitr's proprietary technology platform.  In the May 17, 2018, Waitr acquisition announcement and conference call, Meaux stated, among other things that Waitr has a "very differentiated proprietary technology platform in which we operate."  Doc. 37, p. 15-16, ¶ 31, 33.  Similarly, the August 2, 2018 Form 8-K quoted Meaux as using the term "differentiated proprietary technology platform." Doc. 37, p. 22, ¶ 39.

The Amended Complaint asserts that these statements were materially misleading because Waitr was not able to materially improve its software because of its location in Lake Charles, Louisiana:

> Waitr's "very differentiated proprietary technology platform" provided little or no competitive advantages as the Company was not capable of refining and developing its software to remain competitive in the market (much less become the next front-of-house integrated point of sales solution), because Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers, and engineers in Lake Charles, Louisiana.

Doc. 37, ¶ 32.

The Amended Complaint does not allege that Waitr did not, in fact, have a "differentiated proprietary technology platform" in May to August 2018.  Nor does it allege that Waitr's representatives concealed from plaintiffs that Waitr was headquartered in Lake Charles.  Rather, the Amended Complaint alleges that statements about having a proprietary technology platform were rendered misleading because of the company's lack of access to high-quality programmers in Lake Charles.

Assuming for the sake of argument that Waitr hamstrung itself by headquartering in Lake Charles, it did so openly.  Language quoted elsewhere in the Amended Complaint alleges that Meaux spoke early and often in defiance of conventional wisdom that technology companies should be headquartered in Silicon Valley or the like.  The Amended Complaint states that:

> Meaux was repeatedly quoted in the press as saying, "You don't have to be in Silicon Valley to create a technology company. You can do it in Lake Charles, Louisiana." In an interview published in New Orleans Business on January 31, 2018, Meaux recounted his defiance in the face of experience stating, "I remember pitching some VCs in Houston and they sat me down and said, 'If you're going to do this you're going to have to be in Austin or Silicon Valley because you're not going to find enough software engineers in Louisiana.' They actually said, 'If we're going to invest, you have to move the company.'"

Doc. 37, p. 25.  In short, the Amended Complaint identifies no omission of material fact in the foregoing descriptions of Waitr's technology platform and, therefore, we recommend the court determine this statement is not actionable under Section 14(a).  *Braun v. Eagle Rock Energy Partners*, L.P., 223 F. Supp. 3d 644, 649–50 (S.D. Tex. 2016).

### 6.  *Statements pertaining to W-2 employee drivers*

In the sixth category of statements underlying the Section 14(a) Claims, Waitr's representatives discuss the company's decision to hire drivers as W-2 employees rather than as independent contractors.  On the May 17, 2018, Waitr acquisition conference call, Meaux stated,

> We have over 5,000 restaurants on our platform and over 5,800 drivers. Our drivers are W2 employees, which gives us some flexibility and control over the user experience. [ . . . ] We have the ability to schedule our drivers, which allows us to optimize performance and control quality. Our drivers are readily identifiable and uniformed when they show up at the customer's door, and like the stable job environment that being an employee of Waitr provides, as well as the community, of being a part of something real.

Doc. 37, p. 15-16, ¶ 31, 33 (omission original).  In Fertitta's CNBC interview on the same date, he noted that his companies prefer Waitr, in part, "because they hire their own drivers and they can do more deliveries[.]"  Doc. 37, p. 20, ¶ 37.  The Amended Complaint alleges that these statements are misleading because

> Waitr was not able to extract efficiencies from its full time fixed rate labor force that purportedly allowed the Company to offer its services at a lower rate than competitors, when in fact its W2 labor model was inefficient, resulted in huge costs that could not be sustained (especially if the Company paid all associated labor costs as required by state and federal law), and Waitr reporting the lowest gross margins among its peers. Moreover, unlike its competitors, Waitr incurred unique risks because its drivers were all full-time employees (fixed costs), whereas competitors hired drivers on an as-needed basis, as surge labor, engaging more drivers during periods of peak demand.

Doc. 37, ¶ 32, 38.  The focus of the quoted statements is on the "user experience" (uniforms, performance), the employee's experience (stable job environment, community), and the

company's ability to control these factors through scheduling and quality control measures.   The Amended Complaint does not identify anything misleading about Meaux's and Fertitta's statements; rather it offers a generalized criticism of the W-2 labor model as inefficient and expensive compared to competitors' use of "surge labor."   In effect, it is an argument that Waitr should have known better than to choose this labor model.  But even if hindsight revealed the labor model to be an unwise choice, this does not render the above descriptions of the labor model materially misleading.  That Waitr ultimately incurred extra costs due to its labor force structure and strategically changed its technology development source after these statements were made does not change the fact that the identified statements were truthful when uttered. *See, e.g.*, *Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, No. 4:13-CV-2393, 2015 U.S. Dist. LEXIS 31468, at *28 (S.D. Tex. Mar. 13, 2015) ("Absent substantiation, [] later results do not establish that the earlier statements were false when made.").   Accordingly, we recommend the court determine that the foregoing statements are not actionable under Section 14(a).

### 7.   Financial statements and growth projections

In the seventh category of statements underlying the Section 14(a) Claims, Waitr's representatives provide financial forecasts and descriptions of the company's economic performance.   In the May 17, 2018 Waitr acquisition announcement and conference call, Pringle recounted gross food sales for a preceding period and projected a range of potential gross food sales for  2018 through 2020, correlating those figures to a net revenue ranges for each year.  The projections were based on the stated assumption of "two markets per month rollout plan."   Doc. 37, p. 18, ¶ 35.  On the same day,  in his CNBC interview, Fertitta noted that,

> As I watched their sales, you know, last year $125 million, they're going to do around $250 million this year, and projected to do $500 million next year. I mean, the growth is there, and what I like about them is they're in the smaller markets.

Doc. 37, p. 20, ¶ 37 (emphasis eliminated).  On November 8, 2018, materials filed with the company's Form 8-K quoted Defendant Meaux, in part, as follows:

> "The momentum we experienced in the first half of the year continued into the third quarter. Growth in the third quarter was driven by entering 6 new markets (32 cities) as well as further penetrating our existing markets," said Chris Meaux, founder and Chief Executive Officer of Waitr. "We remain excited about the pending merger with Landcadia as well as the financing agreement to be provided by Luxor Capital Group. Both are high quality partners who will further enable us to accelerate our growth in our current markets, expand into new markets and take advantage of potential opportunistic acquisitions."

Doc. 37, p. 24, ¶ 43 (emphasis eliminated).[10]  These three sets of statements from May to November, 2018, focus on financial performance to date (in particular growth in sales figures) and predictions of future growth based on past performance.  The latter two statements by Fertitta and Meaux also contain opinion.

The Amended Complaint asserts that the statements regarding Waitr's financial performance and projected future performance were materially misleading because the internal functioning of the company was so flawed that it was impossible to make an accurate financial statement or to give the impression that the company was operating as planned:

> It was not true that Waitr's financial statements, SEC reports, or Sarbanes Oxley certifications were true, accurate or reliable, as Waitr had failed to disclose that it had artificially inflated profits and revenues, that it was unable to sustain itself even with rates twice its current take rates, that known adverse trends that were already impacting the Company, and that the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures. As a result of the aforementioned adverse conditions that Defendants failed to disclose, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Waitr could achieve the guidance sponsored and/or endorsed by Defendants. Nor was it

---

[10] On November 8, 2018, Defendants Waitr, JFG, Jefferies, Handler, Meaux, Fertitta, and Pringle filed with the SEC pursuant to Schedule 14A, definitive additional materials required in Going Public Transaction Proxy/Prospectus Filings, which was filed along with the Company's Form 8-K filing of Waitr's release of 2018 third quarter business highlights for the period ended September 30, 2018.

true that Waitr maintained an adequate system of internal controls to report and eliminate material conflicts of interest.

Doc. 37, ¶ 38.  The Amended Complaint also asserts that the financial statements and growth projections were misleading because stronger competitors were moving into Waitr's territory at the time the statements were made:

> Defendants' financial forecasts were also materially false or misleading because, at that time, the cost of revenues was suddenly increasing relative to growth, such that Waitr had no viable path to profitability. This was especially true since national competitors like GrubHub (public), DoorDash (backed by SoftBank), and UberEats were already expanding into Waitr's once unchallenged markets and negatively impacting Waitr's current and foreseeable future sales. Not only were these competitors bigger, better run, and better funded (with more experience and stronger management), but they also each had a significantly stronger business model which allowed them to fund growth in secondary markets with profits generated in primary markets.

Doc. 37, p. ¶ 36, 38, 44.  Under this reasoning, defendants' sales reports, sales projections, and growth projections were materially misleading primarily because of underlying weaknesses in its business model: the inability to sustain the low take rate and inability to sustain revenues with the increasing challenge from stronger encroaching competitors.  The quoted statements also make vague references to "artificially inflated profits and revenues" and "the cost of revenues was suddenly increasing relative to growth."

The statements as to Waitr's past financial performance are not alleged to be false.  Rather, plaintiffs allege that statements of past performance were misleading because the speakers knew or should have known that Waitr's business model had irredeemable weaknesses.  Under the reasoning of *Virginia Bankshares, Inc. v. Sandberg*, 111 S. Ct. 2749, 2760 (1991) the omissions, if any, from the quoted statements do not achieve the level of materiality required to state a claim under Section 14(a), and the Amended Complaint does not plead sufficient facts from which to

draw an inference of deceptiveness on the part of the speakers.  Accordingly, we recommend the court determine that the foregoing statements are not actionable under Section 14(a).

### 8. *Recap of Section 14(a) claims*

Having reviewed the statements underlying the Section 14(a) claims, the explanations provided by the Amended Complaint as to why these statements are misleading, and the surrounding facts and circumstances identified in the Amended Complaint, we determine, and recommend that the district court agree, that the alleged statements are not actionable under Section 14(a) and therefore warrant dismissal under Fed. R. Civ. P. 12(b)(6).

## D.  Standard for Pleading Securities Fraud—Section 10(b) & Rule 10b-5 Claims

Section 10(b) of the imposes liability for the use of manipulative, fraudulent, or deceptive tactics in the purchase or sale of a security.  The relevant statutory language makes it unlawful to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Section 10(b) is typically applied with Rule 10b-5, under which

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for securities fraud in violation of Section 10(b) and Rule 10b–5, a plaintiff must allege (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014).  A fact is material if the reasonable investor would have found the fact significant in making the decision to invest. *Basic Inc. v. Levinson*, 108 S. Ct. 978, 986 (1988).

The elements listed above are also read in conjunction with Rule 9(b) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act ("PSLRA").  *Lormand v. US Unwired, Inc*., 565 F.3d 228, 239 (5th Cir. 2009).  Among other things, these laws impose particularity requirements with regard to the alleged false representations and scienter allegation.

### 1.   *Rule 9(b) Requirements*

Plaintiffs must satisfy the pleading requirements imposed by Fed. R. Civ. P. 9(b).  *Lemmer v. Nu–Kote Holding, Inc.,* No. 3:98–CV–0161–L, 2001 WL 1112577, at *4 (N.D.Tex.2001) (citing *Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir.1994); *Tuchman,* 14 F.3d at 1067)).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Pleading fraud with particularity in this circuit requires "the particulars of 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (quoting *Tel-Phonic Services, Inc. v. TBS International, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)).  "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for

failure to state a claim." *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d

353, 361 (5th Cir. 2004) (citing *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520 (5th Cir. 1993)).

### 2.  *Requirements of the PSLRA*

Congress amended the Exchange Act in 1995 via the PSLRA.  15 U.S.C. § 78u-4(b) (1).

The PSLRA reinforces the particularity requirement of Fed. R. Civ. P. 9 with respect to pleading

securities-fraud claims. *Schiller,* 2002 WL 318441, at \*4; *Coates I,* 26 F.Supp.2d at 914.   In

relevant part, it states:

> (b) Requirements for securities fraud actions
>
> (1) Misleading statements and omissions
>
> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
>> (A) made an untrue statement of a material fact; or
>>
>> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> (2) Required state of mind
>
>> (A) In general
>>
>> Except as provided in subparagraph (B),[11] in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind.

---

[11] Subsection (B) is not applicable here because it applies only to actions involving credit rating agencies.  15 U.S.C.A. § 78u-4.

15 U.S.C. § 78u-4(b)(1)-(2)(emphasis added).   It also requires dismissal for failure to meet pleading requirements when the requirements of paragraphs (1) and (2) are not met.  15 U.S.C. § 78u-4(b)(3)(A).

Under these provisions, the complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint must state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1). A plaintiff alleging securities fraud must, therefore, not only allege the time, the place, the identity of the speaker, and the content of the alleged misrepresentation, but also explain why the challenged statement or omission is false or misleading. *Williams v. WMX Tech .,* 112 F.3d 175, 179 (5th Cir.1997), *cert. denied,* 118 S. Ct. 412 (1997). To satisfy Rule 9(b) and the PSLRA, a plaintiff must plead facts and avoid reliance on conclusory allegations. *Tuchman,* 14 F.3d at 1067; *Coates I,* 26 F.Supp.2d at 915.

The required state of mind "is an intent to deceive, manipulate, or defraud or severe recklessness." *Lormand*, 565 F.3d at 251 (quoting *Indiana Electrical Workers' Pension Trust v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). "Severe recklessness" is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Indiana Electrical*, 537 F.3d at 533 (citation omitted). In *Tellabs*, 127 S. Ct. at 2510, the Supreme Court held that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Plaintiffs cannot rely on group pleading and "must allege facts

sufficient to raise a strong inference of scienter with respect to each individual defendant." R2 Investments LDC v. Phillips, 401 F.3d 638, 643 (5th Cir. 2005); *see also Southland*.

While allegations of recklessness may satisfy the scienter requirement, such occasions are limited to "severe recklessness." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001). "Severe recklessness" is, in turn, "a slightly lesser species of intentional misconduct" and is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.*  "[I]nferences of scienter survive a motion to dismiss only if they are both reasonable and *'strong'* inferences." *Coates v. Heartland Wireless Commc'ns, Inc.*, 100 F. Supp. 2d 417, 422 (N.D. Tex. 2000).  The facts, when "assumed to be true" must "constitute persuasive, effective, and cogent evidence from which it can logically be deduced that Defendants acted with intent to deceive, manipulate, or defraud." *Id*. Since the passage of the PSLRA, it is insufficient to merely plead motive and opportunity in order to create the requisite "strong inference" of scienter. *Nathenson,* 267 F.3d at 409.

The PSLRA also provides a "safe harbor" for certain forward-looking statements that are either "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements" or are "immaterial." 15 U.S.C. § 78u-5(c)(1)(A). If a forward-looking statement is not accompanied by this cautionary language and is material, the plaintiff must plead sufficient facts to show that the

statement was made with "actual knowledge [ . . . ] the statement was false or misleading." 15

U.S.C. § 78u-5(c)(1)(B)(alteration added).[12]

### E.  Application—Section 10(b) & Rule 10b-5 Claims

The crux of the Section 10(b) Claims[13]  is that, after going public, Waitr principals claimed

they were competitive because of their 15% take rate and the fact that the drivers were W2

employees, but this was not sustainable, and they knew it: Waitr had already breached contracts to

use 10% take rate (unilaterally raising their take to 15%), and the W2 labor model had known

inefficiencies and risks.  Their early claim of being a "growth" business benefitting from the proven

expertise of Fertitta was also misleading because its revenues could not sustain its existing

operations, much less expansion, and Fertitta was actually uninvolved in decision making.  And

while they did expand by acquiring Bite Squad, this was a bad decision because Bite Squad itself

was a conglomeration of 17 other acquisitions, resulting in haphazard operations.

Additionally, the 10(b) Claims allege that SEC filings for 1Q 2019 were misleading

because of the failure to disclose these material facts and inappropriate reporting of assets,

revenues and expenses.  By 4Q 2018, GrubHub and DoorDash had entered Waitr's primary

markets, and Waitr's growth rate was slowing, and 10(b) Plaintiffs allege that the SEC filings failed

to disclose these negative trends and Waitr's lack of internal procedures to ensure truth and

accuracy of financial statements.  In April 2019, Waitr made 6.75 million shares available to the

public, valued at $50 million.  In connection with this offering, 10(b) Plaintiffs allege that there

were misleading statements and filings concerning growth prospects, technology platform, and the

---

[12] If the issuer of such forward looking statement is a business entity, the statement must be made with the approval of an executive officer of that entity.  15 U.S.C. § 78u–5(c)(1)(B).

[13] As noted above, the "Section 10(b) Claims" are brought by the plaintiffs who bought the common stock of Waitr in the period after its going public at allegedly artificially high prices caused by certain defendants' alleged misrepresentations and/or omissions.  These claims arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

benefits of W2 labor model (and Waitr's ability to comply with FLSA rules).  In July 2019, Waitr announced an increase in its take rate to 20%-25% depending on revenue; and around the same time announced that it was abandoning its proprietary tech platform and letting go of CEO Meaux, signaling an admission that the basis for its early success was no longer viable.

Section 10(b) Plaintiffs allege that the optimistic misrepresentations and omissions caused Waitr's stock price to be artificially high during late 2018-summer 2019, and if Waitr's principals had been more forthcoming, the stock price would have been lower, plaintiffs wouldn't have paid as much or lost as much when the truth was revealed by lawsuits and Waitr's own retrenching actions in August 2019.

The statements underlying the Section 10(b) claims fall into the same seven categories as those discussed in Section II.C, above, with the additional category of statements involving the Bite Squad Acquisition.

### 1. Statements describing Waiter as a growth business with proven expansion strategy

In the first category of statements underlying the Section 10(b) claims, defendants make statements describing Waiter as a growth business with proven expansion strategy.  In connection with the announcement of the Landcadia/Waitr business combination and Going Public Transaction on November 16, 2018, Waitr filed a Form 8-K with the SEC that included a press release quoting Fertitta as saying, "[Waitr is] also positioned well to take advantage of the massive unpenetrated market for online delivery, particularly in secondary markets."  Doc. 37, p. 42, ¶ 98.

On December 3, 2018, Defendant Meaux conducted an interview for the website 'Skift Table', www.table.skift.com.  Doc. 37, p. 43, ¶ 100.  In it, Meaux stated:

> *Our goal is growth right now. That's what the market wants to see from us and so we've told the market that we're going to continue to invest and grow and we'll do it responsibly because we have to at this point.*

> We haven't had a lot of capital. So we've had to grow responsibly. We'll continue to do that, but our focus is going to be on growth. When the market tells us [the focus] needs to be on profitability, it's gonna be on profitability. ***But right now, there's so much growth to be had.***

Doc. 37, ¶ 102 (emphasis original).

On May 8, 2019, Waitr filed a Form 8-K with the SEC, which included a press release announcing results for first quarter 2019, the period ended March 31, 2019. This press release quoted Meaux discussing the technology platform, team, Bite Squad acquisition and integration, market expansion, and anticipated growth:

> ***We are very pleased with our results this quarter, including revenue growth of 287%, which was a combination of Waitr driven organic growth and the successful acquisition of Bite Squad on January 17," said Chris Meaux, founder and Chief Executive Officer of Waitr….Our continued rapid growth gives me confidence that we have the right team, the right business model and the right technology in place to optimize our pursuit of the large and growing off premise market in the United States. 2019 is proving to be a transformational year as we invest in continued growth, integrate Bite Squad and make strategic infrastructure investments that will strengthen our foundation and allow us to grow aggressively and efficiently into 2020 and beyond.***

Doc. 37, ¶ 121 (emphasis and omission original).  Also on May 8, 2019, Meaux and Yurecko hosted a conference call with analysts and investors in which Meaux discussed Waitr's business model:

> ***Our business model has proven to be an advantage over competitors in the small and midsized markets that we serve.*** These markets are won at the local level, and our proven playbook is local market focused. Therefore, national scale is not always an advantage to winning at a hyperlocal layer….

Doc. 37, ¶ 123 (emphasis and ellipsis original).  He also referenced "leveraging our continued growth" toward the "path to long-term profitability" and stated that "we believe opportunities abound for Waitr's continued growth in 2019 and beyond."  Doc. 37, ¶ 126 (emphasis original). In connection with the Secondary Offering, on May 16, 2019, Waitr filed its Preliminary

Prospectus Supplement to the Secondary Offering Registration Statement with the SEC.  Doc. 37, ¶ 136.  It contained the following language, "Our continued growth is driven in significant part by our ability to successfully expand our network of restaurants and diners using the Platforms."  Doc. 37, ¶ 141.

Using the same language discussed with respect to the Section 14(a) Claims, the Amended Complaint asserts that statements such as "positioned well to take advantage of the massive unpenetrated market for online delivery[]"[doc. 37, ¶ 99] and "'growth' business with growth potential" [*Id.* ¶ 102-03], and "continued growth" [doc. 37, ¶ 121, 122, 126-127, 141-42], and "proven" "business model" [¶ 123, 125] were misleading because Waitr

> did not have a proven business model and expansion strategy, its revenues would not sustain its operations, and it would be impossible to achieve these results without merging with sizable competitors and successfully integrating these competitors into Waitr's operations, which would entail great risks given CEO Meaux's limited operating experience and history of serial business failures.

Doc. 37, ¶ 99, 103, 122, 125, 142.

Under the pleading standards set by the PSLRA and explained by interpretive jurisprudence, a complaint can survive a motion to dismiss only if it sets forth facts giving rise to a strong inference that the defendant acted with the requisite state of mind.  15 U.S.C. § 78u-4(b)(2).  The required state of mind "is an intent to deceive, manipulate, or defraud or severe recklessness." *Lormand*, 565 F.3d at 251.  A reasonable person must be able to find the inference regarding this state of mind at least as cogent and compelling as any opposing inference one could draw from the alleged facts. *Tellabs*, 127 S. Ct. at 2510.

As an alternate to the inference urged by the Amended Complaint, a reasonable person might infer from the foregoing statements that Meaux believed what he said and that he hoped Waitr's past growth would be a model for its future growth.  He was forthcoming in explaining

that the company was prioritizing growth over profitability at that time to secure a foothold in markets before pivoting to profitability.  One might infer that he did not perceive the flaws in the business model that the Amended Complaint posits were so clear.

The Amended Complaint pleads facts suggesting that in the Spring and Summer 2019, it began to be clear that the optimistic vision Meaux sketched in the statements above would not be realized.[14]  However, rather than contributing to the strong inference that Meaux made the foregoing statements with an intent to deceive or severe recklessness, the facts surrounding the decline of Waitr's stock price and Meaux's resignation support the opposite inference:  the plan to grow Waitr's footprint via the Bite Squad acquisition simply did not succeed as hoped.  Although the Amended Complaint blames this lack of success on a series of missteps internal to Waitr and places the fault for this failure squarely on defendants' shoulders, this does not mean that defendants intended to deceive or spoke recklessly when they discussed their plans.  We find— and suggest that the district court agree—that the Amended Complaint does not plead adequate facts to support a strong inference that Meaux spoke the statements outlined above with the requisite state of mind.  At most, his optimism was misplaced or mistaken; it was neither reckless nor manipulative.  Accordingly, we recommend the court find the complaint has failed to meet the required pleading standards for this category of statements and should be dismissed.

---

[14]  Restaurants filed a putative class action against Waitr on April 30, 2019, driving a decline in the stock price.  Doc. 37, p. 71, ¶ 147-49.  On July 5, 2019, Waitr announced a take rate increase from 15% to 25% for its smaller customers, driving further decline in the stock price.  Doc. 37, p. 72; ¶ 150-52.  On August 6, 2019, Waitr announced a partnership with software developer Olo, which the Amended Complaint depicts as "abandonment of Waitr's proprietary technology platform."  Doc. 37, p. 73-74, ¶ 156.  Following Meaux's resignation on August 7, 2019, [doc. 37, p. 71, ¶ 158], investors learned via a Form 8-K that the Bite Squad integration had proven more challenging than anticipated. In an August 8, 2019 Earnings Call, defendant Price pointed to difficulties reconciling the different visions of the Bite Squad and Waitr marketing leadership teams and the two different systems, stating, "we ended up rolling out strategies while trying to integrate those teams without really monitoring the correct metrics for the efficacy of those strategies." *Id.* ¶ 161.

### 2. Statements suggesting Waitr provided a good value for restaurants and customers because of its low 15% take rate.

In the second category of statements underlying the Section 10(b) claims, defendants make statements suggesting Waitr provided a good value for restaurants and customers because of its low 15% take rate regarding on the following occasions:

In the Skift Table interview on December 3, 2018, Meaux had this exchange:

> Meaux: I knew the problems that restaurateurs were facing, so I wanted to be a partner to the restaurant. We knew what Grubhub was charging. ***So we priced ours at half — 15 percent — because in the small markets, restaurants need every dollar they can get.***
>
> ST: And that's what you currently charge.
>
> Meaux: ***Yeah, we're still at 15 percent.*** Our business model involves employing the drivers, as opposed to just using contracted workers. ***Our driver core is probably half of what most of the other companies in our space is, because they're employees of the company and we can tell them when we need them to work.***
>
> ***So, by having that advantage, we have a fixed cost per hour for our drivers. Then, we can leverage that fixed cost to increase profitability for us and then pass that on to the restaurants. That's how we're able to charge 15 percent.***
> [ . . . ]
> ***In markets where we do have competitors, restaurants will push customers to Waitr because we are charging them less. That's been a big advantage for us.***

¶ 100 (omission and emphasis original).  Several months later, on May 8, 2019, Meaux and Yurecko also hosted a conference call with analysts and investors in which Meaux made a connection between "restaurant partnerships" and the company's prospects for "continued growth."  Doc. 37, ¶ 126.

Using the same language we analyzed in connection with the Section 14(a) Claims, the Amended Complaint asserts that this category of statement was misleading because Waitr had

already abandoned a 10% take rate as unsustainable and because it would soon increase the take

rate to 18%:

> it was not true that the Company was providing its services at a sustainable
> low take rate established at 15%. While the Company repeatedly stressed to
> investors that its 15% take rate was a significant market differentiator that
> would enable Waitr to grow and succeed, Defendants omitted to state the
> following material facts necessary in order to make the aforementioned
> statement(s) not misleading: Waitr had already breached certain customer
> contracts to force customers who had initially contracted at a 10% rate to
> adopt the 15% rate, and even at 15%, the Company could not profitably
> provide its services to small, independent restaurants in remote markets.
> Thus, it was necessary to immediately raise take rates as soon as Waitr
> created a public market for Waitr shares. As recounted by Confidential
> Witness 1 ("CW1") herein (see infra at ¶¶ 188-95), Waitr unilaterally raised
> its take rate to 18% during the Class Period, and thereafter raised its take
> rate to 33% (plus an additional 3.1% credit card processing fee), after
> admitting to CW1 that the increase was necessary for Waitr to "continue
> doing business and be solvent."

Doc. 37, ¶ 101, 120, 127, 135.[15]  Section 10(b) Claimants also assert that statements describing

Waitr as a value proposition were materially misleading because Waitr had been using

"onboarding fees" to subsidize its low take rate:

> Waitr had achieved its sales growth by partnering with local restaurants and
> charging them less than the take rates charged by GrubHub and other larger
> competitors, but Waitr was effectively subsidizing these sales with
> "onboarding" fees. This was not sustainable, and Waitr could not achieve
> profitability with its existing contracts. Thus, Waitr was already in the
> process of drastically increasing its prices in a desperate attempt to raise
> revenue by imposing draconian price increases on small independent
> restaurants. These price increases were evidence that Waitr's model of
> providing low-cost services to remote markets was not viable, and the huge
> price increases were a cynical attempt to get customers to abandon their
> contracts so that Waitr did not have to return any of the thousands of dollars
> paid in "onboarding" fees by each restaurant.

Doc. 37, ¶ 122, 127, 142.

---

[15] This language also appears in the explanatory section following excerpts from Waitr's March 15, 2019 Form 10-K for the fourth quarter and full year 2018 [doc. 37, ¶ 116-120] and the "substantially similar" Form 10-Q filed with the SEC on May 10, 2019 [doc. 37; ¶ 134-135].  There is no explicit discussion of the take rate in the excerpts of either document.  *Id.*

In the language quoted above, Meaux explains that the company chose a 15% take rate to be attractive to smaller restaurants with tighter margins; he uses the phrase "we're still at 15 percent;" he expresses a desire to grow via cooperation with restaurant partners.   The Section 10(b) claims ask the court to infer that Meaux knew all along that the 15% take rate was unsustainable, but he promoted it out of recklessness or an intent to deceive.  However, the court finds that subtleties in the language quoted above undermine this inference.  The phrase "we're still at 15 percent" suggests that the take rate might not always be 15%.  The explanation that Waitr chose the 15% take to be attractive to smaller restaurants in smaller markets with tight margins suggests that Waitr thought that a low take rate was necessary to operate in those markets at all, and that the rest of the business model had to allow for that low take rate.   In short, as with the preceding section the court finds that the facts plead do not give rise to a strong inference that Meaux spoke with the necessary scienter when making the foregoing statements.

With regard to the allegation that Waitr's use of "onboarding fees" is evidence that the take rate was unsustainable, we recommend the court adopt the reasoning from the Section 14(a) claims.  Section  II.C.2, *supra*, and conclude the complaint has failed to meet the required pleading standards for this category of statements requiring dismissal.

### 3.   Statements describing Waitr as a "first mover" in a "tertiary market"

In the third category of statement underlying the Section 10(b) claims, Meaux describes advantages of Waitr having arrived early to certain markets, relative to its larger competitors.  On the May 8, 2019, conference call, Meaux had the following exchange (quoted from the Amended Complaint:

> When asked by Jefferies analyst, Brent John Thill, generally about market conditions and whether the market would encourage restaurants "capable of supporting a handful of platforms," Defendant Meaux responded by distinguishing Waitr based on its lower prices and better technology. As evidence of this, Meaux stated, in part, the following:

> **[T]he reality is, is that when we're entrenched in the market and a competitor comes in the market, it really doesn't matter how much money they spend.** They still have to get the restaurant supply. And without the restaurant supply, you don't attract consumers.
>
> [ . . . ]
>
> And the other thing about it, too, Brent, is our platform. Our technology platform is purpose-built for these kinds of markets. So -- and this maybe is a part to the answer to the last question that Jeff was talking about as well.

Doc. 37, ¶ 128 (ellipsis, alteration, and emphasis original).  Again, using the same language analyzed in connection with the Section 14(a) claims, the Section 10(b) claims assert that this is misleading because:

> Whatever 'first mover' or 'market entrenchment' advantage Waitr enjoyed was squandered by its inability to obtain sophisticated high-level programmers and software engineers who could enable Waitr to refine and develop the software necessary to stay competitive in its market.

Doc. 37, ¶ 129.  The Section 10(b) Claims further state that this statements is misleading because,

> At the time Defendant Meaux made the aforementioned statements, national competitors like Grubhub (public), DoorDash (backed by SoftBank), and UberEats were already expanding into Waitr's once unchallenged markets and negatively impacting Waitr's current and foreseeable future sales. Not only were these bigger, better run, and better funded companies with more experience and stronger management, but they each had a significantly stronger business model which allowed them to fund growth in secondary markets with profits generated in primary markets.

Doc. 37, ¶ 129.  Even taken as true, this reasoning simply does not allege that there was anything materially misleading about describing Waitr as being "entrenched" in smaller markets or having software was "purpose built" for smaller markets.  We recommend the court find that the facts plead do not give rise to a strong inference that Meaux spoke with the necessary scienter when making the foregoing statements and, therefore, the claim should be dismissed as it relates to this category of statements.

### 4. Statements describing the benefits from Fertitta's experience and partnerships with his portfolio of holdings.

In the fourth category of statements underlying the Section 10(b) claims, defendants make statements describing the benefits from Fertitta's experience and partnerships with his portfolio of holdings on the following occasions.  In the November 16, 2018 Form 8-K, an included press release quoted Meaux as stating:

> We are excited to partner with Tilman and the Landcadia team and we believe this is a great opportunity.  ***Our combined expertise, experience and resources, and being a publicly-traded company will further enable us to accelerate our growth in the markets we currently serve, expand into new markets and take advantage of potential opportunistic acquisitions.***

Doc. 37, ¶ 98.  Similarly, in his December 3, 2018, "Skift Table" interview,[16] Meaux stated:

> Tilman's got a tremendous amount of restaurant experience, a tremendous amount of business experience, and he's been a phenomenal sounding board for me from a business perspective. He's going to remain on our board. ***If I ever have a question about what to do next, I can pick up the phone and call him because he ran a public company for 17 years. That's why we did the deal. We did the deal because of Tilman and his experience and what he brings to the table.***

Doc. 37, ¶ 104 (emphasis original).

Using the same language as we reviewed in the Section 14(a) claims above, the Amended Complaint asserts that these statements are misleading because

> Waitr would not enjoy benefits from Defendant Fertitta's "expertise, experience and resources" because Defendant Fertitta did little or nothing to promote the Company and Fertitta's guidance and oversight did not materially benefit Waitr in any way.

There is no allegation that Fertitta did not, in fact, "remain on the board."  Beyond that statement of fact, the above language falls into the category of corporate optimism and puffery.

---

[16] On December 3, 2018, Defendant Meaux conducted an interview for the website 'Skift Table', www.table.skift.com. Doc. 37, p. 43, ¶ 100.

See *Southland*, 365 F.3d at 372 (deeming certain statements "non-actionable puffery, as they are of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation").  Accordingly, we recommend the court conclude there is  nothing materially misleading about speculating that Waitr would benefit from synergy with Fertitta or his businesses as of December 2018 and that the complaint fails to meet the required pleading standards for this category of statements and should be dismissed.

### 5.   *Statements regarding Waitr's proprietary technology platform*

In the fifth category of statements underlying the Section 10(b) claims, defendants make statements regarding Waitr's proprietary technology platform.  Included in Waitr's May 8, 2019 Form 8-K was a press release that quoted Meaux as stating, in relevant part, "Our continued rapid growth gives me confidence that we have the right team, the right business model and the right technology in place to optimize our pursuit of the large and growing off premise market in the United States."  Doc 37, ¶ 121.  On a conference call the same date with analysts and investors, Meaux stated,

> Our technology platform is purpose built to serve restaurants and consumers in small to medium markets. Our routing algorithms are optimized for getting food to customers by car in the more spread-out geographies, creating leverageable advantages in our business model.…

Doc. 37, p. 123.  On the same call, he stated that:

> And the other thing about it, too, Brent, is our platform. Our technology platform is purpose-built for these kinds of markets. So -- and this maybe is a part to the answer to the last question that Jeff was talking about as well.

Doc. 37, ¶ 128.  He also stated, discussing the Bite Squad acquisition, that

> [W]e have achieved nearly complete integration of marketing, accounting and sales and have made significant progress toward the integration of restaurant operations, customer support and technology. We expect to achieve full integration in the first half of 2020.

Doc. 37, ¶ 124.

In connection with the Secondary Offering, Waitr filed its Preliminary Prospectus Supplement to the Secondary Offering Registration with the SEC on May 16, 2019.  Doc. 37, ¶ 136.  That document stated in part:

> ***The Platforms use scalable software to provide a consistent and robust user experience as user adoption increases. The internally developed Platforms are purpose-built to streamline online ordering and delivery for consumers and restaurants.*** The Platforms are 100% hosted in the cloud. ***Cloud hosting assists Waitr with addressing potential capacity constraints that Waitr may face as it grows its core applications and provides a level of redundancy, fault tolerance and cost-effectiveness.*** Waitr also hosts its Driver Managr and call center applications on the cloud. The Platforms offer simplicity, ease of use, rich customer data, and online menu integrations. ***Continued scaling of the Platforms is expected to lead to a more consistent and robust user experience.*** Rich customer data and online menu integrations are also expected to result in higher average order value and increased incremental orders.

Doc. 37, ¶ 145 (emphasis original).

As with the Section 14(a) Claims, the Section 10(b) Claims describe these statements as misleading because:

> Waitr's technology platform provided little or no competitive advantages as the Company was not capable of refining and developing its software to remain competitive in the market (much less become the next front-of-house integrated point of sales solution), because Waitr was constrained by its inability to attract and retain necessary and qualified developers, programmers, and engineers in Lake Charles, Louisiana.

Doc. 37, ¶ 120, 122, 125, 129, 135, 146.[17]

Of the statements quoted above, the only one that rings somewhat hollow is Meaux's May 8, 2019, statement concerning the Bite Squad acquisition, in which he described "nearly complete integration of marketing, accounting and sales."  This is inconsistent with facts plead elsewhere in

---

[17] This language also appears in the explanatory section following excerpts from Waitr's March 15, 2019 Form 10-K for the fourth quarter and full year 2018 [doc. 37, ¶ 116-120] and the "substantially similar" Form 10-Q filed with the SEC on May 10, 2019 [doc. 37; ¶ 134-135].  There is no explicit discussion of the technology platform in the excerpts of either document.  *Id.*

the Amended Complaint, specifically defendant Price's August 8, 2019, statement that Waitr faced difficulties, "bringing together two completely different marketing leadership teams at that time from the Bite Squad system and the Waitr system."  Doc. 37, p. 75, ¶ 161.

However, the Section 10(b) Claims do not allege that Meaux's statements about Waitr's technology platform were misleading because the Bite Squad integration was more difficult than he let on.  *See* Doc. 37, ¶ 129.  Nor does the Amended Complaint allege that the technology platform was not "purpose built" for small markets and rural locales or "internally developed" to "streamline ordering" or the like.  Rather, the Section 10(b) Claims allege that statements about having a proprietary technology platform were somehow rendered misleading because of the company's lack of access to high-quality programmers in Lake Charles.  We recommend the court adopt the reasoning from Section II.C.5 to suggest that the Amended Complaint identifies no omission of material fact in the foregoing descriptions of Waitr's technology platform and these statements are not actionable under Section 10(b).

### 6.   *Statements pertaining to W-2 employee drivers*

In the sixth category of statements underlying the Section 10(b) claims, defendants make statements pertaining to W-2 employee drivers on the following occasions.  In the December 3, 2018 Skift Table interview, Meaux stated (in an exchange quoted in Subsection (b) above) that,

> *Our driver core is probably half of what most of the other companies in our space is, because they're employees of the company and we can tell them when we need them to work.*
>
> *So, by having that advantage, we have a fixed cost per hour for our drivers.  Then, we can leverage that fixed cost to increase profitability for us and then pass that on to the restaurants. That's how we're able to charge 15 percent.*

Doc. 37, ¶ 100 (emphasis original).  In the May 8, 2019, conference call for analysts and investors, Meaux stated,

> Our W2 drivers are uniformed and trained to represent our brand to be an
> extension of our restaurants. This enhances the quality of the experience for
> both restaurants and consumers. These are all advantages for Waitr over
> larger competitors in the markets we serve and provide a path for growth
> for our restaurant partners….

Doc. 37, ¶ 123.  He also spoke optimistically about "leveraging [ . . . ] our W2 business model"

along with other aspects of the business to achieve "long-term profitability" and growth.  Doc. 37,

¶ 126.

The Preliminary Prospectus Supplement to the Secondary Offering Registration with the

SEC on May 16, 2019 [doc. 37, ¶ 136], stated in part,

> Company drivers are brand ambassadors for Waitr and the primary point of
> contact with Waitr's diners. As a result, Waitr invests significant resources
> in its drivers, including background checks, in-person interviews, training,
> uniforms, peer reviews and scheduled working hours. This allows Waitr to
> better manage a consistent delivery experience for both restaurants and
> diners, provides drivers with steady income and predictable hours and
> ensures efficient utilization of the driver workforce.

Doc. 37; ¶ 143.  In language similar to that used in connection with the Section 14(a) claims, the

Section 10(b) claims assert that these statements are misleading because:

> Waitr was not able to extract efficiencies from its full time fixed rate labor
> force that purportedly allowed the Company to offer its services at a lower
> rate than competitors, when in fact its W2 labor model was inefficient,
> resulted in huge costs that could not be sustained (especially if the Company
> paid all associated labor costs as required by state and federal law), and
> Waitr reporting the lowest gross margins among its peers. Moreover, unlike
> its competitors, Waitr incurred unique risks because its drivers were all full-
> time employees (fixed costs), whereas competitors hired drivers on an as-
> needed basis, as surge labor, engaging more drivers during periods of peak
> demand.

Doc. 37, ¶ 101; 120, 125, 127, 135, 144.[18]  With regard to the statements made in May 2019, the

Section 10(b) Claims also assert that they are misleading because,

---

[18] This language also appears in the explanatory section following excerpts from Waitr's March 15, 2019 Form 10-K
for the fourth quarter and full year 2018 [doc. 37, ¶ 116-120] and the "substantially similar" Form 10-Q filed with the

> In fact, on February 27, 2019, in the First FLSA Class Action a former Waitr driver sued the Company for violations of the Fair Labor Standards Act alleging Waitr did not pay drivers mileage expenses, such that drivers' net pay actually fell below the minimum wage. The FLSA provision known as the "kickback rule" requires that employees are paid minimum wage free and clear of the cost of doing business. When expenses cause take-home pay to fall below minimum-wage, employers are required to supplement such pay to a federally guaranteed minimum of $7.25 per hour. As a result of Waitr classifying 95% of its workers as W2 employees, it was required to comply with such rules. Shortly thereafter, on March 8, 2019, the Second FLSA Class Action was filed alleging, inter alia, similar violations of the kickback rule for Waitr's failure to reimburse mileage expenses. The foreseeable material impact of a determination in the plaintiffs' favor on the Company's earnings and balance sheet was estimated to be as much as 50% of an employee's compensation and with a profit and loss impact as high as $800 million.

Doc. 37, ¶ 127, 135, 144.

The focus of the quoted statements is on fixed costs from fewer drivers relative to other companies, "leveraging" those fixed costs toward profitability, and the role drivers play in brand development and user experience.  The Amended Complaint does not identify anything explicitly misleading about the quoted statements; rather it offers a generalized criticism of the use of W-2 drivers because the labor model was inefficient and expensive compared to competitors' use of "surge labor," and it points to the allegations of the February 2019 FLSA suit by drivers as evidence of the fact that the W-2 driver model was even more expensive (and less sustainable) than originally thought.

A careful examination of the quoted statements, however, shows that the statements occurring after February 2019 appear to pivot away from praising the W-2 labor model as a tidy "fixed cost" and instead describe the drivers in qualitative terms as an "invest[ment]," and "brand ambassadors" who play an important role in promoting the company.  In short, the statements give

---

SEC on May 10, 2019 [doc. 37; ¶ 134-135].  There is no explicit discussion of the labor model in the excerpts of either document.  *Id.*

rise to the inference that the speaker intended to promote the positive aspects of the W-2 driver model while *avoiding* making too-explicit statements about the profitability of that model that could be perceived as misleading.   We, therefore, recommend the court perceive, as we do perceive, nothing materially misleading about the descriptions of Waitr's W-2 driver model as of February and May 2019 rendering the statements  not actionable under Section 10(b).

### 7.  *Financial statements and growth projections*

In the seventh category of statements underlying the Section 10(b) claims, defendants make statements regarding financial performance and growth projections on the following occasions.

On March 7, 2019, Waitr filed a Form 8-K with the SEC which included a press release announcing financial results for the Fourth Quarter and Fiscal Year of 2018, ended, December 31, 2018. The press release provided purported business highlights of the fourth quarter of 2018 and Full Year 2018.   The Press Release summarized the quarter-to-quarter and year-to-year comparison as follows:

**Fourth Quarter 2018 Financial Highlights Compared to Fourth Quarter 2017**

- Revenue for the fourth quarter of 2018 increased 148% to $21.3 million compared to $8.6 million in the fourth quarter of 2017.

- Gross Food Sales for the fourth quarter of 2018 increased 113% to $83.4 million compared to $39.2 million in the fourth quarter of 2017.

- Net loss for the fourth quarter of 2018 was $17.0 million, or $0.52 per diluted share, compared to a loss of $15.5 million, or $1.55 per diluted share, in the fourth quarter of 2017.

- Adjusted EBITDA for the fourth quarter of 2018 was $(6.4) million compared

- to $(3.9) million in the fourth quarter of 2017.

**Full Year 2018 Financial Highlights Compared to Full Year 2017**

- Revenue for 2018 increased 202% to $69.3 million compared to $22.9 million in 2017.

- Gross Food Sales for 2018 increased 130% to $278.8 million compared to $121.1 million in 2017.

- Net loss for 2018 was $34.3 million, or $2.18 per diluted share, compared to a loss of $26.9 million, or $2.69 per diluted share, in 2017.

- Adjusted EBITDA for 2018 was $(13.2) million compared to $(13.4) million in 2017.

The press release reported fourth quarter and full year 2018 financial highlights for Bite Squad:

- Revenue for the three months and year ended December 31, 2018 totaled $24.8 million and $83.4 million, respectively.

- Gross Food Sales for the three months and year ended December 31, 2018 totaled $74.1 million and $255.0 million, respectively.

Doc. 37, ¶ 111-12.

On March 15, 2019, Waitr filed with the SEC pursuant to Form10-K its financial results for the fourth quarter and full year 2018, the period ended December 31, 2018. Doc. 37, ¶ 116. The Form 10-K was signed by Defendants Fertitta, Meaux and Pringle. *Id.* Among other things, the Form 10-K stated that Waitr's financial statements and notes were prepared in accordance with Generally Accepted Accounting Principles (" GAAP") and SEC regulations. *Id.* ¶ 117. The form also stated that appropriate disclosure controls and procedures, as required by Section 13a-15(e) and 15d-15(e) of the Exchange Act, were in place and were "effective as of December 31, 2018 at the reasonable assurance level." *Id.* ¶ 118. Meaux and Pringle also signed Sarbanes Oxley certifications that confirmed that the report contained no untrue statement or omission of material fact and fairly presented "in all material respects the financial condition, results of operations and cash flows of registrant" for the applicable periods Doc. 37, pp. 50-52, ¶ 119.

As with the 2018 form 10-K discussed above, Waitr's May 10, 2019, Form 10-Q was signed by Yureko and certified by Meaux and Yureko and contained confirmations as to compliance with GAAP, appropriate controls and procedures, and veracity of disclosures. Doc. 37, ¶ 134. The Secondary Offering filings contained similar representations regarding compliance

with GAAP and assured that Critical Accounting Policies and Estimates were in effect, which included a statement that, "there have bee no material changes to our critical accounting policies and estimates [ . . . ]" *Id.* at 137.

      The Section 10(b) Claims assert that these statements are misleading because

> Defendants failed to disclose the existence of material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. Waitr had artificially inflated profits and revenues and failed to disclose that it was unable to sustain itself even with rates twice its current take rates and that the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures. In reality, Waitr saw a pronounced slowdown in its sequential growth rate in the Fourth Quarter of 2018 because, after years of operating in markets without competition, Grubhub and (SoftBank-funded) DoorDash entered Waitr's primary markets. By this time, DoorDash overlapped with Waitr in 46% of its markets, and GrubHub and Waitr overlapped in 75% of markets in Georgia and competed in 41% of the same markets in Texas. In the case of UberEats, the overlap with Waitr increased from 2.4% in January 2018 to 9.8% in July 2108 to 35% by March of 2019. In the period between third quarter of 2018 and fourth quarter of 2018, moreover, Grubhub grew revenues at a 12% sequential rate off a base of almost $250 million, while Waitr only grew revenues by $2 million in absolute terms and 9% in relative terms off an insignificant revenue base of under $20 million; and as a result of the aforementioned adverse conditions that Defendants failed to disclose, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Waitr could achieve the guidance sponsored and/or endorsed by Defendants.

*Id.*, ¶ 113.  This reasoning, which centers on a dip in Waitr's "sequential growth rate in the Fourth Quarter of 2018" because of encroaching competitors, does not identify anything explicitly misleading about the quoted statements, none of which address Waitr's sequential growth rate.

      The Section 10(b) Claims also assert that the financial disclosures and projections are misleading because:

> Defendants failed to disclose the existence of material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. Waitr's financial statements and Defendants' Sarbanes Oxley certifications were not true, accurate or reliable, as Waitr

had artificially inflated profits and revenues, failed to disclose known adverse trends that were already impacting the Company as required by Item 303 of Regulation S-K [17 C.F.R. § 230.303(a)(3)(ii)], and failed to disclose the Company lacked adequate systems of controls and procedures to assure the truth and accuracy of its reported financial statements and public disclosures. Defendants failed to disclose the existence of known trends, events, or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way Defendants knew, or were severely reckless in not knowing, the facts described herein that indicated all of the Company's interim financial statements, press releases, public statements, and filings with the SEC were materially false and misleading for the reasons set forth herein.

Doc. 37, ¶ 120, 135.  Sprinkled throughout the Amended Complaint is the allegation that

a result of the aforementioned adverse conditions that Defendants failed to disclose, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Waitr could achieve the guidance sponsored and/or endorsed by Defendants. Nor was it true that Waitr maintained an adequate system of internal controls to report and eliminate material conflicts of interest.

Doc. 37, ¶ 127; see also similar language at ¶ 120, 135.

Specifically with regard to the Secondary Offering Filings, the Section 10(b) Claims note that the Secondary Offering contains a shift in language regarding Waitr's pricing:

While Waitr reported no material change in its critical accounting policies or estimates, one change that did appear in the Secondary Offering Filings was Waitr's description of its competitive advantage based on lower pricing. Whereas Waitr had theretofore promoted the Company's basic strategy as being a "low-cost leader" in providing services to underserved markets with a sustained take rate of 15%, suddenly Waitr reported that its competitive advantage was based on "Flexibility Around Price Point," which was explained as providing restaurant customers price flexibility, evidenced by "charging restaurants under two fee models: (1) with an initial setup and integration fee and partnership level pricing, and (2) with a higher fee rate and no upfront setup and integration fee." This change in emphasis to "flexibility," rather than cost-savings, was obscured by the fact that the two-tiered pricing alternatives existed throughout the Section 10(b)/20(a) Class Period and marked no change in corporate strategy regarding pricing models.

Doc. 37, ¶ 138.   In short, the Amended Complaint asserts that defendants' sales reports, sales projections, and growth projections were materially misleading primarily because of underlying weaknesses in its business model: the inability to sustain the low take rate and inability to sustain revenues with the increasing challenge from stronger encroaching competitors, and "adverse trends" that were already affecting the company.

The Amended Complaint does not identify any explicit factual errors in the calculation or presentation of financial performance figures.   The Amended Complaint also makes vague references to failure to comply with GAAP, "artificially inflated profits and revenues" and "the cost of revenues was suddenly increasing relative to growth."   These conclusory statements are not actionable under Section 10(b).   Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994) ("We will thus not accept as true conclusory allegations or unwarranted deductions of fact.").

The statements as to Waitr's past financial performance are not alleged to be false.   Rather, Plaintiffs allege that statements of past performance were misleading because the speakers knew or should have known that Waitr's business model had irredeemable weaknesses.   To the extent that these statements address projected future performance these statements meet the PSLRA's definition of a forward-looking statement. 15 U.S.C. § 78u–5(i)(1)(A).   Because there is no showing that these forward-looking statements were either immaterial or were accompanied by meaningful cautionary statement, the plaintiff must plead sufficient facts to show that the statement was made with "actual knowledge [ . . . ] the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B)(alteration added).   See, e.g., Southland Sec. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 360 (5th Cir. 2004).   Here, the allegations "are not supported by sufficient particular facts to give rise to a strong inference of knowing falsity" such as "facts demonstrating that any of the

individual defendants actually knew, or were severely reckless in not knowing, of these alleged infirmities." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 373 (5th Cir. 2004).

Finally, with regard to the change in tone in the Secondary Offering materials, where Waitr began discussing its take rate in terms of "flexibility around price point," abandoning the emphasis on cost savings, the Amended Complaint asserts that this language is misleading because Waitr had previously offered flexibility around price point.   Doc. 37, ¶ 138.  Because the Amended Complaint acknowledges that Waitr's claims to offer "flexibility around price point" were objectively true when made, and because the Amended Complaint pleads no circumstances indicating conscious deceptive intent on the part of defendants, we recommend the court find these statements are not actionable under Section 10(b).  *See Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)

### 8.   *Statements regarding Bite Squad acquisition*

In the eighth category of statements underlying the Section 10(b) claims, various defendants make statements concerning Waitr's acquisition of Bite Squad:

In announcing its decision to acquire Bite Squad, Waitr filed a  Form 8-K with the SEC, which included a press release dated December 12, 2018, that quoted  Meaux, in part, as follows:

> "We have followed Bite Squad's growth and success for many years and believe their mission, business model and growth profile share many similarities to Waitr," said Chris Meaux, founder and Chief Executive Officer of Waitr.
>
> "We believe that a small fraction of the U.S. restaurant industry's sales are from off-premise online transactions and this is evolving rapidly. This acquisition will help us drive additional growth and provide a step function increase in scale throughout the U.S. in order to better serve that developing market."

*Id.*, ¶ 108.  That release also explained the rationale for the Bite Squad acquisition as being based on the following considerations:

- The combination will significantly expand Waitr's scale and footprint across the U.S., serving a total of over 86 markets in more than 500 cities and 22 states;

- Shared strategy to establish a market leadership position in the cities which the Company operates;

- Leverage respective strengths to create a best-in-class organization; and

- Opportunity to realize cost synergies.

*Id.*, ¶ 109.

On March 7, 2019, Waitr held a conference call with investors and analysts in which Meaux discussed the Bite Squad acquisition, describing Waitr's excitement to welcome Bite Squad, the process of "getting to know their team," the similarity in the two companies' business models (smaller markets, W-2 drivers, dedication to restaurant partners), and plans to "leverage respective strengths" to achieve a 2019 net revenue of $250 million and expand into "new markets within our current footprint." *Id.* ¶ 114.

In the May 8, 2019 conference call with investors and analysts, Meaux stated that the integration of Bite Squad's and Waitr's technology platforms would be key to achieving the long-term +20% EBITDA forecasts. Doc. 37, ¶ 132. In the press release included in Waitr's May 9, 2019 Form 8-K, Meaux was quoted as describing the company's "successful acquisition of Bite Squad on January 17" and calling 2019 a "transformational year" which would include the integration of Bite Squad. Doc. 37, ¶ 121. He also stated that,

> the integration of the combined company is moving along nicely. We started unlocking the value of integration with the consolidation of the leadership team as reported in February. Since then, we have achieved nearly complete integration of marketing, accounting and sales and have made significant progress toward the integration of restaurant operations, customer support and technology. We expect to achieve full integration in the first half of 2020.

Doc. 37, ¶ 124. The May 16, 2019 Preliminary Prospectus Supplement to the Secondary Offering Registration Statement stated that,

> On January 17, 2019, we completed the acquisition of Bite Squad, an online
> food ordering and delivery platform, which operates a three-sided
> marketplace, consistent with Waitr, expanding our scale and footprint
> across the United States to more than 600 cities and adding more than
> 11,800 restaurants. The aggregate consideration for the Bite Squad Merger
> consisted of $192,949 payable in cash (subject to adjustments), the pay
> down of $12,705 of indebtedness of Bite Squad and 10,591,968 shares of
> our common stock. We believe the acquisition will help us drive additional
> growth as we leverage our respective strengths, with the opportunity to
> realize cost and operational synergies, including the integration of the two
> platforms.

Doc. 37, ¶ 139.

> The Section 10(b) Claims assert that these statements are materially misleading because:

> The Bite Squad acquisition was not "successful," as it was conducted with
> little or no due diligence and with disregard for the fact that Bite Squad's
> haphazard structure (caused as a result of it being cobbled together through
> 17 other acquisitions).  It was not consistent with Waitr's contiguous growth
> model, whereby the Company grew in an orderly regionally contiguous
> expansion. Defendants were entirely unable to integrate Bite Squad with
> Waitr because the two platforms were incompatible, and as a result
> Defendants were forced to run two poorly managed, money-losing
> operations with little regional overlap and few synergies.

*Id.* ¶ 122 (see similar language at ¶ 110, 115, 125, 140).

The February-March statements about why Waitr acquired Bite Squad and "getting to know their team" are optimistic corporate puffery.  *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (describing "puffery" as language of the "vague and optimistic type" containing "no concrete factual or material misrepresentation.").  As for the remaining statements, although there is some lack of consistency between Meaux's May 2019 statement that the integration of Bite Squad is "moving along nicely" and Price's August 2019 statement that the integration was more challenging than initially imagined and analyst reports that the Bite Squad acquisition caused the company to lose focus on its core business "further dropping the ball," [*see* Doc. 37, ¶ 161-164], this inconsistency does not give rise to the necessary strong inference of the

requisite state of mind because the primary fact underlying the statement is true:  Waitr was in the process of integrating Bite Squad in May 2019.  The phrase "moving along nicely" also amounts to corporate puffery.  *Southland*, 365 F.3d at 372.

Further, the Amended Complaint does not focus on this inconsistency as the reason the foregoing statements are misleading.  Rather, it focuses on the presumption that the Bite Squad acquisition was ill-conceived and the integration of Bite Squad into Waitr was both impossible and inconsistent with Waitr's early growth.  *See, e.g.*, Doc. 37, ¶ 122.  The Amended Complaint does not plead any specific facts supporting the conclusory allegations that the Bite Squad acquisition "was conducted with little or no due diligence" or that the defendants knew the platforms were "incompatible."  *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994) ("We will thus not accept as true conclusory allegations or unwarranted deductions of fact.").  We therefore recommend that the court find these statements not actionable under Section 10(b).

### 9.   *Statements regarding the path to profitability.*

Finally, in the May 8, 2019 conference call, Meaux speculated that profitability was within reach, stating:

> [W]hen we did the Landcadia transaction, we were just a few hundred thousand dollars a month away from profitability. In the case of Bite Squad, they had already been profitable at some period. So we know how to get this business profitable….And so if we stop expanding, if we -- or stop opening new markets, not so much stop expanding because most of our growth is coming from existing markets anyway. But if we just stopped opening new markets, it wouldn't take us long to find profitability.

Doc. 37, ¶ 130.  The Amended Complaint asserts that this statement was materially misleading because

> Waitr lacked a plan to achieve profitability and, contrary to Defendant Meaux's statements, Waitr was not at or near profitability. Rather, Defendants had created the illusion of financial stability by engaging in a

host of illegal and improper activities each designed to inflate revenues and earnings. Waitr could not achieve profitability because its business model based on providing delivery service to small restaurant operators in "underserved" markets was not sound or sustainable, and the Company required draconian price increases that Waitr's core base customers could not afford to pay. Waitr had already breached certain customer contracts to force customers who had initially contracted at a 10% rate to adopt the 15% rate, and even at 15%, the Company could not profitably provide its services to small, independent restaurants in remote markets. Thus, it was necessary to immediately raise take rates as soon as Waitr created a public market for Waitr shares.

Doc. 37. ¶ 131.

The Amended Complaint pleads no facts in support of the statements that "Waitr lacked a plan to achieve profitability," or that "Defendants had created the illusion of financial stability by engaging in a host of illegal and improper activities each designed to inflate revenues and earnings." Courts will not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). Accordingly, we recommend the court conclude the statement regarding Waitr's path to profitability is not actionable under Section 10(b).

### 10. Recap of Section 10(b) claims

Having reviewed the statements underlying the Section 10(b) claims, the explanations provided by the Amended Complaint as to why these statements are misleading, and the surrounding facts and circumstances identified in the Amended Complaint, we determine, and recommend that the district court agree, that the alleged statements do not give rise to a strong inference of knowing falsity and therefore do not meet the pleading requirements established by Fed. R. Civ. P. 9(b) and the PSLRA and therefore warrant dismissal under Fed. R. Civ. P. 12(b)(6).

**F.  Standard and Application for Controlling Person Liability—Section 20(a) Claims**

Section 10(b) Claimants also bring claims under Section 20(a) of the Securities Exchange Act, which governs liability of controlling persons and persons who aid and abet violations.  Doc. 37, ¶ 66 *et seq.*

Section 20(a) provides, in pertinent part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

A claim for controlling-person liability cannot be maintained unless an underlying violation by the controlled person is shown. *Branca v. Paymentech,* No. 3:97-CV-2507-L, 2000 WL 145083, at *12 (N.D. Tex. Feb.8, 2000).  "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996)).  Thus, to prevent dismissal of their Section 20(a) claims, Plaintiffs must first state a claim under either § 10(b) or Rule 10b–5.  Here, because there is no finding of underlying violation, we recommend that the district court find that there is no actionable claim for control person liability under Section 20(a).

**III.**

**CONCLUSION**

For the reasons stated, **IT IS RECOMMENDED** that the Motion to Dismiss Class Action Complaint [doc. 37] be **GRANTED.**

Under the provisions of 28 U.S.C. §636 Rule 72 of the Federal Rules of Civil Procedure, parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglas v. United Services Automobile Ass'n,* 79 F.3d 1415, 1429-30 (5th Cir.1996).

THUS DONE AND SIGNED in Chambers this 15th day of June, 2022.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE