**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| WALTER WELCH, Individually and on Behalf of all Others Similarly Situated,<br><br>  Plaintiff,<br><br>  vs.<br><br>CHRISTOPHER MEAUX, DAVID PRINGLE, JEFF YURECKO, TILMAN J. FERTITTA, RICHARD HANDLER, WAITR HOLDINGS, INC. f/k/a LANDCADIA HOLDINGS, INC., JEFFERIES FINANCIAL GROUP, INC., and JEFFERIES, LLC,<br><br>  Defendants. | Case No. 2:19-CV-01260-TAD-KK<br><br>JUDGE TERRY A. DOUGHTY<br><br>MAG. JUDGE KATHLEEN KAY |

**PLAINTIFFS' OBJECTIONS**
**TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS**

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   STANDARD OF REVIEW .................................................................................. 3

III.    OBJECTIONS TO THE REPORT AND RECOMMENDATIONS .............................. 3

    A.  The Report Incorrectly Recommends Dismissing Plaintiffs' Section 14(a) Claims ......... 3

        1.   Statements Regarding Waitr's Business Model Are Materially Misleading ................ 4

        2.   The Report Analyzes Opinion Statements Using the Wrong Legal Standard ............. 9

        3.   The Report Incorrectly Treats Negligence as a "State of Mind" ............................... 11

    B.  The Report Incorrectly Recommends Dismissing Plaintiffs' Section 10(b) Claims ....... 13

        1.   The Section 10(b) Business Model Statements ............................................. 13

        2.   The "Differentiated Proprietary Technology" Statements ........................................ 20

        3.   The Bite Squad Statements ........................................................................ 22

    C.  The Report Errs in Recommending Dismissal of the Section 20(a) Claims ................... 25

    D.  If the Court Adopts the Report, Plaintiffs Respectfully Request Leave to Amend ......... 25

IV.   CONCLUSION .................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*ABC Arbitrage v. Tchuruk,*
   291 F.3d 336 (5th Cir. 2002) ................................................................................ 13

*Abramson v. NewLink Genetic Corp.,*
   965 F.3d 165 (2d Cir. 2020)................................................................................... 9

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988)................................................................................................ 5

*Baum v. Harman Int'l Indus.,*
   No. 17-246, 2021 U.S. Dist. LEXIS 238411 (D. Conn. Dec. 14, 2021)................ 13

*Beck v. Dobrowski,*
   559 F.3d 680 (7th Cir. 2009) ................................................................................ 11

*Braun v. Eagle Rock Energy Partners, L.P.,*
   223 F. Supp. 3d 644 (S.D. Tex. 2016) .................................................................... 3

*Breton Energy, L.L.C. v. Mariner Energy Res., Inc.,*
   764 F.3d 394 (5th Cir. 2014) .................................................................................. 5

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
   856 F.3d 605 (9th Cir. 2017) .................................................................................. 9

*Del. Cty. Emples. Ret. Sys. v. Cabot Oil & Gas Corp.,*
   No. 21-2045, 2022 U.S. Dist. LEXIS 5884 (S.D. Tex. Jan. 12, 2022).................... 9

*Edwards v. McDermott Int'l, Inc.,*
   No. 4:18-CV-4330, 2021 U.S. Dist. LEXIS 71758 (S.D. Tex. Apr. 13, 2021) .................... 3, 9

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP,*
   No. 20-9992, 2021 U.S. Dist. LEXIS 185730 (S.D.N.Y. Sep. 27, 2021)................ 11

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.,*
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................... 13

*Golub v. Gigamon, Inc.,*
   994 F.3d 1102 (9th Cir. 2021).................................................................................. 9

*Hall v. Rent-A-Ctr., Inc.,*
   No. 4:16-cv-978, 2017 U.S. Dist. LEXIS 205959 (E.D. Tex. Oct. 19, 2017) .................... 9, 19

*Howard v. Fortenberry,*
   723 F.2d 1206 (5th Cir. 1984)................................................................................ 12

*In re BP P.L.C., Sec. Litig.,*
   843 F. Supp. 2d 712 (S.D. Tex. 2012) .................................................................... 24

*In re BP PLC Secs. Litig.,*
   No. 10-md-2185, 2016 U.S. Dist. LEXIS 73721 (S.D. Tex. May 31, 2016) .................... 9

*In re Bristol Myers Squibb Co. Secs. Litig.,*
   586 F. Supp. 2d 148 (S.D.N.Y. 2008)................................................................... 20

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................. 17

*In re Sec. Litig. Bmc Software*,
183 F. Supp. 2d 860 (S.D. Tex. 2001) .................................................................. 8

*In re SolarWinds Corp. Sec. Litig.*,
No. 1:21-CV-138-RP, 2022 U.S. Dist. LEXIS 57969 (W.D. Tex. Mar. 30, 2022)................ 25

*In re Willis Towers Watson PLC Proxy Litig.*,
439 F.Supp 3d 704 (E.D. Va. 2020) ............................................................. 11, 12

*Jaroslawicz v. M&T Bank Corp.*,
962 F.3d 701 (3d Cir. 2020)............................................................................ 9

*Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*,
No. 4:13-CV-2393, 2015 U.S. Dist. LEXIS 31468 (S.D. Tex. Mar. 13, 2015)....................... 7

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ............................................................. 4, 5, 15, 24

*Masel v. Villarreal*,
924 F.3d 734 (5th Cir. 2019) ............................................................. 7, 13, 22

*Mun. Employees' Ret. Sys. v. Pier 1 Imps., Inc.*,
935 F.3d 424 (5th Cir. 2019) ............................................................. 16, 17

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)............................................................................ 17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)............................................................................ 9, 10, 11

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ............................................................................ 16

*Paradise Wire & Cable Defined Ben. Pension Plan v. Weil*,
918 F.3d 312 (4th Cir. 2019) ............................................................................ 9

*Plotkin v. IP Axess Inc., Etc.*,
407 F.3d 690 (5th Cir. 2005) ............................................................. passim

*SEC v. GenAudio Inc.*,
32 F.4th 902 (10th Cir. 2022) ............................................................................ 9

*SEC v. Guardian Oil & Gas, Inc.*,
14-1533, 2014 U.S. Dist. LEXIS 176889 (N.D. Tex. Dec. 23, 2014).................................... 12

*Spitzberg v. Hous. Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ............................................................................ 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................ 11, 15

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)............................................................................ 9

iii

*Virginia Bankshares v. Sandberg*,
   501 U.S. 1083 (1991) ............................................................................... 9

*Wilson v. Great Am. Indus.*,
   855 F.2d 987 (2d Cir. 1988) .................................................................... 12

**Statutes**

15 U.S.C. § 78n ............................................................................................. 3

15 U.S.C. § 78u-4 ....................................................................................... 11

15 U.S.C. § 78u-5 ......................................................................................... 8

28 U.S.C. § 636 ............................................................................................. 3

**Other Authorities**

17 C.F.R. § 240.14a-9 ............................................................................ 3, 4

Fed. R. Civ. P. 72(b) .................................................................................... 3

Fed. R. Civ. P. 72(b) Advisory Committee's Notes .................................... 3

W.D. La., L.R. 74.1(B) ................................................................................ 3

Plaintiffs respectfully submit these objections to the Report and Recommendation (ECF No. 89) (the "Report").[1]

## I.    **INTRODUCTION**[2]

This is not a case of "business efforts" that "simply fell short in the face of serious competition." Report at 2. Rather, it is a case of Defendants selling investors a hunk of coal as a diamond. In the beginning, Waitr was plucked from obscurity at the eleventh hour by a publicly-traded Special Purpose Acquisition Company ("SPAC") named Landcadia Holdings, Inc., which was controlled by well-known billionaire Tillman Fertitta and his "best friend" Richard Handler, the head of one of the nation's largest investment banks. Landcadia would acquire Waitr to take it public, after first seeking approval from Landcadia's shareholders via a proxy statement. After receiving approval, the two entities would merge, Landcadia would change its name to Waitr, and the shares of that new entity would begin trading on the NASDAQ.

To solicit proxies for the approval of the Waitr acquisition and to later reassure Waitr's stockholders, Defendants relentlessly touted Waitr's business model as "proven" and as more advantageous than the competition. These representations were further propped up by the words and reputation of Fertitta. Specifically, Defendants took the unconventional aspects of Waitr's business model, including an industry-low "take rate," a "differentiated proprietary technology platform," and a W-2 driver model, and routinely told investors these features were what set Waitr apart from the competition, thereby creating the impression that Fertitta and Handler had discovered a diamond in the rough. But unknown to investors, and as later admitted by Waitr's

---

[1] This Court referred both motions to dismiss (ECF Nos. 45 and 47) to the Magistrate Judge for a Report and Recommendation. Although some arguments overlap, and Plaintiffs filed only one opposition to both motions (ECF No. 56), the Report refers to only one of them (ECF No. 47). Plaintiffs are uncertain whether the Report inadvertently referred to only one motion, or whether an additional report will be forthcoming for the other motion (ECF No. 45).

[2] Citations to the Amended Class Action Complaint (the "Complaint") (ECF No. 37) are indicated as ¶__.

current CEO, Carl Grimstad, Waitr's business model was *never* sustainable, because it was based on a W-2 model that "could never work," and "[t]here was no analysis in the past with how the service offering was priced." Indeed, in the months following the merger, Waitr began dismantling each element of its purportedly "proven" business model and saw the departures (or forced exits) of its CFO, Defendant Pringle, and founder and CEO, Defendant Meaux. As Grimstad later recounted, Waitr was "definitely headed for bankruptcy." When these truths were revealed, Waitr's stock price plummeted, causing harm to its investors. Tellingly, Waitr recently announced that the SEC is now looking into the disclosures at the heart of this case.

Despite these detailed and compelling allegations, the Report recommends dismissal of the Complaint. But in doing so, the Report commits at least three fundamental errors that impact large portions of its analysis and lead it to reach the wrong conclusions. First, the Report fails to address many of the key facts alleged in the Complaint, including all of the admissions by Carl Grimstad, that go directly to the elements of falsity and scienter. Second, in analyzing whether statements were materially false or misleading under Sections 14(a) and 10(b) of the Exchange Act, the Report fails to consider, in context, whether Defendants omitted to state material facts necessary to make their statements not false or misleading, and instead analyzes, in contravention of Fifth Circuit precedent, only whether certain statements are "literally" true. Third, when analyzing whether certain "opinion" statements are misleading, the Report applies a clearly erroneous legal standard that contradicts more recent Supreme Court precedent. Without differentiating between statements of opinion and fact, it also erroneously applies that opinion standard to non-opinion statements.

After a *de novo* review of all of Plaintiffs' allegations using the correct legal framework, Plaintiffs respectfully submit that this Court should find that the Complaint adequately alleges claims under Sections 14(a), 10(b), and 20(a), and that Defendants' motion should be denied.

## II.    STANDARD OF REVIEW

"A district judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject or modify in whole or in part, the findings or recommendations made by the magistrate judge." W.D. La., L.R. 74.1(B); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

## III.    OBJECTIONS TO THE REPORT AND RECOMMENDATIONS

### A.  The Report Incorrectly Recommends Dismissing Plaintiffs' Section 14(a) Claims

"The elements of a section 14(a) claim are: (1) defendants misrepresented or omitted a material fact in a proxy statement, [ . . . ] (2) defendants acted at least negligently in distributing the proxy statement, [ . . . ] and (3) the false or misleading proxy statement was an essential link in causing the corporate actions [ . . . ]." Report at 14 (citing *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 649-50 (S.D. Tex. 2016); *see also Edwards v. McDermott Int'l, Inc.*, No. 4:18-CV-4330, 2021 U.S. Dist. LEXIS 71758, at *17 (S.D. Tex. Apr. 13, 2021).[3] Section 14(a) and SEC Rule 14a-9 impose liability for soliciting or permitting the use of one's name to solicit any proxy that (1) "contains any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact" **_or_** (2) "which omits to state any material fact necessary in order to make the statements therein not false or misleading…." Report at 13-14 (citing 15 U.S.C. § 78n(a)(1) and 17 C.F.R. § 240.14a-9(a)).

Here, the Report largely fails to consider whether Defendants, as alleged, omitted to state material facts necessary to make their statements not false or misleading. Instead, the Report analyzes the alleged misstatements only in isolation and recommends dismissal because it finds

---

[3] Although the Report rejects Defendants' argument that scienter is a required element of Section 14(a) (*see* Report at 15-16), Defendants did not file objections to that proposed finding (or to any other proposed finding). "When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72(b) Advisory Committee's Notes (1983).

certain statements to be "literally" true. *See* Report at 20, 22, 26, 28, 30. But "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009). When analyzed under the correct legal framework, the Complaint plausibly alleges misleading statements under Section 14(a).

### 1. Statements Regarding Waitr's Business Model Are Materially Misleading

Here, the Complaint plausibly alleges that the Proxy materials omitted to state material facts concerning Waitr's business model that rendered its statements misleading. *See* ¶¶ 27-44.[4] In soliciting proxies, Defendants repeatedly touted the significant advantages of Waitr's "proven" business model, including its 15% take rate, its W-2 labor model, its high growth model, and its differentiated technology platform, and assured investors that these purported advantages "positioned [Waitr] well for the long term." *See* ¶¶ 29, 31, 33, 37, 39, 41. Specifically, Defendant Meaux told investors that Waitr had "the most attractive pricing in the industry, at 15% take rate, compared to our competitors," and that Waitr had "proven that [its] model is scalable to multiple markets." ¶ 33. Defendant Fertitta echoed those statements by referring to Waitr's 15% take rate as "one of [its] edges" (¶ 37), and by describing Waitr as having "a proven track record" (¶ 29). Defendant Meaux further explained, "We believe that our strong position in our current markets, proven expansion strategy, strong value proposition to customers and restaurants, differentiated proprietary technology platform and high growth business model built in a capital efficient manner has positioned us well for the long term." ¶ 39.

---

[4] The Report notes "that the Section 14(a) Plaintiffs do not criticize statements in the Proxy Statement itself, and that all of the highlighted statements were made outside the Proxy Statement." Report at 17. To the extent the Report is suggesting these statements might be inactionable as a result, that would constitute legal error. The very language of SEC Rule 14a-9 does not limit liability to false or misleading statements made only in the Proxy Statement itself; rather, it extends liability to any false or misleading solicitation "made by means of any proxy statement, form of proxy, notice of meeting or *other communication*, written or oral[.]" 17 C.F.R. § 240.14a-9(a) (emphasis added).

A reasonable investor reading these statements in context would have formed the impression that, regardless of literal truth, the statements were based on some analysis supporting that, not only was Waitr's business model currently successful, but also that it had a reasonable expectation of future success and some advantage over competitors. But, as later admitted by Waitr's current CEO, Carl Grimstad, Waitr's business model was *never* sustainable, because it was based on a "driver model that could never work" and a "service offering [that] was mispriced." ¶ 197; *see also* Exs. A, B.[5] In fact, Grimstad conceded that, when he took the reins of Waitr, "There was ***no analysis in the past*** with how the service offering was priced…" Ex. A. None of this information was disclosed to investors, and these "omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Lormand*, 565 F.3d at 249 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

Notably, in the months following the merger, it became clear that the positive portrait painted by Defendants, including Tillman Fertitta, was merely an illusion. One by one, Waitr dropped each aspect of its purportedly "proven" business model. Waitr radically changed its pricing structure just after it went public, unilaterally forcing steep price increases on restaurants without any explanation, leading restaurant owners to bring a class action lawsuit against the Company (which revealed that the take rate increases started before the Class Period in this action began). ¶¶ 47, 147. After pressing, Waitr representatives admitted to Confidential Witness 1 ("CW1") that unilateral increases in the take rate were necessary for Waitr to "continue doing business and be solvent." ¶¶ 30, 193. Likewise, Waitr was not able to sustain its labor model,

---

[5] These two articles, although not copied in full in the Complaint, are cited therein (*see* ¶¶ 196-198), and thus incorporated by reference, and may be relied on by this Court. *See Breton Energy, L.L.C. v. Mariner Energy Res., Inc.*, 764 F.3d 394, 402 n.23 (5th Cir. 2014) (taking judicial notice of a letter that was "referenced in the complaint and central to [Plaintiffs'] claims."); *see also* Transcript of MTD Hearing (ECF No. 81) at 70:8-22 (article offered to Magistrate Judge Kay at oral argument hearing without objection).

causing several employees to sue the Company over unpaid wages. ECF No. 56 at 5-6. Waitr also abandoned its "differentiated proprietary technology platform" for a third-party software shortly after the merger. ¶¶ 26, 93. Once it outsourced this technology, Waitr became little more than a website that employs delivery drivers. *Id.*

Within a few months, Defendants Meaux and Pringle (CEO and CFO of Waitr) resigned from the company or were pushed out, with Meaux being forced to forfeit two-thirds of his restricted stock. ¶¶ 200-206. The new CEO, Grimstad, who took over several months later, recounted that Waitr was "definitely headed for bankruptcy," and "[f]inancial decisions were being made with seemingly no rhyme or reason." ¶ 196. He elaborated, "We were over-staffed, we were paying a lot of our vendors incorrectly or too much, ***our service offering was mispriced***, we had a ***driver model that could never work***, and we had a dwindling cash position . . . To say the least, there were opportunities or problems everywhere to be fixed." ¶ 197 (emphasis added). Moreover, Grimstad explained that "if you looked at it mathematically," Waitr's model "could never get to [a] level of efficiency" where it could be profitable for the Company. *Id.* He also called the math "deceptively simple," implying that basically anyone with access to Waitr's books easily could have figured out that the business model was always doomed to fail. Ex. A. They just had to look.

Without addressing these omissions or context, the Report recommends dismissing the alleged misstatements because, taken in isolation, it found the statements to be literally true. For example, the Report finds the use of the term "proven expansion strategy" to be "not objectively false because Waitr had, in fact, been growing and expanding as of May 2018," (Report at 20), and further found that there was "no basis in the Amended Complaint to infer falsity in the description of Waitr as a value proposition with an industry-low 15% take rate when these statements were made in May to October, 2018," (Report at 22). But such findings overlook that,

6

in context, the relentless touting of Waitr's business model, including its "proven expansion strategy" and 15% take rate, was designed to create the impression that Waitr's business model was sustainable, more advantageous than the competition, and thus would result in a payoff for investors in the future. *Cf. Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("[I]n context, the touting of AGPI/Lynxus [contract] was designed to create an impression that a substantial payoff would soon flow from the contracts."). Any investor certainly would have been surprised to learn, among other things, that the "service offering was mispriced," "the driver model could never work," and "[t]here was no analysis in the past with how the service offering was priced." Ex. A. The omission of these material facts rendered Defendants' statements about Waitr's business model misleading.

The Report also discounts Plaintiffs' allegations relating to the W-2 labor model as "a generalized criticism of the use of W-2 drivers" and as simply an "unwise choice" in "hindsight." Report at 28. But far from "generalized criticism" or being nothing more than an "unwise choice" that later turned out to be wrong, the Complaint alleges Grimstad admitted that the W-2 labor model "could ***never*** work" and pointed out that "the math [regarding the W-2 model] was deceptively simple." ¶ 197; Ex. A. Someone just had to do it. And, although these admissions came after the fact, they nevertheless leave no room for debate at this stage that Defendants' statements were misleading *when made*, because they allow for the reasonable inference that Defendants' business model was anything but "proven" or sustainable at the time of the representations.[6]

---

[6] The Report cites *Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, No. 4:13-CV-2393, 2015 U.S. Dist. LEXIS 31468, at *28 (S.D. Tex. Mar. 13, 2015). In that case, the court found that "linking generalized, optimistic statements with disappointing earnings results announced weeks or months later" did not make the statements false when made. 2015 U.S. Dist. LEXIS 31468 at *28. It did not hold that statements made later in time could never support falsity. In fact, the Fifth Circuit has more than once held that "evidence of later events can provide useful circumstantial evidence that a given representation was false when made." *Masel v. Villarreal*, 924 F.3d 734, 750 (5th Cir. 2019); *see also Plotkin*, 407 F.3d at 698 (Subsequent events can be relevant to falsity when they "are so temporally connected that they shed light on the [] condition of the companies at the time of the [misstatement].").

The Report applies a similar analysis to the alleged misstatements regarding Waitr's "differentiated proprietary technology platform." Report at 25-26. Plaintiffs assert that these statements were materially misleading because the "growth" Waitr claimed to be focused on could not have been accomplished with its existing technology platform, which lacked basic functionality features, such as the ability to send tickets directly into a restaurant's point-of-sale system. ¶ 156. The deficiency of the system was further evidenced by the fact that, shortly after the secondary offering, Waitr switched to a different platform, abandoning yet another of the key features it relentlessly promoted to investors. ¶ 173. Instead of addressing this analysis, the Report finds it literally true that the technology program was "differentiated." Report at 26. Literal truth, however, does not preclude Defendants' statements about the platform from being misleading.

Lastly, the Report notes "that the Proxy Statement itself contained cautionary language relevant to the seven categories of allegedly misleading statements." Report at 17-18. Yet, all but one of the statements at issue were made months earlier than the Proxy Statement. *See* ¶¶ 29, 31, 33, 35, 37 (May 17, 2018), ¶ 39 (August 2, 2018). Further, nearly all the statements were oral; thus, to be protected by the safe harbor, they had to be contemporaneously "identified as forward-looking." *In re Sec. Litig. Bmc Software*, 183 F. Supp. 2d 860, 910 (S.D. Tex. 2001) (citing 15 U.S.C. § 78u-5(c)(2)). They were not, and Defendants didn't argue otherwise.

Nor was the misleading impression created by Defendants dispelled by the Proxy Statement's boilerplate warnings. For example, the Report notes that the Proxy Statement stated: "The acceptable pricing of Waitr's onboarding and services fees to restaurants and delivery fees to consumers and restaurants has not been tested widely." Report at 23 n.9. But saying something "has not been tested widely," signals to investors that it *has* at least been tested and analyzed on some scale. To the contrary, Grimstad stated, "There was no analysis in the past with how the

8

service offering was priced." Ex. A. Thus, these "generic risk disclosures do not shield Defendants' false statements." *See Hall v. Rent-A-Ctr., Inc.*, No. 4:16-cv-978, 2017 U.S. Dist. LEXIS 205959, at *59 (E.D. Tex. Oct. 19, 2017).

### 2. The Report Analyzes Opinion Statements Using the Wrong Legal Standard

The Report's conclusion that the Complaint fails to adequately allege misleading opinion statements rests on the erroneous foundation that such statements "are not actionable under Section 14(a) unless they are both objectively false and not sincerely held." Report at 20 (citing *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991)); *see also* Report at 15, 25, and 30). That is not the correct analysis under current Supreme Court law. Since *Virginia Bankshares*, the case relied upon and cited throughout the Report, the Supreme Court has made clear that opinion statements *are* actionable even when "sincerely held," if (1) the supporting facts underlying the opinion are untrue, or (2) the statement "omits material facts . . . [that] conflict with what a reasonable investor would take from it." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-89 (2015).[7] As a result, the Second Circuit recently acknowledged that the Supreme Court's decision in *Omnicare* "reduced the significance of district courts' classifications of statements as those of fact or opinion" by "increasing the ability of plaintiffs to plead material omissions with respect to statements of opinion." *Abramson v. NewLink Genetic Corp.*, 965 F.3d 165, 175-76 (2d Cir. 2020). Because of this legal error, the Report stops short of a complete falsity

---

[7] Although *Omnicare* involved Section 11 claims, courts have universally applied *Omnicare*'s analysis of opinion statements to both Section 14(a) and Section 10(b) claims. *See, e.g., Golub v. Gigamon, Inc.*, 994 F.3d 1102, 1106-07 (9th Cir. 2021) (applying *Omnicare* to 14(a) claims); *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 717 (3d Cir. 2020) (same); *Paradise Wire & Cable Defined Ben. Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019) (same); *Edwards v. McDermott Int'l, Inc.*, 18-4330, 2021 U.S. Dist. LEXIS 71758, at *22 (S.D. Tex. Apr. 13, 2021) (same); *SEC v. GenAudio Inc.*, 32 F.4th 902, 924 (10th Cir. 2022) (applying *Omnicare* to 10(b) claims); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (same); *Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016) (same); *Del. Cty. Emples. Ret. Sys. v. Cabot Oil & Gas Corp.*, 21-2045, 2022 U.S. Dist. LEXIS 5884, at *24 (S.D. Tex. Jan. 12, 2022) (same); *In re BP PLC Secs. Litig.*, 10-md-2185, 2016 U.S. Dist. LEXIS 73721, at *79-80 (S.D. Tex. May 31, 2016) (same and collecting cases).

analysis with respect to any statements rightly characterized as opinions—whether under Section 14(a) or Section 10(b).[8]

Under the appropriate *Omnicare* standard, the Complaint plausibly alleges actionable opinion statements, including any opinion statements concerning Waitr's business model. *See, e.g.,* ¶¶ 29, 39, 98, 108, 121, 126, 141. For example, in this case, Defendant Meaux stated he had "confidence" that Waitr had the "right business model" in place to be successful. ¶ 121. While reasonable investors certainly understand that opinions about a business model and its component parts are not guarantees that the business model will be successful, reasonable investors also "understand an opinion statement to convey facts about how the speaker has formed the opinion— or, otherwise put, about the speaker's basis for holding that view." *Omnicare*, 575 U.S. at 188-89. So, a reasonable investor, though recognizing that Waitr's "right business model" could ultimately turn out to be the wrong model, would have nevertheless expected that opinion to rest on some meaningful inquiry or reliable analysis supporting why it's the "right business model"—"rather than, say, on mere intuition, however sincere." *Id*. at 188.

The Complaint, however, plausibly alleges, through Grimstad's admissions and post-class period events, that Defendants failed to disclose, among other things, that "there was no analysis in the past with how the service offering was priced" and that Waitr "had a driver model that could never work." *See* ¶¶ 196-98. Thus, even if any of the statements about Waitr's business model (often referred to as "proven" (¶¶ 29, 33, 39, 123)) are statements of opinion, *see* Report at 20, they would still be misleading because Defendants "omit[ted] material facts about the issuer's

---

[8] When analyzing Plaintiffs' Section 14(a) claims, the Report often makes no differentiation between the analysis it conducts on opinion statements and non-opinion statements, instead applying the framework of *Virginia Bankshares* to, for example, all statements about Waitr's "growth" and "proven expansion strategy." *See* Report at 30-31. This is legal error. Nevertheless, as in *Newlink* and as discussed below, whether Defendants' statements here are classified as ones of fact or opinion does not alter the outcome.

inquiry into or knowledge concerning a statement of opinion, and [] those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189. The Report fails to grapple with these arguments because it does not to conduct the full analysis required by *Omnicare* when it erroneously applied only the legal standard from *Virginia Bankshares*.

### 3.   The Report Incorrectly Treats Negligence as a "State of Mind"

Although the Report correctly finds that scienter is not an element of a Section 14(a) claim, (*see* Report at 14; *see also* ECF No. 56 at 31-34), the Report concludes that Plaintiffs' allegations "fall short of the PSLRA requirement that plaintiffs plead specific facts give [sic] rise to a 'strong inference' that each defendant acted with the requisite state of mind of at least negligence." Report at 22.[9] This recommendation, however, conflates the pleading standard for Section 14(a) claims with the enhanced pleading standard required for claims, such as Section 10(b), that require plaintiffs to plead a "strong inference of scienter" (*i.e.*, "a particular state of mind"). *See generally Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 317-29 (2007).

The overwhelming weight of authority holds that the PSLRA's heightened pleading standard for "state of mind" allegations does not apply to Section 14(a) because "negligence is not a state of mind; it is a failure, whether conscious or even unavoidable . . . to come up to the specified standard of care." *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (Posner, J.); *accord Enzo Biochem, Inc. v. Harbert Discovery Fund, LP,* 20-9992, 2021 U.S. Dist. LEXIS 185730, at *19-20 (S.D.N.Y. Sep. 27, 2021) (adopting *Beck* and holding that PSLRA's heightened pleading standard does not apply to Section 14(a) negligence); *In re Willis Towers Watson PLC Proxy Litig.*, 439 F.Supp 3d 704, 715 (E.D. Va. 2020) ("PSLRA's heightened scienter pleading requirement,

---

[9] The PSLRA provides, in pertinent part: "Where a plaintiff may recover money damages *only* on proof that the defendant acted with a *particular state of mind*, the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the *required state of mind*." 15 U.S.C. § 78u-4(b)(2) (emphasis added).

11

relevant only to 'state of minds,' does not require particularized allegations of negligence in Section 14(a) claims.")); *cf. SEC v. Guardian Oil & Gas, Inc.*, 14-1533, 2014 U.S. Dist. LEXIS 176889, at \*16 (N.D. Tex. Dec. 23, 2014) ("Defendant also confuses negligence with scienter where negligence is conduct, not a state of mind."). Although in a different context, the Fifth Circuit has also endorsed that negligence is not a "state of mind." *See Howard v. Fortenberry*, 723 F.2d 1206, 1209 n.6 (5th Cir. 1984) ("No particular state of mind is required to state a cause of action under §1983 for violation of fourteenth amendment rights; negligence will suffice.").

Despite this legal error, Plaintiffs have more than amply demonstrated negligence in this case. "As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the [ ] negligence standard." *Wilson v. Great Am. Indus.*, 855 F.2d 987, 995 (2d Cir. 1988). Thus, in order to establish negligence, Plaintiffs "must only demonstrate that Defendants were subject to and failed to comply with the applicable legal obligation, specifically, not to associate themselves with a proxy statement that contained false or misleading statements or omissions." *In re Willis Towers*, 439 F. Supp. 3d at 715.

In support of their Section 14(a) claims, Plaintiffs allege that: Meaux, Pringle, Fertitta, and Handler signed, made, and/or assisted in the preparation of the proxy filings (¶¶ 8-11); JFG and/or Jefferies served as underwriters for the Going Public Transaction (¶¶ 13-14); all 14(a) Defendants had a duty to "assure that statements contained in the Going Public Transaction Filings or incorporated therein by reference . . . were true, accurate and reliable and did not contain any untrue statement of a material fact or omi[ssion]" (¶ 27); specific false statements were made by the individual 14(a) Defendants with respect to the Going Public Transaction (¶¶ 29, 33, 35, 37); the 14(a) Defendants filed the Going Public Transaction Proxy Filings (¶¶ 39, 41, 43); as

12

underwriters, the Jefferies Defendants and Handler had a duty to conduct an adequate and detailed "due diligence investigation . . . into Waitr's operations, accounting, and guidance assumptions" (¶ 209); and Fertitta and Handler failed to conduct adequate due diligence with respect to the Secondary Offering and the Going Public Transaction. ¶¶ 210-11. When considered alongside Grimstad's admissions, these allegations are more than sufficient to meet Plaintiffs' pleading obligations (even a strong inference of negligence, whatever that might legally mean). *See Baum v. Harman Int'l Indus.*, 17- 246, 2021 U.S. Dist. LEXIS 238411, at *21-22 (D. Conn. Dec. 14, 2021) (allegations that the directors prepared and disseminated a proxy containing a misleading statement sufficient for pleading negligence); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017) (allegations of actionable misrepresentations in proxy statement "sufficient to meet [ ] low bar" of Section 14(a) negligence standard).[10]

### B. The Report Incorrectly Recommends Dismissing Plaintiffs' Section 10(b) Claims

To successfully plead Section 10(b) claims, Plaintiffs must allege, with particularity: "(1) [a] misstatement or omission (2) of material fact (3) in connection with the purchase or sale of a security, which was made (4) with scienter, and upon which (5) plaintiff justifiably relied, (6) proximately causing injury to the plaintiff." *See Masel*, 924 F.3d at 746.[11] A statement is material if there is a "substantial likelihood that the false or misleading statement 'would have been viewed by the reasonable investor as having altered the 'total mix' of information made available.'" *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002) (citation omitted).

#### 1. The Section 10(b) Business Model Statements
##### a. Defendants' Business Model Statements are Materially Misleading

---

[10] Although the Report does not address arguments about whether the Jefferies Defendants were participants in the Proxy solicitation or permitted their names to be used (*see* ECF No. 45), if the issues are raised by Defendants, Plaintiffs briefed them extensively in their opposition to the motion to dismiss. *See* Plaintiffs' Brief at 26-31.

[11] Defendants did not challenge the elements of reliance or loss causation in their Motion to Dismiss.

In the months following the de-SPAC business combination, Defendants continued to relentlessly tout Waitr's business model:

- Waitr is "positioned well to take advantage of the massive unpenetrated market for online delivery, particularly in secondary markets." ¶ 98 (Fertitta, November 16, 2018).

- "We knew what Grubhub was charging. So we priced ours at half—15 percent—because in the small markets, restaurants need every dollar they can get." ¶ 100 (Meaux, December 3, 2018).

- "Our business model involves employing the drivers . . . by having that advantage, we have a fixed cost per hour for our drivers. Then, we can leverage that fixed cost to increase profitability for us and then pass that on to the restaurants." ¶ 100 (Meaux, December 3, 2018).

- "Our business model has proven to be an advantage over competitors in the small and midsized markets that we serve." ¶ 123 (Meaux, May 8, 2019).

- "These are all advantages for Waitr over larger competitors in the markets we serve…." ¶ 123 (Meaux, May 8, 2019)

- "By leveraging our continued growth, our W2 business model, restaurant partnerships and our consistently repeatable local market profitability, we are targeting long-term EBITDA margins of 20%. One only needs to look at the profitability of our top 10 markets to see a path to long-term profitability." ¶ 126 (Meaux, May 8, 2019).

*See also* ¶¶ 98, 100, 102, 121, 123, 126, 128, 130, 141, 143. These statements are materially misleading for the same reasons discussed in Section I.A, *supra*. In fact, the inference of falsity can only grow stronger as the Company is moving even closer to financial ruin. ¶ 196. In the end, Waitr was not poised for continued growth or profitability, because it was barreling towards bankruptcy with an *unproven* business model that "could never work" and that was supported by "no analysis." ¶¶ 196-198; Exs. A, B. None of this information was disclosed to investors, so the total mix of information disclosed to investors was misleading.

With regards to Waitr's W2 labor model, the Report also *sua sponte* observes that Defendants' statements occurring after February 2019 "appear to pivot away from praising the W-2 labor model as a tidy 'fixed cost' and instead describe the drivers in qualitative terms as an

14

'invest[ment],' and 'brand ambassadors' who play an important role in promoting the company," and thus, are not misleading. Report at 50. Putting aside the fact that this "pivot" strongly indicates scienter with regards to the pre-February 2019 statements (a fact not addressed by the Report), regardless of the terms used, the post-February 2019 statements suffer from the same material omissions as all the other statements, namely, that the W-2 labor model "could never work." In fact, the Report goes on to say that the purported "pivot" "give[s] rise to the inference that the speaker intended to promote the positive aspects of the W-2 driver model while *avoiding* making too-explicit statements about the profitability of that model." Report at 50-51 (emphasis in original). The inference that Defendants intentionally omitted a key negative fact with regards to its labor model (*i.e.,* its profitability), while only discussing the positive aspects of the model, is a textbook example of securities fraud. *See, e.g., Lormand.*, 565 F.3d at 248-49 ("Once the defendants engaged in public discussions concerning the benefits of Type II affiliation and the no-deposit programs, they had a duty to disclose a 'mix of information' that is not misleading.").

### b.   The Erroneous Scienter Analysis for the Business Model Statements

The Report further recommends dismissing Defendants' Section 10(b) business model statements for a lack of scienter. *See* Report at 43, 44, 55-56. "[A]ccept[ing] all factual allegations in the complaint as true," the Court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs,* 551 U.S. at 322-23. An inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* Rather, it need only be "at least as compelling" (*i.e.*, in "equipoise") as any opposing inference. *Id.*

The Fifth Circuit recommends a two-step approach to analyzing scienter: "If any single allegation, standing alone, create[s] a strong inference of scienter, then the court may stop there.

15

If it does not, then the district court must take 'a holistic look at all the scienter allegations.'" *Mun. Employees' Ret. Sys. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 430 (5th Cir. 2019) (citing *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015)). The Report fails to properly perform either step.

Indeed, if the Report had conducted the analysis recommended by the Fifth Circuit, it likely could have stopped after the first step, because the admissions of Carl Grimstad give rise to a particularly strong inference of scienter on their own. *See* ¶¶ 196-198. Grimstad gave two interviews in which he discussed the state of the business after he took over in January 2020. On July 23, 2020, in an interview published in foodondemandnews.com, he stated, "[T]he company was on the trajectory to be bankrupt in the first quarter," and elaborated, "[W]e were paying a lot of our vendors incorrectly or too much, our service offering was mispriced, we had a driver model that could never work, and we had a dwindling cash position and a capital structure—meaning $120 million in debt in front of equity that had no value—and were coming off a very big negative EBITDA year." ¶¶ 197-198. The math, he continued, was "deceptively simple," and that "***when you dig into the details*** and it comes to Waitr and Bite Squad, we could never get to that level of efficiency . . . the profit margin would be all over the board or nonexistent," and there was "***no analysis*** in the past with how the service offering was priced. It's all very similar, ***if you've studied it***…." ¶ 197, Ex. A (emphasis added).

Similarly, in an article published on Restaurantbusinessonline.com on August 18, 2020, Grimstad admitted, "The company was definitely headed for bankruptcy," and that one of his first efforts to stave off bankruptcy was abandoning Waitr's W2 labor model in favor of drivers who operated as independent contractors. ¶ 196. He went on to say that, when he took over, he found a company that was overstaffed and using ineffective driver and pricing models, vendor spending was "out of control," and cash had dwindled to somewhere in the $20 million range. Ex. B.

16

"Financial decisions were being made with seemingly no rhyme or reason," he said, "Very quickly, we had to do some quasi-draconian things." Ex. B.

Notably, the Report makes no mention at all of any of Grimstad's admissions, instead recommending that this Court dismiss these Section 10(b) claims because "the Amended Complaint pleads no circumstances indicating **conscious deceptive intent** on the part of defendants." Report at 56 (emphasis added). However, such intent is plainly not the only avenue by which a plaintiff can plead scienter. "Plaintiffs properly plead scienter when they allege that a company knowingly **or recklessly** made statements to the market while aware of facts that, if not disclosed, would render those statements misleading." *Mun. Employees' Ret. Sys., Inc.*, 935 F.3d at 430 (emphasis added). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Plotkin*, 407 F.3d at 700 (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

Here, Defendants repeatedly hyped their business model as "a proven advantage" (¶ 123), even though Grimstad stated, when he arrived at Waitr, that there was "no analysis in the past with how the service offering was priced" and that the driver model "could never work." ¶ 197; Ex. A. As a result, these allegations easily allow for the reasonable inference that Defendants either knew the model could not succeed (despite statements to the contrary) or, at the very least, were reckless in relentlessly touting Waitr's business model without any real analysis to support such statements. Alternatively, that Grimstad was able to come aboard at Waitr and immediately recognize, among other things, that its business model "could never work" is strong circumstantial evidence that these serious problems at Waitr were obvious (even if truly not known). *See In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("[T]hat the new CEO . . . discovered the accounting

17

violations within months of taking the position is a strong indication [they] were obvious….").

Either way, scienter is adequately alleged here.[12]

If the Grimstad admissions alone do not give rise to a strong inference of scienter, when examined holistically, the additional allegations of scienter certainly nudge the Complaint over the line. *See* ¶¶ 183-216; *see also* Plaintiffs' Brief (ECF No. 56) at 17-24. From the start, the Complaint details how, after approximately two years of being unable to find a suitable company to acquire, Defendants Fertitta and Handler's decision "to acquire Waitr was rushed because it was made in the last remaining weeks before a deadline that, if missed, would have required Landcadia to disgorge the $250 million raised via the IPO and financial advisor (Defendant Jefferies) to forfeit over $10 million in Underwriter fees" and would have left Defendants Fertitta and Handler's reputations as high-power dealmakers tarnished. Report at 5. Defendant Fertitta also stood to benefit financially from the transaction, as Fertitta Entertainment (of which Fertitta is the sole shareholder, Chairman and CEO) owned 6.625 million shares of Landcadia stock prior to the Going Public Transaction and was expected to own 4 million shares of Waitr afterwards, and Fertitta was also offered a position as a board member of the new Company. *See* Plaintiffs' Brief at 19. As a result, Defendant Fertitta was highly motivated to hype Waitr's prospects and business model despite either knowing of the flaws that Grimstad was able to immediately detect, or, alternatively, recklessly turning a blind eye to the flaws because the time crunch prevented him from performing adequate due diligence before the transaction. And Fertitta and others did not stop there; they continued to hype Waitr's business model after the business combination,

---

[12] At oral argument, Magistrate Judge Kay commented that the Grimstad admissions were "a little compelling." *See* Transcript of MTD Hearing (ECF No. 81) at 27:8-17 (Magistrate Judge Kay: "I think there's something a little compelling with the thought that, you know, here comes the new CEO who obviously knows what he's doing, and he looked at it supposedly, according to the pleading, or he's quoted as saying it publicly anyway, you know, 'that thing would never work,' which would imply to me that anybody who knew what they were doing, which may not include Mr. Meaux, would also have known that back at the time of the public offering[.]").

suggesting they either continued to knowingly mislead the market or recklessly never took the time to figure it out as Grimstad easily did.

The timing and circumstances of Defendants Pringle and Meaux's departures also support a strong inference of scienter. *See Hall*, 2017 U.S. Dist. LEXIS 205959 at *102 (Executive departures were "circumstantial evidence" that contributed to "a strong inference of scienter."). Less than 90 days after Waitr went public, and only weeks after it provided aggressive forward guidance, Waitr abruptly announced that Pringle, then only 53 years old, would be "retiring" as CFO. ¶¶ 200-02. Then, on August 8, 2019, Waitr suddenly announced that Meaux had "resigned" as CEO, the same day Waitr announced in an earnings call that the Bite Squad integration was not proceeding well. ¶¶ 53, 158, 175, 204. Waitr further announced that, as a result, its revenues had been negatively impacted, net losses for the quarter had more than tripled from the prior year, it would have to lay off personnel, and it had hired (surprise) Jefferies again as a financial advisor to "explore strategic alternatives," including "taking the company private or a sale of the business." ¶¶ 53, 158, 175, 204. Meaux's "resignation" came only two days after Waitr announced its deal with Olo, demonstrating abandonment of its own software development strategy. ¶ 93. Moreover, Meaux's "resignation" was accompanied by a punitive forfeiture of 166,667 shares of his Waitr stock, strongly suggesting he did not leave willingly but was forced out. ¶¶ 205-06.

Lastly, Waitr recently announced that it "received a voluntary request for information and documents from the Enforcement Division of the [the SEC] requesting information and documents primarily relating to the business combination between Landcadia Holdings, Inc. and Waitr Incorporated (the 'de-SPAC Business Combination') on November 15, 2018 and disclosures related thereto." *See* ECF No. 85 (granted by ECF No. 84). The disclosures related to the de-SPAC Business Combination are obviously at the heart of this lawsuit, *see* ECF No. 37, and the fact that

the SEC has now requested information concerning these very disclosures should be considered one piece of the puzzle when taking a "holistic" view of the facts as they relate to scienter. *See In re Bristol Myers Squibb Co. Secs. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008).

When all of these scienter allegations are considered holistically, the Complaint gives rise to an inference of scienter that is "at least as compelling" as any opposing inference.[13]

### 2. The "Differentiated Proprietary Technology" Statements

Defendants also made a number of materially false or misleading statements about their internal technology platform. For example, Defendants stated that Waitr used a "scalable software to provide a consistent and robust user experience" and that the platform "create[ed] leverageable advantages in our business model." ¶¶ 121, 123, 128, 145. They continued touting this tech platform as late as May 16, 2019. ¶¶ 136, 145. Then, less than three months later, in August 2019, Waitr announced that it would be altogether abandoning the platform in favor of one made by third-party developer Olo. ¶ 26. As a result, these facts allow for the reasonable inference that Waitr began negotiating with Olo before that announcement and that Waitr began experiencing problems with its internal platform even before beginning negotiations with Olo. Failing to disclose these problems, while simultaneously hyping the purported "advantages" of its own internal technology platform to investors, renders Defendants' statements materially misleading.

Moreover, when Waitr announced the switch to the Olo platform, it revealed some severe defects in its old software that were not previously disclosed. For example, it did not have the

---

[13] The Report also concludes that "[a]s an alternate to the inference urged by the Amended Complaint, a reasonable person *might infer* from the foregoing statements that Meaux believed what he said and that he hoped Waitr's past growth would be a model for its future growth . . . [o]ne *might* infer that he did not perceive the flaws in the business model that the Amended Complaint posits were so clear." Report at 39. Initially, this language suggests a "tie" on the issue of scienter, which should favor Plaintiffs at this stage. *See Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014) ("Where there are competing inferences on scienter, 'a tie favors the plaintiff' on a motion to dismiss.") (citation omitted). Nevertheless, even if Meaux truly believed what he said, he would still be severely reckless for repeatedly touting the viability of a business model for which he had not "d[u]g into the details" and for which he had "no analysis" to support those statements. *See* ¶ 197, Ex. A.

ability to send requests "directly into a restaurant's point-of-sale (POS) system" or to manage multiple ordering systems at the same time. ¶ 156. Due to these defects, Waitr's platform could never have been scalable because, in essence, a busy restaurant would have had to constantly switch back and forth between Waitr's platform and their main POS and manually enter orders, whereas other delivery systems would simply send the order directly to the restaurant's own system. This platform was not an advantage for Waitr; in fact, it was a major *dis*advantage. The fact that Defendants referred to it as an advantage is also materially misleading.

Without addressing these facts, the Report focuses heavily on the fact that the program was developed by programmers in Lake Charles, and that Defendants did not attempt to conceal this fact. This fact, however, is beside the point. Regardless of whether the technology was developed in Lake Charles or Silicon Valley or anywhere else for that matter, what matters is that it did not work and could not have supported the type of growth, or create the "leverageable advantages," Defendants represented. *This* is what makes the statements materially misleading.

The Report also conducts no scienter analysis with regards to the technology platform statements. That the switch to the Olo platform occurred just *three months* after the May 2019 statements about the value of the technology platform raises a strong inference of scienter. And, as discussed above, it is not unreasonable to infer that Waitr began negotiating with Olo before the announcement and recognized problems with its own platform before it began those negotiations.

The Fifth Circuit has explained that when events are "temporally connected," subsequent events can "shed light" on prior misstatements. *Plotkin*, 407 F.3d at 698. For example, in *Plotkin*, the IPaxess defendants' "laudatory description" of two companies created "a legitimate expectation of revenues from the agreements it had just struck" with the companies. *Id.* at 697. However, one of the companies declared bankruptcy "a mere eight months after the deals had been

21

publicized." *Id.* at 698. Further, four months after the statements, IPaxess's auditors "disagreed so strongly" over the company's desire to record revenue for the aforementioned agreements that it resigned. *Id.* The Fifth Circuit reversed the District Court's ruling that these subsequent events had no bearing IP Access's statements, holding "the allegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation." *Id.* Similarly, in *Masel v. Villarreal*, the Fifth Circuit found that later revelations about an algorithm that one defendant referred to as "secret sauce" made her earlier statements misleading when made, using the analogy: "suppose a pianist represents that he is well-trained and commits to perform Gershwin's Rhapsody in Blue at a concert some time in the future. If he later arrives unable to play even Chopsticks, it becomes highly unlikely that he was a talented piano player to begin with." 924 F.3d at 750. Here, Defendants essentially represented that their technology could perform Rhapsody in Blue, when, in fact, they knew or recklessly disregarded facts that indicated it could not even play Chopsticks. Thus, the Complaint adequately alleges scienter for these statements.

### 3. The Bite Squad Statements

The Complaint also alleges that Defendants made numerous misleading statements about the integration of Bite Squad after Waitr acquired the Company, such as:

- "This acquisition will help us drive additional growth and provide a step function increase in scale throughout the U.S. in order to better serve that developing market… The combination will significantly expand Waitr's scale and footprint across the U.S., serving a total of over 86 markets in more than 500 cities and 22 states." ¶¶ 108-109 (December 12, 2018 Press Release quoting Meaux, 8-K signed by Pringle).

- "We are thrilled to welcome Bite Squad into the Waitr family and have spent time since the acquisition getting to know their team and diligently beginning the integration process of combining the two companies. . . Both Bite Squad and Waitr has [*sic*] similar business models operating a three sided marketplace, dedicated to serving our restaurant partners, active diners and W2 employed delivery drivers… together we expect to achieve net revenue for 2019 of $250 million." ¶ 114 (Meaux, March 7, 2019).

- "I am happy to report that the integration of the combined company is moving along nicely . . . we have achieved nearly complete integration of marketing, accounting and

22

sales and have made significant progress toward the integration of restaurant operations, customer support and technology. We expect to achieve full integration in the first half of 2020." ¶ 124 (Meaux, May 8, 2019).

*See also* ¶¶ 108, 109, 114, 121, 124, 139.

These statements were materially false or misleading when made for multiple reasons: Bite Squad was a disorganized conglomeration of 17 other restaurant delivery companies that could not be successfully integrated with Waitr; it used the same W-2 labor model that Grimstad admitted "could never work"; and the acquisition merely resulted in Defendants running two poorly managed, money-losing operations with little regional overlap and few synergies. ¶¶ 107, 162, 197. In August 2019, just three months after Meaux' statement that the integration was "moving along nicely," Adam Price—who took over as CEO after Meaux' departure—revealed that "the integration was more challenging than initially imagined" and that "[we] took our team's eyes off key growth metrics and delayed certain revenue initiatives." ¶ 162. This led to a severe deterioration in Waitr's goodwill and an eventual write off of $192 million in goodwill primarily related to the Bite Squad acquisition. ¶ 162. This amount was equal to the amount of cash paid for the acquisition, meaning Bite Squad was virtually worthless at the time it was acquired.

The Report acknowledges that this reasoning is compelling, but erroneously finds the allegations do not give rise to a strong inference of scienter:

> [A]lthough there is some lack of consistency between Meaux's May 2019 statement that the integration of Bite Squad is "moving along nicely" and Price's August 2019 statement that the integration was more challenging than initially imagined . . . this inconsistency does not give rise to the necessary strong inference of the requisite state of mind because the primary fact underlying the statement is true: Waitr was in the process of integrating Bite Squad in May 2019.

Report at 58-59.

Here, as the Report admits, it was inconsistent to say that the Bite Squad integration was moving along nicely, when, in fact, the opposite was true. And, because of Meaux's position in

23

the Company and his repeated statements about the importance of the Bite Squad acquisition to Waitr's business and his statements about the integration's progress (¶¶ 114, 121, 123, 124, 139), it is not unreasonable to assume that he would have familiarized himself with the progress of the integration and discovered that the integration was not proceeding according to plan or as represented. *See Plotkin*, 407 F.3d at 700 ("It is reasonable to assume, given the importance of these deals to the company, that IPaxess would have familiarized itself with the financial condition of Lynxus/AGNI and would have discovered details about their poor financial condition[.]"); *see also In re BP P.L.C., Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (When CEO repeatedly spoke about safety, "[t]he competing inference—that Hayward professed to be focused on process safety but remained unaware of actual process safety concerns in BP's operations on the ground— is far less compelling" than the inference of scienter). Thus, the Complaint adequately alleges falsity and scienter with respect to the Bite Squad statements.

The Report further recommends dismissing the Bite Squad statements because the "February-March[14] statements about why Waitr acquired Bite Squad and 'getting to know their team'" and "[t]he phrase 'moving along nicely'" in the May 2018 statement are optimistic corporate puffery, but does not elaborate on why. Report at 58-59. Not only is the phrase "moving along nicely" objectively verifiable (either integration is progressing or it is not), but in this case, Defendants gave a detailed list of activities completed ("nearly complete integration of marketing, accounting and sales") and identified a target for completion ("full integration in the first half of 2020"), further differentiating the phrase from the "vague" statements normally associated with puffery. *See Lormand*, 565 F.3d at 249 n.14 (puffery only if statements are "vague and optimistic" and contain no "concrete factual or material misrepresentation"); *BP PLC Sec. Litig.*, 843 F. Supp.

---

[14] The Complaint does not plead any February 2019 statements regarding the Bite Squad acquisition, so it is unclear which statements the Report intends to refer to here.

2d at 757–59 ("making good progress" not puffery when concrete details of plan given). Similarly, the December and March statements contain concrete and detailed facts, including the number of cities the acquisition would allow Waitr to expand to, what specific factors made the acquisition attractive, and the amount of revenue the combined companies projected generating. Thus, these statements are not mere puffery. *See* Plaintiffs' Brief at 16-17.[15]

### C. The Report Errs in Recommending Dismissal of the Section 20(a) Claims

The Report recommends dismissing Plaintiffs' 20(a) claims because it recommends that the "underlying" 10(b) claims be dismissed. Report at 61. Because the Section 10(b) claims should not be dismissed, as discussed above, the Section 20(a) claims should also survive dismissal.

### D. If the Court Adopts the Report, Plaintiffs Respectfully Request Leave to Amend

If the Court adopts the recommendations in the Report, Plaintiffs respectfully request leave to file an amended Complaint. "The court should freely give leave when justice so requires." *In re SolarWinds Corp. Sec. Litig.*, No. 1:21-CV-138-RP, 2022 U.S. Dist. LEXIS 57969, at *44 (W.D. Tex. Mar. 30, 2022).[16]

## IV.    CONCLUSION

For the foregoing reasons, the Court should sustain Plaintiffs' objections to the Report. Alternatively, Plaintiffs respectfully request leave to amend their Complaint.

DATED: July 13, 2022                     Respectfully submitted,

                                         */s/ Craig J. Geraci, Jr.*
                                         Craig J. Geraci, Jr. (33850)

---

[15] Although not addressed in the Report, nor are any of the Section 10(b) statements protected by the PSLRA safe harbor. *See* Plaintiffs' Brief at 15-16.

[16] There are several occasions where the Report notes that allegations are not well pled but for easily curable deficiencies. For example, it calls Meaux's May 8, 2019 statement concerning the Bite Squad acquisition "somewhat hollow," but states that the Complaint does not adequately plead the reasons why the Report found the statement to be false. Report at 47. While Plaintiffs disagree, the Complaint could be amended to more clearly highlight the facts the Report suggests *would* adequately plead falsity. Similarly, there are several other occasions where the Report deems the facts alleged in the Complaint to be "conclusory." Report at 55, 59, 60. If this Court agrees with this determination, Plaintiffs could add language making the link between the alleged facts and conclusions clearer.

Lewis S. Kahn (23805)
Melissa H. Harris (33573)
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Fax: (504) 455-1498
Craig.Geraci@ksfcounsel.com
Lewis.Kahn@ksfcounsel.com
Melissa.Harris@ksfcounsel.com

Kim E. Miller (admitted pro hac vice)
**KAHN SWICK & FOTI, LLC**
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Kim.Miller@ksfcounsel.com

*Counsel for Lead Plaintiff the Delivery Investment Group and Additional Plaintiffs Walter Welch and Sean Barnard*

Matthew E. Lundy (18988)
**LUNDY, LUNDY, SOILEAU & SOUTH, LLP**
501 Broad Street
Lake Charles, LA 70601
Telephone: (337) 439-0707
Fax: (337) 439-1029
Email: mlundy@lundylawllp.com

*Liaison Counsel for Plaintiffs*

26